UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA,

          -against-                                  25-cr-0592 (LAK)

GÖKÇE GÜVEN,

                              Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/2/2026

**REDACTED MEMORANDUM OPINION GRANTING IN PART
AND DENYING IN PART MOTION TO COMPEL**

Appearances:

Allison Nichols
Alexandra N. Rothman
Assistant United States Attorneys
JAY CLAYTON
UNITED STATES ATTORNEY

Noah Solowiejczyk
FENWICK & WEST LLP
*Attorney for Non-Party Kalder, Inc.*

LEWIS A. KAPLAN, *District Judge*.

        Defendant stands indicted for fraud and identity theft stemming from her alleged

actions as founder, majority owner, and chief executive officer of Kalder, Inc. ("Kalder").  The

grand jury has subpoenaed information about and records from an internal investigation Kalder itself

supposedly conducted after an employee raised concerns about wrongdoing with respect to Kalder's

financial reporting.  Kalder resists the production of such materials on the ground that they are

2

privileged or otherwise protected.  The government now has moved to compel compliance by Kalder.

*Facts*

*Underlying Criminal Case*

The Court previously has described the government's investigation of defendant and her allegedly criminal conduct.[1]  So too has the Court provided the facts associated with the *ex parte* filing of the motion to compel now before it.[2]  There since have been no substantive developments in the criminal case against defendant other than the government obtaining a superseding indictment adding counts charging defendant with securities fraud, visa fraud, and aggravated identity theft.[3] The Court therefore provides here only the facts that are relevant to deciding this motion.

*Kalder's Supposed Internal Investigation*

In 2024, Kalder raised approximately $7 million from investors through a funding seed round.[4]  After that funding round concluded, in the spring of 2025, a Kalder employee ("Employee-1") approached the Kalder board of directors – then consisting of defendant and an

---

[1]     *See* Mem. Op. (Dkt 32) at 2-5.

[2]     *See* Mem. and Order (Dkt 37) at 1-2.

[3]     Superseding Indictment (Dkt 38).

[4]     Rothman Decl., *Ex.* B at 1.

investor in Kalder ("Director-1") – and shared concerns Employee-1 had raised about Kalder's "operations and financial reporting."[5]

According to Kalder, Director-1 formed a special committee – comprised solely of himself – and hired a law firm ("Outside Counsel") to conduct an internal investigation at Director-1's direction into Employee-1's allegations.[6]  That supposed investigation occurred mostly over a two-week period in July 2025,[7] and included what Kalder has described as an audit of Kalder's finances.[8]  This review concluded that Kalder's aggregate revenue for its entire existence was approximately $200,000,[9] which was far less than defendant allegedly had represented to investors.[10]

---

[5]

*Id.*, Ex. A at 4.

[6]

Solowiejczyk Decl. ¶¶ 4, 6.

To be clear at the outset, the Court does not impute any wrongdoing or culpable knowledge to Outside Counsel.

[7]

*Id.* ¶ 6; Gov't's Mot. Compel at 3.

[8]

Gov't's Motion Compel at 3.

The Court has been provided with no evidence that this two-week, so-called audit involved a systematic and documented review of, among other materials, Kalder's balance sheet, income statement, and cash-flow statement.  Nor is there evidence that whatever review occurred adhered to generally accepted accounting principles or some other standards or that any sort of written report was generated at the end of the review.

[9]

According to the government, the review identified approximately $275,000 in lifetime revenue, however, the government has been unable to independently verify that figure.  *Id.* at 3 & n.3.  Meanwhile, after the internal investigation, Kalder, at one point, told an investor that its lifetime revenue "was between approximately $100,000 and $200,000," Rothman Decl., Ex. A at 4, and, at another point, told that investor that it was $200,000, *id.*, Ex. E at 1.

[10]

*See id.*, Ex. B at 1.

4

*Kalder's Subsequent Communications with Investors*

Following the internal investigation, Director-1 participated in a call with one of Kalder's other investors ("Investor-1") on August 1, 2025.[11]  He told Investor-1 that a few employees had approached him and expressed concerns about Kalder's financial numbers not being accurate.[12]  He explained that Kalder, in response, had formed a special committee that investigated those concerns and reviewed all of Kalder's transactions since its inception.[13]  Defendant, according to Director-1, had been "completely cooperative, providing access to [the] systems," during the investigation.[14]  He said that the investigation had found that Kalder had "meaningful revenue" in the "low-[six] figures over [the] past" year and a half.[15]  Nevertheless, Director-1 conceded that Kalder's revenue was "[n]ot nearly at the level [the company] was stating and that "all of the numbers [defendant] provided were substantially misaligned from [Kalder's] actual performance."[16]

---

[11] *Id.* ¶ 5.

