October 15, 2026

**By ECF**

The Honorable Lewis A. Kaplan
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

Re: United States v. Gökçe Güven, 25 Cr. 592 (LAK)

Dear Judge Kaplan:

We submit this letter and attached exhibits on behalf of our client, Gökçe Güven, in advance of her sentencing, scheduled for October 29, 2026. Ms. Güven accepts full responsibility for her conduct, is deeply remorseful, and is determined to lead a law-abiding and productive life. For the reasons discussed below, this is an atypical case, where a lenient sentence will more than meet the goals of sentencing. Fraud cases in this district routinely result in a below-Guidelines sentence. But the circumstances of this case warrant more than a typical deviation below the Guidelines, and more leniency than Probation's recommended sentence of 18 months. Across numerous measures central to the Section 3553(a) factors, Ms. Güven is not the average defendant and that this is not the average case. Ms. Güven is deserving of leniency based on her positive personal characteristics, her wholehearted acceptance of responsibility, and the high confidence she will never reoffend. Leniency is also merited based on the circumstances of the offense, including that Ms. Güven did not target vulnerable victims, inflict financial ruin, or dissipate the funds at issue on a lavish personal lifestyle. Instead, the majority of funds were never spent and will be returned to investors, whom Ms. Güven is also trying to make fully whole through Kalder's acquisition. Finally, Ms. Güven's guilty plea already carries substantial punitive consequences, including a stipulated judicial order of removal, which renders her immediately excludable and inadmissible to the United States for 20 years, a consequence that is devastating for her. For these reasons and those below, we respectfully request that the Court impose a substantially below-Guidelines sentence.

## I. Procedural Background

On November 27, 2025, Thanksgiving, Ms. Güven was arrested at JFK airport as she was coming back into New York, and spent two nights at the Metropolitan Detention Center before she was released on a $10 million bond. (Presentence Investigation Report ("PSR") 2.) On May 15, 2026, Ms. Güven pleaded guilty before Magistrate Judge Sarah Netburn to Count One of the S3 Superseding Information, securities fraud, in violation of 15 U.S.C. §§ 77q(a), 77x. Under the Plea Agreement, the Government and Ms. Güven agree that the advisory sentencing Guidelines range is 37 to 46 months of imprisonment, based on a criminal history category of I and a total offense level of 21. (PSR ¶ 89.) The Guidelines range is driven principally by an 18-level loss enhancement. The PSR agrees with this calculation and recommends a below-Guidelines sentence of 18 months of imprisonment. (PSR 28-31.) Under 15 U.S.C. § 77x Ms. Güven is subject to a statutory maximum of five years of imprisonment.

Ms. Güven's conduct in this case is serious and she unreservedly recognizes that. Ms. Güven pleaded guilty because she is guilty. As the founder and CEO of Kalder, she told investors that the Company had higher recurring revenue and more customers than it did. She shared with potential investors a set of financials with inflated revenue, as well as contracts that included forged signatures. (PSR ¶¶ 11-17.) She included similar false information about Kalder, as well as forged reference letters, to support her visa application. (PSR ¶¶ 21-24.) Ms. Güven takes full responsibility for her actions (PSR ¶¶ 41-42), and has learned from her gross errors in judgment. As she writes, "I ask you to see me as someone who understands what she did, and who intends to spend the rest of her life proving it will never happen again." (Ex. 1, Letter of Gökçe Güven at 4.) As her friends have noticed too, "she has taken responsibility. In our conversations she does not blame others or see the situation as unreasonable. She talks about what she would change and what she regrets." (Ex. 37, Letter of Jack Solomon at 2; see also Ex. 44, Letter of Ashley Zangrillo at 2 (Ms. Güven is "someone who has reflected deeply, accepted responsibility" and "her remorse is genuine."); Ex. 42, Letter of Pryce Yebesi at 2 ("I believe she understands that moving forward requires not simply regret, but growth, responsibility, and a commitment to doing things differently.").)

It is also notable that Ms. Güven accepted responsibility early in the litigation process; she pleaded guilty before the Government and the Court expended substantial resources on trial preparation and trial. Her Plea Agreement includes several additional concessions that reinforce her complete acceptance of responsibility: (1) Ms. Güven agreed not to contest the detailed facts set forth in the S2 Superseding Indictment; (2) Ms. Güven further agreed that Kalder would withdraw, revoke, or terminate her O-1A petition by the time of sentencing, voluntarily surrendering her immigration status; and (3) Ms. Güven also agreed to a stipulated judicial order of removal, which renders her immediately excludable and inadmissible to the United States for 20 years. (PSR ¶ 91.) Additionally, Ms. Güven faces civil charges by the United States Securities and Exchange Commission ("SEC") and is in the process of resolving those—a settlement that will include a possibility of a civil penalty and a six-year bar on acting as a director or officer of a public company. Now before the Court for sentencing, she fully acknowledges that she fell short of the standard she owed to her customers, investors, and this country.

## II. Personal History Prior to the Offense

### A. Upbringing and Family

Ms. Güven is 27 years old. She was born in Izmir, Turkey, on May 18, 1999. Up until she was five years old, Ms. Güven and her older sister, Gonca, lived with and were cared for by their maternal grandmother, Birsen Bayboğan, in Adana, Turkey, while her parents established their medical careers.

Between the ages of five and 13, Ms. Güven and her sister lived with their parents. Reuniting with her parents was a time marked by tumult, stress, and [redacted] (Ex. 18, Letter of Fadime Bayboğan at 1). [redacted]

[redacted] At 13 years old, Ms. Güven's parents separated. [redacted] Instead, her father expressly blamed her for the divorce. He would also try to solicit information from her school about her activities to stop her from participating.

At around 15 years old, Ms. Güven stopped speaking to or seeing her father. [redacted] Ms. Güven's childhood trauma forced her "to become an adult almost immediately." (Ex. 27, Letter of Gonca Güven at 1.) [redacted] (Ex. 39, Letter to Probation Officer from Dr. Ismail Ünal.) [redacted] (Ex. 35, Letter of Dr. Mihriban Aral Özcan at 1.) Achievement was her way of coping—she wanted to outwork the pain. She demanded more from herself than anyone demanded from her.

Given her parents' career paths and ultimately strained relationship, throughout Ms. Güven's life, two of her mother's uncles provided significant financial support to Ms. Güven and her family. Ms. Güven was very close to her uncles, who have since passed away.

### B. Interests, Education, and Philanthropic Efforts

During her childhood, Ms. Güven found an outlet in extracurricular, intellectual, and philanthropic pursuits. She excelled academically. At the same time, she pursued varied interests ranging from horseback riding and soccer to psychology and coding.

Ms. Güven trained in show jumping and through tireless effort in 2013, won the Teknik Metal Cup at the Adana Ataturk Mediterranean tournament.[1] (Ex. 25, Letter of Süleyman Güneş at 1.) Around that time, Ms. Güven received the highest score out of roughly one million students on Turkey's national high school entrance examination. (Ex. 27, Letter of Gonca Güven at 1.) She was admitted to Robert College, an American school in Istanbul, which is one of Turkey's most acclaimed and selective high schools.[2] Robert College is described as a place that "has produced Turkey's prime ministers, its Nobel laureate in literature, its scientists, its business founders. When your child gets into Robert College, it is the proudest day a Turkish family has." (Ex. 24, Letter of Can Gizer at 1.) Ms. Güven was initially subjected to bullying and made to feel unwelcome. But, over time, Ms. Güven earned the love and respect of her classmates not only because "she was near the top of any list, but [also] because she was the kindest and the most genuinely herself." (Id. at 1.) Additionally, Ms. Güven was a debate champion at Robert College.

During this time, at just 14 years old, Ms. Güven co-founded Girls on the Field Academy, a non-profit that organizes soccer and social development camps for girls to empower them to be whatever they want to be.[3] This was particularly remarkable in Turkey at the time, where the prevailing social atmosphere did not encourage young girls to pursue sports or computer science.

---

1 See Kupalar Sahiplerini Buldu, ADANA ATLI SPOR KUBULU (June 13, 2013), https://adanaatlispor.com/kupalar-sahiplerini-buldu/.

2 See ABOUT RC, ROBERT COLLEGE, https://website.robcol.k12.tr/en/about-rc (last visited Oct. 12, 2026)

3 See KIZLAR SAHADA, kizlarsahada.com/en (last visited Sept. 20, 2026).

The organization ran over 40 camps in underserved cities across Turkey, and secured the sponsorship of major global companies, including Visa and Coca-Cola. The Academy was recognized as a United Nations Development Programme Accelerator 2030 Finalist.[4] Today, the Academy reaches "thousands of girls and young women every single year" through its programming and competitions. (Ex. 16, Letter of Melis Abacioğlu at 2.) According to the Academy's co-founder, Ms. Güven "change[d] what our country imagines when it hears the words 'young woman leader.'" (Id. at 2.)