[12] *Id.*, Ex. D at 1.

The notes of this call and the October 2, 2025 call discussed below were submitted *ex parte* and described in relevant part by the government in its motion.  Kalder assumed for the purposes of its opposition that the substance of the calls was as described by the government. Kalder's Opp'n Gov't's Motion Compel at 4 n.3, 5 n.5.  Having reviewed the notes in their entirety, the Court finds the government's descriptions to be accurate and concludes that there is no reason to describe the notes in more detail than what the government included in its motion.

[13] Rothman Decl., Ex. D at 1.

[14] *Id.*

[15] *Id.*

[16] *Id.*

5

Director-1 described the annual recurring revenue numbers defendant had provided to Investor-1 as "forecasts."[17]  Finally, Director-1 told Investor-1 that Kalder was creating "reports to be delivered to investors" and would "come to each investor to reach a settlement on the terms of the round" and, in exchange, "ask for [a] waiver of claims."[18]

Following that call, Investor-1 twice demanded that Kalder return its investment.[19] Kalder did not agree.  Instead, in late September 2025, defendant reached out to Investor-1 to schedule another call "to provide updates on Kalder and discuss next steps."[20]  Meanwhile, Director-1 had resigned from Kalder's board, leaving defendant as Kalder's only board member.[21]  Defendant and Director-1 nevertheless participated together in another call with Investor-1 on October 2, 2025.[22]

During that call, Director-1 – despite purportedly having stepped down from Kalder's board – again described the scope of the investigation, stating that he and Outside Counsel "went through everything [Employee-1] raised" and "spent a lot of time on the concerns [Employee-1] raised."[23]  He reiterated to Investor-1 that defendant "didn't hold anything back" during the

---

[17]     *Id.*

[18]     *Id.*

[19]     *Id.*, Ex. E; *id.*, Ex. F.

[20]     *Id.*, Ex. G at 2.

[21]     Solowiejczyk Decl. ¶ 7.

[22]     Rothman Decl. ¶ 9.

[23]     *Id.*, Ex. H at 2.

investigation.[24]  He repeated the findings of the investigation – namely, that defendant was "fast and loose with a lot of her projections" and that the annual recurring revenue numbers she provided "were fundamentally projections."[25]  Additionally, he maintained that litigation between Investor-1 and Kalder would not be practical because "[a]ny kind of legal action would quickly use up the resources of the" company and, per a "former prosecutor" with whom Director-1 claimed to have spoken, a securities violation case against Kalder would be "extremely weak."[26]

A day after the call, defendant emailed Investor-1, copying Director-1, and purportedly summarized the call and provided updated financial metrics for Kalder.[27]  She wrote that "[t]he Board initiated a process to look closely at the finances to date and has verified the metrics provided," and that "[t]he team and especially the [f]ounder/CEO cooperated fully with the process and has embraced the steps to strengthen governance and financial processes."[28]  Defendant concluded the email by proposing that Investor-1 release its claims in exchange for additional shares of common stock in Kalder.[29]

---

[24]     *Id.*

[25]     *Id.*

[26]     *Id.*

[27]     *Id.*, Ex. G at 1.

[28]     *Id.*

[29]     *Id.*

7

*Grand Jury Subpoenas to Kalder*

The government has served two grand jury subpoenas on Kalder, the first dated November 29, 2025 ("Subpoena I"),[30] and the second dated January 9, 2026 ("Subpoena II").[31]

In relevant part, Subpoena I called for the production of "[a] list of all individuals interviewed by Kalder or its counsel" and some contact information for each interviewee.[32] Subpoena II in relevant part called for the production of the following:

> "1.    All communications between [defendant] and [Director-1] and/or [Outside Counsel] in connection with the [i]nternal [i]nvestigation.
>
> 2.    All interview notes or reports of any interviews conducted of [defendant] in connection with the [i]nternal [i]nvestigation.
>
> 3.    All documents [defendant] sent to [Director-1] and/or [Outside Counsel] in connection with the [i]nternal [i]nvestigation."[33]

Kalder refused to comply with these requests, asserting that the information and records they sought are protected by attorney-client privilege, the work product doctrine, or both.