It is clear that Ms. Güven's drive, work ethic, and contributions to non-profit causes were unusual for a teenager, as was her early interest in entrepreneurship and her tenacity in pursuing opportunity. At 15 years old, Ms. Güven messaged the founder of an e-commerce startup called Lidyana on LinkedIn and advocated her way into an internship. (Ex. 27, Letter of Gonca Güven at 1.) After reading Mindset by Carol Dweck, a renowned psychologist, Ms. Güven reached out to Ms. Dweck's research assistants and landed a summer position in Dweck's Stanford University research lab. (Ex. 18, Letter of Fadime Bayboğan at 1.)

In 2018, Ms. Güven was admitted to the University of California, Berkeley and attended from 2018 to 2022. She received the Adobe Scholars award, which contributed $25,000 per year toward her tuition. (Ex. 10, Letter of IIE.) Ms. Güven received many scholarships/fellowships including the Kleiner Perkins Fellows (2021),[5] Contrary Fellowship (2021),[6] Financial Women of San Francisco Scholarship (2021),[7] Cal Alumni Association Leadership Award (2021),[8] Accel Scholars (2022),[9] Human Capital Delta Fellowship (2022),[10] and Paradigm Fellowship (2022).[11] (See Ex. 27, Letter of Gonca Güven at 2; Ex. 42, Letter of Pryce Yebesi.) These awards all recognize top students and promising young builders. It is no coincidence that each one believed Ms. Güven was deserving of that recognition.

Additionally, at Berkeley, she participated in several student organizations, such as Blockchain at Berkeley and Design at Berkeley. She spent her time teaching principles of product design to traditionally underserved immigrant communities in the Bay Area of California. Ms. Güven graduated with a degree in Cognitive Science and International Business.

---

[4] See Accelerate 2030, IMPACT HUB ISTANBUL https://istanbul.impacthub.net/accelerate-2030/ (last visited Sept. 20, 2026).

[5] See Your Impact Begins Today, KLEINER PERKINS https://fellows.kleinerperkins.com/ (last visited Sept. 20, 2026); Welcome, 2021 Fellows, KLEINER PERKINS https://www.kleinerperkins.com/perspectives/fellows-2021/ (last visited Sept. 20, 2026).

[6] See CONTRARY, https://contrary.com (last visited Sept. 20, 2026).

[7] See FINANCIAL WOMEN OF SAN FRANCISCO, https://financialwomensf.org/ (last visited Sept. 20, 2026).

[8] See Stay Connected to Cal, UC BERKELEY https://alumni.berkeley.edu/ (last visited Sept. 20, 2026).

[9] See Electrical Engineering & Computer Sciences, UC BERKELEY https://eecs.berkeley.edu/resources/undergrads/accel/ (last visited Sept. 20, 2026).

[10] See Human Capital Announces the Winners of its Delta Fellowship Program, TECHCRUNCH https://techcrunch.com/2020/09/13/human-capital-announces-the-winners-of-its-delta-fellowship-program (Sept. 13, 2020, 6:05 pm).

[11] See Matt Huang, Fred Ehrsam, Dan Robinson, Doug Feagin, Paradigm Fellowship, PARADIGM https://www.paradigm.xyz/2022/05/paradigm-fellowship (May 25, 2022).

**C. Character**

Ms. Güven is a good person. Her fundamental goodness is conveyed by letters submitted from three continents and from a wide range of people in Ms. Güven's life: her family, her friends, acquaintances she has helped throughout her life, and even her former employees and investors.

Ms. Güven is kind, loyal, supportive, and generous. She is a dreamer and an optimist, sometimes to a fault, as she now recognizes. She has an energy that fills a room—people want to be around her. She is a connector of people and builder of services that help others. Her friends value her authenticity and warmth. Even though Ms. Güven "had every right . . . to become bitter and closed against life," [redacted] instead, she "chose to love" (Ex. 18, Letter of Fadime Bayboğan at 1), and "has carried many people through their darkest periods" regardless of the length or depth of her relationship with them. (Ex. 20, Letter of Doruk Cinar at 3.)

Ms. Güven's friends describe her as someone who helps others even when there is nothing to gain. (Ex. 16, Letter of Melis Abacioğlu at 2.) As her mother describes Ms. Güven: "Whatever happens, my daughter will spend her life giving. It is the only way she knows to live." (Ex. 18, Letter of Fadime Bayboğan at 3.) Her friends describe her similarly. (Ex. 30, Letter of Defne Kayalar at 1 ("[W]hen most of us were focused on a much smaller world, Gökçe was already thinking about the lives and circumstances of people beyond herself."); Ex. 16, Letter of Melis Abacioğlu at 1 ("[S]omeone who feels a problem [as if it is] her own . . . and cannot rest until it is solved.").) Ms. Güven not only provided emotional support to those she cared for but also financial support. When Ms. Güven was young, she taught her grandmother to read. (Ex. 17, Letter of Birsen Bayboğan.) [redacted] Ms. Güven paid for the operation herself. (Id. at 2.) For individuals who worked with Ms. Güven's mother, Ms. Güven "cover[ed] their families' groceries and call[ed] every month to check on them." (Ex. 18, Letter of Fadime Bayboğan at 2; see also Ex. 25, Letter of Süleyman Güneş; Ex. 36, Letter of Şakir Özgün.)

To be clear, Ms. Güven did not grow up in a wealthy household and depended on the financial support of her uncles growing up. But that didn't stop her from extending financial support to others. In fact, her support assisted four children to attend university. (Ex. 25, Letter of Süleyman Güneş at 2 ("And when Gökçe's troubles began in America, the support [from either Ms. Güven or her mother] did not stop for a single month. The girl who washed her own horse when she was too tired to walk is the woman who carried my family while her own life was falling.").) When Ms. Güven was only a teenager in high school, she was instrumental in helping her mother's secretary take a pilgrimage to Mecca shortly after a death in the secretary's family. (Ex. 36, Letter of Şakir Özgün at 1.) Furthermore, Ms. Güven "left her own dinner, her guests, and her entire night behind" to accompany a friend, who was suffering from a panic attack, to the emergency room. (Ex. 20, Letter of Doruk Cinar at 2.) These examples are all illustrative of Ms. Güven's character.

Ms. Güven's collaborative and generous mindset is a trait also valued in her professional circle. For example, she "spent real time and energy helping [other founders] think through their application and product, sharing her experience as a founder and encouraging them throughout the

process" of applying to Y Combinator, a prestigious venture capital firm and startup accelerator. (Ex. 38, Letter of Amie Sun at 1; see also Ex. 40, Letter of Anika Valenzuela; Ex. 42, Letter of Pryce Yebesi.)

It is clear from all the letters from her family, friends, and colleagues that Ms. Güven's conduct in this case does not reflect her true character, as described by the people who know her best. As one friend explained, "If [Gökçe's] life is a hundred parts, I have witnessed the other ninety-nine: the loyalty, the generosity, the work, the honesty in how she treats the people around her. . . . [T]he whole person is someone I would trust with anything I have." (See Ex. 24, Letter of Can Gizer at 2; see also Ex. 21, Letter of Tutku Cinkilic; Ex. 32, Letter of Harsha Konreddy; Ex. 33, Letter of Pavan Krishnamurthy; Ex. 38, Letter of Amie Sun; Ex. 44, Letter of Ashley Zangrillo; Ex. 42, Letter of Pryce Yebesi.)

## III. Sentencing Considerations

### A. Legal Standard

Section 3553(a) requires the Court to impose a sentence that is "sufficient, but not greater than necessary." 18 U.S.C. § 3553(a). The Court must "undertake 'an individualized assessment'" to determine the appropriate sentence, "based on the facts presented." United States v. Johnson, 567 F.3d 40, 51 (2d Cir. 2009) (quoting Gall v. United States, 552 U.S. 38, 39 (2007)). In making this determination, the Court must consider the applicable Guidelines range but must not presume that the range is reasonable or proper in every case. Gall, 552 U.S. at 49-50. The Court must "conduct its own independent review of the [§ 3553(a)] factors, aided by the arguments of the prosecution and defense." United States v. Cavera, 550 F.3d 180, 189 (2d Cir. 2008) (en banc). Under Section 3553(a), the Court shall consider (i) the nature and circumstances of the offense; (ii) the defendant's history and characteristics; (iii) the need for the sentence imposed to reflect the seriousness of the offense, to deter criminal conduct, and to protect the public from future crimes; and (iv) the need to avoid unwarranted sentencing disparities among similarly situated defendants. See 18 U.S.C. § 3553(a).

We respectfully submit that the balance of these factors should result in a sentence well below the Guidelines range.

### B. Sentencing Guidelines

Pursuant to the Plea Agreement, Ms. Güven pleaded guilty to one count of securities fraud. Ms. Güven does not object to the advisory Guidelines calculation: 37 to 46 months of imprisonment, based on a criminal history category of I and a total offense level of 21. The PSR notes that the average sentence imposed in the past five years for defendants facing the same Guidelines calculation (including criminal history category), after excluding defendants who received Section 5K1.1 substantial assistance departure, was 25 months—a below Guidelines sentence. (PSR 24.) Notwithstanding this range, and the average sentence for defendants in this range, Probation recommends the Court impose a below-Guidelines (and below average) sentence of 18 months of imprisonment. (PSR 28-31.)