---

[30]    *Id.*, Ex. J at 1.

[31]    *Id.*, Ex. K at 1.

[32]    *Id.*, Ex. J at 5.

[33]    *Id.*, Ex. K at 4.

Suboena II requested also all engagement letters between defendant or Kalder and Outside Counsel.  Because Kalder now has agreed to comply with that request, Kalder's Opp'n Gov't's Mot. Compel at 9, the Court need not address it.

8

*Motion to Compel*

The government now seeks an order compelling compliance with both subpoenas. It argues that the remaining information sought by Subpoena I is not protected as attorney work product and therefore is discoverable.  It contends also that either Kalder waived any privilege or protection over the records sought by Subpoena II or the crime-fraud exception to any privilege or protection applies to such records and that the company therefore must comply with Subpoena II.

## Discussion

The Court begins by determining whether Subpoena I's outstanding demand for the identities of those interviewed in Kalder's internal investigation seeks protected materials and, if so, whether that protection has been overcome by the government.  The Court next examines whether Kalder has waived any privilege or other protection over the documents sought by Subpoena II. Finally, the Court considers whether the crime-fraud exception dispels any remaining privilege or protection that shields those records from disclosure pursuant to Subpoena II.

*Attorney Work Product*

The work product doctrine is a qualified protection for "materials prepared by or at the behest of counsel in anticipation of litigation or for trial."[34]  There are two types of work product. "[O]pinion work product reveals the 'mental impressions, conclusions, opinions, or legal theories

---

[34] *In re Grand Jury Subpoenas Dated Mar. 19, 2002 and Aug. 2, 2002*, 318 F.3d 379, 383 (2d Cir. 2003).

9

of an attorney or other representative,' and is entitled to greater protection than fact work product."[35] Fact work product includes the factual material that informs an attorney's opinion or results from an attorney's work.[36]

Work product is protected as opinion work product only when there is "'a real, rather than speculative, concern' that the work product will reveal counsel's thought processes 'in relation to pending or anticipated litigation.'"[37]  The heavy burden to make such a showing falls on the party asserting the doctrine.[38]  Otherwise, the material constitutes fact work product, which is subject to discovery upon the government's showing "that the grand jury has a 'substantial need' for the materials and that it has 'exhausted other means of obtaining the relevant information it seeks.'"[39]

Here, Kalder asserts that the work product doctrine protects disclosure of the identities of the employees whom Outside Counsel interviewed during Kalder's internal investigation.  It seems to argue that the requested list should be protected as opinion work product because, in its words, "[i]n the context of a confidential internal investigation, the risk that disclosing interviewee identities might reveal both the nature of the allegations investigated and the

---

[35]

*In re Grand Jury Subpoena Dated July 6, 2005*, 510 F.3d 180, 183 (2d Cir. 2007).

[36]

*See id.*

[37]

*Id.* at 183-84 (quoting *Grand Jury Subpoenas Dated Mar. 19, 2002 & Aug. 2, 2002*, 318 F.3d at 386)).

[38]

*Grand Jury Subpoenas Dated Mar. 19, 2002 and Aug. 2, 2002*, 318 F.3d at 384.

[39]

*Grand Jury Subpoena Dated July 6, 2005*, 510 F.3d at 185-86 (quoting *In re Grand Jury Proceedings*, 219 F.3d 175, 182 (2d Cir. 2000)).

10

strategy of the investigation is obvious."[40]  But Kalder has failed to demonstrate why that is so, at least in this case.  Such a list would contain none of Outside Counsel's mental impressions of those witnesses apart from the unexceptional fact that Outside Counsel thought that they might have been sufficiently relevant to interview.[41]  Disclosing such a list would not intrude unnecessarily on an attorney's privacy of preparation by handing over to an adversary an attorney's thoughts that previously were his or her own.[42]  Nor would it incentivize an attorney to avoid writing down "much of what is now put down in writing" for fear that such records could be produced to an opposing party.[43]  Nevertheless, such a list is entitled to some protection as attorney work product because Outside Counsel selected the employees to interview in anticipation of litigation with investors who potentially had been misled by defendant and Kalder.  This fact is apparent from Kalder approaching at least Investor-1, and perhaps others, after the investigation to seek a waiver of potential claims.  Thus, the identities of those whom Outside Counsel interviewed are like any other factual material that informed Outside Counsel's work, such as which documents it reviewed, and therefore are entitled to qualified protection as fact work product.[44]

---

[40]  Kalder's Opp'n Gov't's Mot. Compel at 12.