**i. The Loss Enhancement Is Arbitrary and Inappropriately Inflates the Guidelines Range.**

While Ms. Güven does not seek any Guidelines departure or adjustment beyond those reflected in the Plea Agreement, the Court should not treat the stipulated loss enhancement as an accurate measure of culpability. It is invariably true that the loss enhancement is an inapt measure of the appropriate sentence. But it is particularly true in a case like this one, where Ms. Güven did not misappropriate funds or dissipate investor funds for personal use, and where most of the money at issue was still sitting in the bank at the time of Ms. Güven's arrest, waiting to be used for Kalder's legitimate expenses, and now available to make investors nearly whole. That fact is not a defense to liability; it is, however, a salient consideration for sentencing, relevant to assessing the harm from the offense, and underscores why the loss enhancement is disproportionate here.

In this case, the loss enhancement functions not as a proportional adjustment but as a multiplier that swallows the other factors the Guidelines purport to weigh—personal history, culpability, remorse, deterrence, future risk, and collateral consequences. Notably, the Guidelines calculation here does not include a sophisticated means enhancement, aggravating-role enhancement, or obstruction enhancement. (See Plea Agreement; PSR ¶¶ 35-40.) Instead, Ms. Güven's total offense level skyrockets 18 levels pursuant to Section 2B1.1, because the alleged loss amount falls between the range of $3,500,000 and $9,500,000. (PSR ¶ 35.) Without the loss enhancement, Ms. Güven's total offense level would be 4. With a criminal history category of I, her Guidelines range would be 0-6 months of imprisonment. As a first-time offender, Ms. Güven's range would remain 0-6 months imprisonment up to an offense level of 8. Removing the loss enhancement illustrates the dramatic impact of the single factor. This Circuit has recognized that where the Commission assigns a low base offense level to a fraud offense and then increases it dramatically by a loss enhancement, that structure "entitles a sentencing judge to consider a non-Guidelines sentence." United States v. Algahaim, 842 F.3d 796, 800 (2d Cir. 2016); see also Cavera, 550 F.3d at 210 (J. Katzmann, concurring) (district court may vary from the Guidelines "based solely on policy considerations, including disagreements with the Guidelines").

As this Court explained in United States v. Bankman-Fried, "the loss table, which is one of the significant driving forces of the guideline computation . . . is a debatable proposition," with "really no empirical basis for the brackets assigned or for the assignment of different losses to different brackets." (Sentencing Tr. at 6, United States v. Bankman-Fried, No. 22 CR 673 (LAK) (S.D.N.Y. Mar. 28, 2024), ECF. No. 426.) This policy disagreement with the Guidelines supported the Court's below-Guidelines sentence in Bankman-Fried, a case where the defendant misappropriated *billions* of dollars to spend on speculative investments and other unauthorized expenditures, inflicted financial distress on countless victims, and showed no remorse. (See Sentencing Tr. at 30-31, United States v. Abarbanel, No. 21 CR 532 (LAK) (S.D.N.Y. May 17, 2023), ECF No. 80 (imposing a below-Guidelines sentence and explaining that "the loss table that drives the guideline calculations in crimes of this nature is somewhat arbitrary and tends to inflate sentences to a degree that isn't always appropriate")). All the more so here, where the vast majority of the funds remained in the bank and will be returned to investors, the loss enhancement improperly inflates the advisory range. The circumstances here are distinguishable from a case where the defendant misused funds but by sheer luck turned a profit that facilitated repayment, a

chance event that might not diminish culpability. The majority of funds at issue here were *never* spent but remained in the bank for the stated intended use of benefitting Kalder.

The Sentencing Commission's data confirms that judges in this District routinely do not rely on the loss enhancement in Section 2B1.1 to dictate a sentence. In the 2025 Fiscal Year, this District only sentenced 6.7% of Section 2B1.1 defendants within the applicable Guidelines range, while 36.7% received a non-Government-sponsored downward variance and an additional 3.3% received a non-Government-sponsored downward departure. (See Ex. 3, U.S. Sentencing Comm'n, Interactive Data Analyzer, Sentence Imposed Relative to Guideline Range (§ 2B1.1, S.D.N.Y., FY 2025).)[12] The Court, without agreement from the Government, sentenced below the Guidelines range in nearly half of all fraud cases that year. (Id.) And 2025 was not anomalous. The same data shows that non-Government-sponsored downward variances and departures have exceeded the within-Guidelines rate in this District in every year from 2015 through 2025, reaching as high as 94.7% in 2021 and averaging well above 50% across the decade. (Id.)

These figures include the mine run fraud cases where, unlike here, the money is unrecoverable when the defendant is arrested, the fraud inflicts financial ruin on the victims, or the defendant defrauds victims in order to fund a lavish lifestyle. But criticism of the loss enhancement has been particularly pronounced with respect to circumstances like those here. The New York City Bar Association's recent comments to the Sentencing Commission on proposed 2026 amendments urge fundamental revision of Section 2B1.1, citing United States v. Corsey, 723 F.3d 366 (2d Cir. 2013) (Underhill, J., concurring), for the proposition that the Guideline's use of loss as a proxy for culpability has been widely criticized as irrational precisely where the loss figure is large relative to the defendant's actual intent and actual gain.[13]

The case law, the Court's data, and the NYC Bar Association's current advocacy all point in the same direction: a Guidelines range built almost entirely on an 18-level loss enhancement is not the range the Court should treat as presumptively reasonable. Rigor in sentencing does not mean deferring to a table but rather requires individualized scrutiny. See Kimbrough v. United States, 552 U.S. 85, 101-10 (2007); Gall, 552 U.S. at 49-50. Individualized scrutiny here supports a sentence well below the range that includes the loss enhancement.

### C. The Nature and Circumstances of the Offense Demonstrate That This Is Not a Typical Fraud Case.

Ms. Güven pleaded guilty and takes full responsibility for her actions. In many ways, however, this is not a typical white-collar case, and it is imperative for the sentence to reflect that. Not all fraud is the same, and the Guidelines alone do not adequately distinguish between the different degrees of moral culpability that fraud crimes encompass. The nature of the offense distinguishes this case from the archetypal fraud. These considerations support a below-Guidelines sentence.

[12] This exhibit was created based on the information available at https://ida.ussc.gov/analytics/saw.dll?Dashboard on July 23, 2026.

[13] Letter from Jonathan B. New, Chair, Fed. Cts. Comm., N.Y.C. Bar, to U.S. Sentencing Comm'n (Feb. 9, 2026), https://www.nycbar.org/wp-content/uploads/2026/02/20221583-ProposedAmendmentsToUSSG_FINAL.pdf.

**i. Circumstances of the Offense**

Kalder started as an idea sketched out in a college dorm room. Ms. Güven was 21 years old when she went from a student to a founder and CEO. Before Kalder, and during her time at Berkeley, Ms. Güven worked many jobs. She built a platform using Celo's blockchain technology that facilitated micro-lending, which was borne out of her interest in providing underserved communities access to banking services. Because of the success of this project, Celo offered her a paid internship. Additionally, 8VC, a technology and life sciences venture capital firm, recruited Ms. Güven to look for promising startups they could invest in on Berkeley's campus. She also led a financial inclusion design research project for the Dubai government through her work during the IDEO (a global design and consulting firm) CoLab Makeathon in 2019, which is a one-week makeathon.[14]. Further, Ms. Güven worked as a paid product-design intern at Robinhood and OpenSea.

During her time at OpenSea, Ms. Güven started Kalder from her college dorm. Building Kalder, while simultaneously attending classes, was not easy. Ms. Güven led the Company through several concept changes—from a blockchain product, to a debit card issuance, to a white label card-linked loyalty program. Such iteration often happens when motivated founders are trying to develop a successful idea in the early stages of a new company. Today, Kalder allows brands to build and monetize customized loyalty programs directly within their own systems and websites. (PSR ¶¶ 8, 76.) Kalder's first days required significant sacrifice and Ms. Güven embraced the challenges. She employed 18 people working from a co-working space. She built a culture founded on communication, kindness, hard work, and mentorship, and set an example by taking a modest salary herself. As one of Ms. Güven's victims who invested in Kalder describes in a supportive letter, "Gokce [sic] was hardworking, ambitious, and technically strong." (See Ex. 41, Letter of Alyssa Fanelli Varadhan.)

Ms. Güven was quickly engaging in startup seed funding and presenting in front of technology investors and venture capitalists to showcase her business and herself—a situation she was clearly ill-prepared for. While her age, immaturity, and inexperience do not excuse her conduct, they do provide context. Notably, judgment and risk assessment skills continue to develop well into a person's mid-twenties. Prior to the November 2025 version of the Guidelines, this was explicitly acknowledged in the Guidelines under "§ 5H1.1. Age (Policy Statement)" stating "youthful individuals generally are more impulsive, risk-seeking, and susceptible to outside influence as their brains continue to develop into young adulthood." U.S. Sentencing Guidelines Manual § 5H1.1 (U.S. Sentencing Comm'n 2024); id. App. C, amend. 829 (eff. Nov. 1, 2024).