[41]  *See United States v. Amerada Hess Corp.*, 629 F.2d 980, 987-88 (3d Cir. 1980) ("[T]he list of interviewees is just that, a list.  It does not directly or indirectly reveal the mental processes of the Milbank attorneys.  It furnishes no information as to the content of any statement.  There is no realistic possibility that its production will convert any member of the Milbank firm from advocate to witness. None of the policy reasons for protection of work product, other than the fact of its initial compilation by Milbank, applies.").

[42]  *Hickman v. Taylor*, 329 U.S. 495, 510-11 (1947).

[43]  *Id.*

[44]  *United States ex rel. Integra Med Analytics, LLC v. Laufer*, No. 17-cv-9424, 2023 WL 3203912, at *4 (S.D.N.Y. May 2, 2023).

Moving to the next stage of the analysis, the government has failed to show that the grand jury is entitled to production of the list. The government has not established that the grand jury has a substantial need for it or that there are no alternative means to obtain the same information. This is not a case in which the government seeks evidence that only Kalder possesses and that cannot be obtained through other efforts.[45] The government's access to Kalder's current and former employees "appears unimpaired."[46] Nor is this a case in which the government must sift through years of employment logs for hundreds of current and former employees to determine whom to locate and interview.[47] Kalder is a small company with few employees that was founded only a few years ago. The government thus has not made even the "comparatively lower" showing of "[a]voidance of the time and effort involved in compiling a similar list from other sources" that it needed to make to overcome the fact work product protection here.[48]

*Waiver of Privilege and Work Product Protection*

With respect to the remaining Subpoena II requests, the work product doctrine is not the only protection that stands between the government and the requested records. Attorney-client

---

[45]
See *Grand Jury Subpoena Dated July 6, 2005*, 510 F.3d at 188 (compelling production of only existing copies of recordings of conversations); *Grand Jury Subpoenas Dated Mar. 19, 2002 and Aug. 2, 2002*, 318 F.3d at 385-86 (compelling production of bank records the government had been unsuccessfully trying to attain for two years through other means).

[46]
*Hickman*, 329 U.S. at 508 (preventing petitioner from obtaining "discovery as of right of oral and writen statements of witnesses whose identity is well known and whose availability to petitioner appears unimpaired").

[47]
See *Integra Med Analytics*, 2023 WL 3203912, at *6 ("[L]ocating and interviewing the 152 individuals listed in the Government's initial disclosures presents an undue hardship.").

[48]
See *Amerada Hess Corp.*, 619 F.2d at 988.

12

privilege protects communications (1) between a client and its attorney (2) that were intended to be and were kept confidential (3) for the predominant purpose of obtaining or providing legal advice.[49] Assuming for the moment that the records sought by Subpoena II were intended to be and were kept confidential, they would be covered by attorney-client privilege as typically would be communications made by a corporate employee to corporate counsel "acting as such, at the direction of corporate superiors in order to secure legal advice from counsel."[50]  Moreover, the requested records appear to be protected work product, as they were prepared by or furnished to Outside Counsel in anticipation of litigation with investors.  It is not necessary, however, for the Court to determine whether the records requested by Subpoena II are opinion work product, fact work product, or, most likely, a mix of them both.

Both attorney-client privilege and work product protection may be waived.[51]  Waiver occurs when a party "shares otherwise privileged communications with an outsider" such that the party has "disabl[ed] itself from claiming that the communications were intended to be confidential."[52]   "[I]t is the client's responsibility to insure continued confidentiality of his communications."[53]

---

[49]
> *United States v. Mejia*, 655 F.3d 126, 132 (2d Cir. 2011); *In re Cnty. Of Erie*, 473 F.3d 413, 419-20 (2d Cir. 2007).

[50]
> *See Upjohn Co. v. United States*, 449 U.S. 383, 394-95 (1981).

[51]
> *United States v. Nobles*, 422 U.S. 225, 239 (1975) (work product protection); *Schaeffler v. United States*, 806 F.3d 34, 40 (2d Cir. 2015) (attorney-client privilege).

[52]
> *Schaeffler*, 806 F.3d at 40.