Ms. Güven's conduct also did not stem from a fraudulent nature or naked greed but from errors in judgment that Ms. Güven is adamant not to repeat. From childhood, striving for success became her shield against instability, [redacted] and the constant message that she was not good enough and/or that she was the source of her family's problems. Kalder was the vehicle through which Ms. Güven tried to prove her worth and make something of herself. Kalder started as a

[14] The IDEO Makeathon is a fast-paced, collaborative design event focused on building tangible solutions to a specific problem within a short, intense timeframe. The PSR reads, "Güven could not recall how much she earned in this position but noted that it was commission-based." (PSR ¶ 80.) Ms. Güven did not get paid in connection with this work.

side-project borne out of curiosity and ambition. Despite lacking a sophisticated corporate background or colleagues with the same, Ms. Güven built Kalder into a real operating company with a product, salaried employees, assets, liabilities, and bank accounts. (PSR ¶¶ 76, 82.) She led the Company through its pivots, took a low salary, created an enjoyable culture, and ultimately created a product that helps businesses. Admittedly, she had big ambitions—in a note on her phone labeled "ideal rounds" she wrote, among other things, "$7m post $35m seed 2024 round" and "$175m post $2.8b 2027 (youngest self-made woman billionaire of the world)." (PSR ¶ 10.) She fully bought in to the founder's dream of building a unicorn—a business that would achieve outsize utility and success. And she craved recognition that would prove a girl from Adana belonged in the most accomplished circles of Silicon Valley. As she focused on a goal to grow the business exponentially, failure became a catastrophic outcome in her mind. Eager to prove herself in an industry filled with dizzying success and larger-than-life founders, she crossed the line from painting an optimistic vision of growth to overstating the financial progress of her company. In a pressured environment with expectations from investors to demonstrate outsize potential, she began telling lies about the Company that outpaced its true performance to secure investor support.

As Ms. Güven candidly describes: "I said things about our annual recurring revenue, our actual revenue, and our brand partnerships that were not accurate, and I knew they were not accurate, and I said them anyway. I slipped at such a pace that I did not feel myself slipping. Only when this process stopped me, when I finally stood still and read my own words back with ten months of distance, did I see it plainly for what it was. I was shocked at the person I found there. I am still shocked." (Ex. 1, Letter of Gökçe Güven at 3.)

Ms. Güven is also ashamed that she repeated similar misrepresentations about Kalder in her petition for an O-1A visa. (PSR ¶¶ 19-25.) Ms. Güven was desperate to stay in this country and continue working on Kalder. As part of the petition, she attached letters of support bearing the names of executives at companies where she had interned, some of whom she had reached out to for references. While she initially corresponded with some executives about letters of support, and in one instance sent over a draft, she ultimately wrote those letters and signed them without the approval of those executives. When the first petition was denied, she resubmitted the petition with the same letters. (PSR ¶¶ 22-24.) Ms. Güven recognizes that the goal of staying in the country did not justify the misrepresentations or the betrayal of the executives' trust. She is deeply sorry.

As the PSR describes, in the spring of 2025 an employee raised concerns with a director and an investor. Ms. Güven agreed to an investigation by outside counsel and outside accountants. In her interviews that July, she acknowledged overstating recurring revenue and not being accurate in her representations to investors. But she could have, and should have, been more forthright. She continued to describe certain brands as signed customers when they were not, and did not affirmatively disclose that the financial statements provided to investors did not match the internal books. (PSR ¶ 25.) While Ms. Güven did not shy away from an internal investigation, she regrets that she was not even more forthcoming right away.

Ms. Güven did not set out to build a company by defrauding others. Instead, her offense arose from gradual escalation rather than initial design. Ms. Güven will not minimize her errors by calling them a mistake. She acknowledges that she engaged in a deliberate course of conduct that was unequivocally wrong. Still, the progression of her crime is consistent with a pattern

documented by scholars of entrepreneurship. While Ms. Güven was the responsible actor and agent of her decisions, she launched her company in the heart of a startup industry that runs on a "fake-it-'til-you-make-it" ethos, which "imprint[s] deception as an accepted practice on the venture from day one." (Ex. 13, Mathew S. Wood et al., Fake It 'Til You Make It: Hazards of a Cultural Norm in Entrepreneurship, 65 Bus. Horizons 681, 682, 694 (2022).) "Fake it 'til you make it," as other scholars explain, is a "mantra espoused by entrepreneurs and other stakeholders in the field [that] can be understood to explicitly endorse the norm of misrepresenting one's ability to deliver on projected performance goals at intermediate points in time to gain access to critical resources needed for ultimate success." (Ex. 14, Donald Palmer & Tim Weiss, The Unique Vulnerabilities of Entrepreneurial Ventures to Misconduct, at 139, in 81 Research in the Sociology of Organizations (2022).) As Palmer and Weiss write, wrongdoing is sometimes a "product of organizational structures and processes that are inherent in formal organization." (Id. at 130.) While "fake it 'til you make it" began as a self-directed practice that empowered founders to overcome imposter syndrome and barriers to action, it became, through institutionalization, a stakeholder-directed one. (Ex. 15, Tim Weiss & Nevena Radoynovska, Criminal Deception in Silicon Valley, 37 Org. Sci. 1669 (2026) ("As ventures progress, [entrepreneurs] must convincingly meet institutionally conditioned expectations of audiences hoping for exponential growth during a venture's life cycle.")) Founders operate in a culture that promotes the mindset that "deceiving stakeholders is necessary but fail[ing] to acknowledge fully the hazards of doing so," and where embellishment is not merely tolerated but "even expected by stakeholders." (Ex. 13, Wood et al. at 682.) As one of Ms. Güven's investor victims puts it, "Founders often present an overly optimistic picture to attract investors and clients, and she, [Ms. Güven], took this too far." Despite being one of Ms. Güven's victim, she asks the Court to consider "her youth, the influence of blockchain mentors from a loosely regulated industry (I was not among them), and the fact that she has taken full responsibility for her wrongdoing" in weighing the appropriate sentence. (See Ex. 41, Letter of Alyssa Fanelli Varadhan).

None of this excuses Ms. Güven's behavior, which was plainly wrong. This professional context does help illuminate how Ms. Güven—indisputably ambitious and eager to succeed—went astray. As Wood and his co-authors explain: "[M]ost entrepreneurs likely have no intentions of committing fraud" and "[t]hese good-faith individuals end up in a place they never anticipated." (Ex. 13, Wood et al. at 682.) Here, deception escalated based on a wrong and misguided conclusion that the way to meet venture capitalists' high-risk and high-return expectations was to inaccurately portray the financial achievements of her nascent enterprise. As Wood and his co-authors document, in the startup world, "initial deceptions are likely to escalate both in scope and frequency[, and a] single initial mistruth can create a spiral of deception as it is continuously stretched" or compounded with further mistruths "offered to justify the first." (Ex. 13, Wood et al. at 686; see Ex. 14, Palmer & Weiss at 139; see also Ex. 15, Weiss & Radoynovska at 1670 ("Entrepreneurs who solely engage in fictionalizing stories deploy considerable discursive strategies. . . . With widening expectation-reality gaps, organizing efforts intensify, and the deception scheme becomes increasingly elaborate.").)

It is telling what happened to the money after Ms. Güven raised it: it was put in Kalder's bank account for the purpose of growing the Company. At the time of Ms. Güven's arrest, most of the money was still there, and is still there today. Ms. Güven did not raise investor money to fund a lavish lifestyle. Her intent was to spend the money on furthering Kalder's success and

turning the overstated vision of the Company into reality. (Ex. 1, Letter of Gökçe Güven at 4 ("[E]verything I did, right and wrong, was in service of trying to make my company a success. Not only for myself, but also for my investors, my customers, and my team.").) She made catastrophic errors in judgment that overstating the Company's performance was justified to meet venture capitalists' high-risk, high-return expectations, and to turn her ambitions for Kalder into reality. But, Ms. Güven's sentence should reflect her efforts to introduce an innovative product to the market, rather than an effort to "line her own pockets" without regard to performing actual work. (Sentencing Tr. at 30, United States v. Rorke, No. 15 CR 11 (KPF) (S.D.N.Y. May 13, 2016), ECF No. 58 (ruling that the defendant's genuine belief in the value of his product made the case "a qualitatively different case than a case involving lining [defendant's] pockets for nothing other than his personal enjoyment").)

The startup culture in which Ms. Güven operated, combined with the numerous letters attesting to her good character, supports the conclusion that fraud is not in Ms. Güven's nature. Having learned her lesson, she is exceedingly unlikely to ever commit fraud again.

**ii. Victims**

It is a crime to make misrepresentations that would be considered material in the course of raising money, and that is what Ms. Güven did. Still, the Court must consider the real-world circumstances of Ms. Güven's investors and their investment in Kalder.