[53]
> *In re von Bulow*, 828 F.2d 94, 101 (2d Cir. 1987).

Here, Kalder waived privilege and work product protection at least to some extent. On the August 1, 2025 call, Director-1, speaking on behalf of Kalder, told Investor-1 about the reasons for Kalder's investigation and its hiring of Outside Counsel,[54] the investigation's methodology,[55] and, in substantial detail, its results.[56] On the October 2, 2025 call, Director-1 again described the scope of the investigation and purported to repeat its findings.[57] He conveyed to Investor-1 the substance of what he claimed was the advice of Outside Counsel and a "former prosecutor" to get Investor-1 to waive possible legal claims against Kalder in exchange for transparency and more equity.[58] On these calls, Director-1 made a deliberate and voluntary decision on behalf of Kalder to disclose privileged and protected materials to try to benefit Kalder and

---

[54]
    Rothman Decl., Ex. D at 1 (describing employee concerns about inaccuracy of financial numbers).

[55]
    *Id.* (describing formation of special committee, so-called audit reviewing all Kalder's transactions, and defendant's cooperation).

[56]
    *Id.* (describing conclusions that Kalder had "meaningful revenue," but not at level described by defendant, that defendant's numbers were "substantially misaligned" with "actual performance," and that defendant's numbers were "forecasts").

[57]
    *Id.*, Ex. H at 2 (describing going "through everything [Employee-1] raised" and spending "a lot of time on th[ose] concerns," that defendant "didn't hold anything back," that "there was very little" there, how "[t]he incendiary accusations didn't add up," that defendant was "fast and loose with a lot of her projections," and that the revenue numbers she provided "were fundamentally projections").

[58]
    *See id.* (describing how he "spent a ton of time [with] [Outside Counsel] trying to explore alternatives," that any "kind of legal action would quickly use up [Kalder's] resources," and how a "securities violation argument is extremely weak").

14

perhaps also defendant.[59]  Such disclosure "constitute[s] a waiver of the privilege 'for the *communications or portions of communications* disclosed.'"[60]

Defendant seeks to avoid this conclusion by arguing that Director-1, as of the October 2, 2025 call, no longer was authorized to speak on behalf of Kalder because he had resigned his board seat.  But defendant implicitly consented to (former) Director-1 acting as her and Kalder's spokesperson when she emailed Investor-1 to schedule the call with herself and Director-1 and then participated in the call and allowed Director-1 to lead the conversation without any objection.[61]  The Court therefore infers that Kalder authorized Director-1 to make these disclosures.  In any case, it certainly ratified Director-1's actions by virtue of defendant's acquiescence in his statements.  On that October 2, 2025 call, defendant – the only Kalder board member at the time – not only sat by and appeared to allow Director-1 to speak for the company, she followed up by email the next day

---

[59]

See *Grand Jury Proceedings*, 219 F.3d at 184.

[60]

*United States v. Jacobs*, 117 F.3d 82, 91 (2d Cir. 1997) (quoting *In re Kidder Peabody Sec. Litig.*, 168 F.R.D. 459, 469 (S.D.N.Y. 1996)), *abrogated on other grounds by Loughrin v. United States*, 573 U.S. 351 (2014).

[61]

See Rothman Decl., Ex. A at 5; *id.*, Ex. G at 2; *id.*, Ex. H at 2.

and purported to summarize the call.[62]  Defendant, and thus Kalder, knew about and yet did nothing then to repudiate what Director-1 did or said.[63]  They cannot attempt now to do so.[64]

Having found that Kalder to some extent waived its privilege and protection through disclosure, the question of the extent of the waiver remains.  "[A]ttorney-client privilege protects communications rather than information," meaning that it "does not impede disclosure of information except to the extent that that disclosure would reveal confidential communications."[65] Furthermore, the Second Circuit has held that "the extrajudicial disclosure of an attorney-client communication—one not subsequently used by the client in a judicial proceeding to his adversary's prejudice—does not waive the privilege as to the undisclosed portions of the communication."[66] Whether fairness requires further disclosure is a case-by-case determination, depending on the context in which the privilege is asserted and the prejudice to the requesting party caused by the previous limited disclosure.[67]

---

[62]

*Id.*, Ex. G at 2.