The charged conduct arose during Kalder's seed round, where Ms. Güven solicited approximately $7 million from investors in exchange for an equity interest in Kalder. Ms. Güven's misrepresentations were material regardless of her investors' actual reliance on them. The record here indicates, however, that at least some of Kalder's investors were focused on Ms. Güven as a founder and leader, and less focused on the Company's financials, when deciding to support the early-stage company. Although not a victim in this case, one of Kalder's angel investors explains: "Gökçe was bright, young, smart, and energetic and had everything that an early stage looks for. I decided to put a check after a 30 mins meeting. I looked at her and saw a founder that could pivot and iterate in good days and bad days [and] make Kalder a success whatever it takes." (Ex. 43, Letter of Tansu Yegen; Ex. 23, Letter of Utku Dördüncü ("What convinced us, more than any metric, was Gökçe herself.")) This attitude was shared by some of Ms. Güven's investor victims, as reflected in excerpts of interview notes provided by the Government to Ms. Güven in a disclosure letter. In interviews with the government, one victim explained that they were betting on Ms. Güven as opposed to relying on the financials. (Ex. 2, Excerpt of Government Disclosure Letter at 2, Feb. 20, 2026). In some instances, victims did not even recall reviewing, receiving, or downloading the financials or reviewing the contracts. (Id. at 4.) Kalder's lead investor explained that "[a]t the seed stage[,] companies usually do not have much," meaning much in the way of reliable financials. (Id. at 3.) Another investor victim explained that they were "not expecting financial statements at the time," and make their investments based on how they view the founder, noting that "due diligence is marrying the person into the space/company they are starting." (Id. at 2.)[15]

---

[15] One of the categories of misstatements involved ARR, a non-GAAP metric that is itself a probabilistic projection. As one victim investor stated, ARR "doesn't mean booked revenue"—it is "revenue that is committed to or about *(cont'd)*

The deemphasis by some investors on Kalder's financial materials is not because they were negligent in their diligence. Rather, it reflects that venture capital investors recognize that seed-stage companies might not "have much" in terms of reliable and predictive financial statements in this early stage. (Id. at 3.) To be clear, the circumstances do not absolve Ms. Güven of wrongdoing. Ms. Güven obviously thought her misrepresentations would benefit her company and she is culpable for that. Still, it is relevant that at least some of the victims were focused on Ms. Güven, her vision, and the possibility that Kalder could become valuable, not on a belief that Kalder was already a financially mature business. That does set this case apart from the archetypal fraud that leaves a trail of gullible, unsophisticated, or vulnerable victims in its wake, or victims in financial ruin because of a predatory fraud. Indeed, this case did not originate with Kalder's investors crying foul, but from a complaint by a disgruntled employee. (Ex. 12, Affidavit of Chelsea Jia at 13.)[16]

**iii. Lack of Loss**

Additionally, the Court must consider the investors' loss from Ms. Güven's conduct. Above, we discuss the Guidelines loss enhancement in this case. (See supra Section III.B.i.) But the Sentencing Commission's primer on loss calculation under Section 2B1.1 recognizes that loss calculation and the Section 3553(a) inquiry are distinct, and it cites cases in which courts treat very large, technical loss figures as overstating the circumstances of the offense or presenting a low risk of actual loss. (See Ex. 9, U.S. Sentencing Comm'n, Primer on Loss Calculation Under § 2B1.1, at 9-10 (2025).) That same treatment should be applied here. The loss calculation is not a complete picture of the victims' injuries in this case. See United States v. Certified Env't Servs., Inc., 753 F.3d 72, 102-03 (2d Cir. 2014). Thus, the Court must factor in what recovery is available when considering the actual harm the sentence is designed to punish.

In many investment fraud cases, the company is fictitious, investors' money has been dissipated, and the business has no value, leaving victims with little more than an unsecured restitution judgment. See United States v. Marganda, No. 25-959-cr, 2026 WL 762822, at *3 (2d Cir. Mar. 18, 2026) (identifying as aggravating factor that defendant "harmed hundreds of vulnerable victims (some substantially so), used deceit, and absconded for two years to live in luxury using the proceeds of his criminal scheme"). Not here. The investors received equity in Kalder, a real company with money in its bank accounts. In fact, Ms. Güven agreed to forfeit $6,717,998, representing proceeds traceable to the offense. A large portion of the funds, which we understand to be in excess of $6 million, is preserved in corporate accounts, frozen by the Government, and we understand is currently earning interest. The Company also retained value sufficient to support an acquisition, and the acquisition structure requires that victims be paid first upon an equity sale—due to Ms. Güven's tireless effort to repay investors.

---

to be signed, a high probability." (Ex. 2, Excerpt of Government Disclosure Letter at 2.) As one example, OpenAI recently revised its reported annualized revenue from nearly $70 billion to $50 billion based on a change in their method of calculating ARR. Scott McCain, Investors Built $70B OpenAI Revenue Estimate Using Wrong Method; AI Stocks Fell When FT Corrected, Tech Times (Oct. 9, 2026), https://www.techtimes.com/articles/328836/20261009/investors-built-70b-openai-revenue-estimate-using-wrong-method-ai-stocks-fell-when-ft-corrected.htm.

[16] Had Jia testified, she would have been subject to vigorous impeachment. Jia has a history of litigiousness against her former employers and has been terminated four times in her brief career. (See Ex. 12 Affidavit of Chelsea Jia at 15-16.)

Courts have repeatedly treated similar facts—efforts to make victims whole, repayment, forfeiture, and preserved value—as highly relevant when considering a sentence that is sufficient, but not greater than necessary, to achieve the goals of sentencing. In United States v. Rorke, Judge Failla declined to reduce the Guidelines loss figure to zero but expressly found "value" under Section 3553(a) in the software, in the defendant's efforts "to return money to investors," and "to get money to repay the investors," and then imposed a sentence of 24 months of imprisonment when the Guidelines range was 51 to 63 months. (Sentencing Tr. at 30-31, 68, 73, United States v. Rorke, No. 15 CR 11 (KPF) (S.D.N.Y. May 13, 2016), ECF No. 58.) In United States v. Osovitzki, Judge Failla stated that victim repayment is "perhaps worthy of a downward variance or other consideration at sentencing," and later confirmed that she had considered "as bases for a downward variance, the amount of repayment that has been done to date and the amount that will continue to be done in the future." (Sentencing Tr. at 27-28, 49-50, United States v. Osovitzki, No. 19 CR 794 (KPF) (S.D.N.Y. Jan. 4, 2023), ECF No. 134.) Furthermore, in United States v. Ahmed, Judge Marrero imposed a sentence well below the 60-month Guidelines range while expressly acknowledging the defendant's "exceptional" acceptance of responsibility, including that he "returned the proceeds of the crime in full." (Sentencing Tr. at 32-33, 36, United States v. Ahmed, No. 23 Cr. 340 (VM) (S.D.N.Y. Apr. 12, 2024), ECF No. 53.) In United States v. Fowler, Judge Oetken imposed a non-prison sentence despite a 12 to 18 months Guidelines range, emphasizing that the offense was a financial crime "that can be compensated by restitution" and that the defendant "clearly has the capacity to work at jobs that could result in the restitution actually being paid back." (Sentencing Tr. at 11-12, United States v. Fowler, No. 20 CR 526 (JPO) (S.D.N.Y. July 16, 2021), ECF No. 28.) Finally, in United States v. Scheinberg, Your Honor imposed a sentence of time served, when defendant was facing a Guidelines range of 12 to 18 months, after defendant shared that his company repaid each victim of a multimillion-dollar internet gambling scheme, including those who "were owed funds from other online companies that could not or would not repay those players." (Sentencing Tr. at 12, United States v. Scheinberg, No. 10 CR 336 (LAK) (S.D.N.Y. Sept. 23, 2020), ECF No. 445; see also id. at 13-14 (the Court stating: "I don't condone what you did, but the world is filled with fallible people and fallible people make mistakes. This was a big mistake, but it is not one that in my judgment should ruin the balance of your life.")) These decisions demonstrate that efforts to make victims whole should be considered when defining the economic harm that must be punished.

Ms. Güven's conduct occurred during seed-stage financing, involved sophisticated investors purchasing equity in a real company that is now being acquired, and that is on track to result in restitution to return the principal amount at issue. Sentencing Ms. Güven as though she has caused the same financial injury as a defendant who operated a sham enterprise, dissipated investor funds, or left victims with no realistic recovery would not be proportionate to the actual harm reflected in this record. As one victim in this case notes in her letter to the Court, while she wishes Ms. Güven "had done many things differently[,] she sold the company and plans to return most, if not all, of the invested capital to her investors, which reflects her good faith in trying to build a legitimate business." (Ex. 41, Letter of Alyssa Fanelli Varadhan.)

**D. Ms. Güven's History and Characteristics are Extraordinary and Mitigating.**

In determining an appropriate sentence, the Court must consider the "history and characteristics of [a] defendant." 18 U.S.C. § 3553(a)(1); see also Pepper v. United States, 562 U.S. 476, 487-88 (2011); United States v. Rioux, 97 F.3d 648, 662-63 (2d Cir. 1996); United States v. Serafini, 233 F.3d 758, 773 (3d Cir. 2000). In United States v. Adelson, 441 F. Supp. 2d 506 (S.D.N.Y. 2006), aff'd, 301 F. App'x 93 (2d Cir. 2008), Judge Rakoff observed that "if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance" id. at 513-14. We urge the Court to consider Ms. Güven's life and character in its entirety, including the dozens of letters of support written by her family, friends, and colleagues, which specifically emphasize that her conduct in this case is inconsistent with the person they know. (See supra Section II.)