[63]

*IBJ Schroder Bank & Tr. Co. v. Resolution Tr. Corp.*, 26 F.3d 370, 375 (2d Cir. 1994) ("If a corporation acquires or is charged with knowledge of an unauthorized act undertaken by someone on its behalf, and does not repudiate that act within a reasonable time, but instead acquiesces in it, the corporation is bound by the act.").

[64]

*See Bus. Integration Servs., Inc.v. AT & T Corp.*, No. 6-cv-1863, 2008 WL 5159781, at *2-3 (S.D.N.Y. Dec. 9, 2008).

[65]

*In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983*, 731 F.2d 1032, 1037 (2d Cir. 1984).

[66]

*von Bulow*, 828 F.2d at 102.

[67]

*Grand Jury Proceedings*, 219 F.3d at 183, 188-89; *see von Bulow*, 828 F.2d at 101.

16

Additionally, Kalder's disclosures were made to an investor, not a government entity during the course of an investigation.  They thus were extrajudicial.  And as a non-party to this prosecution, Kalder's earlier extrajudicial disclosures to Investor-1 could not have prejudiced the government.[68]  Indeed, there is no evidence that Kalder "tried to use the disclosed material offensively in aid of litigation or in a manner unfair to either of the parties to this criminal proceeding."[69]  After all, the government has brought a criminal case against defendant, not Kalder.  And Kalder, as a corporation, is "a distinct legal entity, with legal rights, obligations, powers, and privileges different from those of the natural individuals who created it, who own it, or whom it employs."[70]  On the other hand, defendant at all relevant times was the majority owner and chief executive officer of Kalder, initially one of two board members, and then the sole board member of the company.  It therefore is hard to see any daylight between Kalder and defendant.  The Court, however, need not determine whether it is appropriate here to look behind Kalder's corporate veil[71] because the government offers another basis for concluding that the records requested by Subpoena II no longer are privileged or otherwise protected from disclosure.

---

[68]
    *von Bulow*, 828 F.2d at 103 ("Although it is true that disclosures in the public arena may be 'one-sided' or 'misleading,' so long as such disclosures are and remain extrajudicial, there is no legal prejudice that warrants a broad court-imposed subject matter waiver.").

[69]
    *United States v. Stewart*, No. 15-cr-287, 2016 WL 11617117, at *2 (S.D.N.Y. July 22, 2016).

[70]
    *Cedric Kushner Promotions, Ltd. v. King*, 553 U.S. 158, 163 (2001).

[71]
    *See generally* Mariana Pargendler, *Veil Peeking: The Corporation as a Nexus for Regulation*, 169 U. PA. L. REV. 717 (2021) (introducing concept of veil peeking as distinct from veil piercing).

*Crime-Fraud Exception*

        The government argues in the alternative that the crime-fraud exception applies to defendant's communications in connection with the internal investigation. "[C]ommunications that otherwise would be protected by the attorney-client privilege or the attorney work product [doctrine] are not protected if they relate to client communications in furtherance of contemplated or ongoing criminal or fraudulent conduct."[72]  The Supreme Court has described the purpose of the crime-fraud exception as "assur[ing] that the seal of secrecy between lawyer and client does not extend to communications made for the purpose of getting advice for the commission of a fraud."[73]  Moreover, the attorney need not be aware "that his advice is sought in furtherance of such an improper purpose."[74]  "The crime or fraud need not have occurred," nor need the client "have succeeded in his criminal or fraudulent scheme" for the exception to apply.[75]  What matters is whether furthering contemplated or ongoing crime or fraud was "the objective of the client's communication."[76]  Thus, to succeed in invoking the crime-fraud exception, "the party seeking disclosure must show a factual basis to support a conclusion that there is probable cause to believe that (1) a crime or fraud was or

---

[72]       *Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983*, 731 F.2d at 1038.

[73]       *United States v. Zolin*, 491 U.S. 554, 563 (1989) (cleaned up).

[74]       *Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983*, 731 F.2d at 1038-39.

[75]       *Id.*

[76]       *Id.* at 1039; *accord Jacobs*, 117 F.3d at 88.