Ms. Güven committed a serious offense. But the offense is not representative of Ms. Güven. In considering the appropriate sentence, we ask the Court to consider the complete picture of Ms. Güven's life, including her upbringing, her contributions to the community, and her positive personal characteristics as a family member, friend, and colleague. Ms. Güven's life has been defined by hard work and commitment to her community. (See supra Section II.) She is described as someone who always shows up both figuratively and literally. During this difficult period, she has not rationalized or denied her mistakes but instead tried to learn from them. She is even more intent on proving herself and contributing in a positive way to society. This speaks volumes about her character and the positive impact she will continue to have on her community if afforded the opportunity.

After this case was opened, Ms. Güven did not disappear or walk away from the Company. Instead, she tried to repair the damage and worked harder. And so did her employees. In fact, many employees either agreed to take a lower salary or none at all because of their belief in Ms. Güven and the Company.[17] (Ex. 27, Letter of Gonca Güven at 1; Ex. 26, Letter of Nazli Gungor at 1; Ex. 28, Letter of Kabiru Haruna; Ex. 40, Letter of Anika Valenzuela.) Ms. Güven did not want to abandon her employees. She also wanted to make her investors whole. Kalder recently announced it is being acquired by Luumis (ServiceSync, Inc.), an operational intelligence infrastructure company for service enterprises. (See Ex. 29, Letter of Frazier Horn.) Ms. Güven identified an acquirer, negotiated the sale, and has remained actively involved through the transition. The terms are documented and state that the purchase price for the Company's intellectual property is "payable in full in cash at the Company's direction to its designated seed investors." (Ex. 11, Kalder and Luumis Term Sheet at 2.) The expectation is that the acquisition will facilitate repaying investors for the restitution that remains outstanding once the forfeited Company funds are distributed. Ms. Güven will receive no proceeds or transaction bonus from the sale.[18] Instead, Ms. Güven will "surrender all common stock for cancellation for no consideration, waive any distribution she would otherwise receive, and disclaim any transaction-related compensation." (Id.)

---

[17] At the time, the Company took out a loan from Stripe Capital to pay the employees' lower salaries.

[18] Ms. Güven has a separate agreement with Luumis for market-rate compensation for advisory work as well as a standard new-hire equity grant in the Company. The agreement is terminable on thirty days' notice.

Apart from Kalder, Ms. Güven has not otherwise been idle. She "is not waiting for this case to end to become useful." (Ex. 27, Letter of Gonca Güven at 2.) Since stepping back from Kalder, Ms. Güven began working on an AI project manager assistant for general contractors and developers. (Ex. 31, Letter of Alpan Keskin (noting "Gökçe and her team have developed an AI software product . . . that I find impressive and believe has strong potential to be valuable within the construction industry.").) She is doing things differently this time. She is not raising money or publicizing the venture. Her focus is exclusively on building a product that delivers a real-world solution to her customers.

It is noteworthy that many individuals from Ms. Güven's professional network want to continue to work with her and/or remain a part of her network even after her guilty plea in this case. (See Ex. 26, Letter of Nazli Gungor at 2; Ex. 28, Letter of Kabiru Haruna; Ex. 33, Letter of Pavan Krishnamurthy at 1; Ex. 34, Letter of Filip Lintner; Ex. 37, Letter of Jack Solomon at 2; Ex. 40, Letter of Anika Valenzuela; Ex. 44, Letter of Ashley Zangrillo at 2; Ex. 42, Letter of Pryce Yebesi at 2.) In fact, one angel investor in Kalder writes, "I say without hesitation I will continue to support and invest . . . in what she builds and in the future." (Ex. 43, Letter of Tansu Yegen.) Another seed round investor writes, "Knowing everything I know today, including everything that came out in this case, I would invest in Gökçe's next venture. I do not say that lightly: across more than 20 investments, she is one of very few founders about whom I would say it after an outcome like this." (Ex. 23, Letter of Utku Dördüncü at 1.) This is a remarkable testament to her character and abilities, despite her misconduct.

Ms. Güven also spends time reading and writing. Without pay, Ms. Güven designs, edits, and writes for Envoy Magazine, a United Nations-affiliated publication. She is also writing fiction that explores the realities of being a young female founder in the technology space to inspire the next generation of female entrepreneurs. Ms. Güven continues to sharpen her technical expertise by researching and reading about AI.

Finally, Ms. Güven has continued to volunteer. Since 2022, Ms. Güven has volunteered weekly for Ali Baba Mediterranean Cuisine, a New York City restaurant that prepares and delivers hot meals to people experiencing homelessness. The owner of Ali Baba Mediterranean Cuisine remarked on her exceptional care for others—[Ms. Güven] "sits with people, talks to them, listens to their stories, and treats them with respect." (Ex. 22, Letter of Ali Riza Dogan at 1.) In these interactions, Ms. Güven has "helped people prepare resumes, look for jobs, and encouraged businesses . . . to give people an opportunity to work and rebuild their lives." (Id.) Ms. Güven also helped build the restaurant's charity's website, developed its vision, and created the "One Meal, One Plate" campaign, through which every meal purchased at Ali Baba Mediterranean Cuisine provides another meal for a homeless New Yorker. (Id. at 2.) The owner noted in his letter that "our restaurant and our family are willing to keep employment opportunities open to her." (Id.)

**E. The Need to Deter Criminal Conduct and Protect the Public Is Addressed.**

Ms. Güven's specific characteristics and the consequences she has and will continue to face—including the significant immigration consequences—are sufficient to deter the conduct and protect the public.

i. **Specific Characteristics**

Ms. Güven's guilty plea for her first-time offense and her actions that followed are mitigating factors the Court must consider. See United States v. Davis, No. 07 Cr. 727(HB), 2008 WL 2329290, at *4-5 (S.D.N.Y. June 5, 2008).

First, Ms. Güven is a first-time offender, and the offense is non-violent. (PSR ¶¶ 45-51.) As the PSR notes, she has remained fully compliant with her bail conditions and has been approved for low-risk supervision. (PSR ¶ 4.) The Sentencing Commission has found that offenders with zero criminal history points have markedly lower recidivism rates than offenders with any criminal history points. U.S. Sentencing Guidelines Manual, § 4A1.1, amend. 821, Reason for Amendment (eff. Nov. 1, 2024) (U.S. Sentencing Comm'n 2023). Congress likewise directed the Commission to reflect the "general appropriateness" of non-prison sentences for first offenders who have not committed crimes of violence or otherwise serious offenses. 28 U.S.C. § 994(j). At the very least, the Commission's treatment of zero-point offenders emphasizes that a lengthy period of incarceration is not necessary. As described above, this was not the misconduct of an unrepentant fraudster. Ms. Güven has accepted responsibility. (Ex. 1, Letter of Gökçe Güven at 4 ("I was young, I was building fast, and I was alone, but none of that is an excuse; the decisions were mine, and they are mine to answer for. People trusted me. My investors, my team, my family. Whatever I believed I was building toward, they deserved better from me, and the consequences of my choices have fallen on them as well as on me.").)

Additionally, Ms. Güven did not force the Court, the Government, or the victims to go through trial. (PSR ¶¶ 41-42.) She pleaded guilty and expressed remorse. That matters. It reflects directly on her recidivism risk. See United States v. Broxmeyer, 699 F.3d 265, 295 (2d Cir. 2012). Furthermore, "acceptance of responsibility" is not measured solely by the fact of a guilty plea. Section 3E1.1 identifies a non-exhaustive list of conduct relevant to whether a defendant has clearly demonstrated acceptance of responsibility, including "voluntary payment of restitution prior to adjudication of guilt," "voluntary assistance to authorities in the recovery of the fruits and instrumentalities of the offense," and "voluntary resignation from the office or position held during the commission of the offense." U.S. Sentencing Guidelines Manual § 3E1.1 cmt. n.1(C), (E), (F) (U.S. Sentencing Comm'n 2023). As detailed above, Ms. Güven has begun to pay the price for her conduct through her agreement to forfeit funds and her effort to repay victims through the acquisition of Kalder. See Kaley v. United States, 571 U.S. 320, 323 (2014) (criminal forfeiture serves punitive and deterrent purposes). These actions reflect a person who has wholeheartedly accepted responsibility.

Last, as detailed above, Ms. Güven's community is strong and supportive—from her mother, sister, and grandmother, to her friends and colleagues. (See supra Section II.) She has long participated in mental health treatment and remains willing to continue to do so. (PSR ¶¶ 67-68.) While she will carry regret with her for the rest of her life, it is clear that she is focused on change and bettering her life and community.

These personal characteristics are mitigating and establish that Ms. Güven does not need to be incarcerated to rehabilitate or be deterred.