18

is being committed, and (2) the communication in question was or is in furtherance of the crime or fraud."[77]

Here, the government has established probable cause to suspect that defendant communicated with Director-1 and Outside Counsel in an attempt to conceal alleged prior misconduct and to continue alleged ongoing fraud on investors. Director-1's descriptions of the financial metrics that defendant provided to investors as being "substantially misaligned from [Kalder's] actual performance"[78] and "fundamentally projections"[79] provides a reasonable basis to believe that defendant was engaged in fraud before the investigation began. She sought to convince Investor-1, potentially as well as other investors, to "waive[] claims" against Kalder,[80] arguing that the investigation purportedly revealed that a securities case against Kalder would be "extremely weak."[81] Thus, there is a reasonable basis to believe that defendant and perhaps Director-1 used the fact of the investigation to minimize and conceal defendant's alleged wrongdoing from law enforcement as well, perhaps, to protect Kalder against litigation costs. Finally, the government's *ex parte* evidence provides a reasonable basis to believe that defendant's communications with

---

[77]

    *Chevron Corp. v. Donziger*, No. 11-cv-0691 (LAK), 2013 WL 1087236, at *25 (S.D.N.Y. Mar. 15, 2013); *accord In re Richard Roe, Inc.*, 68 F.3d 38, 41 (2d Cir. 1995); *Jacobs*, 117 F.3d at 87.

[78]

    Rothman Decl., Ex. D at 1.

[79]

    *Id.*, Ex. H at 2.

[80]

    *Id.*, Ex. D at 1.

[81]

    *Id.*, Ex. H at 2.

19

Outside Counsel were not limited to "past or completed frauds"[82] because her alleged fraud continued in much the same way after Kalder's investigation as it had before.[83]

       None of Kalder's objections overcome the government's showing. Defendant need not have directed Outside Counsel to communicate with them in a way that was intended to facilitate her alleged criminal conduct.[84] It also is of no matter that the investigation ultimately revealed that the revenue numbers defendant previously provided to investors were incorrect. An attempt to use attorney-client communications to conceal fraud remains even if it was unsuccessful.[85] Additionally, as noted above, the government has shown more than mere temporal proximity between defendant's communications with Outside Counsel and her alleged ongoing fraud. The government has provided a reasonable basis to believe that defendant's alleged fraudulent scheme "continued unabated following the company's internal investigation."[86]

---

[82]    *Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983*, 731 F.2d at 1041.

[83]    *See* Rothman Decl., Ex. M at 2; *id.* Ex. N at 3.



[84]    *See Richard Roe, Inc.*, 68 F.3d at 41.

[85]    *Id.*

[86]    Gov't's Mot. Compel at 22 (internal quotation marks omitted).

Finally, Kalder's objective in conducting the investigation need not itself have been to further a crime or fraud for the exception to apply. Although some cases have described the crime-fraud exception in the context of the *client's* communication with its attorney and the *client's* objective, those cases spoke in those terms because they "concerned alleged fraud or crime by the client, not a fraud perpetrated through a purportedly innocent intermediary."[87]  In other words, those cases were not describing the scope of the exception when dealing with corporate clients and employee misconduct revealed by an internal investigation. In contrast, the Second Circuit has explained that the "[u]se of the fact of an investigation to allay the concerns of third parties about possible criminal acts" – exactly what the government contends Kalder did here – is sufficient grounds to invoke the exception even when the corporate client itself did not communicate with counsel with the intent to defraud.[88]  Thus, it does not matter whether Kalder should be regarded as an "innocent party" that was "duped" by defendant.[89]  Its "purported innocence . . . is irrelevant as long as the legal advice [it was] seeking was nevertheless advancing the fraudulent activity."[90]

---

[87]     *Duttle v. Bandler & Kass*, 127 F.R.D. 46, 55 (S.D.N.Y. 1989).

[88]     *In re John Doe Corp.*, 675 F.2d 482, 491-92 (2d Cir. 1982); *see In re Grand Jury Subpoena*, 642 F. App'x 223, 227 n.2 (4th Cir. 2016) (noting its agreement with the Second Circuit "in holding that communications aimed at concealing a criminal or fraudulent scheme obliterate the privilege").

[89]     *See Duttle*, 127 F.R.D. at 53.

[90]     *Id.*; *see also Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983*, 731 F.2d at 1038 (explaining how an attorney's awareness of the illicit purpose of communications is irrelevant because the rationale of the exception is to not protect such communications); *Donziger*, 2013 WL 1087236, at *3 (same).

21

*Conclusion*

For the foregoing reasons, the government's motion to compel is granted to the extent that Kalder shall comply with Subpoena II by March 9, 2026.  It is denied in all other respects.


SO ORDERED.

Dated:          March 2, 2026

_____
Lewis A. Kaplan
United States District Judge