### ii. **Collateral Consequences**

Since the start of this case, Ms. Güven has faced serious personal hardships and impending direct and indirect immigration consequences. These consequences have already had a profound deterrent effect, ensured the public is protected, and served a punitive function independent of any prison sentence.

Additionally, in terms of general deterrence, the law does not require the longest sentence that could conceivably send a message. See Adelson, 441 F. Supp. 2d at 514 ("[E]ven relatively short sentences can have a strong deterrent effect on prospective 'white collar' offenders.'"). This case has already delivered a clear message to immigrant startup founders—misconduct will result in, at a minimum, a felony conviction, restitution, forfeiture, public disgrace, removal from the United States, and a 20-year bar from the United States. The marginal deterrent value of adding years or months to a sentence is low, while the human cost is high. A below-guidelines sentence is therefore sufficient, but not greater than necessary, to afford adequate general deterrence and to punish Ms. Güven for her offense.

#### 1. **Personal Hardships**

Ms. Güven has already suffered personal hardships that will last long after any term of imprisonment ends. First, this case has caused Ms. Güven to be [redacted] (Ex. 39, Letter to Probation Officer from Dr. Ismail Ünal at 1.) As her sister recounts: "[S]he wakes up screaming. She [redacted] She cries out that they are coming to take her. She cries out that she could be sent away from this country - the place she calls home. She says, in her sleep, 'I am nobody now.'" (Ex. 27, Letter of Gonca Güven at 2.) [redacted] er doctor respectfully recommends, "on medical grounds, that any sentence be structured to preserve the conditions on which her recovery depended, namely regular structured meals, continuity of medication[19] and therapy, access to her family and physicians, and periodic neurological follow-up including repeat imaging." (Ex. 35, Letter of Dr. Mihriban Aral Özcan at 2.) Section 3553(a)(2)(D) directs the Court to consider the need for the sentence imposed to provide needed medical care or other correctional treatment in the most effective manner. A sentence that keeps Ms. Güven connected to family support and mental and physical health treatment and monitoring is more likely to meet the goals of sentencing than a multi-year term of imprisonment that interrupts treatment and exacerbates her medical conditions.

Further, Ms. Güven has suffered from the effect her conduct has had on her family's well-being and on her own personal and professional future. While Ms. Güven's family remains completely supportive of her, this case has also been destabilizing and painful for them. [redacted] The case itself, as well as the media

---

[19] Ms. Güven's PSR and letters from doctors reflect that she is prescribed medication. Ms. Güven does not believe she took any medication on the day of her plea proceeding and thus stated that she was not under the influence of medication.

attention across two countries, has cost her relationships, including a romantic relationship. It will also always be a stain on her reputation and will likely impact her professional opportunities in the future. See United States v. Gupta, 904 F. Supp. 2d 349, 355 (S.D.N.Y. 2012) (reputational ruin can make recidivism unlikely), aff'd, 747 F.3d 111 (2d Cir. 2014).

Financially, this case has impaired her ability to work and support herself. She is financially reliant on her family, including on her grandmother who sold her house after Ms. Güven's arrest, a circumstance that has stripped away her independence. She continues to live in a one-bathroom studio apartment with her sister, and the two of them share a single bed. (PSR ¶ 60.)

Courts have recognized that the loss of a person's reputation, livelihood, assets, and professional future can materially reduce the need for additional incarceration. See United States v. Stewart, 590 F.3d 93, 141 (2d Cir. 2009); Adelson, 441 F. Supp. 2d at 514; Gupta, 904 F. Supp. 2d at 355. Specifically, Judge Ramos has noted that specific deterrence was "[not] particularly important" where the defendant was unlikely to break the law again after the experience of prosecution and conviction. Sentencing Tr. at 97:16-23, United States v. Milton, No. 21 Cr. 478 (ER) (S.D.N.Y. Dec. 18, 2023), ECF. No. 322. That is true here. Ms. Güven's personal hardships have served as a powerful deterrent and a source of punishment.

### 2. **Direct Immigration Consequences**

A sentencing court may consider "the uncertainties presented by the prospect of removal proceedings and the impact deportation will have on the defendant and [her] family." United States v. Thavaraja, 740 F.3d 253, 263 (2d Cir. 2014). Consideration of the collateral consequences of deportation may lead a court to decide that justice is served by "a lesser term of imprisonment for noncitizen defendants than otherwise would be appropriate." United States v. Chin Chong, No. 13-CR-570, 2014 WL 4773978, at *7 (E.D.N.Y. Sept. 24, 2014). Here, as a term of her guilty plea, Ms. Güven is faced with the certainty of losing the life and future in the United States that is precious to her. Ms. Güven is a citizen of Turkey and is in the United States on a temporary visa. She has a Department of Homeland Security detainer lodged against her. (PSR ¶ 62.) As part of the Plea Agreement, Ms. Güven agreed that Kalder would withdraw, revoke, or terminate her O-1A petition by the time of sentencing, voluntarily surrendering her immigration status. She also agreed to a stipulated judicial order of removal, which renders her immediately excludable and inadmissible to the United States for 20 years. (PSR ¶ 91.) This consequence is extremely painful and significant for her. Yet Ms. Güven accepted these terms that will facilitate her speedy and efficient removal from this country.

Ms. Güven's life is in the United States and it is a life she dreamed of and strived for. She pursued her education here, made friends here, started her career here, and aspired to build a professional and personal future here. Indeed, her fervent desire to remain in the United States and to work here was the motive for her misrepresentations in her visa petition. The immigration consequences were therefore the most difficult part of her Plea Agreement to accept. (Ex. 27, Letter of Gonca Güven at 1 ("She talks about it the way you talk about the place that made you.").) Not only is she devastated about her departure from the United States, but many individuals who will remain in the United States are devastated as well. (Ex. 19, Letter of Razi Canikligil at 2

("Her absence from this city – and from this country – would be a loss felt well beyond her own life, by our foundation and by the many people her work reaches.").) By leaving the United States, Ms. Güven will be forfeiting her professional dreams, as well as relinquishing the personal and professional communities that she has built here as a young adult. This is the place where Ms. Güven spent her formative years learning, socializing, dating, and working. The prospect of starting anew in another country is overwhelming and scary for Ms. Güven. The punitive consequences of deportation are nothing short of severe.

The Second Circuit has recently reaffirmed that immigration consequences occupy a different category than the ordinary collateral fallout of a criminal conviction, precisely because deportation and exclusion are "too severe," too closely bound up with the criminal process, and too drastic in their effect on a person's life and family to be treated as incidental to sentencing. Farhane v. United States, 121 F.4th 353, 358 (2d Cir. 2024) (en banc). That is true here.

### 3. **Indirect Immigration Consequences**

Ms. Güven's status as a noncitizen, a status that has no bearing on her culpability, her acceptance of responsibility, or her prospects for rehabilitation, will nonetheless cause her to face indirect consequences. While these immigration consequences are indirect, they are not speculative. They are real, guaranteed, and harsh.

Since United States v. Booker, 543 U.S. 220 (2005), rendered the Guidelines advisory, courts have had broad latitude to consider the full range of a defendant's circumstances in determining an individualized sentence. See Pepper, 562 U.S. at 487-88 (sentencing courts may consider the widest possible breadth of information about a defendant's life and characteristics). Though nothing in the Guidelines purports to account for the collateral effects of noncitizen status, a sentencing court may consider those effects. Gall , 552 U.S. at 49-50 (courts may vary from the Guidelines range based on factors including those the Commission did not adequately consider).[20] We urge the Court to consider that because of Ms. Güven's status as a noncitizen, any term of imprisonment would be harsher for her than for someone identical to her in every aspect except citizenship. Specifically, her immigration status will affect the correctional facility where she is housed and limit her ability to reduce her sentence through good behavior.

#### **a. Low Security Institution**

A "Deportable Alien" is a "a male or female inmate who is not a citizen of the United States" and, under Public Safety Factor H, requires housing "in at least a Low security level institution." (Ex. 4, Fed. Bureau of Prisons, Program Statement P5100.08, Inmate Security Designation and Custody Classification, ch. 5, at 9 (Sept. 12, 2006) (as amended by Change Notice 5100.08, CN-3 (May 6, 2026)).) See United States v. Bautista, 258 F.3d 602, 606–07 (7th Cir. 2001) (a court may weigh the fact that a defendant's alienage will preclude any placement in a minimum-security facility or community confinement, so long as the court is not simply treating

[20] There is a narrow list of characteristics that the Commission has deemed off-limits at sentencing. See U.S. Sentencing Guidelines Manual § 1A1.1 (U.S. Sentencing Comm'n 2025) (identifying only race, sex, national origin, creed, religion, and socioeconomic status as never relevant to a sentence). Notably, however, citizenship or alienage is absent from that list.

deportability itself as automatically mitigating). Thus, Ms. Güven's immigration status will cause her to be placed in a Low-security facility, rather than a Minimum-security facility.

Recent BOP Office of Research and Evaluation charts show that Low-security placement carries meaningfully greater risk than Minimum-security placement. For November 2021 through October 2025, Low-security institutions recorded a serious-assault-on-inmate[21] guilty finding in roughly 60% of that time period (28 out of 48 months), with a monthly peak of approximately 2.2 guilty findings per 5,000 inmates (Ex. 6, Off. of Rsch. & Evaluation, Fed. Bureau of Prisons, Serious Assaults on Inmates: Guilty Findings Recorded in Chronological Disciplinary Records at 3 (Nov. 2021 to Oct. 2025) (Security Level=Low).) By contrast, Minimum-security institutions recorded a guilty finding in only about 6% of the same time period (3 out of 48 months), with each of those isolated peaks reaching only approximately 0.4 guilty findings per 5,000 inmates. (Id. at 2 (Security Level=Minimum).) This means that Low-security's peak monthly rate ran roughly five-and-a-half times (about 450 to 460%) higher than Minimum-security's peak. (Id. at 3; id. at 2.) Thus, the Court should consider that any term of imprisonment for Ms. Güven will be served in harsher conditions than the same sentence imposed on a citizen. In United States v. Agarwal, 19 Cr. 864 (N.D. Ill.) (2024), the defendant was convicted at trial of mail, wire, and bank fraud because she overbilled clients and fabricated financial data to secure nearly $1 billion in financing and faced a Guidelines range of 70 to 87 months. The sentencing judge sentenced the defendant to a term of one day to be considered time served because her non-citizen status would mean she was not eligible for a prison camp, and the judge believed being put elsewhere would subject her to "be physically abused or extorted. . . . And that's the practical consequence of a jail sentence in this case." Sentencing Tr. at 98, United States v. Agarwal, 19 Cr. 864 (N.D. Ill.) (2024).

**b. First Step Act Consequences**

The First Step Act provides that "[a] prisoner is ineligible to apply [good] time credits . . . if the prisoner is the subject of a final order of removal." 18 U.S.C. § 3632(d)(4)(E)(i). BOP's First Step Act time-credit guidance implements that statutory limitation. (Ex. 7, BOP Change Notice No. 5410.01 CN-1, First Step Act of 2018—Time Credits: Procedures for Implementation of 18 U.S.C. § 3632(d)(4) (Feb. 6, 2023).) The Plea Agreement requires the entry of a stipulated judicial order of removal upon judgment. (PSR ¶ 91.) As a result, the very immigration resolution that makes her removal certain will also deprive her of time credit benefits. 18 U.S.C. § 3632(d)(4)(E). (Ex. 7, BOP Change Notice No. 5410.01 CN-1.) This fundamentally changes the sentence Ms. Güven will actually serve as compared to others. 18 U.S.C. § 3632(d)(4)(E).

**c. Denied an Ordinary Re-Entry Path**

Ms. Güven will be denied the ordinary re-entry path that reduces the harshness of custody for many citizen defendants. Congress has authorized BOP to place eligible inmates in pre-release custody, including a Residential Re-entry Center or home confinement, and provides that home confinement may extend through the shorter of 10% of the term of imprisonment or six months. 18 U.S.C. § 3624(c)(1)-(2). This means that a citizen defendant may spend the final months of a

[21] "Serious assault" corresponds to Code 101, which covers assaulting any person only when serious physical injury has been attempted or accomplished. (Ex. 5, Fed. Bureau of Prisons, Program Statement P5270.09, Inmate Discipline Program at 45, tbl. 1 (July 8, 2011).)

sentence rebuilding him or herself, employment, and community ties, while Ms. Güven will remain in secure custody. 18 U.S.C. § 3624(c).

**d. Additional Post Sentence Custody**

Ms. Güven faces additional post-sentence custody in immigration detention. The Plea Agreement provides for a judicial order of removal. This means that in the event of imprisonment, on the day the Bureau releases her, Ms. Güven will not be released; instead, she will be transferred to Immigration and Customs Enforcement and subject to mandatory detention. 8 U.S.C. § 1231(a)(2)(A). That period of detention does not begin until she is released from criminal custody and thus does not overlap with any part of her imposed sentence. The Office of the Inspector General ("OIG") within the Department of Homeland Security ("DHS") found that federal inmates with a final order of removal before release spent an average of 23 days in ICE detention and sometimes longer. (Ex. 8, Off. of Inspector Gen., U.S. Dep't of Just., Review of the Institutional Hearing and Removal Program Expansion for Federal Inmates, Report No. 21-123, at 20-21 (Sept. 2021).) In practical terms, Ms. Güven is not facing only the sentence pronounced by the Court, she is also facing the pronounced sentence plus the administrative custody that follows because of her removal. And, importantly, Ms. Güven's agreement to this additional consequence saves the Government substantial resources and further demonstrates her serious acceptance of responsibility for her conduct in this case.

**F. The Need to Avoid Unwarranted Sentencing Disparities Compels a Significantly Below-Guidelines Sentence.**

Section 3553(a)(6) directs the Court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). The comparison must be made to defendants with similar records and similar conduct in light of the individualized sentencing factors. See Gall, 552 U.S. at 54-55; Kimbrough v. United States, 552 U.S. at 107-08; United States v. Fernandez, 443 F.3d 19, 31-32 (2d Cir. 2006), abrogated by Rita v. United States, 551 U.S. 338 (2007). The Court must consider all of Ms. Güven's characteristics and circumstances (see supra Sections II and III.B-E.) and ensure her sentence is not materially different from those similarly situated to her. A substantially below-Guidelines sentence is appropriate to avoid treating Ms. Güven more harshly relative to more culpable defendants with higher loss amounts and relative to defendants who, unlike Ms. Güven, did not accept responsibility for their crimes.

In United States v. Hanratty, the defendant was a first-time offender that was convicted at trial of several charges, including wire fraud and bank fraud, with investor losses exceeding $8 million and a bank loss approaching $20 million. Sentencing Tr. at 10, United States v. Hanratty, No. 21 CR 172 (LJL) (S.D.N.Y. May 26, 2026). The defendant not only did not use the money for personal or lavish expenses but also he made efforts to repay his debts. Id at 59. The defendant received a sentence of a year and a day. Id. Notably, this sentence followed a trial conviction and involved larger alleged losses, yet the defendant only received a sentence of a year and a day.

In United States v. Bozzo, the defendant was a first-time offender who was involved in public-company reporting and audit-related misconduct, and had a loss enhancement based on the

range of $25 million to $65 million. See Sentencing Tr. at 6:4-7:4, 45:18-46:3, United States v. Bozzo, No. 23 Cr. 499 (AS) (S.D.N.Y. Aug. 26, 2024). The defendant faced a 60-month Guidelines range but was sentenced to 12 months of imprisonment. Id. at 43:18-48:16. By contrast, Ms. Güven's offense involved a private startup, significantly less money, and a lower stipulated Guidelines range. These differences support a sentence below the sentence that defendant received.

In United States v. Borges, the defendant was a noncitizen who pleaded guilty to a single investment-adviser fraud count, faced a stipulated Guidelines range of 46 to 57 months, and additional significant immigration consequences. Sentencing Tr. at 2, United States v. Borges, No. 24 CR 253 (LGS) (S.D.N.Y. Nov. 14, 2025). The defendant was sentenced to 14 months of imprisonment. Id. at 29. The judge noted that the defendant's immigration status warranted a downward variance because she may be ineligible for certain programs available to U.S. citizens and would serve her sentence far away from her family. Id. at 28. Similarly, Ms. Güven faces significant immigration consequences that are worthy of a downward variance. And, Ms. Güven's starting Guidelines range is lower than the defendant's in Borges, therefore supporting an even lower sentence.

While the Court must avoid unwarranted disparities with others who are more similarly situated, it must also not create unjustifiable similarities with others who are far more culpable. For example, Trevor Milton and Charlie Javice, who were both charged with securities fraud and other crimes, whose conduct was far more egregious, and who were convicted by a jury after trial and never accepted responsibility for their crimes, received significantly below Guidelines sentences. Mr. Milton's Guidelines range was 210 to 262 months of imprisonment and he received 48 months. Ms. Javice's Guidelines was 144 months of imprisonment and she received 85 months. Ms. Güven's request of a sentence that reflects leniency is consistent with the range of sentences imposed in comparable financial-fraud cases when courts looked past the mechanical loss table and instead focus on culpability, acceptance, victim profile, and collateral consequences.

## IV. Conclusion

For the reasons set forth above, we respectfully request that the Court impose a substantially below-Guidelines sentence.

Respectfully submitted,

*/s/* Danielle Sassoon______
Danielle Sassoon
*Clement & Murphy, PLLC*
767 Fifth Avenue, 15 Fl
New York, New York 10153
(202) 742-8900

/s/ Andrea Griswold_______
Andrea Griswold
Sydney Rosenblum
*Skadden, Arps, Slate, Meagher & Flom LLP*
One Manhattan West
New York, New York 10001
(212) 735-2426

*/s/* Scott Hartman______
Scott Hartman
*Quinn Emanuel Urquhart & Sullivan, LLP*
295 Fifth Avenue
New York, New York 10016
(212) 849-7083

cc: Alexandra Rothman
Allison Nichols
Assistant United States Attorneys (by ECF)