UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

GÖKÇE GÜVEN

Defendant.

1:25-cr-00592-LAK

# SENTENCING MEMORANDUM EXHIBITS

**United States v. Gökçe Güven, 1:25-cr-00592-LAK**

**Exhibit List**

| Exhibit No. | Citation |
|---|---|
| **Exhibit 1** | Letter of Gökçe Güven |
| **Exhibit 2** | Excerpt of Government Disclosure Letter (Feb. 20, 2026) |
| **Exhibit 3** | U.S. Sentencing Comm'n, Interactive Data Analyzer, Sentence Imposed Relative to Guideline (§ 2B1.1, S.D.N.Y., FY 2025) |
| **Exhibit 4** | Fed. Bureau of Prisons, Program Statement P5100.08, Inmate Security Designation and Custody Classification, (Sept. 12, 2006) (as amended by Change Notice 5100.08, CN-3 (May 6, 2026)) |
| **Exhibit 5** | Fed. Bureau of Prisons, Program Statement P5270.09, Inmate Discipline Program (July 8, 2011) |
| **Exhibit 6** | Off. of Rsch. & Evaluation, Fed. Bureau of Prisons, Serious Assaults on Inmates: Guilty Findings Recorded in Chronological Disciplinary Records (Nov. 2021 to Oct. 2025) |
| **Exhibit 7** | BOP Change Notice No. 5410.01 CN-1, First Step Act of 2018—Time Credits: Procedures for Implementation of 18 U.S.C. § 3632(d)(4) (Feb. 6, 2023) |
| **Exhibit 8** | Off. of Inspector Gen., U.S. Dep't of Just., Review of the Institutional Hearing and Removal Program Expansion for Federal Inmates, Report No. 21-123 (Sept. 2021) |
| **Exhibit 9** | U.S. Sentencing Comm'n, Primer on Loss Calculation Under § 2B1.1 (2025) |
| **Exhibit 10** | Letter from IIE |
| **Exhibit 11** | Kalder and Luumis Term Sheet |
| **Exhibit 12** | Affidavit of Chelsea Jia |
| **Exhibit 13** | Mathew S. Wood et al., Fake It 'Til You Make It: Hazards of a Cultural Norm in Entrepreneurship, 65 Bus. Horizons 681, 682, 694 (2022) |
| **Exhibit 14** | Donald Palmer & Tim Weiss, The Unique Vulnerabilities of Entrepreneurial Ventures to Misconduct, in 81 Research in the Sociology of Organizations (2022) |
| **Exhibit 15** | Tim Weiss & Nevena Radoynovska, Criminal Deception in Silicon Valley, 37 Organization Science 1669 (2026) |
| **Exhibit 16** | Letter of Melis Abacioğlu |

| | |
|---|---|
| **Exhibit 17** | Letter of Birsen Bayboğan |
| **Exhibit 18** | Letter of Fadime Bayboğan |
| **Exhibit 19** | Letter of Razi Canikligil |
| **Exhibit 20** | Letter of Doruk Cinar |
| **Exhibit 21** | Letter of Tutku Cinkilic |
| **Exhibit 22** | Letter of Ali Riza Dogan |
| **Exhibit 23** | Letter of Utku Dördüncü |
| **Exhibit 24** | Letter of Can Gizer |
| **Exhibit 25** | Letter of Süleyman Güneş |
| **Exhibit 26** | Letter of Nazli Gungor |
| **Exhibit 27** | Letter of Gonca Güven |
| **Exhibit 28** | Letter of Kabiru Haruna |
| **Exhibit 29** | Letter of Frazier Horn |
| **Exhibit 30** | Letter of Defne Kayalar |
| **Exhibit 31** | Letter of Alpan Keskin |
| **Exhibit 32** | Letter of Harsha Konreddy |
| **Exhibit 33** | Letter of Pavan Krishnamurthy |
| **Exhibit 34** | Letter of Filip Lintner |
| **Exhibit 35** | Letter of Dr. Mihriban Özcan |
| **Exhibit 36** | Letter of Şakir Özgün |
| **Exhibit 37** | Letter of Jack Solomon |
| **Exhibit 38** | Letter of Amie Sun |
| **Exhibit 39** | Letter to Probation Officer from Dr. Ismail Ünal |

| | |
|---|---|
| **Exhibit 40** | Letter of Anika Valenzuela |
| **Exhibit 41** | Letter of Alyssa Varadhan |
| **Exhibit 42** | Letter of Pryce Yebesi |
| **Exhibit 43** | Letter of Tansu Yegen |
| **Exhibit 44** | Letter of Ashley Zangrillo |

# Exhibit 1

The Honorable Lewis A. Kaplan
United States District Judge
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street, New York, NY 10007

Dear Judge Kaplan,

We have passed each other many times in that courtroom, and in all those months I never once got to speak to you. That is how this process works. The lawyers talk, to each other and to you, and everything that passes through them gets stripped down into law, into counts and exhibits, and moves further and further away from who I am and what my story actually is. After eleven months, this letter is the first time I get to voice, in my own words, who I really am. I am grateful for the chance, and I ask you to read this as if we were finally sitting across from each other, because I come to you with nothing left but what is true.

I stand before you having pleaded guilty to offering fraud. I fully accept responsibility for what I did, I am sorry to the people I hurt, and I am grateful for the opportunity to address this court.

I am writing to you, but you now represent more to me than a judge. You represent everything I came to this country for at eighteen. I grew up on the promise that in America it does not matter who you are or where you are from; you can become whoever you are willing to work to be. I believed that promise completely, and I woke up every morning in Berkeley and built, from scratch, the Gökçe who stands in front of you today. And you, Your Honor, represent the other half of that same promise, the half I understood too late: that this country's openness works only because its rules are real, and its courts mean what they say. I am writing to my future, and I am writing to explain.

Now let me tell you what I put at risk, so you know the size of what I broke.

I set out on this journey as a girl raised by her country's schools and by two hardworking, solitary women: my mother and grandmother. In 2013, in Turkey's national high school placement exam, I ranked first with a perfect score among a million students. From Adana I was admitted to Robert College as a boarding student; I graduated with honors, and through my research I represented my country at Stanford and MIT. I was admitted to UC Berkeley, and for four years I studied while working at technology companies to cover my expenses.

I want to say this openly, because I know other impressions may have been created: mine is not a story of wealth or privilege. I got here on scholarships and on paychecks I earned during the school year, and I loved earning them. That pressure taught me more than any classroom did, because I had to work harder than everyone around me just to stay in the room. I won the Adobe Design Scholarship as the only Turk to receive it. I joined OpenSea as an intern in its early days, and as it grew from zero to billions in value, I grew and matured inside that journey. I earned my way into America's most selective entrepreneurship programs: Kleiner Perkins, 8VC, Accel, and more. At 22, I founded my own company, Kalder, entirely on my own. A young Turkish woman, in Silicon Valley, with no one behind her. Kalder raised around ten million dollars over its rounds from leading American and Turkish investors and worked with top firms. My sister ranked 250th in Turkey's university entrance exam. We are, in short, a family that deeply loves to work and to build. I never did this work for money. Coding my product late at night, my dream was to see customers' eyes light up and hear them say, "This is exactly what I needed." My story is the story of three generations of Turkish women's labor, stretching from a state hospital in Adana to New York.

I want you to know how I ran Kalder, because it is the same person who now stands before you. Over four years, Kalder pivoted from crypto to card-linked rewards, and surviving that is an achievement in itself: we iterated, lost products, lost customers, rebuilt, and survived anyway, because we did not quit. In the darkest early days, the whole company lived off a fifty-thousand-dollar grant for six months. I lived, and still live, in a studio with my sister. I took one of the lowest salaries at Kalder at all times and never sold a single share of my own stock in a secondary, even when I had the chance, because I was not there to cash out. I had the power to pay myself more, to hire lavishly, to spend on appearances, and instead I kept us frugal, a small team in a coworking space because we were there for the long run: to build a world where you swipe your card and earn your favorite rewards every day.

I have been fighting this for nearly a year now, and the real suffering has come from an internal moral awakening. I lost my company. I worked six days a week, nine to nine, and I loved every second of it. I loved designing the next map feature so people could see their favorite coffee shops. I loved ideating and iterating with Pavan, Nazlı, and Anika, the in-between office talks, the late-night debugging. I even loved the Twitter DMs from users saying "can you add this." When I die, I want my tombstone to read: "The things she built and the things she wrote changed millions of people's lives, silently and simply, every day, and still do."

This year I lost everything: my company, friends, reputation. [redacted] Judge, and I have to tell you I woke up in the night screaming while my mom and sister held me. But this experience has also been cathartic. I was an ambitious person, very ambitious. I did not take care of my family and friends. I just worked, focused on the outcome, and was ready to fight anything and anyone to win.

I pleaded guilty to offering fraud. Between 2024 and 2025, as the founder and chief executive of Kalder, Inc., a technology company headquartered in New York, I raised seed round investment for Kalder. In some of those calls and emails, I made statements about Kalder's annual recurring revenue, its actual revenue, and the status of certain brand partnerships that I knew, at the time I made them, were not accurate. I will not soften that sentence. I said things that were not true to people who trusted me. I am deeply sorry, and I have had a year to sit with exactly what that means.

Sitting here today, I still cannot believe I am the person writing that paragraph. I have said it out loud to myself, alone in my studio, just to hear it: I pleaded guilty to fraud. How did I get here? How did the girl who ranked first among a million students, who took one of the lowest salaries at her own company, who never sold her own shares, end up saying things that were not accurate?

Let me try to explain the world I was formed in, because I do not think it is a world most people ever see from the inside. In early-stage fundraising, there are no audited financials and often barely a product. A seed-stage company is often just months old. What investors are buying is a vision, a big addressable market, a story about the future, and what the ecosystem rewards, more than anything else, is momentum. The entire vocabulary of the tech and Silicon Valley world is spoken in the future tense delivered as the present tense. Founders pitch what the company will be as if it already is. The folklore every founder is raised on says it directly, and I heard these words from my own mentors and peers: fake it till you make it. Move fast and ask for forgiveness later. Act as if. Go big or go home. I worked in venture capital before and while I built Kalder, and I watched founders celebrated, funded, and put on magazine covers for their audacity. In the rooms I was in, the most selective programs in America, the advice was never be careful, be precise, be conservative. The advice was: bigger. Tell a bigger story. Show more traction. You are not selling what is, you are selling what will be. Say it with conviction and you will raise, and if you raise, you will make it true.

Now put a young girl in her early twenties inside that world. I was starry-eyed. I had made it from Adana into rooms with people I had only read about, and I could not believe I was allowed to be there. I was eager to prove myself, eager to soak up every piece of feedback, dazzled by the success around me and desperate to deserve my place in it… And I was alone in a way I did not understand at the time. I had no co-founder to check me, no parents in the industry to call at midnight, no adult in the room whose job was to pull me aside and say slow down, this is the line. I was the youngest person in almost every room I entered, absorbing the messages of that community with no filter, because that community was the only family I had in this country. And underneath all the encouragement there was a second message, quieter and heavier, that every founder feels in their chest: if the momentum stops, everything stops. Your team's jobs. Your investors' trust. Your one chance. I owed it to everyone to make this a success, whatever it took. People believed in me, and I had to make it work for them.

Here is what I have understood, slowly and painfully, over these eleven months. The line moved a little at a time. Projections became expectations. Expectations became statements. The future tense collapsed into the present tense. And at some point I said things about our annual recurring revenue, our actual revenue, and our brand partnerships that were not accurate, and I knew they were not accurate, and I said them anyway. I cut corners in the names of other people for my visa application for fear of losing the momentum, losing my place in this country. I slipped at such a pace that I did not feel myself slipping. Only when this process stopped me, when I finally stood still and read my own words back with eleven months of distance, did I see it plainly for what it was. I was shocked at the person I found there. I am still shocked.

I am telling you all of this to explain, not to excuse, and I want to be very careful with the difference, because it matters to me that you see I know the difference. The culture is real. Its incentives are wrong, and I believe they have to be fixed, because I will not be the last starry-eyed kid who loses her way. But thousands of founders sit in those same rooms, hear that same advice, feel that same pressure, and do not say things that are untrue. I did. The culture handed me the temptation. It did not make the statements. I made them.

There is one more thing I need you to know about those statements, and I offer it carefully, because I am not quarreling with my plea. I know how these cases usually end: with money missing, with someone's lifestyle built on someone else's trust. That was never my objective, as the facts show. No salary beyond one of the lowest in my own company. No secondary sale. No house, no car, no lifestyle. And a company bank account where more than $6 million of the $6.7 million my seed investors trusted me with still sits, guarded dollar by dollar through a year and a half of daily decisions not to spend it. Every day we could have hired more, spent more, burned more. Instead we chose to stay frugal, extend our runway, and survive long enough to deliver the mission we had set out for. We sacrificed our hours and our comfort to protect that money, guarding every dollar as if it were a promise, because it was. My untrue statements still hurt the people who believed them; I know that, and I carry it. But I say all of this for one reason: everything I did, right and wrong, was in service of trying to make my company a success. Not only for myself, but also for my investors, my customers, and my team.

Let me say again: The wrong was mine, and it was real.

And when it became clear what I owed, I did not wait to be told. For months now, the only thing I have been focused on is turning Kalder into recovery for the people who trusted me. I ran the sale of the company for that single purpose. I found the acquirer, negotiated the deal, and am supporting it through the transition so that every dollar the sale produces, together with the more than $6 million I guarded in the bank, goes toward making my investors whole. I will walk away from the sale of my own company, the work of my twenties, with nothing, and I chose that, because their

recovery matters more than anything I could keep. Selling Kalder is the biggest loss of my life. I will see this through to the last dollar, however long it takes, whatever it asks of me.

And to my investors, if they ever read this: I am sorry. You did not just give me money. You gave me your judgment, your standing with your own partners, and your belief that a young woman from Adana was worth backing. I spent your trust more carelessly than I ever spent your dollars, and I know which one is harder to return. Making you whole financially is underway, and I will finish it. Earning back the rest will take the remainder of my life, and I accept that too.

I was young, I was building fast, and I was alone, but none of that is an excuse; the decisions were mine, and they are mine to answer for. People trusted me. My investors, my team, my family. Whatever I believed I was building toward, they deserved better from me, and the consequences of my choices have fallen on them as well as on me. I do not ask you to see me as someone this happened to. I ask you to see me as someone who understands what she did, and who intends to spend the rest of her life proving it will never happen again.

I also want to tell you plainly what this has already cost, not as a complaint, but so you can weigh what has already happened to me before deciding what happens next. I lost my company. I lost my reputation in the industry I gave my twenties to. My social circle is a fraction of what it was. Some people now look at me the way you look at someone who is already gone, and I have learned what it feels like to be treated as contaminated. I see it already in small ways: introductions that stopped, replies that never came, rooms I am no longer invited into. I had to be ten times better than everyone around me to make it here from Adana. Now, in everything I do for the rest of my life, I will have to be ten times better than that, with fewer chances and smaller doors, and I accept it. My grandmother, who helped raise me and who depends on me for her care, is fighting cancer, and I have not been able to go to her in eleven months. None of this was done to me. It flows from my own conduct, and I know it. I say it only so you know: this year has already been a sentence of its own.

I want to tell you about the night I was arrested. It was Thanksgiving. I landed around 1 a.m., tired and full of joy to be home. By 5 a.m. I was in MDC and told I would not be leaving. I only knew my mother's and sister's Turkish numbers by heart, so I could not call anyone. I did not eat. Somewhere, the mantı and beans my mother and sister had promised me were going cold. On the drive between the airports I stared out the window at a view I had taken for granted my whole adult life, not knowing when I would see it again. Then I was granted bail.

But I have to tell you what surprised me in MDC. The people in the beds, not the doors. The women who made my bed when I arrived. Who gave me their blanket when I did not have one. Who shared their last coffee beans. I used to think, the way most people think, that there is a category of "bad people." I do not anymore. I met people there with so much to give, and I tell you this because I worry they are only ever seen at their worst, and I got to see them at their best. I hope in time people will see that in me too.

I am blessed in one more way, and I want you to know about it because of what it says. My lawyers, Danielle Sassoon, Scott Hartman, and Andrea Griswold, spent years of their careers leading the prosecution of cases exactly like mine in the Southern District of New York. They know better than anyone in this country what fraud looks like and who fraudsters are. They have seen me at my absolute worst, in the worst hours of my life. And knowing I could not pay them, they took my case anyway, and they have led it for a year for free, because they were not willing to let go of the future of a young woman. It is because of them that I have been able to spend these months at home, rebuilding, instead of waiting in MDC. I can call them friends, and in a way parents, when my own parents could not be here. I do not mention them to borrow their credibility. I mention them

because people who spent their lives holding fraudsters accountable looked at me and decided my future was worth their time, and I intend to spend that future proving them right.

This year has also quieted the demands I used to make of myself. I no longer live in 90-day milestones. I do not punish myself for sleeping in. I pray more. I serve my community more. I look around when I walk, and I realize I never did before. I spend an hour a day with myself now, no music, no noise, asking who I really am and what I want to be. My goals are still there, but for the first time I am in tune with them, and the journey has begun to matter more to me than the outcome. These eleven months taught me that life itself is the gift, not the outcomes, and that is how I intend to live. And they showed me what I am most grateful for: the hunger to live and to create; the closeness of my family, our laughter and giggles, a unit I will never be apart from; my closest friends, who never doubted me for a second; my team, whom I still see every day; my health; and my 27-year-old, overexcited, playful mind.

And I did not retreat into my suffering. I turned it into work. My team from Kalder, whom I call my second family, stayed with me after the acquisition, when I could not pay them a dollar, and we started ideating and building together. Ask anyone in this city to work a single month without pay and they will say no. My teammates have done it for eleven months, willingly, beside me, and I have done it with them. That is not something you can buy; it is something you earn over years of showing people who you are. I built a life around pressure before, by choice, and it broke me. I have dismantled that life, and it stays dismantled. One of my close friends is a general contractor, and I started building AI tools for the construction field: daily log and change order collection, and now a voice and text agent that calls hundreds of contractors and subcontractors every day to automate their paperwork so builders can do what they love most, which is build. I did this with no prior construction knowledge, dedicating the past four months to learning the industry from zero. This time I am building it bootstrapped, funded only by customers and shaped only by their needs. And I want you to know that this is not an accident of circumstance; it is a decision. General contractors and subcontractors, here and abroad, now depend on these tools every single day, and when something breaks, I am the one who answers them, the same day. I cannot imagine a morning where a contractor's tools fail and I am not there to fix them. I also give out food every Wednesday, and I journal every morning. I have never felt more like a functioning, contributing member of society than I do now, with no magazine covers and no press.

America is home. After that exam at fourteen, I chose Robert College, an American school, and began bridging Turkish and American worlds. My life, my friends, my relationships, my land are here. I still believe in the American dream, even now, especially now, because I have lived both halves of it: the half that let a girl from Adana build something from nothing, and the half that holds her accountable when she breaks its trust. I do not want to leave. I want to spend my years proving that the country's bet on people like me was right. Being barred from this country would take my home from me, and by the time I could return I would be in my forties. I carry that thought every day.

If you show me leniency, I do not want to offer you hopes. I want to offer you a plan for the next twelve months, and I will be accountable to every line of it.

In the first three months, I will finish the transition of Kalder to its acquirer, so that its customers land safely, my team keeps their jobs, and my investors recover everything that can be recovered. The recovery I owe my investors runs through my hands right now, and every day I am able to work is a day their money comes back faster. Every day after that, I will keep building my construction company the way I have built it these past four months: bootstrapped, growing only on customer revenue, answering the contractors and subcontractors who depend on it the same day they call. Every Wednesday, I will keep serving food in my community. Every morning, I will keep

journaling, and within the year I will finish the book I have been writing through this process. I will stand in front of rooms of young founders, at the same fellowships and programs that formed me, and tell them exactly where the line is and exactly how I crossed it, because no one is better positioned to stop the next starry-eyed founder than the one writing you this letter. And I will begin the groundwork for a scholarship at UC Berkeley for young immigrant entrepreneurial girls, so they have the community they deserve and never feel as alone as I did, and so my story reaches them as both a map and a warning.

Beyond that plan, here is the honest list of what I hope for, if you allow me. I want to go to Adana and snuggle between my mother and grandmother on the couch like I used to. I want to pick silly little fights with my older sister for wearing my necklace or changing our Friday plans. I want Latife teyze to cook gözleme while I wake up late to the scorching sun. I want to be there for my grandmother's next cancer check-in. I want her to braid my hair while I fall asleep in her lap. I want to stop missing family trips, and weddings, and I do not want to miss anything again.

And I will be honest with you: I am afraid. I am worried I will never see my grandmother again. I am worried about no longer providing for the people who need me. I am worried my mom and sister feel so hopeless they will not recover from this. I am worried nobody will work with me again, that nobody will love me again, that I will not have a partner, or children. I am scared of what is next and tired of what is past. But people sometimes look at me now the way you look at someone who is already gone, and I want them to know, and I want you to know, that I am not broken, that I have not lost hope, and that I intend to come out of this stronger, and better, and honest to the bone.

My mother still goes to her state hospital in Adana every morning, brings healing to her patients, and comes home at night to cry for her daughter. I am not powerful.

I have no one to lean on other than my work and my family, and I am asking you, Judge Kaplan, for something rare: a second chance.

The first chapters of my life were built out of nothing by women who did not give up, and I do not intend to be the first in my family who does. Whatever sentence you find just, I will carry it. I only ask you to think about what I can still contribute to America, to technology, and to this society, and to leave me the chance to do that, in this sentencing and beyond. Leave me a road back: to my work, to my family, and to years in which I can show, by what I build and how I live, that the young woman who will finally meet your eyes on October 29 deserves a second chance.

Respectfully,

Gökçe Güven

# Exhibit 2

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

February 20, 2026

**By Email**

Scott Hartman, Esq.
Quinn Emanuel Urquhart & Sullivan, LLP
Andrea Griswold, Esq.
Skadden, Arps, Slate, Meagher & Flom LLP
Danielle Sassoon, Esq.
Clement & Murphy, PLLC

Re: *United States v. Gökçe Güven*, 25 Cr. 592 (LAK)

Dear Counsel:

The Government voluntarily discloses the following excerpts from notes and/or reports of interviews conducted by the United States Attorney's Office, the U.S. Postal Inspection Service ("USPIS"), and/or the Federal Bureau of Investigation ("FBI"). The underlying notes and reports are not a verbatim transcription of witness statements or attorney proffers. These excerpts do not reflect the entirety of the notes and reports, which will be produced at or before trial with the Government's Jencks Act material. In disclosing this information, the Government is not waiving any work product protections or law enforcement privileges that might otherwise apply to the materials, nor is the Government conceding that this information constitutes material exculpatory information under *Brady v. Maryland* and its progeny. This letter and materials enclosed with it are designated Disclosure Material subject to the protective order entered in this case by the Court (the "Protective Order").

We will respond separately to your discovery demand letter of February 6, 2026.

Kalder Investors

1. An FBI report summarizing an interview with a representative of Alumni Ventures[1] ("Investor-1") on or about November 20, 2025 reflects that Investor-1 provided the following information during the interview, in substance and in part:

   - During the summer of 2025, Investor-1 had a call with another representative of Alumni Ventures ("Investor-2") and Chelsea Jia, Kalder's Chief Revenue Officer. Jia informed Alumni Ventures that an internal audit had revealed that Kalder's lifetime revenue was approximately $100,000.

---

[1] Alumni Ventures is represented by Elizabeth Skey of Cooley LLP.

- Shortly after that call, Investor-1 and Investor-2 had a call with Noah Doyle, a co-founder of another Kalder investor, Javelin Venture Partners. Doyle stated that the results from a forensic audit indicated that Kalder's true ARR was $220,000.

2. An FBI report summarizing an interview with Investor-2 of Alumni Ventures on or about January 12, 2026 reflects that Investor-2 provided the following information during the interview, in substance and in part:

   - During the summer of 2025, Doyle informed Alumni Ventures that an audit revealed that Kalder's financials were substantially overstated and that Kalder's lifetime revenue was between approximately $100,000 and $200,000.

3. An FBI report summarizing an interview with Investor-3 on or about December 8, 2025 reflects that Investor-3 provided the following information during the interview, in substance and in part:

   - Güven told Investor-3 prior to Investor-3's investment in mid-2024 that Güven had partnerships with companies including Starbucks, Sephora, and Nike. Investor-3 did not challenge these representations, nor review signed contracts.

4. A USPIS report summarizing an interview with a representative of Niche Capital ("Investor-4") on or about December 10, 2025 reflects that Investor-4 provided the following information during the interview, in substance and in part:

   - Niche is a seed stage investor and makes their investments based on how they view the founder. Investor-4 asks a lot of questions focused on getting to know the founder; where they went to school, and other background questions. Investor-4 likes to find out more about the founder than the company. The due diligence is marrying the person into the space/company they are starting.
   - At the time Niche invested, Kalder was less than a year old and Niche was not expecting financial statements at the time.
   - For this deal, Niche assumed the lead investor did the background on the founder and other verifications.

5. A USPIS report summarizing an interview with a representative of Gingerbread Capital[2] ("Investor-5") on or about December 11, 2025 reflects that Investor-5 provided the following information during the interview, in substance and in part:

   - To Investor-5, annual recurring revenue ("ARR") doesn't mean booked revenue. ARR is revenue that is committed to or about to be signed, a high probability.

---

[2] Gingerbread Capital is represented by Moe Fodeman, Esq., of Wilson Sonsini Goodrich & Rosati.

6. FBI notes summarizing an interview with a representative of Courtyard Ventures Fund I ("Investor-6")[3] on or about December 17, 2025 reflect that Investor-6 provided the following information during the interview, in substance and in part:

- Regarding the document with Bates number Courtyard-Ventures_P_00000004: Investor-6 received the document as part of diligence regarding a follow-on investment and had a lot of confusion and questions. Investor-6 highlighted discrepancies, including numbers that don't add up or make sense. Investor-6 invested an additional $25,000.

7. FBI notes summarizing an interview with a representative of Sequel ("Investor-7") on or about December 18, 2025 reflect that Investor-7 provided the following information during the interview, in substance and in part:

- Some investors confuse "pipeline," which is something that will convert, with ARR.

8. A USPIS report summarizing an interview with Noah Doyle of Javelin Venture Partners[4] on or about December 19, 2025 reflects that Doyle provided the following information during the interview, in substance and in part:

- Javelin has a standard checklist and asks for major customer agreements, lease, and financial documents. At the seed stage companies usually do not have much. Detailed financials are part of the due diligence request. Usually, financials are in the form of a model that may be over 2 to 5 years, and actuals are filled as they go.
- A lot of companies present ARR by multiplying their most recent month of revenue by 12 – this is an extrapolated run rate. Some companies will quote ARR based on contracts signed – this is an aggressive way to calculate ARR. The more common way is to base ARR on earned revenue.
- Regarding the document "Revenue Forecasting New" with Bates number Javelin_00000280: This model seemed a bit unrealistic, but it did underpin the belief that Kalder was a company that was positioned to scale rapidly, and Güven was a founder who thought that way. Güven was thinking big and was talking about big numbers happening in the relatively near future.
- As part of Javelin's due diligence, Doyle spoke to four customers, selected by Güven: Convie, Flamengo, Mile Heat, and Wanderlust. Convie said they had tested Kalder's product but did not roll it out yet.
- Regarding the email dated June 27, 2024 with Bates number Google_SW_P_00550026: There is a request for the last six months' historical full P&L – Kalder never provided this requested information.

---

[3] Investor-6 is represented by Daniel Barton, Esq., of Nolan Barton Olmos & Luciano, LLP.

[4] Javelin and Doyle are represented by Sagar Ravi, Esq., of McDermott Will & Schulte LLP.

9. FBI notes summarizing an interview with a representative of Emergence Capital ("Investor-8") on or about December 24, 2025 reflect that Investor-8 provided the following information during the interview, in substance and in part:

- Emergence made a pre-revenue and pre-product investment. This was more of an investment in Güven. Investor-8 mentors young women in tech and was impressed by Güven.
- Many founders of companies don't report ARR properly. Some founders include pilot programs in this ARR figure, which shouldn't be included.
- Güven was naïve about how to sell the product.
- When Güven raised money, it was the peak of the bubble of Web3 – a lot of companies from this time eventually failed.
- Güven was overly optimistic, and Investor-8 pushed her on that, as a mentor.
- Güven would get very excited after a conversation with a possible partner, thinking everything was going to work out.

10. A USPIS report summarizing an interview with a representative of Courtyard Ventures Fund II ("Investor-9") on or about January 5, 2026 reflects that Investor-9 provided the following information during the interview, in substance and in part:

- Regarding documents with Bates numbers Google_SW_P_00271449, -00271631, and -00273571: Investor-9 does not recall downloading documents titled "Financials_Kalder" "ARR & Pipeline" or "Example Contract," and the files are not on his computer. Some data rooms do not allow you to download files.

11. FBI notes summarizing an interview with a representative of BridgeX Ventures Fund ("Investor-10")[5] on or about January 5, 2026 reflect that Investor-10 provided the following information during the interview, in substance and in part:

- Investor-10 does not recall receiving historical financials.
- Investor-10 wanted to be part of Kalder's journey.

12. FBI notes summarizing an interview with an investor ("Investor-11")[6] on or about February 3, 2026 reflect that Investor-11 provided the following information during the interview, in substance and in part:

- Investor-11 received an outreach via LinkedIn from a Kalder employee, Christian, during the summer of 2025, related to financial issues at the company and concerning Güven. Investor-11 felt that he was not the right person for Christian to be speaking to, as Kalder had a board of directors and institutional investors. Investor-11 felt bad for other investors, in particular his contact at Javelin, but this

[5] Investor-10 is represented by Daniel Barton, Esq., of Nolan Barton Olmos & Luciano, LLP.

[6] Investor-11 is represented by Miles Ehrlich, Esq. of Ehrlich & Craig LLP.

was not something major Investor-11 needed to deal with. Investor-11 had invested $25,000 in Kalder.

13. An FBI report summarizing an interview with a representative of Formus Capital ("Investor-12")[7] on or about February 16, 2026 reflects that Investor-12 provided the following information during the interview, in substance and in part:

- When vetting an investment, Formus considered multiple factors including the founder of the company, market traction, and lead investors. Güven being Turkish was a positive for Investor-12. In February 2023, Formus made its first investment in Kalder.

[redacted]

# Exhibit 3

**Sentence Imposed Relative to Guideline Range**

| | 2015 | | 2016 | | 2017 | | 2018 | | 2019 | | 2020 | | 2021 | | 2022 | | 2023 | | 2024 | | 2025 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Sentence Range** | **N** | **%** | **N** | **%** | **N** | **%** | **N** | **%** | **N** | **%** | **N** | **%** | **N** | **%** | **N** | **%** | **N** | **%** | **N** | **%** | **N** | **%** |
| **Grand Total** | **30** | **100.0%** | **13** | **100.0%** | **13** | **100.0%** | **12** | **100.0%** | **22** | **100.0%** | **23** | **100.0%** | **19** | **100.0%** | **23** | **100.0%** | **17** | **100.0%** | **19** | **100.0%** | **30** | **100.0%** |
| Within Range | 2 | 6.7% | 2 | 15.4% | 1 | 7.7% | 4 | 33.3% | 2 | 9.1% | 7 | 30.4% | - | | 3 | 13.0% | 1 | 5.9% | 4 | 21.1% | 2 | 6.7% |
| Upward Departure | - | | - | | - | | 1 | 8.3% | - | | - | | - | | - | | - | | - | | - | |
| §5K1.1 Substantial Assistance | 12 | 40.0% | - | | - | | - | | 9 | 40.9% | - | | - | | - | | - | | - | | 10 | 33.3% |
| Non-Govt Downward Departure | - | | 1 | 7.7% | - | | - | | - | | 1 | 4.3% | - | | 1 | 4.3% | - | | - | | 1 | 3.3% |
| Upward Variance | 1 | 3.3% | - | | 2 | 15.4% | - | | - | | 1 | 4.3% | - | | - | | - | | - | | 1 | 3.3% |
| Downward Variance Govt Motion | - | | - | | - | | - | | 1 | 4.5% | 1 | 4.3% | 1 | 5.3% | 1 | 4.3% | 3 | 17.6% | 1 | 5.3% | 5 | 16.7% |
| Non-Govt Downward Variance | 15 | 50.0% | 10 | 76.9% | 10 | 76.9% | 7 | 58.3% | 10 | 45.5% | 13 | 56.5% | 18 | 94.7% | 18 | 78.3% | 13 | 76.5% | 14 | 73.7% | 11 | 36.7% |

**FILTER:**
Fiscal Year: 2025,2024,2023,2022,2021; Crime Type: All; Guideline: §2B1.1 Circuit: All; State: All; District: New York, Southern; Race: All; Gender: All; Age: All; Citizenship: All; Education: All; Crime Type: All; Guideline: §2B1.1; Drug Type: All; Criminal History: I; Career Offender Status: All

**SOURCE:** This was produced using the U.S. Sentencing Commission's Interactive Data Analyzer (IDA) (https://ida.ussc.gov).

# Exhibit 4

# U.S. DEPARTMENT OF JUSTICE
## Federal Bureau of Prisons

## CHANGE NOTICE
# Inmate Security Designation and Custody Classification

| | |
|---|---|
| Approved by | William K. Marshall III<br>Director, Federal Bureau of Prisons |
| DPI | CPD |
| Number | 5100.08, CN-3 |
| Date | May 6, 2026 |

This Change Notice (CN) implements a change to Program Statement 5100.08, Inmate Security Designation and Custody Classification, dated September 12, 2006. Change notice updates Section 1, Purpose and Scope. The new language is highlighted. The deleted text has a ~~Strikethrough~~.

1. **PURPOSE AND SCOPE.** This Program Statement provides policy and procedure regarding the Bureau of Prisons inmate classification system. The classification of inmates is necessary to place each inmate in the most appropriate security level institution that also meets their program needs and is consistent with the Bureau's mission to protect society.

   ~~The Bureau's classification, designation and redesignation procedures are consistent with the statutory authority contained in 18 U.S.C. § 3621(b).~~ Designation and redesignation of an inmate's place of imprisonment shall be consistent with the statutory authority contained in 18 U.S.C. § 3621(b), which requires the Bureau of Prisons to designate an inmate's place of imprisonment subject to consideration of several factors.

   28 U.S.C. § 509 provides, "[a]ll functions of other officers of the Department of Justice and all functions of agencies and employees of the Department of Justice are vested in the Attorney General." In certain circumstances, the Attorney General may exercise authority to designate or redesignate the place of a prisoner's imprisonment, consistent with the requirements of 18 U.S.C. § 3621(b).

   Notice of the Attorney General's intention to exercise vested authority to designate or redesignate the place of a prisoner's imprisonment shall be provided to the Bureau of Prisons as soon as practicable. Absent such notification, procedures for making classification, designation and redesignation decisions as described herein should be followed by the Bureau of Prisons.

   Where authority to determine the place of a prisoner's imprisonment is invoked by the Attorney General, the Bureau may provide relevant information in order to facilitate the determination. The Bureau may also facilitate communication or correspondence between the inmate and the Office of the Attorney General.

All classification, designation and redesignation decisions are made without favoritism given to an inmate's social or economic status.

**U.S. Department of Justice**
Federal Bureau of Prisons

P R O G R A M   S T A T E M E N T

| | |
|---|---|
| OPI | CPD/DSC |
| NUMBER | 5100.08, CN-2 |
| DATE | March 6, 2025 |

# Inmate Security Designation and Custody Classification

*/s/*
*Approved*: Kathleen Toomey
Associate Deputy Director, Federal Bureau of Prisons

This Change Notice (CN) implements the following changes to Program Statement 5321.09, **Unit Management and Inmate Program Review**, dated April 8, 2024. This CN updates language to ensure consistency with Executive Orders issued by the Executive Office of the President of the United States. Additions are marked with a highlight.

**CHAPTER 2: DEFINITIONS**

**FEMALE.** A person belonging, at conception, to the sex that produces the large reproductive cell.

**MALE.** A person belonging, at conception, to the sex that produces the small reproductive cell.

**MAN/MEN.** Adult and juvenile human males.

**SEX.** An individual's immutable biological classification as either male or female.

**WOMAN/WOMEN.** Adult and juvenile human females.

**U.S. Department of Justice**
Federal Bureau of Prisons

CHANGE NOTICE
OPI: CPD/CPB
NUMBER: 5100.08, CN-1
DATE: September 4, 2019

# Inmate Security Designation and Custody Classification

/s/
*Approved*: Kathleen Hawk Sawyer
Director, Federal Bureau of Prisons

This Change Notice (CN) implements the following changes to Program Statement 5100.08, **Inmate Security Designation and Custody Classification**, dated September 12, 2006, in light of the FIRST STEP Act.

The highlighted text was added to **INTRODUCTION**:

The Bureau of Prisons shall designate the place of the prisoner's imprisonment, and shall, subject to bed availability, the prisoner's security designation, the prisoner's programmatic needs, the prisoner's mental and medical health needs, any request made by the prisoner related to faith-based needs, recommendations of the sentencing court, and other security concerns of the Bureau of Prisons, place the prisoner in a facility as close as practicable to the prisoner's primary residence, and to the extent practicable, in a facility within 500 driving miles of that residence.

The highlighted text was added and the deleted text is struck through in **Chapter 5, MANAGEMENT VARIABLES AND PUBLIC SAFETY FACTORS**:

D **Release Residence**. The Bureau of Prisons attempts to place each inmate in an institution that is reasonably close to the anticipated release area. ~~Ordinarily, placement within 500 miles of the release area is to be considered reasonable, regardless of whether there may be an institution closer to the inmate's release~~ area. To the extent practicable, placement to the closest facility within 500 driving miles of the release area will be

considered reasonable, subject to bed availability, the prisoner's security designation, the prisoner's programmatic needs, the prisoner's mental and medical health needs, any request made by theprisoner related to faith-based needs, recommendations of the sentencing court, and other security concerns of the Bureau of Prisons. This MGTV may also apply to inmates who are within 36 months of release.

E Following are example situations: facility activation; population pressures affecting available appropriate-level bed space within 500 driving miles of the inmate's anticipated release residence; gang/security concerns.

Additionally highlighted text was added and the deleted text is struck through in **Chapter 7, Institution Classification Transfers.**

2. **NEARER RELEASE TRANSFERS (Code 313)**. Once the inmate has been transferred within 500 driving miles of his or her release residence, ~~no further referrals will be made for nearer release transfer consideration.~~ further referrals can be considered for nearer release transfer consideration subject to bed availability, the prisoner's security designation, the prisoner's programmatic needs, the prisoner's mental and medical health needs, any request made by the prisoner related to faith-based needs, recommendations of the sentencing court, and other security concerns of the Bureau of Prisons.

U.S. Department of Justice
Federal Bureau of Prisons

# Program Statement

**OPI:** CPD/CPB
**NUMBER:** P5100.08
**DATE:** 9/12/2006
**SUBJECT:** Inmate Security Designation and Custody Classification

1. **PURPOSE AND SCOPE.** This Program Statement provides policy and procedure regarding the Bureau of Prisons inmate classification system. The classification of inmates is necessary to place each inmate in the most appropriate security level institution that also meets their program needs and is consistent with the Bureau's mission to protect society.

~~The Bureau's classification, designation and redesignation procedures are consistent with the statutory authority contained in 18 U.S.C. § 3621(b).~~ Designation and redesignation of an inmate's place of imprisonment shall be consistent with the statutory authority contained in 18 U.S.C. § 3621(b), which requires the Bureau of Prisons to designate an inmate's place of imprisonment subject to consideration of several factors.

28 U.S.C. § 509 provides, "[a]ll functions of other officers of the Department of Justice and all functions of agencies and employees of the Department of Justice are vested in the Attorney General." In certain circumstances, the Attorney General may exercise authority to designate or redesignate the place of a prisoner's imprisonment, consistent with the requirements of 18 U.S.C. § 3621(b).

Notice of the Attorney General's intention to exercise vested authority to designate or redesignate the place of a prisoner's imprisonment shall be provided to the Bureau of Prisons as soon as practicable. Absent such notification, procedures for making classification, designation and redesignation decisions as described herein should be followed by the Bureau of Prisons.

Where authority to determine the place of a prisoner's imprisonment is invoked by the Attorney General, the Bureau may provide relevant information in order to facilitate the determination. The Bureau may also facilitate communication or correspondence between the inmate and the Office of the Attorney General.

All classification, designation and redesignation decisions are made without favoritism given to an inmate's social or economic status.

2. **PROGRAM OBJECTIVES.** The expected results of this Program Statement are:

a. Each inmate will be placed in a facility commensurate with their security and program needs through an objective and consistent system of classification which also allows staff to exercise their professional judgement; and,

b. Staff will systematically and objectively review an inmate's classification making the environment in which they are housed safer for both inmates and staff while protecting the public from undue risk.

3. **SUMMARY OF CHANGES.** This revision incorporates Executive Staff decisions 03-04-05 and 99-03-03, as well as other procedural changes such as the movement of most designation/redesignation functions (04-08-17) to the Designation and Sentence Computation Center (DSCC), Grand Prairie, Texas.

a. The scoring item "Type of Prior Commitment" has been replaced with "Criminal History Score." (Chapter 4, Page 8 and Chapter 6, Page 5)

b. A new scoring item for inmate "Age" has been added. (Chapter 4, Page 12 and Chapter 6, Page 8)

c. A new scoring item for "Education Level" has been added. (Chapter 4, Page 12 and Chapter 6, Page 8)

d. The "Drug/Alcohol Abuse" scoring item has been added to the BP-337 and has moved from Section C (Custody Scoring) of the BP-338 to Section B (Base Scoring) of the BP-338. (Chapter 4, Page 13 and Chapter 6, Page 9)

e. The "Mental/Psychological Stability" scoring item has been discontinued.

f. The "Responsibility Demonstrated" scoring item has been replaced with "Living Skills" and "Program Participation." (Chapter 6, Page 10)

g. Instructions for scoring the "Family/Community Ties" scoring item have been clarified. (Chapter 6, Page 13)

h. The floor for the Violent Behavior PSF has been reduced from High to Low Security. (Chapter 5, Page 9)

i. New cutpoints and a new Custody Variance Table have been developed. (Chapter 1, Page 2 and Chapter 6, Page 15)

j. An expiration date for the Greater Security Management Variable has been added. (Chapter 5, Page 5)

k. The criteria for the Deportable Alien PSF has been clarified. (Chapter 5, Page 9)

l. Text has been added that formalizes the Bureau's past and current practice of continually assessing the effectiveness of its inmate classification process. (Program Statement Section 6)

m. Text has been added that encourages DSCC staff to consider using a Management Variable when designating inmates where age is largely the contributing factor in the inmate's placement. (Chapter 5, Page 5)

n. Text has been revised that requires the entry of supporting information in the BP-337 "REMARKS SECTION" when there is Pre-Sentence Investigation Report information relevant to that scoring item. (Chapter 4, Page 13)

o. The DSCC Administrator will ensure that designation/ redesignation decisions are applied consistently on a bureau- wide basis.(Chapter 4, Page 14)

p. DSCC staff must contact the sentencing court if a Statement of Reasons is not received at the time a request for designation is made.(Chapter 3, Page 1)

q. Inmates who currently qualify for unescorted transfer may be transported by family members via POV from one camp to another camp. (Chapter 7, Page 8)

r. The appendices on Sentence Procedures, Institutions Missions and Parolable Institutions have been removed from the manual, but will be available on the CPB website.

s. The Offense Severity Scale, Definition of Roles involved in Drug Offenses and the Special Instructions appendices have been combined into one appendix.

t. All transfer requests under codes 309 - Disciplinary and 323 - Close Supervision will be directed to the Designation and Sentence Computation Center. "W REDES C" has been eliminated and "W REDES D" has been changed to "W REDES R" to reflect routine redesignations. (Chapter 7, Page 2)

u. The female versions of the BP-337 and BP-338 have been discontinued although certain policies and procedures specific to female offenders are maintained i.e. security levels, cutpoints, Public Safety Factors and Management Variables.

v. The "Release on Own Recognizance" scoring item has been discontinued. (Chapter 4, Page 5)

w. The description of Management Variable "U" has been revised to include all long-term detainees. It no longer applies solely to Mariel Cuban Detainees. (Chapter 5, Page 4)

x. The medical transfer code descriptions were revised to include "Level of Care" language.(Chapter 7, Pages 21-22)

y. The criteria for the Prison Disturbance PSF has been clarified.(Chapter 5, Page 10)

## 4. DIRECTIVES AFFECTED

### a. Directive Rescinded

P5100.07 Security Designation and Custody Classification Manual (9/3/99)

### b. Directives Referenced

P5070.10 Responses to Judicial Recommendations and U.S. Attorney Reports (6/30/97)
P5070.11 Study and Observation Report (12/31/97)
P5110.15 Notifications of Release to State and Local Law Enforcement Officials (8/30/00)
P5111.03 Mariel Cuban Detainees (10/25/99)
P5140.35 Transfer of a Prisoner to State Custody Prior to Release from the Federal Sentence (9/12/01)
P5141.02 Sex Offender Notification and Registration (12/14/98)
P5180.04 Central Inmate Monitoring System (8/16/96)
P5215.05 Youth Corrections Act (YCA), Inmates and Programs (3/17/99)
P5216.05 Juvenile Delinquents (9/1/99)
P5264.07 Telephone Regulations for Inmates (1/31/02)
P5270.07 Inmate Discipline and Special Housing Units (12/29/87)
P5280.08 Furloughs (2/4/98)
P5553.07 Escapes/Deaths Notifications (2/10/06)
P5800.13 Inmate Systems Management Manual (6/28/02)
P7310.04 Community Corrections Center (CCC) Utilization and Transfer Procedure (12/16/98)

## 5. STANDARDS REFERENCED

a. American Correctional Association 2nd Edition Standards for

Administration of Correctional Agencies: 2-CO-4B-01

b. American Correctional Association 4th Edition Standards for Adult Correctional Institutions: 4-4132, 4-4296, 4-4300, 4-4306, and 4-4444

c. American Correctional Association 4th Edition Performance- Based Standards for Adult Local Detention Facilities:
4- ALDF-1A-10, 4-ALDF-2A-31, and 4-ALDF-2A-37

6. **ACTION.** All inmate classification decisions and related actions will be made in accordance with the procedures in this Program Statement and are effective immediately. Implementation for each inmate shall occur in accordance with his or her next regularly scheduled custody review. Those cases that have a security level increase as a direct result of the initial implementation of this policy will not ordinarily be transferred to a higher security facility. Bureau institutions may submit lists of these inmates to the DSCC in lieu of a Request for Management Variable for application of an appropriate Management Variable.

In accordance with the procedures set forth in this manual, a Transfer Request/Application of Management Variable must be submitted to the DSCC for those cases that have a security level decrease, for transfer to a lesser security level facility or application of an appropriate Management Variable.

This Program Statement authorizes the continuation of the Bureau's Inmate Classification Workgroup under the direction of the Assistant Director, Correctional Programs Division or his/her designee. The Assistant Director (CPD) will select and replace workgroup members, on an as-needed basis, with subject matter experts in inmate classification and related disciplines who represent institutions, Regional Offices and the Central Office.

The Inmate Classification Workgroup or its subgroups will meet or video conference at least annually to assess the overall effectiveness of the inmate classification system and report as appropriate their findings and recommendations to the Director and the agency's Executive Staff. Consideration may be given to include institutional staff with experience at various security and custody levels.

/s/
Harley G. Lappin
Director

**TABLE OF CONTENTS**

Introduction . . . . . . . . . . . . . . . . . . . . . Chapter 1

Definitions . . . . . . . . . . . . . . . . . . . . . . Chapter 2

Security Designation Procedures for New Commitments . Chapter 3

Inmate Load and Security Designation Form, BP-337 . . Chapter 4

Management Variables and Public Safety Factors . . .. Chapter 5

Custody Classification Form Instructions, BP-338 . . Chapter 6

Inmate Transfer . . . . . . . . . . . . . . . . . . Chapter 7

Offense Severity Scale/Definition of Roles involved in Drug Offenses/Special Instructions . . . . . . . . . . Appendix A

Waiver for Misdemeanants . . . . . . . . . . . . . . Appendix B

Standard Abbreviations/Terms (BP-337) . . . . . . . . Appendix C

Request for Transfer/Application of Management Variable (409) . . . Appendix D

The Sentence Procedures Appendix, Institution Missions Appendix and the Parolable Institutions Appendix can be found on the Correctional Programs Branch (CPB) web page. Quarterly updates will be made based upon submissions by the respective regions to the DSCC Administrator.

# INTRODUCTION

Bureau of Prisons (BOP) institutions are classified into one of five security levels: **MINIMUM**, **LOW**, **MEDIUM**, **HIGH**, and **ADMINISTRATIVE** based on the level of security and staff supervision the institution is able to provide.

An institution's level of security and staff supervision is based on the following factors:

- mobile patrol;
- towers;
- perimeter barriers;
- detection devices;
- internal security;
- type of inmate housing;
- inmate-to-staff ratio; and,
- any special institutional mission.

Similarly, BOP inmates are classified based on the following factors:

- The level of security and supervision the inmate requires; and,
- The inmate's program needs, i.e., substance abuse, educational/vocational training, individual counseling, group counseling, or medical/mental health treatment, etc.

In summary, the initial assignment (designation) of an inmate to a particular institution is based primarily upon:

- The level of security and supervision the inmate requires;
- The level of security and staff supervision the institution is able to provide; and,
- The inmate's program needs.

Additional factors that are also considered when designating an inmate to a particular institution include, but are not limited to:

- The inmate's release residence;
- The level of overcrowding at an institution;
- Any security, location or program recommendation made by the sentencing court;

- Any Central Inmate Monitoring issues (see Program Statement Central Inmate Monitoring Program);

- Any additional security measures to ensure the protection of victims/witnesses and the public in general; and,

- Any other factor(s) which may involve the inmate's confinement; the protection of society; and/or the safe and orderly management of a BOP facility.

Initial designations to BOP institutions are initiated, in most cases by staff at the Designation and Sentence Computation Center (DSCC), Grand Prairie, Texas, who assess and enter information from the sentencing court, U.S. Marshals Service,
U.S. Attorneys Office or other prosecuting authority and the U.S. Probation Office about the inmate into a computer database (SENTRY).

The Bureau of Prisons shall designate the place of the prisoner's imprisonment, and shall, subject to bed availability, the prisoner's security designation, the prisoner's programmatic needs, the prisoner's mental and medical health needs, any request made by the prisoner related to faith-based needs, recommendations of the sentencing court, and other security concerns of the Bureau of Prisons, place the prisoner in a facility as close as practicable to the prisoner's primary residence, and to the extent practicable, in a facility within 500 driving miles of that residence.

SENTRY then calculates a point score for that inmate which (for example, 18 points) is then matched with a commensurate security level institution.

| **Security Level** | **Custody Level** | **Male** | **Female** |
|---|---|---|---|
| MINIMUM | COMMUNITY and OUT | 0-11 points | 0-15 points |
| LOW | OUT and IN | 12-15 points | 16-30 points |
| MEDIUM | OUT and IN | 16-23 points | * |
| HIGH | IN and MAXIMUM | 24+ points | 31+ points |
| ADMINISTRATIVE | All custody levels | All point totals | All point |

An inmate's security point score is not the only factor used in determining a commensurate security level for an inmate. The application of a PSF or MGTV could effect placement at either a higher or lower level institution than the specified point total indicates. (SEE CHAPTER 5 FOR MORE DETAILED INFORMATION)

**NOTE:** A security level cannot be assigned by SENTRY without completing an Inmate Load and Security Designation Form. If an inmate has not been assigned a security level, SENTRY will automatically assign "UNKNOWN" as the security level.

* Female security level institutions are classified as Minimum, Low, High and Administrative.

Once all necessary information has been entered into the SENTRY database, a DSCC or Medical Designations Officer, (hereafter, Designator) selects an institution for service of sentence based on all the previously mentioned factors.

Redesignations (transfers) from one Bureau institution to another are considered in much the same manner using many of the same factors used at the time of initial designation. In addition, the inmate's institutional adjustment and program performance are also carefully reviewed when redesignation is considered.

Finally, an initial custody level (COMMUNITY, IN, OUT, MAXIMUM) is also assigned to the inmate that is consistent with the institutions mission. (See previous chart). An inmate's custody level within any given security level institution is routinely reviewed and may change for various reasons during the period of incarceration.

# DEFINITIONS

**ADMINISTRATIVE INSTITUTION.** An institution with a special mission, where inmates are assigned based on factors other than security and/or staff supervision (for example, medical/mental health, pretrial and holdover). Administrative institutions are designed to house all security level inmates.

**CENTRAL INMATE MONITORING (CIM).** The Bureau monitors and controls the transfer, temporary release, and community activities of certain inmates who present special needs for management. Such inmates, known as Central Inmate Monitoring cases, require a higher level of review prior to any movement outside the institution.

**CLASSIFICATION.** The systematic subdivision of inmates into groups based on their security and program needs.

**COMMUNITY CUSTODY.** The lowest custody level assigned to an inmate which affords the lowest level of security and staff supervision. An inmate who has **COMMUNITY** custody may be eligible for the least secure housing, including any which is outside the institution's perimeter, may work on outside details with minimal supervision, and may participate in community-based program activities if other eligibility requirements are satisfied.

**CONTRACT FACILITY.** A state or local prison, institution, facility, jail, or other non-federal enterprise that contracts with the Bureau to house federal inmates (i.e., Community Corrections Center). Contract facilities are contracted and supervised by the CCMs.

**CRIMINAL HISTORY POINTS.** Criminal History Points are used to calculate the Bureau's Criminal History Score. The Criminal History Points is the calculation, as specified by the U.S. Sentencing Commission Guidelines (Guidelines Manual, Chapter 4), which assigns a numerical value based on the individuals entire criminal record of convictions. Ordinarily, the Criminal History Points are calculated by the United States Probation Office.

**CRIMINAL HISTORY SCORE (CHS).** The CHS is one of the factors used to calculate the inmate's security point total. The CHS is derived from the Criminal History Points whereby the Criminal History Points fall into one of six categories.

**CURRENT OFFENSE.** For classification purposes, the current offense is the most severe documented instant offense behavior regardless of the conviction offense.

**CUSTODY CLASSIFICATION.** The review process to assign a custody level based on an inmate's criminal history, instant offense, and institutional adjustment. A custody level (i.e., **COMMUNITY, OUT, IN,** and **MAXIMUM**) dictates the degree of staff supervision required for an individual inmate.

**DESIGNATION.** An order from the DSCC indicating the initial facility of confinement for an inmate.

**DESIGNATION FACILITY (DFCL).** Each of the separate missions within an institution for designation purposes. Each DFCL is shown as a separate line on the Population Report and has its own security level and destination (DST) assignment. Designations are made to a DFCL code rather than to a facility (FACL) code.

**FEMALE.** A person belonging, at conception, to the sex that produces the large reproductive cell.

**JUDGMENT.** The official court document (e.g., Judgment and Commitment Order or Judgment in a Criminal Case) which is signed by the Judge. The Judgment contains the offense(s) for which the court imposes its sentence, which ordinarily includes a financial, confinement and supervision obligation.

**HISTORY.** The inmate's entire background of criminal convictions (excluding the current offense) and institutional disciplinary findings used to assess points related to his/her history of violence and/or history of escape.

**IN CUSTODY.** The second highest custody level assigned to an inmate which requires the second highest level of security and staff supervision. An inmate who has **IN** custody is assigned to regular quarters and is eligible for all regular work assignments and activities under a normal level of supervision. Inmates with **IN** custody are not eligible for work details or programs outside the institution's secure perimeter.

**LEGAL RESIDENCE.** The inmate's local and state address as reported by the United States Probation Office at the time of conviction.

**LONG-TERM DETAINEE.** A non-U.S. citizen (alien) who has:

- finished serving a local, state, or federal sentence;

- completed immigration proceedings that have resulted in an order of deportation, exclusion, or other

means of

removal by either the Executive Office for Immigration Review (EOIR), or the Bureau of Immigration and Customs Enforcement (ICE), formerly the Immigration and Naturalization Service (INS); and,

- cannot be removed from the country for various reasons.

**MALE.** A person belonging, at conception, to the sex that produces the small reproductive cell.

**MAN/MEN.** Adult and juvenile human males.

**MANAGEMENT SECURITY LEVEL (MSL).** Management Security Level is the security level assigned by the DSCC Administrator or designee to an inmate upon application of any of the following Management Variables:

- PSF Waived;

- Greater Security; and,

- Lesser Security.

Based on these Management Variables, the Management Security Level will normally be one security level greater or lesser than the scored security level.

**MANAGEMENT VARIABLE.** A Management Variable (MGTVs) reflects and supports the professional judgment of Bureau staff to ensure the inmate's placement in the most appropriate level institution. A Management Variable(s) is required when placement has been made and/or maintained at an institution level inconsistent with the inmate's security score — a score which may not completely/ accurately reflect his or her security needs.

**MAXIMUM CUSTODY.** The highest custody level assigned to an inmate requiring the highest level of security and staff supervision. An inmate with **MAXIMUM** custody requires ultimate control and supervision. This classification is for individuals who, by their behavior, have been identified as assaultive, predacious, riotous, serious escape risks, or seriously disruptive to the orderly running of an institution. Accordingly, quarters and work assignments are assigned to ensure maximum control and supervision. A custody change to or from **MAXIMUM** custody must be justified thoroughly on the BP-338 form and maintained permanently in the Inmate Central File.

**MISDEMEANANT.** An inmate convicted of an offense for which the maximum penalty is one year or less. Such inmates may not be transferred to a High security institution without first signing a waiver. 18 U.S.C. § 4083 prohibits placement of such inmates in "penitentiaries" without their

consent; however, the Bureau broadens that prohibition to include any High security institution. A sample of the waiver is provided in Appendix B.

**OUT CUSTODY.** The second lowest custody level assigned to an inmate requiring the second lowest level of security and staff supervision. An inmate who has **OUT** custody may be assigned to less secure housing and may be eligible for work details outside the institution's secure perimeter with a minimum of two-hour intermittent staff supervision.

**PAROLE, MANDATORY RELEASE, OR SPECIAL PAROLE TERM VIOLATOR.** Violators are inmates who were released from Bureau custody to the supervision of a D.C. or U.S. Probation Officer (USPO) and have violated the conditions of their release. These violators are returned to Bureau custody and are required to have a parole hearing within certain time limits. The purpose of this is to provide the inmate with an in-person hearing before the U.S. Parole Commission (USPC) to determine if the inmate has violated the conditions of parole, mandatory release, or special parole. Therefore it is necessary to temporarily place these individuals at parolable institutions in order to conduct parole hearings.

**PRIVATIZED FACILITY.** A prison, institution, or other correctional facility that is operated or supervised by a non- governmental entity. Privatized facilities are managed by private organizations or individuals with oversight provided by Bureau staff.

**PUBLIC SAFETY FACTOR.** There are certain demonstrated behaviors which require increased security measures to ensure the protection of society. There are nine Public Safety Factors (PSFs) which are applied to inmates who are not appropriate for placement at an institution which would permit inmate access to the community (i.e., MINIMUM security). The application of a PSF overrides security point scores to ensure the appropriate security level is assigned to an inmate, based on his or her demonstrated current or prior behavior.

**REDESIGNATION.** The reassignment of an inmate from one institution to another after initial designation. Unit staff submit a request to the DSCC, and the inmate’s case is reviewed for possible transfer. Approval of a redesignation results in an order from DSCC staff indicating a correctional institution to which an inmate is to be transferred. The actual movement of an inmate from one institution or facility to another is referred to as a transfer.

**RELEASE RESIDENCE.** The verifiable destination to which an inmate realistically plans to reside upon release from Bureau custody. The inmate must provide proof of residence to his or her unit staff. Staff will rely upon the following references to assist in verification: Presentence Investigation Report/USPO

verification; telephone and visiting lists; and, incoming and outgoing mail.

**SECONDARY DESIGNATION.** The second part of a two part designation, usually after a temporary designation to receive medical/mental health treatment or to participate in a specific institutional program or parole hearing.

**SECURITY LEVEL.** Used to describe the structural variables and inmate-to-staff ratio provided at the various types of Bureau institutions (i.e., Minimum, Low, Medium, High). It also identifies the institution type required to house inmates based on their histories, institutional adjustment, and Public Safety Factors as well as the physical security of the institution to include mobile patrols, gun towers, perimeter barriers, housing, detection devices, inmate-to-staff ratio, and internal security.

**SEX.** An individual's immutable biological classification as either male or female.

**STATEMENT OF REASONS.** The Statement of Reasons (SOR) is an attachment to the criminal judgment (Judgment and Commitment Order; Judgment in a Criminal Case) which indicates the reason for the court's final sentence, and other sentencing related issues (e.g., resolution of disputed issues, changes in scoring, statements of court intent, etc.). It is required in every felony case where the sentencing range exceeds 24 months, or whenever there is a departure from the U.S. Sentencing Guidelines range. The court may complete an SOR even if not required.

**STUDY CASE.** A study case is an inmate who is committed for a period of study and observation pursuant to 18 U.S.C. §§ 3552(b) or (c)), 4241(b) or (d), 4242(a), 4243(a) or (b), 4244(b), 4245(b), 4246(b), or 4247(b) or (c)). An inmate committed for a study and observation will be referred to the Central Office Medical Designator in the Office of Medical Designations and Transportation (OMDT) for designation to a facility that can complete the study, considering any specific medical or psychiatric issues which should be addressed. The Central Office Medical Designator should attempt to place the inmate in the most suitable facility compatible with the offender's security and custody needs, closest to the court and available resources.

**WOMAN/WOMEN.** Adult and juvenile human females.

# SECURITY DESIGNATION PROCEDURES FOR NEW COMMITMENTS

The Designation and Sentence Computation Center will ordinarily complete the initial designation within three working days of receiving all the necessary documentation from the U.S. Marshals Service (USMS) and the U.S. Probation Officer (USPO) which includes the following: the Presentence Investigation Report (PSR), Judgment, Statement of Reasons (SOR), and Central Inmate Monitoring (CIM) documentation (in cases where a CIM assignment is necessary).

The DSCC will refer all requests for initial designation with potential medical/mental health concerns to the Office of Medical Designations and Transfers (OMDT), Health Services Division, Washington, D.C. no later than the following work day.

## 1. DESIGNATION PROCEDURES

The following is the normal chronology of an initial designation.

a. The inmate is sentenced.

b. The Clerk of the Court transmits the Judgment and Commitment Order (old law cases) or Judgment in a Criminal Case (new law cases) to the USMS.

c. The USMS makes a request to the DSCC advising that the inmate is now ready for designation to a facility.

d. If it has not already been provided, DSCC staff must contact the necessary officials (USPO or USMS) for the following: two copies of the PSR, a copy of the Judgment, to include the SOR, and the Individual Custody and Detention Report (USM-129).

If the SOR is not provided with the Judgment, DSCC staff will make a reasonable effort to obtain a copy by contacting the Court or USPO. If no SOR was prepared for the case or cannot be obtained, DSCC staff will note this in the "Remarks" section of the BP-337 and proceed with the designation process. These procedures will ensure the Bureau is following the intentions of the Court when designating a facility, as the SOR may contain information which overrides the PSR and may affect scoring decisions.

Based on a review of the data, DSCC staff will determine whether a non-federal facility should be designated. If a PSR has not been prepared, DSCC staff will complete a National Crime

Information Center (NCIC) and National Law Enforcement Telecommunication System (NLETS) criminal history check to obtain background information. DSCC staff will then load appropriate information on the SENTRY Update Security Designation screen with a notation that no PSR was available. DSCC staff will contact the USPO and request that a Postsentence Investigation Report be prepared, and forwarded to the designated facility. DSCC staff will document this contact on the SENTRY Update Security Designation Screen.

Frequently, in cases involving Reentry after Deportation, Presentence/Postsentence Investigation Reports are not prepared. In those particular cases, a Magistrate Information Sheet may be used. A Magistrate Information Sheet is a document prepared by
U.S. law enforcement officials. This document contains a summary of the facts related to the defendant's arrest and prior criminal/personal history. This information is primarily obtained through the arresting officer's report, the FBI Rap Sheet and an interview with the defendant.

If more than six months has elapsed since the PSR was prepared, DSCC staff will contact the USPO to determine if there is any new or significant information that should be considered. If the offender was a study case before final sentencing, DSCC staff will take into consideration the results of that study in completing the designation request. The result of the study may be obtained from a PSR, a summary report, or any other information available.

If offense or background information is not available prior to designation, an inmate must be designated to at least a Low security level institution. When information is obtained, the institution may request redesignation, if appropriate.

e. The DSCC uses classification material and SENTRY to determine if Central Inmate Monitoring (CIM) precautions need to be taken. This includes a name search to determine if the offender was previously confined under the current or previous register number. If new to the Bureau, the inmate must be loaded into SENTRY and "admitted" to the DSCC "facility," with any appropriate CIM assignment(s) entered. DSCC staff will identify the documents used to support CIM assignments and forward the documents to the designated institution.

f. DSCC staff will complete and enter into SENTRY an Inmate Load and Security Designation form (BP-337) on all cases with terms exceeding 30 days. The DSCC staff member loading the data has the discretion to complete a hard copy version or may enter the information directly into SENTRY.

DSCC staff must determine if there is a break in custody when the inmate is transferring to federal custody after service of a state sentence. The DSCC usually has access to this type of information for jail credit purposes. If there is no physical release from custody, DSCC staff will consider the state offense as part of the current term of confinement for classification purposes and will not assign any history points for the state offense.

g. Each work day, DSCC Designation Officers determine which cases require designation by displaying a SENTRY Daily Log for a listing of those cases entered the previous day (also to include weekends and holidays). The Designator displays the Initial Designation Data screen and follows the prompts on the screen. This will lead the Designator through a display of the "CIM Clearance and Separatee Data" screen and "Update Security Designation" screen. A list of the appropriate security level facilities will appear in order of proximity to the inmate's legal residence (based on mileage calculated by SENTRY). The final screen in this series requires that the reason for designation be entered, as well as any clearance remarks by the DSCC Designator.

The objective of inmate classification is to place each inmate in the most appropriate facility for service of sentence. To accomplish this, the Designator must consider all relevant information regarding the inmate.

In accordance with Rule 38(b) of the Federal Rules of Criminal Procedure, when the court of conviction recommends that the inmate be retained in a place of confinement which will allow the inmate to participate in the preparation of the appeal, the Bureau will make every effort to place the inmate in such a facility. If a reason exists for not placing the inmate in that facility, the matter is called to the attention of the court and an attempt is made to arrive at an acceptable place of confinement.

h. SENTRY provides information on the capacity and inmate population in each institution. Specifically, for each facility and each Designation Facility (DFCL), SENTRY provides the Rated Capacity, the Designation Capacity, and the percentage of each that the facility or DFCL currently houses.

- The Rated Capacity is a measure of the capacity for which each DFCL was designed.

- The Designation Capacity is the equitable proportion of the inmates in a particular security level that each

designation facility having that security level should house.

The Designation Capacity of each DFCL is based on the rated capacities and population totals of all the DFCLs that have the same security level. The Rated Capacity and Designation Capacity for a facility are calculated as the total Rated Capacity and Designation Capacity of all the DFCLs that exist within that facility.

Designators will ordinarily use the Designation Capacity as a guide for maintaining population balance and an equitable distribution of inmates. However, for newly activating institutions, Designators may designate that institution for a percentage of initial designations.

i. The Designator assigns a facility, which may include a privately managed facility, and will make every effort to accommodate recommendations from the courts, ie. RDAP, locality, etc.

j. Upon completion of the initial designation by the DSCC Designator or Central Office Medical Designator, staff in the following areas will make note of the designation by monitoring SENTRY Destination Daily Logs:

(1) The receiving institution;

(2) The federal facility (MCC, Detention Center, etc.) holding the inmate being designated;

(3) The U.S. Marshals Prisoner Transportation Division in Kansas City, Kansas; and,

(4) The DSCC staff in cases where a medical/mental health inmate has been referred to OMDT.

DSCC staff will inform the USMS who has custody of the inmate of the designation by whatever means is appropriate.

If the inmate is a former study case, DSCC staff must also inform, via GroupWise, the Warden of the institution that completed the study of the designation. This alerts that facility to forward the Inmate Central File and other records to the institution designated.

If there is a secondary designation (e.g., Parole, Special Parole Term, Mandatory Release Violator Hearing, or following medical treatment), DSCC staff (or Central Office Medical Designator for

medical cases) will notify the Warden of the secondary institution. This will alert the secondary institution that the inmate is designated and will be transported after the program or medical treatment is completed. No other designation notation is needed for a secondary designation.

k. When a designation is made, DSCC staff will forward all supporting documents to the designated institution within two working days. If DSCC staff believe that the inmate will arrive at the institution in less than five calendar days, the supporting documentation will be sent to the institution by overnight mail, facsimile, or electronically, within one working day of the designation.

l. The Case Management Coordinator (CMC) will monitor all pending arrivals at that facility. However, if the institution has separate DFCLs for specialized programs (i.e., RDAP, Sex Offender Treatment Program, Life Connections, etc.) or for a satellite camp, then the CMC may delegate this responsibility to staff assigned to those specialized programs or populations. Staff will monitor the Daily Log for that facility, and will print a hard copy of each designation and maintain a copy on file for 120 calendar days. In certain facilities other methods may be just as effective in monitoring pending arrivals.

For example, institutions with a large holdover or pretrial population can be monitored more effectively by running a daily pipeline roster filtering out all "A-HLD"s and "A-PRE"s.

Staff will also monitor the arrival of classification material, and if such material has not arrived within 10 calendar days following the designation, the DSCC will be contacted to determine the status of that material. Upon arrival of the classification material, the CMC, or designee, will review that material and verify the scoring of the Inmate Load and Security Designation form (BP-337). If a scoring issue and/or error is discovered, the CMC will contact the DSCC Administrator via GroupWise. The CMC may need to fax certain pages of the Presentence Investigation Report to the DSCC so the case can be appropriately reviewed. If the CMC and DSCC agree that an error has been made, the error will be corrected by the DSCC. If the CMC and DSCC do not agree that an error has been made, the Central Office, Correctional Programs Administrator, will make the final determination.

The DSCC will also be advised of any non-scoring errors or concerns. In either circumstance, if the correction requires a new designation, the DSCC will make any necessary changes and will enter a new designation into SENTRY. The DSCC will then notify the appropriate USMS office(s) of the designation change.

If the original designation is changed, the CMC will forward the classification material to the newly designated institution.

m. The CMC has oversight responsibilities for monitoring the timely arrival of a newly designated inmate. If an inmate serving a term of one year or more has not arrived at the designated institution within 120 calendar days from the date of the designation, or if an inmate serving a term of less than one year has not arrived after 30 calendar days, staff will use SENTRY to determine the inmate's current location:

(1) If the inmate is in a Bureau facility, staff will contact that facility to expedite movement or ascertain the reason for delay, and will verify whether the designation continues to be valid; and,

(2) If the inmate is not in a Bureau facility, staff will contact the DSCC. Upon notification, DSCC staff will contact the appropriate authorities and ascertain why the inmate has not arrived at the designated institution. If DSCC staff decides the designation is no longer valid, the DSCC will cancel the original designation.

If the designation is canceled, the packet will be returned to the DSCC, who then will return the documentation to the originating agency. Prior to canceling a designation, the DSCC will enter a comment on the "CIM Clearance and Separatee Data" screen to document the reason(s) for this action. This comment will be the only retrievable documentation available to answer future questions regarding the processing of the case. It may be necessary to administratively admit the inmate in order to enter the comment. The DSCC will also delete the associated DST assignment.

Staff will maintain records of their efforts to monitor designations. These records will be maintained for a period of 120 calendar days from the date of initial designation.

n. The release to the general public of an inmate's designation or redesignation information is prohibited, for security reasons, until the inmate has arrived at the designated facility. An inmate confined in a Bureau facility however, may be advised of the destination but will not be advised of the date or time of the transfer. However, caution should be exercised in advising inmates of their destination. The Warden may define cases where the designation will not be disclosed to the inmate. Officials such as Judges and members of Congress may be advised of designations in response to official inquiries for their official use.

**2. NON-ROUTINE DESIGNATION PROCEDURES**

In certain cases, non-routine designation procedures for new commitments are required. Listed below are specific examples of non-routine designations.

a. **Study Cases.** The DSCC will complete an Inmate Load and Security Designation form (BP-337) and enter it into SENTRY. The DSCC will then notify the Central Office Medical Designator via GroupWise requesting designation. The Central Office Medical Designator will designate an appropriate institution for the study. After completion of the study and final sentencing by the court, the DSCC will enter a new Inmate Load and Security Designation form (BP-337) into SENTRY, based on the actual sentence imposed or other new information.

b. **Medical or Mental Health.** The DSCC is responsible for receiving and evaluating information pertaining to an initial designation. DSCC staff must attempt to ascertain whether an inmate requires medical or mental health evaluation or treatment. This information is ordinarily obtained from the Presentence Investigation Report or other source documents. If medical or mental health concerns are apparent, DSCC staff will provide comments in the "Remarks" section of the BP-337 and enter Y (yes) in the OMDT REF item. DSCC staff will fax portions of the Presentence Investigation Report pertaining to the medical or mental health concerns, and the Judgment in a Criminal Case, if it includes any judicial recommendations, to the Central Office Medical Designator.

Upon review of the daily log for W DESIG M cases, the Central Office Medical Designator will access the Inmate Load and Security Designation form (BP-337) in SENTRY and make a designation based on the available information, ordinarily within three working days. If the Central Office Medical Designator determines there are no medical or mental health concerns affecting placement, the DSCC will be advised. The DSCC will then complete the designation to an appropriate institution.

Only the OMDT will make designations for study cases or for cases requiring medical or psychiatric evaluation or treatment. Designation may be made to any Bureau facility having resources to meet the inmate's needs. The Central Office Medical Designator will ensure that whenever a designation is made to an DFCL inconsistent with the inmate's security level, the appropriate Management Variable is entered. Administrative facilities are excluded from this requirement.

c. **Military Prisoners.** The Bureau cooperates with the Security, Force Protection and Law Enforcement Division of the Armed Services for the transfer of military prisoners into the Bureau's custody. These cases are coordinated through the DSCC, in accordance with the provisions contained in Chapter 7, Section 17(d).

d. **Parole, Mandatory Release or Special Parole Term Violator Hearing.** For designation purposes, the U.S. Parole Commission (USPC) provides the revocation packet and a copy of the alleged violator's Presentence Investigation Report to the DSCC. The DSCC will complete an initial designation to a violator hearing site, and a secondary designation to a post-hearing institution for service of the violator term. The Security Designation Data screen will indicate the inmate is to be housed as a holdover at the violator hearing site.

Once the designation has been completed, the DSCC will notify the U.S. Marshals Office of the designated institution, and mail the violator packet to that institution. The USPC will receive notification via Groupwise.

If after the hearing, new information causes a change in the secondary designation (i.e., short-term parole date), institution staff will contact the DSCC for appropriate action.

- In cases where the projected release date (PRD) is between 60 to 120 days from the date of hearing, the DSCC will consider changing the secondary designation to the nearest appropriate facility.

- In cases where the PRD is 60 days or less from the date of hearing, hearing facility staff will consider having the inmate remain at the hearing facility for release processing purposes.

- If a change in designation is not necessary, institution staff may process the inmate's transfer to the secondary designation.

Procedures for violators requiring medical treatment are referenced in Chapters 3 and 7. Once the information is reviewed and evaluated by the DSCC, and it is determined that medical or psychiatric treatment is required, the request for designation will be entered into SENTRY and referred to the Central Office Medical Designator for designation. The DSCC will notify the appropriate USMS Office of the inmate's designated institution, and mail the violator packet to that institution. The USPC will receive notification via LAN.

Local revocation hearings will be conducted at a site determined by the USPC, normally within commuting distance of where the alleged violation occurred. The USPC may request, in writing, to the DSCC Administrator that an alleged violator be moved to a Bureau institution. Violators who have received their local revocation hearing will not be transported until the USPC Notice of Action has been received and a designation has been determined. In some instances, violators who are granted a short-term release date should be considered for placement in a contract facility.

e. **Long-term Detainees.** The Detention Services Branch (DSB), Correctional Programs Division, Central Office, is responsible for the initial designation of long-term detainees. Requests for placement into the BOP from the U.S. Immigration and Customs Enforcement (ICE) are sent directly to DSB, where they are completed. If a medical or mental health placement is needed, DSB will refer it to the Central Office Medical Designator.

Long-term detainees are no longer serving a sentence but their detention is indeterminate and they will not, in all probability, be repatriated to their home country.

Long-term detainees are from countries, such as Cuba, that refuse to accept their return from the U.S. government. The Detention Services Branch, Correctional Programs Division, will advise when changes in applicable countries occur. This does not include citizens from countries that take a significant amount of time to accept its citizens. Travel orders can be obtained and they are eventually returned. ICE requests the placement of long-term detainees into the BOP and they are ordinarily designated into a general population.

Long-term detainees include:

- Mariel Cubans, detainees who entered the United States during the Mariel boatlift between April 15, 1980 and October 31, 1980;

- Cubans who entered the United States from other countries, or from Cuba other than during the Mariel boatlift; and,

- Detainees from counties that ICE has identified that refuse to receive its citizens.

Designation procedures for long-term detainees are unique because the detainees are not serving a sentence. Refer to the current

Program Statement Mariel Cuban Detainees for the designation procedures.

**3. DESIGNATIONS TO NON-FEDERAL FACILITIES**

The DSCC may designate a federal inmate to a non-federal facility in accordance with the criteria below. An updated Security Designation form (BP-337) will be completed and entered into SENTRY for any sentence exceeding 30 days. When the USMS takes custody of an inmate from state or local custody to begin serving a federal sentence, the same procedures for new commitments will be followed.

When designating an inmate to a non-federal facility for an inmate, Designators shall consider the inmate's religious beliefs, if known as one of the factors in making a designation decision. If possible, a non-federal facility where the inmate's religious beliefs can be accommodated will be designated. If necessary, Designators may consult with Central Office chaplaincy staff in making this designation decision.

**4. TYPES OF COMMITMENTS**

a. **Juvenile Commitments.** All inmates committed under the Juvenile Justice and Delinquency Prevention Act (JJDPA) and all inmates under the age of 18 will be designated and housed in accordance with the requirements of Program Statement Juvenile Delinquents, Juvenile Justice and Delinquency Prevention Act.

The CCM will complete a BP-337 for juvenile offenders housed in contract juvenile facilities; however, the CCM does not need to complete the BP-338 while the juvenile is housed there unless it is helpful to do so.

**b. Jail Commitments.** When funds and appropriate jail space are available, the DSCC may designate a contract jail or detention facility for an inmate who is generally sentenced to one year or less. If funds and appropriate jail space are not available or if an inmate has special needs, a federal institution will be designated through the DSCC.

Prior to placement, DSCC staff must determine whether any PSF(s) or other circumstances would contradict a jail designation. If so, the lowest security level dictated by the applicable PSF must be satisfied.

However, such designations should also take into consideration underpopulated Bureau facilities prior to placement in a contract facility.

c. **Youth Corrections Act (YCA)/District of Columbia Youth Rehabilitation Act (DCYRA) Offenders.** Although the YCA statutes were repealed effective October 12, 1984 (see 18 U.S.C. §§ 5005 through 5026 (repealed)), an offender originally committed under these statutes could be returned to custody as a parole violator.
Ordinarily, DCYRA inmates will not be initially designated to non-federal facilities.

d. **State Prisoners.** 18 U.S.C. § 5003 enables the Director, Bureau of Prisons, to establish contracts to accept state prisoners for boarding in federal institutions. The term "State" as used in this section includes any state, territory, or possession of the United States. The statute does not permit the Bureau to contract placement of state prisoners in third party custody. This includes CCC placements.

When there is a compelling reason for placing a state prisoner in a non-federal facility, institution staff will contact the DSCC Administrator, who may suggest to officials of the state that they may want to make their own direct placement in a non- federal facility.

Once an inmate is accepted into Bureau custody, occasionally, there may be a reason to return the inmate to the original state. In this instance, institutional staff will contact the DSCC Administrator. If the DSCC Administrator determines that it would be appropriate for the inmate to be returned, they will contact state officials.

# INMATE LOAD AND SECURITY DESIGNATION FORM INSTRUCTIONS (BP-337)

## INMATE LOAD DATA

The Inmate Load Data section (Items 1 to 25) of the Inmate Load and Security Designation form (BP-337) records the physical and demographic information of inmates entered into SENTRY (the Bureau of Prisons' on-line database). In practice, inmates are entered into SENTRY whether or not the inmate's security level is scored (e.g., pre-trial detainees, material witnesses, etc.). Therefore, when the initial security designation data is entered into SENTRY it is essential that the load data is compared to the information contained in the Presentence Investigation Report (PSR), and that the information is updated or reconciled as appropriate.

| | | | |
|---|---|---|---|
| 1. REGISTER NUMBER | | | |
| 2. LAST NAME | 3. FIRST NAME | 4. MIDDLE | 5. SUFFIX |
| 6. RACE | 7. SEX | 8. ETHNIC ORIGIN | 9. DATE OF BIRTH |
| 10. OFFENSE/SENTENCE | | | |
| | | | |
| 11. FBI NUMBER | 12. SSN NUMBER | | |
| 13. STATE OF BIRTH | 14. OR COUNTRY OF BIRTH | 15. CITIZENSHIP | |
| 16. ADDRESS-STREET | | | |
| | | | |
| 17. CITY | 18. STATE | 19. ZIP | 20. OR FOREIGN COUNTRY |
| 21. HEIGHT:FT_____IN ____ | 22. WEIGHT: | 23. HAIR COLOR | 24. EYE COLOR |
| 25. ARS ASSIGNMENT | | | |

1. **REGISTER NUMBER.** The U.S. Marshals Service (USM) assigns an eight-digit register number to each inmate with the last three digits denoting the U.S. Marshals' judicial code. The format is five digits, hyphen, three digits.

2. **LAST NAME.** Twenty-four spaces are provided for the inmate's last name, which must match the name on the Judgment. The first character must be a letter. Each subsequent character must be a letter, space, hyphen, or apostrophe.

3. **FIRST NAME.** Twelve spaces are provided for the inmate's first name.

   **NOTE:** Only the inmate's committed name (as it appears in

the Judgment) will be entered on the "Load Inmate" transaction. All other names (e.g., true name, aliases, nicknames, maiden name, etc.) will be entered into SENTRY using the "Update Nicknames and Aliases" transaction.

4. **MIDDLE.** Eight spaces are provided for the inmate's middle name.

5. **SUFFIX.** Three spaces are provided for any name suffixes (i.e., Jr., Sr., II). Suffix codes are found in the Name Suffix Code section of the SENTRY General Use Technical Reference Manual (TRM).

6. **RACE.** Standards for the Classification of Federal Data on Race and Ethnicity are set by the Office of Management and Budget. Enter the appropriate code:

| **CODE** | **RACE** | **DEFINITION** |
|---|---|---|
| A | Asian | A person having origins in any of the Pacific Islands or any of the original peoples of the Far East, Southeast Asia, or the Indian subcontinent including, for example, Cambodia, China, India, Japan, Korea, Malaysia, Pakistan, the Philippine Islands, Thailand, and Vietnam. |
| B | Black or African American | A person having origins in any of the black racial groups of Africa. |
| I | American Indian or Alaska Native | A person having origins in any of the original peoples of North and South America (including Central America), and who maintains tribal affiliation or community attachment. |
| W | White | A person having origins in any of the original peoples of Europe, the Middle East, or North Africa. |

7. **SEX.** Enter M = Male or F = Female.

8. **ETHNIC ORIGIN.** Enter the appropriate code.

| **CODE** | **ETHNIC ORIGIN** | **DEFINITION** |
|---|---|---|
| H | Hispanic or Latino | A person of Cuban, Mexican, Puerto Rican, South or Central American, or other Spanish culture or origin, regardless of race. |
| O | Not Hispanic or Latino | A person who does not meet the above definition. |

9. **DATE OF BIRTH.** Ten spaces are provided for the inmate's birth date (MM-DD-YYYY); (e.g., July 2, 1981 = 07-02-1981). If the inmate's birth date is unknown or not available, enter 01-01-1800.

10. **OFFENSE/SENTENCE.** The offense(s), sentence imposed, and docket number (as specified in the Judgment) should be entered in the space provided. Additionally, if the inmate is admitted to another SENTRY facility, care should be taken to preserve existing information.

11. **FBI NUMBER.** Nine spaces are provided for the Federal Bureau of Investigation (FBI) number. The FBI number can be any combination of letters and numbers and must be entered without spaces or dashes. It cannot duplicate an existing FBI number in SENTRY. This field must be left blank if the FBI number is unknown at the time the inmate is loaded.

12. **SOCIAL SECURITY NUMBER (SSN).** Nine spaces are provided for the inmate's SSN. The number must be entered without dashes or spaces. It cannot duplicate an existing SSN in SENTRY. If the SSN is unknown, or the inmate has never been issued a SSN this field must be left blank. In cases where the inmate will not be issued a SSN (i.e., illegal aliens) a back slash may be entered.

13. **STATE OF BIRTH.** Two spaces are provided for the state code for the state in which the inmate was born. If entered, it must be a valid code from the State and Possession Code Table in the SENTRY General Use TRM.

14. **COUNTRY OF BIRTH.** If entered, it must be a valid code from the Country Code Table in the SENTRY General Use TRM.

**NOTE:** SENTRY will not allow "US" to be entered if a "state of birth" is entered (Item 13 above).

15. **CITIZENSHIP.** Enter the country code that corresponds to the inmate's citizenship. This must be a valid code from the Country Code Table in the SENTRY General Use TRM. Do not rely on the inmate's current place of residence to determine citizenship. Special emphasis must be placed on the accuracy of citizenship at the time of the inmate's admission.

16. **ADDRESS - STREET.** At least twenty-eight spaces are provided for the inmate's street number and name as listed in the PSR as "legal address." Enter any combination of alphanumeric characters.

17. **CITY.** Fifteen spaces are provided for the inmate's city of residence as listed in the PSR as "legal address." If entered, a state or foreign country must be entered.

18. **STATE.** Two spaces are provided for the state code. If entered, it must be a valid state code found under State Possession Code, SENTRY General Use TRM. Enter country code under Item 20 if residence is not in the United States or one of its territories or commonwealths.

19. **ZIP CODE.** Five spaces are provided for the zip code. It must be entered when a state code has been entered. If not available, the city, state, and zip code of the USMS Office assigning the register number will be entered. An accurate zip code is important because it is used by SENTRY to determine mileage between the inmate's legal residence and designated institution.

20. **FOREIGN COUNTRY.** Two spaces are provided for the country code. If entered, it must be a valid country code from the Country Code Table of the SENTRY General Use TRM. "US" may not be entered as the country code. This field must be completed if a state or zip code is not entered in the address field (see Items 18 & 19 above).

21. **HEIGHT.** Height must be entered in a measurement of feet and inches. Values in feet (FT) must be 1 through 9. Values in inches (IN) must be 00 through 11.

22. **WEIGHT.** Weight values must be 001-999 and represent pounds.

23. **HAIR.** Two spaces are provided for the color code. If entered, it must be a valid code found under the Hair Color Code, SENTRY General Use TRM.

24. **EYES.** Two spaces are provided for the color code. If entered, it must be a valid code found under the Eye Color Code, SENTRY General Use TRM.

25. **ARS ASSIGNMENT.** Use a valid SENTRY category assignment, SENTRY General Use TRM.

## SECURITY DESIGNATION DATA

The Security Designation Data section (Items 1 to 18) of the Inmate Load and Security Designation form (BP-337) records sentencing, programing recommendations, and background information from the Judgment, the Statement of Reasons (SOR), and the PSR. This information is used to determine the inmate's security level.

| 1. JUDGE | 2. REC FACILITY | 3. REC PROGRAM | 4. USM OFFICE |
|---|---|---|---|

1. **JUDGE.** Enter the sentencing Judge's last name.

2. **RECOMMENDED FACILITY.** The court may recommend a specific institution or a geographical region for a newly committed inmate. Enter the name of the recommended institution or region. If a specific SENTRY facility code is entered, that facility will appear at the top of the list presented to the Designator for consideration.

3. **RECOMMENDED PROGRAM.** Enter the name or type of any program recommended by the sentencing Judge.

4. **USM OFFICE.** Enter the location of the USM Office (e.g., E/VA-NOR).

5. **VOLUNTARY SURRENDER**

| | |
|---|---|
| 5. VOLUNTARY SURRENDER **0** = NO **(-3)** = YES<br><br>IF YES, MUST INDICATE: 5a. VOLUNTARY SURRENDER DATE: ____________________<br>and 5b. VOLUNTARY SURRENDER LOCATION: | |

This item allows for the subtraction of three points from the Security Point Total, Item 15, when the Judgment indicates the inmate was allowed to voluntarily surrender. For purposes of this item, voluntary surrender means the inmate was not escorted by a law enforcement officer to either the U.S. Marshals Office or the place of confinement. Additionally, this item applies only to post-sentencing voluntary surrender, and does not include cases where the inmate surrendered to the U.S. Marshals on the same day as sentencing. Voluntary Surrender Credit may only be

applied to the initial term of confinement; it may not be applied to any subsequent Supervised Release, Mandatory Release or parole Violation return to custody.

5a. **VOLUNTARY SURRENDER DATE.** If the court has provided for voluntary surrender, enter the date of the voluntary surrender in this block. If the court provided for voluntary surrender but did not provide a specific date for the surrender, the DSCC will contact the court to establish a mutually agreeable date.

**NOTE:** In cases where the court allows the inmate to voluntarily surrender but the inmate will not receive (-3) points on this item the date will still be entered on this item.

5b. **VOLUNTARY SURRENDER LOCATION.** The DSCC will note whether the inmate is to voluntarily surrender to the USMS or to the designated institution.

6. **MONTHS TO RELEASE**

| |
|---|
| 6. MONTHS TO RELEASE ________ |

This item reflects the estimated number of months the inmate is expected to be incarcerated. Consecutive federal sentences will be added together for classification purposes. Federal sentences may have different beginning dates, based on the Judgment Order. There may even be a computation in SENTRY with a beginning date in the future. Based on the inmate's sentence(s), enter the total number of months remaining, less 15% (for sentences over 12 months), and credit for any jail time served. This item is not figured into the security point total but impacts the Sentence Length Public Safety Factor.

**Example:** An adult convicted of Breaking and Entering under the Sentence Reform Act is sentenced to eight years. The expected length of incarceration is (96 months x 85% = 81.6 months). Round to the nearest whole number to get 82 and subtract any jail time credit (180 days) = 76 months to release.

**NOTE:** Enter 540 months for death penalty cases, life sentences, and Parolable life sentences for which a parole date has not been established.

7. **SEVERITY OF CURRENT OFFENSE**

| | | | | |
|---|---|---|---|---|
| 7. SEVERITY OF CURRENT OFFENSE | **0** = LOWEST<br>**1** = LOW MODERATE | **3** = MODERATE<br>**5** = HIGH | **7** = GREATEST | |

Enter the appropriate number of points that reflect the most severe documented instant offense behavior regardless of the conviction offense. For multiple offenses, the highest score will be used in scoring the current offense. Staff will consider the offense behavior on all sentences, including federal sentences that have a future beginning date or a previous D.C. or state sentence if there was no physical release from custody.

**NOTE:** This will require DSCC staff to make reasonable efforts to obtain documentation.

Severity is determined by using the Offense Severity Scale (Appendix A).

**Example:** According to the PSR, the individual was involved in an Assault With Serious Injury (Greatest severity level) but pled guilty to a Simple Assault (Moderate severity level). Assign the points on the basis of the more severe documented behavior, i.e., assign 7 points (Greatest severity level).

**In determining "Severity of Current Offense" staff must review the Statement of Reasons (SOR) and ensure the information provided is appropriately used in classifying the inmate.**

**Example:** According to the PSR the individual was involved in a drug conspiracy responsible for distribution of 31 grams of Cocaine Base "Crack", but was individually only responsible for
2 grams, he/she would be scored as Moderate Severity for this item. However, the SOR, indicates the Sentencing Judge found the individual responsible for less than 1 gram; therefore, the appropriate scoring should be Low Moderate severity.

- **PROCEDURES FOR PAROLE, MANDATORY RELEASE, SPECIAL PAROLE TERM, OR SUPERVISED RELEASE VIOLATORS**

If the violation was the result of new criminal conduct, regardless of conviction status, use the new criminal conduct for scoring "Severity of Current Offense" (see Appendix A).If the violation behavior was a technical violation, score the "Severity of Current Offense" as Low Moderate.

The original offense behavior which occurred prior to the violation is considered past behavior and is not used in determining "Severity of Current Offense."

- **PROCEDURES FOR PROBATION VIOLATORS**

The original offense behavior that resulted in probation should be used for scoring "Severity of Current Offense" (see Appendix A).However, if the new criminal conduct (violation behavior) is more severe than the original offense behavior, then use this behavior for scoring "Severity of Current Offense." **The most severe documented behavior between the original offense and the violation behavior will be used for scoring "Severity of Current Offense."**

8. **CRIMINAL HISTORY SCORE**

| | | | | |
|---|---|---|---|---|
| 8. CRIMINAL HISTORY SCORE | **0** = 0-1<br>**2** = 2-3 | **4** = 4-6<br>**6** = 7-9 | **8** = 10-12<br>**10** = 13 + | |
| 8a. SOURCE OF DOCUMENTED CRIMINAL HISTORY | - PRESENTENCE INVESTIGATION REPORT<br>_____- NCIC III | | | |

Enter the appropriate number of Criminal History Points(CHP). SENTRY will automatically convert the CHP to the Bureau's Criminal History Score (CHS).

The CHS is derived from the US Sentencing Guidelines Criminal History Points, as reflected in the final judgment and the SOR. If not found in either the Judgment or SOR, use the points assessed by the USPO in the PSR.

In some cases the Criminal History Points are not available (i.e., when the PSR is waived, on offenses committed prior to November 1, 1987, state cases, and military and D.C. Code offenders). Under these circumstances the Criminal History Score will be derived from the criminal history documented in the NCIC III Report according to the following procedures:

(a) Add 3 points for each prior sentence of imprisonment exceeding one year and one month;

(b) Add 2 points for each prior sentence of imprisonment of at least sixty days not counted in (a);

(c) Add 1 point for each prior conviction not counted in (a) or (b), up to a total of 4 points for this item; and,

(d) Add 2 points if the instant offense is a revocation accompanied by a new state or federal conviction, or if the instant offense occurred while under federal supervision including incarceration, probation, parole or supervised release.

The documentation used to assess the Criminal History Points must be provided as specified in all cases.

9. **HISTORY OF VIOLENCE**

| 9. HISTORY OF VIOLENCE | | NONE | >15 YEARS | 10-15 YEARS | 5-10 YEARS | <5 YEARS | |
|---|---|---|---|---|---|---|---|
| | MINOR | 0 | 1 | 1 | 3 | 5 | |
| | SERIOUS | 0 | 2 | 4 | 6 | 7 | |

Enter the appropriate number of points that reflect any history of violence, considering only those acts for which there are documented findings of guilt (i.e., DHO, Court, Parole, Mandatory Release, or Supervised Release Violation). This item includes the individual's entire background of criminal violence, excluding the current term of confinement.

**Exception:** Any institution disciplinary hearing (UDC or DHO) finding that a prohibited act was committed during the current term of confinement will be scored as a history item. DSCC staff must review the Chronological Disciplinary Record (CDR) for inmates who were previously housed in a federal institution or contract facility. Any violent act(s) reflected on the CDR must be scored as a history item. State disciplinary findings must be scored unless there is documentation that the state disciplinary proceedings did not afford due process protection to the inmate.

Severity of violence is determined by the offense behavior regardless of the conviction/finding of guilt offense. History of Violence points combine both seriousness and recency of prior violent incidents to assess the propensity for future violence. Therefore, if there is more than one incident of violence, score the combination of seriousness and recency that yields the highest point score. Prior periods of incarceration will be considered a “history” item if the inmate was physically released from custody and then returned to serve either a violation or a new sentence. In determining time frames, use the date of the documented behavior. Documented information from a juvenile, Youth Corrections Act (YCA) or District of Columbia Youth Rehabilitation Act (DCYRA) adjudication can be used unless the record has been expunged or vacated.

Minor History of Violence - Aggressive or intimidating behavior which is not likely to cause serious bodily harm or death (e.g.,

simple assault, fights, domestic disputes, etc.) There must be a finding of guilt.

Serious History of Violence - Aggressive or intimidating behavior which is likely to cause serious bodily harm or death (e.g., aggravated assault, domestic violence, intimidation involving a weapon, incidents involving arson or explosives, rape, etc.).
There must be a finding of guilt.

**Example:** If an offender was found guilty of homicide 20 years ago and a simple assault 3 years ago, assign 5 points for the simple assault. Or in another case, the offender had guilty findings for homicide 12 years ago; aggravated assault 8 years ago; and fighting 2 years ago, score 6 points for the aggravated assault 8 years ago.

**NOTE:** Attempted suicide, self-mutilation and possession of weapons are not applicable behaviors for History of Violence scoring. In addition, verbal threats (such as Code 203- Threatening Bodily Harm) are to be viewed as minor violence.

10. **HISTORY OF ESCAPE OR ATTEMPTS**

| 10. HISTORY OF ESCAPE OR ATTEMPTS | | NONE | >15 YEARS | 10-15 YEARS | 5-10 YEARS | <5 YEARS | |
|---|---|---|---|---|---|---|---|
| | MINOR | 0 | 1 | 1 | 2 | 3 | |
| | SERIOUS | 0 | 3(S) | 3(S) | 3(S) | 3(S) | |

Enter the appropriate number of points that reflect the escape history of the individual considering only those acts for which there are documented findings of guilt (i.e., DHO, Court, Parole, Mandatory Release, or Supervised Release Violation).

Escape history includes the individual's entire background of escapes or attempts to escape from confinement, or absconding from community supervision, excluding the current term of confinement.

**Exception:** Any institution disciplinary hearing (UDC or DHO) finding that a prohibited act was committed during the current term of confinement will be scored as a history item. DSCC staff must review the Chronological Disciplinary Record (CDR) for inmates who were previously housed in a federal institution or contract facility. Any escape(s) or attempt(s) reflected on the CDR must be scored as a history item. State disciplinary findings are to be scored unless there is documentation that the state disciplinary proceedings did not afford due process protection to the inmate.

Fleeing or Eluding Arrest, Failure to Appear for traffic violations, Absconding, runaways from foster homes and similar

behavior should not to be scored under the Escape History item, even if clearly documented, but should be considered on a case- by-case basis under the Management Variable "Greater Security." Failure to Appear or Flight to Avoid Prosecution for any offense however, must be counted when there is a documented finding of guilt.

In determining time frames, use the date of the documented occurrence. Documented information from a juvenile, YCA, or DCYRA adjudication can be used unless the record has been expunged or vacated.

Minor History of Escape - An escape from an open institution or program (e.g., minimum security facility, CCC, furlough) not involving any actual or threat of violence. Also includes military AWOL, Bail Reform Act, Flight to Avoid Prosecution, and Absconding from Community Supervision. There must be a finding of guilt except as previously noted.

Serious History of Escape - An escape from secure custody with or without threat of violence. Also includes escapes from an open facility or program with actual threat of violence. There must be a finding of guilt. S = 3 points and requires application of PSF L.

11. **TYPE OF DETAINER**

| | | | | |
|---|---|---|---|---|
| 11. TYPE OF DETAINER | **0** = NONE<br>**1** = LOWEST/LOW MODERATE | **3** = MODERATE<br>**5** = HIGH | **7** = GREATEST | |

Enter the appropriate number of points that reflect detainer status. Refer to the Offense Severity Scale, Appendix A. Determination is based on the offense of the most serious detainer.

- If there is a pending charge, points based on the documented behavior are assigned on the "Type of Detainer" item. If the pending charges or detainer involve a probation violation, use the most severe documented behavior in the original offense as the basis for assigning points in scoring the detainer.

  If law enforcement officials indicate a firm intent to lodge a detainer, consider it lodged. Score a concurrent state sentence as a detainer only if it is expected that the state sentence will exceed the federal sentence. However, score consecutive state sentences, lodged state detainers, and/or state parole violation terms/warrants as detainers.

- Consecutive federal sentences are ordinarily not lodged as detainers because federal sentences are computed as they are received. If there is more than one sentence, the most severe offense will be used as "Severity of Current Offense."

  **Example:** For an individual with two detainers for Violation of Firearms Act (Moderate severity level) and one for Extortion (High severity level), use High = 5 points and enter "5".

- No points will be awarded for U.S. Parole Commission warrants (adjudicated or unadjudicated). However, the original offense behavior will be factored into the criminal history points and the violation behavior (including new offense behavior) will be scored as the instant offense.

- No points will be awarded for ICE detainers. However, each case will be carefully reviewed to determine whether the PSF for Deportable Alien is applicable.

12. **AGE**

| | | | |
|---|---|---|---|
| 12. AGE | **0** = 55 and over<br>**2** = 36 through 54 | **4** = 25 through 35<br>**8** = 24 or less | |

SENTRY will automatically enter the appropriate number of points based on the inmate's date of birth. Staff do not have to manually enter an offender's age or points on the BP-337. If the offenders date of birth is unknown, SENTRY will default to a score of 4 points.

13. **EDUCATION LEVEL**

| | | |
|---|---|---|
| 13. EDUCATION LEVEL | **0** = Verified High School Degree or GED<br>**1** = Enrolled in and making satisfactory progress in GED Program<br>**2** = No verified High School Degree/GED and not participating in GED Program | |
| 13a. HIGHEST GRADE COMPLETED ______________ | | |

Enter the appropriate number of points that reflect the inmate's verified education level at the time of designation.

In addition to the points assigned for the education level, the highest grade completed (HGC) will also be recorded on the BP-
337. For example, an inmate who began, but did not complete the 7th grade will be given a 6 in the HGC field. Similarly, a GED

will be given a 12, a college graduate a 16, a Master's degree an 18, and a Ph.D. a 21 (the maximum allowed) in the HGC field.

The value entered for the HGC should, unless missing, be consistent with the points assessed for the inmates education level. If missing, enter a "U" for unknown.

14. **DRUG/ALCOHOL ABUSE**

| | | | |
|---|---|---|---|
| 14. DRUG/ALCOHOL ABUSE | **0** = Never/ >5 Years | **1** = <5 Years | |

Enter the appropriate number of points that reflect drug or alcohol abuse by the inmate. Examples of drug or alcohol abuse include: a conviction of a drug or alcohol related offense, a parole or probation violation based on drug or alcohol abuse, positive drug test, a DUI, detoxification, etc. Absent any information similar to the above, an inmate's self-report is sufficient to score this item. If this information is unknown enter a "U" and the item will be scored as zero.

15. **SECURITY POINT TOTAL**

| | |
|---|---|
| 15. SECURITY POINT TOTAL | |

Enter the sum of Items 5 through 14.

16. **PUBLIC SAFETY FACTORS**

| | | | |
|---|---|---|---|
| 16. PUBLIC SAFETY FACTORS | **A**-NONE | **I**-SENTENCE LENGTH (males only) | |
| | **B**-DISRUPTIVE GROUP (males only) | **K**-VIOLENT BEHAVIOR (females only) | |
| | **C**-GREATEST SEVERITY OFFENSE (males only) | **L**-SERIOUS ESCAPE | |
| | **F**-SEX OFFENDER | **M**-PRISON DISTURBANCE | |
| | **G**-THREAT TO GOVERNMENT OFFICIALS | **N**-JUVENILE VIOLENCE | |
| | **H**-DEPORTABLE ALIEN | **O**-SERIOUS TELEPHONE ABUSE | |

See Chapter 5, pages 7-13 for a description of Public Safety Factors and their application.

17. **REMARKS**

| |
|---|
| 17. REMARKS |
| |
| |
| |

A brief explanation of the current offense(s) is required in the "Remarks" section. Similarly, Pre-Sentence Investigation Report information relevant to other scoring items that may have an impact on the designation process or the transportation of the inmate (e.g., medical or psychiatric information, or arrest behavior with no conviction) must also be noted in this section. Refer to Appendix C, Standard Abbreviations/Terms. Also, the

individual scoring the case will enter his or her initials at the end of the "Remarks" section.

18. **OMDT REFERRAL**

18. OMDT REFERRAL (YES/NO) _____

The Medical Designator, Office of Medical Designations Transportation (OMDT), must review all cases in which there is a physical or mental health concern. Enter "Y" (yes) or N (no) in this category. The response will determine which daily log will reflect the designation information.

**DESIGNATION AND SENTENCE COMPUTATION CENTER ACTION - INITIAL DESIGNATION**

It is extremely important for Designators to communicate on a regular basis to ensure that designation decisions are consistent. The Correctional Programs Division encourages the need for communication and consistency to all Designators.

1. **FACILITY DESIGNATED.** Enter the mnemonic code for the institution designated (Refer to "Enter Initial Designation," SENTRY General Use TRM).

2. **CUSTODY ASSIGNMENT.** Enter the initial custody assignment in accordance with Table 4-1.

**Table 4-1**

| LEVEL OF INSTITUTION INITIALLY DESIGNATED | INITIAL CUSTODY ASSIGNMENT |
|---|---|
| Minimum | OUT |
| Low | IN |
| Medium | IN |
| High | IN, unless initial designation is to USP Marion or ADX Florence, in which case the initial custody assignment is MAXIMUM. |
| Administrative | IN, unless inmate is Minimum security level and designation was not for security reasons, in which case the initial custody assignment is OUT. |

3. **DESIGNATOR.** The Designator will enter his or her initials.

4. **REASON FOR DESIGNATION.** Designators will use this section to document whether the primary reason for designation was for security reasons or for management reasons.

- Enter "S" if the inmate's security level is the primary reason for designation and the placement is within normal guidelines. If "S" is entered, SENTRY will not permit an entry in the "Management Reason" field.

- Enter "M" if a Management Variable is the primary reason for designation and placement is outside normal guidelines. When "M" is entered, you must enter the appropriate Management Variable(s) (e.g., B = Judicial Recommendation, D = Release Residence, etc.) under the Management Reason item.While one MGTV is generally sufficient, a maximum of three MGTVs may be entered into SENTRY. In the unlikely event that an inmate's designation facility is inconsistent with his or her MSL, at least one additional non-MSL MGTV must be added to support and explain the inconsistency.

- When it is necessary to place an inmate at a particular institution temporarily in order to receive a parole hearing, a secondary designation is required.

  The DSCC will notify the Warden of the secondary institution via GroupWise.

  Following the hearing, the institution where the inmate was first placed should review the secondary designation and contact the DSCC if the results of the hearing indicate that a change in the secondary designation is required.

5. **MANAGEMENT VARIABLES.** See Chapter 5, pages 1-6 for a description of Management Variables and their application.

6. **REMARKS.** The Designator will enter any relevant information not already recorded that may have an impact on the designation process or the transportation of the inmate.

BP-337 **INMATE LOAD AND SECURITY DESIGNATION FORM** **FEDERAL BUREAU OF PRISONS**

**INMATE LOAD DATA**

| | | | | |
|---|---|---|---|---|
| 1. REGISTER NUMBER | | | | |
| 2. LAST NAME | | 3. FIRST NAME | 4. MIDDLE | 5. SUFFIX |
| 6. RACE | 7. SEX | 8. ETHNIC ORIGIN | 9. DATE OF BIRTH | |
| 10. OFFENSE/SENTENCE | | | | |
| 11. FBI NUMBER | | | 12. SSN NUMBER | |
| 13. STATE OF BIRTH | | 14. OR COUNTRY OF BIRTH | 15. CITIZENSHIP | |
| 16. ADDRESS-STREET | | | | |
| 17. CITY | 18. STATE | 19. ZIP | 20. OR FOREIGN COUNTRY | |
| 21. HEIGHT FT_____IN | 22. WEIGHT _____ LBS | 23. HAIR COLOR | 24. EYE COLOR | |
| 25. ARS ASSIGNMENT | | | | |

**SECURITY DESIGNATION DATA**

| | | | |
|---|---|---|---|
| 1. JUDGE | 2. REC FACILITY | 3. REC PROGRAM | 4. USM OFFICE |

5. VOLUNTARY SURRENDER STATUS **0** = NO **(-3)** = YES

IF YES, MUST INDICATE: 5a. VOLUNTARY SURRENDER DATE: ________________
5b. VOLUNTARY SURRENDER LOCATION: ________________

6. MONTHS TO RELEASE ________

7. SEVERITY OF CURRENT OFFENSE
**0** = LOWEST **3** = MODERATE **7** = GREATEST
**1** = LOW MODERATE **5** = HIGH

8. CRIMINAL HISTORY SCORE
**0** = 0-1 **4** = 4-6 **8** = 10-12
**2** = 2-3 **6** = 7-9 **10** = 13 +

8a. SOURCE OF DOCUMENTED CRIMINAL HISTORY _____ - PRESENTENCE INVESTIGATION REPORT or ______ - NCIC III

9. HISTORY OF VIOLENCE

| | NONE | >15 YEARS | 10-15 YEARS | 5-10 YEARS | <5 YEARS |
|---|---|---|---|---|---|
| MINOR | **0** | **1** | **1** | **3** | **5** |
| SERIOUS | **0** | **2** | **4** | **6** | **7** |

10. HISTORY OF ESCAPE OR ATTEMPTS

| | NONE | >15 YEARS | >10 YEARS | 5-10 YEARS | <5 YEARS |
|---|---|---|---|---|---|
| MINOR | **0** | **1** | **1** | **2** | **3** |
| SERIOUS | **0** | **3 (S)** | **3(S)** | **3(S)** | **3(S)** |

11. TYPE OF DETAINER
**0** = NONE **3** = MODERATE **7** = GREATEST
**1** = LOWEST/LOW MODERATE **5** = HIGH

12. AGE
**0** = 55 and over **4** = 25 through 35
**2** = 36 through 54 **8** = 24 or less

13. EDUCATION LEVEL
**0** = Verified High School Degree or GED
**1** = Enrolled in and making satisfactory progress in GED Program
**2** = No verified High School Degree/GED and not participating in GED Program

13a. HIGHEST GRADE COMPLETED ________________

14. DRUG/ALCOHOL ABUSE **0** = Never/>5 Years **1** = <5 Years

15. SECURITY POINT TOTAL

16. PUBLIC SAFETY FACTORS
**A**-NONE
**B**-DISRUPTIVE GROUP (males only)
**C**-GREATEST SEVERITY OFFENSE (males only)
**F**-SEX OFFENDER
**G**-THREAT TO GOVERNMENT OFFICIALS
**H**-DEPORTABLE ALIEN
**I**-SENTENCE LENGTH (males only)
**K**-VIOLENT BEHAVIOR (females only)
**L**-SERIOUS ESCAPE
**M**-PRISON DISTURBANCE
**N**-JUVENILE VIOLENCE
**O**-SERIOUS TELEPHONE ABUSE

17. REMARKS

18. OMDT REFERRAL (YES/NO) ____

TEMPLATE

# MANAGEMENT VARIABLES AND PUBLIC SAFETY FACTORS

## MANAGEMENT VARIABLES

A Management Variable is required when placement has been made and/or maintained at an institution level inconsistent with the inmate's scored security level. Application of a Management Variable requires review and approval by the DSCC Administrator. When completing the BP-338, institution staff may only enter a Management Variable which the DSCC previously approved and entered as a management reason. Otherwise, the DSCC is the only office authorized to enter a variable. A maximum of three Management Variables may be entered for each case.

**NOTE:** SENTRY will not permit the simultaneous application of the Greater Security and Lesser Security MGTVs.

When a Management Variable no longer applies, institution staff will remove the variable(s) accordingly. When no Management Variable is required, institution staff will insert the letter "A" (NONE) in the space to signify that no MGTV(s) apply.
Management Variables entered at initial designation are manually transferred to the BP-338, Custody Classification form.

**Request for Management Variable/Management Variable expiration date.** All requests to apply a Management Variable (MGTV) or to update the Management Variable Expiration Date (MVED) must be submitted to the DSCC via GroupWise using the 409 form. Requests for Management Variables on WITSEC inmates are to be forwarded to the Inmate Monitoring Section, Central Office, Washington, DC. The following criteria will be utilized:

Only the DSCC or Central Office staff can apply a MGTV and update a MVED, with the exception of "I" (Med/Psych), which will be applied and reviewed by the Central Office Medical Designator and "U" (Long-Term Detainee), which will be applied by the Detention Services Branch, Correctional Programs Division, Central Office.

When requesting a MGTV or an updated MVED, only sections four and six need to be completed on the form 409. This request should normally be made to the DSCC within 21 calendar days following the inmate's scheduled custody review to ensure the DSCC is receiving a current Custody Classification Form, BP-338. After approval by the Warden, the request may be routed from the unit or shared folders, and unit staff must enter a DST assignment using the Update Transaction. Staff will enter W MGTV

as a DST assignment when the request is routed. DSCC staff will remove the assignment when the decision is made.

When requesting an updated MVED, staff are to indicate the recommended expiration date on the top portion of form 409.

When a case with the MGTV of "I" (Med/Psych) is scheduled for review and it is anticipated that this MGTV is no longer applicable, institution staff will complete all sections of form 409 and forward the request to the Central Office Medical Designator and the DSCC. The Central Office Medical Designator will review the case for continuation or deletion of this MGTV. If this MGTV is no longer appropriate, the Central Office Medical Designator will remove the MGTV. After the Central Office Medical Designator removes the MGTV "I," the DSCC will review the case for transfer. If a transfer is not appropriate, another MGTV is to be applied.

Expiration dates will be assigned in accordance with Table 5-1. The DSCC Administrator must evaluate the information on the form 409 to determine the appropriate expiration date for all applicable Management Variables. At the established expiration date, case management staff will review the current Management Variable(s) to determine appropriateness. In the rare instance when more than one MGTV is applied, all expiration dates will be displayed on the BP-338. When running a SENTRY roster, each MGTV and corresponding MVED will be displayed.

**Management Security Level (MSL).** Upon application of any of the following Management Variables: PSF Waived; Greater Security; Lesser Security, the DSCC is to apply an overriding Management Security Level (MSL) to reflect the inmate's assessed security needs. This MSL takes precedence over the security level reflected in SENTRY which is based upon the scored security level and the application of Public Safety Factors.

Designation must be made to a DFCL commensurate with the inmate's security needs as reflected in the Management Security Level. **If there is an extenuating circumstance in which an inmate's designation facility is inconsistent with his or her MSL, at least one additional non-MSL MGTV must be added to support and explain the inconsistency.**

**A** **None.** No Management Variables apply. Institution staff are permitted to enter this item.

**B** **Judicial Recommendation.** The sentencing court may recommend a specific institution or program. When consistent with policies or when such actions are consistent with sound correctional management, the Bureau of Prisons attempts to satisfy judicial recommendations. When this is not feasible, the court is notified in writing with an explanation outlining the reasons for not satisfying that recommendation.

**D** **Release Residence.** The Bureau of Prisons attempts to place each inmate in an institution that is reasonably close to the anticipated release area. ~~Ordinarily, placement within 500 miles of the release area is to be considered reasonable, regardless of whether there may be an institution closer to the inmate's release area~~. To the extent practicable, placement to the closest facility within 500 driving miles of the release area will be considered reasonable, subject to bed availability, the prisoner's security designation, the prisoner's programmatic needs, the prisoner's mental and medical health needs, any request made by the prisoner related to faith-based needs, recommendations of the sentencing court, and other security concerns of the Bureau of Prisons. This MGTV may also apply to inmates who are within 36 months of release.

**E** **Population Management.** Situations may occur in which an inmate requires housing in a facility which is not commensurate with his or her security level. Following are example situations: facility activation; population pressures affecting available appropriate-level bed space within 500 driving miles of the inmate's anticipated release residence; gang/security concerns.

**G** **Central Inmate Monitoring Assignment.** Pursuant to the CIM Program Statement, some inmates, for specified reasons, need to be monitored or separated from others. Sometimes these special management concerns limit the options for placement.

**I** **Medical or Psychiatric.** An inmate who has a history of or is presently exhibiting psychiatric problems may need an initial designation to a psychiatric referral center. Similarly, documented information reflecting that the inmate may need medical or surgical treatment may require a designation to a medical referral

center. Designations and redesignations of these inmates will be made by the Central Office Medical Designator.

**N** **Program Participation.** Occasionally, inmates become involved in specialized programs which are only available on a limited basis, or at specific institutions; in such instances, it might be appropriate to delay transfer pending completion of the program. Likewise, an inmate's ability to participate in a unique program may require placement at an institution not commensurate with his or her security level. Accordingly, when an inmate's security level changes during participation in a special program not likely to be available in another appropriate facility, causing placement outside normal guidelines, this MGTV will apply.

**R** **Work Cadre.** At secure facilities without satellite camps, the Regional Director may authorize a certain number of work cadre inmates to perform work outside the perimeter of the institution. The DSCC will apply the MGTV upon request of the institution.

**S** **PSF Waived.** An inmate may receive up to three Public Safety Factors (PSFs). PSFs may be waived after review and approval by the DSCC Administrator. When Public Safety Factors are waived causing placement outside normal guidelines, this MGTV will apply. Application of this MGTV mandates that the DSCC Administrator determine the most appropriate level of security required by the inmate and apply a Management Security Level (MSL). The MSL must be at least one level less than the scored security level which is based on the Security Total and PSF(s).

**Request for Public Safety Factor Waiver.** Only the DSCC Administrator is authorized to waive a PSF. A request for waiver of a PSF will be submitted to the DSCC via form 409, available on SALLYPORT. The form 409 will indicate that the request is for waiver of a Public Safety Factor. Items 1 through 7 must be completed when submitting a request for waiver of a PSF.

**U** **Long-term Detainee.** Long-term detainees are given an initial custody and security level. However, Custody Classification Forms are not to be completed on long- term detainees due to the unavailability or non- applicability of certain data (i.e., current term of confinement, length of time remaining to serve, accurate criminal history).

Therefore, transfers for positive or negative behavior may cause placement in a facility different from his or her scored security or custody level. When needed, this MGTV will be applied by the Detention Services Branch, Correctional Programs Division, Central Office.

Long-term criminal detainees whose security or custody level does not match that of their facility will have this Management Variable applied. This applies as well if an inmate rolls over to the status of a long-term detainee after being ordered detained upon expiration of the federal sentence and the security or custody level does not match that of the designated facility.

**V** **Greater Security.** There may be security concerns which are not adequately reflected in the classification scheme. In circumstances where an inmate represents a greater security risk (i.e., pending charges, detainer, escape risk, etc.) than their assigned security level, they may be placed in an institution outside normal guidelines, and this MGTV will apply. When this MGTV is applied based on institutional behavior which is **not** supported by a UDC/DHO finding of guilt, staff will ensure compliance with the criteria as set forth in the Program Statement on Inmate Discipline and Special Housing Units. Application of this MGTV mandates the DSCC Administrator determine the most appropriate level of security required by the inmate and apply a Management Security Level (MSL). Designation will then be made to a DFCL commensurate with the inmate's Management Security Level. The MSL must be at least one level greater than the scored security level which is based on the Security Total and Public Safety Factor(s). This MGTV requires up to a 24 month expiration date.

**W** **Lesser Security.** There may be security concerns which are not adequately reflected in the classification scheme. In circumstances where an inmate represents a lesser security risk (i.e., detainer removed, positive adjustment, etc.) than the assigned security level, the inmate may be placed in an institution outside normal guidelines. For example, where age is largely the contributing factor in the inmate's placement, this Management Variable will apply.

Application of this MGTV mandates the DSCC Administrator to determine the most appropriate level of security required by the inmate and apply a Management Security Level (MSL).
The MSL must be at least one level less than the scored

security level which is based on the Security Total and Public Safety Factor(s).

**DISCONTINUED MANAGEMENT VARIABLES.** The following Management Variables have been discontinued: C - Age, F - Racial Balance, H - Voluntary Surrender, J - Custody, K - Detainer, L - Discipline, M - Grandfather Clause, O - Security, P - Sentence Limitation, and Q - Sliding Scale.

**Table 5-1**

| MANAGEMENT VARIABLE EXPIRATION TABLE | | |
|---|---|---|
| CODE | DESCRIPTION | LENGTH |
| A | None | N/A |
| B | Judicial Recommendation | N/A |
| D | Release Residence/Planning | N/A |
| E | Population Management | Up to 18 months** |
| G | Central Inmate Monitoring Assignment | N/A |
| I | Medical/Psychiatric | 6 months |
| N | Program Participation | Up to 18 months, at the discretion of the Regional Director** |
| R | Work Cadre | N/A |
| S | PSF Waived* | N/A (However, if an inmate is transferred to a more secure institution based on behavior related to the waived PSF, this MGTV will be removed.) |
| U | Long-Term Detainee | N/A |
| V | Greater Security* | Up to 24 months** |
| W | Lesser Security* | N/A |

* requires application of a Management Security Level (MSL)
** if no expiration date is entered, SENTRY will default to an expiration date 12 months in advance

**PUBLIC SAFETY FACTORS**

A Public Safety Factor (PSF) is relevant factual information regarding the inmate's current offense, sentence, criminal history or institutional behavior that requires additional security measures be employed to ensure the safety and protection of the public. Public Safety Factors are normally applied on the Inmate Load and Security Designation Form (BP-337) prior to an inmate's initial assignment to an institution, however, additions or deletions may be made at anytime there after via the Custody Classification Form, (BP-338). A maximum of three PSFs may be applied, however if more than three apply, those which would provide the greatest security and public safety will be utilized.

| CODE | PSF - DESCRIPTION |
|---|---|
| **A** | **None.** No Public Safety Factors apply. |
| **B** | **Disruptive Group.** A **male** inmate who is a validated member of a Disruptive Group identified in the Central Inmate Monitoring System will be housed in a High security level institution, unless the PSF has been waived.<br><br>At the time of initial designation, if the Presentence Investigation Report or other documentation identifies the inmate as a possible member of one of the Central Inmate Monitoring Disruptive Groups, DSCC staff will enter a PSF on the BP-337. However, DSCC staff will not enter the CIM assignment "Disruptive Group." Upon loading this PSF on a not-yet-validated member, DSCC staff will (1) make a notation in the Remarks Section to indicate the need for validation upon arrival at the institution, and (2) notify the Central Office Intelligence Section, via GroupWise, to advise them of the inmate's status. Upon the inmate's arrival at the designated institution, the intake screener will notify the institution's Special Investigation Supervisor of the inmate's PSF, to initiate the validation process. |
| **C** | **Greatest Severity Offense.** A **male** inmate whose current term of confinement falls into the "Greatest Severity" range according to the Offense Severity Scale (Appendix A) will be housed in at least a Low security level institution, unless the PSF has been waived. |

**F** **Sex Offender.** A **male** or **female** inmate whose behavior in the current term of confinement or prior history includes one or more of the following elements will be housed in at least a Low security level institution, unless the PSF has been waived. A conviction is not required for application of this PSF if the Presentence Investigation Report (PSR), or other official documentation, clearly indicates the following behavior occurred in the current term of confinement or prior criminal history. If the case was dismissed or nolle prosequi, application of this PSF cannot be entered.
However, in the case where an inmate was charged with an offense that included one of the following elements, but as a result of a plea bargain was not convicted, application of this PSF should be entered.

**Example:** According to the PSR, the inmate was specifically described as being involved in a Sexual Assault but pled guilty to Simple Assault. Based on the documented behavior, application of this PSF should be entered:

(1) Engaging in sexual contact with another person without obtaining permission to do so (forcible rape, sexual assault or sexual battery);

(2) Possession, distribution or mailing of child pornography or related paraphernalia;

(3) Any sexual contact with a minor or other person physically or mentally incapable of granting consent (indecent liberties with a minor, statutory rape, sexual abuse of the mentally ill, rape by administering a drug or substance);

(4) Any sexual act or contact not identified above that is aggressive or abusive in nature (e.g., rape by instrument, encouraging use of a minor for prostitution purposes, incest, etc.). Examples may be documented by state or Bureau of Prisons' incident reports, clear NCIC entries, or other official documentation;

(5) Attempts are to be treated as if the sexual act or contact was completed; and/or,

(6) Any offense referenced in the Sex Offender Notification and Registration Program Statement.

| CODE | PSF - DESCRIPTION |
|---|---|
| **G** | **Threat to Government Officials.** A **male** or **female** inmate classified with a Central Inmate Monitoring assignment of Threat to Government Official will be housed in at least a Low security level institution, unless the PSF has been waived. |
| **H** | **Deportable Alien.** A male or female inmate who is not a citizen of the United States. All long-term detainees will have this PSF applied. When applied, the inmate or the long-term detainee shall be housed in at least a Low security level institution.<br><br>The PSF shall not be applied, or shall be removed when the U.S. Immigration and Customs Enforcement (ICE) or the Executive Office for Immigration Review (EOIR) have determined that deportation proceedings are unwarranted or there is a finding not to deport at the completion of deportation proceedings. The Institution Hearing Program CMA of NO IHP or IHP CMP ND will then be applied. Additionally, the PSF shall not be applied if the inmate has been naturalized as a United States citizen. |
| **I** | **Sentence Length.** A **male** inmate with more than ten years remaining to serve will be housed in at least a Low security level institution unless the PSF has been waived.<br><br>A **male** inmate with more than 20 years remaining to serve will be housed in at least a Medium security level institution, unless the PSF has been waived.<br><br>A **male** inmate with more than 30 years remaining to serve (including non-parolable LIFE sentences) will be housed in a High security level institution unless the PSF has been waived. |
| **K** | **Violent Behavior.** A **female** inmate whose current term of confinement or history involves two convictions (or findings of commission of a prohibited act by the DHO) for serious incidents of violence within the last five years will be assigned to at least a Low security level institution, unless the PSF has been waived. |

**L** **Serious Escape.** A **female** inmate who has been involved in a serious escape within the last ten years, including the current term of confinement, will be assigned to the Carswell Administrative Unit, unless the PSF has been waived.

A **male** inmate who has escaped from a secure facility (prior or instant offense) with or without the threat of violence or who escapes from an open institution or program with a threat of violence will be housed in at least a Medium security level institution, unless the PSF has been waived.

**M** **Prison Disturbance.** A **male** or **female** inmate who was involved in a serious incident of violence within the institution and was found guilty of the prohibited act(s) of Engaging, Encouraging a Riot, or acting in furtherance of such as described in, but not limited to institution disciplinary codes such as 103, 105, 106, 107, 212, 213 or 218. Such a finding must be in conjunction with a period of simultaneous institution disruptions. Males will be housed in at least a HIGH security level institution and females will be assigned to the Carswell Administrative Unit, unless the PSF has been waived.

**N** **Juvenile Violence.** A **male** or **female** offender, currently of juvenile age, who has any documented single instance of violent behavior, past or present, which resulted in a conviction, a delinquency adjudication, or finding of guilt. Violence is defined as aggressive behavior causing serious bodily harm or death or aggressive or intimidating behavior likely to cause serious bodily harm or death (e.g., aggravated assault, intimidation involving a weapon, or arson).

**O** **Serious Telephone Abuse.** A **male** or **female** inmate who utilizes the telephone to further criminal activities or promote illicit organizations and who meets the criteria outlined below, must be assigned a PSF for Serious Telephone Abuse. A conviction is **not required** for the PSF if the Presentence Investigation Report (PSR) or other official documentation clearly indicates that the above behavior occurred or was attempted. An inmate who meets this criteria must be housed in at

least a Low security level institution, unless the PSF is waived.

The PSF should be entered if any **one** of the following criteria applies.

(1) PSR or comparable documentation reveals the inmate was involved in criminal activity facilitated by the telephone who:

- meets the definition of a leader/organizer or primary motivator; or
- utilized the telephone to communicate threats of bodily injury, death, assaults, or homicides; or
- utilized the telephone to conduct significant fraudulent activity (actual or attempted) in an institution; or
- leader/organizer who utilized the telephone to conduct significant fraudulent activity (actual or attempted) in the community; or,
- arranged narcotic/alcohol introductions while confined in an institution.

(2) Federal law enforcement officials or a U.S. Attorney's Office notifies the Bureau of Prisons of a significant concern and need to monitor an inmate's telephone calls;

(3) The inmate has been found guilty of a 100 or 200 level offense code for telephone abuse.

**NOTE:** 200 level offense codes will be reviewed on a case-by-case basis.

(4) A Bureau of Prisons official has reasonable suspicion and/or documented intelligence supporting telephone abuse.

**NOTE:** Any inmate who is assigned the Serious Telephone Abuse PSF may be subject to telephone restriction in accordance with the Telephone Regulations for Inmates Program Statement.

**DISCONTINUED PUBLIC SAFETY FACTORS**

**D** Firearms **E** High Drug **J** Designation Assessment

**Table 5-2**

| **SECURITY DESIGNATION TABLE (MALES)** | | |
|---|---|---|
| INMATE SECURITY LEVEL ASSIGNMENTS BASED ON CLASSIFICATION SCORE AND PUBLIC SAFETY FACTORS | | |
| Securit y Point | Public Safety Factors | Inmate Security Level |
| **0 - 11** | **No Public Safety Factors** | **Minimum** |
| | Deportable Alien | Low |
| | Juvenile Violence | Low |
| | Greatest Severity Offense | Low |
| | Sex Offender | Low |
| | Serious Telephone Abuse | Low |
| | Threat to Government Officials | Low |
| | Sentence Length | |
| | Time remaining > 10 Yrs | Low |
| | Time remaining > 20 Yrs | Medium |
| | Time remaining > 30 Yrs (Includes non-parolable LIFE and Death penalty cases) | High |
| | Serious Escape | Medium |
| | Disruptive Group | High |
| | Prison Disturbance | High |
| **12 - 15** | **No Public Safety Factors** | **Low** |
| | Serious Escape | Medium |
| | Sentence Length | |
| | Time remaining > 20 Yrs | Medium |
| | Time remaining > 30 Yrs (Includes non-parolable LIFE and Death penalty cases) | High |
| | Disruptive Group | High |
| | Prison Disturbance | High |
| **16 - 23** | **No Public Safety Factors** | **Medium** |
| | Disruptive Group | High |
| | Prison Disturbance | High |
| | Sentence Length | |
| | Time remaining > 30 Yrs (Includes non-parolable LIFE and Death penalty cases) | High |
| **24 +** | | **High** |

**Table 5-3**

| **SECURITY DESIGNATION TABLE (FEMALES)** | | |
|---|---|---|
| INMATE SECURITY LEVEL ASSIGNMENTS BASED ON CLASSIFICATION SCORE AND PUBLIC SAFETY FACTORS | | |
| Security Point Total | Public Safety Factors | Inmate Security Level |
| **0 - 15** | **No Public Safety Factors** | **Minimum** |
| | Deportable Alien | Low |
| | Juvenile Violence | Low |
| | Serious Telephone Abuse | Low |
| | Sex Offender | Low |
| | Threat to Government Officials | Low |
| | Violent Behavior | Low |
| | Prison Disturbance | High |
| | Serious Escape | High |
| **16 - 30** | **No Public Safety** | **Low** |
| | **Factors** Prison | High |
| | Disturbance Serious | High |
| **31 +** | | **High** |

## CUSTODY CLASSIFICATION FORM INSTRUCTIONS (BP-338)

**INTRODUCTION.** Custody classification is a procedure whereby an inmate is assigned a level of supervision according to their criminal history and institutional behavior/adjustment. An inmate's custody level is an indication of how much staff supervision an inmate requires within and beyond the confines of the institution.

An inmate's first custody classification will be scored at the first program review following initial classification (approximately 7 months after arrival at an institution). Subsequent reviews will occur at least every 12 months, but may be conducted earlier in order to enable progress toward community activities. Custody classification will ordinarily occur every 12 months at a regularly scheduled program review. Only changes which increase or decrease the overall security level assignment of the inmate, i.e. FRP refuse, incident report(s), new sentence, sentence reduction etc., should be scored outside of the 12 month cycle.

When transferring to another institution, inmates normally retain their custody assignments. If the custody level is inconsistent with that authorized at the receiving institution, the sending institution will change the inmate's custody prior to transfer.
Holdovers will retain their initial custody level assignments until their first regularly scheduled custody review at their designated facility for service of sentence.

At each annual custody review, a new Custody Classification Form (BP-338) will be completed, even though the scoring elements may not have changed from the previous form. Only the most current BP-338 form will be retained in the Inmate Central File, except for those forms that must be retained to document appropriate review and approval for custody reductions (e.g., custody reductions for exception cases require the Warden, or designee, to sign the Custody Classification Form. The form should be maintained to document the review and approval). As set forth in the definition of "Maximum" custody, Chapter 2, a BP-338 form changing an inmate's custody to or from "Maximum" custody must be permanently maintained.

It should be clearly understood that the Custody Classification Form only recommends an inmate's custody. The Unit Team and/or Warden is the final review authority. The intent of the Custody Classification system is to permit staff to use professional judgment within specific guidelines. Custody changes are not

dictated solely by the point total. However, when the Unit Team decides not to follow the recommendation of the point total, they must document the reason(s) for this decision in writing on the Custody Classification Form, and inform the inmate.

| A. IDENTIFYING DATA | | |
|---|---|---|
| 1. INSTITUTION CODE | 2. UNIT | 3. DATE |
| 4. NAME | 5. REGISTER NUMBER | |
| 6. MANAGEMENT VARIABLES | **A** - NONE<br>**B** - JUDICIAL RECOMMENDATION<br>**D** - RELEASE RESIDENCE/PLANNING<br>**E** - POPULATION MANAGEMENT<br>**G** - CIMS<br>**I** - MED/PSYCH TREATMENT<br>**N** - PROGRAM PARTICIPATION<br>**R** - WORK CADRE | **S** - PSF WAIVED<br>**U** - LONG-TERM DETAINEE<br>**V** - GREATER SECURITY<br>**W** - LESSER SECURITY |
| 7. PUBLIC SAFETY FACTORS | **A** - NONE<br>**B** - DISRUPTIVE GROUP (males only)<br>**C** - GREATEST SEVERITY OFFENSE (males only)<br>**F** - SEX OFFENDER<br>**G** - THREAT TO GOVERNMENT OFFICIALS<br>**H** - DEPORTABLE ALIEN | **I** - SENTENCE LENGTH (males only)<br>**K** - VIOLENT BEHAVIOR (females only)<br>**L** - SERIOUS ESCAPE<br>**M** - PRISON DISTURBANCE<br>**N** - JUVENILE VIOLENCE<br>**O** - SERIOUS TELEPHONE ABUSE |

1. **INSTITUTION CODE.** (Automatically displayed by SENTRY.)

2. **UNIT.** (Automatically displayed by SENTRY.)

3. **DATE.** (Automatically displayed by SENTRY.)

4. **NAME.** (Automatically displayed by SENTRY.)

5. **REGISTER NUMBER.** (Automatically displayed by SENTRY.)

6. **MANAGEMENT VARIABLES.** See Chapter 5, pages 1-6.

7. **PUBLIC SAFETY FACTORS.** See Chapter 5, pages 7-13.

## B. BASE SCORING

1. **TYPE OF DETAINER**

| | | | | |
|---|---|---|---|---|
| 1. TYPE OF DETAINER | **0** = NONE<br>**1** = LOWEST/LOW MODERATE | **3** = MODERATE<br>**5** = HIGH | **7** = GREATEST | |

Enter the appropriate number of points that reflect the inmate's detainer status. Refer to the Offense Severity Scale (Appendix A). If multiple detainers have been filed, enter the point value for the most serious charge. Frequency and sentence length are not considered.

The scoring of detainers on the Inmate Load and Security Designation Form (BP-337) may differ from the score received on the Custody Classification Form (BP-338). If there is a pending charge, points based on the documented behavior are assigned on

the type of detainer item; if the pending charge involves a probation violation, use the most severe documented behavior from the original offense as the basis for assigning points in the detainer scoring.Only formally filed detainers are considered on the Custody Classification Form after the second regularly scheduled custody review.

- Score consecutive state sentences, lodged state detainers and/or state parole violation terms/warrants as detainers. Inmates should be informed that it is vitally important that all pending charges and detainers be resolved as quickly as possible so that institution programming and release planning can occur.

- Score concurrent state sentences, as a detainer only if it is expected that the state sentence will exceed the federal sentence and the state has formally filed a detainer. Other formally filed state pending charges, consecutive sentences, and/or parole violation term/warrants will be scored as detainers.
  Points will be assigned the same as they would be for a federal violation (see page 4 of this Chapter for further instructions).

- No points will be awarded for U.S. Parole Commission warrants (adjudicated or unadjudicated). However, the original offense behavior will be factored into the criminal history points and the violation behavior (including new offense behavior) will be scored as the current offense.

- No points will be assigned for ICE detainers. However, each case will be carefully reviewed to determine whether the PSF for Deportable Alien is applicable.

- If a formally filed detainer involves a probation violation, use the most severe documented behavior in the original offense as the basis for assigning points in the detainer scoring chart above.

2. **SEVERITY OF CURRENT OFFENSE**

| | | | | |
|---|---|---|---|---|
| 2. SEVERITY OF CURRENT OFFENSE | **0** = LOWEST<br>**1** = LOW MODERATE | **3** = MODERATE<br>**5** = HIGH | **7** = GREATEST | |

Enter the appropriate number of points that reflect the most severe documented instant offense behavior. For multiple offenses, the highest score will be used when scoring the current offense. Staff will consider the offense behavior of all sentences, including federal sentences that have a future

beginning date or a prior state or D.C. sentence if there was no physical release from custody.

Severity is determined by using the Offense Severity Scale (Appendix A). Do not use instant offense behavior to also assign points on the "history" items on the Custody Classification Form.

**Example:** According to the Presentence Investigation Report, the individual was involved in an Assault With Serious Injury (Greatest severity level) but pled guilty to a Simple Assault (Moderate severity level). Assign the points on the basis of the more severe documented behavior, i.e., assign 7 points (Greatest severity level). Do not use the current term of confinement information to assign points on the "history" items (numbers 5 and 6 on the Security Designation Data section of the BP-337).

**In determining "Severity of Current Offense" staff must review the Statement of Reasons, (attachment to the Judgment) and ensure the information provided is appropriately used in classifying the inmate.**

**Example:** According to the Presentence Investigation Report the individual was involved in a drug conspiracy responsible for distribution of 31 grams of cocaine base "Crack", but was individually only responsible for 2 grams, he/she would be scored as Moderate Severity in this category. However, the **STATEMENT OF REASONS**, indicates the Judge found the individual responsible for less than 1 gram; therefore, the appropriate scoring should be Low Moderate Severity.

- **Procedures for Parole, Mandatory Release, Special Parole Term, or Supervised Release Violator**

  If the violation was the result of new criminal conduct, regardless of conviction status, use the new criminal conduct for scoring "Severity of Current Offense" (see Appendix A). If the violation behavior was a technical violation, score the "Severity of Current Offense" as Low Moderate Severity.

  The original offense behavior which occurred prior to the violation is considered past behavior and is not used in determining "Severity of Current Offense."

- **Procedures for Probation Violator**

  The original offense behavior that resulted in probation should be used for scoring "Severity of Current Offense" (see Appendix A).

  However, if the new criminal conduct (violation behavior) is more severe than the original offense behavior, then use this behavior for scoring "Severity of Current Offense." The most severe documented behavior between the original offense and the violation behavior is to be used for scoring "Severity of Current Offense."

3. **MONTHS TO RELEASE DATE**

| |
|---|
| 3. MONTHS TO RELEASE __________ |

If there is a current and valid sentence computation in SENTRY, SENTRY will automatically enter the number of months remaining into this field. If however, there is not a complete Sentence Computation/Projected Release Date in SENTRY, this entry must be manually computed. This item is not figured into the security point total but impacts the Sentence Length Public Safety Factor.

4. **CRIMINAL HISTORY SCORE**

| | | | | |
|---|---|---|---|---|
| 4. CRIMINAL HISTORY SCORE | **0** = 0-1<br>**2** = 2-3 | **4** = 4-6<br>**6** = 7-9 | **8** = 10-12<br>**10** = 13 + | |

SENTRY will automatically insert the score that was entered for this item on the BP-337. If this item was not entered on the BP-337, insert the appropriate number of points that reflect the Criminal History Score. For further details on Criminal History Score see Chapter 4, Section 8.

5. **HISTORY OF ESCAPE OR ATTEMPTS**

| 5. HISTORY OF ESCAPE OR ATTEMPTS | | NONE | >15 YEARS | 10-15 YEARS | 5-10 YEARS | <5 YEARS | |
|---|---|---|---|---|---|---|---|
| | MINOR | **0** | **1** | **1** | **2** | **3** | |
| | SERIOUS | **0** | **3(S)** | **3(S)** | **3(S)** | **3(S)** | |

Enter the appropriate number of points that reflect the escape history of the individual, considering only those acts for which there are documented findings of guilt (i.e., DHO, Court, Parole, Mandatory Release, or Supervised Release Violation). Escape History includes the individual's entire background of escapes or attempts to escape from confinement, or absconding from community supervision, excluding the current term of confinement.

**EXCEPTION:** Any institution disciplinary hearing (UDC or DHO) finding that a prohibited act was committed during the current term of confinement will be scored as a history item.

State disciplinary findings are scored unless there is documentation that the state disciplinary proceedings did not afford due process protection to the inmate.

Fleeing or Eluding Arrest, Failure to Appear for traffic violations, runaways from foster homes and similar behavior should not be scored under the Escape History item, even if clearly documented, but should be considered on a case-by-case basis under the Management Variable "Greater Security." Failure to Appear or Flight to Avoid Prosecution for any offense however, must be counted when there is a documented finding of guilt.

In determining time frames, use the date of the documented occurrence. Documented information from juvenile or YCA adjudications can be used unless the record has been expunged or vacated.

Minor History of Escape - An escape from an open institution or program (e.g., minimum security facility, CCC, furlough) not involving any actual or threat of violence. Also includes military AWOL, Bail Reform Act, Flight to Avoid Prosecution, and Absconding from Community Supervision. There must be a finding of guilt.

Serious History of Escape - An escape from secure custody with or without threat of violence. Also includes escapes from an open facility or program with actual threat of violence. There must be a finding of guilt. S = 3 points and requires application of PSF L.

6. **HISTORY OF VIOLENCE**

| 6. HISTORY OF VIOLENCE | | NONE | >15 YEARS | 10-15 YEARS | 5-10 YEARS | <5 YEARS | |
|---|---|---|---|---|---|---|---|
| | MINOR | 0 | 1 | 1 | 3 | 5 | |
| | SERIOUS | **0** | **2** | **4** | **6** | **7** | |

Enter the appropriate number of points that reflect any history of violence, considering only those acts for which there are documented findings of guilt (i.e., DHO, Court, Parole, Mandatory Release, or Supervised Release Violation). This item includes the individual's entire background of criminal violence, excluding the current term of confinement.

**EXCEPTION:** Any institution disciplinary hearing (UDC or DHO) finding that a prohibited act was committed during the current term of confinement will be scored as a history item.

State disciplinary findings are scored unless there is documentation that the state disciplinary proceedings did not afford due process protection to the inmate.

Severity of violence is determined by the offense behavior regardless of the conviction/finding of guilt offense. History of Violence points combine both seriousness and recency of prior violent incidents to assess the propensity for violent behavior, where more points mean greater risk. Therefore, if there is more than one incident of violence, score the combination of seriousness and recency that yields the highest point score. Prior periods of incarceration will be considered a "history" item if the inmate was physically released from custody and then returned to serve either a violation or a new sentence. In determining time frames, use the date of the documented behavior. Documented information from juvenile or YCA adjudication can be used unless the record has been expunged or vacated.

Minor History of Violence - Aggressive or intimidating behavior which is not likely to cause serious bodily harm or death (e.g., simple assault, fights, domestic disputes, etc.) There must be a finding of guilt.

Serious History of Violence - Aggressive or intimidating behavior which is likely to cause serious bodily harm or death (e.g., aggravated assault, domestic violence, intimidation involving a weapon, incidents involving arson or explosives, rape, etc.). There must be a finding of guilt.

**Example:** If an offender was found guilty of homicide 20 years ago and a simple assault 3 years ago, assign 5 points for the simple assault. Or in another case, the offender had guilty findings for homicide 12 years ago; aggravated assault 8 years ago; and fighting 2 years ago, score 6 points for the aggravated assault 8 years ago.

**NOTE:** Attempted suicide, self-mutilation and possession of weapons are not applicable behaviors for History of Violence scoring. In addition, verbal threats (such as Code 203- Threatening Bodily Harm) are to be viewed as minor violence.

7. **VOLUNTARY SURRENDER**

| | | | |
|---|---|---|---|
| 7. VOLUNTARY SURRENDER | **0** = NOT APPLICABLE | (**-3**) = VOLUNTARY SURRENDER | |

This item allows for the subtraction of three points from the "Base Score" (Item 11 below), when the Judgement indicates the inmate was ordered to voluntarily surrender. Enter the appropriate number of points.For purposes of this item, voluntary surrender means the inmate was not escorted by a law enforcement officer to either the U.S. Marshals Office or the place of confinement.

**NOTE:** Supervised Release, Mandatory Release, and Parole Violators will not receive credit for Voluntary Surrender even if it is approved by the court.

8. **AGE**

| | | | |
|---|---|---|---|
| 8. AGE | **0** = 55 and over<br>**2** = 36 through 54 | **4** = 25 through 35<br>**8** = 24 or less | |

SENTRY will automatically cross-reference the inmate's date of birth and assign the appropriate number of points that reflect his or her age. Staff do not have to manually enter an offender's age.

9. **EDUCATIONAL LEVEL**

| | | |
|---|---|---|
| 9. EDUCATION LEVEL | **0** = Verified High School Degree/GED<br>**1** = Enrolled in and making satisfactory progress in GED Program<br>**2** = No verified High School Degree/GED & not participating in GED Program | |

Enter the appropriate number of points, that reflect the inmate's education level as verified by the Education Department.

**NOTE:** The scoring of this item on the Custody Classification form differs from the scoring on the Security Designation form. Therefore, unit staff must reconcile information obtained since the inmate's previous score on this item.

In addition to the points assigned for the education level, the highest grade completed (HGC) will also be recorded on the BP-337. For example an inmate who began but did not complete the 7th grade will be given a 6 in the HGC field. Similarly, a GED will be given a 12, a college graduate a 16, a Master's degree an 18, and a Ph.D. a 21 (the maximum allowed) in the HGC field.

10. **DRUG/ALCOHOL ABUSE**

| | | | |
|---|---|---|---|
| 10. DRUG/ALCOHOL ABUSE | **0** = Never/>5 Years | **1** = <5 Years | |

Enter the appropriate number of points that reflect drug or alcohol abuse by the inmate. Examples of drug or alcohol abuse include: a conviction of a drug or alcohol related offense, a parole or probation violation based on drug or alcohol abuse, positive drug test, a DUI, detoxification, etc. Absent any information similar to the above, an inmate's self report is sufficient to score this item. If this information is unknown, enter a "U" and the item will be scored as zero.

11. **BASE SCORE**

| | |
|---|---|
| 11. BASE SCORE (ADD B. ITEMS 1 - 10) | |

SENTRY will compute the base score based upon the points entered for Items 1 - 10 (excluding Item 3).In cases where the total results in a negative number the base score will be set at zero.

## C. CUSTODY SCORING

1. **PERCENTAGE OF TIME SERVED**

| | | | |
|---|---|---|---|
| 1. PERCENTAGE OF TIME SERVED | **3** = 0-25%<br>**4** = 26-75% | **5** = 76-90%<br>**6** = 91+% | |

Enter the number of points that reflect the percentage of time the inmate has already served on the present commitment at the time of the review. To determine the percent, divide the number of months already served on the present sentence by the number of months of incarceration the inmate will have served upon reaching his/her projected release date. If applicable, give credit for jail time.

**Example:** An inmate has served 15 months (14 months at the institution, plus credit for one month jail time) of an anticipated total of 78 months of confinement.

$$\frac{\text{Actual Time Served}}{\text{Anticipated Time in Confinement}} = \frac{15}{78} = 19.2\%$$

Enter "3" , since 3 represents a range of 0 to 25%.

## 2. PROGRAM PARTICIPATION

| 2. PROGRAM PARTICIPATION | **0** = POOR | **1** = AVERAGE | **2** = GOOD | |
|---|---|---|---|---|

Enter the appropriate number of points that reflect the inmate's level of initiative in programming. This is based on the inmate's active program involvement, eg. RPP, FRP, Drug education or Treatment Programs, education programs, or any other suitable programs as recommended by the Unit Team. Unit Teams should score this area at the time of the custody review so input may be gained from all classification team members.

**NOTE:** Inmates in "FRP Refuse", "RPP Refuse", or who refuse to participate in mandatory drug education or treatment programs will be scored with 0 points regardless of any other programs achievements. Otherwise, assign points as follows:

GOOD - The inmate actively participates in multiple recommended programs.

AVERAGE - The inmate could be participating in multiple recommended programs but chooses to be involved in one at a time. This also includes inmates who are on official waiting lists for programs recommended by the Unit Team.

POOR - No program involvement, refuses to participate, or poor participation in programs in which he/she is enrolled.

## 3. LIVING SKILLS

| 3. LIVING SKILLS | **0** = POOR | **1** = AVERAGE | **2** = GOOD | |
|---|---|---|---|---|

Enter the appropriate number of points that reflect the inmate's living skills during the past 12 months. This is based on the inmate's demeanor, attitude, personal accountability and nature of interaction with staff and other inmates. Incident Reports in and of themselves are not the determining factor in assessing the points on this item; however, the underlying behavior(s) may influence the scoring of this item. Unit Teams should score this item at the time of the custody review so input may be gained from all classification team members.

**NOTE:** Inmates in "FRP Refuse", "RPP Refuse", or who refuse to participate in mandatory drug education or treatment programs will be scored with 0 points regardless of any other programs achievements. Otherwise, assign points as follows.

GOOD - The inmate fully complies with staff expectations. He/she consistently receives outstanding sanitation and work reports and impresses staff as a "model inmate" in all other aspects of adjustment. He/she has developed a good rapport with staff. This high level of responsibility is consistent throughout the year.

While behavior(s) of a minor concern may occur occasionally, they do not detract from the inmate's overall favorable performance.
He/she is perceived by staff as attempting to program in a positive manner. Some examples of such behavior(s) are as follows:

- Rare property/sanitation related counseling necessary; however, not as the result of or leading to an Incident Report or extra duty;

- Work reports that are excellent overall, though not all evaluation elements are rated as "outstanding;" and,

- Uncharacteristic instances of staff reported negative interactions or behavior that do not result in Incident Reports.

AVERAGE - The inmate generally complies with staff expectations although falls short of providing a full and complete effort.
He/she has been counseled about sanitation, work performance and/or other aspects of adjustment; however, the inmate is not viewed as problematic. The inmate's rapport with staff is satisfactory. The inmate presents well personally; however, he/she fails to display any significant motivation for self-improvement.

POOR - The inmate consistently fails to meet staff expectations as evidenced by poor quarters sanitation, personal hygiene, negative interaction with staff/peers, or poor work reports.

4. **TYPE AND NUMBER OF MOST SERIOUS INCIDENT REPORT(S)**

| | |
|---|---|
| 4. TYPE & NUMBER **0** = ANY GREAT (100) IN PAST 10 YRS **3(A)**= 1 MOD (300) IN PAST YR<br>OF MOST **1** = > 1 HIGH (200) IN PAST 2 YRS **3(B)**= >1 LOW MOD (400) IN PAST YR SERIOUS<br>**2(A)**= 1 HIGH (200) IN PAST 2 YRS **4** = 1 LOW MOD (400) IN PAST YR INCIDENT RPT<br>**2(B)**= > 1 MOD (300) IN PAST YR **5** = NONE | |

Enter the points that reflect the most serious Incident Report(s) received by the inmate. This is determined by using the Institution Disciplinary Codes and Sanctions Severity Scale. Points are assigned based on the most severe Incident Report(s) for which the inmate has been found guilty by either

the Unit Disciplinary Committee (UDC) or the Discipline Hearing Officer (DHO), within the specified time frames. Points are to be assigned only for the current period of incarceration.

**NOTE:** Disciplinary findings while an inmate is housed under BOP authority in non-BOP correctional facilities should be scored if received during the current period of incarceration unless there is documentation that the disciplinary proceeding(s) did not afford due process protection to the inmate.

**Example:** If an inmate has been found guilty of three HIGH severity Incident Reports within the past two years, he/she would receive a score of "1."If the inmate has only received one HIGH severity incident report within the past two years, the inmate would receive a score of "2(a)."

**NOTE:** Greatest severity Incident Reports merit a score of "0" regardless of the total number received in the last ten years.

The letter characters assigned to numerical scores 2 and 3 are merely used to differentiate between these items which have identical numerical values. The letter character is not used for computation.

**NOTE:** For supervised release, mandatory release, and parole violators, Incident Reports received during a previous period of confinement should be used, if they apply, for scoring "History of Escape or Violence," and "Drug/Alcohol Abuse." However, Incident Reports received during a previous period of confinement will not be counted when scoring "Type and Number of Most Serious Incident Reports" and "Frequency of Incident Reports" since this behavior occurred during a previous period of confinement.Only Incident Reports received during the current supervised release and parole violator term will be counted in these categories.

5. **FREQUENCY OF INCIDENT REPORTS**

| | | | |
|---|---|---|---|
| 5. FREQUENCY OF INCIDENT REPORTS (IN PAST YEAR) | **0** = 6+<br>**1** = 2 THRU 5 | **2** = ONE<br>**3** = NONE | |

Enter the appropriate number of points that reflect the frequency of Incident Reports.

This is determined by assigning points based on the number of Incident Reports for which the inmate has been found guilty by

either the Unit Discipline Committee or the Discipline Hearing Officer during the past 12 months.

6. **FAMILY/COMMUNITY TIES**

| 6. FAMILY/COMMUNITY TIES | **3** = NONE OR MINIMAL | **4** = AVERAGE OR GOOD | |
|---|---|---|---|

Enter the number of points that reflect the level of family and community ties. This is based on the inmate's efforts to build, maintain and strengthen family/community ties rather than the unilateral efforts of the family/community to provide support and assistance to the inmate.Consideration should be given to the following:

- Financial support (not to include FRP participation);
- Visiting (consider inmate's efforts in establishing visiting list, frequency of visits, and who is visiting);
- Development of phone list with focus on family, employment, and community;
- Sending and receiving regular correspondence;
- Participation in Institution Release Preparation Program and institution sponsored mock job fairs;
- Involvement in parenting program and other family oriented activities;
- Contacts with social service providers to promote/enhance family stability (i.e., school guidance counselors, welfare workers, treatment providers);
- Contact with Prisoner Visitation Services;
- Participation in institution sponsored community service opportunities (i.e., Toys for Tots, Make a Wish Foundation, community gardens, Special Olympics); and,
- Voluntary involvement with community activities.

Score each inmate based on his/her unique circumstances while focusing on what the inmate does to maintain, build or strengthen these ties. To best accomplish this, Unit Teams should score this item at the custody review so input can be gained from all classification team members and possibly even the inmate.

**Examples:**

Inmates who demonstrate no initiative to further and/or enhance relationships with supportive parents/spouse/children should be scored as "none or minimal." (e.g., visiting and phone lists that do not include family members, no effort to provide financial support for children);

Inmates with limited financial resources who have parents/spouse/children living significant distances from their designated facilities, and request to have these family members placed on their visiting and phone lists, and send and receive frequent letters from family and make phone calls to them when funds are available. These inmates score as "average or good;" and,

Inmates with no surviving parents, siblings, spouse, or children may receive an "average or good" rating by developing contacts through Prisoner Visitation Services (PVS) and participation in community based activities and community service opportunities.

7. **CUSTODY TOTAL**

| | |
|---|---|
| 7. CUSTODY TOTAL (ADD C. 1 - 6) | |

Add the points in items 1 through 6, Section C, and enter the sum in this block.

8. **CUSTODY VARIANCE**

| | |
|---|---|
| 8. CUSTODY VARIANCE (FROM APPROPRIATE TABLE ON BP-338, PAGE 2) | |

The Custody Variance adjusts the inmate's total security points as specified in Tables 6-1(M) and 6-1(F) based upon the inmates custody score. If the appropriate table indicates a value other than zero the application of the Custody Variance will:

- add points to the base score, thus raising the security level and increasing the custody (when the value is positive); or,

- subtract points from the base score, thus lowering the security level and decreasing the custody (when the value is negative).

**Table 6-1(M)**

| **Male Custody Variance Table** | CUSTODY TOTAL 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| BASE SCORE 0-11 | +4 | +4 | +3 | +3 | +2 | +1 | +1 | +1 | 0 | 0 | -1 | -1 | -2 | -3 | -4 | -5 | -5 |
| 12-15 | +4 | +4 | +3 | +3 | +2 | +1 | +1 | +1 | 0 | 0 | 0 | -1 | -2 | -3 | -4 | -5 | -5 |
| 16-23 | +8 | +6 | +5 | +4 | +4 | +3 | +2 | +1 | +1 | 0 | 0 | 0 | -1 | -1 | -2 | -2 | -3 |
| 24+ | +8 | +6 | +5 | +4 | +4 | +3 | +2 | +1 | +1 | +1 | 0 | 0 | 0 | -1 | -1 | -2 | -3 |

**Example:** A male inmate has a Base Score of 17 points and a Custody Total of 11 points. By using the Custody Variance Matrix, the intersecting point for these two items is +3. Thus, +3 is the Custody Variance score that will be entered on Item 8, Section C.

**Table 6-1(F)**

| **Female Custody Variance Table** | CUSTODY TOTAL 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| BASE SCORE 0-15 | +15 | +11 | +7 | +4 | +3 | +2 | +1 | +1 | 0 | 0 | 0 | 0 | -2 | -4 | -8 | -12 | -16 |
| 16-30 | +15 | +11 | +7 | +4 | +3 | +2 | +1 | +1 | 0 | 0 | 0 | 0 | 0 | -4 | -8 | -12 | -16 |
| 31+ | +15 | +11 | +7 | +4 | +3 | +2 | +1 | +1 | 0 | 0 | 0 | 0 | 0 | 0 | -1 | -5 | -8 |

**Example:** A female inmate has a Base Score of 17 points and a Custody Total of 11 points. By using the Custody Variance Matrix, the intersecting point for these two items is +2. Thus, +2 is the Custody Variance score that will be entered on Item 8, Section C.

9. **SECURITY TOTAL**

| | |
|---|---|
| 9. SECURITY TOTAL (ADD OR SUBTRACT CUSTODY VARIANCE (C.8) TO BASE SCORE (B.10)) | |

Apply the Custody Variance Score to the Base Score, and enter the result on Item 10, Section C.

**Example:** An inmate has a Base Score of 16 and a Custody Variance Score of +4. By applying +4 to 16, a Security Total of 20 is obtained and entered on Item 9, Section C.

**NOTE:** If the Custody Variance score is 0, the figure entered will be exactly the same as the Base Score. If the application of the Custody Variance to the Base Score results in a negative number, use 0.

10. **SCORED SECURITY LEVEL**

| 10. SCORED SECURITY LEVEL ____________ |
|---|

An inmate's Security Level is determined by the Security Total and any applicable Public Safety Factors (see Chapter 5).

11. **MANAGEMENT SECURITY LEVEL (MSL)**

| 11. MANAGEMENT SECURITY LEVEL ___________ |
|---|

A Security Level which is entered by the DSCC or Central Office upon application of any of the three MSL Management Variables (PSF Waived, Greater Security, Lesser Security). The MSL overrides the inmate's scored security level. If there was a previously entered MSL, it will automatically appear in this position.

12. **CUSTODY CHANGE CONSIDERATION**

To determine eligibility for a custody change, the following procedures apply:

- If the Custody Variance Score (Section C, Item 8) is in the positive (+) range, consider a custody increase;

- If the Custody Variance Score (Section C, Item 8) is 0, the inmate's present custody is continued; or,

- If the Custody Variance Score (Section C, Item 8) is in the negative (-) range, consider a custody decrease.

## SECTION D. INSTITUTION ACTION

1. **TYPE OF REVIEW**

| 1. TYPE OF REVIEW (EXCEPTION OR REGULAR) | |
|---|---|

An inmate should be handled as an exception case if there is documentation of the following:

- **Public Safety Factors.** Any inmate with a PSF. If the PSF has been waived the case is still considered an exception;

- **Central Inmate Monitoring Assignment.** An inmate with a CIM assignment, excluding state prisoners and separation cases; or,

- **Other.** The Warden may specify in writing other offenses or cases that require exception review.

If the inmate does not meet any of the above criteria the "Type of Review" will be "Regular." For Regular Cases, the Unit Team has authority to make custody assignments, and the Unit Manager is the signature authority on the BP-338. For Exception Cases, the Warden or designee is the approving official and retains signature authority for the BP-338 whenever there is a decrease in custody. Unit staff will indicate on the BP-338 form the reason for the Exception Case, only in those instances in which the unit team will make a recommendation for a reduction in custody level.

2. **CURRENT CUSTODY**

| | |
|---|---|
| 2. CURRENT CUSTODY (MAXIMUM, IN, OUT, COMMUNITY) | |

Checkthe proper code for the inmate's current custody:

MAX = MAXIMUM, IN = IN, OUT = OUT, COM = COMMUNITY

3. **NEW CUSTODY**

| | |
|---|---|
| 3. NEW CUSTODY (MAXIMUM, IN, OUT, COMMUNITY) | |

Check the proper code for the inmate's new custody:

MAX = MAXIMUM, IN = IN, OUT = OUT, COM = COMMUNITY

As indicated below, the Custody Classification Form only recommends; the final decision rests with the review authority. With the exceptions noted previously in Item 1, Type of Review, the Unit Team has the following options:

**Table 6-2**

| BP-338 FORM RECOMMENDS | CLASSIFICATION TEAM OPTIONS |
|---|---|
| Custody Increase(+) range | Increase custody one level<br>or<br>Continue same custody assignment and document why |
| Custody Decrease(-) range | Decrease custody one level<br>or<br>Continue same custody assignment and document why |
| Continue Present Custody | Continue same custody assignment<br>or<br>(Refer to the Warden, see below) |

The custody level should normally be reduced or increased by only one level (i.e., a reduction of IN would be to OUT, not to COMMUNITY; an increase from COMMUNITY would be to OUT, not to IN). However, an exception regarding increases can be made for disciplinary cases involving prohibited acts of the Greatest Severity or escape, provided it is justified by the Unit Team in a memo to the inmate's central file with a copy to the inmate.

Additionally, transfer to a CCC may require the custody level to be decreased more than one level. If the inmate is receiving a custody reduction solely for the purpose of transferring to a CCC, a new Custody Classification Form (BP-
338) does not need to be completed. Approval for a decrease to COMMUNITY custody is granted by virtue of the Warden’s approval and signature on the Institution Referral for CCC Placement (BP-210).

While it is mandatory that COMMUNITY custody be effected at the time of transfer, it may not be appropriate to reduce the inmate’s custody level prior to the date of transfer (e.g., it would not be appropriate for an IN custody inmate at a MEDIUM security level institution to have COMMUNITY custody while still housed at the institution). In such cases, upon receipt of a CCC acceptance date, a SENTRY future assignment would be established for the date of transfer. The effective time for the reduction would be 12:01 AM. An inmate must be assigned COMMUNITY custody status prior to transfer to a CCC.

If the Custody Variance (Section C, Item 8) is zero (Continue Present Custody), and the Unit Team believes that there is a compelling reason to change the inmate's custody, the Unit Team will refer the case to the Warden, who is the deciding official.

4. **ACTION**

| 4. ACTION: (APPROVE, DISAPPROVE) | |
|---|---|

For exception cases only, the Warden or designee should check the appropriate box indicating either approval or disapproval of the Unit Team's decision. If the Warden disagrees with the form, he/she will indicate the reasons on the 338 form. For regular cases, the Unit Manager will take this action.

5. **DATE OF NEXT REVIEW**

| 5. DATE OF NEXT REVIEW | |
|---|---|

Enter the month and year of the next scheduled review.

6. **CHAIRPERSON**

| 6. CHAIRPERSON |
|---|
| ~~NAME AND SIGNATURE~~ |

The Unit Manager will print his or her name and sign the form in the space provided.

7. **EXCEPTION REVIEW**

| 7. EXCEPTION REVIEW |
|---|
| ~~NAME (WARDEN OR DESIGNEE) AND SIGNATURE~~ |

This item is reserved for the Warden or designee's printed name and signature if the inmate is an exception case as defined in Item 1 of this section.If the Warden or designee disapproves, the reason will be documented on the Custody Classification Form (BP-338) and a copy provided to the inmate.

8. **SUMMARY OF FINAL ACTION**

| 8. SUMMARY OF FINAL ACTION: | SECURITY LEVEL | |
|---|---|---|
| | CUSTODY | |

After all action is complete (exception cases signed off, etc.,) the final outcome will be entered. Upon completion, the form is to be filed in the Inmate Central File, Section 2, and the appropriate custody assignment updated in SENTRY.

BP-338 **CUSTODY CLASSIFICATION FORM** **U.S. DEPARTMENT OF JUSTICE**
**PAGE 1** **FEDERAL BUREAU OF PRISONS**

TEMPLATE

## A. IDENTIFYING DATA

| | | |
|---|---|---|
| 1. INSTITUTION CODE | 2. UNIT | 3. DATE |
| 4. NAME | 5. REGISTER NUMBER | |

6. MANAGEMENT VARIABLES
- **A** - NONE
- **B** - JUDICIAL RECOMMENDATION
- **D** - RELEASE RESIDENCE/PLANNING
- **E** - POPULATION MANAGEMENT
- **G** - CIMS
- **I** - MED/PSYCH TREATMENT
- **N** - PROGRAM PARTICIPATION
- **R** - WORK CADRE
- **S** - PSF WAIVED
- **U** - LONG TERM DETAINEE
- **V** - GREATER SECURITY
- **W** - LESSER SECURITY

7. PUBLIC SAFETY FACTORS
- **A** - NONE
- **B** - DISRUPTIVE GROUP (males only)
- C - GREATEST SEVERITY OFFENSE (males only)
- **F** - SEX OFFENDER
- **G** - THREAT TO GOVERNMENT OFFICIALS
- **H** - DEPORTABLE ALIEN
- **I** - SENTENCE LENGTH (males only)
- **K** - VIOLENT BEHAVIOR (females only)
- **L** - SERIOUS ESCAPE
- **M** - PRISON DISTURBANCE
- **N** - JUVENILE VIOLENCE
- **O** - SERIOUS TELEPHONE ABUSE

## B. BASE SCORING

1. TYPE OF DETAINER: **0** = NONE; **1** = LOWEST/LOW MODERATE; **3** = MODERATE; **5** = HIGH; **7** = GREATEST

2. SEVERITY OF CURRENT OFFENSE: **0** = LOWEST; **1** = LOW MODERATE; **3** = MODERATE; **5** = HIGH; **7** = GREATEST

3. MONTHS TO RELEASE ____________

4. CRIMINAL HISTORY SCORE: **0** = 0-1; **2** = 2-3; **4** = 4-6; **6** = 7-9; **8** = 10-12; **10** = 13 +

5. HISTORY OF ESCAPE OR ATTEMPTS

| | NONE | >15 YEARS | 10-15 YEARS | 5-10 YEARS | 0 <5 YEARS |
|---|---|---|---|---|---|
| MINOR | **0** | **1** | **1** | **2** | **3** |
| SERIOUS | **0** | **3(S)** | **3(S)** | **3(S)** | **3(S)** |

6. HISTORY OF VIOLENCE

| | NONE | >15 YEARS | 10-15 YEARS | 5-10 YEARS | <5 YEARS |
|---|---|---|---|---|---|
| MINOR | **0** | **1** | **1** | **3** | **5** |
| SERIOUS | **0** | **2** | **4** | **6** | **7** |

7. VOLUNTARY SURRENDER STATUS: **0** = NOT APPLICABLE; **(-3)** = VOLUNTARY SURRENDER

8. AGE: **0** = 55 and over; **2** = 36 through 54; **4** = 25 through 35; **8** = 24 or less

9. EDUCATION LEVEL:
**0** = Verified High School Degree/GED
**1** = Enrolled in and making satisfactory progress in GED Program
**2** = No verified High School Degree/GED & not participating in GED Program

10. DRUG/ALCOHOL ABUSE: **0** = Never/>5 Years; **1** = <5 Years

11. BASE SCORE (ADD §B. ITEMS 1 - 10)

## C. CUSTODY SCORING

1. PERCENTAGE OF TIME SERVED: **3** = 0-25%; **4** = 26-75%; **5** = 76-90%; **6** = 91+%

2. PROGRAM PARTICIPATION: **0** = POOR; **1** = AVERAGE; **2** = GOOD

3. LIVING SKILLS: **0** = POOR; **1** = AVERAGE; **2** = GOOD

4. TYPE & NUMBER OF MOST SERIOUS INCIDENT RPT:
**0** = ANY GREAT (100) IN PAST 10 YRS
**1** = > 1 HIGH (200) IN PAST 2 YRS
**2(A)** = 1 HIGH (200) IN PAST 2 YRS
**2(B)** = > 1 MOD (300) IN PAST YR
**3(A)** = 1 MOD (300) IN PAST YR
**3(B)** = >1 LOW MOD (400) IN PAST YR
**4** = 1 LOW MOD (400) IN PAST YR
**5** = NONE

5. FREQUENCY OF INCIDENT REPORTS (IN PAST YEAR): **0** = 6+; **1** = 2 THRU 5; **2** = ONE; **3** = NONE

6. FAMILY/COMMUNITY TIES: **3** = NONE OR MINIMAL; **4** = AVERAGE OR GOOD

7. CUSTODY TOTAL (ADD § C. 1 - 6)

8. CUSTODY VARIANCE (FROM APPROPRIATE TABLE ON BP-338, PAGE 2)

9. SECURITY TOTAL (ADD OR SUBTRACT CUSTODY VARIANCE (§ C.8) TO BASE SCORE (§ B.11)

10. SCORED SECURITY LEVEL ____________ 11. MANAGEMENT SECURITY LEVEL ____________

BP-338 **CUSTODY CLASSIFICATION FORM**
**PAGE 2**

**U.S. DEPARTMENT OF JUSTICE**
**FEDERAL BUREAU OF PRISONS**

| **SECTION D: INSTITUTION ACTION** | |
|---|---|
| 1. TYPE OF REVIEW: (EXCEPTION OR REGULAR) | |
| 2. CURRENT CUSTODY: (MAXIMUM, IN, OUT, COMMUNITY) | |
| 3. NEW CUSTODY: (MAXIMUM, IN, OUT, COMMUNITY) | |
| 4. ACTION: (APPROVE, DISAPPROVE) | |
| 5. DATE OF NEXT REVIEW | |
| 6. CHAIRPERSON ____________ NAME AND SIGNATURE | |
| 7. EXCEPTION REVIEW ____________ NAME (WARDEN OR DESIGNEE) AND SIGNATURE | |
| 8. SUMMARY OF FINAL ACTION: SECURITY LEVEL | |
| CUSTODY | |

| CUSTODY CHANGE RECOMMENDATIONS BASED ON CUSTODY VARIANCE | |
|---|---|
| IF CUSTODY VARIANCE IS IN THE (+) RANGE | CONSIDER A CUSTODY INCREASE |
| IF CUSTODY VARIANCE IS IN THE (-) RANGE | CONSIDER A CUSTODY DECREASE |
| IF CUSTODY VARIANCE IS ZERO | CONTINUE PRESENT CUSTODY |

| **Male Custody Variance Table** | CUSTODY | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| BASE SCORE | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| 0-11 | +4 | +4 | +3 | +3 | +2 | +1 | +1 | +1 | 0 | 0 | -1 | -1 | -2 | -3 | -4 | -5 | -5 |
| 12-15 | +4 | +4 | +3 | +3 | +2 | +1 | +1 | +1 | 0 | 0 | 0 | -1 | -2 | -3 | -4 | -5 | -5 |
| 16-23 | +8 | +6 | +5 | +4 | +4 | +3 | +2 | +1 | +1 | 0 | 0 | 0 | -1 | -1 | -2 | -2 | -3 |
| 24+ | +8 | +6 | +5 | +4 | +4 | +3 | +2 | +1 | +1 | +1 | 0 | 0 | 0 | -1 | -1 | -2 | -3 |

| **Female Custody Variance Table** | CUSTODY | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| BASE SCORE | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| 0-15 | +15 | +11 | +7 | +4 | +3 | +2 | +1 | +1 | 0 | 0 | 0 | 0 | -2 | -4 | -8 | -12 | -16 |
| 16-30 | +15 | +11 | +7 | +4 | +3 | +2 | +1 | +1 | 0 | 0 | 0 | 0 | 0 | -4 | -8 | -12 | -16 |
| 31+ | +15 | +11 | +7 | +4 | +3 | +2 | +1 | +1 | 0 | 0 | 0 | 0 | 0 | 0 | -1 | -5 | -8 |

# INMATE TRANSFER

**TRANSFER PROCEDURES.** Transfers (also known as redesignations) are used to move inmates from one institution to another as needed, with each type of transfer having a specific objective. The following are some of the more frequent reasons for a transfer:

- institution classification;
- nearer release;
- disciplinary/close supervision;
- adjustment;
- medical/psychological treatment;
- temporary transfers;
- training purposes/program participation;
- Institution Hearing Program;
- pre-release; and,
- transfers from CCC's.

After review and approval by the Unit Team, a transfer request is submitted via the Request for Transfer/Application of Management Variable (409) to the DSCC. The procedures for completing the 409 are outlined below and may only be waived or modified with the approval of the Assistant Director, Correctional Programs Division, Washington, D.C. or his/her designee.

1. **Inmate's Medical Status.** Include current, complete, and accurate available information concerning any medical problem that might affect redesignation;

2. **Institution Adjustment.** Include a brief description of the inmate's adjustment during this period of incarceration with emphasis on recent adjustment;

3. **Rational for Referral.** Include a complete, specific justification and support for the requested action;

4. **Parole Hearing Scheduled.** Indicate whether or not the inmate is eligible for a parole hearing. If yes, indicate the date of the hearing. (See SALLYPORT for a current listing of parole/non-parole institutions).

5. **Past or Present Behavior and/or Management Concerns.** Note any past or present behavior and/or management concerns which may affect placement (i.e., history of arrests or disruptive behavior

which may not have resulted in a conviction, inmates preference regarding this request, etc.). Also note any Security Threat Group concerns/associations. In addition, it is necessary for staff to closely review each case submitted for any CIM concerns. Any CIM concerns should be noted on the 409 if applicable.
However, it is not necessary for staff to route a Request for CIM Activity Clearance with each transfer request since CIM activity clearance is included in the redesignation for all CIM assignments except WITSEC cases. Redesignations between same security level institutions are discouraged, except for CIM purposes, nearer release purposes, or other unusual circumstances. Copies of all transfer requests for Disruptive Group Members will be forwarded to the Intelligence Section, Central Office, via GroupWise upon approval of the transfer. Additionally, the institution Special Investigative Supervisor should also receive a copy of the transfer request; and

6. **BP-337/BP-338 Discrepancies.** Include a brief description of any scoring changes between the BP-337 and BP-338.

Complete all required information, then route the request through normal institutional review channels for approval by the CEO. After approval by the CEO, it may be routed to the DSCC Administrator from the unit's mailbox. The Unit Team will enter the appropriate "DST" assignment (see below) into SENTRY as confirmation that a redesignation request has been submitted to the DSCC or OMDT. Enter this SENTRY assignment under the "DST" category using the "Update Inmate Assignment" transaction.

- Enter "W REDES R" if the transfer request is for a routine transfer.

- Enter "W REDES M" if the transfer request requires a review by the OMDT (Medical Designator).

Once the e-mail requesting redesignation is received, DSCC staff will at a minimum review the following SENTRY transactions to determine if the inmate is appropriate for redesignation:

CIM Clearance and Separatee Data;
Inmate Load Data;
Inmate Profile;
Custody Classification Form;
Security/Designation Data Form; and,
Chronological Disciplinary Record.

If the transfer is approved, DSCC staff will enter the information and the appropriate destination (DST) assignment in

SENTRY on the "Enter Redesignation" screen and will also note the approved institution transfer code. The method of transportation is at the discretion of the Warden. Should a change in DST be required, DSCC staff will make the change in SENTRY prior to the inmate's arrival at the designated institution.

If the transfer is denied, DSCC staff will indicate the denial on the "Update Inmate Remarks" screen and will also delete the "W REDES" from SENTRY. Unit staff should closely monitor SENTRY for deletions of the "W REDES" transaction.

1. **INSTITUTION CLASSIFICATION TRANSFERS.** These transfers are typically referred to as either "Lesser Security" (Code 308) transfers or "Greater Security" (Code 307) transfers.

a. **Security Level Changes**

(1) When a decrease in the inmate's security level is indicated by the Custody Classification Form, transfer of the inmate to a lower security level institution should be considered.

(2) Likewise, an increased security level may be indicated in a similar fashion. The security total may increase to a higher security level range.

If an updated security scoring, combined with Public Safety Factors, indicate that an inmate is rated at a different security level, the inmate must be referred to the DSCC for either transfer or application of a Management Variable. For example, if an inmate in a Low security level institution is reclassified to Minimum security, the case must be referred for transfer or application of a Management Variable. If transfer is denied, DSCC staff will apply an appropriate Management Variable and add a Management Security Level, if applicable.

b. **Custody Level Changes.** During an inmate's custody review, a custody level may be increased or decreased (ordinarily, only one level at a time) indicating a transfer is appropriate. For example:

(1) A Medium security level inmate has OUT custody, and becomes eligible for COMMUNITY custody. If the Unit Team decides to reduce custody, the inmate would normally be referred for redesignation to a Low or Minimum security level facility, since Medium security level institutions do not house COMMUNITY custody inmates. If approved for transfer by the DSCC, the Management Variable of Lesser Security will be applied and the Management Security Level will be changed accordingly.

(2) An inmate's transfer to a higher security institution could be triggered by an increase in custody needs. For example, a Medium security level inmate with IN custody becomes eligible for a custody increase. The team agrees to increase the custody to Maximum. Since Medium security level facilities are not authorized to house Maximum custody inmates, the inmate must be referred for transfer to a High security level institution and the MSL changed in accordance with the application of an MGTV.

2. **NEARER RELEASE TRANSFERS (Code 313).** Nearer release transfers move the inmate closer to their legal residence or release destination, consistent with their security level. Inmates may be considered for a nearer release transfer only after serving 18 consecutive months of clear conduct in a general population. Nearer release transfers should be incorporated with "Lesser Security" transfers whenever possible. Once the inmate has been transferred within 500 driving miles of his or her release residence, ~~no further referrals will be made for nearer release transfer consideration.~~ further referrals can be considered for nearer release transfer consideration subject to bed availability, the prisoner's security designation, the prisoner's programmatic needs, the prisoner's mental and medical health needs, any request made by the prisoner related to faith- based needs, recommendations of the sentencing court, and other security concerns of the Bureau of Prisons.

Transfer to a facility in an area other than the inmate's legal residence or sentencing district may be considered by the inmate's Unit Team provided the inmate can provide strong evidence of community and/or family support. Institution staff should use sound correctional judgment when reviewing such requests for transfer to ensure the transfer is consistent with guidelines established in this chapter.

Inmates with an Order for Deportation, an Order of Removal, an ICE detainer for an unadjudicated offense(s) or an ICE detainer for a hearing will not be transferred for nearer release purposes since they will be returning to the community outside, rather than inside, the United States upon release.

3. **WITSEC TRANSFERS.** All movement of Witness Security cases is coordinated exclusively through the Inmate Monitoring Section of the Correctional Programs Branch, Central Office. Witness Security cases will not be transferred without authorization from that office. Witness Security inmates who require medical or mental health treatment at a medical center must also be approved by the Medical Designator.

If the inmate is classified as a WITSEC case, a copy of the medical referral will be sent simultaneously to the Inmate

Monitoring Section (IMS) and the Medical Designator. The Inmate Monitoring Section will coordinate with the OMDT regarding an appropriate placement. Placement will be based on available medical resources, security needs, bed space availability, and the inmate's need for medical care. IMS will enter activity clearances for WITSEC cases.

4. **DISCIPLINARY/CLOSE SUPERVISION TRANSFERS (Codes 309/323).** An act(s) of documented institution misconduct may result in an inmate’s transfer to another institution, normally of greater security, for disciplinary reasons. Wardens may recommend same security level transfers only when placement at a greater security level institution is not possible or other overriding circumstances exist.

Disciplinary or Close Supervision transfer requests will be sent electronically to the DSCC Administrator and contain the following information:

(a) Request for Transfer/Application of Management Variable (must be thorough and specific);

(b) Close Supervision investigation report, if requested; and,

(c) Intelligence data or supporting memorandum if requested.

Institution staff should carefully review the management of 309/323 cases on an individual basis, applying sound correctional judgment that considers the safety and security of the inmate, the institution and its staff and the community.

5. **ADJUSTMENT TRANSFERS (Code 330).** All transfer referrals submitted as Code 330 transfers for adjustment purposes will be reviewed by the DSCC. Adjustment purposes transfer requests will be sent electronically to the DSCC Administrator via Form 409. DSCC staff will ensure that the transfer does not meet the requirements of an unverified protection transfer, Code 323.

6. **MEDICAL AND PSYCHIATRIC TRANSFERS (Codes 331-336 and 338, 339).** Medical designations and transfers are approved by the Central Office Medical Designator, Office of Medical Designations and Transportation (OMDT). The Central Office Medical Designator assigns inmates to Medical Referral Centers (MRC), institutions with medical resources, or non-Bureau community care centers to provide needed medical services.
Medical redesignations are initiated for inmates with acute medical, surgical, or psychiatric condition, or for those inmates who have chronic care needs that cannot be addressed at the parent institution. Transfers will be classified as either

(a) Emergency, (b) Routine/Urgent, or (c) Routine.

If an inmate objects, either in writing or through his or her attorney, to a transfer for psychiatric/mental health treatment, the provisions of 18 U.S.C. § 4245 may apply. Staff will suspend transfer action in such cases and refer the matter to their Regional Counsel for review. The Regional Counsel will notify the institution when the transfer action can be re-instituted.

a. **Emergency Transfer** - An emergency transfer is a medical, surgical, or psychiatric situation determined by medical/mental health staff that requires immediate, direct transportation.
This includes inmates not medically or psychiatrically capable of transport via routine BOP air/surface transportation, e.g., bus, commercial air, or USMS/Bureau airlift. Direct transportation is defined as air ambulance, air charter, or ground ambulance and, in some instances, an institution vehicle may be utilized.

b. **Routine/Urgent Transfer** - A routine/urgent transfer is initiated for medical, surgical, or psychiatric treatment that is not an emergency, however must be transported directly to a MRC, typically within two to three weeks of designation.

Routine urgent transfers require direct transfer to the MRC because of the acuity of their medical, surgical, or psychiatric condition, or because MRC-based services need to be initiated within an appropriate time frame. Holdover housing at a county jail or Bureau general population institution is not permissible.

c. **Routine Transfer** - A routine transfer is initiated for medical, surgical, or psychiatric treatment that is not an emergency and time en-route is not a major factor. Routine transfers may travel by any available means.

d. **Procedures for Initiating Emergency, Routine/Urgent, and Routine Transfer Requests.** All transfer requests for medical, surgical, or psychiatric designations will be initiated via GroupWise on the Medical/Surgical and Psychiatric Referral Request Form (BP-770) available on SALLYPORT. The HSA, with input from the Clinical Director and other providers involved with the inmate's care (e.g., mid-level providers, psychologists, consultant physicians), is responsible for completing the BP-770. The referring institution Warden must review the BP-770 and authorize the request for transfer.

The BP-770 serves as the redesignation, transportation, and security worksheet from which the actual redesignation is made. It will also serve as the emergency referral request form, documentation of the inmate's condition and the reason

for transfer. Accordingly, it is essential that the BP-770 be completed thoroughly and accurately.

The Medical Designator will review each request for redesignation and approve or deny the requested transfer. Based on clinical information and in consultation with the Medical Director, the Medical Designator may change the urgency level of the request.

OMDT will authorize CIM clearance (if appropriate) and enter approved transfers to an appropriate BOP facility in SENTRY on the "Enter Redesignation" screen.

e. **Completion of Treatment** - All requests for redesignation to the parent facility upon completion of Medical/Surgical or Psychiatric treatment, or to another medical facility for continuation of treatment, will be initiated by the facility currently housing the inmate via GroupWise on the Discharge Transfer Summary form. This form serves as the designation, transportation, and security worksheet from which the redesignation is made.

Medical cases are normally returned to their parent facility unless the DSCC approves a change in the parent facility based on clinical justification provided prior to redesignation by the Medical Designator.

7. **TEMPORARY TRANSFERS.** It is sometimes necessary to temporarily transfer an inmate to a contract facility or other Bureau institution. This is normally for security reasons, when the current institution does not have a Special Housing Unit. In such cases, institution staff will forward a request for temporary transfer approval from the Warden to the DSCC. The request will include the rationale for transfer, with assurance that the receiving facility is in agreement with the temporary transfer. Transfer approval must be obtained prior to the transfer during normal working hours, or if after hours, the next work day. A copy of this request will be routed to the appropriate CCM office, if the transfer is to a contract facility.

8. **TRANSFERS FOR TRAINING PURPOSES OR PROGRAM PARTICIPATION.** An inmate is ordinarily only transferred for specialized national programs not offered at the parent facility to include:

(a) Residential Drug Treatment Program;
(b) Life Connections Program;
(c) Special Management Unit; and
(d) Sex Offender Programs.

When placement for program participation is inconsistent with the assigned security level, the appropriate Management Variable must be applied by the DSCC. Ordinarily, the inmate will be

returned to the referring institution upon completion of the specialized training or program if the inmate has 18 months or more remaining until the inmate's release date at the time of the transfer. Further, if the program facility is nearer to the inmate's release residence, than is the referring institution, the inmate may remain at the program facility.

9. **INSTITUTION HEARING PROGRAM TRANSFERS.** The Institution Hearing Program (IHP) is a coordinated effort by the Bureau, ICE, and the EOIR to provide deportation or exclusion proceedings to sentenced aliens as expeditiously as possible after the date of conviction. Eligibility, designation, classification, and transfer procedures are specifically outlined in Bureau directives. IHP sites have been established for male and female non-U.S. citizens who are serving federal sentences to ensure a deportation or exclusion hearing is conducted early in their sentence instead of at the end of their sentence.

10. **TRANSFERS TO SATELLITE CAMPS.** The Warden of an institution with a satellite camp may transfer an inmate from the main institution to the camp if the inmate is assigned an appropriate security and/or custody level. The Camp Administrator of a satellite camp adjacent to a Low or Medium security level institution may temporarily transfer the inmate to the main institution for disciplinary purposes (i.e., disciplinary segregation). If a need for an immediate redesignation arises, the inmate may be placed as a holdover in Administrative Detention at the main institution while approval is sought from the DSCC for redesignation to that institution or another institution.

An inmate may travel via "unescorted transfer" from a low or minimum security level institution to a minimum security level institution if the inmate is a minimum security level inmate and has OUT or COMMUNITY custody. The inmate's family (on the approved visiting list) may provide transportation to the receiving institution only if the inmate is transferring from a minimum security level institution to another minimum security level institution, and if approved by the Warden. The inmate's family is expected to bear all transportation costs. The inmate must go directly from the sending institution to the receiving institution.

The Warden may authorize clearance for the transfer of a CIM Case, with the exception of WITSEC cases, to the satellite camp of the parent facility provided established regulations for regular transfer authority have been met. (Refer to the CIM Manual for more specific details).

11. **PRE-RELEASE TRANSFERS.** Inmates in federal and contract institutions may be transferred to CCCs in accordance with the Program Statement Community Corrections Center (CCC) Utilization and Transfer Procedure. Inmates who have been approved for CCC referral and are otherwise appropriate for camp placement are to be transferred to a camp for intermediate placement if at all practicable. Inmates should be encouraged to complete all or most of the Institution Release Preparation Program at the parent institution prior to transfer.

The parent institution is to complete the CCC referral packet and the camp should be closer to the inmate's release residence. This process should be completed to allow the inmate a minimum of a 60-day placement at the camp prior to the reporting date at the CCC. CCC referrals may be made 12 to 18 months in advance of an anticipated reporting date with the concurrence of local CCM offices. A notation that the CCC referral was made with a specific projected placement date should be included in the request for institution transfer, and the transfer request should be prepared at the same time as the CCC referral.

12. **TRANSFERS FROM CCC'S.** When an inmate fails to meet the conditions of CCC placement, the CCM should designate the inmate to the parent institution with consideration given to the following criteria for designation:

(a) local manday detention rates;
(b) availability of Bureau Detention Centers;
(c) budgetary constraints;
(d) projected release date; and,
(e) distance to parent facility.

When returning the inmate to the parent institution is not cost effective, the Community Corrections Office will refer the case to the DSCC for designation. DSCC staff, will make the designation, and should consider the closest institution commensurate with the inmate's security needs. When the DSCC designates the inmate to a facility, DSCC staff will notify the parent institution to facilitate the forwarding of the central file.

13. **LONG-TERM DETAINEES.** The authority for the redesignation of long-term detainees rests with the Detention Services Branch, Correctional Programs Division, Central Office. Refer to the current Program Statement Mariel Cuban Detainees for transfer procedures. Transfers for medical or mental health treatment however, shall be referred to the Central Office Medical Designator. Mariel Cubans who are sentenced, and therefore not detainees, are handled in a routine fashion by DSCC staff.

14. **IN-TRANSIT DATA FORM**

a. Upon notice that an inmate is being transferred or temporarily released to an authorized law enforcement officer (e.g., U.S. Marshal, state law enforcement officer, or Bureau bus officer), the Unit Manager will ensure the following:

- The top portion of the SENTRY automated In-Transit Data Form is accurate and the bottom portion is completed;
- CIM, YCA, DCYRA and any other important information is included in the space for "Non-Routine Security Needs;"
- CIM separation information is accurate, up-to-date and the SENTRY generated "CIM Clearance and Separatee Data" is attached to the In-Transit Data Form; and,
- The In-Transit Data Form is signed, dated, and forwarded to ISM staff who will attach a current inmate photograph and provide the form to the transporting officer.

**NOTE:** The most recent In-Transit Data Form is maintained in the Inmate Central File. The "CIM Clearance and Separatee Data" display will not be filed with the In-Transit Data Form.

b. Upon receipt of the In-Transit Data Form, ISM staff will ensure the following:

- The information indicated on the top portion of the form is correct. SENTRY update functions should be executed in the event that the data is not accurate;
- The Sentencing Remarks should include the offenses and the length of sentence as noted on the Judgment. If this information is not accurate, the load data should be updated;
- The Detainer Remarks should indicate all active detainers and the charge or offense. If the detainer has been litigated, information regarding the sentence imposed or time remaining to serve should be listed. If this information is not current, the commitment should be updated; and,

- Initials are placed below the detainer remarks indicating that the information has been confirmed and is accurate and up-to-date.

15. **TRANSFER CODES.** The reason for transfer, as shown by one of the codes listed at the end of this chapter, must be provided in the top portion of the Transfer Order. If there is more than one reason for transfer, the most pertinent code should be used. Note that all Unescorted Transfers are Discharge Code - FURL TRANS for Furlough Transfer.

16. **SPECIAL REQUIREMENTS**

a. An inmate having a detainer or pending charge may be transferred to any institution for which he or she properly classifies; however, generally when there is a formally filed detainer, the inmate is not to be transferred to an institution more distant from the detaining authority unless there is substantial reason to believe the detainer will be dropped or the pending charge will not be prosecuted.

An inmate who indicates an intention to oppose extradition is not to be transferred within the last 30 calendar days prior to release to an institution in the state that placed the detainer. Such cases, and others in which there are legal or jurisdictional problems, are to be referred to the Regional Correctional Programs Administrator (See Program Statement Inmate Systems Management Manual.

b. When there is reason to transfer an inmate to a non-federal institution for concurrent service of federal and state sentences, the Warden will refer the case to the DSCC Administrator. Refer to the Program Statement, Transfer of a Prisoner to State Custody Prior to Release from the Federal Sentence, for procedures.

17. **RELATIONSHIPS WITH OTHER AGENCIES**

a. **U.S. Parole Commission.** Parolable inmates must be housed at a parolable institution in accordance with their parole hearing requirements unless a hearing is no longer required.

b. **Administrative Office of the U.S. Courts.** The court of conviction may recommend to the Attorney General or the Bureau that the defendant be retained at, or transferred to, a place of confinement near the place of trial or the court of appeals, for a period reasonably necessary to permit the defendant to assist in the preparation of his or her appeal. Upon receiving this recommendation, the Bureau will make every effort to place the inmate in such a facility. If a reason exists for not placing the inmate in that facility, the court must be notified of the situation and an attempt will be made to arrive at an acceptable place of confinement.

Ordinarily, complicated jurisdictional or legal problems should be resolved before transfer. Ordinarily, the sending Case Management Coordinator will determine if an inmate has legal action pending in the district in which confined. If so, the individual should not be transferred without prior consultation with the appropriate U.S. Attorney or Regional Counsel, or both. Under Rule 23(a) of the Federal Rules of Appellate Procedures, an inmate may not be transferred, pending review of a Habeas Corpus proceeding commenced before a court, without the approval of the court.

Approval for transfer should be sought through the U.S. Attorney or Regional Counsel in cases where a Habeas Corpus petition is pending.

c. **Non-Federal Authorities.** The decision to accept a state prisoner in the Bureau is the responsibility of the DSCC Administrator. When notifying the state authority of acceptance, the state's contract code will be identified.

The Office of Procurement, Central Office is responsible for negotiating contracts for housing state prisoners. If it is necessary to transfer a federal inmate to a local jail, the sending institution must immediately notify the U.S. Marshals and the CCM, preferably prior to the transfer.

d. **Military Inmates.** The DSCC will accept a military or Coast Guard inmate recommended for transfer to federal custody if, after examination of all available information, the Bureau can provide appropriate resources for the inmate's needs. The DSCC will be responsible for the designation and redesignation of all military and Coast Guard inmates accepted for service of their sentence in Bureau custody.

In some cases, special agreements or Memoranda of Understanding (MOU) have been established with various military branches.
These MOUs give direction to Bureau staff regarding which Bureau regulations and policies apply to the military inmates. Pursuant to 10 U.S.C. § 858, staff should be aware that military or Coast Guard inmates confined in Bureau institutions are subject to the same discipline and treatment as other inmates in those institutions.

Additionally, the Bureau will accept the sentence computation provided by the military or Coast Guard authorities with the exception that the Bureau will release such inmates, if not paroled, under the provisions of 18 U.S.C. § 4164 provided they have accrued good time deductions in excess of 180 days. DSCC staff will refer to the appropriate military or Coast Guard authorities for resolution of suspected sentence computation errors or discrepancies, or challenges to the sentence computation by the inmate or his or her representative, or both.

Once a military inmate comes into Bureau custody, all notifications and requirements apply as if he or she were a Bureau inmate, i.e., VWP notification, VCCLEA notification, Sex Offender Notification, and IFRP requirements.Notification to the military is also required at least 30 days prior to the inmate's release.

18. **STATE PLACEMENT.** Inmates who have exhausted available resources within the Bureau, should be referred for placement in an appropriate non-federal facility under contract with the Bureau. Preparation of a transfer referral to merely "exhaust" all BOP resources is not required when the inmate is clearly not appropriate for any facility within the Bureau.

a. **Placement Procedures.** The Warden will prepare a memorandum to the DSCC Administrator outlining the reasons for state placement of a federal inmate. This memorandum will be forwarded along with supporting documentation and classification material that will, at a minimum, include the following:

(1) Presentence Investigation Report;

(2) Two copies of the Judgment;

(3) Relevant SENTRY data;

(4) Current Progress Report; and,

(5) Any Disciplinary or SIS Reports.

If the DSCC Administrator approves an inmate for state placement, DSCC staff will select a state correctional system for referral. The system selected will be based on the type of facilities within the system; available bed space; court status (state systems that are under injunction because of overcrowding or violations of inmates' civil rights will not be used), and the state's willingness to accept federal boarders. Once a suitable state correctional system has been identified, DSCC staff will forward the transfer packet to the appropriate Community Corrections Regional Administrator, overseeing the state in which the DSCC Administrator has identified for possible placement.
DSCC staff may make up to two referrals per inmate at a time, and continue this process until an appropriate placement is secured. The CCRA will work through the local CCM office which will refer the case for state placement. The CCM office will advise the CCRA of the response from the state authority/Department of Corrections. If approved for placement, the CCRA will initiate SENTRY redesignation procedures, and forward the inmate file to the CCM office. If not approved for placement the CCRA will

advise the DSCC Administrator, who will continue to secure a suitable state placement.

The CCM office with state monitoring authority in which the inmate is eventually housed assumes full responsibility for the inmate, including biennial reviews and subsequent transfer authority. State placement materials containing, at a minimum, a Progress Report, Presentence Investigation Report, and all memoranda pertaining to the state placement, will be forwarded to and maintained by the CCM office after the inmate has been approved for placement.

If an inmate is approved for permanent return to the Bureau, the place of confinement will be determined by the DSCC. If an inmate is returned to the Bureau for medical treatment, the inmate will be returned to the state when the medical treatment is completed. Occasionally, returning the inmate to the originating state may not be appropriate. In such cases, the DSCC will obtain a new place of incarceration for the inmate, after consultation with the Office of Medical Designation and Transportation.

b. **Post-Placement Monitoring**. After a federal inmate has been placed in a state contract facility, the appropriate CCM will review the case every two years beginning from the date of the inmate's arrival to determine whether the inmate is still appropriate for state placement. The CCM's cover memorandum containing a recommendation and a Progress Report provided by the state contract facility will be forwarded to DSCC staff who will make a determination for continued state placement or return to Bureau custody.

If the inmate requires continued placement in that state facility, DSCC staff will enter a notation on the SENTRY "CIM Clearance and Separatee Data" screen indicating such. However, if state placement is no longer necessary, the inmate will be redesignated to Bureau custody by the DSCC.

Inmates serving a sentence of Death will also be reviewed for continued state placement. Information received from Community Corrections staff during the review of the contract may be used to make a determination for continued state placement.

The DSCC is responsible for monitoring and tracking state placement requests received from BOP institutions. The CCRA will prepare a quarterly report (statistical/narrative) which will be forwarded to the DSCC Administrator.

19. **SECONDARY DESIGNATION.** Upon initial designation, an inmate may be designated specifically for a parole hearing or program participation, and as a result, may require a secondary designation upon completion of the activity. If upon completion of the activity, staff determine that the secondary designation is no longer appropriate, the DSCC will be notified for reconsideration. Otherwise, when the conditions of the initial designation are met, institution staff will prepare a Transfer Order for signature of the sending institution Warden and arrangements will be made for movement of the inmate through routine procedures.

A secondary designation will not normally be made for cases designated for medical or psychiatric treatment. The medical center or reviewing institution will notify the Medical Designator upon completion of evaluation or treatment. Approval will be given for a secondary designation at that time. This approval will be based on medical requirements of the inmate and resources of the secondary designation.

20. **POPULATION MANAGEMENT.** The Assistant Director, Correctional Programs Division periodically reviews each institution's Rated and Designation Capacities. Occasionally, it is necessary to impose a moratorium or population cap on a particular institution to avoid or reduce overcrowding. The Assistant Director, Correctional Programs Division, with the approval of the Population Management Subcommittee of the Executive Staff, may impose a moratorium on other facilities including the Medical Referral Center general population units. The Assistant Director, Health Services Division, with the approval of the Population Management Subcommittee of the Executive Staff, may authorize a moratorium or population cap for Medical Referral Centers (excluding general population).

a. Referral Procedures

(1) The Warden of the institution recommends to the Regional Director that a moratorium or population cap be established.

(2) The Regional Director reviews the request, and if in agreement, contacts the Assistant Director, Correctional Programs Division, or the Assistant Director, Health Services Division, and either requests a population cap or total moratorium.

A population cap places a ceiling on the number of inmates that can be designated to a facility. A total moratorium is defined as a complete cessation of all initial designations and redesignations to an institution or DFCL assignment.

In extreme circumstances, the Assistant Director, Correctional Programs or Health Services Division with concurrence of the Subcommittee may direct that inmates en route to a facility be redesignated. When a moratorium or population cap is imposed, a termination date will be established. The cap or moratorium will be terminated on that date unless the Regional Director contacts the appropriate Assistant Director, Correctional Programs or Health Services Division, and obtains an extension.

(3) The appropriate Assistant Director will issue a GroupWise e-mail notifying the DSCC Administrator and Chief Executive Officers of the cap or moratorium.

21. **INSTITUTIONS WITH SPECIAL MISSIONS**

a. **FCI Oakdale.** The Bureau, ICE, and the Executive Office for Immigration Review (EOIR) work closely together to meet the requirements of the Immigration Reform and Control Act of 1986, by ensuring the expeditious review of criminal aliens for deportation. Beds are available for federally sentenced aliens, who are subject to administrative proceedings under the Immigration and Naturalization Act. Such inmates are transferred to FCI Oakdale for disposition of their ICE detainer prior to completion of their federal sentence.

Mexican and Cuban nationals are not eligible for the Oakdale Criminal Alien Program. The following procedures apply for the actual selection and designation of inmates to the Oakdale Criminal Alien Program.

(1) The ICE Officer in Charge at FCI Oakdale will monitor the inmate male population via SENTRY to identify criminal aliens appropriate for the program at FCI Oakdale. After they have been identified, ICE staff will place a detainer on these individuals through the DSCC. Each week DSCC staff will compile a list of the criminal aliens who are to be released within the next year. A courtesy list will be submitted, via GroupWise, to FCI Oakdale for monitoring purposes.

(2) ICE staff at FCI Oakdale will forward to DSCC staff information on alien inmates via GroupWise to assist in the movement of inmates to FCI Oakdale at a later date. The movement of inmates to FCI Oakdale will be authorized and coordinated by the DSCC. DSCC staff will ensure CIM clearance is obtained and the Custody Classification form reflects appropriate use of any Management Variable.

(3) Inmates will be redesignated no later than seven months from a firm projected release date. Once approved for transfer,

institution and transportation staff will immediately schedule the inmate for movement to FCI Oakdale. Institution staff will notify the Oakdale CMC if the inmate is not en route within 15 working days of the transfer approval. The central file should contain a current Progress Report and all pertinent case management activities should be completed prior to transfer including fines and the ordering of parole certificates, when applicable, or preparation of other release documents as required.

(4) ISM staff will ensure any other detainers lodged against those inmates approved for transfer are resolved and the detaining authority notified before the inmate is transferred to FCI Oakdale.

(5) Because of unforeseen circumstances, some criminal aliens may be inappropriate for transfer to FCI Oakdale. ICE staff at FCI Oakdale will notify DSCC staff when this occurs and will advise of any additional action necessary to coordinate the resolution of the inmate's citizenship/release status. Conversely, institution staff are to contact DSCC staff if they believe a transfer should not occur. If the transfer is deemed inappropriate, DSCC staff will delete the Oakdale "DST" transfer approval.

(6) The Detention Services Branch, Correctional Programs Division, Central Office will assist with coordination of the Oakdale Criminal Alien Program and will act as the primary liaison with ICE and EOIR Headquarters on matters of mutual interest affecting the program's development and/or modification. Any questions regarding these matters should be directed to that office.

b. **USP Marion/ADX Florence.** USP Marion/ADX Florence general population units are designed for male inmates who have demonstrated an inability to function in a less restrictive environment without being a threat to others, or to the secure and orderly operation of the institution.

(1) **Referral Procedures and Criteria.** Prior to referring an inmate to USP Marion or ADX Florence, redesignation to another high security institution should be considered first. If transfer to another institution is not appropriate, Wardens will refer the proposed USP Marion or ADX Florence case to North Central Regional Director. The North Central Region will designate the inmate as appropriate.

Assignment to USP Marion or ADX Florence will ordinarily be made without regard for such factors as release destination or

program needs, such as education and vocational training. Prior to transfer to USP Marion or ADX Florence, staff at the sending institution will ensure that the inmate is assigned Maximum custody. While in transit to USP Marion or ADX Florence, inmates will be housed and provided visiting, correspondence, and telephone privileges as if confined at USP Marion or ADX Florence.

Inmates currently diagnosed as suffering from serious psychiatric illnesses should not be referred for placement at either USP Marion or ADX Florence.

(2) **Referral Packet for USP Marion or ADX Florence.** The referral packet for either USP Marion or ADX Florence general population will include the following items:

(a) A memorandum from the Warden to the North Central Regional Director with the specific rationale supporting the institution's recommendation;

(b) Copies of all disciplinary reports, investigative materials or other official documentation related to the behavior prompting the referral;

(c) A current Progress Report;

(d) A copy of the inmate's latest Presentence Investigation Report; and,

(e) A recent psychiatric or mental health evaluation.

Inmates with severe or chronic behavior patterns that cannot be addressed in any other Bureau institution should be referred to ADX Florence general population, and those who are somewhat less problematic should be referred to USP Marion. In describing the reasons underlying the referral, the Warden should explain why he or she has selected USP Marion or ADX Florence, respectively.

(3) **Acceptance or Rejection of Referrals.** The North Central Regional Director has final review authority for referrals to the USP Marion and ADX Florence general population units. In some cases, the Regional Director may approve placement at USP Marion when a referral has been submitted for ADX Florence and vice versa.

A response to a recommendation for USP Marion or ADX Florence placement will ordinarily be made by the North Central Regional Director within 60 calendar days after receiving the

referral packet from the referring institution. Approval or denial will be noted in SENTRY on the inmate's "CIM Clearance and Separatee Data" screen, with a brief memorandum from the North Central Regional Director to the requesting Warden to follow.

(4) **Transfer from USP Marion or ADX Florence.** Once an inmate successfully completes the USP Marion or ADX Florence program, the Warden will submit a transfer request to the North Central Regional Director. Upon the North Central Regional Director's approval the request will be forwarded to the DSCC for determination of an appropriate facility. Inmates will ordinarily be transferred from USP Marion or ADX Florence using Code 308 - Lesser Security. Ordinarily, inmates completing the ADX Florence program will be transferred to a High Security facility, other than USP Marion.

(5) **USP Marion Failures.** Inmates who continue to exhibit disruptive misconduct at USP Marion may be considered for referral to ADX Florence general population or the Control Unit.

c. **FMC Carswell Administrative Unit**

(1) **Initial Designations.** Initial designations may only occur in extraordinary situations by DSCC staff.

(2) **Redesignation Criteria.** The FMC Carswell Administrative Unit is designed to house females exhibiting any of the following:

- A history of escape or attempted escape from a secure institution;
- Demonstrated repeated incidents of assaultive or predatory behavior;
- Demonstrated chronic behavior problems; and/or
- Special management concerns.

(3) **Referral** for transfer to the FMC Carswell Administrative Unit will be submitted via the Request for Transfer/Application of Management Variable (409) to the DSCC Administrator.

(4) **Acceptance or Rejection of Referrals.** The DSCC Administrator has final review authority for referrals to FMC Carswell Administrative Unit.

| TRANSFER CODES | |
|---|---|
| CODE | DESCRIPTION |
| 276 | **FURLOUGH TRANSFER:** Unescorted furlough transfer to a CCC. |
| 307 | **INSTITUTION CLASSIFICATION:** Transfer to an institution with greater security (e.g., Low to Medium). |
| 308 | **INSTITUTION CLASSIFICATION:** Transfer to an institution with less security (e.g., High to Medium). |
| 309 | **DISCIPLINARY:** Transfer as a result of an act(s) of misconduct related to documented poor institutional adjustment. See Program Statement on Discipline and Special Housing Unit. |
| 313 | **NEARER RELEASE:** Transfer for the purpose of placing an inmate in an institution nearer the release destination or to facilitate the release process. |
| 314 | **TRAINING PURPOSES:** Discontinued (Use Code 324). |
| 315 | **TRAINING COMPLETED:** Discontinued (Use Code 325). |
| 316 | **TEMPORARY TRANSFER:** Transfer to the custody of U.S. Marshals or local authority. |
| 317 | **RELIEVE OVERCROWDING:** Transfer to relieve overcrowding at a facility. |
| 318 | **INCREASE POPULATION:** Transfer to build a population, usually upon activation of a new facility. |
| 319 | **DRUG ABUSE PROGRAM:** Transfer to participate in a specialized Drug Abuse Program. |
| 320 | **WORK/STUDY RELEASE: Discontinued.** |
| 321 | **TRANSFER TO CONTROL UNIT:** Transfer to Control Unit (see Chapter 7, Section 4). |
| 322 | **TRANSFER FROM CONTROL UNIT:** Transfer from Control Unit (See Chapter 7, Section 4). |
| 323 | **CLOSE SUPERVISION CASE:** Transfer as a result of an investigation that indicates a safety, security, or escape risk. Includes verified and unverified protection cases. |
| 324 | **PROGRAM PARTICIPATION:** Transfer for a parole hearing or to participate in a specialized program. |
| 325 | **PROGRAM COMPLETED/WITHDRAWAL/REMOVAL:** Return to the original institution following the completion, withdrawal, or removal from a specialized program. |
| 326 | **CONCURRENT SERVICE IN NON-FEDERAL FACILITY:** Transfer to non-federal facility (excluding CCC) for service of concurrent federal and state sentences. |
| 327 | **BOARDING IN NON-FEDERAL FACILITY:** Transfer to non-federal facility (excluding CCC) for service of federal sentences only. |

| TRANSFER CODES | |
|---|---|
| CODE | DESCRIPTION |
| 328 | **RETURN FROM NON-FEDERAL FACILITY:** Return from non-federal facility to federal institution for service of federal sentence only. |
| 330 | **ADJUSTMENT PURPOSES:** Transfer for the purpose of placing the inmate in a new setting due to poor institutional adjustment or CIM concerns. This code differs from a 323 Close Supervision Transfer in that an SIS investigation is not normally conducted. |
| 331 | **TRANSFER FOR MEDICAL TREATMENT:** Transfer from general population for the purpose of obtaining medical/physical treatment in a Medical Referral Center. Requires a change to a CARE 4 assignment. |
| 332 | **MEDICAL TREATMENT COMPLETED:** Return from Medical Referral Center to general population after treatment for medical/physical treatment. Requires a change from CARE 4 assignment to a lesser care level assignment. |
| 333 | **TRANSFER FOR PSYCHOLOGICAL/PSYCHIATRIC EVALUATION:** Transfer from general population for the purpose of obtaining psychiatric treatment in a Medical Referral Center. Requires a change to a CARE 4 assignment. |
| 334 | **PSYCHOLOGICAL/PSYCHIATRIC EVALUATION COMPLETED:** Return from a Medical Referral Center to general population after obtaining psychiatric treatment. Requires a change from CARE 4 assignment to a lesser care level assignment. |
| 335 | **TRANSFER FOR HOSPITALIZATION AND TREATMENT:** Transfer between BOP Medical Referral Centers for continued medical/physical or psychiatric treatment. (SPG to BUT). CARE 4 assignment remains intact. |
| 336 | **HOSPITALIZATION AND TREATMENT COMPLETED:** Discontinued (See Code 332). |
| 337 | **OTHER:** This category may be used only when no other transfer code above applies. (DISCONTINUED) |
| 338 | **DECREASE IN MEDICAL CARE LEVEL:** Transfer used when there has been a decrease in the inmate's medical care level and the inmate no longer requires the higher level of medical services. This code is to be used when the transfer occurs between non-MRC institutions and when there is a decrease from the CARE assignments 2 and 3 only. |
| 339 | **INCREASE IN MEDICAL CARE LEVEL:** Transfer used when there has been an increase in the inmate's medical care level and inmate is being transferred for the sole purpose of requiring increased medical resources. This code is to be used when the transfer occurs between non-MRC institutions and when there is an increase from the CARE assignments 1 and 2 only. |
| 369 | **FACILITY REORGANIZATION:** Transfer based on a mission change of the institution. |

# OFFENSE SEVERITY SCALE

| GREATEST SEVERITY |
|---|
| **Aircraft Piracy** - placing plane or passengers in danger<br>**Arson** - substantial risk of death or bodily injury<br>**Assault** - serious bodily injury intended or permanent or life threatening bodily injury resulting)<br>**Car Jacking** - any<br>**Drug Offense** - see criteria below*<br>**Escape** - closed institution, secure custody, force or weapons used<br>**Espionage** - treason, sabotage, or related offenses **Explosives** - risk of death or bodily injury **Extortion** - weapon or threat of violence<br>**Homicide or Voluntary Manslaughter** - any<br>**Kidnaping** - abduction, unlawful restraint, demanding or receiving ransom money<br>**Robbery** - any<br>**Sexual offenses** - rape, sodomy, incest, carnal knowledge, transportation with coercion or force for commercial purposes<br>**Toxic Substances/Chemicals:** - weapon to endanger human life<br>**Weapons** - distribution of automatic weapons, exporting sophisticated weaponry, brandishing or threatening use of a weapon |

* Any **drug offender** whose current offense includes the following criteria will be scored in the Greatest severity category:

The offender was part of an organizational network and he or she organized or maintained ownership interest/profits from **large-scale** drug activity,

***AND***

The drug amount equals or exceeds the amount below:

**Cocaine** - greater than or equal to 10,000 gm, 10 K, or 22 lb
**Cocaine Base "Crack"** - greater than or equal to 31 gm
**Hashish** - greater than or equal to 250,000 gm, 250 K, or 551 lb
**Marijuana** - greater than or equal to 620,000 gm, 620 K, or 1,367 lb
**PCP** - greater than or equal to 100,000 mg, 100 gm, or 20,000 dosage units
**Heroin or Opiates** - greater than or equal to 2,000 gm, 2 K, or 4.4 lb
**Methamphetamine** - greater than or equal to 16,000 gm, 17 K, or 35 lbs
**Other illicit drugs:** - Amphetamine, Barbiturates, LSD, etc. greater than or equal to 250,000 dosage units

| HIGH SEVERITY |
| --- |

**Arson** - other
**Cruelty to Children** - any
**Drugs (For Females only)**

**Cocaine** - greater than or equal to 10,000 gm, 10 K, Or 22 lb
**Cocaine Base "Crack"** - greater than or equal to 31 gm **Hashish** - greater than or equal to 250,000 gm, 250 K, Or 551 lb
**Marijuana** - greater than or equal to 620,000 gm, 620 K, Or 1,367 lb
**PCP** - greater than or equal to 100,000 mg, 100 gm, or 20,000 dosage units
**Heroin or Opiates** - greater than or equal to 2,000 gm, 2 K, or 4.4 lb
**Methamphetamine** - greater than or equal to 16,000 gm, 17 K, or 35 lb
**Other illicit drugs** - Amphetamine, Barbiturates, LSD etc. - greater than or equal to 250,000 dosage units

**Explosives** - other
**Extortion** - other
**Involuntary manslaughter** - includes vehicular homicide
**Residential Burglary** - with evidence that occupants were in dwelling during the commission of the offense
**Rioting** - any
**Sexual Offenses** - sexual exploitation of children, unlawful sexual conduct with a minor, pornography
**Stalking** - any
**Threatening Communications** - with conduct evidencing intent to carry out such threat
**Toxic Substances/Chemicals** - other

| MODERATE SEVERITY |
|---|
| **Assault** - other |
| **Auto Theft** - any |
| **Breaking and Entering** - any |
| **Burglary** - other |
| **Child Abandonment** - any |
| **Contempt of Court** - criminal contempt |
| **Drugs Cocaine** - greater than or equal to 400 gm, .4 K, or .88 lb |
| **Cocaine Base "Crack"** - greater than or equal to 1 gm |
| **Hashish** - greater than or equal to 11,000 gm, 11 K, or 24 lb |
| **Marijuana** - greater than or equal to 25,000 gm, 25 K, or 55 lb |
| **PCP** - greater than or equal to 4,000 mg, 4 gm, or .14 oz |
| **Heroin or Opiates** - greater than or equal to 80 gm, .08 K, or .18 lb |
| **Methamphetamine** - greater than or equal to 667 gm, .67 K, or 1.47 lb |
| **Other illicit drugs** - Amphetamine, Barbiturates, LSD, etc. greater than or equal to 10,000 dosage units, .05 K, or .11 lb |
| **Escape** - walkaway from open institution, failure to appear/bail reform act, no threat of violence involved |
| **Immigration Offenses** - transportation of unlawful aliens |
| **Obstruction of Justice** - any |
| **Property Offenses** - over $250,000, includes theft, fraud, tax evasion, forgery, currency offenses |
| **Sexual Offenses** - other |
| **Weapons** - other |

| LOW-MODERATE SEVERITY |
|---|
| **Bigamy** - Polygamy |
| **Drugs Cocaine** - less than 400 gm, .4 K, or .88 lb |
| **Cocaine Base "Crack"** - less than 1 gm |
| **Hashish** - less than 11,000 gm, 11 K, or 24 lb |
| **Marijuana** - less than 25,000 gm, 25 K, or 55 lb |
| **PCP** - less than 4,000 mg, 4 gm, or .14 oz |
| **Heroin or Opiates** - less than 80 gm, .08 K, or .18 lb |
| **Methamphetamine** - less than 667 gm, .67 K, or 1.47 lb |
| **Other illicit drugs** - Amphetamine, Barbiturates, LSD, etc., less than 10,000 dosage units, .05 K, or .11 lb |
| **Indecent Exposure** - indecent acts, lewd behavior |
| **Immigration Offenses** - other |
| **Post-Release Supervision Violation** - technical, administrative |
| **Property Offenses** - valued between $2,000 and $250,000) |

| LOWEST SEVERITY |
|---|
| **Drugs** - personal use<br>**Gambling Law Violation** - any<br>**Liquor Law Violation** - any<br>**Property Offenses** - less than $2,000<br>**Suspicion** - any<br>**Traffic Laws** - any<br>**Vagrancy** - any<br>**Vandalism** - any |

| MARIJUANA EQUIVALENT CHART | |
|---|---|
| DRUG | MARIJUANA EQUIVALENT |
| 1 gm of Heroin | 1000 gm |
| 1 gm of Cocaine Powder | 200 gm |
| 1 gm of Methamphetamine | 2000 gm |
| 1 gm of LSD | 100,000 gm |
| 1 gm of "crack" cocaine | 20,000 gm |
| 1 gm of Hashish Oil | 50 gm |
| For other drug equivalents, please refer to the U.S. Sentencing Commission Guidelines Manual. | |

| MEASUREMENT CONVERSION TABLE | |
|---|---|
| 1 oz = 28.35 gm<br>1 lb = 453.6 gm<br>1 lb = 0.4536 kg<br>1 gal = 3.785 liters<br>1 qt = 0.946 liters | 1 gm = 1 ml (liquid)<br>1 liter = 1,000 ml<br>1 kg = 1,000 gm<br>1 gm = 1,000 mg<br>1 grain = 64.8 mg |

## DEFINITION OF ROLES INVOLVED IN DRUG OFFENSES

To determine whether an individual involved with a drug offense rose to the level of an organizer or leader, read the "Offense Conduct" section of the Presentence Investigation Report, and any other available information (i.e., Statement of Reasons,
U.S. Attorney Report, etc.) to determine what the individual's role was in the criminal activity. The role definitions below are grouped into two categories: Those that rise to the level of organizer/leader; and, those that do not.

### ORGANIZER/LEADER

**Importer/High-Level Supplier:** imports or otherwise supplies large quantities of drugs; is at or near the top of the distribution chain; has ownership interest in drugs (not merely transporting drugs for another individual); usually supplies drugs to other drug distributors and does not deal in retail amounts; may employ no or very few subordinates.

**Organizer/Leader:** organizes, leads, directs, or otherwise runs a drug distribution organization. Receives the largest share of the profits and has the greatest decision-making authority.

**Grower/Manufacturer:** grows, cultivates, or manufactures a controlled substance, and is the principal owner of the drugs. (Keep in mind, the intent of this definition is to capture the individual who has the capability to manufacture enormous amounts of drugs in his garage/lab for example, and not the individual who is growing only five marijuana plants in his basement.)

**Financier/Money Launderer:** provides money for purchase, importation, manufacture, cultivation, transportation, or distribution of drugs; launders proceeds of drug sales or purchases.

**Aircraft Pilot/Vessel Captain:** pilots vessel or aircraft; requires special skill; does not include inmate who is the only participant directing a small boat (i.e., a speed boat) onto which drugs had been loaded from a "mother ship" (such person is a courier).

**NOT A DRUG ORGANIZER/LEADER**

**Manager:** serves as a lieutenant to assist one of the above; manages all or a significant portion of the manufacturing, importation, or distribution operation; takes instructions from one of the above and conveys to subordinates; directly supervises at least one other co-participant in an organization of at least five co-participants.

**Bodyguard/Strongman/Debt Collector:** provides physical and personal security for another co-participant in the offense; collects debts owed, or punishes recalcitrant persons.

**Chemists/Cooks/Chemical Supplier:** produces LSD, methamphetamine, crack cocaine, or other illegal drugs, but does not qualify as a Grower/Manufacturer because he/she is not the principal owner of the drugs. Chemical supplier does not handle drugs themselves but engages in the unlawful diversion, sale, or furnishing of listed chemicals or equipment used in the synthesis or manufacturing of controlled substances.

**Supervisor:** supervises at least one other co-participant, however, has limited authority and does not qualify as a Manager.

**Street-Level Dealer:** distributes retail quantities directly to the user.

**Broker/Steerer/Go-Between:** arranges for two parties to buy/sell drugs, or directs potential buyer to a potential seller.

**Courier:** transports or carries drugs with the assistance of a vehicle or other equipment. Includes situations where individual, who is otherwise considered to be a crew member, is the only participant directing a vessel (e.g., a speed boat) onto which drugs had been loaded from a "mother ship".

**Mule:** transports or carries drugs internally or on their person, often by airplane, or by walking across a border. Also includes an individual who only transports or carries drugs in baggage, souvenirs, clothing, or otherwise.

**Renter/Storer:** provides (for profit/compensation) own residence, structures (barns, storage bins, buildings), land, or equipment for use to further the offense.This inmate is distinguished from the enabler because he/she is paid (in some way) for his/her services.

**Money runner:** transports/carries money and/or drugs to and from the street-level dealer.

**Off-loader/Loader:** performs the physical labor required to put large quantities of drugs into storage, hiding, or onto some mode of transportation.

**Gopher/Lookout/Deckhand/Worker/Employee:** performs very limited, low-level function in the offense (whether or not ongoing); includes running errands, answering the telephone, receiving packages, packaging the drugs, manual labor, acting as lookout to provide early warnings during meetings, exchanges, or off-loading, or acting as deckhand/crew member on vessel or aircraft used to transport large quantities of drugs.

**Enabler** (Passive): plays no more than a passive role in the offense, knowingly permitting a certain unlawful criminal activity to take place without actually being involved with the activity; may be coerced or unduly influenced to play such a function (e.g., a parent or grandparent threatened with displacement from a home unless they permit the activity to take place), or may do so as "a favor" (without compensation).

**User Only:** possessed small amount of drugs apparently for personal use only; no apparent function in any conspiratorial criminal activity.

**Wholesaler:** sells more than retail/user-level quantities (greater than one ounce) in a single transaction.

**SPECIAL INSTRUCTIONS**

In the case of an offense involving marijuana plants, one plant equals 100 grams (or the actual weight of the useable marijuana, whichever is greater).

If the offense includes several types of drugs, compute the marijuana equivalent and total the sum to arrive at a grand total. For example, if the inmate has marijuana, cocaine, and heroin, compute the cocaine and heroin to an equivalent amount of marijuana and hold the inmate accountable for the sum total of the equivalent amount of marijuana.

Offenses not listed will be assigned a severity category according to the most comparable listed offense.

Score any attempt, aiding and abetting, conspiracy, misprision of a felony, and accessory after the fact in the same severity category as the underlying offense. Total offense behavior is to be considered, utilizing the most serious offense or act committed. However, in drug conspiracy cases, the individual will be held accountable as documented by the Judge in the Statement of Reasons. If the Statement of Reasons is not attached, the Case Manager will review the Presentence Investigation Report to determine the individual's specific reported behavior, and not hold the individual accountable for the entire drug conspiracy empire.

If committed as a parole, mandatory release, special parole term, or supervised release violator as a result of a new conviction, use that new offense behavior for scoring "Severity of Current Offense."

If committed as a probation violator, use the most severe documented behavior between the original offense that prompted probation and the new criminal conduct (violation behavior) for scoring "Severity of Current Offense."

For this Program Statement's purposes, sentences with a specific finding of "withheld adjudication" will be considered the same as if the Judge made a finding of guilt.

**WAIVER FOR MISDEMEANANTS**

I, ______________________________, ____________________
(Name of Inmate) (Register Number)

have been convicted under ______________________________
(Offense Code and Title)

______________________________

and committed to the custody of the Attorney General or the Bureau of Prisons for service of a misdemeanor sentence, do hereby waive my right as a misdemeanant offender to serve my sentence in a facility other than a high security level institution. I understand my conviction could entitle me to be placed in a Minimum, Low, or Medium level institution, as deemed appropriate by the Bureau of Prisons; however, I voluntarily waive my right to such placement. I further understand that this waiver does not prevent the Federal Bureau of Prisons from transferring me to a Minimum, Low, or Medium security level institution in the future, if appropriate.

______________________________ ____________________
Inmate's Signature Date

______________________________
Witness

______________________________
Witness

**STANDARD ABBREVIATIONS/TERMS (BP-337)**

| | |
|---|---|
| ADW | Assault with a Deadly Weapon |
| ALC | Alcohol |
| ATT | Attempt |
| BRA | Bail Reform Act (constitutes escape) |
| CC | Concurrent |
| CC FRD | Credit Card Fraud |
| COC | Cocaine |
| CONSP | Conspiracy |
| CRK | Crack |
| CS | Consecutive |
| D/DS | Day/days |
| DETN | Detainer |
| DRG | Drug |
| DUI | Driving under the influence |
| DWI | Driving while influenced |
| DWOL | Driving without a License |
| DWP/DWIP | Dismissed without/with Prejudice |
| ESS | Execution of Sentence Suspended (If part of the sentence was imposed score as prior. If the entire sentence was suspended, do not count as prior, HOWEVER, if the offense involved escape or violence, score under appropriate history item.) |
| F/A | Firearm |
| FTA | Failure to Appear (constitutes escape) |
| GD | Good |
| GTA | Grand Theft Auto |
| H/G | Handgun |
| HX | History |
| IR | Incident Report |
| ISS | Imposition of Sentence Suspended (If part of the sentence was imposed score as prior. If the entire sentence was suspended, do not count as prior, HOWEVER, if the offense involved escape or violence, score under appropriate history item.) |
| ITSMV | Interstate Transportation of Stolen Motor Vehicle |
| JTC | Jail Time Credit |
| LOC | Lack of Cooperation |
| LOP | Loss of Privileges |
| M/MOS | Month/months |
| MH | Mental health |
| MJ | Marijuana |
| PBJ | Probation Before Judgment |
| PC | Pending Charge |
| PED | Parole Eligibility Date |
| PLIO | Pled to Lesser Instant Offense |
| PROB | Probation |
| PSY | Psychological/Psychiatric |
| PWITD | Possession with Intent to Distribute |
| PV | Parole Violation |

**STANDARD ABBREVIATIONS/TERMS (BP-337)**

| | |
|---|---|
| SRV | Supervised Release Violation |
| TRD | Tentative Release Date |
| UUV | Unauthorized Use of a Vehicle |
| VOP | Violation of Probation |
| WPN | Weapon |
| Y/YRS | Year/years |

Form 409, **REQUEST FOR TRANSFER/APPLICATION OF MANAGEMENT VARIABLE** is available on BOPDOCS

# Exhibit 5

**U.S. Department of Justice**
Federal Bureau of Prisons

CHANGE NOTICE
OPI: CPD/CSB
NUMBER: 5270.09, CN-1
DATE: November 18, 2020

# Inmate Discipline Program

*/s/*
*Approved*: M.D. Carvajal
Director, Federal Bureau of Prisons

This Change Notice (CN) implements the following change to Program Statement 5270.09, **Inmate Discipline Program**, dated July 8, 2011. Additional discipline code, noted by highlighted text will be added to the program statement as follows:

**Table 1. PROHIBITED ACTS AND AVAILABLE SANCTIONS**

**HIGH SEVERITY LEVEL PROHIBITED ACTS**

**231 Requesting, demanding, pressuring, or otherwise intentionally creating a situation, which causes an inmate to produce or display his/her own court documents for any unauthorized purpose to another inmate.**

**U.S. Department of Justice**
Federal Bureau of Prisons

PROGRAM STATEMENT

OPI: CPD/CSB
NUMBER: 5270.09
DATE: July 8, 2011.

# Inmate Discipline Program

/s/
*Approved*: Thomas R. Kane
Director, Federal Bureau of Prisons

## 1. PURPOSE AND SCOPE

### § 541.1 Purpose.

**This subpart describes the Federal Bureau of Prisons' (Bureau) inmate discipline program. This program helps ensure the safety, security, and orderly operation of correctional facilities, and the protection of the public, by allowing Bureau staff to impose sanctions on inmates who commit prohibited acts. Sanctions will not be imposed in a capricious or retaliatory manner. The Bureau's inmate discipline program is authorized by 18 U.S.C. 4042(a)(3).**

### § 541.2 Application.

**This program applies to sentenced and unsentenced inmates in Bureau custody. It also applies to sentenced and unsentenced inmates designated to any prison, institution, or facility in which persons are held in custody by direction of, or under an agreement with, the Bureau of Prisons.**

This policy applies to all persons in the custody of the Federal Bureau of Prisons or Bureau contract facilities, including persons charged with or convicted of offenses against the United States; D.C. Code felony offenders; and persons held as witnesses, detainees, or otherwise. These provisions do not apply to Federal inmates designated to a non-Federal facility (e.g., inmates serving Federal sentences in state or county facilities).

**Federal Regulations from 28 Code of Federal Regulations, part 541, are shown in this type.**
Implementing instructions are shown in this type.

2. **SUMMARY OF CHANGES**

a. Establish Greatest and High severity level prohibited acts for sexual assault of any person. The Greatest severity level act (114) requires the use or threat of force. The High severity level act (229) is for incidents without the use or threat of force.

b. Increase the severity level of escapes from non-secure facilities from a High to a Greatest severity level prohibited act.

c. Amend the Code 104 to include any instrument used as a weapon.

d. Establish a Code 115 for destroying and/or disposing of any item during a search or attempt to search.

e. Establish a High severity level prohibited act code for escape from a work detail, a non-secure institution, or other non-secure custody, including a community facility, with subsequent voluntary return to custody within four hours.

f. Clarify possession of a cellular telephone or other electronic communications device is a Greatest severity level prohibited act.

g. Increase the severity level of all alcohol-related offenses from a High to a Greatest severity level prohibited act.

h. Establish a High severity level prohibited act code for stalking.

i. Establish a High severity level prohibited act code for possession of stolen property.

j. Establish a Moderate severity level prohibited act code for circulating a petition.

k. Establish a High severity level prohibited act code for refusing to participate in a required physical test or examination unrelated to testing for drug abuse (e.g., DNA, HIV, TB).

l. Increase the severity level for tattooing and self-mutilation to a High severity level prohibited act.

m. Establish a Moderate severity level prohibited act code for the fraudulent or deceptive completion of a skills test.

n. Increase the severity level for conducting a business to a Moderate severity level prohibited act.

o. Establish a Moderate severity level prohibited act code for communicating gang affiliation.

p. Establish Greatest, High, and Moderate severity level prohibited acts for abuse of the mail.

q. Establish a sanction of monetary fine.

r. Remove the formal sanctions of reprimand and warning.

s. Increase the sanction of disciplinary segregation from a range of 7 to 60 days to a range of 1 to 18 months.

t. Change from three work days to five work days for the UDC to ordinarily conduct a review.

u. The Special Housing Unit policy (conditions of disciplinary segregation, administrative detention, and protection cases) has been removed and guidance is provided in a separate program statement.

3. **PRINCIPLES**

Several general principles apply to every disciplinary action:

a. Incident reports can be written by Bureau staff, Federal Prison Industries (FPI) staff, and Public Health Service (PHS) officers detailed to the Bureau. Community Corrections Managers may take disciplinary action on inmates in contract RRC's.

b. Staff take disciplinary action at such times and to the degree necessary to regulate an inmate's behavior within Bureau rules and institution guidelines and to promote a safe and orderly institution environment.

c. Staff control inmate behavior in an impartial and consistent manner.

d. Disciplinary action may not be capricious or retaliatory.

e. Staff may not impose or allow corporal punishment of any kind.

4. **DIRECTIVES AFFECTED**

a. **Directive Rescinded**

P5270.08 Inmate Discipline and Special Housing Units (12/4/09)

b. **Directives Referenced**

P1315.07 Inmate Legal Activities (11/5/99)
P1330.16 Administrative Remedy Program (12/31/07)
P1505.03 Language Translations Used in Official Documents (10/31/97)
P2000.02 Accounting Management Manual (10/15/86)

| | |
|---|---|
| P4500.07 | Trust Fund/Deposit Fund Manual (4/19/10) |
| P4700.05 | Food Service Manual (6/12/06) |
| P5100.08 | Inmate Security Designation and Custody Classification (9/12/06) |
| P5162.05 | Categorization of Offenses (3/16/09) |
| P5180.05 | Central Inmate Monitoring System (PS Only) (12/31/07) |
| P5180.06 | Central Inmate Monitoring System (Operations Manual Only) (3/24/08) |
| P5212.07 | Control Unit Programs (2/20/01) |
| P5215.05 | Youth Corrections Act (YCA) Inmates and Programs (3/17/99) |
| P5264.08 | Inmate Telephone Regulations (1/24/08) |
| P5265.14 | Correspondence (4/5/11) |
| P5267.08 | Visiting Regulations (5/11/06) |
| P5270.10 | Special Housing Units (8/1/11) |
| P5322.12 | Inmate Classification and Program Review (11/29/06) |
| P5360.09 | Religious Beliefs and Practices (12/31/04) |
| P5380.08 | Financial Responsibility Program, Inmate (8/15/05) |
| P5500.11 | Correctional Services Manual (10/10/03) |
| P5500.12 | Correctional Services Procedures Manual (10/10/03) |
| P5521.05 | Searches of Housing Units, Inmates, and Inmate Work Areas (6/30/97) |
| P5580.07 | Inmate Personal Property (12/28/05) |
| P5800.15 | Correctional Systems Manual (1/1/09) |
| P5880.28 | Sentence Computation Manual (CCCA of 1984) (7/20/99) |
| P5880.30 | Sentence Computation Manual (Old Law, Pre-CCCA of 1984) (9/8/99) |
| P5880.32 | Sentence Computation Manual (District of Columbia) (1/23/01) |
| P5884.03 | Good Conduct Time Under the Prison Litigation Reform Act (3/31/06) |
| P7300.09 | Community Corrections Manual (5/19/99) |
| P7331.04 | Pretrial Inmates (1/31/03) |

c. Rules cited in this Program Statement are contained in 28 CFR § 541.2 and §§ 541.10-23.

5. **AGENCY ACA ACCREDITATION PROVISIONS**

a. American Correctional Association 4th Edition Standards for Adult Correctional Institutions:

4-4226, 4-4227, 4-4228, 4-4229, 4-4230, 4-4231, 4-4232, 4-4233, 4-4234, 4-4235, 4-4236, 4-4237, 4-4238, 4-4239, 4-4240, 4-4241, 4-4242, 4-4243, 4-4244, 4-4245, 4-4246, 4-4247, 4-4248, 4-4255, 4-4399

b. American Correctional Association 4th Edition Performance-Based Standards for Adult Local Detention Facilities:

4-ALDF-2A-47, 4-ALDF-2A-50, 4-ALDF-3A-01, 4-ALDF-3A-02, 4-ALDF-4C-40, 4-ALDF-6C-01, 4-ALDF-6C-02, 4-ALDF-6C-03, 4-ALDF-6C-04, 4-ALDF-6C-05, 4-ALDF-6C-06, 4-ALDF-6C-07, 4-ALDF-6C-08, 4-ALDF-6C-09, 4-ALDF-6C-10, 4-ALDF-6C-11, 4-ALDF-6C-12, 4-ALDF-6C-13, 4-ALDF-6C-14, 4-ALDF-6C-15, 4-ALDF-6C-16, 4-ALDF-6C-17, and 4-ALDF-6C-18.

## 6. INSTITUTION SUPPLEMENTS

None required.

## 7. NOTICE TO INMATE OF THE INMATE DISCIPLINE PROGRAM

Staff must give each inmate a copy of the following documents promptly after his/her arrival at an institution:

# Summary of the Inmate Discipline System (Appendix B).
# Inmate Rights and Responsibilities (Appendix C).
# Prohibited Acts and Available Sanctions (Table 1).

Receipt of these documents must be noted on the intake screening form and maintained in the inmate's central file. The receipt is kept in the inmate's central file.

To the extent reasonably available, a qualified staff member or translator will help an inmate who has a language or literacy problem, in accordance with the Program Statement **Language Translations Used in Official Documents**.

**CONTENTS**

**Chapter 1**


**§ 541.3 Prohibited acts and available sanctions** .......... 9
- (a) Prohibited acts .......... 9
- (b) Available sanctions .......... 9
  - (1) Greatest Severity Level Offenses .......... 9
  - (2) High Severity Level Offenses .......... 9
  - (3) Moderate Severity Level Offenses .......... 9
  - (4) Low Severity Level Offenses .......... 10
  - (5) All Severity Level Offenses .......... 10

**§ 541.4 Loss of good conduct sentence credit as a mandatory sanction** .......... 11
- (a) Groups that lose good conduct sentence credit .......... 11
  - (1) VCCLEA – violent inmates .......... 11
  - (2) PLRA inmates and D.C. Code offenders .......... 11
- (b) Amount of credit lost .......... 11
  - (1) Greatest Severity Level Offenses .......... 11
  - (2) High Severity Level Offenses .......... 11
  - (3) Moderate Severity Level Offenses .......... 12
  - (4) Low Severity Level Offenses .......... 12

**Available Sanctions** .......... 12

(A) Recommend Parole Date Rescission or Retardation .......... 12

(B) Forfeit Earned Statutory Good Time, Non-vested Good Conduct Time, or Terminate or Disallow Extra Good Time .......... 12

(B.1) Disallowance of Good Conduct Time .......... 13

(C) Disciplinary Segregation .......... 14

(D) Make Monetary Restitution .......... 15

(E) Monetary Fine .......... 15

(F) Loss of Privileges .......... 15

(G) Change Housing Quarters .......... 15

(H) Remove from Program or Group Activity .......... 15

(I) Loss of Job .......... 16

(J) Impound Inmate§s Personal Property .......... 16

(K) Confiscate Contraband .......... 16

(L) Restrict to Quarters .......... 16

(M) Extra Duty .......... 16

**Chapter 2**

**§ 541.5 Discipline process** ....17
- (a) Incident report ....17
- (b) Investigation ....18
  - (1) Information ....18
  - (2) Statement ....18
  - (3) Informally resolving the incident report ....20

**Chapter 3**

**§ 541.6 Mentally ill inmates** ....21
- (a) Competency to participate in disciplinary proceedings ....21
- (b) Responsibility for conduct ....21

**Chapter 4**

**§ 541.7 Unit Discipline Committee (UDC) review of the incident report** ....23
- (a) Available dispositions ....23
- (b) UDC members ....23
- (c) Timing ....24
- (d) Inmate appearance ....24
- (e) Evidence ....24
- (f) Sanctions ....24
- (g) Referral to the DHO ....25
- (h) Written report ....25
- (i) Appeals ....25

**Chapter 5**

**§ 541.8 Discipline Hearing Officer (DHO) hearing** ....27
- (a) Available dispositions ....27
- (b) Discipline Hearing Officer ....27
- (c) Timing ....27
- (d) Staff representative ....27
  - (1) How to get a staff representative ....28
  - (2) How the staff representative will help ....28
  - (3) How the staff representative may appear ....28
- (e) Inmate appearance ....28
- (f) Evidence and witnesses ....29
- (g) Sanctions ....33
- (h) Written report ....34
- (i) Appeals ....35

**APPENDIXES**

**A.** List of Forms ....................37

**B.** Summary of Inmate Discipline System ....................38

**C.** Inmate Rights and Responsibilities ....................39

**D.** Data Entry Instructions ....................41

**TABLES**

**1.** Prohibited Acts and Available Sanctions ....................44

**2.** Additional Available Sanctions for Repeated Prohibited Acts
Within the Same Severity Level ....................55

**CHAPTER 1.**

## § 541.3 Prohibited acts and available sanctions.

**(a) *Prohibited acts.* The list of prohibited acts are divided into four separate categories based on severity: Greatest; High; Moderate; and Low. We describe the prohibited acts in Table 1 - Prohibited Acts and Available Sanctions. Aiding, attempting, abetting, or making plans to commit any of the prohibited acts is treated the same as committing the act itself.**

**(b) *Available sanctions.* The list of available sanctions for committing prohibited acts is listed in Table 1 - Prohibited Acts and Available Sanctions. If you commit repetitive prohibited acts, we can impose increased sanctions, as listed in Table 2 - Additional Available Sanctions for Repeated Prohibited Acts Within the Same Severity Level.**

(1) **Greatest Severity Level Offenses**. The Discipline Hearing Officer (DHO) imposes one or more of sanctions A through E. Sanction B.1 must be imposed for a VCCLEA inmate rated "violent" (an inmate who, per the Violent Crime Control and Law Enforcement Act of 1994, committed a crime of violence on or after September 13, 1994) and for a PLRA inmate (an inmate sentenced for an offense committed on or after April 26, 1996, per the Prison Litigation Reform Act). The DHO may impose any available sanctions (A through M) in addition to sanctions A through E. All Greatest severity level charges must be referred to the DHO.

(2) **High Severity Level Offenses**. The DHO imposes one or more of sanctions A through M, and, except as noted in the sanction, may also suspend one or more sanctions A through M. Sanction B.1 must be imposed for a VCCLEA inmate rated "violent" and for a PLRA inmate. All High severity level charges must be referred to the DHO.

Prohibited Act Code 225, Stalking, is for the purpose of punishing repetitive inmate behavior, e.g., loitering, staring, leering, inappropriate remarks (short of insolence, profanity, or sexual proposals), that are not clearly covered by another prohibited act code. When staff encounter such behavior, the inmate should be specifically warned that it is inappropriate and must cease. If the behavior fits another prohibited act code provision, the inmate should be charged with violating that specific provision instead of stalking. Examples of other prohibited act code behavior that may be used instead of Code 225, Stalking, include, but are not limited to Insolence (Code 312), Being in an Unauthorized Area (Code 316), Threatening (Code 203), and Making a Sexual Proposal or Threat (Code 206).

(3) **Moderate Severity Level Offenses**. The DHO imposes at least one sanction A through M, but, except as noted in the sanction, may suspend any sanction(s) imposed. Sanction B.1 ordinarily must be imposed for a VCCLEA inmate rated "violent" and for a PLRA inmate.

Except for charges referred to the DHO, the Unit Discipline Committee (UDC) shall impose at

least one sanction F through M, but may suspend any sanctions imposed.

The UDC ordinarily refers to the DHO a moderate severity level charge for a VCCLEA inmate rated "violent" or for a PLRA inmate if the inmate was found to have committed two moderate offenses during his/her current anniversary year (the 12-month period for which an inmate may be eligible to earn good conduct time [GCT]). The UDC must document the reasons why a third charge for such an inmate was not referred to the DHO.

A prohibited act charge for 331 involving tobacco or nutritional supplements must be referred to the DHO for final disposition.

(4) **Low Severity Level Offenses**. The DHO imposes at least one sanction B.1, or D through M. The DHO may suspend any sanction(s) imposed; however, a B.1 sanction may not be suspended. Except for charges referred to the DHO, the UDC imposes at least one sanction F through M, but may suspend any sanction(s) imposed.

The UDC ordinarily refers to the DHO a low severity level charge for a VCCLEA inmate rated "violent" or for a PLRA inmate if the inmate had been found to have committed three low offenses during his/her current anniversary year. The UDC must document the reasons why a charge for such an inmate was not referred to the DHO.

Sanction B.1 may be imposed on the Low severity level **only** if the inmate has committed a Low severity level prohibited act more than once within a six-month period (except for a VCCLEA inmate rated "violent" or a PLRA inmate).

(5) **All Severity Level Offenses**. In all categories of severity**, aiding** another person to commit any of these offenses, **attempting** to commit them, or **making plans** to commit them, **is considered equivalent to committing the offense itself**. In these cases, the letter "A" is combined with the offense code. For example, planning an escape is Escape, Code 102A. Attempting to adulterate food or drink is Code 209A.

When the prohibited act is **Interfering with a Staff Member in the Performance of Duties (Code 198, 298, 398 or 498) or Conduct Which Disrupts (Code 199, 299, 399, or 499)**, the DHO or UDC must specify the severity level of the conduct that is most comparable to an offense(s) at that severity level. **Example:** "I find the act of Conduct Which Disrupts (Code 299) to be of High severity level, most comparable to the prohibited act of Engaging in a Group Demonstration (Code 212)."

**Suspensions of any sanction cannot exceed six months**. Suspended sanctions may only be revoked and executed if the inmate is found to have committed a subsequent prohibited act. Only the DHO may execute, suspend, or revoke and execute suspension of sanctions A through E (B and B.1. may never be suspended). The DHO or UDC may execute, suspend, or revoke and

execute suspensions of sanctions F through M. The DHO may execute UDC-suspended sanctions. However, the UDC may **not** execute DHO-suspended sanctions A through E.

When an inmate receives an incident report while on a DHO-imposed, but suspended sanction, the new incident report is forwarded by the UDC to the DHO, both for a final disposition on the new incident report, and for a disposition on the suspended sanction. This procedure is not necessary when the UDC informally resolves the new incident report. The DHO may return an incident report to the UDC if a decision not to execute the suspended sanction is made.

The UDC or DHO may impose increased sanctions for repeated, frequent offenses per the guidelines in Table 2.

Noting that not all UDC or DHO decisions finding an inmate committed a prohibited act will result in a change to the inmate's security designation score, the Unit Team may recommend a greater security transfer, using their professional judgment, and in accordance with the policy on Inmate Security Designation and Custody Classification.

**§ 541.4 Loss of good conduct sentence credit as a mandatory sanction.**

**(a) You will lose good conduct sentence credit as a mandatory disciplinary sanction if you are in one of the following two groups:**

**(1) *VCCLEA-violent inmates.* The date of your U.S. Code offense was on or after September 13, 1994, but before April 26, 1996, and you committed a "crime of violence" as defined by the Violent Crime Control and Law Enforcement Act of 1994 (VCCLEA); or**

**(2) *PLRA inmates and D.C. Code offenders.* The date of your U.S. Code offense was on or after April 26, 1996, and, therefore, under the Prison Litigation Reform Act (PLRA), or the date of your District of Columbia (DC) Code offense was on or after August 5, 2000.**

**(b) If you are an inmate in one of the above groups and commit a prohibited act, you will lose good conduct sentence credit as a mandatory disciplinary sanction. The amount of good conduct sentence credit you will lose depends on the severity level of the prohibited act(s) committed, as follows:**

**(1) *Greatest Severity Level Offenses.* You will lose at least 41 days, or 75% of available credit if less than 54 days are available for the prorated period, for each act committed.**

**(2) *High Severity Level Offenses.* You will lose at least 27 days, or 50% of available credit if less than 54 days are available for the prorated period, for each act committed.**

**(3) *Moderate Severity Level Offenses.* You will lose at least 14 days, or 25% of available credit if less than 54 days are available for the prorated period, after committing two or more Moderate severity acts during the current year of your good conduct sentence credit availability.**

**(4) *Low Severity Level Offenses.* You will lose at least 7 days, or 12.5% of available credit if less than 54 days are available for the prorated period, after committing three or more Low severity acts during the current year of your good conduct sentence credit availability.**

**Available Sanctions** (upon finding the inmate committed the prohibited act(s)):

**(A) Recommend Parole Date Rescission or Retardation.** The DHO may recommend retardation or rescission of parole grants to the U.S. Parole Commission or respective parole authority.

**(B) Forfeit Earned Statutory Good Time, Non-vested Good Conduct Time, or Terminate or Disallow Extra Good Time.**

*Forfeited good conduct time* (GCT) is not eligible for restoration. However, *forfeited statutory good time* (SGT) may be restored. Restoration of statutory good time is approved at initial eligibility only when the inmate has shown a period of improved good behavior. When the Warden (or designee) denies restoration of forfeited statutory good time, the unit team notifies the inmate of the reasons for denial. The unit team establishes a new eligibility date, not to exceed six months from the date of denial.

An application for restoration of statutory good time is forwarded from the inmate's unit team, through the DHO and Captain for comments, to the Warden for final decision.

Inmates who committed their crimes on or after November 1, 1987, and are sentenced under the Sentencing Reform Act provisions of the Comprehensive Crime Control Act, are only eligible to receive 54 days GCT credit (18 U.S.C. § 3624(b)). This credit is given at the end of each year served and, once given, is vested. For these inmates, the DHO§s authority is final and subject only to review by the Regional Director to ensure conformity with the discipline policy and by inmate appeal through Administrative Remedy procedures.

The statutory good time available for forfeiture is limited to an amount computed by multiplying the months served at the time of the offense for which forfeiture is taken, by the applicable monthly rate specified in 18 U.S.C. § 4161 (less previous forfeiture or withholding). The amount of GCT available for forfeiture is limited to total days in "non-vested" status at the time of misconduct (less previous forfeiture).

Forfeiture of GCT may not be suspended.

Disallowance of extra good time is limited to extra good time for the calendar month in which the violation occurs. It may not be withheld or restored.

The sanction of termination or disallowance of extra good time may not be suspended.

Forfeited GCT will not be restored. Authority to restore forfeited statutory good time is delegated to the Warden, and may not be delegated lower than the Associate Warden level. Limitations on this sanction and eligibility for restoration are based on the severity scale. (See Table 2.)

To ensure an inmate§s case is not overlooked when statutory good time has been forfeited, the unit manager will ensure the eligibility requirements are reviewed for restoration per the time frames in the Program Statement on Classification and Program Review of Inmates. A recommendation of the unit team for or against restoration is forwarded to the Warden through the DHO and Captain. Except as noted, eligibility for restoration of forfeited statutory good time is computed from the date of the withholding or forfeiture action by the DHO.

An inmate who has escaped and receives a forfeiture at a subsequent in absentia hearing begins the eligibility for restoration period upon return to Bureau custody. The Warden refers to the Regional Director any case where exceptional circumstances support restoration of statutory good time before completion of the eligibility requirements.

Sanction B does not apply to inmates committed under the Comprehensive Crime Control Act for crimes committed on or after November 1, 1987, and prior to passage of the Violent Crime Control and Law Enforcement Act of 1994 (September 23, 1994). For those inmates, the applicable sanction is B.1.

**(B.1) Disallowance of Good Conduct Time.** An inmate sentenced under the Sentencing Reform Act provisions of the Comprehensive Crime Control Act (committed a crime on or after November 1, 1987) may not receive statutory good time, but is eligible to receive 54 days GCT credit each year (18 U.S.C. § 3624(b)). Once awarded, the credit is vested, and may not be disallowed.

Crimes committed on or after September 13, 1994, and before April 26, 1996, (VCCLEA) credit is not vested unless the inmate has earned or is making satisfactory progress toward a high school diploma or equivalent degree (or is exempt because of a learning disability).

For crimes committed on or after April 26, 1996, (PLRA and SRAA) GCT credit toward an inmate's service of sentence vests on the date the inmate is released. Once disallowed, the credit may not be restored, except by immediate review or appeal as indicated below. Prior to this award being made, the credit may be disallowed for an inmate found to have committed a prohibited act.

A sanction of GCT disallowance may not be suspended. Only the DHO can take action to

disallow GCT. The DHO considers the severity of the prohibited act and the suggested disallowance guidelines in making a determination.

A decision to go above the guideline is warranted for a greatly aggravated offense or a repeated violation of another prohibited act within a relatively short time (e.g., within 24 months for a greatest severity level prohibited act, 18 months for a high severity level prohibited act, and 12 months for a moderate severity level prohibited act). A decision to go below the guidelines is warranted for strong mitigating factors. A decision above or below the guidelines is justified in the DHO report.

VCCLEA inmates rated "violent" and PLRA inmates are ordinarily disallowed GCT for each prohibited act they are found to have committed at a DHO hearing, consistent with the following:

# **Greatest Severity Level Offenses**. A minimum of 41 days (or, if less than 54 days are available for the prorated period, a minimum of 75% of available GCT) for each act committed.

# **High Severity Level Offenses**. A minimum of 27 days (or, if less than 54 days are available for the prorated period, a minimum of 50% of available GCT) for each act committed.

# **Moderate Severity Level Offenses**. A minimum of 14 days (or, if less than 54 days are available for the prorated period, a minimum of 25% of available GCT) for each act committed if the inmate has committed two or more moderate severity level offenses during the current anniversary period.

# **Low Severity Level Offenses**. A minimum of 7 days (or, if less than 54 days are available for the prorated period, a minimum of 12.5% of available GCT) for each act committed if the inmate has committed three or more low moderate offenses during the current anniversary period.

Except for VCCLEA inmates rated "violent" or PLRA inmates, Sanction B.1 may be imposed on the Low severity level only where the inmate has committed a Low severity level act more than once within a six-month period.

GCT credit may only be given to an inmate serving a sentence of more than one year, but less than life. In the last year or part of a year of an inmate's sentence, only the GCT available for the time remaining may be disallowed.

**(C) Disciplinary Segregation.** The DHO may direct that an inmate be placed or retained in disciplinary segregation. Consecutive disciplinary segregation sanctions can be imposed for inmates found to have committed offenses that are part of different acts only. Limits on time in disciplinary segregation are based on the severity scale (see Tables 1 and 2).

Unless otherwise specified by the DHO, disciplinary segregation placements for different or separate prohibited acts are imposed consecutively.

**(D) Make Monetary Restitution.** The DHO may direct that an inmate reimburse the U.S. Treasury for damages to U.S. Government property that the individual caused or contributed to. The UDC is prohibited from imposing the sanction of make monetary restitution.

Commissary privileges should be suspended by the DHO until restitution is made. See the Program Statement **Trust Fund/Deposit Fund Manual** for instructions regarding impoundment of inmate funds.

**(E) Monetary Fine.** The DHO may direct that an inmate pay a fine, as follows:

- Greatest severity level offense – Up to $500, or 75% of the inmate's trust fund balance.
- High severity level offense – Up to $300, or 50% of the inmate's trust fund balance.
- Moderate severity level offense – Up to $100, or 25% of the inmate's trust fund balance.
- Low severity level offense – Up to $50, or 12.5% of the inmate's trust fund balance.

Commissary privileges should be suspended until the fine is paid. See the Trust Fund/Deposit Fund Manual for instructions regarding impoundment of inmate funds.

This sanction cannot be used as a form of monetary restitution. The UDC is prohibited from imposing the sanction of monetary fine.

**(F) Loss of Privileges (e.g., visiting, telephone, e-mail, commissary, movies, recreation).** The DHO or UDC may direct that an inmate forego specific privileges for a specified time.

The DHO or UDC may impose non-contact visiting or immediate family-only visitation in addition to loss of visiting.

Loss of recreation privileges (exercise periods) may not be imposed on inmates in a Special Housing Unit (SHU), but may be used for general population inmates.

The DHO or UDC may impose a loss of mattress sanction from lights on to lights off for inmates in the SHU. Staff must ensure the inmate has a mattress from lights off to lights on.

**(G) Change Housing (Quarters)**. The DHO or UDC may direct that an inmate be moved to other housing.

**(H) Remove from Program or Group Activity.** The DHO or UDC may direct that an inmate not participate in any program or group activity for a specified time.

**(I) Loss of Job.** The DHO or UDC may direct that an inmate be removed from his/her present

job or assigned to another job.

**(J) Impound Inmate§s Personal Property.** The DHO or UDC may direct that an inmate's personal property be stored in the institution for a specified time.

**(K) Confiscate Contraband.**

**(L) Restrict Quarters.** The DHO or UDC may direct that an inmate be confined to quarters or its immediate area for a specified time.

**(M) Extra Duty.** The DHO or UDC may direct that an inmate perform tasks other than those performed during his/her regular job.

**CHAPTER 2.**

## § 541.5 Discipline process.

**(a) *Incident report.* The discipline process starts when staff witness or reasonably believe that you committed a prohibited act. A staff member will issue you an incident report describing the incident and the prohibited act(s) you are charged with committing. You will ordinarily receive the incident report within 24 hours of staff becoming aware of your involvement in the incident.**

When staff witness or reasonably believe that a violation of Bureau regulations has been committed, staff must prepare an incident report and forward it to the appropriate Lieutenant. The Lieutenant will enter the incident report into SENTRY.

The reporting employee immediately completes Part 1 of the incident report. The incident is a prohibited act listed in Appendix C. The entire language of the prohibited act(s) does not have to be copied. For example, "Destroying Government Property, Code 218" or "Possessing Narcotics, Code 113" would be acceptable listings.

The description of the incident should contain all facts known by the employee that are not confidential. Anything unusual about the inmate's behavior should be noted. The reporting employee also lists persons (staff, inmates, others) at the scene, and physical evidence (weapons, property, etc.) the employee may have handled. The report reflects any actions taken, including use of force. The reporting employee signs the report, enters his/her title, date, and time, and forwards it to the Lieutenant. The description of the incident provides the inmate with specific evidence for which he/she may prepare a defense.

References to attachments and other investigative materials should not be identified in Section 11 of the report. For example, if staff observe two inmates in a physical altercation, the reporting officer should describe in Section 11 specific actions by each inmate; e.g., throwing punches to the head with a closed fist, striking one another with closed fists, biting, scratching, hair pulling.

Acts are different or separate if they have different elements (time, place, persons involved, actions). For example, if an inmate is involved in a fight with another inmate and also strikes a staff member trying to break it up, the inmate can be charged with fighting (Code 201) and assaulting a staff member (Code 224 or 101, depending on seriousness of injuries).

Code 305, Possession of anything not authorized, may be appropriate for inmates possessing items in excess of authorized limits.

Codes 199, 299, and 399, most like 196, 296, and 396, respectively, may be appropriate for inmates using electronic messaging (e.g., TRULINCS) in violation of policy. Sanctions Code F., Loss of privileges, in the form of loss of electronic messaging privileges, may be an appropriate

sanction for these offenses.

**(b) *Investigation.* After you receive an incident report, a Bureau staff member will investigate it.**

The Investigating Officer is an employee at the supervisory level who conducts an investigation of alleged inmate misconduct. The Investigating Officer must be IDC-certified, and may not be the employee reporting the incident or otherwise be involved in the incident. The officer is ordinarily a Lieutenant, but the Warden may appoint another staff member.

Staff conduct the investigation as promptly as possible. The Investigating Officer is ordinarily appointed within 24 hours of the incident report. The investigation should be finished within 24 hours after the appointment.

When it appears likely that the incident may involve criminal prosecution, the investigating officer suspends the investigation. Staff may not question the inmate until the FBI or other investigative agency releases the incident report for administrative processing. The incident report should then be delivered to the inmate by the end of the next business day. The time frame for processing the Incident report is suspended until it is released for processing.

The Investigating Officer may informally resolve the Incident report (except for prohibited acts in the Greatest or High severity level categories) or conduct an investigation consistent with this section.

**(1) *Information:* The investigator will specifically inform you:**

**(A) of the charge(s) against you; and**

**(B) that you may remain silent at all stages of the discipline process, but that your silence may be used to draw an adverse inference against you at any stage of the process. Your silence alone, however, cannot be the basis for finding you committed the prohibited act(s).**

**(2) *Statement:* When the investigator asks for your statement, you may give an explanation of the incident, request any witnesses be interviewed, or request that other evidence be obtained and reviewed. However, the staff investigation of the incident report may be suspended before requesting your statement if it is being investigated for possible criminal prosecution.**

The Investigating Officer provides a copy of the incident report to the inmate at the beginning of the investigation, unless there is good cause for later delivery, such as absence of the inmate from the institution or a medical condition that argues against delivery. If the investigation is delayed, any employee may deliver the charge(s) to the inmate. The reason for the delay must be documented in the discipline record.

The incident report should be delivered to the inmate within 24 hours of the time staff become aware of the inmate's alleged misconduct. If an incident is referred for prosecution, the report is delivered by the end of the next business day after release for administrative processing. (The five-day time frame for a UDC review starts when the incident report is released for administrative processing.)

The staff member must record the date and time the inmate received a copy of the report. The investigator also reads the charge(s) to the inmate and asks for the inmate's statement about the incident.

The investigator then talks to persons with direct and relevant information, and summarizes their statements. (For example, if an inmate was in a fight, the investigator talks with the other inmate(s) involved.) Often, the investigator will want to talk to the reporting employee to obtain a report firsthand and to clarify any questions. Although an inmate may not identify or request any witnesses at this stage of the discipline process, the investigator should interview any witnesses to the incident (and victims, if applicable) to record their statements. The investigator records the disposition of evidence.

If practicable, the inmate's statements offering a rationale for his/her conduct or for the charges against him/her should be investigated. If the inmate requests exculpatory evidence, such as video or audio surveillance, the investigator must make every effort to review and preserve the evidence. It would also be prudent for the investigator to review and preserve the video or audio surveillance even if the inmate does not make a specific request as such evidence is relevant to the incident.

An inmate who receives an Incident report based on a "positive" urine test may claim this result comes from either:

# Permissible medication he/she was given.
# A combination of medications he/she is taking.

In the first situation, the investigator must contact Health Services staff to determine if the inmate is receiving medication that contains the compound found in the urinalysis. In the second situation, the investigator must confirm that the inmate is authorized to take the medications. When necessary, the testing laboratory is contacted to see if the combined medications could produce a "false positive."

While an inmate can challenge the **results** of a urine test, and this may be considered by the DHO, the validity of the testing **process** is not at issue. Neither the investigator nor the DHO has the experience to assess the accuracy of the laboratory process. See the Program Statement **Urine Surveillance**.

Under Comments and Conclusions, the investigator may include:

- # Comments on the inmate's prior record and behavior.
- # Analysis of any conflict between witnesses.
- # Conclusions regarding what happened.

The investigator must record all steps and actions taken on the incident report and forward the relevant materials to staff holding the initial hearing.

**The inmate does not receive a copy of the investigation (Sections 23 through 27 of the incident report).** However, if the case is ultimately forwarded to the DHO, the DHO must give a copy of the investigation and other relevant materials to the inmate's staff representative, if requested, for use on the inmate's behalf.

The UDC chairman or DHO taking **final** action ensures that the required information is entered into SENTRY. The unit team files all discipline documents in the inmate's central file.

**(3) *Informally resolving the incident report.* The incident report may be informally resolved at any stage of the disciplinary process, except for prohibited acts in the Greatest and High severity levels, or as otherwise required by law or these regulations. If the incident report is informally resolved, it will be removed from your records.**

The Bureau encourages informal resolution of incidents. However, prohibited acts in the Greatest severity level (100 level) and High severity level (200 level) may not be informally resolved, and must be referred to the DHO. Moderate severity level (300 level) and Low severity level (400 level) offenses can be informally resolved at any stage of the process. A record of any informal resolution is maintained in SENTRY. However, the incident report is not filed in the inmate's central file.

Staff may suspend discipline proceedings up to two calendar weeks while informal resolution is undertaken. If informal resolution is unsuccessful, staff may reinstate disciplinary proceedings at the stage at which they were suspended. The time requirements then restart at the point at which they were suspended. Staff are required to write the incident report before starting informal resolution so the facts of the incident will be preserved if informal resolution is not successful. While informal resolution requires the consent of both staff and inmate to be successful, the determination to informally resolve an incident report is solely at the discretion of staff.

## CHAPTER 3.

### § 541.6 Mentally ill inmates.

**If it appears you are mentally ill at any stage of the discipline process, you will be examined by mental health staff.**

**(a) *Competency to Participate in Disciplinary Proceedings.* If evidence indicates that you cannot understand the nature of the disciplinary proceedings, or cannot help in your own defense, disciplinary proceedings may be postponed until you are competent to participate. The Unit Disciplinary Committee or Discipline Hearing Officer will make this decision based on evidence, including evidence presented by mental health staff.**

**(b) *Responsibility for Conduct.* You will not be disciplined for conduct committed when, as the result of a severe mental disease or defect, you were unable to appreciate the nature and quality, or wrongfulness of the act. The UDC or DHO will make this decision based on evidence, including evidence presented by mental health staff.**

If it appears at any stage of the discipline process that an inmate is mentally ill, staff refers him/her to a mental health professional to determine whether he/she is responsible for his/her conduct or is incompetent. Staff may take no discipline action against an inmate who is determined by a mental health professional to be incompetent to participate in the disciplinary proceedings or not responsible for his/her behavior.

A person is **not responsible** for his/her conduct if, at the time of the conduct, as a result of a severe mental disease or defect, he/she was unable to appreciate the nature and quality or the wrongfulness of his/her acts. When a person is determined not responsible for his/her conduct, the incident report shows as a finding that the person did not commit the prohibited act because he/she was found not mentally responsible. The incident report is retained in the inmate's central file. The DHO or UDC, as appropriate, enters this finding into SENTRY in the Chronological Disciplinary Record.

A person is **incompetent** if he/she lacks the ability to understand the disciplinary proceedings, or to assist in his/her defense. When a person is determined incompetent, the disciplinary proceedings are postponed until the inmate is able to understand the proceedings and assist in his/her defense. If competency is not restored within a reasonable time, the incident report shows as a finding that the inmate is incompetent. The incident report is retained in the inmate's central file. The DHO or UDC chairman records the finding into SENTRY in the Chronological Disciplinary Record.

Generally, the UDC initiates referral to a mental health professional. However, staff at any stage of the discipline process may make such a referral. The completed mental health evaluation is returned to the UDC, which then decides whether the incident may be handled by the UDC (other than Greatest or High severity level), or referred to the DHO. In Greatest or High severity level cases, the UDC may refer an inmate for a mental health evaluation along with referral to the DHO. The completed evaluation is returned to the UDC, which forwards it to the DHO.

**CHAPTER 4.**

**§ 541.7 Unit Discipline Committee (UDC) review of the incident report.**

**A Unit Discipline Committee (UDC) will review the incident report once the staff investigation is complete. The UDC§s review involves the following:**

**(a) *Available dispositions.* The UDC will make one of the following decisions after reviewing the incident report:**

**(1) You committed the prohibited act(s) charged, and/or a similar prohibited act(s) as described in the incident report;**

**(2) You did not commit the prohibited act(s) charged; or**

**(3) The incident report will be referred to the Discipline Hearing Officer (DHO) for further review, based on the seriousness of the prohibited act(s) charged.**

**(4) If you are charged with a Greatest or High severity prohibited act, or are an inmate covered by § 541.4, the UDC will automatically refer the incident report to the DHO for further review.**

**(b) *UDC members.* The UDC ordinarily consists of two or more staff. UDC members will not be victims, witnesses, investigators, or otherwise significantly involved in the incident.**

The Warden designates ordinarily two or more unit staff members to hold an initial review and impose available sanctions upon completion of the investigation of alleged misconduct for moderate category and low category offenses. One staff member UDCs are permitted when other members are not reasonably available.

Only one unit staff member is required to hold an initial review when the incident report is required by policy to be referred to the DHO.

A staff member witnessing an incident may serve on the UDC in cases where virtually every staff member in the institution witnessed the incident in whole or in part.

A staff member may not sit on the UDC without successfully completing the self-study program for UDC certification.

Each Warden must select at least one UDC Trainer to monitor the progress of staff participating in the self-study program.

**(c) *Timing.* The UDC will ordinarily review the incident report within five work days after it is issued, not counting the day it was issued, weekends, and holidays. UDC review of the incident report may also be suspended if it is being investigated for possible criminal prosecution.**

The Warden's approval is required for any extension beyond five work days. The UDC will ensure the approval is documented and included in the discipline packet. The time that an incident report is suspended for referral to another agency for possible prosecution is not included in this five work day time frame. The time line commences when the incident report is released from the outside agency for administrative processing. However, the inmate should be advised of the delay, and if appropriate, the reason for the delay.

**(d) *Inmate appearance.* You are permitted to appear before the UDC during its review of the incident report, except during UDC deliberations or when your presence would jeopardize institution security, at the UDC's discretion. Also:**

**(1) You may appear either in person or electronically (for example, by video or telephone conferencing) at the UDC§s discretion.**

**(2) You may waive your appearance before the UDC. If you waive your appearance, the UDC will review the incident report in your absence.**

**(3) If you escape or are otherwise absent from custody, the UDC will conduct a review in your absence at the institution where you were last confined.**

The UDC must document its reasons for excluding an inmate from the hearing.

A waiver may be in writing, signed by the inmate, or if the inmate refuses to sign, by a memo indicating the inmate's refusal to appear (Waiver of Appearance (BP-A0307)).

**(e) *Evidence.* You are entitled to make a statement and present documentary evidence to the UDC on your own behalf. The UDC will consider all evidence presented during its review. The UDC's decision will be based on at least some facts and, if there is conflicting evidence, on the greater weight of the evidence.**

The phrase "some facts" refers to facts indicating the inmate committed the prohibited act. The phrase "greater weight of the evidence" refers to the strength of the evidence.

**(f) *Sanctions.* If you committed a prohibited act(s), the UDC can impose any of the available sanctions listed in Tables 1 and 2, except loss of good conduct sentence credit, disciplinary segregation, or monetary fines.**

**(g) *Referral to the DHO.* If the UDC refers the incident report to the DHO for further review, the UDC will advise you of your rights at the upcoming DHO hearing, as detailed in § 541.8.**

The UDC is prohibited from imposing the sanctions of make monetary restitution or monetary fines.

The UDC forwards copies of relevant documents to the DHO with a statement of reasons for the referral, along with recommendations for sanctions if the DHO finds the inmate has committed the act or another prohibited act. The UDC Chair records reasons for the referral and recommendations for disposition in the "Committee Action" section of the incident report. Recommendations are contingent upon a DHO finding that the inmate committed the act.

When charges are referred to the DHO, the UDC advises the inmate of the rights afforded at a hearing. The UDC asks the inmate to choose a staff representative, if any, and the names of witnesses the inmate wishes to be called to testify and what testimony they are expected to provide. The UDC advises the inmate that he/she may waive the right to be present at the hearing, but still have witnesses or a staff representative appear on his/her behalf.

If an inmate waives the right to appear at the UDC review, the UDC ensures the inmate is advised of the rights afforded at a hearing before the DHO (see forms for Inmate Rights at Discipline Hearing and Notice of Discipline Hearing Before the Discipline Hearing Officer (DHO)).

**(h) *Written report.* You will receive a written copy of the UDC§s decision following its review of the incident report.**

The UDC prepares a record of its proceedings, which need not be verbatim. A record of the hearing and supporting documents is kept in the inmate's central file.

The UDC gives the inmate a written copy of the decision and disposition by the close of business the next work day. Action taken as a minor disposition may be reviewed under the Administrative Remedy Program (see 28 CFR Part 542, Subpart B.).

All UDC member**(s)** must print their name and sign Part II of the incident report to certify they served on the UDC and that the completed Part II accurately reflects their review.

When the UDC finds the inmate committed the prohibited act charged or a similar prohibited act reflected in the incident report, the chair ensures the information is entered into SENTRY in the Chronological Disciplinary Record.

**(i) *Appeals.* You may appeal the UDC§s action(s) through the Administrative Remedy Program, 28 CFR Part 542, Subpart B.**

The Program Statement **Administrative Remedy Program** covers the regulations in 28 CFR Part 542, Subpart B. In addition to a review under the Administrative Remedy procedure, the Warden or designee audits and reviews discipline hearings and dispositions to ensure conformity with this policy.

When the UDC holds a full review and determines that the inmate did not commit a prohibited act of Moderate or Low severity, the UDC expunges the inmate's file of the incident report and related documents.

**CHAPTER 5.**

**§ 541.8 Discipline Hearing Officer (DHO) hearing.**

**The Discipline Hearing Officer (DHO) will only conduct a hearing on the incident report if referred by the UDC. The DHO§s hearing involves the following:**

**(a) *Available dispositions.* The DHO will make one of the following decisions after a hearing on the incident report:**

**(1) You committed the prohibited act(s) charged, and/or a similar prohibited act(s) as described in the incident report;**

**(2) You did not commit the prohibited act(s) charged; or**

**(3) The incident report will be referred back for further investigation, review, and disposition.**

**(b) *Discipline Hearing Officer.* The DHO will be an impartial decision maker who was not a victim, witness, investigator, or otherwise significantly involved in the incident.**

The term Discipline Hearing Officer (DHO) refers to a one-person, independent officer who conducts hearings and imposes sanctions for incidents of misconduct referred by the UDC. A DHO may not conduct hearings without receiving specialized training and passing a certification test. If the institution's assigned DHO is unable to conduct hearings, the Warden arranges for another DHO, who must be certified.

The DHO may not hear any case not referred by the UDC. Only the DHO has authority to impose or suspend sanctions A through E.

**(c) *Timing.* You will receive written notice of the charge(s) against you at least 24 hours before the DHO§s hearing. You may waive this requirement, in which case the DHO§s hearing can be conducted sooner.**

The inmate does not appear before the DHO less than 24 hours before receiving written notice, unless he/she is to be released from custody within that time or waives the 24-hour notice requirement.

**(d) *Staff Representative.* You are entitled to have a staff representative during the DHO hearing process as follows:**

**(1) *How to get a staff representative.* You may request the staff representative of your choice, so long as that person was not a victim, witness, investigator, or otherwise significantly involved in the incident. If your request(s) cannot be fulfilled, and you still want a staff representative, the Warden will appoint one. The Warden will also appoint a staff representative if it appears you are unable to adequately represent yourself before the DHO, for example, if you are illiterate or have difficulty understanding the charges against you.**

**(2) *How the staff representative will help you.* Prior to the DHO§s hearing, the staff representative will be available to help you understand the incident report charges and potential consequences. The staff representative may also assist you by speaking with and scheduling witnesses, obtaining written statements, and otherwise helping you prepare evidence for presentation at the DHO§s hearing. During the DHO§s hearing, you are entitled to have the staff representative appear and assist you in understanding the proceedings. The staff representative can also assist you in presenting evidence during the DHO's hearing.**

**(3) *How the staff representative may appear.* Your staff representative may appear either in person or electronically (for example, by video or telephone conferencing) at the DHO§s discretion. If your staff representative is not available for the scheduled hearing, you may either select another staff representative, request the hearing be postponed for a reasonable amount of time until your staff representative can appear, or proceed without a staff representative.**

The Warden provides a full-time staff member to represent an inmate, if requested. If the request cannot be fulfilled, and the inmate still wants a staff representative, the Warden will appoint one. The executive staff, the DHO or alternate DHO, reporting officer, investigating officer, witnesses to the incident, and UDC members involved in the case may not be staff representatives. The Warden may exclude other staff in a particular case or when there is a potential conflict.

The DHO arranges for the presence of the staff representative selected by the inmate. If the staff member declines or is unavailable, the inmate can select another representative, wait a reasonable period for the staff member's return, or proceed without a representative. The DHO affords a staff representative adequate time to speak with the inmate and interview witnesses. While it is expected that a staff member will have ample time to prepare before the hearing, delays to allow additional preparation may be ordered by the DHO.

**(e) *Inmate appearance.* You are permitted to appear before the DHO during the hearing on the incident report as follows:**

**(1) You may appear either in person or electronically (for example, by video or telephone conferencing), at the DHO's discretion.**

**(2) Your appearance may be prohibited during DHO deliberations or when your presence would jeopardize institution security, at the DHO's discretion.**

**(3) You may waive your appearance before the DHO. If you waive your appearance, the DHO hearing will be conducted in your absence.**

**(4) If you escape or are otherwise absent from custody, the DHO will conduct a hearing in your absence at the institution where you were last confined.**

Although an inmate may waive the right to be present, he/she may elect to have a staff representative and witness(es) appear.

The DHO must document reason(s) for excluding an inmate from the hearing. An inmate may waive the right to be present, provided the waiver is documented and reviewed by the DHO. A waiver may be in writing, signed by the inmate, or if the inmate refuses to sign, by a memo signed by staff and witnessed by a second staff member indicating the inmate's refusal to appear.

The DHO may conduct a hearing in the absence of an inmate when the inmate waives the right to appear. If an inmate escapes or is otherwise absent, the DHO conducts a hearing in the inmate's absence at the institution in which the inmate was last confined. When an inmate returns to custody following an absence during which sanctions were imposed by the DHO, the Warden has the charges reheard before the DHO, ordinarily within 60 days after the inmate's arrival at the institution to which he/she is designated after return to custody, following an appearance before the UDC at that institution.

The UDC ensures that the inmate is aware of all rights for an appearance before the DHO, including delivery of charge(s), advisement of the right to remain silent, and other rights exercised before the DHO. Procedural requirements before the DHO apply to this in-person hearing, except that written statements of witnesses not readily available may be liberally used in place of in-person witnesses.

The DHO may affirm the earlier action taken, dismiss the charge(s), modify the finding of the original DHO as to the offense committed, or modify sanctions imposed in the inmate's absence.

When an inmate escapes, and is in local custody where a hearing may be held, an in-person rather than in-absentia hearing may be held at the DHO's discretion.

**(f) *Evidence and witnesses.* You are entitled to make a statement and present documentary evidence to the DHO on your own behalf. The DHO will consider all evidence presented during the hearing. The DHO§s decision will be based on**

**at least some facts and, if there is conflicting evidence, on the greater weight of the evidence. Witnesses may appear at the DHO§s hearing as follows:**

**(1) Witnesses may appear before the DHO either in person or electronically (for example, by video or telephone conferencing) at the DHO's discretion.**

**(2) The DHO will call witnesses who have information directly relevant to the charge(s) and who are reasonably available. However, the DHO need not call witnesses adverse to you if their testimony is adequately summarized in the incident report or other investigation materials.**

**(3) You or your staff representative may request witnesses appear at the hearing to testify on your behalf. Your requested witnesses may not appear if, in the DHO§s discretion, they are not reasonably available, their presence at the hearing would jeopardize institution security, or they would present repetitive evidence.**

**(4) If your requested witnesses are unavailable to appear, written statements can be requested by either the DHO or staff representative. The written statements can then be considered during the DHO§s hearing.**

**(5) Only the DHO may directly question witnesses at the DHO's hearing. Any questions by you or your staff representative must be submitted to the DHO, who will present the question to the witness in his/her discretion.**

**(6) The DHO may consider evidence provided by a confidential informant (CI) that the DHO finds reliable. You will not be informed of the CI§s identity. You will be informed of the CI's testimony to the extent it will not jeopardize institution security, at the DHO§s discretion.**

The DHO may refer the case back to the UDC for further information or disposition when the case does not warrant DHO involvement. When further investigation or more evidence is needed, the DHO may postpone or, before deciding whether a prohibited act was committed, continue the hearing until a later date. A postponement or continuance must be for good cause (determined by the DHO) and documented in the record.

The phrase "some facts" refers to facts indicating the inmate committed the prohibited act. The phrase "greater weight of the evidence" refers to the strength of the evidence, not to its quantity or to the number of witnesses testifying.

The DHO may consider negative information (e.g., known peddler of contraband) as part of the fact-finding process. Negative information may be used to draw an adverse inference against the inmate. However, negative information alone may not be used to support a finding that an inmate committed a prohibited act.

# **Witnesses**. An inmate may request witnesses from outside the institution. In such instances, the inmate charged may be excluded during the appearance of an outside witness. An outside witness should appear in an area in which outside visitors are usually allowed. Written statements from outside witnesses may be used by the DHO in lieu of live testimony.

The DHO need not call repetitive witnesses. The reporting officer and other adverse witnesses need not be called if their knowledge of the incident is adequately summarized in the incident report and other investigative materials. The DHO must document reasons for declining to call requested witnesses in the DHO report, or, if the reasons are confidential, in a separate report, not available to the inmate.

The inmate's staff representative, or, when the inmate waives staff representation, the DHO, questions witnesses requested by the inmate, who are called before the DHO. An inmate who waives staff representation may submit questions for requested witnesses in writing to the DHO. The inmate may not question witnesses.

When an inmate is excluded during the appearance of a witness, including an outside witness, the DHO informs the inmate before the close of the hearing of the substance of the testimony, except where security would be jeopardized.

There is no minimum or maximum number of witnesses who may be called; the number should be based on the situation and the information to be presented. While several eyewitnesses may be called, it is expected that the number of character witnesses would be limited, at the discretion of the DHO.

The DHO may not refuse to call a witness who is reasonably available (e.g., on a different shift) and has information relevant to the charge **solely** because the witness (staff or inmate) does not wish to appear. An inmate witness can be required to attend, and failure to cooperate with the DHO can result in disciplinary action (e.g., for Refusing to Obey an Order of a Staff Member, Code 307).

The DHO may notify the inmate when a witness does not wish to testify. This may be warranted when it appears that to force the witness's appearance could result in threats to a person's safety, or disruption to security or orderly running of the institution.

The statement of an inmate requesting a witness is not enough to mandate the witness's appearance. There must be an indication that the witness has information directly relevant to the charges.

The DHO may remind an inmate witness that statements at the hearing must be "true" to the best of the inmate's knowledge.

On occasion, an inmate may request a witness who is not reasonably available to testify in person (e.g., an inmate from another institution). When this occurs, the DHO ordinarily

allows time for the written statement of the witness to be received, if he/she is expected to have relevant information. The witness should sign the written statement. If an extension is not granted, the DHO must clearly state in the record reasons for not granting it.

# **Confidential informants**. When a discipline decision is based on confidential informant information, the UDC or DHO must document, ordinarily in the hearing report, their finding as to the reliability of each confidential informant and the factual basis for that finding. If the report would reveal the confidential informant's identity, this finding is part of a separate report prepared by the DHO, not available to the inmate.

Confidential informant information should not be used, or relied on in the report, when independent information is available to support a finding. Just because an informant provided information that opened an investigation does not mean that informant must be referred to, as long as there are other facts or independent evidence.

An **informant** is a person (non-staff, ordinarily an inmate) who provides staff (usually at the person's initiation) with information about the commission of an offense or about misconduct. A **confidential informant** is one whose identity must be protected for personal safety. Ordinarily, the finding that an inmate committed a prohibited act must be supported by more than one reliable confidential source. If there is only one, the confidential information must be corroborated by independently verified evidence linking the inmate to the prohibited act.

Uncorroborated confidential information from a single informant is **insufficient** as the sole basis for a finding, **unless** the circumstances of the incident and the knowledge possessed by the informant are convincing enough to show that the information must be reliable. In an unwitnessed assault, for example, the statement of a seriously injured assault victim **could** be sufficient to support a finding without corroborating evidence.

The reliability of a confidential informant must be established before the information may be used to support a finding. Reliability may be determined by a record of past reliability or by other factors that reasonably convince the DHO. The staff member providing information to the DHO must include a written statement of the frequency with which the informant provided information, the period during which the informant provided information, and the information's accuracy. If reliability is based on other factors, they must be clearly specified.

Staff have an obligation to determine whether there is any basis for concluding that the informant is providing false information. Neither the DHO nor UDC may consider information obtained in exchange for the promise of a favor to support its finding.

Confidential information presented to the UDC or DHO must be in writing and must state facts and the manner in which the informant learned the facts. If possible, the statement must be signed by the confidential informant. If the informant does not write a statement,

the staff member receiving the information provides the information in language as close to the informant's as possible (actual words where possible).

The identity of a confidential informant must be known, at a minimum, by the DHO. Where the UDC does not make a final disposition, but refers a case to the DHO, the UDC need not know the identity of an informant or the substance of the information.

An inmate's staff representative need not know the identity of informants. While confidential information may, at the discretion of the DHO, be divulged to, and challenged by, a staff representative, the **reliability** of informants may not be questioned by the staff representative. The DHO is responsible for establishing reliability.

Confidential informants§ statements must, at a minimum, be incorporated in discipline hearing reports by reference. The UDC or DHO must document, ordinarily in the UDC or DHO report, their finding as to the reliability of each informant and its factual basis. The report must identify specific information relied on and the factual basis for that reliance. When the DHO decides that information given by a single confidential informant is sufficient, the report should include a rationale for that decision.

When the DHO determines that including information in the report would not reveal the identity of the informant, such information is included. When the DHO determines that including information in the report might reveal the identity of the informant, the DHO prepares a separate report documenting the findings of the reliability of each informant, their factual basis, the information relied on, and the factual basis for that reliance. This separate report need not be placed in the inmate central file, but is retained in a secure location as long as it is available for later administrative or judicial review, and as long as the separate report is incorporated by reference into the DHO report.

Since information received anonymously does not meet the necessary reliability standard, it may not be used as evidence in making a finding. Such information, however, may be used in the investigation.

When relying on confidential informant information in making a finding, the DHO must justify the reliability of this information and its factual basis. If the testimony of conflicting witnesses (any witness, not just confidential informants) is presented, or there are other conflicts in the evidence, the DHO indicates in the record the reason for believing the testimony of one witness over another or otherwise resolving the conflict. When including this information in the written report would jeopardize security, the DHO may provide it in a separate report, not available to the inmate.

**(g) *Sanctions.* If you committed a prohibited act(s), the DHO can impose any of the available sanctions listed in Tables 1 and 2.**

The Regional Director audits discipline hearings and dispositions to ensure conformity with this policy.

**(h) *Written Report.* You will receive a written copy of the DHO's decision following the hearing. The DHO is not required to prepare a verbatim record of the hearing. The DHO's written report will document the following:**

**(1) Whether you were advised of your rights during the DHO process;**

**(2) The evidence relied on by the DHO;**

**(3) The DHO's decision;**

**(4) The sanction imposed by the DHO; and**

**(5) The reason(s) for the sanction(s) imposed.**

The DHO prepares a record of the proceedings. The evidence, decision, and reasons for actions taken must be specific, unless this would jeopardize security. The DHO gives the inmate a written copy of the decisions and disposition, ordinarily within 15 work days of the decision.

The DHO signs the discipline hearing report, certifying that it accurately reflects the proceedings.

A record of the hearing and supporting documents are kept in the inmate central file.

The DHO ensures that the required information is entered into SENTRY in the inmate's Chronological Disciplinary Record.

If the DHO expunges an incident report, unit staff must ensure the inmate's central file does not include the incident report and/or related documents.

References to significant prohibited acts that are not supported by disciplinary actions and hearings may not be used by the Bureau in ways that have an adverse impact on an inmate, specifically the forfeiture or disallowance of good time, good conduct time, or a parole recommendation. Staff may maintain such references in an inmate's central file for use in making classification, administrative transfer, and other decisions if the following conditions are met:

# References in an inmate's central file must be maintained accurately. For example, an inmate suspected of being involved in an escape attempt who was never found to have violated disciplinary regulations or was never charged due to lack of evidence would have to have the lack of evidence noted in any reference to alleged involvement in the escape attempt.

# Placement of a reference to 100 or 200 severity level offenses not supported by disciplinary action in an inmate's central file may only be done with the written approval of the Warden of the institution where the incident occurred. This must be documented in the inmate's central file. Approval signifies that in the Warden's judgment this information is necessary for proper management of the inmate.

**(i) *Appeals.* You may appeal the DHO's action(s) through the Administrative Remedy Program, 28 CFR Part 542, Subpart B.**

The reviewing official (Warden, Regional Director, or General Counsel) may approve, modify, reverse, or send back with directions, including ordering a rehearing, any action of the UDC or DHO, but may not increase a valid sanction. The initial reviewing official for the UDC is the Warden. The decision of the DHO is final and subject to review only by the Regional Director to ensure conformity with the discipline policy and by appeal through the Administrative Remedy program. The DHO ensures the inmate is notified that any appeal must be made within the time frames in the Administrative Remedy procedures. The Warden may also review DHO hearings to the extent he or she considers necessary to ensure substantial compliance with the provisions of the discipline policy. Also, the DHO may receive informal complaints about the procedure and correct mistakes locally.

On appeals, the reviewing authority considers:

# Whether the UDC or DHO substantially complied with regulations on inmate discipline.
# Whether the UDC or DHO based its decision on facts.
# If there was conflicting evidence, whether the decision was based on the greater weight of the evidence.
# Whether an appropriate sanction was imposed or the severity level of the prohibited act, and other relevant circumstances.

The reviewing official is limited to determining if the UDC or DHO could have rationally concluded that the evidence supports the decision, not necessarily whether the reviewing official would have made the same decision.

The investigator, UDC members, DHO, reporting officer, or staff representative may not investigate or help prepare the response to administrative appeals from UDC or DHO actions.

Where a remand is directed, the UDC or DHO is bound by the original sanction(s), except where:

# The sanction is in violation of policy.
# The remand is made specifically because of the sanction.
# The inmate's behavior or activity since the first hearing is determined by the UDC or DHO to justify an increase or decrease in sanction(s). The intervening behavior or activity and the

reasons for an increase or decrease in sanction(s) must be documented in the hearing record.

When an appeal results in the original sanction being replaced by a suspended sanction, the suspension (when possible) runs from the date the original sanction was imposed.

When an inmate files a Regional or Central Office appeal of a disciplinary action, those offices may request copies of disciplinary records. Each Warden will designate an appropriate staff member with the proper clearance to ensure that copies sent for review or appeal include confidential information, witness and notice of rights forms, staff memos concerning the incident, investigative reports, and any dissenting reports. Documentation is forwarded within three working days of the receipt of request.

**Appendix A. LIST OF FORMS**

- # Incident Report (BP-A0288 JUN 11).
- # Inmate Rights at Discipline Hearing (BP-A0293 JUN 11).
- # Notice of Discipline Hearing Before the Discipline Hearing Officer (DHO) (BP-A0294 JUN 11).
- # Duties of Staff Representative (BP-A0306 JUN 11).
- # Waiver of Appearance (BP-A0307 JUN 11).
- # Discipline Hearing Officer (DHO) Report (BP-A0304 JUN 11).

**Appendix B. SUMMARY OF INMATE DISCIPLINE SYSTEM**

1. Staff becomes aware of inmate's involvement in incident or once the report is released for administrative processing following a referral for criminal prosecution.

ordinarily maximum of 24 hours

2. Staff gives inmate notice of charges by delivering Incident Report.

maximum ordinarily of 5 work days from the time staff became aware of the inmate's involvement in the incident. (Excludes the day staff become aware of the inmate's involvement, weekends, and holidays.)

3. Initial review (UDC)

minimum of 24 hours (unless waived)

4. Discipline Hearing Officer (DHO) Hearing

**NOTE**: Time limits are subject to exceptions as provided in the rules.

Staff may suspend disciplinary proceedings for a period not to exceed two calendar weeks while undertaking informal resolution. If informal resolution is unsuccessful, staff may reinitiate disciplinary proceedings. The requirements then begin running at the same point at which they were suspended.

## Appendix C. INMATE RIGHTS AND RESPONSIBILITIES

| RIGHTS | RESPONSIBILITIES |
|---|---|
| 1. You have the right to expect that you will be treated in a respectful, impartial, and fair manner by all staff. | 1. You are responsible for treating inmates and staff in the same manner. |
| 2. You have the right to be informed of the rules, procedures, and schedules concerning the operation of the institution. | 2. You have the responsibility to know and abide by them. |
| 3. You have the right to freedom of religious affiliation and voluntary this worship. | 3. You have the responsibility to recognize and respect the rights of others in regard. |
| 4. You have the right to health care, which includes nutritious meals, proper bedding and clothing,- and a laundry schedule for cleanliness of the same, an opportunity to shower regularly, proper ventilation for warmth and fresh air, a regular exercise period, toilet articles, and medical and dental treatment. | 4. It is your responsibility not to waste food, to follow the laundry and shower schedule, maintain neat and clean living quarters, to keep your area free of contraband, and to seek medical and dental care as you may need it. |
| 5. You have the opportunity to visit and correspond with family members and friends, and correspond with members of the news media, in accordance with Bureau rules and institution guidelines. | 5. It is your responsibility to conduct yourself properly during visits. You will not engage in inappropriate conduct during visits to include sexual acts and introduction of contraband, and not to violate the law or Bureau guidelines through your correspondence. |
| 6. You have the right to unrestricted and confidential access to the courts by correspondence (on matters such as the legality of your conviction, civil matters, pending criminal cases, and conditions of your imprisonment.) | 6. You have the responsibility to present honestly and fairly your petitions, questions, and problems to the court. |

7. You have the right to legal counsel from an attorney of your choice by interviews and correspondence.

7. It is your responsibility to use the services of an attorney honestly and fairly.

8. You have the right to participate in the use of law library reference materials to assist you in resolving legal problems. You also have the right to receive help when it is available through a legal assistance program.

8. It is your responsibility to use these resources in keeping with the procedures and schedule prescribed and to respect the rights of other inmates to the use of the materials and assistance.

9. You have the right to a wide range of reading materials for educational purposes and for your own enjoyment. These materials may include magazines and newspapers sent from the community, with certain restrictions.

9. It is your responsibility to seek and use such materials for your personal benefit, without depriving others of their equal rights to the use of this material.

10. You have the right to participate in educational, vocational training, counseling, and employment programs as resources permit, and in keeping with your interests, needs, and abilities.

10. You have the responsibility to take advantage of activities which will aid you to live a successful and law-abiding life within the institution and in the community. You will be expected to abide by the regulations governing the participation in such activities.

11. You have the right to use your funds for commissary and other purchases, consistent with institution security and good order, for opening bank and/or savings accounts, and for assisting your family, in accordance with Bureau rules.

11. You have the responsibility to meet your financial and legal obligations, including, but not limited to, DHO and court-imposed assessments, fines, and restitution. You also have the responsibility to make use of your funds in a manner consistent with your release plans, your family needs, and for other obligations that you may have.

**Appendix D. DATA ENTRY INSTRUCTIONS**

Each Discipline Hearing Officer (DHO) or Unit Discipline Committee (UDC) is responsible for the validity and accuracy of the data on all cases resolved at their level. It is critical that the data is reported correctly and uniformly.

**Prohibited Acts**. Data collection requirements apply only to the following prohibited acts:

# Code 100 – Killing.
# Code 101 – Assaulting any Person (Serious).
# Code 107 – Taking Hostages.
# Code 114 – Sexual Assault by Force.
# Code 203 – Threatening Another with Bodily Harm.
# Code 205 – Engaging in Sexual Acts.
# Code 206 – Making Sexual Proposals or Threats to Another.
# Code 224 – Assaulting any Person (Less Serious).
# Code 225 – Stalking.
# Code 229 – Sexual Assault without Force.

**SENTRY Screens**. When an inmate is found to have committed one or more of the prohibited acts listed above, the DHO or UDC enters data on the following SENTRY screens:

# Add Hearings/Findings or Update Status After Procedural Hearing.
# Update Hearing/Findings or Execute/Unexecute Sanctions.

Because data collection is not required at the charging or accusatory levels, there are no additional requirements for the Update Charges screen.

**Data Keying Requirements**. Four characters are available to enter data on a particular act; the fourth is always used for aiding and abetting or attempts (for example, code 101**A**).

For the prohibited acts specified above, SENTRY allows three additional characters (fields) for DHOs or UDCs to input data:

# The first field requires data on **type of victim**.
# The second requires data on **type of weapon** used.
# The third applies to the **nature of the injury**.

A fourth, separate field records whether the incident was referred for prosecution.

**Type of Victim**. The DHO and UDC Chairman must select one of three codes that best identifies the victim's status and enter it in the Additional Tracking Identifier (ATI) field for the prohibited act (e.g., ATI.: S, ATI.: O):

I ‘ Inmate
S ‘ Staff
O ‘ Other

There can be only one victim for each prohibited act. When there are multiple victims (two or more inmates, or one staff member and one inmate), there must be multiple prohibited acts against the inmate. If there are multiple acts for the same code, they must be keyed under separate incident report numbers even though the finding could be based on a single incident report.

“Other” is entered when the victim is a visitor, contracting staff, U.S. Marshal, etc.

**Type of Weapons Classification**. DHOs must review the list of weapons codes starting from the top (code “A”) to the bottom (code “N”). Using this rank-ordered review, select the **first** code that **best** describes the most serious weapon the inmate used or attempted to use. The selection is placed in the second position after the type of victim (e.g. ATI.: S**B**, ATI.: O**F**):

A gun
B sharp object (used to inflict cutting injury)
C pointed object (used to inflict stabbing injury)
D solid\blunt object (thrown or used to hit)
E toxic or flammable fluids or substances
F fists\hands
G feet\legs
H bodily fluids\waste (spit, urine, feces, blood, etc.)
J teeth
K head
L water
M other or unknown
N no weapon

“Weapons” refers to objects, instruments, or substances listed above that the inmate controlled at the time of the offense, and are considered an element of the offense.

When an inmate threatens to use a weapon that was not readily available or under his or her control at the time of the incident, select code “N”, “no weapon.”

**Nature of Injury Assessment**. The level of injury is best assessed by considering the medical treatment required, if any. Choose the injury code that best describes the most serious injury suffered. The choice is placed in the third position after type of weapon (e.g., ATI.: SB**4**, ATI.: OF**1**):

1 **No injury** - The victim or medical staff reported no injuries.

2 **Minor injury** - The victim received minor injuries that may have been treated at the facility, or treated at the facility with a possible recommendation for a non-inmate victim to consult with his/her physician.

3 **Moderate injury** - The victim received more serious injuries that generally require treatment at an outside hospital, or, in the case of non-inmate victims, treatment by their own physicians. Moderate injuries are not judged life-threatening.

4 **Major injury** - The victim received injuries that are life-threatening, requiring emergency medical treatment at an outside hospital.

5 **Fatal injury** - The victim received injuries resulting in loss of life.

**Example One**: ATI.: **SB4** – "Staff-**S**" victim, with the weapon being a "sharp object-**B**", and "major injuries-**4**" sustained.

**Example Two**: ATI.: **OF1** – "Other-**O**" victim with the weapon being "fists/hands-**F**", and "no injury-**1**" sustained.

**Referrals for Prosecution (RFP)**. For this system to provide accurate data, it is imperative that Special Investigative Supervisors (SIS) and Special Investigative Agents (SIA) refer assaults for prosecution and record the data in section 25 of the incident report. This is a separate field; the DHO keys either accepted or declined for prosecution by the Assistant U.S. Attorney in the screens for:

# Add Hearings/Findings.
# Update Status After Procedural Hearing.
# Update Hearing/Findings.
# Execute/Unexecute Sanctions.

The SIS or SIA documents this under "Other Facts" in section 25 of the incident report (e.g., RFP.: A for accepted or RFP.: D for declined).

**Table 1. PROHIBITED ACTS AND AVAILABLE SANCTIONS**

**GREATEST SEVERITY LEVEL PROHIBITED ACTS**

**100 Killing.**

**101 Assaulting any person, or an armed assault on the institution's secure perimeter (a charge for assaulting any person at this level is to be used only when serious physical injury has been attempted or accomplished).**

**102 Escape from escort; escape from any secure or non-secure institution, including community confinement; escape from unescorted community program or activity; escape from outside a secure institution.**

**103 Setting a fire (charged with this act in this category only when found to pose a threat to life or a threat of serious bodily harm or in furtherance of a prohibited act of Greatest Severity, *e.g.,* in furtherance of a riot or escape; otherwise the charge is properly classified Code 218, or 329).**

**104 Possession, manufacture, or introduction of a gun, firearm, weapon, sharpened instrument, knife, dangerous chemical, explosive, ammunition, or any instrument used as a weapon.**

**105 Rioting.**

**106 Encouraging others to riot.**

**107 Taking hostage(s).**

**108 Possession, manufacture, introduction, or loss of a hazardous tool (tools most likely to be used in an escape or escape attempt or to serve as weapons capable of doing serious bodily harm to others; or those hazardous to institutional security or personal safety; *e.g.,* hacksaw blade, body armor, maps, handmade rope, or other escape paraphernalia, portable telephone, pager, or other electronic device).**

**109 (Not to be used).**

**110 Refusing to provide a urine sample; refusing to breathe into a Breathalyzer; refusing to take part in other drug-abuse testing.**

**111 Introduction or making of any narcotics, marijuana, drugs, alcohol, intoxicants, or related paraphernalia, not prescribed for the individual by the medical staff.**

**112 Use of any narcotics, marijuana, drugs, alcohol, intoxicants, or related paraphernalia, not prescribed for the individual by the medical staff.**

**113 Possession of any narcotics, marijuana, drugs, alcohol, intoxicants, or related paraphernalia, not prescribed for the individual by the medical staff.**

**114 Sexual assault of any person, involving non-consensual touching by force or threat of force.**

**115 Destroying and/or disposing of any item during a search or attempt to search.**

**196 Use of the mail for an illegal purpose or to commit or further a Greatest category prohibited act.**

**197 Use of the telephone for an illegal purpose or to commit or further a Greatest category prohibited act.**

**198 Interfering with a staff member in the performance of duties most like another Greatest severity prohibited act. This charge is to be used only when another charge of Greatest severity is not accurate. The offending conduct must be charged as "most like" one of the listed Greatest severity prohibited acts.**

**199 Conduct which disrupts or interferes with the security or orderly running of the institution or the Bureau of Prisons most like another Greatest severity prohibited act. This charge is to be used only when another charge of Greatest severity is not accurate. The offending conduct must be charged as "most like" one of the listed Greatest severity prohibited acts.**

**AVAILABLE SANCTIONS FOR GREATEST SEVERITY LEVEL PROHIBITED ACTS**

**A. Recommend parole date rescission or retardation.**

**B. Forfeit and/or withhold earned statutory good time or non-vested good conduct time (up to 100%) and/or terminate or disallow extra good time (an extra good time or good conduct time sanction may not be suspended).**

**B.1. Disallow ordinarily between 50% and 75% (27-41 days) of good conduct time credit available for year (a good conduct time sanction may not be suspended).**

**C. Disciplinary segregation (up to 12 months).**

**D. Make monetary restitution.**

**E. Monetary fine.**

**F. Loss of privileges (*e.g.,* visiting, telephone, commissary, movies, recreation).**

**G. Change housing (quarters).**

**H. Remove from program and/or group activity.**

**I. Loss of job.**

**J. Impound inmate's personal property.**

**K. Confiscate contraband.**

**L. Restrict to quarters.**

**M. Extra duty.**

**HIGH SEVERITY LEVEL PROHIBITED ACTS**

**200 Escape from a work detail, non-secure institution, or other non-secure confinement, including community confinement, with subsequent voluntary return to Bureau of Prisons custody within four hours.**

**201 Fighting with another person.**

**202 (Not to be used).**

**203 Threatening another with bodily harm or any other offense.**

**204 Extortion; blackmail; protection; demanding or receiving money or anything of value in return for protection against others, to avoid bodily harm, or under threat of informing.**

**205 Engaging in sexual acts.**

**206 Making sexual proposals or threats to another.**

**207 Wearing a disguise or a mask.**

**208 Possession of any unauthorized locking device, or lock pick, or tampering with or blocking any lock device (includes keys), or destroying, altering, interfering with, improperly using, or damaging any security device, mechanism, or procedure.**

**209 Adulteration of any food or drink.**

**210 (Not to be used).**

**211 Possessing any officer's or staff clothing.**

**212 Engaging in or encouraging a group demonstration.**

**213 Encouraging others to refuse to work, or to participate in a work stoppage.**

**214 (Not to be used).**

**215 (Not to be used).**

**216 Giving or offering an official or staff member a bribe, or anything of value.**

**217 Giving money to, or receiving money from, any person for the purpose of introducing contraband or any other illegal or prohibited purpose.**

**218 Destroying, altering, or damaging government property, or the property of another person, having a value in excess of $100.00, or destroying, altering, damaging life-safety devices (e.g., fire alarm) regardless of financial value.**

**219 Stealing; theft (including data obtained through the unauthorized use of a communications device, or through unauthorized access to disks, tapes, or computer printouts or other automated equipment on which data is stored).**

**220 Demonstrating, practicing, or using martial arts, boxing (except for use of a punching bag), wrestling, or other forms of physical encounter, or military exercises or drill (except for drill authorized by staff).**

**221 Being in an unauthorized area with a person of the opposite sex without staff permission.**

**222 (Not to be used).**

**223 (Not to be used).**

**224 Assaulting any person (a charge at this level is used when less serious physical injury or contact has been attempted or accomplished by an inmate).**

**225 Stalking another person through repeated behavior which harasses, alarms, or annoys the person, after having been previously warned to stop such conduct.**

**226 Possession of stolen property.**

**227 Refusing to participate in a required physical test or examination unrelated to testing for drug abuse (e.g., DNA, HIV, tuberculosis).**

**228 Tattooing or self-mutilation.**

**229 Sexual assault of any person, involving non-consensual touching without force or threat of force.**

**231 Requesting, demanding, pressuring, or otherwise intentionally creating a situation, which causes an inmate to produce or display his/her own court documents for any unauthorized purpose to another inmate.**

**296 Use of the mail for abuses other than criminal activity which circumvent mail monitoring procedures (e.g., use of the mail to commit or further a High category prohibited act, special mail abuse; writing letters in code; directing others to send, sending, or receiving a letter or mail through unauthorized means; sending mail for other inmates without authorization; sending correspondence to a specific address with directions or intent to have the correspondence sent to an unauthorized person; and using a fictitious return address in an attempt to send or receive unauthorized correspondence).**

**297 Use of the telephone for abuses other than illegal activity which circumvent the ability of staff to monitor frequency of telephone use, content of the call, or the number called; or to commit or further a High category prohibited act.**

**298 Interfering with a staff member in the performance of duties most like another High severity prohibited act. This charge is to be used only when another charge of High severity is not accurate. The offending conduct must be charged as "most like" one of the listed High severity prohibited acts.**

**299 Conduct which disrupts or interferes with the security or orderly running of**

**the institution or the Bureau of Prisons most like another High severity prohibited act. This charge is to be used only when another charge of High severity is not accurate. The offending conduct must be charged as "most like" one of the listed High severity prohibited acts.**

**AVAILABLE SANCTIONS FOR HIGH SEVERITY LEVEL PROHIBITED ACTS**

**A. Recommend parole date rescission or retardation.**

**B. Forfeit and/or withhold earned statutory good time or non-vested good conduct time up to 50% or up to 60 days, whichever is less, and/or terminate or disallow extra good time (an extra good time or good conduct time sanction may not be suspended).**

**B.1 Disallow ordinarily between 25% and 50% (14-27 days) of good conduct time credit available for year (a good conduct time sanction may not be suspended).**

**C. Disciplinary segregation (up to 6 months).**

**D. Make monetary restitution.**

**E. Monetary fine.**

**F. Loss of privileges (*e.g.,* visiting, telephone, commissary, movies, recreation).**

**G. Change housing (quarters).**

**H. Remove from program and/or group activity.**

**I. Loss of job.**

**J. Impound inmate's personal property.**

**K. Confiscate contraband.**

**L. Restrict to quarters.**

**M. Extra duty.**

**MODERATE SEVERITY LEVEL PROHIBITED ACTS**

**300 Indecent Exposure.**

**301 (Not to be used).**

**302 Misuse of authorized medication.**

**303 Possession of money or currency, unless specifically authorized, or in excess of the amount authorized.**

**304 Loaning of property or anything of value for profit or increased return.**

**305 Possession of anything not authorized for retention or receipt by the inmate, and not issued to him through regular channels.**

**306 Refusing to work or to accept a program assignment.**

**307 Refusing to obey an order of any staff member (may be categorized and charged in terms of greater severity, according to the nature of the order being disobeyed, *e.g.* failure to obey an order which furthers a riot would be charged as 105, Rioting; refusing to obey an order which furthers a fight would be charged as 201, Fighting; refusing to provide a urine sample when ordered as part of a drug-abuse test would be charged as 110).**

**308 Violating a condition of a furlough.**

**309 Violating a condition of a community program.**

**310 Unexcused absence from work or any program assignment.**

**311 Failing to perform work as instructed by the supervisor.**

**312 Insolence towards a staff member.**

**313 Lying or providing a false statement to a staff member.**

**314 Counterfeiting, forging, or unauthorized reproduction of any document, article of identification, money, security, or official paper (may be categorized in terms of greater severity according to the nature of the item being reproduced, *e.g.,* counterfeiting release papers to effect escape, Code 102).**

**315 Participating in an unauthorized meeting or gathering.**

**316 Being in an unauthorized area without staff authorization.**

**317 Failure to follow safety or sanitation regulations (including safety**

**regulations, chemical instructions, tools, MSDS sheets, OSHA standards).**

**318 Using any equipment or machinery without staff authorization.**

**319 Using any equipment or machinery contrary to instructions or posted safety standards.**

**320 Failing to stand count.**

**321 Interfering with the taking of count.**

**322 (Not to be used).**

**323 (Not to be used).**

**324 Gambling.**

**325 Preparing or conducting a gambling pool.**

**326 Possession of gambling paraphernalia.**

**327 Unauthorized contacts with the public.**

**328 Giving money or anything of value to, or accepting money or anything of value from, another inmate or any other person without staff authorization.**

**329 Destroying, altering, or damaging government property, or the property of another person, having a value of $100.00 or less.**

**330 Being unsanitary or untidy; failing to keep one§s person or quarters in accordance with posted standards.**

**331 Possession, manufacture, introduction, or loss of a non-hazardous tool, equipment, supplies, or other non-hazardous contraband (tools not likely to be used in an escape or escape attempt, or to serve as a weapon capable of doing serious bodily harm to others, or not hazardous to institutional security or personal safety) (other non-hazardous contraband includes such items as food, cosmetics, cleaning supplies, smoking apparatus and tobacco in any form where prohibited, and unauthorized nutritional/dietary supplements).**

**332 Smoking where prohibited.**

**333 Fraudulent or deceptive completion of a skills test (*e.g.,* cheating on a GED,**

**or other educational or vocational skills test).**

**334 Conducting a business; conducting or directing an investment transaction without staff authorization.**

**335 Communicating gang affiliation; participating in gang related activities; possession of paraphernalia indicating gang affiliation.**

**336 Circulating a petition.**

**396 Use of the mail for abuses other than criminal activity which do not circumvent mail monitoring; or use of the mail to commit or further a Moderate category prohibited act.**

**397 Use of the telephone for abuses other than illegal activity which do not circumvent the ability of staff to monitor frequency of telephone use, content of the call, or the number called; or to commit or further a Moderate category prohibited act.**

**398 Interfering with a staff member in the performance of duties most like another Moderate severity prohibited act. This charge is to be used only when another charge of Moderate severity is not accurate. The offending conduct must be charged as "most like" one of the listed Moderate severity prohibited acts.**

**399 Conduct which disrupts or interferes with the security or orderly running of the institution or the Bureau of Prisons most like another Moderate severity prohibited act. This charge is to be used only when another charge of Moderate severity is not accurate. The offending conduct must be charged as "most like" one of the listed Moderate severity prohibited acts.**

**AVAILABLE SANCTIONS FOR MODERATE SEVERITY LEVEL PROHIBITED ACTS**

**A. Recommend parole date rescission or retardation.**

**B. Forfeit and/or withhold earned statutory good time or non-vested good conduct time up to 25% or up to 30 days, whichever is less, and/or terminate or disallow extra good time (an extra good time or good conduct time sanction may not be suspended).**

**B.1 Disallow ordinarily up to 25% (1-14 days) of good conduct time credit available for year (a good conduct time sanction may not be suspended).**

**C. Disciplinary segregation (up to 3 months).**

**D. Make monetary restitution.**

**E. Monetary fine.**

**F. Loss of privileges (*e.g.,* visiting, telephone, commissary, movies, recreation).**

**G. Change housing (quarters).**

**H. Remove from program and/or group activity.**

**I. Loss of job.**

**J. Impound inmate's personal property.**

**K. Confiscate contraband.**

**L. Restrict to quarters.**

**M. Extra duty.**

**LOW SEVERITY LEVEL PROHIBITED ACTS**

**400 (Not to be used).**

**401 (Not to be used).**

**402 Malingering, feigning illness.**

**403 (Not to be used).**

**404 Using abusive or obscene language.**

**405 (Not to be used).**

**406 (Not to be used).**

**407 Conduct with a visitor in violation of Bureau regulations.**

**408 (Not to be used).**

**409 Unauthorized physical contact (e.g., kissing, embracing).**

**498 Interfering with a staff member in the performance of duties most like**

**another Low severity prohibited act. This charge is to be used only when another charge of Low severity is not accurate. The offending conduct must be charged as "most like" one of the listed Low severity prohibited acts.**

**499 Conduct which disrupts or interferes with the security or orderly running of the institution or the Bureau of Prisons most like another Low severity prohibited act. This charge is to be used only when another charge of Low severity is not accurate. The offending conduct must be charged as "most like" one of the listed Low severity prohibited acts.**

**AVAILABLE SANCTIONS FOR LOW SEVERITY LEVEL PROHIBITED ACTS**

**B.1 Disallow ordinarily up to 12.5% (1-7 days) of good conduct time credit available for year (to be used only where inmate found to have committed a second violation of the same prohibited act within 6 months); Disallow ordinarily up to 25% (1-14 days) of good conduct time credit available for year (to be used only where inmate found to have committed a third violation of the same prohibited act within 6 months) (a good conduct time sanction may not be suspended).**

**D. Make monetary restitution.**

**E. Monetary fine.**

**F. Loss of privileges (e.g., visiting, telephone, commissary, movies, recreation).**

**G. Change housing (quarters).**

**H. Remove from program and/or group activity.**

**I. Loss of job.**

**J. Impound inmate's personal property.**

**K. Confiscate contraband**

**L. Restrict to quarters.**

**M. Extra duty.**

**Table 2. ADDITIONAL AVAILABLE SANCTIONS FOR REPEATED PROHIBITED ACTS WITHIN THE SAME SEVERITY LEVEL**

| Prohibited Act Severity Level | Time Period for Prior Offense (same code) | Frequency of Repeated Offense | Additional Available Sanctions |
|---|---|---|---|
| Low Severity (400 level) | 6 months | 2nd offense | 1. Disciplinary segregation (up to 1 month).<br>2. Forfeit earned SGT or non-vested GCT up to 10% or up to 15 days, whichever is less, and/or terminate or disallow extra good time (EGT) (an EGT sanction may not be suspended). |
| | | 3rd or more offense | Any available Moderate severity level sanction (300 series). |
| Moderate Severity (300 level) | 12 months | 2nd offense | 1. Disciplinary segregation (up to 6 months).<br>2. Forfeit earned SGT or non-vested GCT up to 37 1/2% or up to 45 days, whichever is less, and/or terminate or disallow EGT (an EGT sanction may not be suspended). |
| | | 3rd or more offense | Any available High severity level sanction (200 series). |
| High Severity (200 level) | 18 months | 2nd offense | 1. Disciplinary segregation (up to 12 months).<br>2. Forfeit earned SGT or non-vested GCT up to 75% or up to 90 days, whichever is less, and/or terminate or disallow EGT (an EGT sanction may not be suspended). |
| | | 3rd or more offense | Any available Greatest severity level sanction (100 series). |
| Greatest Severity (100 level) | 24 months | 2nd or more offense | Disciplinary Segregation (up to 18 months). |

# Exhibit 6



Serious Assaults on Inmates
Guilty Findings Recorded in Chronological Disciplinary Records
Security Level=BOP Facilities
Counts
50
40
30
20
10
0
Rate/5000
1.5
1.4
1.3
1.2
1.1
1.0
0.9
0.8
0.7
0.6
0.5
0.4
0.3
0.2
0.1
Year + Month
Office of Research and Evaluation


Serious Assaults on Inmates
Guilty Findings Recorded in Chronological Disciplinary Records
Security Level=Minimum
Counts
Rate/5000
Year + Month
Office of Research and Evaluation

# Serious Assaults on Inmates

## Guilty Findings Recorded in Chronological Disciplinary Records

Security Level=Low




Office of Research and Evaluation

# Serious Assaults on Inmates

## Guilty Findings Recorded in Chronological Disciplinary Records

Security Level=Medium




Office of Research and Evaluation

# Serious Assaults on Inmates

## Guilty Findings Recorded in Chronological Disciplinary Records

Security Level=High




Office of Research and Evaluation


Serious Assaults on Inmates
Guilty Findings Recorded in Chronological Disciplinary Records
Security Level=Admin
Rate/5000
Counts
Year + Month
Office of Research and Evaluation

# Exhibit 7

**U.S. Department of Justice**
Federal Bureau of Prisons

CHANGE NOTICE
OPI: CPD/CPB
NUMBER: 5410.01 CN-2
DATE: March 10, 2023

# First Step Act of 2018 – Time Credits: Procedures for Implementation of 18 U.S.C. § 3632(d)(4)

/s/
*Approved*: Colette S. Peters
Director, Federal Bureau of Prisons

This Change Notice (CN) implements the following changes to Program Statement 5410.01, **First Step Act of 2018 – Time Credits: Procedures for Implementation of 18 U.S.C. § 3632(d)(4)**, dated November 18, 2022.

*The highlighted text has been changed (either added or struck through) in* ***Section 10. APPLICATION OF FTCs****:*

To apply FTCs to prerelease placement, an inmate ordinarily must otherwise be eligible to participate in prerelease custody consistent with limitations as outlined in the Program Statement **Community Corrections Center (CCC) Utilization and Transfer Procedure**~~, separate from any FSA eligibility criteria,~~ and be "opted in" at the time of the referral and be in minimum or low risk status through their last two assessment periods and transfer to prerelease placement. However, in all cases, earned time credits will be applied to prerelease custody (RRC and/or HC) as required by the First Step Act.

The First Step Act requires that, if an individual meets the criteria outlined in (c)(1), the credits must be applied when the amount of time credits earned is equivalent to remainder of the prisoner's imposed term of imprisonment, consistent with the method for calculation described below. Pre-release placement in a Residential Reentry Center (RRC) or Home Confinement (HC) will be based on FTCs other than those credits already applied to early transfer for supervised release.

**U.S. Department of Justice**
Federal Bureau of Prisons

CHANGE NOTICE
OPI: CPD/CPB
NUMBER: 5410.01 CN-1
DATE: February 6, 2023

# First Step Act of 2018 – Time Credits: Procedures for Implementation of 18 U.S.C. § 3632(d)(4)

/s/
*Approved*: Colette S. Peters
Director, Federal Bureau of Prisons

This Change Notice (CN) implements the following changes to Program Statement 5410.01, **First Step Act of 2018 – Time Credits: Procedures for Implementation of 18 U.S.C. § 3632(d)(4)**, dated November 18, 2022.

*The highlighted text has been added to **Section 5. RISK AND NEED ASSESSMENT:***
If an inmate fails to complete a recommended EBRR or PA to address an identified need area, staff will enter the applicable fail or withdraw code into SENTRY, and the inmate will not be considered to have opted out, and therefore, in non-earning status.

An inmate will be reassessed for both risk level and needs at each regularly scheduled Program Review throughout the remainder of the inmate's incarceration **at a BOP institution**. As defined in the Program Statement **Inmate Classification and Program Review**, the unit team will document the inmate's progress toward recommended goals and update the Individualized Need Plan, as appropriate. The inmate will receive a copy of their updated Individualized Need Plan which will include the reassessed risk level, need areas, and program recommendations. **Inmates placed in prerelease custody, and who are not subject to regularly scheduled program review, will not receive reassessments. For inmates in prerelease placement, reassessments will be completed automatically on a monthly basis and will capture changes which occur during prerelease placement.**

*The highlighted text has been added to **Section 6. HOW TO EARN FTCs:***
**For inmates in prerelease custody, "the most recent two consecutive risk assessments" refers to the final two risk assessments conducted while the inmate was at a BOP institution, prior to the application of FTCs, i.e., the inmate's transfer to supervised release**

**or prerelease custody. For those inmates who have not completed two assessments prior to transfer to prerelease custody, reassessments will be completed automatically on a monthly basis and will capture changes which occur during prerelease placement.**

*The highlighted text has been added to* ***Section 8. TRACKING AND EARNING OF FTCs:***
**FSA Time Credit Assessments (FTC Worksheets) will be automatically uploaded to the Inmate Central File during each auto-calculation. Inmates will be provided a copy of the most recent FTC Worksheet during regularly scheduled program reviews.**

*The highlighted text in has been changed (either added or struck through) in* ***Section 10. APPLICATION OF FTCs****:*
~~**While inmates with unresolved pending charges and/or detainers may earn FTCs, if otherwise eligible, they will be unable to apply them to prerelease custody or release to supervision unless the charges and/or detainers are resolved. An inmate with an unresolved immigration status will be treated as if he/she has unresolved pending charges with regard to the application of FTCs.**~~

To apply FTCs to prerelease placement, an inmate ordinarily must otherwise be eligible to participate in prerelease custody consistent with limitations as outlined in the Program Statement **Community Corrections Center (CCC) Utilization and Transfer Procedure**, separate from any FSA eligibility criteria, and be "opted in" at the time of the referral and be in minimum or low risk status through their last two assessment periods and transfer to prerelease placement. ~~**For inmates with minimum or low risk who have not yet maintained two consecutive assessments, they will need to submit a BP-A0148, Inmates Request to Staff, during their regularly scheduled Program Review in order to have their early application of FTCs considered. The Unit Manager will submit a request, along with the unit team's recommendation, to the Warden (or designee) for final decision.**~~

**Once an inmate has been transferred to prerelease custody pursuant to the procedures outlined in this section, the inmate will maintain the recidivism risk level the inmate had at the time of the transfer, unless the inmate benefits from a lower recidivism risk level based on the passage of time or the inmate's actions result in a higher risk rating. If an inmate is removed from prerelease custody for a violation, and is returned to a BOP institution, the inmate's recidivism risk level will be reassessed pursuant to the procedures outlined in Section 5 of this Program Statement.**

For inmates who meet the following criteria, up to 365 days of earned FTCs will be automatically applied to early release:

- ~~**Has no detainers or unresolved pending charges, to include unresolved immigration status and**~~

- **Is not the subject of a final order of removal under immigration laws, and**

**As used in this Section, "last risk and needs assessment" refers to the final risk and needs assessment conducted while the inmate was at a BOP institution, prior to the inmate's transfer to supervised release or prerelease custody.**

*The highlighted text has been added to the* ***REFERENCES*** *section:*

7310.04 CN-1 Community Corrections Center (CCC) Utilization and Transfer Procedure (12/16/1998)

**U.S. Department of Justice**
Federal Bureau of Prisons

PROGRAM STATEMENT
OPI: CPD/CPB
NUMBER: 5410.01
DATE: November 18, 2022

# First Step Act of 2018 - Time Credits: Procedures for Implementation of 18 U.S.C. § 3632(d)(4)

/s/
*Approved*: Colette S. Peters
Director, Federal Bureau of Prisons

## 1. PURPOSE AND SCOPE

**§ 523.40 Purpose.**

**(a) The purpose of this subpart is to describe procedures for the earning and application of Time Credits as authorized by 18 U.S.C. 3632(d)(4) and Section 101 of the First Step Act of 2018 (Pub. L. 115-391, December 21, 2018, 132 Stat. 5194) (FSA), hereinafter referred to as "FSA Time Credits" or "Time Credits."**

**(b) Generally, as defined and described in this subpart, an eligible inmate who successfully participates in Evidence-Based Recidivism Reduction (EBRR) Programs or Productive Activities (PAs) that are recommended based on the inmate's risk and needs assessment may earn FSA Time Credits to be applied toward prerelease custody or early transfer to supervised release under 18 U.S.C. 3624(g).**

The purpose of this policy is to establish Bureau of Prisons (Bureau) criteria and procedures for awarding time credits pursuant to 18 U.S.C § 3632(d)(4) and 18 U.S.C § 3624(g) to eligible inmates under the provisions of First Step Act of 2018 (FSA) codified in part in Title 18 U.S.C. § 3632.

**Federal Regulations from 28 CFR are shown in this type.**
Implementing instructions are shown in this type.

a. **Program Objectives**. The expected results of this Program Statement are to:

- Inform inmates and staff of the process for earning, documenting, applying, forfeiting, and restoring after forfeiture FSA Time Credits (FTCs) in accordance with the FSA.
- Inform inmates and staff of the circumstances which would preclude an inmate from earning and/or applying FTCs.
- Identify the process for applying FTCs in combination with the Residential Drug Abuse Treatment Program (RDAP) early release benefit under 18 U.S.C. § 3621(e).

b. **Institution Supplement**. None required. Should local facilities make any changes outside changes required in national policy or establish any additional local procedures to implement national policy, the local Union may invoke to negotiate procedures or appropriate arrangements.

## 2. BACKGROUND

The FSA provides eligible inmates may earn FTCs for successfully participating and completing approved EBRR programs or PAs. The FSA prohibits inmates from receiving credit prior to its enactment, prior to the commencement of the inmate's sentence, or if the inmate is serving a sentence for a disqualifying offense or has a disqualifying prior conviction. The FSA allows qualifying inmates to apply FTCs toward prerelease community-based placement (i.e., Residential Reentry Center (RRC) and/or home confinement (HC)). Further, at the discretion of the Director of the Federal Bureau of Prisons (Director), the FSA allows for FTC to be applied toward early release to supervision.

## 3. DEFINITIONS OF TERMS

**§ 523.41 Definitions.**

**(a) *Evidence-Based Recidivism Reduction (EBRR) Program.* An EBRR Program is a group or individual activity that has been shown by empirical evidence to reduce recidivism or is based on research indicating that it is likely to be effective in reducing recidivism; and is designed to help prisoners succeed in their communities upon release from prison. EBRR Programs may include, but are not limited to, those involving the following types of activities:**

> **(1) Social learning and communication, interpersonal, anti-bullying, rejection response, and other life skills;**
> **(2) Family relationship building, structured parent-child interaction, and parenting skills;**
> **(3) Classes on morals or ethics;**

**(4) Academic classes;**
**(5) Cognitive behavioral treatment;**
**(6) Mentoring;**
**(7) Substance abuse treatment;**
**(8) Vocational training;**
**(9) Faith-based classes or services;**
**(10) Civic engagement and reintegrative community services;**
**(11) Inmate work and employment opportunities;**
**(12) Victim impact classes or other restorative justice programs; and**
**(13) Trauma counseling and trauma-informed support programs.**

A list of approved EBRR programs is available on the FSA resource page of the Bureau's public website and the Correctional Programs Branch and Reentry Services Division's intranet pages. The list will be updated as programs/activities are added.

**(b) *Productive Activity (PA).* A PA is a group or individual activity that allows an inmate to remain productive and thereby maintain or work toward achieving a minimum or low risk of recidivating.**

Productive activities include a variety of groups, programs, classes and individual activities which can be either structured or unstructured. These pro-social activities contribute to an inmate's overall positive institutional adjustment, to include maintaining clear institution conduct, and include, but are not limited to:

- Structured, curriculum-based group programs and classes
- Productive, free-time activities (e.g., recreation, hobby crafts, or religious services)
- Family interaction activities (e.g., social visiting)
- Personal growth and development classes (e.g., adult continuing education classes)
- Institution work programs
- Community service projects
- Participation in an Inmate Financial Responsibility plan

The Bureau has approved a group of specific, structured, curriculum-based PAs which are available to assist the inmate in addressing identified needs. The list is available on the FSA resource page of the Bureau's public website and the Correctional Programs Branch and Reentry Services Division intranet pages. The list will be updated as programs/activities are added.

**(c) *Successful participation.***

**(1) An eligible inmate must be "successfully participating" in EBRR Programs or**

**PAs to earn FSA Time Credits for those EBRR Programs or PAs.**
**(2) "Successful participation" requires a determination by Bureau staff that an eligible inmate has participated in the EBRR programs or PAs that the Bureau has recommended based on the inmate's individualized risk and needs assessment, and has complied with the requirements of each particular EBRR Program or PA.**

An inmate will remain in FTC earning status while on any waitlist for EBRR Programs or PAs recommended based on the inmate's needs assessment, not to exceed two assessment periods, as long as the inmate has not refused or declined to participate. Active participation in at least one EBRR Program or PA by the inmate supersedes this requirement. Exceptions to the two-assessment period time frame can be granted by the Regional Director upon request from the Warden. However, should an inmate refuse or decline to participate in the recommended EBRR program or PA for which they had been on a waitlist, staff will enter the applicable decline code in SENTRY, and the inmate will be considered declined, or opted out, for the entire waitlist period. The waitlist period is defined in terms of the corresponding need area(s). When an inmate declines participation after being on a waitlist, the auto-calculation application will first identify any need areas associated with the declined program and then identify the oldest waitlist associated with the need area(s). Any credits earned since the oldest waitlist associated with the need area, without intervening participation, will be rescinded to reflect the inmate's refusal.

**(3) Temporary operational or programmatic interruptions authorized by the Bureau that would prevent an inmate from participation in EBRR programs or PAs will not ordinarily affect an eligible inmate's "successful participation" for the purposes of FSA Time Credit eligibility.**
**(4) An eligible inmate, as described in paragraph (d) of this section, will generally not be considered to be "successfully participating" in EBRR Programs or PAs in situations including, but not limited to:**
**(i) Placement in a Special Housing Unit;**

Inmates in Disciplinary Segregation status will not be considered to be "successfully participating." Inmates in restrictive housing for Administrative Detention shall obtain FTCs if they otherwise remain in earning status under the policy.

**(ii) Designation status outside the institution (*e.g.,* for extended medical placement in a hospital or outside institution, an escorted trip, a furlough, etc.);**
**(iii) Temporary transfer to the custody of another Federal or non-Federal government agency (*e.g.,* on state or Federal writ, transfer to state custody for service of sentence, etc.);**

In the case of placement or transfers outside the institution (e.g., furlough, writ, escorted trip, outside hospital placement, etc.), an inmate will continue to earn FTCs if they are in the institution for any part of the day. An inmate must be out of the institution for the entire 24-hour day before the inmate reverts to non-earning status. Upon return to the institution, the inmate's earning status will resume.

**(iv) Placement in mental health/psychiatric holds; or**
**(v) "Opting out" (choosing not to participate in the EBRR programs or PAs that the Bureau has recommended based on the inmate's individualized risk and needs assessment).**

An inmate is considered to be opting out, and therefore, is not in earning status, if the inmate refuses or declines to participate in any EBRR programs or structured, curriculum-based PAs recommended based on an identified need. Further, an inmate is considered to be opting out if the inmate refuses to participate in or fails to complete any portion of the Standardized Prisoner Assessment for Reduction in Criminality (SPARC-13), the Bureau's assessment system. See the Program Statement **First Step Act Needs Assessment**.

**(5)(i) If an eligible inmate "opts out," or chooses not to participate in any of the EBRR programs or PAs that the Bureau has recommended based on the inmate's individualized risk and needs assessment, the inmate's choice must be documented by staff.**

An inmate's refusal to complete any portion of the SPARC-13 or to participate in EBRR programs or structured, curriculum-based PAs recommended to address an identified need is documented in SENTRY using FSA-specific assignments. See the Program Statement **First Step Act Needs Assessment.**

**(ii) Opting out will not, by itself, be considered a disciplinary violation. However, violation of specific requirements or rules of a particular recommended EBRR Program or PA, including refusal to participate or withdrawal, may be considered a disciplinary violation. (*see* this part: 28 C.F.R. part 541)**
**(iii) Opting out will result in exclusion from further benefits or privileges allowable under the FSA, until the date the inmate "opts in" (chooses to participate in the EBRR programs or PAs that the Bureau has recommended based on the inmate's individualized risk and needs assessment, as documented by staff).**

Note: C.F.R. citation added due to typographical error in published regulations.

**(d) *Eligible inmate —***

**(1) *Eligible to earn FSA Time Credits.* An inmate who is *eligible to earn* FSA Time Credits is an *eligible inmate* for the purposes of this subpart. Any inmate sentenced to a term of imprisonment pursuant to a conviction for a Federal criminal offense, or any person in the custody of the Bureau, is *eligible to earn* FSA Time Credits, subject to the exception described in paragraph (d)(2) of this section.**

**(2) *Exception.* If the inmate is serving a term of imprisonment for an offense specified in 18 U.S.C. 3632(d)(4)(D), the inmate is not *eligible to earn* FSA Time Credits.**

Federal inmates in state custody are not eligible to earn FTCs. Additionally, state boarders, treaty transfers inmates, and military inmates sentenced pursuant to the Uniform Code of Military Justice who are serving their sentence in Bureau custody are not eligible to earn FTCs.

Inmates sentenced under the Code of District of Columbia (DC Code) cannot earn FTCs unless or until the DC Council defines eligibility to earn FTCs (i.e., which DC Code offenses, if any, preclude eligibility). If and when the earning of FTCs is authorized for inmates sentenced under DC Code, the unit team will review inmates for eligibility and enter the applicable eligibility assignment into SENTRY. Any retroactive application of FTCs will be made consistent with the authorities granted under DC Code.

## 4. DETERMINATION OF ELIGIBILITY

At the inmate's Initial Classification, the unit team will conduct a review of the inmate's current conviction(s) as well as prior criminal convictions to determine the inmate's eligibility to earn FTCs.

For the current offense(s) review, the unit team will review the Judgement & Commitment (J&C) Order and the Presentence Investigation Report (PSR) for sentencing enhancements, if necessary, to determine if the inmate is ineligible. The list of FTC ineligible offenses, identified by statute, based on the inmate's current offense(s) is available on the FSA resource page of the Bureau's public website and the Correctional Programs Branch intranet page. If an inmate is determined to be ineligible based on the current offense(s), no review of prior offenses is required.

For the prior conviction review, an inmate is ineligible to earn FTCs if:

- The current offense is determined to be a "serious violent felony" not already specifically listed by the statute, and

- The inmate was sentenced to a term of imprisonment of more than a year for the current offense, and
- The inmate served a term of imprisonment of more than a year for a previous federal or state offense consisting of murder, voluntary manslaughter, assault with intent to commit murder, aggravated sexual abuse and sexual abuse, abusive sexual contact, kidnapping, carjacking, arson, or terrorism.

Additional criteria regarding the prior offense include:

- The conviction must have been based on an adult conviction. Juvenile adjudications are not considered, and
- If the prior conviction is a state offense, the state offense must match the specific federal offense listed above element-by-element.

For purposes of this review only, "serious violent felony" offense is defined by 18 U.S.C. § 3559(c)(2)(F):

> (i) a Federal or State offense, by whatever designation and wherever committed, consisting of murder (as described in section 1111); manslaughter other than involuntary manslaughter (as described in section 1112); assault with intent to commit murder (as described in section 113(a)); assault with intent to commit rape; aggravated sexual abuse and sexual abuse (as described in sections 2241 and 2242); abusive sexual contact (as described in sections 2244(a)(1) and (a)(2)); kidnapping; aircraft piracy (as described in section 46502 of Title 49); robbery (as described in section 2111, 2113, or 2118); carjacking (as described in section 2119); extortion; arson; firearms use; firearms possession (as described in section 924(c)); or attempt, conspiracy, or solicitation to commit any of the above offenses; and
>
> (ii) any other offense punishable by a maximum term of imprisonment of 10 years or more that has as an element the use, attempted use, or threatened use of physical force against the person of another or that, by its nature, involves a substantial risk that physical force against the person of another may be used in the course of committing the offense[.]

Due to the complexity of the prior offense review, questions regarding whether an offense is disqualifying may be referred to an institution's local Consolidated Legal Center (CLC) for guidance.

An inmate's eligibility status will be documented on the inmate's Individualized Needs Plan in the Insight case management system, and the inmate will receive a copy. The unit team will also enter the appropriate FSA eligibility assignment into SENTRY.

## 5. RISK AND NEED ASSESSMENT

All sentenced inmates, regardless of eligibility status, will receive both a risk and need assessment. The Prisoner Assessment Tool Targeting Estimated Risk and Needs (PATTERN) is the recidivism risk assessment tool and part of the Bureau's FSA-approved Risk and Needs Assessment System. The PATTERN tool is completed during the inmate's Initial Classification and is used to assign each incoming inmate an initial recidivism risk level of Minimum, Low, Medium, or High. The Standardized Prisoner Assessment for Reduction in Criminality (SPARC-13) is the Bureau's needs assessment system and the other half of the Bureau's FSA-approved Risk and Needs Assessment System. It is used to assess the inmate in 13 need areas which can be targeted to reduce the inmate's risk of recidivating. See the Program Statement **First Step Act Needs Assessment.**

After the inmate's arrival to their designated facility for service of their sentence and during the initial admission and orientation phase, the PATTERN and SPARC-13 assessments will be completed. While PATTERN is completed during the inmate's Initial Classification, the SPARC-13 is a multi-part, multi-department assessment process. Ordinarily, the Initial Classification is completed within 28 days of the inmate's arrival, but completing the PATTERN tool requires the inmate's sentence computation to be completed. If the sentence computation is incomplete, the Initial Classification should be delayed pending its completion, and the basis for delay should be annotated on the inmate's Program Review Report. The SPARC-13 is ordinarily completed within the 30 days of an inmate's arrival, however, portions of the SPARC-13 assessment require the inmate's active participation. Failure on the inmate's part to complete the survey assessments timely will delay completion and negatively impact the inmate's ability to begin earning FTCs as the inmate will be considered "opted out," and therefore is in non-earning status regardless of eligibility to earn FTCs.

Using SPARC-13, staff will recommend and document EBRR programs and/or PAs for inmates consistent with the requirements of the Program Statement **First Step Act Needs Assessment.** If the inmate declines to participate in an EBRR program or PA which has been recommended based on an identified needs area, the department staff assessing the need area will enter a program decline code indicating the inmate's opt out status; otherwise, the inmate will be placed in the program or on a waitlist with the applicable assignment keyed into SENTRY by the department staff assessing the need area.

Should an inmate later refuse or decline to participate in the recommended EBRR program or PA for which they had been on a waitlist, staff will enter the applicable decline code in SENTRY, and the inmate will be considered declined for the entire period on the waitlist. Any credits earned during the waitlist period will be rescinded to reflect the inmate's refusal.

If an inmate fails to complete a recommended EBRR or PA to address an identified need area, staff will enter the applicable fail or withdraw code into SENTRY, and the inmate will not be considered to have opted out, and, therefore, in non-earning status. Inmates with cognitive or physical disabilities may require more time or additional accommodations to complete an EBRR program or PA. The Program Statement **Management of Inmates with Disabilities** provides guidance on developing local accommodations. If questions about the impact of a disability on earning FTC arise, staff may contact the Women and Special Populations Branch in the Reentry Services Division.

During the inmate's Initial Classification, the unit team will develop an Individualized Need Plan for the inmate based on the results of the inmate's needs assessment and related recommendations provided by the departments that assessed the need area as documented in SENTRY and Insight Feedback. Recommendations may include EBRR programs and/or structured curriculum-based PAs designed to address the inmate's identified need areas and based on the inmate's ability to complete the program/activity.

Additional groups, programs, classes, or unstructured activities may be recommended to assist the inmate in establishing positive institutional adjustment and involvement in pro-social activities. The inmate's risk level, needs assessment results, and program recommendations will be documented on the inmate's Insight Individualized Need Plan, and the inmate will receive a copy.

An inmate will be reassessed for both risk level and needs at each regularly scheduled Program Review throughout the remainder of the inmate's incarceration **at a BOP institution**. As defined in the Program Statement **Inmate Classification and Program Review**, the unit team will document the inmate's progress toward recommended goals and update the Individualized Need Plan, as appropriate. The inmate will receive a copy of their updated Individualized Need Plan which will include the reassessed risk level, need areas, and program recommendations. **Inmates placed in prerelease custody, and who are not subject to regularly scheduled program review, will not receive reassessments. For inmates in pre-release placement, reassessments will be completed automatically on a monthly basis and will capture changes which occur during prerelease placement.**

## 6. HOW TO EARN FTCs

### § 523.42 Earning First Step Act Time Credits.

**(a)** ***When an eligible inmate begins earning FSA Time Credits.*** **An eligible inmate begins earning FSA Time Credits after the inmate's term of imprisonment commences (the date the inmate arrives or voluntarily surrenders at the designated Bureau facility where the**

**sentence will be served).**

Because the ability to accrue time credits begins after the inmate's current term of incarceration begins (e.g., the date the inmate arrives at or voluntary surrenders to their initially designated Bureau facility to serve their sentence), an inmate cannot earn FTCs during pretrial confinement, nor can they earn credits based on a prior incarceration. Further, an inmate cannot earn FTC when not in Bureau custody, including when in U.S. Marshals Service custody prior to arriving at their designated facility, regardless of where they are housed, or once released to their supervised release term.

**(b)** ***Dates of participation in EBRRs or PAs.***

**(1) An inmate cannot earn FSA Time Credits for programming or activities in which he or she participated before December 21, 2018, the date of enactment of the First Step Act of 2018.**

**(2) An eligible inmate, as defined in this subpart, may earn FSA Time Credits for programming and activities in which he or she participated from December 21, 2018, until January 14, 2020.**

**(3) An eligible inmate, as defined in this subpart, may earn FSA Time Credit if he or she is successfully participating in EBRR programs or PAs that the Bureau has recommended based on the inmate's individualized risk and needs assessment on or after January 15, 2020.**

**(c)** ***Amount of FSA Time Credits that may be earned.***

**(1) For every thirty-day period that an eligible inmate has successfully participated in EBRR Programs or PAs recommended based on the inmate's risk and needs assessment, that inmate will earn ten days of FSA Time Credits.**

**(2) For every thirty-day period that an eligible inmate has successfully participated in EBRR Programs or PAs recommended based on the inmate's risk and needs assessment, that inmate will earn an additional five days of FSA Time Credits if the inmate:**

**(i) Is determined by the Bureau to be at a minimum or low risk for recidivating; and**

**(ii) Has maintained a consistent minimum or low risk of recidivism over the most recent two consecutive risk and needs assessments conducted by the Bureau.**

The calculation of FTCs is fully automated and based on the number of 30-day periods in earning status. Additionally, the eligibility to earn FTCs is distinct from the ability to apply/use FTCs.

**For inmates in prerelease custody, "the most recent two consecutive risk assessments" refers to the final two risk assessments conducted while the inmate was at a BOP institution, prior to the application of FTCs, i.e., the inmate's transfer to supervised release or prerelease custody. For those inmates who have not completed two assessments prior to transfer to prerelease custody, reassessments will be completed automatically on a monthly basis and will capture changes which occur during prerelease placement.**

## 7. LIMITATIONS ON EARNING OF FTCs

Despite being eligible to earn FTCs, there are situations where an inmate is unable or unwilling to participate in EBRR programs or PAs, and therefore cannot earn FTCs. Such circumstances may include, but are not limited to, the following:

- Placement in Disciplinary Segregation status);
- Designation status outside the institution (e.g., an outside medical trip or escorted trip, in-transit or at an in-transit facility, a furlough for the full day, etc.);
- Placement in the custody of another jurisdiction (e.g., on state or federal writ, transfer to state custody for service of sentence, transfer to another federal agency, etc.);
- Placement in mental health/psychiatric holds;
- Detention as a material witness or for civil contempt;
- Placement in civil commitment; or
- "Opting out" (choosing not to participate in the EBRR programs or PAs that the Bureau has recommended based on the inmate's individualized risk and needs assessment).

If an inmate refuses to participate in required programs (e.g., Inmate Financial Responsibility (FRP), Drug Education, etc.), the inmate will not earn FTC. While these programs are voluntary, the refusal to participate can result in the loss of certain benefits including the inability to earn FTCs.

## 8. TRACKING AND EARNING OF FTCs

FTCs are awarded based on the inmate's eligibility to earn credit, completion of the PATTERN and SPARC-13 assessments, and ongoing participation in programs designed to reduce the risk of recidivating. Once an inmate is in earning status, they will remain in earning status unless or until the limitations outlined in the previous section of this Program Statement are applied.

FTCs are auto-calculated based on 30-day increments in earning status. Partial credit will not be awarded. FTCs will be credited on a monthly basis agency-wide, as well as during the inmate's regularly scheduled Program Reviews, based on a completed 30-day period. No FTCs will post to the inmate's record if he/she has not accrued 30 days in earning status. Rather, any days in FTC earning status will carry over to the next monthly cycle, and the inmate will receive all

applicable FTCs at that time.

For example: If the first monthly posting of FTCs for an inmate occurs only five days after completing their initial assessments and going into earning status, no FTCs will post to the inmate's record as they have not yet accrued 30 days in earning status. Rather, the five days will carry over to the next monthly cycle, and the inmate will receive the FTCs at the end of the second month. If later, the inmate goes into FRP Refuse or declines a recommended needs-related program and goes into opt out status, the inmate is no longer in earning status, and therefore, stops accruing days toward FTCs and no FTCs will post to the inmate's record. Once the inmate returns to earning status, they will resume accruing days toward the earning of FTCs.

**FSA Time Credit Assessments (FTC Worksheets) will be automatically uploaded to the Inmate Central File during each auto-calculation. Inmates will be provided a copy of the most recent FTC Worksheet during regularly scheduled program reviews.**

9. **LOSS AND RESTORATION OF FTCs**

**§ 523.43 Loss of FSA Time Credits.**

***(a) Procedure for loss of FSA Time Credits.*** **An inmate may lose earned FSA Time Credits for violation of the requirements or rules of an EBRR Program or PA. The procedures for loss of FSA Time Credits are described in 28 CFR part 541.**

Per the FSA, only earned time credits can be lost, and future time credits cannot be impacted. For purposes of inmate discipline, time credits are considered officially "earned" during the monthly auto-calculation or at the time of the inmate's last Program Review assessment, whichever was most recent. A sanction of loss of FSA time credits by the Discipline Hearing Officer (DHO) may only be imposed when an inmate is found to have committed a prohibited act. Loss of FTCs cannot be entered as a suspended sanction. See the Program Statement **Inmate Discipline Program**.

**(b)** ***How to appeal loss of FSA Time Credits.*** **Inmates may seek review of the loss of earned FSA Time Credits through the Bureau's Administrative Remedy Program (28 CFR part 542).**

**(c)** ***Restoration of FSA Time Credits.*** **An inmate who has lost FSA Time Credits under this subpart may have part or all of the FSA Time Credits restored to him or her, on a case-by-case basis, after clear conduct (behavior clear of inmate disciplinary infractions under 28 CFR part 541) for two consecutive risk and needs assessments conducted by the Bureau.**

The authority to restore any portion of the offender's lost FTCs is delegated to the Warden and may not be delegated lower than the Associate Warden level. The inmate may request restoration of FTCs during a regularly scheduled Program Review and only after having maintained clear conduct for two consecutive risk and needs assessments. The Unit Manager will submit a request using BP-A1156, Restoration of Federal Time Credits, along with the unit team's recommendation, through the DHO to the Warden (or designee) for final decision. If the recommendation to restore FTCs is approved, the Unit Manager or Acting Unit Manager will process the restoration approval into the inmate's record and update via Insight or Insight Feedback.

Whether denied or approved, a copy of the decision will be provided to the inmate. If denied, the inmate will be advised that they may reapply for FTC restoration six months from the date of denial, if clear conduct is maintained. A copy will be maintained in the inmate's J&C and electronic inmate central file (e-ICF), with other sentence computation documents.

10. **APPLICATION OF FTCs**

**§ 523.44 Application of FSA Time Credits.**

**(a) *How Time Credits may be applied.* For any inmate eligible to earn FSA Time Credits under this subpart who is:**

> **(1) Sentenced to a term of imprisonment under the U.S. Code, the Bureau may apply FSA Time Credits toward prerelease custody or supervised release as described in paragraphs (c) and (d) of this section.**
> **(2) Subject to a final order of removal under immigration laws as defined in 8 U.S.C. 1101(a)(17) (*see* 18 U.S.C. 3632(d)(4)(E)), the Bureau may not apply FSA Time Credits toward prerelease custody or early transfer to supervised release.**
> **(3) Serving a term of imprisonment pursuant to a conviction for an offense under laws other than the U.S. Code (see Section 105 of the FSA, Pub. L. 115-391, 132 Stat. 5214 (not codified; included as note to 18 U.S.C. 3621)), the Bureau may not apply FSA Time Credits toward prerelease custody or early transfer to supervised release. This paragraph (a)(3) will not bar the application of FSA Time Credits, as authorized by the DC Code, for those serving a term of imprisonment for an offense under the DC Code.**

Inmates sentenced under the DC Code can neither earn nor apply FTCs unless and until the DC Council defines eligibility to earn FTCs (i.e., which DC Code offenses, if any, preclude eligibility) and defines the criteria which authorizes the application of FTC (i.e., any circumstances, if any, which preclude application). If and when the earning and application of

FTCs is authorized for inmates sentenced under the DC Code, the unit team will review inmates for eligibility and enter the applicable eligibility assignment into SENTRY. Any retroactive application of FTCs will be made consistent with the authorities granted under the DC Code.

~~**While inmates with unresolved pending charges and/or detainers may earn FTCs, if otherwise eligible, they will be unable to apply them to prerelease custody or release to supervision unless the charges and/or detainers are resolved. An inmate with an unresolved immigration status will be treated as if he/she has unresolved pending charges with regard to the application of FTCs.**~~

**(b) *Consideration for application of FSA Time Credits.* Where otherwise permitted by this subpart, the Bureau may apply FSA Time Credits toward prerelease custody or early transfer to supervised release under 18 U.S.C. 3624(g) only if an eligible inmate has:**

**(1) Earned FSA Time Credits in an amount that is equal to the remainder of the inmate's imposed term of imprisonment;**

**(2) Shown through the periodic risk reassessments a demonstrated recidivism risk reduction or maintained a minimum or low recidivism risk, during the term of imprisonment; and**

**(3) Had the remainder of his or her imposed term of imprisonment computed under applicable law.**

**(c) *Prerelease custody.* The Bureau may apply earned FSA Time Credits toward prerelease custody only when an eligible inmate has, in addition to satisfying the criteria in paragraph (b) of this section:**

**(1) Maintained a minimum or low recidivism risk through his or her last two risk and needs assessments; or**

**(2) Had a petition to be transferred to prerelease custody or supervised release approved by the Warden, after the Warden's determination that:**

**(i) The prisoner would not be a danger to society if transferred to prerelease custody or supervised release;**

**(ii) The prisoner has made a good faith effort to lower their recidivism risk through participation in recidivism reduction programs or productive activities; and**

**(iii) The prisoner is unlikely to recidivate.**

To apply FTCs to prerelease placement, an inmate ordinarily must otherwise be eligible to participate in prerelease custody consistent with limitations as outlined in the Program Statement **Community Corrections Center (CCC) Utilization and Transfer Procedure**~~, separate from any FSA eligibility criteria,~~ and be "opted in" at the time of the referral and be in minimum or low risk status through their last two assessment periods and transfer to prerelease placement.

However, in all cases, earned time credits will be applied to prerelease custody (RRC and/or HC) as required by the First Step Act.

The First Step Act requires that, if an individual meets the criteria outlined in (c)(1), the credits must be applied when the amount of time credits earned is equivalent to remainder of the prisoner's imposed term of imprisonment, consistent with the method for calculation described below. Pre-release placement in a Residential Reentry Center (RRC) or Home Confinement (HC) will be based on FTCs other than those credits already applied to early transfer for supervised release.

~~**For inmates with minimum or low risk who have not yet maintained two consecutive assessments, they will need to submit a BP-A0148, Inmates Request to Staff, during their regularly scheduled Program Review in order to have their early application of FTCs considered. The Unit Manager will submit a request, along with the unit team's recommendation, to the Warden (or designee) for final decision.**~~

Inmates with high or medium PATTERN recidivism risk levels are exceptions to the routine application of this policy with regard to awarding FTCs toward early transfer to prerelease custody and/or supervised release. The Warden will consult with the Regional Director before approving an inmate under section (c)(2), unless an exemption is granted by the Regional Director consistent with the Program Statement **Directives Management Manual**. Ordinarily, inmates considered inappropriate for early transfer to prerelease custody or supervised release under section (c)(2) include, but are not limited to, inmates who:

- Have a high or medium PATTERN recidivism risk level
- Have a current or prior offense listed in the Program Statement **Categorization of Offenses**. Early transfers for such inmates are considered only in highly unusual circumstances. Ordinarily, an inmate is precluded from receiving an early transfer if he/she has an offense listed in either the Section titled "Offenses categorized as crimes of violence", or the Section titled, "Offenses that at the Director's discretion shall preclude an inmate's receiving certain Bureau program benefits".
- Has a Public Safety Factor (PSF) that the Designation and Sentence Computation Center (DSCC) Administrator has not waived.
- Have a history of community-based supervision (i.e., probation, parole, supervised release, halfway house, home confinement, etc.) non-compliance to include technical violations, escape, absconding/eluding, and/or new criminal conduct.
- Inmates who have been found to have committed 100 OR 200 level prohibited acts during the current term of incarceration, or the prohibited acts of using drugs or alcohol, drug possession, possession of drug paraphernalia, or introduction of drugs into Bureau institutions within the last three years from the date of the incident.

Additionally, inmates with high or medium PATTERN recidivism risk levels must demonstrate a good faith effort to lower their recidivism risk by:

- Maintaining clear conduct for at least three years from the date of the request.
- Successfully completing at least one of the Bureau's residential EBRR programs recommended based on an identified need area within the past five years, if any have been assigned.
- Is otherwise compliant with all the other requirements of this Program Statement with regard to successful program participation.

Inmates may initiate a request under (c)(2) by submitting a BP-A0148, Inmate Request to Staff, during their regularly scheduled Program Review. The Unit Manager will submit a request, along with the unit team's recommendation, to the Warden (or designee) for final decision.

For Minimum and Low PATTERN risk inmates, consistent with the methodology described in Sections 6 and 7 of this policy, the Bureau will initially estimate an FSA conditional Projected Release Date (PRD) by calculating the maximum number of potential FTC that an inmate may earn during his or her sentence. The Bureau will make an initial projection based on the inmate's PATTERN risk level. (For inmates currently in custody as of the effective date of this policy, the PATTERN risk level will be presumed to be the current level). This FSA PRD is subject to change during the inmate's incarceration, and it will be adjusted if the inmate's PATTERN score changes or if the inmate enters non-earning status.

FTC will not be applied towards an inmate's release date unless earned. Medium and High PATTERN risk inmates may earn FTC, but will not receive an estimated FSA PRD.

RRC and/or HC referrals will ordinarily be submitted to the respective Residential Reentry Management (RRM) office 12 months in advance of the inmate's PRD or at least 60 days prior to the projected RRC/HC placement date, whichever is greater. The RRC and/or HC recommendation will include the total number of days recommended based on the Five Factor Review (see 18 U.S.C. § 3621(b)), required under the Second Chance Act, plus the remaining number of FTC days not applied to supervised release at the time of the referral. When determining the FTC days available to be applied toward RRC/HC placement, the Bureau will assume that the inmate will remain in earning status from the referral date until the transfer to prerelease custody. There is no expectation the RRC/HC placement date will be modified once the referral has been submitted to the RRM office.

**Once an inmate has been transferred to prerelease custody pursuant to the procedures outlined in this section, the inmate will maintain the recidivism risk level the inmate had at the time of the transfer, unless the inmate benefits from a lower recidivism risk level based**

**on the passage of time or the inmate's actions result in a higher risk rating. If an inmate is removed from prerelease custody for a violation, and is returned to a BOP institution, the inmate's recidivism risk level will be reassessed pursuant to the procedures outlined in Section 5 of this Program Statement.**

Prerelease placement is dependent on, but not limited to, the inmate's release residence, program requirements, and available contract bed space and funding.

**(d) *Transfer to supervised release.* The Bureau may apply FSA Time Credits toward early transfer to supervised release under 18 U.S.C. 3624(g) only when an eligible inmate has, in addition to satisfying the criteria in paragraphs (b) and (c) of this section:**

> **(1) An eligible inmate has maintained a minimum or low recidivism risk through his or her last risk and needs assessment;**
> **(2) An eligible inmate has a term of supervised release after imprisonment included as part of his or her sentence as imposed by the sentencing court; and**
> **(3) The application of FSA Time Credits would result in transfer to supervised release no earlier than 12 months before the date that transfer to supervised release would otherwise have occurred.**

For inmates who meet the following criteria, up to 365 days of earned FTCs will be automatically applied to early release:

- Has a term of supervised release to follow the term of incarceration
- Has a low or minimum PATTERN risk level
- Has maintained a low or minimum PATTERN risk level for at least two consecutive assessments conducted during regularly scheduled Program Reviews
- ~~Has no detainers or pending charges, to include unresolved immigration status and~~
- Is not the subject of a final order of removal under immigration laws, and
- Has not opted out or refused to participate in any required program, and therefore, is in earning status.

As explained in Section 10(b), the Bureau will calculate an inmate's PRD by assuming that an inmate will remain in earning status throughout his or her sentence, including while in prerelease custody. If an inmate on prerelease custody has already earned the maximum 365 days of credit toward supervised release, the PRD will be adjusted only if the inmate loses earned FTCs consistent with Section 9. If an inmate is returned to prison for a violation during prerelease custody or any other reason, their projected FTCs may be adjusted depending on any failure to remain in earning status.

**As used in this Section, "last risk and needs assessment" refers to the final risk and needs**

**assessment conducted while the inmate was at a BOP institution, prior to the inmate's transfer to supervised release or prerelease custody.**

11. **RESIDENTIAL DRUG ABUSE TREATMENT PROGRAM EARLY RELEASE BENEFIT AND FTCs**

Inmates who successfully complete the Residential Drug Abuse Treatment Program (RDAP) and are eligible for early release pursuant to 18 U.S.C. § 3621(e) may also earn FTCs which could be applied towards an additional reduction to their Projected Release Date (PRD). Eligibility to apply earned FTCs is separate and unrelated to the eligibility requirements under 3621(e).

An inmate must complete all required components of RDAP, including the community-based treatment component, in order to receive the early release benefit pursuant to 18 U.S.C. § 3621(e). The 3621(e) benefit will be applied first to the inmate's sentence computation, followed by the application of FTCs, however, an inmate must have sufficient time remaining to serve to complete all required components of the RDAP program (i.e., 120-day community-based treatment).

In the event an inmate has insufficient time remaining to serve after completing the RDAP program to receive both the early release benefit under 3621(e) and the full 365 days toward early release of earned FTCs, the number of FTC days applied will be reduced to allow for, at a minimum, the 120-day community-based placement as required under 3621(e).

Regardless of whether the inmate is receiving the 3621(e) release benefit alone or in conjunction with FTCs, the inmate will have a conditional release method entered into SENTRY until the inmate receives a community-based placement date with, at a minimum, the required 120 days and the unit team has submitted a completed BP-A0628, Notification of RRC Placement Date, to the Designation and Sentence Computation Center (DSCC).

Inmates who release early pursuant to section 3621(e) and who also earn FTCs will be keyed with the release method which identifies that both benefits have been applied. The Correctional Systems t intranet page provides a list of FSA release method codes and descriptions for staff.

12. ADMINISTRATIVE REMEDIES.

Inmates who wish to seek review of any issue relating to this Program Statement may use the procedures outlined in the Program Statement **Administrative Remedy Program**.

**REFERENCES**

*U.S. Codes or Regulations Referenced*
8 U.S.C. § 1101
18 U.S.C. § 3624
18 U.S.C. § 3632
28 C.F.R. § 541
28 C.F.R. § 542

*Program Statements*

| | |
|---|---|
| 1221.66 CN-1 | Directives Management Manual (7/21/1998) |
| 1330.18 | Administrative Remedy Program (1/6/2014) |
| 5162.05 | Categorization of Offenses (3/16/2009) |
| 5200.06 | Management of Inmates with Disabilities (11/22/2019) |
| 5220.01 | First Step Act Program Incentives (7/14/2021) |
| 5270.09 CN-1 | Inmate Discipline Program (11/18/2020) |
| 5322.13 | Inmate Classification and Program Review (5/16/2014) |
| 5330.11 CN-1 | Psychology Treatment Programs (4/25/2016) |
| 5331.02 CN-2 | Early Release Procedures under 18 U.S.C. § 3621(e) (9/27/2017) |
| 5400.01 | First Step Act Needs Assessment (6/25/2021) |
| 7310.04 CN-1 | Community Corrections Center (CCC) Utilization and Transfer Procedure (12/16/1998) |

*Forms*

| | |
|---|---|
| BP-A0148 | Inmate Request to Staff |
| BP-A0628 | Notification of RRC Placement Date |
| BP-A1156 | Restoration of Federal Time Credits |

*ACA Standards:*
**American Correctional Association Standards for Adult Correctional Institutions - 5th Edition:**
5-ACI-2C-11, 5-ACI-3C-01, 5-ACI-3C-03, 5-ACI-3C-04, 5-ACI-3C-07, 5-ACI-3C-08, 5-ACI-3C-11, 5-ACI-3C-13, 5-ACI-3C-15, 5-ACI-3C-19,
5-ACI-3C-23, 5-ACI-3D-19, 5-ACI-4A-09, 5-ACI-5B-01, 5-ACI-5B-03, 5-ACI-5B-04, 5-ACI-5B-05, 5-ACI-5B-06, 5-ACI—5B-07, 5-ACI-5B-08,
5-ACI-5B-09, 5-ACI-5E-02, 5-ACI-5E-11, 5-ACI-5E-12, 5-ACI-5E-13, 5-ACI-5E-14, 5-ACI-5E-15, 5-ACI-6A-42, 5-ACI-6C-06, 5-ACI-7B-10

**American Correctional Association Performance Based Standards for Adult Local Detention Facilities - 4th Edition:**
4-ALDF-2A-30, 4-ALDF-2A-47, 4-ALDF-2A-50, 4-ALDF-3A-01, 4-ALDF-3A-02, 4-ALDF-

4C-40, 4-ALDF-5A-04, 4-ALDF-5A-08,
4-ALDF-6B-01, 4-ALDF-6B-02, 4-ALDF-6B-04, 4-ALDF-6B-05, 4-ALDF-6B-08, 4-ALDF-6C-01, 4-ALDF-6C-03. 4-ALDF-6C-04, 4-ALDF-6B-07, 4-ALDF-6C-09, 4-ALDF-6C-11, 4-ALDF-6C-12, 4-ALDF-6C-14, 4-ALDF—6C-15, 4-ALDF-6C-18, 4-ALDF-7D-2

*Records Retention Requirements*
Requirements and retention guidance for records and information applicable to this program are available in the Records and Information Disposition Schedule (RIDS) on Sallyport.

# Exhibit 8



# Review of the Institutional Hearing and Removal Program Expansion for Federal Inmates

★ ★ ★

21-123

**SEPTEMBER 2021**

# EXECUTIVE SUMMARY

# Review of the Institutional Hearing and Removal Program Expansion for Federal Inmates

## Introduction[1]

The Institutional Hearing and Removal Program (IHRP), a joint program of the U.S. Department of Justice (Department or DOJ) and the U.S. Department of Homeland Security (DHS), was established in 1988 following passage of immigration legislation that, among other things, directed the Attorney General to "begin any deportation proceeding as expeditiously as possible" for foreign-born individuals convicted of a deportable offense. The IHRP identifies potentially deportable foreign-born inmates serving sentences in federal, state, and local prisons and begins—and seeks to complete—removal proceedings against them while they are still incarcerated (hereinafter "IHRP inmates"). This results in IHRP inmates potentially spending significantly less time in ICE detention awaiting deportation, as well as cost savings to the federal government.

At the federal level, DOJ's Executive Office for Immigration Review (EOIR) and Federal Bureau of Prisons (BOP) coordinate with DHS's Immigration and Customs Enforcement (ICE) and U.S. Citizenship and Immigration Services (USCIS) to complete judicial and administrative immigration review proceedings against foreign-born BOP inmates. IHRP inmates go through the IHRP process while in BOP custody and, if ordered removed from the United States, are transferred to ICE custody to be deported at the end of their sentence.

Starting in 2015, a Working Group consisting of EOIR, BOP, and ICE officials began meeting periodically to discuss ways to expand and reinvigorate the IHRP. On March 30, 2017, the Department announced the expansion of the IHRP at BOP facilities with three goals: (1) increasing the number of active IHRP facilities, (2) enhancing video teleconference (VTC) capabilities and updating the existing technical infrastructure for holding removal hearings for IHRP inmates, and (3) formalizing a new uniform intake policy.

The Office of the Inspector General (OIG) initiated this review to assess: (1) the Department's planning and implementation of the IHRP expansion, (2) the steps the Department has taken to coordinate with DHS to plan and implement the expansion, and (3) the direction and guidance the Department provided to its components to expand the IHRP. We also analyzed early data results after the program's expansion to identify potential impacts.

## Results in Brief

We found that DOJ coordinated with DHS to achieve the three goals of the IHRP expansion. We also found that the guidance and direction from the Department and component headquarters were sufficient to implement the expansion.

We found that the DOJ and DHS agencies involved in the IHRP do not have performance metrics that allow them to assess the impact of the IHRP or its expansion. However, the OIG's data analysis identified a recent decrease in the average number of days an IHRP participant (an IHRP inmate transferred to ICE detention) spent in ICE custody if a final decision (also known as a final order) was issued while the participant was still in BOP custody. The decrease may be attributable to the expanded IHRP. However, there may be other variables that affected the data points we

[1] At the outset of the coronavirus disease 2019 pandemic in March 2020, the OIG shifted resources to conduct extensive pandemic-related oversight, including of the response by the Executive Office for Immigration Review and the Federal Bureau of Prisons to the pandemic, which delayed our completion and issuance of this report.

assessed. To fully assess the effect of the expansion and the IHRP itself, the agencies should develop performance metrics and consistently collect the appropriate data.

### The Department Increased the Number of Federal IHRP Facilities, Enhanced VTC Capabilities at Federal IHRP Facilities, and Implemented Uniform Intake Policies

We found that the Department generally met each of the three IHRP expansion goals. The IHRP now operates out of 5 additional BOP facilities, bringing the total number of federal IHRP facilities to 17. Furthermore, all IHRP facilities have new or upgraded VTC equipment and the program has two new intake policies, one that makes it easier for EOIR to identify IHRP cases incoming from ICE and another that centralizes the assessment of potential IHRP inmates entering BOP custody. In addition, the IHRP Working Group finalized a Memorandum of Understanding that details each agency's roles and responsibilities in the program.

We also found that the Department provided sufficient support to initiate the expansion, entrusting the specifics of implementing the expansion to the IHRP Working Group components. We found that the BOP and EOIR provided sufficient guidance and direction about the IHRP expansion to the field.

However, we also found that the IHRP Working Group agencies encountered challenges while expanding the IHRP. These included an increasing immigration caseload and staffing challenges that affected the IHRP expansion at some sites and could potentially affect the IHRP in the future.

### Although Neither DOJ nor DHS Has a Plan to Assess the IHRP Expansion, OIG Data Analysis Indicates that IHRP Participants Are Spending Less Time in ICE Detention

The DOJ and DHS agencies involved in the IHRP independently collect data related to the IHRP but do not have plans to jointly establish performance metrics, collect data, or evaluate the expansion of the program itself. However, the OIG's data analysis found that IHRP participants are spending significantly less time in ICE detention, possibly due to the program, and that this also results in potential cost savings for the government.

The goal of the IHRP is to issue a final decision on deportation while inmates are still in BOP custody, which typically reduces the time that the IHRP participants spend in ICE detention while awaiting deportation. We found that IHRP participants spent an average of 23 days in ICE detention if they had a final order of deportation prior to release from BOP custody. By contrast, those who did not have a final order when they transferred from BOP custody to ICE detention at the end of their sentence spent an average of 89 days in ICE detention.

Having IHRP participants spend less time in ICE detention before removal reduces the amount of time they are deprived of their freedom. In addition, reducing their time in custody decreases the cost to the government and the taxpayer. We found that the ICE detention costs for IHRP inmates without a final order at the end of their sentence was, on average, twice the cost for the IHRP inmates with a final order issued before their transfer from BOP to ICE custody.

While these results appear to be positive, we cannot directly link them to the IHRP expansion because there are other variables that could affect the data points we assessed. EOIR and ICE individually track elements of the IHRP for their agency performance reports, but there is no collective dataset that contains all the information needed to assess the IHRP or its expansion.

## Recommendation

In this report, we make one recommendation for the BOP and EOIR to work with ICE and the USCIS to develop performance metrics to assess the IHRP expansion and the program itself.

# Table of Contents

Introduction ..... 1

Background ..... 1

Scope and Methodology of the OIG Review ..... 6

Results of the Review ..... 8

The Department Increased the Number of Federal IHRP Facilities, Enhanced VTC Capabilities at Federal IHRP Facilities, and Implemented Uniform Intake Policies ..... 8

Although Neither DOJ nor DHS Has a Plan to Assess the IHRP Expansion, OIG Data Analysis Indicates that IHRP Participants Are Spending Less Time in ICE Detention ..... 16

Conclusion and Recommendation ..... 23

Conclusion ..... 23

Recommendation ..... 24

Appendix 1: Purpose, Scope, and Methodology ..... 25

Standards ..... 25

Purpose and Scope ..... 25

Interviews ..... 25

Data Analysis ..... 26

Policy and Document Review ..... 28

Email Review ..... 28

Appendix 2: IHRP Expansion Press Release ..... 29

Appendix 3: BOP IHRP Guidance with Updated IHRP Assignments for SENTRY ..... 30

Appendix 4: IHRP Facilities ..... 31

Appendix 5: IHRP Eligibility Process ..... 32

Appendix 6: IHRP Removal Proceedings ..... 33

Appendix 7: EOIR Immigration Courts That Process IHRP Cases ..... 34

Appendix 8: IHRP Facility Locations ..... 35

Appendix 9: DOJ Response to the Draft Report ..... 36

Appendix 10: OIG Analysis of DOJ's Response to the Draft Report ..... 38

# Introduction

## Background

The Institutional Hearing and Removal Program (IHRP), a joint program of the U.S. Departments of Justice (Department, DOJ) and Homeland Security (DHS), identifies potentially deportable foreign-born inmates in federal, state, and local prisons who are serving sentences of imprisonment following a criminal conviction (hereinafter "IHRP inmates") and begins removal proceedings against them. The IHRP was established in 1988 following passage of the Immigration Reform and Control Act of 1986, which, among other things, directed the Attorney General to "begin any deportation proceeding as expeditiously as possible" after the date a noncitizen is convicted of an offense that makes the noncitizen subject to deportation.[2]

According to Executive Office for Immigration Review (EOIR) documents, the program is designed to complete IHRP inmates' immigration cases before the end of their sentence by holding hearings before Immigration Judges, either in person or by video teleconference (VTC), while the inmates are still incarcerated. According to EOIR, most foreign-born inmates, particularly those in federal custody, are deportable due to the nature of their convictions, and the IHRP aims to eliminate the need to hold individuals for prolonged periods of time in DHS detention facilities in order to assess their deportability following the completion of their prison sentences, thus reducing costs to U.S. Immigration and Customs Enforcement (ICE) and the taxpayer, increasing the efficiency of the immigration system, and contributing to the nation's security.[3] Additionally, for those inmates who are not deportable, the IHRP enables that determination to be made while the inmates are still serving their prison sentence, thereby allowing those inmates to be released from prison upon completion of their sentence.

In fiscal year (FY) 2018, EOIR reported that it received 308,304 new immigration cases, of which 2,790 (0.9 percent) were IHRP inmates housed in federal, state, or local correctional facilities.[4] Although EOIR does not break out the number of new IHRP cases by type (federal, state, or local) in its public reports, our analysis of EOIR data determined that 29 percent of 2,790 IHRP cases in FY 2018 (or fewer than 1,000 cases) involved inmates incarcerated in a Federal Bureau of Prisons (BOP) or contract facility.[5] Of the remaining IHRP cases, 66 percent involved state inmates and the remaining 5 percent were local/municipal inmates.

### IHRP Working Group and Proposed Program Expansion

In 2015, ICE officials decided to focus resources on IHRP cases in order to improve and expand the program and invited BOP and EOIR officials to meet and discuss how to accomplish that goal. The three agencies

---

[2] Pub. L. No. 99-603.

[3] EOIR, "Institutional Hearing Program Fact Sheet," January 2018, www.justice.gov/eoir/page/file/1023101/download (accessed September 16, 2021).

[4] EOIR, EOIR Statistics Yearbook, FY 2018, www.justice.gov/eoir/file/1198896/download (accessed September 16, 2021).

[5] Contract facilities are owned and operated by a private corporation that contracts with the BOP to house federal inmates.

developed the IHRP Working Group, which included headquarters staff responsible for the IHRP from each agency. The IHRP Working Group met periodically in 2015 and the first few months of 2016.[6]

In January 2017, then President Donald Trump signed an Executive Order directing the DHS Secretary to prioritize for removal noncitizens who had been convicted of any criminal offense, among other categories.[7] In addition, the Executive Order required the Attorney General and the DHS Secretary to issue quarterly reports that include the immigration status of all noncitizens incarcerated in the BOP.

In early March 2017, the BOP, EOIR, and ICE reinvigorated the IHRP Working Group that had been created in 2015. The working group began to discuss implementing an IHRP expansion and modernization, including identifying additional BOP IHRP facilities, exploring the logistics of conducting immigration court hearings in the new facilities, assessing existing and additional VTC equipment, devising a methodology to fulfill the Executive Order's reporting requirements, and developing approaches to incorporate the U.S. Citizenship and Immigration Services (USCIS) into the IHRP. The working group invited the USCIS to participate in the meetings and started drafting a Memorandum of Understanding (MOU) that would formalize each agency's role in the IHRP. The working group also worked with the Office of the Deputy Attorney General (ODAG) during this time to help plan the IHRP expansion and modernization.

On March 30, 2017, then Attorney General Jefferson Sessions announced an effort by the Department to expand and modernize the IHRP for federal inmates.[8] Specifically, he stated that the program would be expanded by: (1) increasing the number of BOP and contract prisons that were active IHRP facilities, (2) enhancing VTC capabilities at federal IHRP facilities and updating the existing technical infrastructure for holding removal proceedings, and (3) formalizing a new uniform intake policy between EOIR and ICE.

## Federal IHRP Process

The federal IHRP process involves coordination between DOJ components (the BOP and EOIR) and DHS components (ICE and the USCIS). The BOP is responsible for housing and managing IHRP inmates and coordinating with the other agencies involved in the IHRP. EOIR is responsible for conducting immigration hearings and making decisions on removal and relief for IHRP inmates. ICE is the agency responsible for initiating the IHRP (and removal) process, and the USCIS is responsible for conducting credible fear and reasonable fear screenings for IHRP inmates. The text box below outlines the roles and responsibilities of each DOJ and DHS agency in the IHRP for federal inmates.

---

[6] During our review period, the members of the IHRP Working Group included the BOP Correctional Programs Branch Administrator; EOIR's Deputy Chief Immigration Judge; the Unit Chief of ICE's Criminal Alien Program; and the USCIS's Operations Branch Chief and Asylum Officer, Operations Branch, Asylum Division.

[7] Executive Order on Enhancing Public Safety in the Interior of the United States, January 25, 2017.

[8] DOJ Office of Public Affairs, Press Release, "Attorney General Sessions Announces Expansion and Modernization." See Appendix 2 for a copy of the press release.

The federal IHRP process starts when a foreign-born inmate is incarcerated in the BOP following a criminal conviction. An ICE liaison to the BOP, located at the BOP's Central Office, evaluates all foreign-born inmates who enter into BOP custody to determine their eligibility for the IHRP.[9] The liaison determines incoming inmates' citizenship status, their removability from the United States following their sentence, and the necessity of a hearing before an EOIR Immigration Judge to consider their removability.[10]

> **IHRP Roles and Responsibilities at a Glance**
>
> **BOP:** provides a list of all foreign-born inmates to ICE, transfers IHRP-eligible inmates to IHRP facilities, provides space at BOP facilities for VTC equipment, and escorts inmates to hearings.
>
> **ICE:** interviews foreign-born BOP inmates to determine whether they should be designated IHRP, initiates the removal process by filing a Notice to Appear, and attends the hearings at BOP facilities.
>
> **EOIR:** schedules immigration hearings, conducts hearings for IHRP inmates, makes decisions on removal and relief, and maintains VTC and other necessary office equipment at BOP facilities for the program.
>
> **USCIS:** conducts credible fear and reasonable fear screenings and maintains any necessary office equipment for these screenings at BOP facilities.
>
> Source: IHRP MOU

Generally, the process involves the following steps:

1. When an inmate enters the BOP's custody, the BOP assigns the inmate a country of citizenship based on information provided by the inmate. If the country of citizenship is anything other than the United States, the BOP considers the inmate "foreign born."[11]

2. The BOP sends the ICE liaison daily rosters of incoming inmates containing information related to foreign-born inmates, such as name, country of birth, country of citizenship, and criminal convictions.

3. The ICE liaison vets the information through ICE databases and reviews any additional data to categorize inmates into one of four categories:

   (a) the inmate does not require a hearing because ICE can issue an expedited removal order, an administrative final removal order, or reinstate a prior final order of removal;

---

[9] The ICE liaison is also the point of contact for ICE's Criminal Alien Program academies and DOJ's International Prisoner Transfer Program (Treaty Transfer Program) at the BOP. The Treaty Transfer Program allows the Department to return eligible foreign national inmates to their country of origin to serve the remainder of their prison sentences rather than completing their sentence in the United States. For more information on the Treaty Transfer Program, see DOJ OIG, *Status Review on the Department's International Prisoner Transfer Program*, Evaluation and Inspections Report 15-07 (August 2015), www.oversight.gov/sites/default/files/oig-reports/e1507.pdf.

[10] A foreign-born inmate is removable if he or she is in the country illegally or subject to any of the grounds for removal listed in the Immigration and Nationality Act of 1990, 8 U.S.C. § 1227. The Act describes various types of criminal convictions that are grounds for removal, including the noncitizen having been inadmissible at the time of entry into the United States.

[11] An inmate can self-report as foreign born.

(b) the inmate does not require a hearing (is not deportable) because the inmate is a foreign-born U.S. citizen;

(c) the inmate requires a hearing before an Immigration Judge; or

(d) ICE does not have enough information to make a determination on eligibility for removal.

4. If additional information is necessary to determine the inmate's eligibility for the IHRP, ICE officers in the field office covering the IHRP facility interview the inmate and make a determination.

5. If ICE determines that it can issue an expedited removal order, administrative final removal order, or reinstate a prior removal order, and the inmate expresses a fear of return, ICE coordinates with the BOP and USCIS to schedule the inmate for a credible fear or reasonable fear screening with the USCIS.[12]

Once ICE determines that an inmate is eligible for the IHRP, the BOP enters an IHRP assignment, or code, into the BOP's inmate management system, SENTRY, which identifies how ICE has categorized the inmate. The IHRP assignment in SENTRY allows BOP staff to monitor and track an inmate's status in the program (see Appendix 3 for a list and definitions of IHRP assignments).[13] When the IHRP inmate has between 48 and 60 months remaining in his or her sentence, the BOP reassigns the inmate to an IHRP facility so that ICE can initiate removal proceedings. If an inmate is sentenced to less than 60 months, the BOP assigns him or her directly to an IHRP facility. Appendix 4 contains a list of IHRP facilities. Appendix 5 contains a flow chart that outlines the IHRP eligibility process.

**Immigration Removal Proceedings for Federal IHRP Inmates**

The first step in federal IHRP removal proceedings occurs when ICE determines that there are potential grounds to remove an inmate. The ICE field office that geographically corresponds to the location of the BOP IHRP facility serves the inmate a written notice describing the nature of the proceedings, the legal authority under which the proceedings are conducted, the acts or conduct alleged to be in violation of the

---

[12] As of May 2021, the USCIS had not yet participated in any IHRP cases.

The USCIS conducts a credible fear interview when an individual who is subject to expedited removal expresses an intention to apply for asylum, expresses a fear of persecution or torture, or expresses a fear of returning to his or her country of birth. The USCIS conducts a reasonable fear interview in two types of cases referred by ICE: (1) in the case of a noncitizen convicted of an aggravated felony against whom a final administrative order of removal is issued or (2) in the case of a noncitizen subject to reinstatement of a prior order of exclusion, deportation, or removal. The reasonable and credible fear screening and adjudication process is outside the scope of this review.

[13] Case Management Coordinators are the BOP field staff responsible for monitoring IHRP inmate status, ensuring that the SENTRY assignments for IHRP inmates are correct, ensuring that IHRP inmates are submitted for transfer when appropriate, acting as a liaison between the BOP and the other IHRP agencies, ensuring that the immigration hearing schedule does not conflict with other institution events, and ensuring that inmates are brought to the hearing rooms when scheduled. BOP Program Statement 5111.04, Institution Hearing Program.

law, and other relevant information.[14] This notice is referred to as a Notice to Appear (NTA). Once the NTA is served upon the inmate, ICE files the NTA with the immigration court of jurisdiction to initiate removal proceedings before an Immigration Judge. ICE's target range for initiating removal proceedings is within 6–60 months before the end of the inmate's sentence.

Across 26 states, EOIR has 41 immigration courts that handle federal, state, and local IHRP cases.[15] When the immigration court receives a federal inmate's NTA from ICE, the Court Administrator or legal assistant assigns the case to an Immigration Judge and coordinates with the BOP and ICE to schedule a hearing. EOIR provides a translator for the immigration hearing if needed.

The majority of IHRP hearings for federal inmates are conducted through VTC. The Immigration Judge, attorney for the IHRP inmate (if the inmate has one), and attorneys representing ICE communicate from the immigration court via VTC with the federal IHRP inmate, who is located in a hearing room at the IHRP facility.[16] Additionally, an ICE officer is usually present in the hearing room at the IHRP facility because ICE has the authority and responsibility to process and explain immigration court documents to inmates. If an Immigration Judge orders an inmate to be removed at the end of the inmate's sentence, the inmate may appeal this decision within 30 days to the Board of Immigration Appeals and subsequently, if necessary, to the appropriate U.S. Circuit Court of Appeals.

At the conclusion of the adjudication process, if the inmate is still in BOP custody, EOIR notifies the BOP of the immigration court's decision. If the inmate is ordered to be removed, the BOP coordinates with ICE for the inmate to be transferred to ICE's custody at the end of the inmate's sentence. ICE will pick up the inmate from the BOP institution and arrange transportation to the inmate's country of origin.[17] If the inmate is not ordered to be removed, the BOP requests and obtains documentation lifting any ICE detainers that may have been filed before the hearing and, when appropriate, initiates planning for the inmate's release from

---

[14] ICE has 24 field offices. IHRP cases are processed at nine field offices: (1) Los Angeles, California; (2) San Francisco, California; (3) Atlanta, Georgia; (4) New Orleans, Louisiana; (5) St. Paul, Minnesota; (6) Philadelphia, Pennsylvania; (7) Dallas, Texas; (8) El Paso, Texas; and (9) Seattle, Washington.

[15] Appendix 7 contains a list of the immigration courts that process IHRP cases.

[16] During the hearing, the Immigration Judge explains to the inmate his or her rights, which include the right to retain an attorney, to request a continuance to better prepare for the hearing, and to petition the judge for asylum. If the inmate chooses to avail himself or herself of any of these rights, the judge may grant continuances to allow sufficient time to address each request until ultimately ruling on the inmate's removability from the United States and any pending petitions for asylum. If an inmate waives these rights, at the first hearing an Immigration Judge can make a final decision about whether to remove the inmate at the end of his or her sentence. For more information about EOIR's management of immigration cases, see DOJ OIG, *Management of Immigration Cases and Appeals by the Executive Office for Immigration Review*, Evaluation and Inspections Report 13-01 (October 2012), www.oig.justice.gov/reports/2012/e1301.pdf.

[17] In order for ICE to deport a foreign-born national, including a BOP inmate in the IHRP, the foreign national's home country must issue travel documents to allow ICE to deport the individual. If ICE cannot deport a foreign-born national because a country refuses to issue travel documents, ICE releases the individual into the United States on an Order of Supervision and requires the individual to report to ICE periodically.

The BOP reported that, between FY 2018 and FY 2019, 3,636 IHRP inmates completed a sentence of incarceration and were held for ICE. The average number of days that those IHRP inmates waited for pickup was 0.89 days, and 98 percent of the inmates were picked up within 72 hours.

the BOP institution.[18] If the inmate has not completed the adjudication process prior to the end of his or her sentence, the inmate is transferred to ICE custody and remains in ICE detention pending completion of the removal proceedings. Appendix 6 contains a flow chart that outlines the IHRP removal proceedings process.

According to the most recent Alien Incarceration Report, at the end of the of FY 2019 a total of 27,494 known or suspected noncitizens were in BOP custody.[19] Of the total number of known or suspected noncitizens in BOP custody as of September 30, 2019:

- 61.7 percent (16,970) had been ordered to be removed from the United States by an Immigration Judge after completion of their federal sentences;
- 13.2 percent (3,627) were undergoing removal proceedings in front of an Immigration Judge;
- 22.3 percent (6,120) were under investigation by ICE to determine whether the federal government could initiate removal proceedings; and
- the remaining 2.8 percent (777) had been granted relief or protection from removal and, therefore, would not be removed from the United States at the end of their federal sentences.[20]

All of the above-described inmates, except those still under ICE investigation, were IHRP inmates.

## Scope and Methodology of the OIG Review

The OIG examined the Department's planning and implementation of the IHRP expansion and modernization for inmates in BOP custody. Specifically, we assessed: (1) whether DOJ achieved the three goals of the expansion; (2) the steps DOJ took to coordinate with DHS to plan and implement the expansion; and (3) the direction and guidance DOJ provided to its components to expand the IHRP.

Our fieldwork, which we conducted from June 2018 through March 2019, included interviews of current and former DOJ and DHS officials, data collection and analyses, and document reviews.[21] We interviewed current and former BOP, EOIR, ICE, and USCIS officials who were involved in the planning or implementation of the IHRP expansion. To observe the structural and population-based characteristics and changes before and after the March 2017 expansion, we analyzed BOP foreign-born inmate data from FY 2013 through

---

[18] A detainer is a mechanism used by ICE to request that a federal, state, or local law enforcement agency notify ICE before a removable noncitizen is released from criminal custody. The detainer also requests that the law enforcement agency notify ICE as early as practicable (at least 48 hours before release, if possible) and maintain custody of the noncitizen for a period not to exceed 48 hours to allow ICE to assume custody.

[19] DHS and DOJ, *Alien Incarceration Report, Fiscal Year 2019*, 24, www.justice.gov/archives/ag/page/file/1328326/download (accessed June 24, 2021). President Trump's January 2017 Executive Order on Enhancing Public Safety in the Interior of the United States required DOJ and DHS to report quarterly on incarcerated noncitizens, including those in BOP custody.

[20] DHS and DOJ, *Alien Incarceration Report,* 4.

[21] The OIG shifted resources to extensive pandemic-related oversight, including of the response by EOIR and the BOP to the pandemic beginning in March 2020, which delayed our completion and issuance of this report.

FY 2018 and EOIR IHRP case data from FY 2013 through the first 3 quarters of FY 2019. We also analyzed a dataset of ICE IHRP case data from FY 2013 through the first 3 quarters of FY 2019. We reviewed a sample of ODAG staff emails from January 1 through April 30, 2017, to understand DOJ leadership's role in developing and implementing the IHRP expansion. See Appendix 1 for a more detailed description of the review's methodology.

# Results of the Review

## The Department Increased the Number of Federal IHRP Facilities, Enhanced VTC Capabilities at Federal IHRP Facilities, and Implemented Uniform Intake Policies

The OIG found that, since the March 2017 announcement, DOJ coordinated with DHS at both headquarters and field office levels to plan and implement the IHRP expansion and modernization. As a result, the IHRP now operates out of 17 BOP and contract prisons; all federal IHRP facilities have upgraded or new via video teleconference (VTC) equipment; and incoming federal inmates are classified in the IHRP in a centralized, consistent manner. In addition to working on the three goals of the IHRP expansion, in September 2020 the IHRP Working Group finalized a Memorandum of Understanding (MOU) to outline the roles and responsibilities of each agency in the IHRP.

While the OIG focused primarily on determining whether DOJ and DHS achieved the goals of the IHRP expansion (discussed below), we also assessed the IHRP expansion guidance and direction that the Department, the BOP, and EOIR provided to the components and field staff. We found that the Department, through the Office of the Deputy Attorney General (ODAG), provided sufficient high-level guidance and support to allow the components to accomplish the IHRP expansion. While ODAG left the details of implementing the expansion to the components via the IHRP Working Group, it worked closely with the components through in-person meetings and emails to provide input and guidance on the expansion as necessary.

Most of the staff we interviewed said that they considered the guidance they received from the BOP about the IHRP expansion to be sufficient, while a handful of BOP staff members told us that they would have liked additional direction about the new SENTRY codes/assignments for IHRP inmates.[22] The IHRP guidance document that the BOP provided us includes clear directions for finding information about whether an inmate is to be removed in a SENTRY field that includes information about detainers (for a list of IHRP SENTRY codes, see Appendix 3). Based on our review of BOP guidance documents and interviews with BOP staff involved in the IHRP, we concluded that the BOP sufficiently communicated the IHRP expansion and provided guidance to the field.

We determined that with just a few exceptions Court Administrators and Immigration Judges found that the guidance and information from EOIR was sufficient for them to fulfill their responsibilities. The guidance, which included both written documentation and in-person instruction, described how EOIR would be implementing the IHRP expansion and directed field staff on how to handle various functional and technological changes resulting from the expansion. Although not all EOIR immigration court staff received the same type or amount of guidance, we believe that the guidance provided was sufficient to assist EOIR staff responsible for both pre- and post-expansion federal IHRP facilities with carrying out the duties of the IHRP and the expansion.

[22] The BOP issued an updated Program Statement for the IHRP, also known as a Change Notice, in 2017. BOP Program Statement 5111.04, CN-1.

## DOJ and DHS Expanded the Number of IHRP Facilities

The first goal listed in the March 2017 press release was to expand the number of active IHRP federal facilities to 20 (14 BOP prisons and 6 BOP contract prisons). Prior to the expansion, the program had 12 IHRP facilities (6 BOP prisons and 6 BOP contract prisons).[23] We found that the expansion initially added 8 additional BOP prisons and 1 additional BOP contract prison, for a total of 21 IHRP facilities. However, as of May 2021, the BOP reported that this number had been reduced to 17 IHRP facilities.[24]

In selecting the post-expansion IHRP facilities, the BOP consulted with EOIR and U.S. Immigration and Customs Enforcement (ICE), through the IHRP Working Group, to ensure that the program included:

- all types of federal prison security levels to accommodate the range of foreign national inmates' security classifications;
- both male and female facilities; and
- facilities in all areas of the United States, including the East and West Coasts and the Central region.

Additionally, the IHRP Working Group considered the following when selecting the new IHRP facilities:

- facilities that are within relatively close proximity to the associated ICE field office to reduce the distances ICE personnel would have to travel;
- facilities that have available space to conduct IHRP hearings, either in person or VTC; and
- the degree of difficulty in connecting new VTC wiring at each potential site.

The OIG determined that the IHRP facilities active at the time of our review were of different security levels, were spread across all of the geographic areas of the country, were both male and female institutions, and were within 1 hour driving time of the associated ICE field office. Additionally, each of the IHRP facilities received new or upgraded VTC equipment for two hearing rooms and all of the new facilities had available space and wiring to connect the equipment. The full list of pre- and post-expansion facilities is in Appendix 4, and a map of the facilities is in Appendix 8.

We asked the members of the IHRP Working Group who were involved in the expansion planning for their perspective on whether the initial 21 IHRP facilities was the appropriate number to address the capacity of the program. The BOP's Correctional Programs Branch (CPB) Administrator told the OIG that the 21 facilities constituted enough capacity for the number of IHRP inmates currently requiring hearings. We interviewed

[23] Facilities that had the IHRP prior to the expansion are hereinafter referred to as "pre-expansion IHRP facilities," and facilities that added the IHRP as a result of the expansion are hereinafter referred to as "post-expansion IHRP facilities."

[24] The BOP reported that the Adams County Correctional Center in Mississippi, a pre-expansion IHRP facility, was no longer an IHRP facility after July 2019 because the contract was not renewed. In May 2021, the BOP also reported that it had ended contracts with four contract prisons that were IHRP facilities (three pre-expansion and one post-expansion) but the BOP was considering adding two BOP prisons as IHRP facilities.

the former Unit Chief of ICE's Criminal Alien Program, who told us that, from ICE's viewpoint, there would not be an operational benefit or need to add additional IHRP facilities. Both the CPB Administrator and the Unit Chief said that the agencies involved in the IHRP Working Group would decide whether additional capacity was needed for the IHRP. In May 2021, the OIG asked the BOP CPB Administrator whether the reduction in the number of IHRP facilities to 17 has affected the program. He said that it was too early to tell and, once the IHRP is operational at the two additional prisons the BOP was looking to add as IHRP sites, the BOP will complete an assessment to determine whether additional sites are needed.

We found that increasing the number of IHRP facilities from 12 to 21 (now 17) gave the BOP more flexibility regarding where to house foreign national inmates who require IHRP hearings. The CPB Administrator told us that, when assigning inmates to facilities, having additional IHRP facilities helps the BOP to more effectively manage available bed space, provide programming options for inmates, and mitigate the effects of inmate gang affiliations. We believe that the additional seven IHRP facilities may also have reduced the caseload of specific ICE field offices and EOIR immigration courts by spreading the cases across more locations around the country.

**One Facility Had Not Held Any IHRP Hearings Because of an ICE Field Office's Resistance to Program Policy Changes**

We found that one of the post-expansion facilities, the Federal Correctional Institution (FCI) in Oakdale, Louisiana (Oakdale II), had not held any IHRP hearings because, according to BOP, EOIR, and ICE headquarters and field staff, the local ICE field office would not follow two program policy changes developed by the IHRP Working Group. Specifically, the IHRP policy changes included setting a target for ICE to initiate removal proceedings by filing Notices to Appear (NTA) with EOIR within 6–60 months of the inmate's earliest possible release date and requiring an ICE representative to be present at the BOP or contract facilities for IHRP hearings. The Oakdale ICE Assistant Field Office Director with responsibility for the Oakdale II facility at the time told us that he disagreed with the timeline for filing NTAs because he believed that ICE should be able to file them closer to the inmate's release date.[25] The ICE Assistant Field Office Director also said that he believed that sending ICE personnel to hearings was unnecessary and consumed time that could be used elsewhere.

We believe that filing an NTA with a short timeline could affect EOIR's ability to issue a decision before the end of the inmates' sentences and potentially result in Immigration Judges feeling pressure to complete the IHRP case faster to meet performance goals.[26] We have similar concerns about the possible absence of the Oakdale ICE officer in the hearing room in that the ICE officer is responsible for ensuring that any documents related to the immigration case are properly passed between the immigration court and the IHRP inmate and for explaining any immigration court documents to inmates. We believe that, if the ICE

---

[25] The Federal Correctional Complex (FCC) Pollock IHRP facility is also under the responsibility of the Oakdale ICE field office but is overseen by an Assistant Field Office Director different from the Oakdale facility. The BOP told us that ICE personnel did not attend the first IHRP hearing held at FCC Pollock in March 2018 and started attending IHRP hearings at the facility only in July 2018. EOIR confirmed that cases at the facility were suspended for approximately 4 months because of the ICE field office's failure to attend.

[26] An individual Immigration Judge's performance is assessed, in part, based on whether IHRP cases are completed before the end of an inmate's sentence, regardless of when the NTA is filed. In addition, although IHRP cases are only a small part of EOIR's caseload, they can constitute a large percentage of the caseload of an individual judge.

officer is not present to handle the paperwork, cases could be delayed and questions of fairness about the proceedings could arise.[27]

The EOIR Deputy Chief Immigration Judge at the time told us that, to address the ICE field office leadership's concerns and to ensure that the agencies can collaborate effectively at each site, in early 2019 the IHRP Working Group modified the draft IHRP MOU to allow the Assistant Chief Immigration Judges (ACIJ) to modify the standard NTA timeline of 6–60 months as appropriate for the immigration court(s) they oversee. He said that the Oakdale ICE field office and the Oakdale immigration court came to an agreed timeline of filing an NTA within 4 months of the end of an inmate's sentence at FCI Oakdale II. While the timeline is shorter than the program standard, EOIR and the local immigration court agreed to try to work within this parameter. In May 2021, EOIR reported that the immigration court handling the Oakdale II IHRP cases was receiving a small number of NTAs from the ICE field office for Oakdale II IHRP inmates.

## DOJ Updated the Existing VTC Infrastructure and Increased the Number of VTC Units at Each IHRP Facility

The second goal of the IHRP expansion was for every IHRP facility (both pre- and post-expansion) to receive updated or new VTC equipment to conduct removal proceedings. As described in the text box below, we were told about concerns related to the use of VTCs in immigration hearings and technology problems that may affect immigrants' due process rights, primarily those involving non-IHRP hearings at DHS detention camps. The text box includes our analysis of the number of VTC malfunctions in federal IHRP immigration hearings. While the scope of this review did not include assessing the overall use of VTCs by EOIR in immigration hearings, or the potential effects of their use on due process rights, the OIG initiated a separate inspection and review of the use of VTCs in immigration hearings conducted in the DHS tent facilities at the United States/Mexico border.

We found that, with regard to the federal IHRP facilities, EOIR was responsible for purchasing and installing the VTC equipment and EOIR provided technical support for each unit. EOIR told the OIG that it purchased 40 new units at a cost of $4,855 per system, for a total of $194,200. The BOP was responsible for ensuring that each IHRP facility had the appropriate wiring to operate new or updated VTC equipment, as well as rooms available to conduct removal proceedings. The BOP is responsible for housing and protecting the VTC equipment inside each facility, and an ICE representative is typically in charge of operating the VTC equipment. According to the BOP and EOIR, as well as field staff we interviewed, each IHRP facility now has

[27] Because our oversight jurisdiction is limited to DOJ programs and personnel, we did not review the impact of the ICE officer's presence in the hearing room.

2 VTC units, including 40 new units overall, to use for removal hearings, which should enable more flexibility in scheduling hearings and provide the capacity to hold additional hearings.[28]

The BOP, EOIR, and ICE staff we interviewed indicated that the new VTC equipment had improved the quality of the video proceedings and provided opportunities to conduct simultaneous hearings due to the second VTC-equipped hearing room, but we were also told that not all facilities were using both hearing rooms. For example, one IHRP location did not have enough IHRP inmates at the hearing stage of the program to warrant using two hearing rooms/VTCs and one location did not have enough ICE officers to staff both of the rooms during the hearings.

### VTC Technology Issues

During our review, we learned about an increasing number of complaints related to the use of VTCs in all types of immigration hearings. The VTC complaints primarily concerned non-IHRP hearings involving DHS detention camps. The complaints alleged that the use of VTCs restricted immigrants' access to their attorneys and translators, which could adversely affect their due process rights, and that VTC technology problems impact immigrants' rights to fair hearings.

These concerns appear generally to be focused on non-IHRP hearings and are not specifically directed at the federal IHRP hearings that were within the scope of this review. Nevertheless, we analyzed EOIR data to determine how often VTC technology problems or malfunctions caused a federal IHRP hearing to be adjourned. We determined that from FY 2013 through FY 2018:

- Seventy federal IHRP hearings were adjourned for video malfunctions during the 6 years of our study period. This represents slightly less than 1 percent (70 out of 9,672) of all immigration hearings for federal IHRP inmates, the vast majority of which were VTC hearings.
- Those 70 adjourned hearings were held by 7 different immigration courts for IHRP inmates at 9 BOP IHRP facilities. The hearings were held on 22 unique dates (courts can schedule numerous hearings on a single day).

A few Immigration Judges told us about technology issues with the older VTC equipment but said that they could usually solve problems that arose and that it did not affect their ability to process cases.

Source: OIG analysis of EOIR data and interviews

## DOJ and DHS Developed Two New Uniform Intake Policies

The third goal of the IHRP expansion was for EOIR and ICE to finalize a new and uniform IHRP intake policy. Our interviews with senior EOIR and ICE officials and our review of relevant DOJ emails showed that the IHRP agencies had implemented two different intake policies since March 2017 as part of the effort to improve the program. The first policy, which was announced in then Attorney General Session's press release, was intended to help EOIR more easily identify IHRP NTAs filed by ICE. The second policy, created after the announcement of the expansion, centralized and standardized the classification of IHRP inmates by an ICE liaison to the BOP when the inmates first enter into the BOP.

The first new intake policy created a process whereby ICE added an IHRP notation to NTAs to make it easier for EOIR to identify IHRP cases.[29] Specifically, EOIR's Deputy Chief Immigration Judge at the time stated that EOIR, ICE, and the then ICE liaison at the BOP Central Office met and decided to modify IHRP NTAs by including "IHP" and the inmate's estimated release date in the top corner and by ensuring that this process was uniformly and nationally followed. The Deputy Chief Immigration Judge told the OIG that he believes that this change was initiated in May 2017 and fully implemented by October 2017. Most of the Court

[28] EOIR told the OIG in May 2021 that the VTC units purchased for the four prisons that are no longer IHRP facilities were repurposed for use at other EOIR sites.

[29] As discussed in the Introduction, an NTA is a written notice, served by ICE, for an inmate to appear at immigration proceedings. The notice describes the nature of the proceedings, the legal authority under which the proceedings are conducted, the acts or conduct alleged to be in violation of the law, and other relevant information.

Administrators we interviewed said that the notation is helpful and makes it easier to identify the IHRP NTAs, although some also said that the notation was not necessary because they could determine whether the NTA was for an IHRP inmate from other areas on the NTA, specifically the name of the facility. One Court Administrator told us that her immigration court was not receiving NTAs with an IHRP notation but that she was nevertheless able to identify the IHRP NTAs by the name of the facility.

The second new intake policy implemented a process that centralizes the assessment of BOP inmates to determine whether they should be designated as IHRP inmates. Specifically, under this process, the ICE liaison to the BOP assesses incoming BOP inmates and determines their citizenship and eligibility for IHRP and removal from the country, as we described in the Introduction. The Unit Chief of ICE's Criminal Alien Program at the time told us that, prior to the initiation of this new centralized process, local ICE field offices assessed foreign-born inmates for IHRP eligibility and categorization and there were no standard or centralized processes for assessing and vetting those inmates. A BOP Case Management Coordinator told us that, under the prior process, her IHRP institution had sometimes received transfer inmates that had been designated as IHRP inmates by the local ICE field offices for their former, non-IHRP institutions, but that, when the ICE field office associated with her IHRP institution secondarily reviewed these inmates, it determined that some inmates were in fact not eligible for the IHRP. She stated that as a result these inmates had been unnecessarily transferred to that IHRP facility. The Case Management Coordinator stated that she has not experienced this problem since mid-2018.

BOP and ICE headquarters staff identified for us another benefit of the new intake policy. Specifically, the CPB Administrator during our review noted that prior to the new process it was challenging for the BOP to correctly identify and classify IHRP inmates. Previously, local ICE field offices determined a foreign-national federal inmate's IHRP designation and different ICE field offices may have different determinations, as described above. The new policy centralized and simplified that process because the ICE liaison determines each inmate's removability and whether he or she needs a hearing prior to the inmate's arrival at the prison. This should enable the BOP and individual prison facilities to manage IHRP inmates more consistently and efficiently.

### The IHRP Working Group Finalized an IHRP MOU

While developing an MOU for the IHRP was not one of the goals of the IHRP expansion, we found that the IHRP Working Group during the expansion created a draft MOU which provides the framework for the program's operations and finalized it in September 2020. We reviewed the IHRP MOU and found that it describes the roles and responsibilities of each agency (the BOP, EOIR, ICE, and U.S. Citizenship and Immigration Services (USCIS)) in the program, provides a mechanism for resolving disagreements between participating agencies, and establishes timelines and protocols for initiating the IHRP. During most of our fieldwork, because the MOU had not been finalized the participating agencies told the OIG that they were operating under the draft MOU's provisions and had directed field staff to follow its guidelines and procedures until the MOU was finalized. When we asked staff to describe and assess the guidance they received for the IHRP and the expansion, some pointed to the draft MOU and said that it was sufficient for them to work within the program. We found that the agencies involved in the IHRP were able to collaborate and coordinate effectively at the headquarters and field levels under the auspices of the draft MOU.

Now that the agencies have finalized the MOU, we believe that the MOU will reinforce the successful cooperation between the agencies participating in the IHRP and provide a basis for holding each agency accountable for fulfilling its role in the process. As we describe in more detail below, each agency has

competing priorities and other constraints, such as processing other types of immigration cases or maintaining prison security for all inmates. These issues make it challenging to work within the IHRP or for one agency to "own the program." The MOU should assist with these challenges.

#### The IHRP MOU Addressed USCIS Requirements for Processing IHRP Inmates

As discussed in the Introduction, the USCIS's role in IHRP cases is to interview inmates who request asylum because they claim fear of persecution or torture should they return to their country of birth. The EOIR Chief Deputy Immigration Judge told us that almost all IHRP inmates will file a claim of asylum, and therefore EOIR, the BOP, and ICE believed that it was important that the USCIS be a participant in the Working Group and be able to process asylum claims of IHRP inmates while they were still incarcerated in the BOP. While most IHRP inmates are not eligible for asylum because of their criminal conviction, the USCIS must process and make a decision on all credible and reasonable fear referrals. If the USCIS finds that the IHRP inmate does not have a credible or reasonable fear of persecution or torture, the inmate may request that an Immigration Judge review that negative determination. Prior to the IHRP expansion, the USCIS would conduct reasonable or credible fear interviews in a private setting once the inmates were in ICE detention. In March 2017, the USCIS joined the IHRP Working Group and explained the requirements for processing credible and reasonable fear referrals, which include conducting private interviews, allowing inmates to have an attorney or consultant present for interviews, and providing interpreters.

USCIS officials told us that they raised to the IHRP Working Group several concerns about the requirements for processing credible and reasonable fear cases. First, according to the USCIS Operations Branch Chief, conducting an interview when an inmate still has a year left on his or her sentence would be ineffective because conditions in the inmate's country of origin could change prior to the conclusion of the inmate's prison sentence. The IHRP Working Group agreed that the USCIS would interview the inmate toward the end of his or her sentence. Second, according to the USCIS, BOP facilities lack a private setting for reasonable or credible fear interviews. Additionally, USCIS officials said that USCIS field offices are often located far from prisons, making it impractical to interview the inmate in a USCIS field office. USCIS officials told us that they are exploring other options, such as conducting reasonable or credible fear interviews telephonically when a USCIS field office is not close to an IHRP facility. The IHRP MOU states that the BOP will provide space, separate from other detainees, for the USCIS to conduct credible fear and reasonable fear interviews at IHRP facilities. USCIS officials told us that the MOU fully addressed their concerns. As of May 2021, the USCIS reported that it had not yet received any credible or reasonable fear referrals for IHRP cases.

### Increasing DHS Immigration Caseloads and BOP Staffing Challenges May Affect the IHRP's Caseload

EOIR's statistical reports show a substantial increase in the number of NTAs filed with EOIR for removal in immigration cases in which DHS alleged that an individual was inadmissible to the United States, had entered the country illegally, or had entered the country legally but then violated one or more conditions of admission. The number of NTAs filed for these removal cases increased by 34 percent, from 226,673 to 304,342 cases, from FY 2014 through FY 2018. However, IHRP cases (federal, state, and local) represent a small number of all removal cases, only 0.9 percent in FY 2018, because the majority of removal cases involve foreign nationals who are not incarcerated in prison. Figure 1 below shows all new NTAs filed for EOIR's removal cases.

Figure 1

Number of New EOIR Removal Cases, FY 2014–FY 2018




Source: EOIR Statistics Yearbook, FY 2018

In its FY 2017 Annual Performance Report and FY 2019 Annual Performance Plan, the Department stated that EOIR's ability to complete IHRP cases prior to the inmate's release depends largely on DHS filing an NTA with sufficient time remaining in the inmate's sentence for EOIR to complete the case. An EOIR headquarters official told us that ICE's staffing issues can result in EOIR receiving the NTA less than 6–60 months before the end of the inmate's sentence, as provided for in the established timeline.

We found specific instances in which the federal IHRP caseload was affected by competing immigration priorities. A Senior ICE official told us that ICE personnel find themselves pulled in different directions because of increasing responsibilities competing for priority. For example, according to the official, the focus on immigration enforcement at the Southwest border has strained ICE's ability to focus on IHRP cases. Similarly, we heard from BOP, ICE, and EOIR staff that IHRP cases were suspended between June and November 2018 at Federal Correctional Complex Victorville because ICE was prioritizing cases involving detainees from the U.S. Southwest border.[30] Additionally, ICE staff from one field office told us that they

[30] In June 2018, ICE said that it was "working to meet the demand for additional immigration detention space" due to increased illegal border crossings and the Zero Tolerance Policy and was working with the BOP, among others, to meet this need. Sarah N. Lynch and Kristina Cooke, "Exclusive: U.S. Sending 1,600 Immigration Detainees to Federal Prisons," *Reuters,* June 7, 2018, www.reuters.com/article/us-usa-immigration-prisons-exclusive/exclusive-u-s-sending-1600-immigration-detainees-to-federal-prisons-idUSKCN1J32W1 (accessed September 16, 2021). At ICE's request, EOIR suspended IHRP cases at FCC Victorville between June and November 2018 because ICE was prioritizing cases involving detainees from the U.S. Southwest border. The BOP informed us that the ICE detainees transferred out of Victorville in October 2018. EOIR informed us that FCC Victorville resumed processing IHRP cases in November 2018. The cases that started in November 2018 were outside the scope of our review.

were required to prioritize, over IHRP cases, the processing of non-IHRP cases involving inmates with impending release dates due to retroactively reduced sentences under the Fair Sentencing Act of 2010 (Pub. Law No. 111-220).

Staffing challenges at ICE field offices could affect future IHRP cases if non-IHRP cases with fast-approaching release dates are prioritized for processing. The Unit Chief of ICE's Criminal Alien Program at the time told us that for the IHRP to be successful ICE would need a team that worked on IHRP cases exclusively. (See the text box for an example of how ICE addressed caseload and staffing issues.)

In addition, we were given examples of BOP staffing challenges delaying IHRP proceedings due to security needs. For example, an Immigration Judge said that BOP staff in one IHRP facility often had to focus on other priorities, such as security incidents at the facility, which made it challenging for inmates to properly prepare for court and ultimately delayed IHRP proceedings. Separately, a Court Administrator said that staff at one of the BOP facilities she serviced cited the lack of Correctional Officers as the reason why the facility could not support IHRP hearings more than once a month.

**ICE Employed Surge Operations to Address Caseload and Staffing Issues**

In an attempt to mitigate caseload and staffing issues, ICE headquarters employed "surge operations," which consisted of a team of ICE personnel traveling to field offices to help work through case backlogs, including IHRP cases, for a certain period of time. During FY 2018, ICE conducted five surges at IHRP sites: Taft Correctional Institution in California; Federal Detention Center SeaTac in Washington State; FCI Pollock in Louisiana; D. Ray James Correctional Institution in Georgia; and FCI Big Spring (Flight Line Unit, Airpark Unit, and Cedar Hill Unit) in Texas. ICE planned five more surges for FY 2019 and planned some for IHRP sites.

The EOIR Deputy Chief Immigration Judge at the time told us that the immigration courts in the areas where surges occurred did see an increase in the number of IHRP NTAs filed immediately after the surge operations.

Source: OIG interviews

## Although Neither DOJ nor DHS Has a Plan to Assess the IHRP Expansion, OIG Data Analysis Indicates that IHRP Participants Are Spending Less Time in ICE Detention

The DOJ and DHS agencies involved in the IHRP each independently collect data related to the IHRP, but we found that they do not have a plan to jointly establish performance metrics and evaluate the IHRP expansion or the program itself. Despite this lack of complete performance data to enable a reliable program assessment, the OIG conducted its own analysis of existing data and found that the expansion appears to be lessening the time IHRP participants spend in ICE detention, resulting in cost savings for the government.[31]

The goal of the IHRP is that inmates will receive a final decision, or final order (e.g., removal, relief, voluntary departure), before the end of their prison sentence. Accordingly, for the purposes of our data analysis, we used the number of IHRP cases that were completed before the end of the inmates' sentences as an indicator of the potential success of the IHRP and its expansion. Using this metric, we identified a decrease in the number of days an IHRP participant spends in ICE custody when the final decision was made while in BOP custody and, therefore, less money spent on ICE detention.

[31] We use the term "IHRP participant" to refer to IHRP inmates transferred to ICE detention.

## DOJ and DHS Do Not Have Plans to Separately or Jointly Evaluate the IHRP Expansion

Though both EOIR and ICE separately track elements of IHRP case data, including the date that IHRP inmates receive a final order or decision, we found that there is no collective dataset containing information needed to analyze the success of the IHRP and its expansion. EOIR provides information about its IHRP cases in its publicly available statistical reports, but it reports only the total number of new cases received and cases completed by decision. ICE does not have public reports that separate the number of IHRP removals from the number of all removals. Moreover, the BOP does not track data on IHRP inmates' removal cases. The BOP's data on IHRP inmates contains demographic information such as the facility or facilities in which the inmate has been housed, the date the inmate was placed in an IHRP facility, the inmate's projected release date, and the inmate's nationality. This information is necessary for the BOP to carry out its role of housing and managing IHRP inmates, but the nature of this data does not allow it alone to be used to assess the IHRP expansion.

The OIG attempted to use EOIR data to assess the effect, if any, of the IHRP expansion. However, we found anomalies in the EOIR dataset and we determined that we could not reliably use the EOIR case data.[32] ICE officials were able to provide the OIG with data on IHRP cases for FY 2013 through the first 3 quarters of FY 2019.[33] We could then determine whether the IHRP inmates received a final order before the end of their prison sentence, the number of days IHRP participants spent in ICE detention, and the average cost of ICE detention associated with those IHRP cases.

We analyzed an ICE dataset composed of a total of 4,022 federal IHRP cases that were opened or closed from FY 2013 through FY 2019 and for which we could verify the status or outcome of the case in our EOIR and BOP datasets. Of those 4,022 cases:

- 3,079 resulted in an order of removal, and the foreign national was removed;
- 1 resulted in an order of "relief granted" to the foreign national;
- 1 resulted in the foreign national agreeing to voluntary depart the United States upon completion of his or her sentence;
- 35 ended in administrative closure or termination; and
- 906 were still open as of June 26, 2019. Of these cases:

[32] See Appendix 1 for additional information on the anomalies. We concluded that it would be extremely labor intensive to clean and reliably analyze the EOIR dataset to determine the number of IHRP inmates who received a final order before the end of their BOP sentence. After ICE officials told the OIG that they could provide us with similar data on IHRP cases to help make the same determination, we opted to use ICE data for our analysis.

[33] The ICE data included only the final order date, the date IHRP participants entered an ICE detention facility, and the dates the IHRP participants left the ICE detention facility to be deported. ICE also provided us with the actual average daily adult bed cost for their detention facilities. However, this average daily adult bed cost was for all types of ICE detention facilities, not the costs specific to IHRP participants or detaining IHRP participants.

- 247 were still in removal proceedings,
- 620 had a final order of removal but were still in BOP custody serving their prison sentence, and
- 39 had a final order of removal and were in ICE detention awaiting removal from the United States.[34]

Figure 2 shows the status of the 4,022 federal cases in the dataset.

**Figure 2**

**Status of Open and Closed Federal IHRP Cases, FY 2013–FY 2019**




Note: FY 2019 includes data for the first 3 quarters only.

Source: OIG analysis of ICE IHRP case data

All of the analyses presented in the following sections were conducted on the 3,081 closed cases and do not include cases that were administratively closed or terminated.

[34] "Relief granted" means that the IHRP inmate was granted relief from removal, such as adjustment to permanent resident status or cancelation of removal, or was granted asylum or another form of protection relief. Some cases that are closed with administrative closure or termination can be reopened later under a different case number, and the ICE dataset did not include information regarding the outcome of these cases. Therefore, we could not use the administrative closure or termination cases in our analysis.

## IHRP Participants Spent Less Time in ICE Detention

The OIG found that the number of IHRP cases with a final order before the end of the inmate's BOP sentence as a percentage of the total number of IHRP cases did not change significantly over our study period, FY 2013 to FY 2019. The percentage of cases that were completed when the IHRP participant was still in BOP custody varied between 8 percent and 13 percent over the 7 years. In our dataset, 2,756 (89 percent) of the cases had a final order when the IHRP participant was in BOP custody and 325 (11 percent) of the cases had a final order when the IHRP participant had moved into ICE custody. Figure 3 shows the percent of IHRP cases with a final order before and after transfer to ICE detention in each fiscal year.

**Figure 3**

**Percent of Federal IHRP Cases, by Time of Final Order and Fiscal Year**




Notes: FY 2019 includes data for the first 3 quarters only. As discussed in the Introduction, in March 2017 the Attorney General announced the expansion of the IHRP.

Source: OIG analysis of ICE IHRP case data

However, the OIG found that federal IHRP inmates who received a final order before the end of their prison sentence spent considerably less time in ICE detention than those whose final order was decided after they completed their sentence. Additionally, the average number of days IHRP inmates who received a final order before the end of their prison sentence spent in ICE custody has been decreasing since FY 2017. Between FY 2013 and the first 3 quarters of FY 2019:

- federal IHRP inmates who had a final order before entering ICE detention spent an average of 23 days in ICE detention, and
- if a federal IHRP inmate did not have a final order before the end of his or her sentence, the number of days in ICE detention increased to an average of 89 days.

Figure 4 shows the average number of days federal IHRP inmates spent in ICE detention according to the time the final order was issued.

Figure 4

Average Number of Days in ICE Detention, by Time of Final Order and Fiscal Year




Note: FY 2019 includes data for the first 3 quarters only.

Source: OIG analysis of ICE IHRP case data

When we analyzed this data by ranges, we found:

- Twenty-five percent of federal IHRP participants who received a final order before the end of their prison sentence were out of ICE detention in 1 day.
- Almost 50 percent of the federal IHRP participants who received a final order before the end of their prison sentence were out of ICE detention within a week.

- Sixty-six percent of the federal IHRP participants who received a final order before the end of their prison sentence were out of ICE detention within a month.

- By contrast, only 29 percent of the federal IHRP participants who received a final order after entering ICE detention were out within a month.

## ICE Detention Costs per IHRP Participant Decreased in FY 2018

We found that the average amount ICE spent to detain federal IHRP participants in ICE custody decreased in FY 2018 if a final order was issued before the IHRP inmate was released from BOP custody.[35] Figure 5 shows the average cost of ICE detention per IHRP participant for each type of case in our dataset, for each fiscal year.

Figure 5

Average Cost of ICE Detention for Each Federal IHRP Participant, by Time of Final Order and Fiscal Year




Source: OIG analysis of ICE data

[35] ICE provided the OIG with actual daily adult bed cost for each quarter, FY 2015 through FY 2018, which we averaged for each of the 4 years. For FY 2013 and FY 2014, we used the actual daily adult bed cost as listed in the ICE Congressional Budget Overview for FY 2018. (However, in FY 2019, ICE realigned service-wide costs and moved them to the Mission Support base funding. According to ICE, the daily adult bed cost no longer includes these operational enterprise costs and was reduced. We did not calculate the costs for the FY 2019 cases because we could not compare the costs equally.) We then used these daily bed costs to estimate the cost for ICE to detain the IHRP participants. ICE, Budget Overview, FY 2019, 24, www.dhs.gov/sites/default/files/publications/U.S.%20Immigration%20and%20Customs %20 Enforcement.pdf, and Budget Overview, FY 2018, 14, www.dhs.gov/sites/default/files/publications/ICE%20FY18 %20Budget.pdf (both accessed September 16, 2021).

Because the IHRP participants who received a final order after they entered ICE detention stayed in ICE detention longer than those who received a final order while still incarcerated by the BOP, the associated costs were higher—more than double the costs in every fiscal year except FY 2017.

The OIG cannot definitively state with specificity the degree to which the IHRP or its expansion contributed to IHRP participants spending less time in ICE detention and the resulting reduction in costs in FY 2018 because other variables could have affected the data points we assessed. Variables such as the number of Immigration Judges at the IHRP sites or whether an IHRP participant appeals the removal decision may impact the length of time it takes to complete removal proceedings.[36] It is also likely that some benefits of the program expansion will not be measured for a period of months or years. For example, those foreign-national federal inmates serving very long prison sentences may not yet have started the IHRP process because they are not within 60 months of completing their prison sentence or they have received final orders through the IHRP but have not left BOP custody because they have many months remaining in their prison sentence.

While the OIG cannot determine with specificity the cost savings associated with the IHRP expansion, the results suggest that it has resulted in savings to ICE. We believe that the agencies involved in the IHRP should work together to develop performance measures and consistently collect the appropriate data to fully assess the effect of the IHRP expansion, as well as the program itself. In addition, the IHRP MOU does not include any procedure, or assign responsibilities related to, collecting, sharing, or analyzing data to evaluate the program's or the expansion's performance. Accordingly, the IHRP agencies should work together to identify each agency's role and responsibilities related to data collection, reporting, and evaluation.

[36] Other possible variables include the location of the IHRP facility, ICE field office, or immigration court (resources could vary across the locations and contribute to increased case processing times); whether ICE deployed a "surge operation" in that IHRP site (locations with surge operations may have processed cases faster); how close the IHRP inmates were to the end of their sentence (the agencies have a shorter time to complete removal proceedings and may not complete them before the end of an inmate's sentence); and whether the inmate's country of origin has a treaty with the United States to accept the inmate back after removal (IHRP participants whose country of origin does not have a treaty with the United States may spend more time in ICE custody awaiting deportation). For more information on the last variable, see DOJ OIG, *Status Review on the Department's International Prisoner Transfer Program*, Evaluation and Inspections Report 15-07 (August 2015), www.oig.justice.gov/reports/2015/e1507.pdf.

# Conclusion and Recommendation

## Conclusion

As part of its broader effort to advance immigration-related initiatives, the Department announced an expansion of the IHRP in March 2017 and established three goals: (1) expand the number of federal IHRP facilities, (2) update existing VTC infrastructure and increase the number of VTC units, and (3) develop a new uniform intake policy. We found that DOJ and its components involved in the IHRP were able to achieve these three goals. The IHRP is now operating out of 17 BOP facilities, each IHRP facility has updated or new VTC equipment, and the program has 2 new intake policies that help the program's efficiency and standardization. Further, the IHRP Working Group finalized a draft Memorandum of Understanding formalizing each agency's responsibilities and authorities, as well as program guidelines and procedures.

We found that DOJ coordinated with DHS to achieve the goals of the IHRP expansion, except in one site.[37] We also found that DOJ worked closely with its components involved in the IHRP and provided sufficient support to kick off the expansion while entrusting to the components in the IHRP Working Group the specifics of implementing the expansion. BOP and EOIR headquarters and field staff believed that the IHRP guidance and direction from the Department and component headquarters were sufficient.

We also identified a number of challenges that DOJ and DHS faced while expanding the IHRP that might affect the IHRP's efficiency and success in the future, such as limited BOP and ICE staffing; increasing immigration caseloads and ongoing inmate security considerations. In order for DOJ and DHS to determine how to address these challenges, their components involved in the IHRP must continue coordinating and collaborating.

Finally, we found that the DOJ and DHS agencies involved in the IHRP do not have an evaluation plan or performance metrics for the program or its expansion. Though both EOIR and ICE separately track elements of IHRP cases for their own performance reports, there is no collective dataset containing all of the information needed to assess the program. The OIG analyzed ICE and EOIR IHRP datasets, and our results identified a decrease in the average cost for IHRP participants in ICE custody for cases in which the final decision was made when the participant was in BOP custody. In response to a working draft of this report, ICE officials told the OIG that they support ongoing meetings to assess current operations and ways to improve the program's effectiveness and that these efforts align with Executive Order 13993 to protect national and border security, address the humanitarian challenges at the southern border, and ensure public health and safety.[38]

[37] As discussed in the Results of the Review, the local ICE field office for Federal Correctional Institution Oakdale II did not agree with program requirements that established when to initiate removal proceedings for IHRP inmates and that directed ICE to have a representative at the IHRP hearings.

[38] Executive Order 13993, Revision of Civil Immigration Enforcement Policies and Priorities, January 20, 2021.

## Recommendation

We believe that agencies participating in the IHRP should determine how the IHRP expansion and the program itself should be evaluated. While each agency may be collecting and analyzing data related to the IHRP separately, there is no plan to collaborate and jointly assess the program. Therefore, we recommend that the BOP and EOIR work with ICE and the USCIS to:

1. Develop performance metrics to assess the effect of the Institutional Hearing and Removal Program expansion and assess the program itself, including the roles and responsibilities each agency will have related to performance metrics, data collection, and evaluation.

# Appendix 1: Purpose, Scope, and Methodology

## Standards

The OIG conducted this review in accordance with the Council of the Inspectors General on Integrity and Efficiency's *Quality Standards for Inspection and Evaluation* (January 2012).

## Purpose and Scope

The OIG conducted a targeted review of DOJ's role in the IHRP expansion. Our review included the following objectives:

- Assess the expansion of the IHRP to determine whether DOJ achieved the three goals listed in the Attorney General's press release.
- Determine and assess the steps DOJ took to coordinate with DHS in the expansion of the IHRP.
- Determine and assess the direction and guidance that DOJ provided to expand the IHRP.

## Interviews

We interviewed 16 DOJ and DHS component headquarters staff who had been previously or were associated with the IHRP at the time of our review. We conducted these interviews to gain a better understanding of each agency's roles and responsibilities in planning, developing, coordinating, implementing, and overseeing the IHRP expansion. These interviews included current and former staff of the following agencies:

- the Office of the Deputy Attorney General (ODAG),
- the BOP,
- EOIR,
- ICE, and
- U.S. Citizenship and Immigration Services (USCIS).

We also conducted interviews with 37 BOP, EOIR, and ICE field staff who work with the IHRP at five sites: (1) Allenwood, Pennsylvania; (2) Dallas, Texas; (3) Los Angeles, California; (4) San Francisco, California; and (5) Oakdale, Louisiana.[39] We chose the five sites based on a series of factors, including: pre- or post-

[39] Each of our sites included a BOP IHRP facility or facilities, the EOIR immigration court with responsibility for IHRP cases at the BOP IHRP facility or facilities, and the ICE field office with responsibility for the IHRP cases in those BOP IHRP facility or facilities. At the time of our fieldwork, the USCIS did not have field staff working with the IHRP.

expansion IHRP facilities, BOP or contract prison facilities, number of IHRP inmates, and number of facilities covered by a single immigration court. Table 1 lists the agency and position type of all 37 field interviewees.

Table 1

OIG Field Interviewees by Agency and Position Type

| Agency | Position Type | Number of Interviewees |
|---|---|---|
| BOP | Case Management Coordinator | 11 |
| | Complex Case Management Coordinator | 1 |
| | Associate Warden | 1 |
| | IHRP Assistant | 1 |
| | Unit Manager | 1 |
| EOIR | Immigration Judge | 8 |
| | Court Administrator | 5 |
| ICE | Supervisory Detention and Deportation Officer | 5 |
| | Assistant Field Office Director | 3 |
| | Deportation Officer | 1 |
| Total | | 37 |

Source: OIG records

The OIG conducted follow-up interviews with the points of contact for the IHRP at each of the participating agencies, the BOP, EOIR, ICE, and the USCIS, in April and May 2021, to obtain updates about the program after OIG resources had been diverted to pandemic-related work.

## Data Analysis

We analyzed three datasets for the review: BOP SENTRY data from FY 2013 through FY 2018 and EOIR IHRP case data and ICE IHRP data from FY 2013 through the first 3 quarters of FY 2019. The purpose of our BOP and EOIR data analysis was to provide insight into the make-up of the IHRP population and how the IHRP cases proceeded through the immigration courts during our review period. Our analysis of the ICE dataset was to determine whether IHRP participants received a final order before the end of their prison sentence and the number of days they spent in ICE detention.

The BOP SENTRY dataset consisted of "snapshots" of the IHRP inmate population at the end of each fiscal year from FY 2013 through FY 2018. The dataset included fields such as the inmate's security level, country of citizenship, and location or facility. We analyzed a total of 222,063 IHRP cases.[40] The total number of IHRP

[40] There were 222,072 IHRP cases during our review period, but we removed 9 of them because the BOP was unable to tell us what their IHRP SENTRY assignments/codes signified.

cases across all fiscal years is not equal to the number of IHRP inmates across all years because many inmates were incarcerated during more than 1 fiscal year and we counted each inmate only once per fiscal year.

Our primary analysis of the EOIR case data pertaining to IHRP cases identified the number of cases opened by EOIR from FY 2013 through FY 2018 and the number of cases in which an EOIR Immigration or Appellate Judge rendered a decision of removal, relief, voluntary departure, termination, or other.[41] EOIR provided data from FY 2013 through the first 3 quarters of FY 2019 pertaining to all active IHRP cases and included information such as case number; inmate name; inmate alien identification number; date the case was opened; date an Immigration Judge rendered a decision; the decision; and related appeals, if any. As advised by EOIR, we removed 266 cases from our analysis because 191 cases were not IHRP cases and 75 cases involved proceedings unrelated to the IHRP process.[42] We removed an additional 81 cases because proceedings associated with those cases included more than one federal, state, or municipal IHRP value, therefore the cases could not be singly grouped into one of these categories.

The OIG requested assistance from EOIR to ensure that our methodology for identifying the point at which a case transitions from IHRP to non-IHRP (when the IHRP inmate transfers from BOP custody to ICE detention) was accurate. EOIR said that this transition can be observed in two data fields in EOIR's case management system: "Hearing Location," or origin facility, and "Transfer To," or destination. However, when we conducted the preliminary analysis, we noticed anomalies with the destination data field contents for some cases. We determined that, using the EOIR dataset, it would be extremely labor intensive to analyze the data to determine the number of IHRP inmates that had a final order or decision before the end of their sentence and entered ICE detention. Specifically, the potential discrepancies in the EOIR data appeared to result in missing transfer orders or cases in which inmates appear to have been transferred between non-IHRP and IHRP facilities multiple times. As a result, the OIG raised this concern with EOIR.

EOIR responded that the destination data point could represent a specific facility or the immigration court of jurisdiction, which may be composed of multiple IHRP and non-IHRP facilities. The destination data point in the system is represented by a three-letter code used by EOIR to identify facilities, but EOIR also uses three-letter codes to identify immigration courts. We identified 66 codes that could be either an immigration court or a specific facility, potentially affecting 16 percent of the federal cases in the EOIR dataset. EOIR confirmed to the OIG that, if a proceeding in its dataset included a federal, state, or municipal IHRP value, the vast majority (94 percent) of the IHRP values accurately reflected the proceeding's IHRP status at that time. In addition, the absence of an IHRP value would provide a similarly accurate indication that the proceeding was not an IHRP case at that point in time. To address this issue, EOIR informed us that it is developing a new methodology for calculating its quarterly performance reports that does not utilize data from the destination data point. In October 2019, EOIR told us that the new methodology will be used for the next quarterly performance report, in FY 2020.

---

[41] EOIR uses these five categories of decisions in its annual Statistics Yearbooks to report the number of completed IHRP cases.

[42] EOIR advised us to remove any proceedings involving a "zero bond" decision (to consider releasing a noncitizen upon the payment of a bond) by an Immigration Judge because these proceedings are separate from removal proceedings. In 75 instances, the proceeding with a zero bond decision was the only proceeding that represented the case in the dataset.

The OIG provided ICE a list of alien numbers and IHRP inmate names from the EOIR dataset for FY 2013 through the first 3 quarters of FY 2019. ICE provided the OIG with a dataset that included the alien number, IHRP inmate name, IHRP facility, final order date, "book in" date, and "book out" date. The OIG cleaned the data, deleted duplicates, and verified the final order dates with our EOIR dataset and BOP data. The dataset included a total of 4,022 IHRP participants.

## Policy and Document Review

We reviewed legislation, laws, and regulations related to the IHRP and immigration, as well as BOP and EOIR policy, procedures, and guidance related to the IHRP from its inception through the expansion. We reviewed DOJ and DHS memoranda, press releases, and other documents related to the expansion. We reviewed Alien Incarceration Reports (reports issued jointly by DOJ and DHS). We also reviewed past and current iterations of the Memorandum of Understanding between the BOP, EOIR, ICE, and the USCIS, which outlines each agency's role in the IHRP.

## Email Review

To augment the information we obtained in interviews with current and former ODAG staff, ODAG staff suggested that we review their emails prior to and through the time of the announcement of the IHRP expansion. Our search parameters included all email and calendar data from January 1 through April 30, 2017, from the accounts of 12 ODAG and Office of the Attorney General employees. To increase the likelihood of receiving records that were relevant to this report, we reviewed records that included 1 or more of 24 IHRP-related key words. This data gave us specific information about when ODAG and the Office of the Attorney General became involved in the expansion, the officials from these offices that were involved, and the extent to which they were involved.

# Appendix 2: IHRP Expansion Press Release

JUSTICE NEWS

**Department of Justice**

Office of Public Affairs

FOR IMMEDIATE RELEASE Thursday, March 30, 2017

## Attorney General Sessions Announces Expansion and Modernization of Program to Deport Criminal Aliens Housed in Federal Correctional Facilities

Attorney General Jeff Sessions today announced the expansion and modernization of the Department's Institutional Hearing Program (IHP).

The IHP identifies removable criminal aliens who are inmates in federal correctional facilities, provides in-person and video teleconference (VTC) immigration removal proceedings, and removes the alien upon completion of sentence, rather than releasing the alien to an ICE detention facility or into the community for adjudication of status. Bringing an Immigration Judge to the inmate for a determination of removability, rather than vice versa, saves time and resources and speeds hearings.

The program is coordinated by the Department of Justice's Executive Office for Immigration Review (EOIR), the Bureau of Prisons (BOP) and Immigration and Customs Enforcement (ICE).

"We owe it to the American people to ensure that illegal aliens who have been convicted of crimes and are serving time in our federal prisons are expeditiously removed from our country as the law requires," said Attorney General Sessions. "This expansion and modernization of the Institutional Hearing Program gives us the tools to continue making Americans safe again in their communities."

The expansion and modernization of the IHP program will occur in the following three ways:

1. ICE, BOP, and EOIR will expand the number of active facilities with the program to a total of 14 BOP and 6 BOP contract facilities;

2. EOIR and BOP will increase each facility's VTC capabilities and update existing infrastructure to aid in the ability to conduct removal proceedings; and

3. EOIR and ICE will finalize a new and uniform intake policy. EOIR and ICE expect to have reached agreement on this new intake process by April 6, 2017.

These improvements will speed the process of deporting incarcerated criminal aliens and will reduce costs to taxpayers.

**Component(s):**
Office of the Attorney General

**Press Release Number:**
17-340

*Updated March 30, 2017*

# Appendix 3: BOP IHRP Guidance with Updated IHRP Assignments for SENTRY

## IHP Guidance

Definitions:

**IHP PEND** – This assignment applies only to inmates who have been determined by ICE to require an IHP hearing before an Administrative Judge and are not currently at a hearing site.

**IHP PART** – This assignment applies only to inmates who require an IHP hearing, as determined by ICE, and are at an active IHP hearing site.

**IHP COMPLT** – This assignment applies only to inmates who have completed an IHP Hearing, and an Administrative Judge made a determination. The decision to deport or not deport has no impact on an assignment of IHP COMPLT, as DETN Y/N will denote this decision. All inmates who participate in and complete an administrative hearing at an IHP site will have a CMA assignment of IHP COMPLT.

**NO IHP HRG** – This assignment applies to inmates do not require an IHP hearing, as determined by ICE. This also applies if a deportation order from ICE exists, or if ICE has determined the inmate will not be deported.

**IHP INTRVW** – Applies to inmates who need to be interviewed by ICE for a hearing determination. If the inmate's immigration status is unknown, this assignment applies. Inmates with an ICE Detainer or Notify order not indicating a final order of removal should be placed in this assignment.

The signature authority (the entity making the final determination of deportation), despite whether the inmate will be removed, determines the IHP assignment.

- If the signature authority is ICE, **NO IHP HRG** is the only applicable CMA assignment.
- If an immigration/administrative judge is/will be the final authority, CMA assignments of **IHP PEND**, **IHP PART**, and **IHP COMPLT** may apply.
- **IHP INTRVW** is considered a short-term assignment, and should be changed upon receipt of disposition following the ICE interview.

In order to determine IHP status, review the following documentation:

**PPG0** – If 337d is after March 1, 2017 (follow Attachment A chart)
**Deportation Order** – differs from INS Detainer or Notify. Signature authority of the deportation order will determine IHP assignment.
**INS Detainer** – Requires IHP Interview (**IHP INTRVW**), unless a final order of removal is noted. If the inmate is to be deported, the CMA assignment should be **NO IHP HRG**.
If no documentation is located, **IHP INTRVW** is appropriate.

# Appendix 4: IHRP Facilities

Table 2

IHRP Facilities, Pre- and Post-Expansion, BOP and Contract

| Type of Facility | Facility Name and Location | IHRP Facility as of May 2021 |
|---|---|---|
| *Pre-Expansion* | Low Security Correctional Institution Allenwood, Pennsylvania | √ |
| | Federal Correctional Institution (FCI) Allenwood, Pennsylvania | √ |
| | U.S. Penitentiary (USP) Allenwood, Pennsylvania | √ |
| | FCI La Tuna, Texas | √ |
| | FCI Aliceville (female), Alabama | √ |
| | FCI Dublin (female), California | √ |
| | Adams County Correctional Center, Mississippi | X |
| | Big Spring Correctional Center (Cedar Hill and Flightline), Texas | √ |
| | D. Ray James Correctional Center, Georgia | X |
| | Giles W. Dalby Correctional Center, Texas | √ |
| | Moshannon Valley Correctional Center, Pennsylvania | X |
| | Reeves Detention Centers I&II and III, Texas | √ |
| *Post-Expansion* | FCI Oakdale 2, Louisiana | √ |
| | FCI Pollock, Louisiana | √ |
| | USP Pollock, Louisiana | √ |
| | Federal Detention Center SeaTac, Washington | √ |
| | USP Victorville, California | √ |
| | FCI Victorville I, California | √ |
| | FCI Victorville II, California | √ |
| | FCI Waseca (female), Minnesota | √ |
| | Taft Correctional Institution, California | X |
| Total Number of IHRP Facilities as of May 2021 | | 17 |

Source: IHRP program documents

# Appendix 5: IHRP Eligibility Process

Figure 6

IHRP Eligibility Process Flow Chart




Note: A Notice to Appear (NTA) is a legal document summoning a person to appear before an Immigration Judge.

Source: OIG analysis of IHRP program documents

# Appendix 6: IHRP Removal Proceedings

Figure 7

IHRP Removal Proceedings Flow Chart




Note: A Notice to Appear (NTA) is a legal document summoning a person to appear before an Immigration Judge.

Source: OIG analysis of IHRP program documents

# Appendix 7: EOIR Immigration Courts That Process IHRP Cases

Arizona
- Eloy
- Florence
- Phoenix
- Tucson

California
- Adelanto
- Imperial
- Los Angeles North
- Los Angeles, Van Nuys
- San Diego
- San Francisco

Colorado
- Denver

Connecticut
- Hartford

Florida
- Miami

Georgia
- Atlanta
- Stewart

Illinois
- Chicago

Kansas
- Kansas City

Louisiana
- La Salle
- Oakdale

Maryland
- Baltimore

Massachusetts
- Boston

Michigan
- Detroit

Minnesota
- Fort Snelling

Nebraska
- Omaha

Nevada
- Las Vegas

New Jersey
- Elizabeth
- Newark

New York
- Fishkill
- Ulster

North Carolina
- Charlotte

Ohio
- Cleveland

Oregon
- Portland

Pennsylvania
- York

Puerto Rico
- San Juan

Texas
- Dallas
- El Paso
- Houston
- San Antonio

Utah
- Salt Lake City

Virginia
- Arlington

Washington
- Seattle

# Appendix 8: IHRP Facility Locations

Figure 8

Map of Pre- and Post-Expansion IHRP Facilities as of May 2021




Notes: CC=Correctional Center; FDC=Federal Detention Center; FCI=Federal Correctional Institution; LSCI=Low Security Correctional Institution; USP=U.S. Penitentiary. Pre-expansion facilities are in black, and post-expansion facilities are in blue. Reeves I&II is one facility built in two phases.

Source: OIG analysis

# Appendix 9: DOJ Response to the Draft Report

**U.S. Department of Justice**

Justice Management Division

*Washington, D.C. 20530*

MEMORANDUM

| | |
|---|---|
| TO: | René Rocque Lee<br>Assistant Inspector General<br>Evaluation and Inspections Division |
| FROM: | Lee J. Lofthus<br>Assistant Attorney General<br>for Administration<br>Lee Lofthus Date: 2021.09.16 13:15:11 -04'00' |
| SUBJECT: | Management Response Letter to the DOJ IG's formal draft report A-2018-007 entitled *Review of the Institutional Hearing and Removal Program Expansion for Federal Inmates* |

The Department of Justice (the Department or DOJ) has reviewed the recommendation contained in the Inspector General's report entitled, *Review of the Institutional Hearing and Removal Program Expansion for Federal Inmates* A-2018-007 released on September 1, 2021. The Department is pleased to provide its response to the recommendation.

**Recommendation 1:** Develop performance metrics to assess the effect of the Institutional Hearing and Removal Program expansion and assess the program itself, including the roles and responsibilities each agency will have related to performance metrics, data collection, and evaluation.

**Response**: The Bureau of Prisons (BOP) and the Executive Office for Immigration Review (EOIR) concur with the recommendation. The following are actions taken and planned in furtherance of the recommendation. BOP generated a roster of approximately 20,000 non-U.S. citizens to be vetted by Immigration and Customs Enforcement (ICE) to determine proper inmate placement in the Institutional Hearing and Removal Program (IHRP). Once vetted by ICE, the BOP will make updates, if necessary, to Case Management Assignments (CMA) in SENTRY. This will ensure accurate IHRP CMA assignments have been entered into SENTRY.

When assignments have been corrected, an updated roster will be sent to EOIR. This roster will list inmates who are designated to an IHRP site and are participating (IHP PART) in the program and inmates who require a transfer (IHP PEND) to an IHRP site for participation in the program. This roster will be shared with ICE and EOIR on at least a quarterly basis. Accurate

counts will enable BOP, ICE, and EOIR to establish reliable populations to conduct viable performance analyses. Once analyses have been conducted, the agencies can work to establish metrics that best represent the desired performance (and establish baselines and/or future performance targets). Based on current conditions and subject to change due to unforeseen circumstances causing delay, the estimated completion date for these actions is early 2023.

If you have any questions, please do not hesitate to contact me on 202-514-3101.

# Appendix 10: OIG Analysis of DOJ's Response to the Draft Report

The OIG provided a draft of this report to the BOP and EOIR for comment. The Department provided a joint response, which is included in Appendix 9 to this report. The OIG's analysis of the joint response and the actions necessary to close the recommendation are discussed below.

## Recommendation 1

Develop performance metrics to assess the effect of the Institutional Hearing and Removal Program expansion and assess the program itself, including the roles and responsibilities each agency will have related to performance metrics, data collection, and evaluation.

**Status:** Resolved.

**DOJ Response:** The BOP and EOIR concurred with the recommendation. The Department stated that the BOP has generated a roster of approximately 20,000 non-U.S. citizens in the BOP population, which will be provided to ICE to vet and determine proper inmate placement in the IHRP. Once ICE makes the determinations for placement, the BOP will make updates, if necessary, to the Case Management Assignments (CMA) for these inmates in SENTRY, which will ensure that accurate IHRP CMA assignments have been entered into SENTRY. When assignments have been corrected, an updated roster will be sent to EOIR and will list inmates who are designated to an IHRP site and participating in the program (IHP PART), as well as inmates who require a transfer to an IHRP site for participation in the program (IHP PEND). The BOP will share the roster with ICE and EOIR on at least a quarterly basis. The Department stated that accurate counts will enable the BOP, ICE, and EOIR to establish reliable populations to conduct viable performance analyses. Once analyses have been conducted, the agencies can work to establish metrics that best represent the desired performance (and establish baselines and/or future performance targets). The Department estimated that these actions would be completed in early 2023.

**OIG Analysis:** The BOP and EOIR's planned actions are responsive to the recommendation. By January 10, 2022, please provide an update on the vetting and IHRP determinations of the approximately 20,000 noncitizens in the BOP population and the CMA updates required as a result of the vetting. Additionally, please describe any actions taken to establish performance metrics, including defining the roles and responsibilities of each agency related to the performance metrics, data collection, and evaluation.

# Exhibit 9

# Primer



# Loss Calculation Under §2B1.1

Prepared by the
Office of the General Counsel

# DISCLAIMER

The Commission's legal staff publishes this document to assist in understanding and applying the sentencing guidelines. The information in this document should not be considered definitive or comprehensive. In addition, the information in this document does not necessarily represent the official position of the Commission on any particular issue or case, and it is not binding on the Commission, the courts, or the parties in any case. To the extent this document includes unpublished cases, practitioners should be cognizant of Fed. R. App. P. 32.1, as well as any corresponding rules in their jurisdictions.

Want to learn more about relevant statutes, case law, and guidelines on a specific topic? The Commission's legal staff offers a series of primers to assist in understanding and applying the sentencing guidelines on the following topics—

- Aggravating and Mitigating Role Adjustments
- Antitrust Offenses
- Categorical Approach
- Offenses Involving Commercial Sex Acts and Sexual Exploitation of Minors
- Computer Crimes
- Crime Victims' Rights
- Criminal History
- Departures and Variances
- Drug Offenses
- Economic Crime Victims
- Fines for Organizations
- Firearms Offenses
- Immigration Offenses
- Intellectual Property Offenses
- Loss Calculation under §2B1.1
- Relevant Conduct
- Retroactive Guideline Amendments
- RICO Offenses
- Robbery Offenses
- Selected Offenses Against the Person and VICAR
- Sexual Abuse and Failure to Register Offenses
- Supervised Release

Learn more at https://www.ussc.gov/guidelines/primers.

**UNITED STATES SENTENCING COMMISSION**
One Columbus Circle, N.E.
Suite 2-500, South Lobby
Washington, DC 20002-8002
T: (202) 502-4500
F: (202) 502-4699
www.ussc.gov || @theusscgov

*This document was produced and published at U.S. taxpayer expense.*

# TABLE OF CONTENTS

I. INTRODUCTION ..... 1
II. OVERVIEW OF LOSS CALCULATION ..... 1
A. Actual Loss ..... 3
B. Intended Loss ..... 5
1. Generally ..... 5
2. Specific Factual Circumstances ..... 6
a. Credit card theft ..... 7
b. Fraudulent checks ..... 8
c. Government programs and benefits ..... 8
d. Insurance ..... 9
e. Real property ..... 9
3. "Impossible or Unlikely" Loss ..... 9
C. Loss Calculations and the 18 U.S.C. § 3553(a) Factors ..... 9
III. GAIN AS ALTERNATIVE MEASURE ..... 10
IV. ESTIMATING LOSS ..... 10
A. Generally ..... 10
B. Relevant Factors ..... 13
1. Fair Market Value ..... 13
2. Development Costs ..... 14
3. Cost of Repairs ..... 15
4. Number of Victims Multiplied by Loss ..... 15
5. Reduction in Value of Securities ..... 16
C. Special Rules ..... 16
1. Stolen or Counterfeit Credit Cards and Access Devices ..... 16
2. Government Benefits ..... 17
3. Davis-Bacon Act Violations ..... 19
4. Ponzi and Other Fraudulent Schemes ..... 19
5. Certain Other Unlawful Misrepresentation Schemes ..... 20
6. Value of Controlled Substances ..... 21
7. Value of Cultural Heritage Resources or Paleontological Resources ..... 21
8. Federal Health Care Offenses Involving Government Health Care Programs ..... 21
V. EXCLUSIONS FROM LOSS ..... 22
A. Interest, Finance Charges, Late Fees, Penalties and Similar Costs ..... 22
B. Costs to the Government and Costs Incurred by Victims ..... 22

VI. CREDITS AGAINST LOSS ..... 23
A. Money and Property Returned/Services Rendered ..... 23
B. Collateral ..... 25

## I. INTRODUCTION

This primer discusses common issues regarding loss calculation under §2B1.1(b)(1), which provides for offense level increases based on the amount of loss involved in the offense.[1] Although the primer identifies some of the key cases and concepts relating to loss calculation, it is not a comprehensive compilation of authority nor intended to be a substitute for independent research and analysis of primary sources.

## II. OVERVIEW OF LOSS CALCULATION

As a general rule, the guidelines define "loss" as "the greater of actual loss or intended loss."[2] This loss amount may be reduced by certain credits.[3] For certain offense types, "special rules" for loss calculation apply,[4] and credits against the loss amount may not be available.[5] In all cases, certain items are excluded from the calculation of loss, including interest of any kind.[6]

The court "need only make a reasonable estimate of the loss."[7] The estimate should be based on available information, and the court may consider a variety of different factors.[8] Notably, loss calculation is distinct from restitution, and the amounts may not be the same.[9]

---

1 *See* U.S. SENT'G COMM'N, GUIDELINES MANUAL §2B1.1(b)(1) (Nov. 2024) [hereinafter USSG].

2 USSG §2B1.1(b)(1)(Note A). Amendment 827 moved this instruction from Application Note 3(A) to the guideline to address a circuit conflict regarding whether intended loss was ever a permissible measure of loss. *See* USSG App. C, amend. 827 (effective Nov. 1. 2024). The Third Circuit had held that the term "loss" in §2B1.1 is unambiguous, meaning only "actual loss," and that Application Note 3(A), which included both "actual loss" and "intended loss," impermissibly expanded the guideline under the analysis set forth in *Kisor v. Wilkie*, 588 U.S. 558 (2019). United States v. Banks, 55 F.4th 246, 255–59 (3d Cir. 2022). The other circuits to address the question "uniformly applied the general rule in Application Note 3(A)." USSG App. C, amend. 827 (effective Nov. 1. 2024)*; see, e.g.*, United States v. Boler, 115 F.4th 316, 327 (4th Cir. 2024) (concluding that the term "loss" is "genuinely ambiguous," the commentary defining the term "falls 'within the bounds of reasonable interpretation,' " and the "character and context of the commentary entitle it to controlling weight"). The amendment sought "[t]o ensure consistent loss calculation across circuits." USSG App. C, amend. 827 (effective Nov. 1. 2024).

3 USSG §2B1.1, comment. (n.3(D)).

4 USSG §2B1.1, comment. (n.3(E)); *see also* USSG §2B1.1, comment. (n.3(A)) (outlining "Rules of Construction in Certain Cases").

5 *See, e.g.*, USSG §2B1.1, comment. (n.3(E)(v)) ("no credit provided for the value of . . . items or services" provided in certain unlawful misrepresentation schemes).

6 USSG §2B1.1, comment. (n.3(C)).

7 USSG §2B1.1, comment. (n.3(B)); *see also* United States v. Sullivan, 765 F.3d 712, 716 (7th Cir. 2014) (absolute accuracy is not required as long as the calculation is not "outside the realm of permissible computations" (quoting United States v. Jackson, 25 F.3d 327, 330 (6th Cir. 1994))).

8 *See* USSG §2B1.1, comment. (n.3(B)).

9 *See, e.g.*, United States v. Dadyan, 76 F.4th 955, 959 (9th Cir. 2023) ("There is no categorical rule that restitution must be equal to or less than the amount of loss found when applying Sentencing Guidelines

Loss is calculated based on all relevant conduct and is not limited to losses directly attributable to the instant offense.[10] Courts have aggregated the loss amount from multiple victims of the same offense when calculating the guideline range because the loss amount represents the different harms faced by each victim.[11] For example, where a defendant was convicted of defrauding Medicare but also had defrauded private insurers and patients under the same fraud scheme, the sentencing court properly included the losses not only to the Medicare program but also to private insurers and patients in its loss calculation.[12]

Under relevant conduct rules, certain losses caused by the acts of others also should be included in the loss calculation.[13] Losses caused by others may only be attributed to the defendant if they were reasonably foreseeable and within the scope of the criminal activity that the defendant "agreed to jointly undertake."[14] A court may be reversed if there are

§2B1.1(b)(1) or similar loss-based Guidelines sections."), *cert. denied sub nom.* Dadyan petitioners v. United States, 144 S. Ct. 1040 (2024); United States v. Kuhrt, 788 F.3d 403, 423 (5th Cir. 2015) (rejecting defendant's argument that the government's inability to calculate restitution demonstrates that total loss also cannot be determined because they are "wholly distinct questions"); *see also* United States v. Certified Env't Serv., 753 F.3d 72, 102–03 (2d Cir. 2014) (reversing, *inter alia*, because district court conflated loss and restitution; emphasizing distinctions between these concepts).

[10] *See* USSG §1B1.3 (Relevant Conduct (Factors that Determine the Guideline Range)); United States Cornelsen, 893 F.3d 1086, 1089–90 (8th Cir. 2018) (district court did not clearly err in including uncharged conduct in loss calculation).

[11] *See, e.g.*, United States v. Johnson, 79 F.4th 684, 709 (6th Cir. 2023) (district court did not improperly double count by counting the loss to the Department of Housing and Urban Development and to the IRS from the defendant's federal program theft and tax offenses because the harms were to two distinct entities).

[12] United States v. Hoffman-Vaile, 568 F.3d 1335, 1343–44 (11th Cir. 2009).

[13] *See* USSG §1B1.3(a)(1)(B) (defining relevant conduct for jointly undertaken activity). Numerous cases have examined when losses caused by other people's acts qualify as relevant conduct that may be included in the loss calculation. *See, e.g.*, United States v. Igboba, 964 F.3d 501, 510 (6th Cir. 2020) (ultimately concluding that all losses were attributable to the defendant himself); United States v. Moran, 778 F.3d 942, 973–75 (11th Cir. 2015) (district court did not clearly err by finding that defendants were responsible for losses caused by co-conspirators); United States v. Robinson, 603 F.3d 230, 234 (3d Cir. 2010) (same); *see also* United States v. Offill, 666 F.3d 168, 180 (4th Cir. 2011) (applying same principle to financial gain imputed to defendant in conspiracy).

[14] USSG §1B1.3, comment. (n.3(B), (D)); *see, e.g.*, United States v. Ahmed, 51 F.4th 12, 23–24 (1st Cir. 2022) (district court did not err in including overbilling for clinical services in loss calculation, in addition to defendant-interpreter's overbilling for interpreting services, because defendant "knew or should have known that the providers could only seek reimbursement for interpreter services in the same units of time as . . . for the counseling services," and so it was reasonably foreseeable that providers would overbill for both (quotations omitted)); United States v. Lloyd, 807 F.3d 1128, 1142, 1145 (9th Cir. 2015) (in securities fraud case, reversing judgment attributing loss from California telemarketing boiler room to defendant managing Florida boiler room because defendant did not design overall scheme, did not pool resources, and was compensated from commissions from only his operation); United States v. Rodriguez, 751 F.3d 1244, 1256–57 (11th Cir. 2014) (defendant in mortgage scheme was properly attributed with losses associated with fraudulent use of her post office box because she "participated in the conspiracy and did not withdraw from it" and moreover because "rerouting the mail was essential to the success of the fraudulent scheme"); *see also* United States v. Sykes, 774 F.3d 1145, 1150–52 (7th Cir. 2014) (analyzing concept of foreseeability in detail).

insufficient findings on this point.[15] Given the focus on foreseeability, a medical biller who processes each bill in a healthcare fraud scheme, for example, may be held accountable for more losses than a physician in the conspiracy who was unable to foresee the full extent of the conspiracy.[16]

## A. Actual Loss

Actual loss, which is often referred to as "but for" loss, is defined as "the reasonably foreseeable pecuniary harm that resulted from the offense."[17] A loss enhancement may apply even where a defendant personally received no pecuniary gain.[18] Pecuniary harm is reasonably foreseeable if it is "harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense."[19] All reasonably foreseeable losses that flow directly, or indirectly, from a defendant's conduct should be included in the loss calculation. For example, where a defendant committed mortgage fraud by fraudulently misrepresenting information about her job and income to lenders who she knew were likely to sell the loans to secondary lenders, the court held the defendant caused the banks at issue to assume a risk of default, and the loss of unpaid principal on each loan was reasonably foreseeable.[20]

One of the most commonly litigated issues concerning actual loss is whether the harm was, in fact, "reasonably foreseeable." In determining whether loss is reasonably foreseeable, courts have found that the actual loss must have a causal link to the

[15] *See, e.g.*, United States v. McClatchey, 316 F.3d 1122, 1128 (10th Cir. 2003) (emphasizing distinction between involvement in conspiracy and scope of jointly undertaken activity); United States v. Treadwell, 593 F.3d 990, 1002 (9th Cir. 2010) ("[A] district court may not automatically hold an individual defendant responsible for losses attributable to the entire conspiracy, but rather must identify the loss that fell within the scope of the defendant's agreement with his co-conspirators and was reasonably foreseeable to the defendant."), *overruled on other grounds by* United States v. Miller, 953 F.3d 1095 (9th Cir. 2020).

[16] *See* United States v. Barnes, 979 F.3d 283, 317 (5th Cir. 2020); *see also* United States v. Grady, 18 F.4th 1275, 1292 (11th Cir. 2021) (the district court did not err in holding defendant accountable for entire loss amount arising from co-defendants' action in vandalizing naval base where evidence showed the defendant helped plan the group's actions for over two years and the defendant went to the naval base with the group knowing they were armed with various tools).

[17] USSG §2B1.1(b)(1)(Note C(i)); *see also* United States v. Stein, 964 F.3d 1313, 1319–22 (11th Cir. 2020) (affirming district court's loss calculation based on government expert's testimony establishing investor reliance on defendant's fraudulent information, which satisfied "but for" causation requirement).

[18] *See, e.g.*, United States v. Ledee, 772 F.3d 21, 38 (1st Cir. 2014) (explaining that there is no requirement of personal gain as a condition of enhancement under §2B1.1(b)(1)).

[19] USSG §2B1.1(b)(1)(Note (C)(iv)); *see also, e.g.*, United States v. Domnenko, 763 F.3d 768, 775–76 (7th Cir. 2014) (remanding for court to explain its reasoning in attributing loss that lender sustained on sale of home to defendants because there was "no evidence" that sellers were aware that the purchaser was "fictional"). A district court's determination of a loss (and sentence) higher than what a defendant proposed does not render a plea unknowing. United States v. Agarwal, 24 F.4th 886, 893 (3d Cir. 2022) (rejecting defendant's argument that his plea was unknowing because he could not have foreseen the losses that would be attributed to his computer fraud violations).

[20] United States v. Crowe, 735 F.3d 1229, 1240 (10th Cir. 2013).

defendant's conduct.[21] In one case, a defendant was convicted of converting funds from employees' paychecks that were intended for medical benefits and of making false statements related to those employees' health benefits.[22] The "actual loss" was calculated using the total amount of unpaid medical claims made by the employees.[23] However, the Seventh Circuit reversed because the trial court stated on the record that there was no causal link between the defendant's misstatements about benefits and the losses caused by the medical claims in the case.[24] Similarly, the Sixth Circuit found that loan losses could not properly be attributed to the defendant where there was no reasonable link between the fraud committed by the defendant during the construction of a building and the subsequent default on a construction loan.[25]

The reasonable foreseeability issue has received particular attention in the context of mortgage fraud. For example, the Eighth Circuit has rejected arguments that defendants could not have "reasonably foreseen" the downturn in the housing market.[26] In one frequently cited case, the defendant obtained numerous mortgage loans through applications overstating the named purchaser's net worth and income, leading to default and subsequent foreclosure.[27] The district court calculated the actual loss as the difference between the unpaid principal balance of the twelve mortgages and the subsequent sale price of the properties.[28] Although the defendant argued that the government failed to prove that the loss amount was fully attributable to him, as opposed to normal market conditions, the Eighth Circuit held that "[t]he appropriate test is not whether market factors impacted the amount of loss, but whether the market factors and the resulting loss were reasonably foreseeable."[29] Several other circuits also have rejected arguments that a defendant's loss amount should be reduced because the downturn in the housing market

21 *See, e.g.*, United States v. Whiting, 471 F.3d 792, 802 (7th Cir. 2006); United States v. Rothwell, 387 F.3d 579, 584 (6th Cir. 2004).

22 *Whiting*, 471 F.3d at 793.

23 *Id.* at 802.

24 *Id.*

25 *Rothwell*, 387 F.3d at 584; *see also* United States v. Isaacson, 752 F.3d 1291, 1305–07 (11th Cir. 2014) (remanding because government failed to establish that fraudulent valuations caused losing investment); United States v. Stein, 846 F.3d 1135, 1154 (11th Cir. 2017) (remanding because government failed to prove that investors relied upon fraudulent information).

26 *See* United States v. Mshihiri, 816 F.3d 997, 1011 (8th Cir. 2016) ("[W]e have recognized that it was reasonably foreseeable that a scheme premised on false loan applications and inflated real estate prices would unravel, and that market conditions could exacerbate the losses." (quotations, alteration, and citation omitted)).

27 United States v. McKanry, 628 F.3d 1010, 1014–15 (8th Cir. 2011).

28 *Id.* at 1019.

29 *Id.*

was unforeseeable, holding instead that the foreseeability analysis applies only to the calculation of loss of the unpaid principal and not to the future value of collateral.[30]

In a case involving investment losses, the Eighth Circuit similarly has refused to reduce actual losses by "legitimate market factors and business expenses," explaining that the net-loss analysis required by §2B1.1 involves whether the defendant transferred something of value to the victim, not whether the victim's total losses were affected by market forces.[31] The Eighth Circuit held that the district court did not commit clear error in estimating the losses resulting from defendant's fraud offenses by calculating the total amounts lost by all investors who submitted Victim Impact Statements.[32]

## B. INTENDED LOSS

### 1. *Generally*

The guidelines define intended loss as "the pecuniary harm that the defendant purposely sought to inflict."[33] The defendant's subjective intent is relevant to the intended loss inquiry.[34]

Intended loss includes "intended pecuniary harm that would have been impossible or unlikely to occur."[35] For example, intended loss would include pecuniary harm that a defendant intended, but could not have actually caused, in a case involving a government sting operation or insurance fraud in which the claim exceeded the insured value.[36] There is no requirement that the court calculate actual loss before relying on intended loss;

---

30 *See, e.g.*, United States v. Cavallo, 790 F.3d 1202, 1235–36 (11th Cir. 2015) ("The sentencing guidelines, therefore, require foreseeability of the loss of the unpaid principal, but do not require foreseeability with respect to the future value of the collateral." (quoting United States v. Wendlandt, 714 F.3d 388, 394 (6th Cir. 2013) (quotation marks omitted))); United States v. Morris, 744 F.3d 1373, 1375 & n.1 (9th Cir. 2014) (collecting cases); *accord* United States v. Foley, 783 F.3d 7, 24 n.14 (1st Cir. 2015) (noting in passing that other circuits do not apply a foreseeability analysis to the calculation of credits against loss). *But see* United States v. Evans, 744 F.3d 1192, 1197–98 (10th Cir. 2014) (distinguishing the scenario in which victims were sold real estate securities "whose value necessarily fluctuated" as opposed to being "simply promised loan payments"). *See also infra* Section VI.B (discussing collateral in context of mortgage and loan losses).

31 United States v. Walker, 818 F.3d 416, 422–23 (8th Cir. 2016).

32 *Id.* at 423.

33 USSG §2B1.1(b)(1)(Note (C)(ii)(I)).

34 USSG App. C, amend. 792 (effective Nov. 1, 2015). Prior to the amendment, courts had differed as to whether the intended loss amount was based on the defendant's subjective intent or on an objective standard. *Id.*; *see also* United States v. Carrasquillo-Vilches, 33 F.4th 36, 41–44 (1st Cir. 2022) (discussing standard before and after the amendment and affirming loss amount because, even though the PSR referenced both standards, "the record amply support[ed] the finding that the defendant subjectively intended to inflict at least" the lowest loss amount required for the enhancement imposed).

35 USSG §2B1.1(b)(1)(Note (C)(ii)(II)).

36 *Id.*

indeed, in some cases, it may be easier "as a matter of proof" to calculate intended loss.[37] However, actual losses, or losses actually completed before discovery, are included in any calculation of intended loss.[38] That is, the categories are not mutually exclusive and may be combined to calculate an overall intended loss.[39]

Courts have considered what the loss would have been if the defendant had not been caught.[40] For example, in a case related to government disability benefits, the Eighth Circuit held that the district court's calculation of loss based on finding that the defendant intended to collect disability benefits through the age of 62, the age she would qualify for retirement, was not clearly erroneous.[41] The Eighth Circuit held that "a district court may reasonably conclude that the defendant intended continued receipt of illegal benefits until retirement without additional *mens rea* evidence."[42]

### 2. *Specific Factual Circumstances*

Determining intended loss is often a fact-specific inquiry.[43] A court's determination of whether to calculate intended loss at the full face value of the property at issue or some lesser amount often turns on whether the defendant intended to jeopardize, or in fact

37 United States v. Thurston, 358 F.3d 51, 68 (1st Cir. 2004), *vacated on other grounds,* 543 U.S. 1097 (2005).

38 *See* United States v. Sesay, 937 F.3d 1146, 1153 (8th Cir. 2019) ("Intended loss . . . includes actual losses suffered."); United States v. Carboni, 204 F.3d 39, 47 (2d Cir. 2000) (district court correctly combined the actual loss from defendant's misrepresentations with potential loss stemming from a particular misrepresentation).

39 *Sesay*, 937 F.3d at 1153.

40 United States v. Frisch, 704 F.3d 541, 544 (8th Cir. 2013); *see also* United States v. Elizondo, 21 F.4th 453, 473–75 (7th Cir. 2021) (where police officers who were the subject of a sting investigation properly inventoried and did not take any cash, it was not clear error to consider full $15,000 of planted money as loss amount because evidence indicated that they would have taken full amount if they had not been on surveillance cameras).

41 United States v. Lemons, 792 F.3d 941, 950 (8th Cir. 2015) (also rejecting defendant's argument that court should use actual loss incurred); *see also* United States v. Vargas, 21 F.4th 332, 337 (5th Cir. 2021) ("[I]t was not clear and obvious error for the court to infer that [the defendant] intended to receive benefits to which he was not legally entitled for as long as he could.").

42 *Lemons*, 729 F.3d at 950 (quotations and citation omitted) (finding, however, that there was additional evidence to support the court's finding that the defendant intended to continue receiving benefits through retirement, including statements in reports filed with the Social Security Administration and three appeals of cessation of benefits); *see also* United States v. Rettenberger, 344 F.3d 702, 708 (7th Cir. 2003) (finding that the district judge properly assumed the defendant would have continued faking his disability until the age at which most insurance policies' would end, without any evidence beyond the terms of the policies and the general facts of the case). *But see* United States v. Peel, 595 F.3d 763, 772 (7th Cir. 2010) (noting that if a defendant "present[ed] credible evidence for discounting a stream of future payments to [a lower future] value, the district court must consider [that evidence]").

43 *See, e.g.*, United States v. Ainabe, 938 F.3d 685, 692 (5th Cir. 2019) ("[T]he appropriate method of calculating the amount of intended loss is determined by the facts of the case.").

recklessly jeopardized, the full amount of the property.[44] Thus, for example, the Eleventh Circuit agreed that intended loss amounts varied in health care fraud cases depending on whether specific defendants were aware of reimbursement details: for those defendants with such awareness, the intended loss was the lower reimbursable amount; for the defendant *without* such knowledge, the intended loss was a higher, billed rate.[45] While the analysis is fact-specific, certain schemes and claims are particularly common, and some of these situations are discussed below.

### a. Credit card theft

In a case in which a defendant sold stolen credit cards to others, the sentencing judge fixed the intended loss at the total credit limits of all of the credit cards.[46] In upholding the sentencing court's decision, the First Circuit concluded that the defendant reasonably could expect such a loss as "the natural and probable consequences of his or her actions."[47] In another case, the defendant fraudulently opened credit accounts at local businesses in the names of victims.[48] The court calculated intended loss by totaling the credit limits of all open accounts even though the defendant had not used all of the available credit.[49] Similarly, in a case where the defendant unsuccessfully attempted to obtain cash advances from stolen credit cards, the court held that the total amount the defendant attempted to withdraw was the appropriate intended loss figure, even where it exceeded the cash advance limits.[50]

In fact, some circuits have concluded that simply obtaining information regarding a credit account creates a presumption that the entire credit limit was targeted, which must be rebutted by the defendant.[51] Conversely, at least one circuit has held that where the

---

44 *See, e.g.*, United States v. Harris, 597 F.3d 242, 256–59 (5th Cir. 2010) (district court properly sentenced defendant based on the aggregate credit limit of the credit cards that she recklessly jeopardized by selling to third parties).

45 United States v. Moran, 778 F.3d 942, 974–75 (11th Cir. 2015). *But see* United States v. Moss, 34 F.4th 1176, 1190–92 (11th Cir. 2022) (district court did not clearly err by considering the $6.7 billed amount, rather than the $2.5 million reimbursed amount, because, despite defendant's arguments that he knew the reimbursement schedule, other evidence demonstrated defendant sought to get the "maximum possible payments from Medicare and the full benefit from any of its schedule increases").

46 United States v. Alli, 444 F.3d 34, 38–39 (1st Cir. 2006); *see also Harris*, 597 F.3d at 252–53 (looking to whether the defendant "recklessly jeopardized" the full credit card limits by selling the card numbers to a third party).

47 *Alli*, 444 F.3d at 38.

48 United States v. Wilfong, 475 F.3d 1214, 1216 (10th Cir. 2007).

49 *Id.* at 1217.

50 United States v. Ravelo, 370 F.3d 266, 272–73 (2d Cir. 2004).

51 United States v. John, 597 F.3d 263, 280–81 (5th Cir. 2010), *abrogated on other grounds by* Van Buren v. United States, 593 U.S. 374 (2021).

defendant did not know the credit limit, the burden remains with the government to demonstrate what portion of the credit limit the defendant intended to use.[52]

### b. Fraudulent checks

In cases involving fraudulent or forged checks, courts often use the face value of the instruments to calculate the intended loss figure.[53] Courts have treated the face amount of the checks as prima facie evidence of the defendant's intent but allow the defendant to offer evidence to rebut that figure.[54] If, however, the defendant does not provide sufficient evidence to rebut intent, courts may accept the loss figure taken from the face value of the instruments.[55]

### c. Government programs and benefits

Full value also has been used to measure loss in fraud cases involving government benefits and programs. For example, the Eleventh Circuit held that the sentencing judge did not clearly err by considering the full value of all fraudulent applications for FEMA relief filed by the defendant even though she had not attempted to obtain all available funds from each application.[56] Similarly, the Seventh Circuit held that the intended loss was the full amount of loan commitments a defendant secured from the Small Business Administration because, although the defendant did not receive the full amount, that sum was diverted from the intended recipients.[57]

---

52 *See* United States v. Manatau, 647 F.3d 1048 (10th Cir. 2011) (construing loss and intended loss in this context).

53 *See, e.g.*, United States v. Skouteris, 51 F.4th 658, 671–72 (6th Cir. 2022) (district court did not clearly err by using full face value of forged checks even though actual loss suffered by victims was less; the Sixth Circuit has "repeatedly blessed intended loss calculations based on the face value of a fraudulently deposited check"); United States v. Grant, 431 F.3d 760, 762 (11th Cir. 2005) ("The other circuits to address this issue have held a district court does not clearly err when it uses the full face value of a check to calculate intended loss.").

54 *See* United States v. Santos, 527 F.3d 1003, 1008 (9th Cir. 2008) (agreeing with the Third and Eleventh Circuits that the face value of the stolen checks is "probative" of the defendants' intended loss but holding that court must also consider any evidence tending to show that defendant did not intend to produce counterfeit checks up to the full face value of the stolen checks).

55 *See* United States v. Adejumo, 772 F.3d 513, 527 (8th Cir. 2014) (basing intended loss on face value of stolen checks, even though many were photocopies that could not be negotiated, when defendant "presented no contrary evidence that he did not intend to use the full face value of the checks").

56 United States v. Willis, 560 F.3d 1246, 1250–51 (11th Cir. 2009) (per curiam) (reasoning that because the defendant exhibited a pattern of applying for funds beyond FEMA's automatic disbursement on some applications, it was reasonable to infer intent to pursue additional funds on the remaining applications).

57 United States v. Kosth, 257 F.3d 712, 722 (7th Cir. 2001); *see also* United States v. Conroy, 567 F.3d 174, 179–80 (5th Cir. 2009) (per curiam) (where the defendant asked for $70,000 in a fraudulent grant application, but was approved for $100,000, the appropriate intended loss was the higher value); *infra* Section IV.C.2.

#### d. Insurance

In insurance fraud cases, the First Circuit has held that "it is appropriate for the loss-computation method to distinguish between a fraudster who wholly fabricates a non-existent claim and a fraudster who artificially inflates a legitimate claim."[58] Thus, as in other contexts, the loss amount should not include the amount the insurance company would have paid absent the fraud.[59]

#### e. Real property

The Fifth Circuit has concluded that unless the defendant was "so 'consciously indifferent or reckless' about the repayment of the loans as to impute to him the intention that the lenders should not recoup their loans," intended loss is typically not the appropriate measure of loss because the real property serves as collateral and will be recoverable should the owner default.[60]

### *3. "Impossible or Unlikely" Loss*

The definition of intended loss instructs courts to include intended harm that would have been "impossible or unlikely to occur."[61] The sentencing judge nonetheless might consider the impossibility of the loss in considering the reasonableness of the sentence.[62]

## C. Loss Calculations and the 18 U.S.C. § 3553(a) Factors

At least one circuit has explored the application of the 18 U.S.C. § 3553(a) factors to the calculation of loss.[63] The sentencing judge concluded that the calculation of loss in the presentence report was "too speculative" and found a guideline loss of zero, but then "set the guidelines aside because we are outside the heartland" and sentenced the defendant to five years—an upward variance of over three years above the applicable guideline range.[64] On appeal, the Ninth Circuit emphasized that "the district court's consideration of the large potential loss that could result . . . was not unreasonable" and that "the potential loss to the

[58] United States v. Alphas, 785 F.3d 775, 780–84 (1st Cir. 2015).

[59] *Id.*

[60] United States v. Goss, 549 F.3d 1013, 1018 (5th Cir. 2008) (quoting United States v. Morrow, 177 F.3d 272, 301 (5th Cir. 1999)); *see also infra* Section VI.B.

[61] USSG §2B1.1(b)(1)(Note (C)(ii)(II)); *see also* United States v. Moss, 34 F.4th 1176, 1192 (11th Cir. 2022) ("As we've said several times now, intended loss includes even loss and harm that is unlikely to occur.").

[62] *See* United States v. McBride, 362 F.3d 360, 374, 376 (6th Cir. 2004) ("[T]here is surely some point at which a perpetrator's misperception of the facts may become so irrational that the words 'intended loss' can no longer reasonably apply.").

[63] United States v. Hilgers, 560 F.3d 944, 947–48 (9th Cir. 2009).

[64] *Id.* at 946–47 (emphasis omitted).

victims" was an important section 3553(a) factor.[65] Other courts also have suggested that a proper review of the section 3553(a) factors includes consideration of the loss caused by the defendant.[66]

## III. GAIN AS ALTERNATIVE MEASURE

The guidelines instruct the court to "use the gain that resulted from the offense as an alternative measure of loss only if there is a loss but it reasonably cannot be determined."[67] Courts cannot use gain "as a proxy for each defendant's culpability" and must properly calculate loss when possible but consider gain as an option if loss cannot be determined.[68] A court cannot sentence based on gain, however, if there is "no loss," as opposed to an incalculable loss.[69]

## IV. ESTIMATING LOSS

### A. GENERALLY

As discussed above, the court "need only make a reasonable estimate of the loss."[70] Courts make this estimate using available information, and the sentencing judge is "entitled

65 *Id.* at 947–48.

66 *See, e.g.*, United States v. Corsey, 723 F.3d 366, 377 (2d Cir. 2013) (per curiam) (remanding case with a very large intended loss amount but "low risk that any actual loss would result"); United States v. Edwards, 595 F.3d 1004, 1010, 1018 (9th Cir. 2010) (upholding a probationary sentence below the guideline range of 27–33 months as substantively reasonable in a fraud case where the sentencing judge stated that the guideline range calculated using intended loss "overstated the circumstances" of the defendant's case); United States v. Livesay, 587 F.3d 1274, 1278–79 (11th Cir. 2009) ("A sentence of probation for a high-ranking officer in a corporation where over a billion dollars of fraud was perpetrated . . . is not reasonable" under the factors listed in § 3553(a) (emphasis omitted)).

67 USSG §2B1.1(b)(1)(Note (B)); *see also, e.g.*, United States v. Jimenez, 946 F.3d 8, 14 (1st Cir. 2019) ("[H]ere the gain to the homeowners serves as a good economic proxy for loss: what the owners did not pay, the banks did not receive."). The recently promulgated amendment to §2B1.1 moved the rule providing for the use of gain as an alternative measure of loss from the commentary to the new Notes to §2B1.1(b)(1). *See* USSG App. C, amend. 827 (effective Nov. 1. 2024).

68 United States v. Gallant, 537 F.3d 1202, 1240 (10th Cir. 2008); *see also* United States v. Vrdolyak, 593 F.3d 676, 681 (7th Cir. 2010) (a sentencing judge's refusal to consider gain as an alternative measure in a case where a "probable" but difficult to calculate loss exists is reversible error); United States v. Armstead, 552 F.3d 769, 778 (9th Cir. 2008) (gain can be used as a "proxy for a portion of the total loss where some, but not all, of the loss can be determined" (emphasis omitted)).

69 *See* USSG §2B1.1(b)(1)(Note (B)); *see also* United States v. Bazantes, 978 F.3d 1227, 1250–51 (11th Cir. 2020) (vacating sentences because the §2B1.1(b)(1) loss enhancement was erroneously applied based on gain even though there was no loss).

70 USSG §2B1.1, comment. (n.3(B)); *see also, e.g.*, United States v. Melgen, 967 F.3d 1250, 1265 (11th Cir. 2020) ("[T]he district court need only reach a reasonable estimate of loss.").

to appropriate deference" because of the court's unique position to assess the evidence.[71] The government must prove the loss attributable to the defendant by a preponderance of the evidence and the factual findings supporting a sentencing judge's loss calculation are reviewed by the appellate courts under a clear error standard.[72] The loss calculation *method*, however, is reviewed *de novo*.[73] Some circuits have held that a sentencing court does not commit "clear error" when a loss calculation is supported by the presumptively reasonable facts from the presentence report and the defendant fails to rebut those facts.[74]

Although the guidelines are advisory, a sentencing judge still must make factual findings as to the amount of loss and a "reasonable estimate" of loss to satisfy evidentiary requirements. A court's failure to do so will render a loss calculation invalid.[75] However, courts have held that when procedural errors in loss calculation do not affect the sentence, there is no clear error.[76]

---

[71] USSG §2B1.1, comment. (n.3(B)); *see also* United States v. Moss, 34 F.4th 1176, 1190 (11th Cir. 2022); United States v. Comstock, 974 F.3d 551, 558–59 (5th Cir. 2020).

[72] *See, e.g.*, United States v. Nicolescu, 17 F.4th 706, 721–22 (6th Cir. 2021) (the district court's findings are reviewed "under a deferential clear-error standard" and the district court "need only make a reasonable estimate of the loss using a preponderance of the evidence standard" (citation omitted)); United States v. Cavallo, 790 F.3d 1202, 1232 (11th Cir. 2015) (same); United States v. McKanry, 628 F.3d 1010, 1019 (8th Cir. 2011) (same).

[73] *See, e.g.*, United States v. Alfaro, 30 F.4th 514, 518–19 (5th Cir. 2022) ("We review the district court's loss calculations for clear error, but the district court's method of determining loss, as well as its interpretations of the Guidelines, are reviewed *de novo*."); United States v. Iwuala, 789 F.3d 1, 12 (1st Cir. 2015) (method review *de novo*).

[74] *See, e.g.*, United States v. Chalker, 966 F.3d 1177, 1194 (11th Cir. 2020) ("The district court can base its loss determination on factual findings derived from, among other things, evidence heard during trial, undisputed statements in the PSI, or evidence presented during the sentencing hearing." (quotations and citation omitted)); *see also* United States v. Vargas, 21 F.4th 332, 336–37 (5th Cir. 2021) (district court did not clearly err by adopting the loss amount in the PSR that "went entirely unchallenged").

[75] *See* United States v. Newton, 76 F.4th 662, 674 (7th Cir. 2023) (loss calculation was clearly erroneous where "only speculation can support the district court's starting presumption that 90% of Medicare reimbursements . . . were fraudulent"); United States v. Burns, 843 F.3d 679, 688–89 (7th Cir. 2016) (the district court committed plain error by enhancing sentence based on a loss amount without making specific factual findings); United States v. Warshak, 631 F.3d 266, 329–30 (6th Cir. 2010) (remanding where the district court's explanation of its loss determination was inadequate); United States v. Hall, 610 F.3d 727, 745 (D.C. Cir. 2010) (remanding for resentencing where the district court provided no reason for finding loss in excess of one million dollars); United States v. Gupta, 572 F.3d 878, 889 (11th Cir. 2009) (reversing loss calculation where the sentencing judge "pick[ed] a figure . . . about half way in between" two competing estimates without giving any non-arbitrary reason therefor); United States v. Medina, 485 F.3d 1291, 1304–05 (11th Cir. 2007) ("[T]he district court clearly erred when it did not make specific factual findings upon which to base the loss amounts attributable to each individual defendant.").

[76] *See, e.g.*, United States v. Karie, 976 F.3d 800, 804–05 (8th Cir. 2020) (noting that any error in the loss calculation would be harmless where the same level loss enhancement would apply regardless of the specific loss amount); United States v. Belfrey, 928 F.3d 746, 751 (8th Cir. 2019) (any error in calculating loss was harmless where district court stated that whether loss was $18 million or $4 million, it would not affect the sentence because the guideline range was higher than the sentence the court deemed appropriate).

In keeping with these principles, courts have applied a wide range of approaches to estimate loss. For example, in bankruptcy fraud cases, courts have used both the amount sought to be discharged and the amount concealed from the bankruptcy court.[77] In a case in which defendants induced homeowners to refinance their homes to pay for renovations that the defendants did not perform, the loss was estimated by totaling the gross income from the refinance jobs above a certain price level and deducting labor and material costs.[78] In a case where the defendant fraudulently registered vehicles to avoid state tax, the combined lost sales tax for each of the vehicles—charged and uncharged—was a reasonable estimate of loss to the state.[79]

The sentencing judge may consider a wider variety of evidence to calculate loss. For example, courts have relied upon:

- hearsay testimony of a corporate investigator based on information provided by an informant;[80]
- cash deposits made into the defendant's account in a case involving multiple cash thefts;[81]
- the defendant's own trial testimony;[82] and
- statistical extrapolation based on a representative sample.[83]

A defendant who challenges a district court's loss calculation carries a heavy burden and must show that the calculation was not just inaccurate, but "outside the realm of

77 *See* United States v. Yurek, 925 F.3d 423, 442–43 (10th Cir. 2019) (affirming loss calculation based on the amount defendant was trying to discharge in bankruptcy and collecting circuit cases discussing different approaches in bankruptcy fraud cases).

78 United States v. Sullivan, 765 F.3d 712, 716 (7th Cir. 2014).

79 United States v. Harmon, 944 F.3d 734, 736–38 (8th Cir. 2019).

80 United States v. Bogdanov, 863 F.3d 630, 634–35 (7th Cir. 2017).

81 United States v. Hahn, 551 F.3d 977, 980–81 (10th Cir. 2008).

82 United States v. Norman, 776 F.3d 67, 79–80 (2d Cir. 2015).

83 *See* United States v. Alfaro, 30 F.4th 514, 519 (5th Cir. 2022) (affirming the district court's use of an extrapolation method in an investment fraud case involving many investors and citing past circuit cases "affirm[ing] that method to calculate loss amounts in other fraud cases"); United States v. Matheny, 42 F.4th 837, 845 (8th Cir. 2022) (district court did not clearly err by extrapolating loss amount from a one-month review period within a four-year fraud scheme because, "[e]specially where the defendant's scheme encompassed many fraudulent acts over a long period of time, extrapolating from a representative sample may yield 'a reasonable estimate,' " and noting that the specific sample in this case may have been skewed in defendant's favor); United States v. Annamalai, 939 F.3d 1216, 1235–37 (11th Cir. 2019) (affirming loss figure that assumed all credit card disputes were related to fraudulent activity based on evidence that related to a portion of those disputes, and collecting cases "approv[ing] of statistical extrapolation or sampling to determine a reasonable estimate of loss").

permissible computations."[84] The sentencing judge also may choose among viable competing methods.[85]

## B. RELEVANT FACTORS

As noted above, the loss estimate must be based on available information, considering various factors that are "appropriate and practicable under the circumstances."[86] The sentencing judge can consider general factors in estimating loss, "such as the scope and duration of the offense and revenues generated by similar operations."[87] Specific factors to consider also are set forth in the application notes, some of which are discussed below.

### 1. *Fair Market Value*

The first factor that courts may consider is "[t]he fair market value of the property unlawfully taken, copied, or destroyed; or, if the fair market value is impracticable to determine or inadequately measures the harm, the cost to the victim of replacing that property."[88]

Although only a reasonable estimate of loss is required, courts must "utilize a 'realistic, economic approach' " when determining fair market value.[89] Fair market value of certain services, such as insurance coverage, can be determined by their cost or premium value.[90] Fair market value of items that have a wholesale or retail value are typically determined on a case-by-case basis. For example, the Ninth Circuit has found that the loss should be the wholesale value of the stolen items where the true owner intended to sell the

---

84 *See* United States v. Nicolescu, 17 F.4th 706, 720 (6th Cir. 2021) ("In challenging the court's loss calculation, [the defendant] must carry the heavy burden of persuading this Court that the evaluation of loss was not only inaccurate, but also outside the realm of permissible computations." (citation omitted)); United States v. Elizondo, 21 F.4th 453, 473 (7th Cir. 2021) (same); *see also* United States v. Lewis, 594 F.3d 1270, 1289 (10th Cir. 2010) (a defendant must provide "substantial ground for rejecting the district court's determination that the evidence used by the government was reliable").

85 *See* United States v. Campbell, 765 F.3d 1291, 1304 (11th Cir. 2014) (rejecting defendant's argument that the court was required to examine itemized proof of individualized fraudulent transactions; emphasizing fact-specific nature of proof); United States v. McMillan, 600 F.3d 434, 458–59 (5th Cir. 2010) (when the sentencing court has contradictory and "hotly contested" testimony and evidence regarding loss, the appellate court cannot conclude that the sentencing court committed clear error in selecting one or the other theory).

86 USSG §2B1.1, comment. (n.3(B)).

87 USSG §2B1.1, comment. (n.3(B)(vi)).

88 USSG §2B1.1, comment. (n.3(B)(i)).

89 United States v. Ritchey, 117 F.4th 762, 766–67 (5th Cir. 2024) (citation omitted) (vacating and remanding the sentence of a defendant who sold personal protective equipment to the Department of Veterans Affairs at an inflated price where the district court calculated fair market value based on pre-pandemic prices rather than the actual acquisition cost paid by the defendant during the pandemic).

90 United States v. Simpson, 538 F.3d 459, 463 (6th Cir. 2008).

items at such prices.[91] In contrast, when the items in question were taken from retailers, courts have reasoned that "the price at which the retailers would have sold that merchandise serves as a reasonable estimate of the loss."[92] Courts must determine the intended victims and the market in which the goods would be sold to determine whether it is appropriate to measure loss using wholesale value or retail value.[93]

When loss may fluctuate, sentencing judges have determined "fair market value" on the date the fraud occurred or ceased.[94] There is "no error in selecting the end of the conspiracy as an appropriate date from which to calculate loss."[95]

As noted above, replacement costs also can be used to make a loss estimate where "fair market value is impracticable to determine or inadequately measures the harm."[96] For example, the Eleventh Circuit determined that actual cash value was inadequate to measure the harm caused by burning down a church; instead, it relied on replacement cost as the "only effective way to return to the victims the fair equivalent of what they lost."[97]

### *2. Development Costs*

In the case of theft of trade secrets or other proprietary information, it is often difficult to estimate fair market value, in which case "the cost of developing that information or the reduction in the value of that information" may be used.[98] However, the government still must prove that the development costs are either an appropriate

---

91 United States v. Hardy, 289 F.3d 608, 613–14 (9th Cir. 2002).

92 United States v. Wasz, 450 F.3d 720, 727 (7th Cir. 2006) (collecting cases from different circuits).

93 United States v. Qazah, 810 F.3d 879, 888–90 (4th Cir. 2015) (vacating and remanding sentence based on loss amount calculated at retail value because district court did not adequately gather facts to determine, for example, whether intended victim was only a large cigarette wholesaler or also included retailers); United States v. Lige, 635 F.3d 668, 671–72 (5th Cir. 2011) (affirming district court's use of retail prices of stolen phones rather than wholesale prices because the providers offered the phones for sale in the retail market).

94 United States v. Harris, 83 F.4th 1093, 1098–99 (8th Cir. 2023) (vacating sentence based on loss amount calculated using the fair market value of properties at the time of sentencing instead of at the time of the offense); United States v. Bae, 250 F.3d 774, 776–77 (D.C. Cir. 2001) ("[F]or the purpose of sentencing, the loss associated with . . . fraudulent procurement is equal to the value of the goods at the time of the offense."); United States v. Hart, 273 F.3d 363, 374 (3d Cir. 2001) (upholding decision to calculate loss at the time fraud ceased and rejecting defendant's argument that victim could have mitigated losses by selling at a later date).

95 *Hart*, 273 F.3d at 374.

96 USSG §2B1.1, comment. (n.3(B)(i)); *see also* United States v. Howard, 887 F.3d 1072, 1077 & n.1 (10th Cir. 2018) (collecting cases using replacement value as proper measure in the context of determining loss for purposes of the Mandatory Victims Restitution Act).

97 United States v. Shugart, 176 F.3d 1373, 1375 (11th Cir. 1999).

98 USSG §2B1.1, comment. (n.3(B)(ii)); *cf.* United States v. Howley, 707 F.3d 575, 582–83 (6th Cir. 2013) (clear error for the sentencing court to find the value of stolen trade secrets was zero, when it cost $520,000 to develop those secrets).

measure of actual loss[99] or that the defendant intended that amount of loss.[100] Courts have also used "hypothetical lost profits to estimate the intended loss from a company targeted for attempted trade-secret theft."[101]

### *3. Cost of Repairs*

The cost of repairing damaged property also can be used to estimate loss.[102] Improvements to property can be included in loss if they are necessary to repair the damage caused by a defendant. For example, the Fifth Circuit concluded that improvements made to a victim company's computer system after a hacker broke in could be included in the loss figure as necessary repair costs.[103]

Some estimated repair costs are specific to certain offenses. For example, the Tenth Circuit applied special provisions relating to the Archaeological Resources Protection Act to determine "repair costs" to damaged Native American sites on federal lands.[104]

### *4. Number of Victims Multiplied by Loss*

It is appropriate for the sentencing judge to take an average loss per victim and multiply it by the approximate number of victims to generate a total loss figure in cases where specific losses for individual victims are not easily calculated.[105] Victim is defined as "any person who sustained any part of the actual loss" or "any individual who sustained bodily injury as a result of the offense."[106] For example, in a credit card fraud case, the sentencing judge estimated intended loss based on the average credit card limit multiplied by the number of cards used.[107] Further, such an estimation can include victims who are

---

99 *See* United States v. Snowden, 806 F.3d 1030, 1033–34 (10th Cir. 2015) (explaining that it is inappropriate to use costs of development as actual loss where evidence in the record indicated that the company suffered no business losses, but affirming as harmless error).

100 United States v. Pu, 814 F.3d 818, 824–27 (7th Cir. 2016) (clear error to base loss amount on development costs where there was no evidence in record of whether defendant intended any loss).

101 *See* United States v. Xu, 114 F.4th 829, 846 (6th Cir. 2024).

102 USSG §2B1.1, comment. (n.3(B)(iii)).

103 United States v. Lindsley, No. 99-11164, 2001 WL 502832, at *3–4 (5th Cir. May 3, 2001) (per curiam) (the security improvements "were the only means available to prevent continued intrusion into [the victim's] computer systems caused by the defendants' activities").

104 United States v. Shumway, 112 F.3d 1413, 1424–26 (10th Cir. 1997); *see also* United States v. Christianson, 586 F.3d 532, 535–37 (7th Cir. 2009) (loss was properly calculated as the cost of replacing a government experiment that defendants destroyed by cutting down trees that were experiments' subjects).

105 USSG §2B1.1, comment. (n.3(B)(iv)); *see, e.g.*, United States v. Showalter, 569 F.3d 1150, 1161 (9th Cir. 2009) (noting that Application Note 3 to §2B1.1 allows the court to estimate loss based on multiplying the average loss by the approximate number of victims); United States v. Abiodun, 536 F.3d 162, 167–68 (2d Cir. 2008) (same).

106 USSG §2B1.1, comment. (n.1).

107 United States v. Mei, 315 F.3d 788, 792 (7th Cir. 2003).

not aware they have been defrauded or even those who "relay[] their satisfaction with [the] fraudulent treatment."[108]

### *5. Reduction in Value of Securities*

The reduction in "value of equity securities or other corporate assets" due to the offense may be considered in the estimate of loss.[109] The guidelines provide for use of a "modified rescissory method"[110] as one possible method to calculate actual loss in securities and commodities fraud cases, though courts may use "any method that is appropriate and practicable under the circumstances."[111] Under this method, courts calculate the difference between the average price of the security or commodity during the period that the fraud occurred and the average price of the security or commodity during the 90-day period after the fraud was disclosed to market, then to multiply that difference by the number of shares outstanding.[112] "In determining whether the amount . . . is a reasonable estimate of the actual loss . . . , the court may consider, among other factors, the extent to which the [calculation] includes significant changes in value not resulting from the offense . . . . "[113] Examples of changes that might affect share prices include "changed economic circumstances, changed investor expectations, and new industry-specific or firm-specific facts, conditions, or events."[114]

## C. SPECIAL RULES

### *1. Stolen or Counterfeit Credit Cards and Access Devices*

"In a case involving any counterfeit access device or unauthorized access device, loss includes any unauthorized charges made with the counterfeit access device or unauthorized access device and shall be not less than $500 per access device."[115] If,

---

108 United States v. Curran, 525 F.3d 74, 80 (1st Cir. 2008).

109 USSG §2B1.1, comment. (n.3(B)(v)).

110 *See* USSG App. C, amend. 761 (effective Nov. 1, 2012). The modified rescissory method looks at the difference between the average price of the stock during the period that the fraud occurred and the average stock price during a set period after the fraud was disclosed; the difference between these two average prices is the loss. By averaging the stock price during these periods, the modified rescissory method takes into account factors other than the fraud, such as overall growth or decline in the price of the stock. *See, e.g.*, United States v. Brown, 595 F.3d 498, 523–27 (3d Cir. 2010).

111 USSG §2B1.1, comment. (n.3(E)(ix)).

112 *Id.*

113 *Id.*

114 *Id.*

115 USSG §2B1.1, comment. (n.3(E)(i)). However, the Sixth Circuit has held that where the special rule in Application Note 3(F)(i) provides that loss cannot be less than $500 per access device, it impermissibly expands the word "loss" as used in the guideline text at §2B1.1(b)(1) and is not entitled to deference. *See* United States v. Riccardi, 989 F.3d 476, 483 (6th Cir. 2021). The Ninth Circuit has reached a similar result

however, the unauthorized access device is a means of telecommunications access identifying a specific instrument or account and was only possessed (not used), the loss assessed shall not be less than $100 per unused means.[116] Courts that continue to apply the special rule have generally agreed that the $500 minimum per access device applies if the device was possessed but not used[117] and regardless of whether it is *usable*—that is, currently or potentially functional.[118]

### 2. Government Benefits

In cases "involving government benefits (*e.g.*, grants, loans, entitlement program payments)," loss should not be less than "the value of the benefits obtained by unintended recipients or diverted to unintended uses."[119] A sentencing judge may use the face value of the claims for government benefits as the starting point in calculating loss, and the burden of production then shifts to the defendant to offer evidence showing which claims were for legitimate amounts.[120] The final amount of loss should be determined based on the amount the government, which continues to hold the ultimate burden of proof, is able to establish.[121]

A sentencing judge should not calculate loss based on the total amount of benefits received if a portion of those benefits would have been received absent the fraud.[122] For example, the Sixth Circuit reasoned that the loss derived by a defendant's fraudulent application for and use of federal grant funds was calculated "by subtracting the amount

---

to the Sixth Circuit. *See* United States v. Kirilyuk, 29 F.4th 1128, 1137 (9th Cir. 2022) ("The question here is simple: Is [the] 'special rule' for calculating loss by using a minimum $500-per-card multiplier consistent with the plain meaning of "loss"? We hold that it is not."). *But see* United States v. Johnson, 104 F.4th 662, 666–67 (7th Cir. 2024) (the "$500-per-card minimum" rule in "is entitled to controlling weight" as the note "is not inconsistent with or a plainly erroneous reading of §2B1.1").

116 USSG §2B1.1, comment. (n.3(E)(i)).

117 *See, e.g.*, United States v. Rueda, 933 F.3d 6, 10 (1st Cir. 2019) (provisions of special rule apply "regardless of whether each access device was actually charged" (emphasis omitted)); United States v. Thomas, 841 F.3d 760, 764 (8th Cir. 2016) (special rule "may be applied to fraudulent cards which have been merely possessed rather than used"); United States v. Moore, 788 F.3d 693, 695 (7th Cir. 2015) (stolen cards need not have been used for special rule to apply).

118 *See Rueda*, 933 F.3d at 9–10 (special rule applied to each counterfeit or unauthorized access device, without additional proof that the device "can be used"); United States v. Carver, 916 F.3d 398, 403 (4th Cir. 2019) (rejecting a usability standard); United States v. Popovski, 872 F.3d 552, 554 (7th Cir. 2017) ("The district judge therefore was entitled to rely on the rule . . . without requiring card-by-card proof of functionality while the scheme was in operation.").

119 USSG §2B1.1, comment. (n.3(E)(ii)).

120 United States v. Rivera-Ortiz, 14 F.4th 91, 103 (1st Cir. 2021) (affirming the district court's use of the face value of the defendant's total benefits as the starting and end point for the loss calculation, where the government had produced payment history and beneficiary list evidence and the defendant had not put forth any additional evidence).

121 *Id.*

122 USSG §2B1.1, comment. (n.3(E)(ii)) ("For example, if the defendant was the intended recipient of food stamps having a value of $100 but fraudulently received food stamps having a value of $150, loss is $50.").

that the recipient *would have received* from the government if it had known of the fraud from the amount the recipient *actually received* from the government."[123] However, where the government shows the fraud to be "so extensive and pervasive that separating legitimate benefits from fraudulent ones is not reasonably practicable, the burden shifts to the defendant" to identify which benefits were legitimate.[124] Absent such a showing by the defendant, the district court may reasonably treat the entire claim as intended loss.[125]

Courts have disagreed about whether to apply this special rule where defendants have improperly received benefits pursuant to a set-aside or similar program that awards a certain percentage of government procurement contracts to socially or economically disadvantaged businesses. A number of courts have held that because the purpose of the programs is to benefit minority-owned or small businesses, they are effectively "benefits" and loss cannot be reduced by the value of services actually rendered.[126] More recently, the Third, Fifth, Sixth, and Ninth Circuits have disagreed, concluding that procurement fraud involving set-aside programs should be treated under the general rules for loss calculation like any other procurement fraud.[127]

For example, the Fifth Circuit explained that "[t]he mere fact that a government contract furthers some public policy objective apart from the government's procurement needs is not enough to transform the contract into a 'government benefit' akin to a grant or an entitlement program payment."[128] Similarly, the Ninth Circuit contrasted fraudulent procurement of set-aside contracts with benefits that unilaterally benefit the recipient, like food stamps, explaining that loss to the government should not be the full value of the

---

[123] United States v. Agrawal, 97 F.4th 421, 437 (6th Cir.), *cert. denied*, 145 S. Ct. 258 (2024); *see also* United States v. Catone, 769 F.3d 866, 876–77 (4th Cir. 2014) (construing the government benefits rule to require courts to distinguish between legitimate and illegitimate benefits in calculating loss; remanding because trial court failed to identify what, if any, portion of unemployment benefits could have been legitimately obtained).

[124] United States v. Hebron, 684 F.3d 554, 563 (5th Cir. 2012).

[125] *Id.*

[126] *See, e.g.*, United States v. Maxwell, 579 F.3d 1282, 1306 (11th Cir. 2009) (appropriate amount of loss is entire value of contracts that were diverted from the intended recipient); United States v. Leahy, 464 F.3d 773, 790 (7th Cir. 2006) (a municipal minority contracting program was a "government benefits" program under §2F1.1, §2B1.1's predecessor); United States v. Bros. Constr. Co. of Ohio, 219 F.3d 300, 317–18 (4th Cir. 2000) (fraudulent receipt of Disadvantaged Business Enterprise funds involved the diversion of "government benefits"). *But see* United States v. Near, 708 F. App'x 590, 603–04 (11th Cir. 2017) (per curiam) (no error in district court's decision not to apply government benefits rule where contracts were properly awarded to small business but some of the funds were diverted to unintended uses; "*Maxwell* does not speak to whether the value of services provided by an intended recipient can be credited against losses caused by that recipient's unintended use of funds. We are persuaded that such losses can be offset by the value of service provided.")

[127] United States v. Kousisis, 82 F.4th 230, 248 (3d Cir. 2023) ("[W]e now expressly hold that the government benefits rule . . . does not apply to [disadvantaged business enterprises ("DBE")] procurement fraud cases such as the one here."), *cert. granted*, 144 S. Ct. 2655 (2024); United States v. Kozerski, 969 F.3d 310, 313–14 (6th Cir. 2020); United States v. Harris, 821 F.3d 589, 602–04 (5th Cir. 2016); United States v. Martin, 796 F.3d 1101, 1110–11 (9th Cir. 2015).

[128] *Harris*, 821 F.3d at 604.

contracts where those contracts were fully or partially performed.[129] The Sixth Circuit cited to both the Fifth and Ninth Circuits in holding that the government benefits rule does not apply to the loss associated with a defendant's fraudulent procurement of set-aside contracts for veterans.[130]

The Third Circuit has held that regardless of whether loss is calculated under typical loss rules or under the government benefit rules, the appropriate measure of loss is the value of the contracts less the fair market value of the services rendered under those contracts.[131] In explaining its ruling, the court determined that where the government benefits rule applied, it was not inconsistent to also apply Application Note 3(D)(i), which requires that the fair market value of the property returned and services rendered be credited against the loss.[132]

### *3. Davis-Bacon Act Violations*

The loss involving a violation of the Davis-Bacon Act,[133] concerning the payment structure under employment contracts for government-funded projects, will be "not less than the difference between the legally required wages and actual wages paid."[134]

### *4. Ponzi and Other Fraudulent Schemes*

In a case involving a fraudulent investment scheme, "loss shall not be reduced by the money or the value of the property transferred to any individual investor in the scheme in

---

[129] *Martin*, 796 F.3d at 1109–12 (remanding and suggesting possible methods to consider loss, including potential premium paid by the government above what it would have paid in competitive bidding process, non-pecuniary harm to the integrity of the program, and harm to legitimate contractors that might otherwise have been awarded the contract).

[130] *Kozerski*, 969 F.3d at 313–14.

[131] United States v. Nagle, 803 F.3d 167, 179–183 (3d Cir. 2015) (loss calculation "is the face value of the contracts [the company] received minus the fair market value of the services they provided under the contracts" because the special rule supplants only the definition of "loss" and, therefore, under §2B1.1's instructions regarding credits against loss a loss reduction for services rendered is nonetheless required); *see also* United States v. Shulick, 18 F.4th 91, 114 (3d Cir. 2021) (holding that regardless of whether the defendant's management of school district budgeting was a "fee-for-service business deal" or a case involving government benefits, the proper loss amount was the difference between the face value of the contracts and the value of services the defendant actually provided).

[132] *Nagle*, 803 F.3d at 179–83. The Seventh Circuit is the only circuit to apply Application Note 3(E)(v) (relating to, among other things, cases where regulatory approval by a government agency is obtained by fraud) in this context. *See infra* Section IV.C.5 (citing United States v. Giovenco, 773 F.3d 866, 870–71 (7th Cir. 2014)).

[133] 40 U.S.C. § 3142; 18 U.S.C. § 1001.

[134] USSG §2B1.1, comment. (n.3(E)(iii)); *see also, e.g.*, United States v. Clark, 787 F.3d 451, 464–65 (7th Cir. 2015) (district court properly applied loss enhancement because defendant "caused" actual loss to employees by false statements regarding wages; government's ability to stop payments to subcontractors meant that defendant's lies caused "loss" within the meaning of the guidelines).

excess of that investor's principal investment."[135] For example, in Ponzi scheme cases, where payments routinely are made to some or all of the victims, the defendant will receive no credit for payments that exceeded the investor's principal investment.[136]

As discussed in Section V.A, losses, whether actual or intended, "shall not include . . . [i]nterest of any kind, finance charges, late fees, penalties, amounts based on an agreed-upon return or rate of return, or other similar costs."[137] In the context of a Ponzi scheme, however, courts have recognized a distinction between the general prohibition on interest and the earnings reinvested by victims of a Ponzi scheme. The Second Circuit joined the Eighth Circuit in holding that "a federal sentencing court can include as part of its 'intended loss' determination those earnings that victims reinvested in a Ponzi scheme, even though those 'earnings' were invented as part of the scheme itself."[138] The court noted that "[w]hen an investor in a Ponzi scheme faces the choice either to withdraw or to reinvest, the choice to reinvest—an act frequently necessary to maintain the scheme itself—transforms promised interest into realized gain that can be used in the computation of loss for the purposes of federal sentencing."[139] The court further stated, that, "[i]n such a case, only the most recent promised or reported interest gains are excluded from sentencing consideration as per the [g]uidelines' exclusion of interest or rates of return from the loss calculation."[140]

### *5. Certain Other Unlawful Misrepresentation Schemes*

When defendants falsely pose as licensed professionals, represent that products are approved by the government when they are not, fail to properly obtain approval for regulated goods, or fraudulently obtain approval for goods from the government, the loss shall include "the amount paid for the property, services or goods transferred, rendered, or misrepresented, with no credit provided for the value of those items or services."[141] For example, a defendant received no credit for the value of the misbranded prescription drugs he sold to victims even where there was no evidence that the drugs that were delivered did not perform as promised.[142] Nor will a defendant receive credit for legal services rendered

[135] USSG §2B1.1, comment. (n.3(E)(iv)).

[136] *See id.*; *see also* United States v. Snelling, 768 F.3d 509, 512–13 (6th Cir. 2014) (remanding case where district court failed to credit against loss amounts repaid that were *not* in excess of amounts invested). The Eighth Circuit has explained that the government "need not present direct evidence about the circumstances of each alleged victim" when a defendant "never contended that he accepted money for any purpose other than his fraudulent scheme." United States v. Hatchett, 622 F.3d 984, 987 (8th Cir. 2010).

[137] USSG §2B1.1, comment. (n.3(C)).

[138] United States v. Hsu, 669 F.3d 112, 120, 121 n.4 (2d Cir. 2012).

[139] *Id.* at 121.

[140] *Id.*

[141] USSG §2B1.1, comment. (n.3(E)(v)).

[142] United States v. Milstein, 401 F.3d 53, 74 (2d Cir. 2005) (per curiam).

where he or she falsely claimed to be a licensed attorney.[143] Similarly, the Seventh Circuit has held that Application Note 3(E)(v) applies to some circumstances in which defendants falsely claim qualifications to participate in set-aside programs.[144]

### *6. Value of Controlled Substances*

The loss in a case involving controlled substances is the estimated street value of the substances involved.[145]

### *7. Value of Cultural Heritage Resources or Paleontological Resources*

The value of a "cultural heritage resource" or "paleontological resource" shall include the archaeological value, the commercial value, or the cost of restoration.[146] The court "need only make a reasonable estimate of the value of the resource based on available information."[147]

### *8. Federal Health Care Offenses Involving Government Health Care Programs*

In federal health care fraud offenses involving a government health care program, "the aggregate dollar amount of fraudulent bills submitted to the Government health care program shall constitute prima facie evidence of the amount of the intended loss, *i.e.*, is evidence sufficient to establish the amount of the intended loss, if not rebutted."[148] However, objections to the loss amount alone do not constitute competent rebuttal

---

143 *See, e.g.*, United States v. Kieffer, 621 F.3d 825, 834 (8th Cir. 2010).

144 *See* United States v. Giovenco, 773 F.3d 866, 870–71 (7th Cir. 2014) (counting as loss entire amount improperly paid under contract without credit for services provided when defendants obtained contract based on false claims that they were a minority-owned business).

145 USSG §2B1.1, comment. (n.3(E)(vi)); *see also* United States v. Kumar, 112 F.4th 30, 36–39 (1st Cir. 2024) (affirming the district court's calculation of loss amount in a case involving conspiracy to smuggle misbranded drugs into the United States).

146 USSG §2B1.1, comment. (n.3(E)(vii)); USSG §2B1.5, comment. (n.2(A)); *see also* United States v. Shumway, 112 F.3d 1413, 1424–26 (10th Cir. 1997) (affirming the district court's calculation of loss based on testimony regarding the archeological value and cost of repair of archeological sites that the defendant unlawfully excavated).

147 USSG §2B1.5, comment. (n.2(B)); *see also* United States v. McCarty, 628 F.3d 284, 290–91 (6th Cir. 2010) (discussing commentary regarding the value of a cultural heritage resource in the context of stolen antique books).

148 USSG §2B1.1, comment. (n.3(E)(viii)).

evidence.[149] A defendant instead must put forth evidence of legitimate services rendered[150] or other specific evidence that a lower loss amount was intended.[151]

Courts have discounted the loss amount by the services rendered only if those services are medically necessary and otherwise in compliance with regulations.[152] For example, in a kickback scheme between a doctor and home healthcare agencies (HHAs), the services billed by the HHAs to Medicare were properly included in the overall loss amount attributed to the doctor, who had falsely certified the need for home healthcare for non-homebound patients, but the services the doctor provided that Medicare would have covered absent the fraud were excluded from the loss amount.[153]

## V. EXCLUSIONS FROM LOSS

### A. Interest, Finance Charges, Late Fees, Penalties and Similar Costs

The loss calculation excludes any interest, "finance charges, late fees, penalties, amounts based on an agreed-upon return or rate of return, or other similar costs."[154]

### B. Costs to the Government and Costs Incurred by Victims

In addition, the costs to the government and the costs incurred by victims to aid in the investigation and prosecution of a defendant are not included in any loss calculation.[155]

---

149 *See, e.g.*, United States v. Iwuala, 789 F.3d 1, 14–15 (1st Cir. 2015) ("[T]here is no evidence in this record that would have compelled the district court to find that the defendant knew that the amount billed was more than the scheduled amounts that Medicare routinely paid.").

150 *See* United States v. King, 93 F.4th 845, 852 (5th Cir. 2024) ("The government here proved by preponderance of the evidence that [the doctor's] entire operation was fraudulent [and] provided no legitimate medical care . . . . [The defendants], in contrast, failed to offer rebuttal evidence of any legitimate medical expenses billed to Medicare that should be set off from the $537,992.55 paid to [them] for 'treatment' provided."); United States v. Karie, 976 F.3d 800, 804 (8th Cir. 2020) (affirming loss calculation where defendant did not present evidence of legitimate daycare services); United States v. Bikundi, 926 F.3d 761, 797–98 (D.C. Cir. 2019) (per curiam) (affirming $80 million loss calculation because defendants "did not produce evidence of [legitimate] services with any specificity").

151 *Compare* United States v. Valdez, 726 F.3d 684, 696 (5th Cir. 2013) (district court committed error in failing to consider audiotape demonstrating that defendant anticipated being paid far less than what he billed to Medicaid), *with* United States v. Elliot, 600 F. App'x 225, 228–30 (5th Cir. 2015) (per curiam) (district court did not err in calculating loss at full amount billed where it considered, but did not find credible, defendant's evidence that he intended a lower loss amount).

152 *See, e.g.*, United States v. Hamilton, 37 F.4th 246, 264–66 (5th Cir. 2022).

153 *Id.*; *see also* United States v. Emordi, 959 F.3d 644, 652–53 (5th Cir. 2020) (defendant was not entitled to discount in loss amount because Medicare and Medicaid would not have paid for services rendered because defendant was excluded from working as a provider).

154 USSG §2B1.1, comment. (n.3(C)(i)).

155 USSG §2B1.1, comment. (n.3(C)(ii)); *see also* United States v. Schuster, 467 F.3d 614, 618–20 (7th Cir. 2006) (reversing loss figure that included such costs).

By contrast, costs incurred by a bank for investigating its own employee (the defendant) may be considered because the investigation was an "immediate response" to the defendant's conduct and was not conducted primarily to aid the government in prosecution.[156] Amounts reimbursed to victims by insurance companies are not excluded from loss because this "merely shifts the loss to another victim (the insurance company)."[157]

## VI. CREDITS AGAINST LOSS

### A. MONEY AND PROPERTY RETURNED/SERVICES RENDERED

Loss shall be reduced by "money returned, and the fair market value of the property returned and the services rendered, by the defendant or other persons acting jointly with the defendant, to the victim *before* the offense was detected."[158] Failure to credit such value may constitute reversible error.[159] However, where the fraud is so pervasive that it is not reasonably practicable to separate legitimate from fraudulent conduct, the burden shifts to the defendant to prove the legitimate amount.[160]

Detection of the offense occurs at "the earlier of (I) the time the offense was discovered by a victim or government agency; or (II) the time the defendant knew or reasonably should have known that the offense was detected or about to be detected by a victim or government agency."[161] Property returned after detection will not be credited

156 United States v. DeRosier, 501 F.3d 888, 895 (8th Cir. 2007); *see also* United States v. Levy, 18 F.4th 1019, 1022 (8th Cir. 2021) (district court did not err in including cost of hospital's "lookback" review of defendant's pathology cases in loss amount because it was conducted for the benefit of the business, not the criminal investigation, and would have been done regardless of whether there was a criminal investigation).

157 *See, e.g.*, United States v. Kitts, 27 F.4th 777, 789 (1st Cir. 2022) (quotations and citation omitted).

158 USSG §2B1.1, comment. (n.3(D)(i)) (emphasis added); *see also* United States. v. Campbell, 765 F.3d 1291, 1305 (11th Cir. 2014) (although court may be justified in treating all money transfers as loss when conduct is "permeated" with fraud, "value may be rendered even amid fraudulent conduct" and defendant appropriately received credit for such value (internal citation and punctuation omitted)); United States v. Klein, 543 F.3d 206, 214–15 (5th Cir. 2008) (district court erred by failing to offset loss to insurers by value of drugs that patients actually needed).

159 *See, e.g.*, United States v. Alphas, 785 F.3d 775, 784 (1st Cir. 2015) (remanding case to allow determination as to amounts, if any, that would have legitimately been paid for insurance claims that were artificially inflated but may have contained genuine claims; "void-for-fraud" clauses in insurance policy did not change analysis and "intended loss").

160 *See, e.g.*, United States v. Hess, 106 F.4th 1011, 1027–28 (10th Cir. 2024) (outlining the burden-shifting framework but explaining it did not apply in the instant case because there was no finding that the evidence upon which the offset calculation was based was unreliable nor that certain services were not rendered); United States v. Mazkouri, 945 F.3d 293, 304 (5th Cir. 2019) (rejecting defendant's argument that some of the billings to Medicare were not fraudulent without specific evidence); *Alphas*, 785 F.3d at 784.

161 USSG §2B1.1, comment. (n.3(D)(i)).

against the loss figure.[162] For example, the Seventh Circuit upheld a sentencing judge's decision not to subtract the value of money returned after discovery of the offense, reasoning that "[p]ayments to victims after a fraudulent scheme may reflect a desire to avoid punishment and not genuine remorse for wrongdoing" and could "lead to perverse incentives."[163] Additionally, services rendered before discovery may not qualify for a credit against loss if the defendant was not authorized to provide or the beneficiaries were ineligible to receive those services.[164]

Timing is not the only consideration when determining whether a credit applies against the loss figure. For example, a personal injury lawyer received kickbacks from a chiropractor to whom he referred clients and argued at sentencing that the loss figure should be reduced by the "valuable free services" and legal fee reductions he provided the victim clients.[165] The court declined to adopt this approach because the lawyer routinely provided these services to all of his clients, not just those defrauded, and the "net detriment" to those victims was not lessened relative to the other clients.[166]

Courts also have found that a defendant is not entitled to a credit when the defendant's objective in repaying a victim is to perpetuate ongoing fraud. For example, the Eighth Circuit held that a defendant should receive no credit for amounts he had returned to a victim only to prevent discovery of his fraud.[167] The defendant had encouraged his cousin to allow him to invest his money in an organization that would supposedly provide substantial yields with little risks but instead appropriated the funds for his own use. Over several years, he returned about one-third of the money, but "only when repeatedly confronted with [the victim's] desperate medical needs or threats of legal action by third parties, either of which could have foreseeably led to discovery of the scheme."[168] Under the circumstances, the court concluded that the defendant should receive no credit because he had effectively intended to defraud his relatives of the entire amount invested.[169]

Additionally, a defendant's loss calculation is not reduced by costs incurred in defrauding victims. Thus, when a defendant engages in fraud to raise money for his

---

162 *See* United States v. Gordon, 37 F.4th 767, 775 (1st Cir. 2022) (defendant is not entitled to a credit for refunds to victims made after he received a demand letter from the state Attorney General's Office, which put him on notice that his offenses had been detected).

163 United States v. Gulzar, 92 F.4th 684, 687 (7th Cir. 2024).

164 *See supra* notes 149–50 and accompanying text (discussing loss calculation in the healthcare fraud context).

165 United States v. Hausmann, 345 F.3d 952, 959–60 (7th Cir. 2003).

166 *Id.* at 960.

167 United States v. Callaway, 762 F.3d 754, 759–60 (8th Cir. 2014).

168 *Id.* (payments to victim were "necessary to give [defendant's] scheme a veneer of legitimacy"); *see also* United States v. Stochel, 901 F.3d 883, 890–91 (7th Cir. 2018) (defendant not entitled to offset where he paid some funds towards genuine receivership expenses because they were made to conceal and "were essentially the cost of perpetuating the scheme").

169 *Callaway*, 762 F.3d at 760.

business operation, the portion of those funds used for business expenses cannot be credited against loss because nothing of value is conferred on the victims.[170]

## B. COLLATERAL

"In a case involving collateral pledged or otherwise provided by the defendant," loss will be reduced by "the amount the victim has recovered at the time of sentencing from disposition of the collateral, or if the collateral has not been disposed of by that time, the fair market value of the collateral at the time of sentencing."[171] In cases involving a mortgage loan where the property has not been disposed of by the time of sentencing, there is a "rebuttable presumption that the most recent tax assessment value of the collateral is a reasonable estimate of the fair market value."[172] However, where the property has been disposed, the loss amount remains the difference between the unpaid principal balance and the subsequent sale price of the property.[173] In cases in which the loss determination is based on intended rather than actual loss, courts have examined whether the defendant intended for the victim to receive the value of the collateral.[174]

At least one circuit has construed Application Note 3(D)(ii) to mean that the "pledge" of such collateral must, like money and property returned, be done before discovery of the offense.[175] There, the Fifth Circuit reasoned that allowing collateral to be "pledged" as late as sentencing "would be totally at odds with the principles embodied in subsection (i) and would alter the long-standing, well-recognized rule that post-detection repayments or pledges of collateral do not reduce the loss."[176] Additionally, at least one

---

170 *See* United States v. Byors, 586 F.3d 222, 225–26 (2d Cir. 2009); *see also* United States v. Alfaro, 30 F.4th 514, 519 (5th Cir. 2022) ("[B]ecause the investors did not receive any value or benefit from [the defendant's] legitimate business expenditures, there is no reason to credit those amounts against the actual loss amount."); United States v. Evans, 744 F.3d 1192, 1198 (10th Cir. 2014) (same).

171 USSG §2B1.1, comment. (n.3(D)(ii)); *see also* United States v. Cavallo, 790 F.3d 1202, 1232–40 (11th Cir. 2015) (district court correctly used property value at the time of sentencing, rather than value of property years earlier, the time at which the defendant claimed, without substantiation, that he withdrew from mortgage fraud conspiracy).

172 USSG §2B1.1, comment. (n.3(D)(iii)).

173 *See* United States v. Foley, 783 F.3d 7, 23 (1st Cir. 2015) (in mortgage fraud cases, the actual loss is "always the difference between the original loan amount and the final foreclosure price (less any principal repayments)"; accordingly, "actual loss usually can be calculated by subtracting the value of the collateral—or, if the lender has foreclosed on and sold the collateral, the amount of the sales price—from the amount of the outstanding balance on the loan" (quoting United States v. Appolon, 695 F.3d 44, 67 (1st Cir. 2012))).

174 *See, e.g.*, United States v. Lacey, 699 F.3d 710, 720 (2d Cir. 2012) (allowing the sentencing court to draw an inference, where supported by appropriate evidence, that the intended loss in the case of a loan secured by real property should include an offset for the value of the property); United States v. McCoy, 508 F.3d 74, 79 (1st Cir. 2007) ("The guideline makes clear that intended loss—" 'expected' " would be a better term—is to be used where it is higher than actual loss, that expectation being a measure for the defendant's culpability."); United States v. McCormac, 309 F.3d 623, 629 (9th Cir. 2002).

175 United States v. Austin, 479 F.3d 363, 369 (5th Cir. 2007).

176 *Id.*

circuit has adopted a rule where an intentional loss figure cannot be reduced by the return of property, even before discovery, if no property was pledged before or during the actual fraud. In a Seventh Circuit case, the defendant secured a fraudulent loan with collateral four months after originally receiving the loan proceeds but before discovery of the fraud.[177] The court declined to credit the defendant for the value of the collateral when calculating intended loss, because at the time he received the loan, the defendant had no intention of repaying any part of it.[178]

In mortgage fraud cases, courts often are met with the question of how to calculate actual loss where the defendant fraudulently obtained a loan from one lender who then sold the mortgage to a second lender. The key consideration in such cases is whether the transfer from the original lender to the successor lender was foreseeable to the defendant at the time he or she fraudulently obtained a loan.[179] Courts have typically found that mortgage reselling was reasonably foreseeable, and thus, the composite loss[180] is the proper measure of actual loss.[181]

Several circuits have held that Application Note 3 applies the concept of reasonable foreseeability only to its calculation of "actual loss," and not to the calculation of "credits against loss."[182] These courts therefore have rejected arguments that mortgage fraud defendants should receive credits against loss because they could not have reasonably foreseen the economic downturn that led properties to be worth less than they expected. Instead, defendants could receive credit only for the actual value of the collateral to the lenders. These courts are at odds with the Eighth Circuit, which has held that the concept of reasonable foreseeability applies to credits against loss as well as to actual loss.[183]

---

177 United States v. Severson, 569 F.3d 683, 689–90 (7th Cir. 2009).

178 *Id.* at 690.

179 *Compare* United States v. James, 592 F.3d 1109, 1115 (10th Cir. 2010) (where district court determined that successor lender victims were not foreseeable to the defendant, the proper loss amount was initial loan minus transfer price between initial lender and successor lender), *with* United States v. Smith, 705 F.3d 1268, 1276 (10th Cir. 2013) (because successor lender victims were foreseeable victims to the defendant, the proper measure of loss was initial loan minus foreclosure sale price). *See also* United States v. Howard, 784 F.3d 745, 748 (10th Cir. 2015) (reiterating that total loss may include both original and downstream loans); United States v. Crowe, 735 F.3d 1229, 1242 (10th Cir. 2013) (" '[W]here losses to both original and successor lenders is foreseeable,' a district court can calculate loss simply by subtracting the foreclosure sales price from the amount of the outstanding balance on the loan.").

180 "Composite loss" means the foreclosure proceeds subtracted from original loan amount, adjusted for principal repayments and foreclosure expenses.

181 *See, e.g.*, *Howard*, 784 F.3d at 748–49; United States v. Hymas, 780 F.3d 1285, 1293 (9th Cir. 2015); *Smith*, 705 F.3d at 1276; United States v. Appolon, 695 F.3d 44, 67–68 (1st Cir. 2012).

182 United States v. Cavallo, 790 F.3d 1202, 1235 (11th Cir. 2015); United States v. Morris, 744 F.3d 1373, 1375 & n.1 (9th Cir. 2014); United States v. Wendlandt, 714 F.3d 388, 393–94 (6th Cir. 2013); *Crowe*, 735 F.3d at 1236–37; United States v. Turk, 626 F.3d 743, 748–51 (2d Cir. 2010); *accord* United States v. Mallory, 461 F. App'x 352, 361 (4th Cir. 2012) (per curiam).

183 United States v. Parish, 565 F.3d 528, 535 (8th Cir. 2009); *see also Morris*, 744 F.3d at 1375 n.1 ("[W]e join the Second Circuit in rejecting" *Parish*); *Crowe*, 735 F.3d at 1241 & n.5 (same).

# Exhibit 10

The Power
of International
Education

February 3, 2025
RE: Letter for Gokce Guven, Adobe Design Circle Scholarship Recipient, Cohort 1

To whom it may concern:

**Gokce Guven** is a former scholarship recipient of the Adobe Design Circle Scholarships program, which was funded by Adobe and administered by the Institute of International Education (IIE).

Since its inception in 2020, the program has supported college or university education tuition for 30 young people from various countries. Adobe Design Circle Scholars practice self-expression as an opportunity to open minds, to innovate, and to inform the world around them.

Gokce successfully completed her degree program in May 2022 and was an eligible recipient of an annual renewable scholarship award of up to $25,000 USD from August 2020 to May 2024.

We hope that this information will be of assistance to the application for a visa for **Gokce Guven.**

Should you need any additional information, please do not hesitate to contact me. I can be reached by e-mail at: AdobeScholarship@iie.org.

Sincerely,

**Jahnissi Tirado**
Program Analyst
Corporate and Foundation Programs
Institute of International Education
1350 I (Eye) Street NW, Suite 600 • Washington, DC 20005
www.iie.org
**IIE** • *The Power of International Education*

Institute of International Education • iie.org
One World Trade Center, 36th Floor • New York, NY 10007

# Exhibit 11

CONFIDENTIAL — FOR DISCUSSION PURPOSES ONLY — NON-BINDING

# SUMMARY OF PROPOSED TERMS

Acquisition of Certain Assets of Kalder, Inc. by ServiceSync, Inc.

This Summary of Proposed Terms (this "**Term Sheet**") outlines the principal terms of a proposed acquisition by ServiceSync, Inc. of certain assets of Kalder, Inc. Except for the sections titled *Exclusivity*, *Confidentiality*, *Expenses*, and *Governing Law*, which are binding, this Term Sheet is non-binding and is subject to the negotiation and execution of definitive agreements.

**Parties.** Buyer: HornHaus Technologies Inc. ("**Buyer**"). Seller: Kalder, Inc. ("**Seller**" or the "**Company**"). Founder: Gokce Guven, in her individual capacity (the "**Founder**").

**Structure.** Acquisition in two phases. Phase 1 (the team transition and operational integration) proceeds immediately upon execution of this Term Sheet and approval of the Company's Board of Directors, it being understood that in connection with such team transition the designated team members will serve in an advisory capacity to Buyer during Phase 1 and Buyer and the Company shall enter into the Interim License as further described below). Phase 2 (the purchase of the Company's intellectual property and other assets, and the Company's subsequent dissolution) proceeds in parallel and closes upon receipt of the stockholder approvals described below. Buyer acquires no equity of the Company; the transaction is not a merger; and Buyer assumes no liabilities except as expressly stated.

## PHASE 1 — TEAM TRANSITION AND INTEGRATION (Board approval only)

**Team Transition.** The collaboration and transition of the Company's product and engineering team is the centerpiece of Phase 1. Designated Company employees will resign and enter into direct employment or contractor arrangements with Buyer, and will begin work for Buyer upon execution of the Phase 1 documents. No stockholder approval is required for this step.

**Interim License.** Solely to maintain continuity of service, the Company grants Buyer a limited, non-exclusive, revocable license to use the Company's technology during the interim period, together with transition services, so that Buyer may operate and support the product for customers immediately. For the avoidance of doubt, no ownership of, and no exclusive right in, any intellectual property or other asset passes in Phase 1; all such transfer occurs solely at the Phase 2 closing. The license may be terminated if the Phase 2 closing has not occurred within six (6) months following the Phase 1 execution date or if Phase 2 is otherwise abandoned or terminated by either party.

**Phase 1 Consideration.** Phase 1 is structured as a zero-cost collaboration period. The Company's transaction and legal costs will be funded from the Phase 2 investment proceeds. If Phase 2 is not closed within 6 months either party may terminate Phase 1 with no penalty. Full list of active contracts, MRR, andassignability to be provided before Phase 1 execution.

**Announcement.** Following full execution of the Phase 1 documents, the parties will jointly announce that Buyer is acquiring Kalder and that the Kalder team is joining Buyer, with the definitive closing subject to customary stockholder approvals. The form and content of any announcement or public communication shall be mutually approved in writing by the parties prior to release. The parties will integrate operations and commence rebranding.

## PHASE 2 — INTELLECTUAL PROPERTY & ASSET PURCHASE AND DISSOLUTION (Stockholder approval)

**Acquired Assets.** The Company's intellectual property is the principal Acquired Asset, comprising all source code, trademarks, copyrights, trade secrets, know-how, patents, patent applications. The Acquired Assets also include the Company's customer contracts, relationships, and data; domain names and brand assets; tangible operating assets; and related books and records.

**Excluded Assets.** All cash and cash equivalents; accounts receivable; tax attributes; insurance policies; corporate and minute-book records; claims and causes of action; and any asset not included in the Acquired Assets.

**IP assignment:** Any revenue generated from reactivated customers during Phase 1 flows 50% to Buyer. All work product created by team during Phase 1 advisory period belongs to Buyer.

**Excluded Liabilities.** Buyer assumes only those obligations arising after the Phase 2 closing under contracts expressly assigned to it. All other liabilities of the Company remain with the Company and will be resolved in its dissolution, including, without limitation, all pre-closing taxes, employee and benefit-plan obligations, lease obligations, accounts payable, litigation and any successor liability of any kind. For avoidance of doubt, all pre-Phase 1 compensation owed to team members (including back pay January-July 2026) remains Company's obligation.

**Purchase Price.** Up to $1,000,000 for the Acquired Assets (principally the Company's intellectual property), payable in full in cash at the Company's direction to its designated seed investors (the "Designated Investors"), due upon the closing of Buyer's due upon the closing of a strategic investment into Buyer, and in any event no later than twelve (12) months following the Phase 1 execution date. If the strategic investment into Buyer, has not closed within twelve (12) months of the Phase 1 execution date, the parties will discuss in good faith whether to extend, restructure, or terminate the arrangement, with no penalty to Buyer.

**Allocation Among Investors.** Allocation of the Purchase Price among Designated Investors will be determined prior to the definitive agreement, consistent with the Company's charter, and may include the waiver or voluntary reallocation of proceeds among investors.

**Required Approvals.** Approval of the Company's Board of Directors; the holders of a majority of the Company's outstanding common stock; and the holders of a majority of the Company's Series Seed Preferred Stock, in each case as required under the Company's charter and the Delaware General Corporation Law (Sections 271 and 275). No further individual stockholder consents are required.

**Founder Waiver.** At the Phase 2 closing, the Founder will surrender all common stock for cancellation for no consideration, waive any distribution she would otherwise receive, and disclaim any transaction-related compensation.

**Representations; As-is Sale.** Customary representations for an asset purchase. Indemnification uncapped for title, authority, IP, taxes, fraud. General claims capped at 15% with 24-month survival. **Exclusivity (Binding).** For 60 days following execution of this Term Sheet, the Company will negotiate exclusively with Buyer, subject to the fiduciary duties of the Company's Board.

**Confidentiality (Binding).** This Term Sheet is subject to the parties' existing non-disclosure agreement, except that the parties may make the joint announcement described under "Announcement" above and any further public communications regarding the transaction as they mutually agree.

**Expenses (Binding).** Each party bears its own costs; the Company's costs are payable from the Phase 1 Consideration.

**Governing Law (Binding).** Delaware, with exclusive jurisdiction in the Delaware Court of Chancery.

**Timeline.** Execution of Phase 1 documents and announcement within 3-21 days; definitive Phase 2 agreements within 30 days; investor consents gathered in parallel; Phase 2 closing upon satisfaction of the required approvals.

**Non-Binding Effect.** Except for the sections expressly stated to be binding, this Term Sheet creates no binding obligation and is superseded in its entirety by the definitive agreements.

*Acknowledged and agreed (as to the binding provisions only; otherwise as a non-binding indication of terms):*

**SERVICESYNC, INC.**

By: Signed by: [signature] DB29B6F36C0D40A... Name: Frazier Horn Title: Founder & Chief Executive Officer

**FOUNDER** (Gokce Guven, in her individual capacity as a majority stakeholder)

DocuSigned by: Gokce Guven A5690902653E4B5... Date: 7/21/2026

**KALDER, INC.** (by Nazli Gungor, Head of Product)

Signed by: Nazli Gungor D68E406DEE514FE... Date: 7/21/2026

# Exhibit 12

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | | |
|---|---|---|
| CHELSEA JIA, Plaintiff, | : | Index No. 158516/2018 |
| - against - | : | Hon. Louis L. Nock |
| CHINA RENAISSANCE SECURITIES (US) INC., JONATHAN DEAN HONG, and NICHOLAS THOMAS GANZ, Defendants. | : | **AFFIDAVIT OF CHELSEA JIA** |

STATE OF NEW YORK )
) SS:
COUNTY OF NEW YORK )

I, Chelsea Jia, being first duly sworn according to law, upon the best of my information and belief, depose and say as follows:

1. My name is Chelsea Jia. I am the plaintiff in this action. I submit this affidavit in opposition to Defendants' motion for a summary judgment. This affidavit is based on my personal knowledge.

## I. My Education and Business Background

2. I was born in Shanghai. When I was three years old, I moved with my father to the United States. I attended Head Start and primary school in Hoboken, New Jersey. I attended high school in Rutherford, New Jersey, and in 2009 I graduated from Dartmouth College with a Bachelor of Arts degree in Economics and Asian Studies.

3. After I graduated from Dartmouth, I sought an entry-level position in the financial services industry and in September 2009 was offered a back office operations position at Fidelity Investments in Boston, Massachusetts.

4. In June 2010, I accepted an institutional equity sales position, "Sales Trader," at Deutsche Bank in Hong Kong, and spent two years there on a steep learning curve and had success both in the work and in building relationships. In June 2012, I was let go as part of a reduction in force. I then attended art school for approximately one year in Florence, Italy, after which, in June 2013, I returned to Hong Kong to accept a short-term position raising capital with a fellow Dartmouth alumna at Asiya Investments ("Asiya").

5. I left Asiya after my contract ended and received an offer in February 2014 to join Wellington Management Company as a trader of Asia equity markets. At Wellington, I worked both in Boston and Hong Kong. My preference was to work in Boston to be closer to my family, but in Boston I worked overnight hours because my trading day was Hong Kong's day, and eventually I left Hong Kong and Wellington to live closer to my family full-time.

6. Back in Boston, I took a position with PanAgora Asset Management ("PanAgora") as a quantitative ("quant") trader. In October 2015, I resigned from PanAgora and joined Société Générale Americas Securities LLC's ("SocGen") Quantitative Execution Services Group in New York City.

7. I worked at SocGen from November 2015 to January 2017. SocGen terminated me in January 2017.

8. Between February 2017 and March 2018, I worked on projects as a consultant for various companies, including Hina Group, Inc.

## II. Hiring by CRSUS

9. In late 2017, I reached out to Henry Wang ("Wang") to discuss a potential position at CRSUS. I had met and became friendly with Wang when we were both at Deutsche Bank. He was working in equity sales and we worked together to cover clients for Deutsche Bank. As is true for most investment advisory firms, the duties of sales traders and salespersons often overlap as we each "sell" the firm's research products and market certain investments to a firm's clients. Salespersons typically work with a client's portfolio managers and analysts while sales traders typically work with the employees on a client's trading desk. For smaller accounts where the client may have only one employee performing the duties typically performed by a portfolio manager and trader at larger firms, only one salesperson or sales trader would cover the account. Wang has since left Deutsche Bank to become the Head of International Sales and Trading at China Renaissance Securities (Hong Kong) Limited ("CRSHK"), a subsidiary of China Renaissance Holdings Limited ("CR").[1]

10. I also reached out to Kevin McGunnigle ("McGunnigle"), whom I met through a mutual friend, also to discuss a potential position at CRSUS.[2] Both Wang and McGunnigle offered to recommend me to Jonathan Hong ("Hong"), President of CRSUS, and I interviewed with various members of the CRSUS team in mid-December 2017. Over the next three months, I provided Hong and Wang with six references from prior employers, three client references, my client list, and sample marketing emails that I sent to clients in the past so that they could see my selling approach. I also introduced Hong to one of my clients.

---

[1] CR is also the parent of CRSUS.

[2] McGunnigle was working as a Director at CRSUS in sales at this time.

11. In late February 2018, CRSUS asked me to meet with Wang in-person and speak with Haoyi Li ("Li"), a sales trader based in Hong Kong. During these interviews, Wang and Li emphasized that any individual hired for the role would be required to demonstrate that they could grow CRSUS's business. I reiterated to them that I could grow business for CRSUS and referred them back to my client list and the attempts I already made to introduce Hong to one of my relationships.

12. I received an offer of employment on March 12, 2018 from Hong.

## III. My Employment at CRSUS

### A. Duties and Responsibilities

13. I joined CRSUS as a Vice President of Equity Sales on or about March 28, 2018. I was a member of CRSUS's Sales and Trading Division ("S&T Team") which was then comprised of five other licensed salespersons and sales traders: Hong, McGunnigle, Christopher Galati ("Galati"), Christopher Chase ("Chase"), and John Devaney ("Devaney"). Of the six members, I was the only woman.[3]

14. CRSUS and its Hong Kong-based sister entity, CRSHK, operate as a single integrated unit for the benefit of CR. All members of the New York S&T Team frequently communicate with and work with employees and management in Hong Kong, which office operates as CR's global headquarters. Although Hong was the head of the U.S. office, we (and Hong) functionally reported to Wang during my tenure at CRSUS.

15. My job was to grow CRSUS's client base and its business with existing clients. To do that, I sent daily marketing emails to my clients to inform them of news that might impact

[3] Ting Zhou, an analyst who joined full-time in April 2018, also sat in the S&T Team, but she did not (and could not) perform any sales or sales trading responsibilities because she was not licensed.

their investment positions in Asian securities; sponsored conference calls for clients and prospective clients with relevant subject matter experts; responded to client inquiries; and set up client meetings between myself, client representatives, and, at times, senior management of CRSUS.

16. As a separate part of my duties, once a CRSUS client was prepared to make an initial public offering ("IPO") or offer another transaction to the market, the S&T Team performed "syndicate" responsibilities by marketing the offering to CRSUS clients. Members of the S&T Team sat on the public side of what is known in the industry as the "Chinese Wall." This meant that we only knew about deals or transactions after they became public. Any reporting that we did on these offerings, or on any security for that matter, had to be sourced exclusively from public information.

17. Once a deal became public, we worked with members of CRSUS's Equity Capital Markets ("ECM") division to sell that transaction to CRSUS's current and prospective clients – sometimes referred to at CRSUS as "syndicate" responsibilities or "syndicate messaging." At a larger bank or firm, syndicate responsibilities typically reside in a separate divisions made up of ECM and sales employees whose sole purpose is to price and then later market IPOs. As a smaller investment firm, however, CRSUS does not have designated "syndicate" desk or employees. Instead, Lisa Marrapodi ("Marrapodi"), a member of the ECM Division, worked on the private side of the wall to price the IPO.[4] After the deal became public, the S&T Team would be tasked with "building the Book" which, in essence, is selling and marketing the IPO.

[4] Marrapodi reported to Hong and Kai Fang, Global Head of ECM based in Hong-Kong.

**B. My Efforts to Grow CRSUS's Business in Accordance with Wang's Instructions**

18. Because Wang and I previously worked together at Deutsche Bank and we both spoke Mandarin, Wang spoke with me more frequently over the phone and via WeChat, an instant messaging application, than in comparison with my male peers in the U.S. office. Wang made it clear to me that growing CRSUS's footprint and client relationships in the U.S. was his and Hong Kong-based senior management's number one priority during these conversations.

19. Based on these conversations with Wang, I worked tirelessly to build business in the U.S. While I was doing this with Wang's approval, Wang often complained to me that he felt that the rest of the U.S. S&T Team did not work as hard as their Hong Kong-based counterparts or me (to which I agreed), and he pushed me to grow business for the firm. We spoke frequently about how to grow the business, including about moving client assignments from male peers of mine, who had developed little or no relationships at the clients to which they were assigned, to me. At times, Wang told me to "just do it," or "go ahead" and contact the client on behalf of CRSUS. (*See, e.g.*, Rosenberg Aff., Ex Q (JIA0000456 at 471.) Because he was a member of the senior leadership team and one of my superiors, I did not hesitate to follow his directives.

20. Wang also voiced his opinion that CRSUS's syndicate function was weak. This was voiced to me during my initial interview with him, and also voiced to me during my conversation with Hong. As a result, I specifically included "buyside" contacts who looked after the syndicate function to show that I can fill this gap on the client list I transmitted to them prior to my hiring. I also reached out to Kai Fang, Global Head of ECM and with whom I had a prior professional relationship, after my interview with Wang. Fang spoke candidly with me during our phone call about the limitations in syndicate. I remained in contact with Fang consistently.

21. During one conversation in early April 2018, I told Wang that I thought I could help develop the company's syndicate relationships. Wang told me to "just own it . . . we don't need ecm. Lol." in response. (*Id.* at JIA0000462.) As a result, I began to refer to myself as having a "hybrid syndicate/sales" role. As described above, even without Wang's permission, this is an accurate description of my responsibilities because I did have some syndicate responsibilities, namely marketing and selling CRSUS IPOs.

## IV. Defendants' Discriminatory Conduct

22. Soon after I joined CRSUS, it became apparent to me that I was being treated differently than my male peers. My efforts and successes, along with my character, were degraded by Defendants and my male peers, who subjected me to numerous harassing and discriminatory gender-based remarks.

### A. Initial Comments and Hostility

23. For example, on or about April 23, 2018, I arranged for client meetings with a large pension fund based in Toronto. Although the client was not assigned to any salesperson at the time, I let Galati, who had covered the Toronto region, know that I arranged for the meeting. Galati's response was to say, within earshot of my male colleagues, "You only got the meeting because [the client's representative] wants to sleep with you." McGunnigle, who was present, agreed with Galati, adding that the representative "has lots of affairs." Both men laughed and then, in my presence, searched on the internet for the representative's wife, ex-wife, and his ex-wife's new husband and continued to discuss his purported affairs.

24. I left this conversation feeling shocked, degraded, and embarrassed, especially as I was a new employee working to prove myself.

25. Shortly after Galati and McGunnigle made these comments, Hong informed me that CRSUS could not send two salespersons to Toronto and that only Galati – even though I booked the meeting with the client – would travel to Toronto to attend the meeting between the Toronto pension fund, Wang, Fang, and himself. As described below, I later complained to Wang about this assignment and Hong, upon Wang's instructions, ultimately removed Galati from the trip and re-assigned it to me. When a copy of my schedule for the Toronto trip was circulated shortly thereafter, Galati (who sat next to me in the office) said "What a bitch!," slammed his drawer shut after taking his wallet and ID card out, and stormed out of the office. Again, I was humiliated and appalled.[5]

**B. May 9, 2018 Lunch with Hong**

26. On May 9, 2018, my supervisor and CRSUS President Hong unexpectedly asked me to lunch (for the first and only time). To my surprise, despite that I had been the victim of harassing and unfair treatment by Galati and McGunnigle, Hong told me that I needed to be "nicer to my peers." Specifically, Hong told me that I was "mean," "too aggressive," and "bitchy." Hong told me that I needed to be "more quiet" and "submissive," and that I should not be "the stereotype of a Shanghai woman." I was shocked.

27. I did not understand the reference to a "Shanghai woman" at the time. After the lunch, however, I 'googled' the term and discovered that he was referring to the demeaning stereotype that women from Shanghai are devious and untrustworthy. I felt demeaned and humiliated and targeted for being a Chinese woman.

---

[5] Team schedules were typically circulated to the entire S&T Team so that we could see what other were working on or if others were out of town.

28. I did not know how to respond after Hong made these statements so I simply listened during the first part of the lunch. Afterwards, I tried to push the conversation back to work and clients and raised with him that I felt that I was better positioned to develop CRSUS's business with three specific accounts. I also explained that I thought I had a better relationship with the Toronto pension fund. I raised these issues to show that I had not been "bitchy" or merited any such criticism, and that I was doing my best to grow CRSUS's business.

29. Later that afternoon, Hong emailed me to inform me that he was going to assign me three accounts we discussed at lunch which had originally been assigned to McGunnigle. Hong also told me that Galati would not attend the Toronto meeting after all. This was only after I made a point to tell Wang about Hong's failure to assign me certain accounts and invitation to Galati to attend the trip.

**C. <u>Discriminatory Treatment After the May 9, 2018 Meeting</u>**

30. The discriminatory and harassing remarks increased after I was assigned McGunnigle's former accounts and Galati was removed from the Toronto trip. Each of the remarks implied that I had an inappropriate sexual relationship with my superiors or clients.

31. For example, after I voiced my opinion that the S&T Team should comply with an administrative request made by Wang via email, Chris Chase, a CRSUS sales trader, remarked, in front of the entire S&T Team including Hong, "Why are you worried? You're Henry's girl." Being referred to as anyone's "girl" was embarrassing and demeaning by itself; but the comment was further harassing because it implied that I had had an inappropriate sexual relationship with Wang, a superior. It was also particularly humiliating because the comment was made in front of the entire sales team and my supervisor, Hong. No one, including Hong, defended me or reprimanded Chase for making the comment.

32. Galati frequently made similar comments. For example, after I returned to the office from an out-of–the-office meeting with Kai Fang, Global Head of ECM, who was only in New York for one day to see clients, Galati winked at me and asked "How was your session with Kai?" unmistakably implying that I must have engaged in inappropriate sexual conduct with Fang. Commenting on the frequency with which Wang called me – which frequency was based both on our familiarity from our days at Deutsche Bank and my alignment with his goals for CRSUS – Galati stated, "Henry only wants to call *you* back" and asked whether Wang sent me "love messages." Galati made a similar innuendo when he said one morning as I arrived at work, "That's a nice dress. Are you seeing a client tonight?" Again, he implied that I would be using my sexuality to further my client relationships.

33. These comments always made me feel embarrassed and uncomfortable. My successes were earned without resort to sex, sexuality, or demeaning myself; rather, I only felt demeaned by my superiors and coworkers in the office.

**D. The Company's General Counsel Joins the Chorus of Abuse and a Senior Executive Ignores My Complaints**

34. Prior to my trip to Toronto, which was scheduled for May 10, 2018, I stopped by Ganz's office. Unexpectedly, I found Ganz hostile, and he told me that he heard "chatter around the office about you and [Wang]." He told me that I "shouldn't be in bed with [Wang]." Although it was clear to me from the context that Ganz was suggesting I was in a sexual relationship with Wang, or that I must have been gaining favor because of my gender or purported sexualized conduct, I asked him explicitly what he meant, and he replied "you know exactly what I mean."

35. I left Ganz's office horrified. I reported the comments to Wang on or about May 10, 2018 in Toronto. I told Wang that I felt others had a similar impression of our relationship.

Wang laughed off the comment and incredibly, despite the fact that I was the victim of constant chatter and degrading comments about an inappropriate relationship with him, including by the General Counsel, Wang invited me into his hotel room during our business trip in Toronto. He did not make any romantic gestures towards me but I was surprised by the inappropriate request and concerned afterwards that this would fuel the pervasive hostile comments in the office about my successes. I did not know if Wang would tell anyone that I had joined him in his hotel room and I worried about others learning about it which added to my overall distress in the office.

36. I did not know how else to report the comment because I was horrified that one of the senior officers of CRSUS could speak to me this way. When Wang did not seem to take any action in response, I decided to keep my head down and do my job.

## V. <u>Unequal Treatment</u>

37. In addition to participating in and allowing my co-workers to engage in discriminatory and demeaning conduct towards me, Ganz and Hong subjected me to unequal treatment in comparison to my male peers. I was repeatedly reprimanded, and ultimately terminated, for engaging in the same conduct as my male peers especially following my return to the office from my trip to Toronto.

38. For example, Ganz repeatedly criticized me for the "tone" of my sales marketing emails, stating that my emails were "too flamboyant," I should not "try so hard," and "it's nice [I] have opinions, but that's not what [I was] hired to do."[6] My male peers were never criticized for similar emails in which they conveyed market "rumors," discussed market "chatter," or failed to properly cite their sources. (*See, e.g.*, Rosenberg Aff. Ex. Z (McGunnigle referencing

[6] In paragraph 14 of his affidavit, Ganz again says that I should not have opinions on stocks.

"chatter" in emails sent both internally, with Hong copied, and externally to clients); Ex. AA (same); Ex. BB (same); see also Ex. CC (Devaney emails referencing "chatter").)

39. Ganz and Hong also required me to attend individual compliance trainings for purported compliance failures. But they did not require my male peers to attend similar trainings even when I pointed out that those co-workers had violated firm policies.

40. For example, on one occasion Ganz reprimanded me for sending an email marked for "internal use only" to my client list. He told me that circulating this email outside the firm violated firm policy. I informed Ganz during this meeting that I only circulated the email (which was authored by one of the male peers) because my male peers had done so, and I assumed it was permitted. Ganz did not reprimand the men, nor did he require them to attend an individual compliance training session as he required me to do. Instead, Ganz simply stepped out of his private office, told the men collectively not to do it anymore, and went back to work. I never sent such emails out again after that meeting, but my male peers continued to do so by either forwarding "internal use only" emails or by copying and pasting the "internal use only" information into their sales emails in violation of Ganz's instructions. Hong was copied on the emails as well. But neither he nor Ganz reprimanded my male peers for sending the emails even after they were instructed not to do so. A small portion of these emails are attached to the Rosenberg Aff. as Exhibit II, GGG, III, JJJ, KKK. These exhibits only represent a small sampling of these documents as I received (given that I was copied) emails similar to those listed in Exhibit II nearly every day.

41. Hong and Ganz also reprimanded me for contacting clients that were not formally assigned to me. Neither Hong nor Ganz, however, reprimanded my male peers for contacting

clients that I or other employees covered. (*See, e.g.*, Rosenberg Aff., Ex. WW (Galati contacting one of my clients); Ex. XX (McGunnigle contacting one of my clients).)

42. Following my return from Toronto, Ganz's unequal treatment and criticisms of my work increased. Over the next few weeks, Ganz continued to criticize me for my daily sales emails, required me to engage in one-on-one meetings with him to review purported compliance issues which did not exist, and, as I later learned, asked his associate to monitor my emails.

## VI. I Complained to Ganz and He Retaliated

43. Fed up with consistently being targeted and reprimanded by Ganz, I complained to Ganz that he was targeting me but not my male colleagues who engaged in similar conduct.

44. For example, one occasion to Ganz I said, "I feel like you're targeting me. Why do you read my messages but you don't read Kevin's and you don't read Chris's? You don't see what they're doing, but somehow I'm under a microscope from you for everything that I'm doing the same as they are doing? And there is red flags all over the office and you're targeting me versus the rest of the salespeople" who are all men.

45. Ganz got visibly angry in response to my complaint and threateningly asked me whether I wanted a second "U-5." I was very frightened by this threat because I previously told Ganz that I was upset with the language contained in my U-5 from SocGen because I knew that it could impact my career. By asking me in a loud intimidating voice, "do you want to have a U-5. How do you think that would look? This is the second U5 on you!" I understood that Ganz was threatening to terminate me and ruin my career. And I knew that combined with my prior termination from SocGen, "a second U-5" would effectively bar me from pursuing a career in the financial services industry.

46. I was scared to tell Wang or anyone else about this interaction or to ever again complain about how I was being treated.

## VII. Termination

47. Ultimately, Ganz followed through on his threat to terminate me. Defendants terminated my employment on June 18, 2018 upon my return from a business trip in California.

48. Upon my arrival to work on June 18, before I even had time to put my lunch box in the refrigerator, Hong immediately called me into a conference room with Hong, Ganz and Ganz's compliance associate, Sagan Beder. Hong said I was "making people feel uncomfortable" and I was being terminated. Ganz then spoke next and handed me a termination letter. Ganz and Hong refused to provide me with any reason for my termination during the meeting and only told me that I made other employees "uncomfortable" and that there was a "compliance" issue.

49. Concerned that Ganz would follow through with his threat of filing a negative Form U-5 against me, I quickly left the meeting and handwrote a resignation letter and left it on Hong's desk.

50. After I was terminated, Wang told me that I was terminated for sending a historical "model" to a client. I did not (and still do not) understand how this email led to my termination because the email contained only publicly available historical figures.[7] Wang

[7] A model suggests something was "modeled," or extrapolated out based on future forecasts and modeling/calculations, but the email's attachment of historical forecasts were hardly "models."

originally agreed with me, and, as I learned after reviewing Defendants' production, Wang pushed back on the justification for my termination.[8]

51. The email originally stemmed from requests from two clients for information on a stock ("YY"). In response to these requests, I reached out Alex Liu, Vice President Research, for information that I could send to the clients.[9] He sent me historical figures that I could forward to the clients provided that I told the clients that CRSUS did not formally cover the stock. I agreed to make this disclaimer, and Liu and I each sent emails with the historical figures to the clients stating that it was not an official forecast. (Kaplan Aff., Exs. KKK, MMM.) Although I was allegedly terminated for sending this email, Liu still works for CRSHK according to his Linkedin profile. Defendants' unequal treatment of me compared to Liu, a male peer, exemplifies the unequal and discriminatory treatment I experienced at CRSUS throughout my tenure at the company.

## VIII. Other Response to Defendants' Allegations of Misconduct

52. Defendants submitted four affidavits along with their summary judgment motion. To the extent I have not already responded to the allegations above, my specific responses to each of these affidavits and underlying incidents they reference are set forth below.

### A. Ganz Affidavit

#### 1. Employment History

53. Contrary to Ganz's characterizations, I was not terminated from four companies for performance issues. Two of the four terminations, were the result of reductions in force,

---

[8] An audio file produced by Defendants is attached to the Rosenberg Aff. as Exhibit __. This file was sent to Hong in WeChat, an instant messaging application, shortly following my termination. I recognize this voice as Wang's voice as Wang and I communicated frequently by phone and via WeChat audio files.

[9] Liu did not report to me and held my same "Vice President" position at the time these emails were sent.

including Deutsche Bank, as set forth above, and Money Lion, a position I obtained *after* CRSUS terminated me. The other two terminations were from SocGen and CRSUS itself.[10]

54. I explained my SocGen termination during my interviews for a position at CRSUS. I also reached out to Ganz personally even after CRSUS made me an offer of employment to further discuss my termination from SocGen and the Form U-5 language he references in paragraph 5 of his affidavit. I reached out to discuss this language with Ganz because I understood that it did impact my employment. Because I was so open and forthcoming about my SocGen termination with Ganz, I was surprised and frightened that Ganz later threatened me with "a second U-5" during my employment when I complained to him that I felt that I was being targeted by him compared to my male peers.

**2. <u>Alleged Violations of the Chinese Wall</u>**

55. I cannot fully respond to Ganz's statement that I was "over the wall on emails to clients" in paragraph 13 of his affidavit.

56. I was only inadvertently wall-crossed on one occasion in a meeting with a client where Marrapodi, Fang, and Henry were in attendance. Even then Fang only mentioned a company name but didn't say CRSUS was working on a deal. If Ganz later didn't subsequently tell me that I was inadvertently wall crossed, it would not have crossed my mind. I later told Wang and Fang about this inadvertent wall cross during my trip to Toronto and both said it wasn't actually a wall cross by mentioning a client name like the way they did. Fang also said that my male peers were in similar meetings where the client's name was mentioned and did not get wall crossed. Learning this made me feel that Marrapodi and Ganz were targeting me

[10] To the extent Defendants claim I was terminated from Asiya, I left Asiya at the conclusion of my short-term contract. I was not terminated.

especially as I frequently saw Marrapodi spend hours in Ganz's office gossiping and eating sweets.

57. Ganz does not explain how I allegedly crossed the wall for the other clients he references nor provide a copy of the emails he references.

58. Ganz also did not inform me to stop circulating to Unicorn Email (as defined in the accompanying opposition brief). As I testified, Ganz and I only discussed creative elements of the email and I believed I resolved any issues that he had by providing him with copies of my sources.

**B. <u>Affidavit of Ella Jia</u>**

59. Ella Ji was not present for any of the hostile and discriminatory comments made to me by Defendants as described in this affidavit.

60. Ji states that she was uncomfortable that I asked her for advice on a sales email I wrote. This is surprising considering both Wang and Hong were copied on that chat. (*See* Ji Affidavit, Ex. B.) Ji's complaint about my request for advice is especially confusing given that she admits that "we work as a team to provide high-quality services to our clients [at China Renaissance]." (*See* Ji Affidavit, Paragraph 5.)

61. Ji also alleges that I contacted a corporate client "behind [her] back" to schedule meetings. (*Id.*) She does not identify when this occurred or the clients she is referencing. In any event, I do not recall that this occurred and neither Hong nor anyone else ever raised this issue.

62. Finally, Ji alleges that I asked her to contact a client to provide him information about a private company. *Id.* at Paragraph 6. As my chats with Ji make clear, when Ji informed me it was a "compliance grey area" I simply explained that I didn't agree with her conclusion

because of information I did not know at the time. Ji never raised with me that this interaction was troubling to her in any way.

63. I believe that the discriminatory and belittling insults and rumors about me around the office impacted Ji's view of me as she seemed to assist my male co-workers, but not me. For example, Ji was very willing to help Galati with a translation for one of his clients despite his claim that he is fluent in Mandarin. When I asked her to do the same, she did not agree and questioned if I actually read and write Mandarin. I was shocked that she would say no to me but help my male peers. I can only assume the insults and belittling of me around the office impacted her view of me.

**C. <u>Affidavit of Debra Yu</u>**

64. Debra Yu ("Yu") was not present for any of the hostile and discriminatory comments made to me by Defendants as described in this affidavit.[11]

65. Yu's statement that I did not have the client contacts as I represented is false. To the extent that my clients did not attend the conference, they did not attend because of schedule conflicts. I provided them with late notice of the conference because I was not originally made aware of the conference until a few weeks after it was scheduled. (*See, e.g.,* Exhibit A (June 8, 2018 email from me to Yu forwarding a cancellation from Moore given the late notice, produced by Defendants' as document bates-stamped CRSUS-00011054).)

66. Yu also notes that I improperly spoke with corporate clients at the conference. As the only Mandarin speakers at the conference from CRSUS, the representatives naturally spoke to me.

[11] Yu's lack of knowledge is not surprising as Yu doesn't work in the New York office full-time. She comes in about once a week from New Jersey.

**D. Affidavit of Lisa Marrapodi**

67. Lisa Marrapodi was not present for any of the hostile and discriminatory comments made to me by Defendants as described in this affidavit.

68. I dispute Marrapodi's characterization of my role as I and other salespersons and sales traders did have syndicate functions. (*See* ¶ 16 *supra*; *see also* Rosenberg Aff., Ex. VV.)

69. Marrapodi's reference to the deal pipeline is also disingenuous. The deal pipeline is public information and obtainable by paying for access to the pipeline through capital markets specialist websites, such as the following website: https://www.ifre.com/story/2113442/ifr-us-ecm-pipeline-l2n27a1ry. To avoid incurring costs for CRSUS, I asked Marrapodi for the publicly available content instead of paying for the information through this website because I knew she had a memberships to various capital markets news websites.[12] Marrapodi always agreed to provide me with this information and never said that I was acting inappropriately. Indeed, it was not until I read her affidavit that I learned for the first time, she believes I engaged in "inappropriate" behavior.

70. In her affidavit, Marrapodi also claims that she "had to hunt" me down to obtain information about my clients. I do not know what events she is referring to as she provides no specifics.

71. In paragraphs 8 and 9 of her affidavit, Marrapodi conflates one interaction I had with her (as best I can tell from her vague descriptions) as two separate events. I never "loudly announced on the sales floor" or "stood up in the middle of the trading floor to ask about an event" as Marrapodi describes in two separate instances. I believe Marrapodi is referencing one occasion where I asked her and Ganz why I was not wall crossed on a particular transaction but

[12] Her public LinkedIn profile also listed that she was part of this group.

Galati and McGunnigle were wall crossed. After the meeting, I spoke with Galati individually (who knew about the transaction) about the deal schedule. I also do not recall having a meeting with Marrapodi wherein she told me I breached compliance protocols as she claims in paragraph 8 of her affidavit.

72. Marrapodi repeatedly references other instances where I purportedly moved myself over the wall or tried to obtain private information. None of her statements are accurate. Although I'd like to further dispute her characterizations, she does not (because she cannot) identify a single email, client, or specific date of when my alleged misconduct occurred.

## IX. Conclusion

73. Because of the multiple acts of discrimination I experienced in only eleven weeks, I commenced this suit to assert my rights under the New York State Human Rights and New York City Human Rights Law. I respectfully ask this Court to deny Defendants' motion for summary judgment for the reasons set forth herein and in the accompanying memoranda of law.

**[Remainder of Page Intentionally Left Blank]**

Date: August 28, 2020

Chelsea Jia

Sworn to me
this 28 day of August, 2020

Melissa Barahona
Notary Public
Melissa Barahona
No. 02BA6391238
Exp. 04/29/2023

# Exhibit 13

Business Horizons (2022) **65**, 681—696

Available online at www.sciencedirect.com

ScienceDirect

KELLEY SCHOOL OF BUSINESS
INDIANA UNIVERSITY

www.journals.elsevier.com/business-horizons

# Fake it 'til you make it: Hazards of a cultural norm in entrepreneurship

**Matthew S. Wood*, David J. Scheaf, Sean M. Dwyer**

*Hankamer School of Business, Baylor University, 1621 S. Third Street, Waco, TX 76706, U.S.A.*

**KEYWORDS**
Faking it;
Reality distortion;
Entrepreneurial fraud;
Misleading stakeholders;
Lordstown Motors;
Theranos;
uBiome

**Abstract** Fake it 'til you make it—that is, deceptively claiming a new endeavor exhibits characteristics of successful entrepreneurial ventures to gain support from others—has become an accepted practice in entrepreneurship. One overlooked hazard of this strategy is that entrepreneurs' efforts to fake it can become a slippery slope in which the deception escalates to a point where stakeholders accuse entrepreneurs of committing fraud. We delineate that the responsible use of faking it in entrepreneurial endeavors rests on entrepreneurs' full appreciation of the determinants that make turning fiction into fact less and not more difficult. Leveraging prior research to offer new insights, we outline these determinates as controllable vs. uncontrollable elements, sole vs. contingent entrepreneurial action, and limited vs. extensive stakeholder interactions. We also look at faking it examples Lordstown Motors and uBiome, two startups whose founders engaged in and escalated faking it to the point where stakeholders accused them of fraud.
© 2021 Kelley School of Business, Indiana University. Published by Elsevier Inc. All rights reserved.

## 1. Entrepreneurs exaggerate

Whether it is creatively elaborating their qualifications, knowledge, experiences, or accomplishments, it is common for individuals to embellish what they know or have achieved to impress others. The general human tendency to embellish has become a cultural norm in entrepreneurship referred to as fake it 'til you make it. *Fake it 'til you make it* is deceptively exhibiting the perceived characteristics of successful entrepreneurs and/or successful entrepreneurial ventures to gain support from others with the intent to turn fiction into reality during the creation of an economically viable and sustainable business (e.g., Brenkert, 2009; Rutherford et al., 2009). Fake it 'til you make it is often viewed as a necessary aspect of playing the game of entrepreneurship and is a skill that entrepreneurs tend to develop. Indeed, it underpins phenomena such as blitzscaling,

* Corresponding author
*E-mail addresses:* ms_wood@baylor.edu (M.S. Wood), david_scheaf@baylor.edu (D.J. Scheaf), sean_dwyer1@baylor.edu (S.M. Dwyer)

https://doi.org/10.1016/j.bushor.2021.12.001
0007-6813/© 2021 Kelley School of Business, Indiana University. Published by Elsevier Inc. All rights reserved.

whereby entrepreneurs strive to bring new offerings to the market as quickly as possible and then rapidly scale to attract and satisfy investors (Kuratko et al., 2020). While these dynamics have benefits, an overlooked hazard is that entrepreneurs' efforts to fake it can become a slippery slope to alleged fraud when entrepreneurs, blitzscaling or otherwise, fail to "make it" (Scheaf & Wood, 2021). This creates tension as the fake-it-'til-you-make-it culture in entrepreneurship promotes a normative mindset among entrepreneurs that deceiving stakeholders is necessary but fails to acknowledge fully the hazards of doing so (Rutherford et al., 2009).

This overarching culture and resultant individual mindset of faking it in entrepreneurship has become a balancing act for entrepreneurs. On the one hand, embellishing facts related to things like the benefits of new products is an artifact of entrepreneurs being overconfident and can be a highly effective strategy that is even expected by stakeholders (Moore, 2021). On the other hand, because faking it involves deception, it can quickly become more fiction than fact. While the notion of fake it 'til you make it has been intended to reflect entrepreneurs' use of far more fact than fiction, technological and other advances have ushered in a mechanism by which endeavors based on more fiction than fact can gain traction. For instance, Theranos and its founder Elizabeth Holmes serve as salient examples given the widespread attention received for faking critical aspects of the Edison blood testing devices to secure investment capital (Waltz, 2017). Theranos has been characterized as a dangerous unicorn in which the founder engaged in "myopic personal ambition, bad-faith inducement, an apparent dearth of strategic thought, fraudulent storytelling, and scientific impossibility" (Straker et al., 2021, p. 3). It is this type of dynamic that is a concern as it reflects the reality that fake it 'til you make it can metastasize, intentionally or not, into something quite sinister.

How does this happen? The answer is complex, but it rests on the recognition that the business world is a social construction (Berger & Luckmann, 1966). As business practices become institutionalized with socially constructed edifices, the underlying meaning behind those practices can become distorted, resulting in the distorted version being taken for granted (Mizruchi & Fein, 1999). In the case of fake it 'til you make it, we advance that the original meaning of faking it to combat barriers to action (e.g., imposter syndrome) has been distorted such that the target audience for faking it has shifted from the self (i.e., the entrepreneur) to others (i.e., stakeholders; Clance & Imes, 1978). This means the entrepreneur moves past using faking it as a means of self-deception intended to overcome fear and bolster self-confidence, and instead, faking it becomes stakeholder-focused via fabricating a fictional reality for outsiders to garner their support. We contend that shifting the target of faking it from the self to stakeholders can create a significant hazard of fraud when entrepreneurs wrongfully assume that they have the power to turn fiction into fact (Scheaf & Wood, 2021). It is this potential pitfall of fake it 'til you make it that we seek to draw out in this article.

Toward this end, our discussion details how entrepreneurs who fake it create a gap between fact and fiction through their communication with stakeholders that needs to be resolved in order to make it. We highlight that not all faking is equal, and some fiction-fact gaps are more difficult to resolve than others. We identify three determinants that make resolving the fiction-fact gap more or less difficult and posit that the more difficult fiction-fact gaps are to resolve, the greater the likelihood that entrepreneurs will escalate initial deceptions to avoid being exposed, creating a slippery slope toward accusations of fraud. We ground our insights in the foundational understanding that while some actors intend to commit fraud from the outset (i.e., by design), most entrepreneurs likely have no intentions of committing fraud. These good-faith individuals end up in a place they never anticipated, and we contend that part of the reason for this is a distortion of the institutionalized elements of the fake-it-'til-you-make-it culture in entrepreneurship (i.e., the way the game is played), with limited appreciation for how deceptions can compound. It is this amplification process that we hope to mitigate so that entrepreneurs— whose claims and associated outputs are often difficult to verify—become less likely to cascade into fraud.

## 2. What is fake it 'til you make it?

Entrepreneurs bring new introductions to the market, and those introductions face rather long odds of success. New introductions are essentially unproven ideas that are based on entrepreneurs' intuitions about what potential customers or users might need or want relative to what is currently available (Shane, 2003). A key challenge here is that a new offering must be distinct from what already exists but cannot be so different that the offering is seen as unrealistic or impossible to

execute (Navis & Glynn, 2011; Stinchcombe, 1965). In the early days of conceptualizing and developing new offerings, entrepreneurs tend to claim distinctiveness while at the same time establishing legitimacy through storytelling (Navis & Glynn, 2011; Pollack et al., 2012). Stories are developed and used to paint the picture of entrepreneurs' visions in ways that denote something distinct about the offering such that it will appeal to potential customers and other needed supporters, who are largely strangers at the beginning (Fisher et al., 2016). Hence, entrepreneurs use stories to marshal needed resources and support from external actors, and their ability to do so has "a significant impact on the survival and sustainability of a new venture" (Fisher et al., 2017, p. 128).

As entrepreneurs develop stories, they embed in each story mechanisms of identity (i.e., who the entrepreneur and venture are) and association (i.e., connections with recognizable actors or entities) to build an image of the venture that aligns with the expectations of external audiences such as customers and investors (Fisher et al., 2017). In essence, external audiences are influenced by embedded institutional logic — "historical patterns of material practices, assumptions, values, beliefs, and rules by which individuals produce and reproduce their material subsistence" (Thornton & Ocasio, 1999, p. 804) — and entrepreneurs develop explicit statements about their identity and association that are thought to resonate with the institutional logics of needed transaction partners (see Pahnke et al., 2015). This is where fake it 'til you make it enters the equation.

We define fake it 'til you make it as the practice of entrepreneurs using deception to exhibit the perceived characteristics of successful entrepreneurs and/or successful entrepreneurial ventures with the intent to eventually turn fictional elements into reality such that an economically viable and sustainable business venture is created. Unpacking this definition into its components, we see that while deception is fundamental to faking it, fictions cast by entrepreneurs are done so with the intent to make true what they are saying. For that to happen, entrepreneurs' words must be backed by entrepreneurial action. This aligns with work on entrepreneurial intentions that has established intentions as fundamental for implementing entrepreneurial ideas (Bird, 1988) and for realizing key entrepreneurial outcomes (Shapero & Sokol, 1982). Moving from intention to behavior, entrepreneurial action theory denotes the importance of activities that involve "the location, the form, and the use of goods, resources or institutions" (Herbert & Link, 1988, p. 155) as core to turning visions of what could be into concrete realities (McMullen & Shepherd, 2006).

These elements of intention and action serve as a basic premise of fake it 'til you make it. An entrepreneur's motive at the onset of their venture is to take the actions needed to deliver on the vision of the venture and its offering(s) and, therein, make it. As this vision implementation process unfolds, the faking-it aspect typically involves the use of deception targeted at stakeholders to induce transactions or other needed support (Theoharakis et al., 2020). The magnitude of deception can vary, but the underlying factor remains that entrepreneurs are knowingly embedding false information in the stories they tell to stakeholders as means to garner the support needed to start or perpetuate their entrepreneurial endeavors. As previously noted, one place where this happens is in blitzscaling, whereby entrepreneurs attract investors by prioritizing high-velocity growth over other business priorities, and in doing so, some entrepreneurs push things beyond their capabilities and end-up launching unfinished or inferior products (Kuratko et al., 2020).

Because entrepreneurs pushing things too far has become commonplace, it is sometimes used by con artists to devise fraudulent schemes, and therefore we note that an important qualifier of fake it 'til you make it is that it involves *actual entrepreneurs* who are starting or growing legitimate and legal businesses as opposed to imposters posing as entrepreneurs who fabricate businesses in cons and scams.[1] For entrepreneurs engaged in legitimate venturing, using deception can be effective when the entrepreneur fakes it and makes it. In such cases, concerns of fraud are minimal because the entrepreneur was able to fulfill his or her vision that previously included elements of fiction at the time of the communication but, through the entrepreneur's efforts, have now been made factual (i.e., fiction becomes a reality), resulting in no material harm to stakeholders. By contrast, there are instances where entrepreneurs use deception to fake it but fail to make it. In these cases, entrepreneurs are unable to turn fiction into reality which squanders resources and, by extension, causes harm to those who supported the endeavor (Campana, 2016) and also inflicts damage on the entrepreneur's reputation (Fassin, 2005).

[1] See Scheaf and Wood (2021) for more on fraud and entrepreneurship.

Given the uncertainty of outcomes in entrepreneurial projects, a key challenge with fake it 'til you make it is that because it is future-oriented, one can never be sure if the fictional elements of the venture embedded in one's story can be made fact (Dimov, 2011; Packard & Clark, 2020). One reason entrepreneurs may underestimate this uncertainty is that businesses have long been known for amplifying rhetoric and deploying marketing tactics such as *puffery* (i.e., exaggerating the value and benefit of product or service features to entice stakeholder engagement and support; Gao & Scorpio, 2011; Haan & Berkey, 2002). These types of strategies have proven especially useful when there is a sizable power differential between the entrepreneur and the respective stakeholders (Waldron et al., 2016). This practice, however, neglects the well-documented potential downside to puffed rhetoric in which businesses move beyond exaggeration to engage in material deceptions that deliberately mislead stakeholders into taking action that otherwise would have been forgone (Haan & Berkey, 2002). While such issues are a concern for business in general, they take on additional gravity for entrepreneurs because they are engaged not just in puffed advertising of an established product or service but also in creating a new offering where the elements of the product or service may not just be exaggerated, but imagined (Shackle, 1979). Whether the elements of the new product or service will materialize in the way the entrepreneur has imagined remains to be seen.

Hence, fake it 'til you make it involves entrepreneurs taking gambles. They hope to deliver on what was deceptively presented to the exchange partner before the deception is uncovered (Pollack & Bosse, 2014). Research by Brenkert (2009) demonstrates this with documentation of an entrepreneur who deceived an advertising agent by deceptively overstating the number of employees on his payroll, exaggerating the size of his marketing budget, and fabricating the number of media outlets promoting his product which resulted in the agent providing the entrepreneur with delayed payment terms for ad space in a leading industry magazine. The issue, however, was that the entrepreneur could not afford the ad buy unless the ad itself was successful. As it turned out, the ad was successful, and the entrepreneur was able to pay his invoice, rendering no material harm to the vendor. In this case, the entrepreneur faked it and made it—he was able to follow through on what was promised even though he used deception to garner partner support. On the other side of the coin, a study by Hossain and Oparaocha (2017) documents how some entrepreneurs overstate technological functionality to induce investment on crowdfunding platforms, only to eventually ship a product with inferior functionality because the entrepreneurs could not resolve the fiction-fact gap. In these cases, entrepreneurs faked it and did not make it because they were unable to deliver on the quality that was promised.

These illustrative examples reveal the double-edge sword of faking it. First, the deception is intended to be temporary because if things go as planned, the fictional elements entrepreneurs communicate in the present will cohere with reality in the future, rendering no material harm related to faking it. Second, faking it is effectual in the sense that fictional elements are intended to produce the desired result of garnering needed support from outsiders. Hence, faking it is strategic and targeted so that it aligns with what entrepreneurs believe stakeholders want to hear (Metcalfe, 1990). The risk for both the entrepreneur and the stakeholders, however, is that despite the temporary and effectual intentions of fake-it-'til-you-make-it deceptions, the execution of one's plans may not work as intended. This is concerning because when the expectations established by entrepreneurs' faking it are not carried out promptly via effectuating results that reconcile the entrepreneurs' stories of what could be with the reality of what is, stakeholders lose invested time and/or money. This occurs as individual stakeholders accept entrepreneurs' statements as truth when entrepreneurs have been fabricating (i.e., faking) aspects of their individual capabilities, elements of new market offerings, and/or venture activities. Stakeholders often lack the time and energy to conduct due diligence in the verification of an entrepreneur's claims (Ellman & Hurkens, 2019), which, as a result, leads stakeholders to engage in transactions with the entrepreneur that they might not have if they had received accurate rather than fake-it statements from the entrepreneur (see von Werder, 2011; Williamson, 1993). Given these dynamics, a key insight we offer here is that problems for stakeholders emerge when the temporary and effectual aspects of entrepreneurs' deceptions become visible as entrepreneurs struggle to turn fiction into fact.

Although it is well documented that some entrepreneurs fake it and make it while others fake it and do not make it, there has been little discussion as to what distinguishes these cases. Below, we unpack the elements of faking it by conceptualizing three determinants that make turning fiction

Case 1:25-cr-00592-LAK Document 88-1 Filed 10/15/26 Page 334 of 506


into fact less instead of more difficult. Specifically, we look at whether resolving the fiction-fact gap involves controllable vs. uncontrollable elements, sole vs. contingent entrepreneurial action, and limited vs. extensive stakeholder interaction determines the difficulty of the resolution, and therein the likelihood of making or not making it. Fake it 'til you make it begins to unravel when entrepreneurs struggle to resolve the *fiction-fact gap*, which drives entrepreneurs to engage in more faking to conceal prior deceptions. Hence, entrepreneurs struggling to resolve fiction-fact gaps are prone to escalate deceptions as they confront the path dependencies of past fictions. This escalation of faking it can generate such a wide gap between fiction and fact that if/when stakeholders become aware of the untruths, there is a real hazard of fraud accusations. We illustrate this model in Figure 1.

## 3. Determinants of fiction-fact gap resolution difficulty and escalation of deception

### 3.1. Controllable vs. uncontrollable focus of deception

The first determinant in whether resolving the fiction-fact gap is less versus more difficult depends on the degree to which the entrepreneur has control over the actions needed to close the gap. *Controllability* is often referred to in management research as a boundary of the firm issue, where boundaries determine which activities are engaged inside of or outside of the firm (e.g., Thompson, 1967). We apply the same logic to entrepreneurial endeavors such that entrepreneurs make claims about who they are, what they are doing, and what they plan to accomplish. The stories they tell in this regard are often construed to reflect audience preferences such that an entrepreneur's claim delineates the new offering as unique from what is currently in the market (Fisher et al., 2016). At issue, however, is that entrepreneurs act on an imagined rather than an actual future, and this entails an "emergent flow" (Venkataraman et al., 2013, p. 165) whereby the pathway forward and the final destination are not fully known (McMullen & Dimov, 2013). This fluidity gives entrepreneurs ample space to construct their own truth about what can realistically be achieved and how to do it. This is where controllability comes in.

Controllable factors are those elements of the entrepreneur's claims and commitments that the entrepreneur has a direct and significant impact on the degree to which the factor materializes and operates as it should. New product development research, for example, delineates factors such as "product quality" and "proficiency of technical activities" as controllable (Calantone et al., 1996, p. 343), and these controllable elements are crucial as metanalytic studies have concluded that factors most strongly associated with the success of new products are controllable (Montoya-Weiss & Calantone, 1994). Concerning fake it 'til you make it, then, it matters whether the fictional elements of entrepreneurs' claims involve controllable factors. When fictional elements are under the control of the entrepreneur, the entrepreneur is better able to leverage the temporary and effectual aspects of faking it so he or she can indeed make it. In other words, entrepreneurs are more likely to turn fiction into fact when the fiction concerns elements that are controllable by the entrepreneurs.

Field testing a new product is largely under the control of the entrepreneur. Research by Kowalska

**Figure 1. Fraud hazard model of Fake It 'Til You Make It**



(2018) documents that in one instance, an entrepreneur claimed to outsiders that products within its control had been tested when, in reality, the products were still under development. That said, entrepreneurs have at least some ability to make field testing happen and can even do so on an accelerated timeline if needed. Hence, because field testing has a high degree of controllability, the entrepreneur has some power over the degree to which deceptive claims about field testing can become a reality rather than remain fiction. By contrast, uncontrollable factors are more problematic given the lack of power entrepreneurs have to effect outcomes. If the entrepreneur, for example, claims that he or she will receive a CE mark (i.e., certification for health, safety, and environmental protection standards in Europe) in 3 months but knows full well that the average time frame to receive the certification is 9 months, then it is almost certain that the fiction-fact gap will remain unresolved because the entrepreneur lacks the necessary control to turn the fiction into fact.

As this divergence between what was claimed (fiction) and what is possible (fact) is constructed by the entrepreneur, it becomes problematic because, over time, initial deceptions are likely to escalate both in scope and frequency. A single initial mistruth can create a spiral of deception as that mistruth is continuously stretched (increases in scope) or is compounded with multiple mistruths offered to justify the first (increased frequency). This escalation reflects the path-dependent nature of fake it 'til you make it, via which early deceptions lock in (Page, 2006) the entrepreneur to the falsehood and, therein, the lie cascades in ways that make truthful options less and less available over time. Entrepreneurs can consciously reinforce faking it, but by doing so, the initial deception is compounded in ways that create an irreconcilable rift between reality and the false narrative, which can ultimately lead to the commission of entrepreneurial fraud.

## 3.2. Sole vs. collective entrepreneurial action required

A second determinant in whether resolving the fiction-fact gap is less vs. more difficult to close depends on the degree of complexity required in subsequent entrepreneurial action. The complexity of subsequent entrepreneurial action ranges from activities solely dependent on the entrepreneur's action(s) to activities that require collective action(s) among other key players like cofounders, critical employees, key investors, and the like. New ventures are unknown to the world and, in response, entrepreneurs make self-referential claims that define the essence of the endeavor by specifying its core attributes and key objectives (Corley & Gioia, 2004). These claims allow outsiders to make sense of why the venture exists and understand, as potential stakeholders, their role and purpose concerning the venture (Fisher et al., 2016). While a solo entrepreneur is confronted with the constraints of limited time and competing priorities (Neergaard, 2005), these can often be overcome via entrepreneurial hustle whereby, via sheer determination and associated long work hours, solo entrepreneurs deploy unorthodox actions that address immediate challenges (Fisher et al., 2020). Hence, with solo entrepreneurs, there are fewer contingencies. This creates a pathway by which hustling is effective because there is a clear line of sight between the person who made commitments that included fictional elements and the person who will take the actions required to deliver on those commitments.

By contrast, entrepreneurial endeavors can require a high degree of collective action. This happens when the skills, resources, and actions needed to implement entrepreneurs' visions exceed their capacity to fulfill commitments by themselves. No longer does reconciling the fictional fake-it-'til-you-make-it narrative about what can be achieved rests on the actions of a single person, but instead, it rests on several individuals acting in concert. While working collectively has its advantages in terms of enhanced creativity, information-processing, and problem-solving capabilities (Derksen et al., 2019), resolving the fiction-fact gap becomes exponentially more complex under these conditions because it requires effective synchronization among actors (Mohammed & Nadkarni, 2014). There are ample discussions in teams research concerning the challenges of contingent action (see Guzzo & Dickson, 1996), which, due to the uncertainty of entrepreneurship, are often amplified in entrepreneurial teams (Patzelt et al., 2020).

Indeed, the success of contingent action often rests on a "common understanding of the time-related aspects of executing collective tasks" (Mohammed & Nadkarni, 2014, p. 405) that can be hard to achieve in entrepreneurial teams because of the newness of their initiatives (Stinchcombe, 1965). Entrepreneurial teams routinely face the need to perform tasks for the first time (e.g., designing a new product, implementing new technology), which means that trial-and-error processes are the norm (Patzelt et al., 2020) and it is difficult, if not impossible, for entrepreneurs

to coordinate trial-and-error types of tasks. Prior research demonstrates that collective action often unfolds unevenly. Neergaard (2005, p. 257) studied networking in entrepreneurial teams and found that "not all founding team members are equally active networkers" often because team members vary in the desire to network, the networking skills possessed, and so forth. This is indicative of the collective action conundrum because while adding team members increases capacity, it also adds contingencies to the mix. One cannot simply hustle their way to making fiction reality because others must do the same to accomplish the shared objective. What does this means for fake it 'til you make it? If the venture has made fictional claims requiring collective action, then the uneven performance by those involved (i.e., team members) can become a liability for the entrepreneur.

Accordingly, when faking it involves a high degree of collective action to make it, there is a higher likelihood that fiction will remain fiction. Collective action creates contingent relationships in which the actions of one person depend on the actions of others, limiting the agency the entrepreneur has in achieving promised outcomes (Mohammed & Nadkarni, 2014). This can be problematic to resolving the rift between fiction and fact in fake-it-'til-you-make-it claims. For instance, while one or more of the key players may believe the vision of the future presented to the world can be achieved, if some of the actors are less capable than expected or simply not fully bought in, then the contingent nature of collective action hinders the likelihood of the success for the endeavor. As these dynamics surface, entrepreneurs are placed on pathways where promises go unfulfilled and they may make moves toward escalating deception. Perhaps ironically, we contend that collective action deceptions may morph from initial embellishments about the new offering (e.g., product features, shipping availability) to deceptions that cover up voids in contingent action such as deficiency of co-founders, to the point that the original deceptions about the offering fade while new targets take center stage. The entrepreneur may point to the failures of specific team members as an excuse for not turning fiction into reality.

### 3.3. Limited vs. extensive stakeholder interaction

A third determinant of whether resolving the fiction-fact gap is less or more difficult concerns the frequency of interaction between the entrepreneur and stakeholders after the entrepreneur engages in faking it (i.e., communicating information that contains fictional elements). In agency-based relationships in which stakeholders (e.g., backers, shareholders, bankers) trust actors (e.g., entrepreneurs) to behave per stakeholder interests, information asymmetries between the parties provide actors with the opportunity to conceal information (Abrahamson & Park, 1994). To mitigate information asymmetry, stakeholders often expect, or even require, periodic updates from principles (i.e., entrepreneurs) about how the project is progressing and whether promised milestones are being met. In crowdfunding, for example, entrepreneurs often commit to giving investors/backers periodic updates, and it is often expected by investors/backers that entrepreneurs will update them on project progress with high frequency (Block et al., 2018). Information exchanges can take different forms (e.g., email announcements, verbal communication, press releases), but a key element in determining whether it is easier or more difficult to resolve the fiction-fact gap is the frequency (i.e., minimal to extensive) by which an entrepreneur-to-stakeholder information exchange occurs.

Entrepreneurs who initially fake it to paint a rosier picture of their venture to stakeholders create a fiction-fact gap that needs to be resolved before the stakeholders become aware the gap exists. In other words, once entrepreneurs fake it at the onset of establishing expectations, the clock officially starts ticking for entrepreneurs to make fiction a reality. As stakeholders demand more frequent updates, there is less time between updates to make progress on resolving the fiction gap; thus, further faking may be required to show progress is in line with stakeholder expectations, many of which were established as the result of the entrepreneur's deception. Entrepreneurs that fail to make it (i.e., fulfill their commitment) before time runs out are likely to be confronted with deception laid bare for all to witness. For example, an entrepreneur who states that the venture has reached a milestone in sales (e.g., $500,000) when sales are lagging (e.g., $300,000) must make up for the sales lag and progress to an even higher level of sales to demonstrate continued progress for future interactions. If the stakeholder meeting only occurs quarterly, then the entrepreneur has a longer window to turn fiction into fact. However, if the stakeholder requests weekly sales figures, the entrepreneur's compressed interaction time window makes it more difficult to resolve the fiction-fact gap. Hence, each time entrepreneurs exchange information with stakeholders becomes a potential

trigger point for deception escalation while they work to close the gap between fiction and reality.

Unpacking this further, deception can escalate as the frequency of exchanges with stakeholders increases because there is a temporal focus on the information exchanged. As Wood et al. (2021) noted, entrepreneurs develop narrative stories that are future-focused, but those stories are anchored in the present. Entrepreneur information exchanges (i.e., project updates) that are consistently future tense rather than present tense are more likely to be injected with deceptions that increase the gap between fiction and reality. Returning to the example of new product field testing, if the entrepreneur must engage in frequent information exchanges with stakeholders about a field test, this creates a proximal effect wherein the space between what the focal actor knows and what associated others know is reduced simply because the parties interact frequently (Pratt et al., 2010). This creates a situation in which if the field test has not happened or is not going as planned, then they will point to the future as the solution as exemplified in this future-based claim: "We will have a successful field test next month." Compare this to the following present-based claim: "We just completed a successful field test." The present tense puts the entrepreneurs on record as an event that has happened as opposed to what will happen in the future, and this truncates the fiction-to-fact reality gap because the claim is the field test event has already happened with results that should be verifiable by stakeholders.

The net effect, here, is that with fewer information exchanges, stakeholders can more readily assume that things are going according to the entrepreneur's plan, and this gives the entrepreneur a longer runway to turn fiction into fact. When frequent interactions with stakeholders are expected or demanded, the fiction-to-fact transformation runway is condensed, and entrepreneurs are more likely to engage in escalating deceptions that widen the fiction-to-fact gap, especially when the exchanged information is focused on future possibilities as opposed to present realities.

## 4. Fraud hazard as a reality of faking it but not making it

The quintessential risk for entrepreneurs engaging in fake-it-'til-you-make-it deception is being accused by stakeholders of committing fraud—a misrepresentation made recklessly without belief in its truth to induce another person to act to their detriment. Since the hazard of a fraud accusation flows from the perception of stakeholders that some material harm came to them as the result of deception, what determines whether such perceptions of harm surface is whether the entrepreneur can reconcile the fictional elements of their claims with the reality that follows (Scheaf & Wood, 2021). Assuming entrepreneurs are acting in good faith, the outcome of fake-it-'til-you-make-it deception rests almost entirely on whether the gap between fiction and fact can be successfully closed within a specified time window and done so with a level of efficacy that satisfies stakeholders, rendering the result faked it and made it.

While faked it and made it is the desired outcome, the harsh reality is that entrepreneurial endeavors are highly uncertain (Shane & Venkataraman, 2000), which renders high odds that fictional elements cannot be made into fact, be done at the pace required, or be effectuated at a level that is acceptable to stakeholders. When these circumstances arise, the entrepreneur's deception is exposed and it becomes clear that the result of the unresolved fiction-to-fact gap is that the entrepreneur faked it but did not make it. What should be appreciated here is that entrepreneurs' deceptive claims, even those that start as minor embellishments, unwittingly expose stakeholders to unknown probabilities of loss (von Werder, 2011). Once discovered, this exposure can trigger a significant backlash against the entrepreneur. Severe backlash is likely to involve accusations of fraud, and oftentimes this results in corresponding legal action (Scheaf & Wood, 2021). The aforementioned opens the door to an overlooked fraud hazard embedded in the fake-it-'til-you-make-it culture in entrepreneurship: Early deception(s) can sometimes escalate to the point that stakeholders accuse the entrepreneur of committing fraud.

When looking holistically at fake it but did not make it as a potential and dare we say likely outcome (see Figure 1), the concern for entrepreneurs becomes clear. It is a short leap—rather than a long road—from fake-it-'til-you-make-it deception to ending up in the realm of entrepreneurial fraud. This is one of the downsides of the fake-it-'til-you-make-it culture and mindset in entrepreneurship and one that is not talked about very often. Rather than using deception as a self-enhancing mechanism to build confidence in the face of uncertainty as is often touted in the popular press, our discussions highlight that deception must be very carefully navigated so that one is aware of the drivers of the difficulty of resolving the fiction-to-fact gap. Doing so helps ensure that

the chasm between fiction and fact stays manageable, and by extension, escalation of deception can be monitored and stopped when needed. It is with this in mind that we turn to real-world illustrations of the dynamics outlined in our model as they unfolded in the startup ventures of Lordstown Motors and uBiome.

## 5. Fiction-to-fact resolution in action: Two cases of fake it 'til you make it

As our model depicts, not all faking is equal, and some types of faking are more difficult to resolve than others. Specifically, entrepreneurs that employ faking, which involves uncontrollable elements, contingent action, and spans extensive stakeholder interaction, run the risk of not being able to resolve the fact-fiction gap adequately, or ever. Entrepreneurs struggling to make fiction into fact are likely to escalate their deceptions to conceal past misdeeds in an attempt to buy more time. This tailspin of deception creates a fraud hazard for entrepreneurs. When stakeholders' expectations are established using fiction and subsequently are not met because the fiction cannot be converted to fact, it can result in stakeholders accusing entrepreneurs of fraud. This hazard is real. Numerous well-intentioned entrepreneurs have been caught up in the fake-it-'til-you-make-it game, not realizing the dangers it poses to their careers, reputations, and well-being. To illustrate the very real danger that exists and the dynamics outlined in our model, we discuss two startup cases, Lordstown Motors and uBiome, whose founders and venture leaders escalated faking it to the point to which they were accused of fraud.

### 5.1. Lordstown Motors

Founded in 2018, Lordstown Motors is an electronic vehicle manufacturer based in Lordstown, Ohio. The company's stated mission is to design and manufacture electronic commercial vehicles to "revolutionize the way work gets done" (Lordstown Motors Corp., 2021). In November 2019, Lordstown Motors invested $12.2 million to start production of a new electric truck: the Endurance (Business Journal Daily, 2020). The company also acquired the former General Motors Lordstown auto manufacturing plant for $20 million with production plans expected "to ramp up as early as the second half of 2020" (Nelson, 2019). The founder and CEO of Lordstown, Steve Burns, consistently claimed that a critical element that made Lordstown Motors an attractive company for investor support is speed to market. Burns insisted the company was beating the competition by being the first mass producer of full-size electric pickup trucks, allowing Lordstown to capture significant market share (Gastelu, 2021). Burns' statement about capturing market share by being first, however, was highly speculative and largely out of his control. In other words, his claim that Lordstown would be first to market contained fictional elements that Burns hoped to make a reality. Burns repeatedly stated the company would be first to market even though its aggressive production plans were full of challenges and setbacks—several of which even a casual observer could recognize.

As the endeavor progressed, the company fell significantly behind the first-to-market timeline that Burns had consistently advocated, resulting in several revised vehicle delivery target dates. While Burns had initially indicated that deliveries would begin at the end of 2020, in April 2020, Burns announced this timeline would be pushed back to January 2021 as a result of COVID-19 (Lordstown Motors Corp., 2020a). While the company attributed the delays largely to the pandemic, this was a misdirection as the company continued to push back product deliveries and, as the public would later learn, pervasive vehicle design and manufacturing issues played a major role in hampering the progression toward product delivery. Thus, by continuing to fake it, Burns was able to buy the company time in hopes of eventually making it.

Despite a series of major setbacks and the resultant chasm in the fiction-fact gap, Burns doubled down on his faking it by continuing to push the promise of its product to the public and investors just months before taking the company public to raise a significant amount of capital from investors (Vanac, 2020). In June 2020, Lordstown hosted a highly publicized event to unveil the Endurance to the public, and at the unveiling Burns announced that Lordstown had its "first year of production already pre-sold" with "preorders and letters of intent" for 20,000 vehicles (Lordstown Motors Corp, 2020b). These claims were an escalation of deception because the firm was not close to being ready to commence with product deliveries, and the preorders Burns discussed were no more than nonbinding letters of interest. In 2021, Burns' fake-it-'til-you-make-it campaign and related endeavors would soon unravel as the company failed to make fiction fact.

In March 2021, a research report called "The Lordstown Motors mirage: Fake orders, undisclosed production hurdles, and a prototype

inferno" revealed significant concerns around deceptive claims regarding the progress of the company's production timeline as well as the quantity and quality of the customer preorders (Hindenburg Research, 2021). The report included interviews with former employees describing, in detail, the reasons for the production delays. Employees highlighted drastic design modifications to the Endurance along with manufacturing issues that put the company years out from production as opposed to the short timelines Burns continued to promise the public and investors. In fact, in January 2021—the month that Burns indicated at the Endurance unveiling that initial product deliveries would be made—a police report indicated that an Endurance prototype had gone up in flames 10 minutes into a test drive. Thus, Burns was having great difficulty closing the gap between fact and fiction.

Even worse, Burns engaged in what appears to be smoke-and-mirror-style deception related to Lordstown's customer preorders. Unlike its competitor Tesla, which took prepayments for customer preorders, Lordstown was paying an outside firm called Climb2Glory to secure nonbinding preorders by paying Climb2Glory $50 per preorder. A company representative included in Lordstown's preorder count exclaimed: "I'm not committed to anything, not to buying a single vehicle. I committed to *consider buying* vehicles. I'd have a lot of questions before I commit to anything" (Hindenburg Research, 2021). Another potential customer came forward and revealed: "The letters of interest are non-binding. It's not like you'd obligate yourself to a preorder or that you would contractually bind yourself to buying this truck" (Hindenburg Research, 2021). In addition, the researchers found that a 14,000 truck preorder deal—$735 million—was made by a 3-man firm called E Squared operating out of an apartment, and one of the members of E Squared admitted that its preorders were estimates for some undisclosed project. Hence, many of the preorders Burns presented to investors were not preorders at all, and many of the nonbinding commitments were highly questionable at best and fraudulent at worst.

What the Lordstown case illustrates is that its founders' initial fake-it claims to early investors about being first to market and capturing significant market share did serve to direct attention to Lordstown, but it also generated a rift between fact and fiction. The claim was highly problematic from the start because it exhibited all three determinants of difficult fiction-fact resolution that we outline. First, reaching technological feasibility for an electronic pickup truck in a compressed time frame is full of challenges that are outside the sole control of Steve Burns. To reach technological functionality, consistency, and safety of a machine as complex as an electronic pickup truck and do so for mass production is a major undertaking, and simply claiming you can overcome technological and engineering problems does not mean those claims can be satisfied. Second, the production of an electronic pickup truck rests on contingent action. Steve Burns and the rest of the top management team at Lordstown could not simply work on the truck themselves. Indeed, Lordstown outsourced much of the technology and key components of the Endurance to other firms such as Workhorse Technologies, and these necessitated numerous engineers working in tandem to develop the vehicle (Hindenburg Research, 2021). Third, Lordstown's investment trajectory from startup to initial public offering involved numerous stakeholder meetings and public events. The frequent interactions resulted in production problems coming to light and a resultant escalation of deception by Burns, who responded to those concerns with revised timelines and greatly exaggerated claims about preorders.

The net effect is that Burns became stuck when his initial fake-it claims became impossible and the fiction-to-fact gap was unresolvable, which he responded to by expanding the scope of his deceptive claims. As a result, in March of 2021, investors accused Lordstown of committing fraud and filed a class-action lawsuit. The investors claimed that Lordstown had "no revenue and no sellable product" despite Burns and Lordstown management consistently stating otherwise (Associated Press, 2021). In June 2021, Steve Burns resigned from the company (Chapman, 2021).

### 5.2. uBiome

uBiome was established in 2012 by cofounders Jessica Richman and Zac Apte as a company specializing in the analysis of human microbiomes. In November 2012, uBiome raised $350,000 on the crowdfunding website Indiegogo for a gut microbiome test kit sold directly to consumers (Cutler, 2015). The product developed by Richman and Apte was an at-home kit; customers would take mouth swabs, send the samples to uBiome for sequencing, and then receive a result of their gut microbiome. In July 2013, Richman gave a TEDMED talk highlighting the key features of uBiome and citizen scientists, a name used to describe the customers who enjoyed uBiome products. While the company did gain some traction with the at-

home model, Richman and Apte realized that to scale the venture, uBiome's business model needed to pivot from a direct-to-customer sequencing model (the model pitched to Indiegogo backers and TEDMED) to a physician order clinical test model that included billable tests to health insurance providers. uBiome officially developed a diagnostic (i.e., clinical) version of the microbiome kit and received Clinical Laboratory Improvement Amendments certification from the California Department of Public Health. The pivot into the physician-directed healthcare market and resultant health insurance and billable tests was a critical aspect of the business in pitches made to professional investors. As a result, the startup was valued at approximately $300 million and raised more than $100 million in venture funding from leading investment groups, including 8VC, Y Combinator, and Andreessen Horowitz (Alois, 2014).

During venture development, Richman and Apte routinely made claims about company progress, projected revenues, and profitability (Farr, 2019). However, these statements about revenue and profitability contained fake-it-'til-you-make-it elements. The duo blurred the lines by leveraging the enthusiasm of the Indiegogo campaign and the direct-to-consumer model as evidence for market penetration and then used growth numbers and metrics based on billable tests (i.e., insurance claims) produced for the healthcare business model. However, Richman and Apte were aware that billable tests filed as insurance claims only materialize into revenue if insurance companies validate the claim and issue reimbursements. The pitch and valuation model put pressure on Apte and Richman once they encountered significant hurdles and obstacles to capturing health insurance reimbursements.

Faced with coming clean about the obstacles or escalating the deception, Richman and Apte decided to escalate the deception by "falsely describing the firm as a rapidly growing company with a strong track record of reliable revenue through health insurance reimbursements for its tests" (SEC vs. Apte & Richman, 2021). This escalation of deception created a dual problem for Richman and Apte. First, uBiome needed to ramp up the ordering of billable tests to offset declined claims; however, Richman and Apte found it difficult to get physicians to order the tests for their patients. In response, Richman and Apte undertook an aggressive direct-to-patient marketing strategy. uBiome advertised diagnostic testing kits to individuals based on internet search history related to gastrointestinal issues and illnesses. Once patients received the testing kits, uBiome would send upwards of three email reminders every week until tests were returned, and even incentivized patient kit return by offering Amazon gift cards in exchange for returned kits (Farr, 2019).

While the direct-to-patient marketing approach facilitated submitted tests, it created a second serious problem. To validate claims, health insurance providers require physicians who have established a doctor-patient relationship to approve the ordering of uBiomes clinical tests. Given that the test kits were sent direct-to-patient without a physician provider ordering the test, Apte and Richman created a website that connected doctors with consumers for purposes of ordering tests (Pflanzer, 2021). Apte and Richman designed the website to steer doctors toward ordering tests based on online questionnaires and without synchronous patient interactions, while giving the appearance to health insurance providers that doctors established the required doctor-patient relationship. Despite warnings from uBiome's general counsel against any tests prescribed based solely on consumers' questionnaires instead a live consultation between consumer and doctor, Apte and Richman continued uBiome's use of the questionnaire-based doctor network and concealed this fact from the general counsel and the uBiome board (SEC vs. Apte & Richman, 2021). Even more egregious, uBiome duped doctors on the website into approving many nonclinical tests. Apte and Richman submitted consumers' old samples and deceived doctors by making the consumers' resulting retest requests appear to be entirely new requests. For example, at Apte and Richman's direction, uBiome resubmitted consumers' originally reported symptoms to the doctors reviewing retest requests as if they were newly reported symptoms. This operation allowed uBiome to consistently overbill the patients' health insurance providers (Farr, 2019). The company adopted as standard practice billing insurance providers $2,970 per test, and each kit involved six total tests. All the while, the company updated investors with metrics that appeared to be authentic orders from physicians who previously established a doctor-patient relationship and were ordering the tests based on their medical judgment.

While it is easy to see that what Richman and Apte were engaged in was unethical and likely illegal, it all started with fake-it-'til-you-make-it claims, and as those initial claims became difficult to resolve, they escalated the deception. This dynamic followed the pattern outlined in our

model. First, uBiome had little control over physicians ordering the microbiome tests. The determinants of test ordering are patient needs and the medical relevance of the tests. However, medical professionals did not readily see the utility of sequencing the microbiome for their patients' needs. Second, the business model is based on a complex and contingent network of agents with differing incentives: the patients rarely have preferences for diagnostic tools, healthcare providers need to be aware of the benefits of uBiome's test kits, and the insurance providers need to ensure validation of the tests and medical necessity to approve claims to issue reimbursement with an incentive to decline claims. In other words, the payer of test kits is disconnected from the person who orders the test, who is disconnected from the test user. These contingencies made it extremely difficult for Richman and Apte to turn their fictional claims around things like revenues into fact. Last, the frequent interaction between uBiome and its high-profile investors contributed to intense pressure to deliver on the fake-it-'til-you-make-it claims the duo offered. This pressure likely contributed to Richman and Apte's decisions to escalate faking it by deceptively billing health insurance providers.

The inability of the cofounders to turn fiction into fact and the repeated escalation of deception manifested, as our model would predict, into a fraud hazard. In April of 2019, uBiome offices were raided by the FBI. Richman and Apte were placed on administrative leave in May 2019. Following a Federal investigation, Jessica Richman and Zac Apte were charged in March 2021 with Federal Securities, Health Care Fraud Conspiracies in an indictment served by the U.S. Attorney of the Northern District of California and sued by the Securities and Exchange Commission (SEC vs. Apte & Richman, 2021; United States vs. Apte & Richuman, 2021). If convicted, they face severe financial penalties and potential jail time.

## 5.3. Lordstown Motors, uBiome, and the fraud hazard model

The Lordstown and UBiome cases illustrate the problems that surface when fake-it-'til-you-make-it practices create a significant rift between fact and fiction. The fictional claims made by the entrepreneurs behind Lordstown Motors and uBiome were highly problematic because they exhibited all three of the determinants of difficult fiction-fact resolution outlined in our model (see Figure 1). For Lordstown Motors, building an entirely new electric pickup truck in a compressed time frame rests on many uncontrollable elements and Lordstown doubled down on the uncontrollable by contracting much of the truck's initial engineering development to an outside firm. At the same time, developing the truck required wide-scale collective and contingent action. Many of the elements needed to produce the truck were considerably outside the control of Steve Burns and simply claiming he could overcome technological and engineering problems did not make it a reality. Just as critically, Lordstown's investment trajectory from start-up to initial public offering involved extensive stakeholder interaction via regular meetings with investors and numerous public events. The frequent interactions brought fiction to fact resolution failures to light and just as our model predicts, resulted in further escalation of deception. Burns responded to investor concerns with greatly exaggerated claims about things like the number of customer preorders.

In the case of uBiome, we observe a similar pattern. First, uBiome had limited control over physicians ordering the microbiome tests, and this created serious issues when medical professionals did not readily see the utility of sequencing the microbiome for their patients.

Second, uBiome's business model was based on a complex and contingent network of agents with differing incentives. Some of the interrelated actions needed to make Richman and Apte's claims a reality were that patients would advocate for the use of uBiome's specific diagnostic tool, healthcare providers would see the benefits of uBiome's test kits and prescribe them, and insurance providers would validate the tests as a medical necessity so that insurance claims would be approved. Making any one of these things happen would have been difficult, but doing all three and coordinating them to happen in lockstep proved, as our model suggests, to be a bridge too far. Finally, the frequent interaction between uBiome's founders and the company's high-profile investors created intense pressure to perform on the fake-it-'til-you-make-it claims the duo offered. The frequent interactions kept them accountable in terms of meeting milestones and timelines, which were largely created by Apte's and Richman's fake-it claims. As milestone failures mounted, the duo responded by escalating deception, crossing a clear line as they began to engage in practices such as deceptively billing health insurance providers.

## 6. Key lessons and takeaways

The Lordstown Motors and uBiome cases demonstrate our model in action where specific determinates make resolving the gap between fact and fiction more or less difficult. On the surface, it is easy for outsiders to assume these founders designed elaborate schemes to defraud customers, investors, and society at the forefront. However, if a more fine-grained and nuanced lens is applied, it appears that the founders of Lordstown Motors and uBiome became caught up in fake-it-'til-you-make-it deception, and through escalation, they were unable to adequately resolve the fiction-fact gap. Reflecting on these cases, we assert that one theme shared between Lordstown Motors and uBiome is the belief among the founders that they would be able to resolve the rift between fiction and fact before any harm was done to stakeholders. This belief, however, relied on three distorted assumptions about the use of fake it 'til you make it, and entrepreneurs would do well to understand such distortions.

First, the founders of Lordstown Motors and uBiome fell into the trap of assuming that the deception is temporary. Second, they assumed they had the power to create the future such that today's fiction would become tomorrow's fact. Third, they assumed that creating a false reality is an easier path than confronting the truth as it is known. We call these fallacies distorted assumptions because they are often accepted in the community of entrepreneurs as conventional wisdom when it comes to the fake-it-'til-you-make-it mindset in entrepreneurship, yet the reality of the assumptions is often quite different from what one might think. Let us explain.

One of the assumptions of fake it 'til you make it is that the deception is temporary. But temporary timelines are fickle, and given the uncertain nature of entrepreneurship, the reality is that the fictional story created by the entrepreneur may never happen or happen so slowly that stakeholders lose patience. As research on things like consumer fraud shows, deceptions are sticky, and the temporary tends to become long-lasting with the magnitude of the deception escalating over time (Holtfreter et al., 2005). Hence, assuming that deception is temporary is a distortion of the most common outcome of entrepreneurship; the visions offered are far more likely to fail than succeed (Shane, 2008). Of course, the entrepreneur can at any point come clean and confess that initial claims were fueled by unrealistic aspirations and thus were embellished but doing so requires overcoming the fear of failure as well as the stigma of entrepreneurial failure (see Cacciotti et al., 2016). Hence, most individuals demur when the chance to come clean surfaces. We contend that this is because the entrepreneur continues to believe that his or her deceptions are temporary, and we caution entrepreneurs against putting stock in such an assumption.

A second distortion is the assumption that entrepreneurs, through their own agency, hold vast potential to turn fiction into fact. Entrepreneurship scholars have long noted the limits of human agency in determining outcomes such as new venture success, with entrepreneurs themselves citing uncontrollable external enablers (Davidsson, 2015) such as technological change and serendipitous shifts in consumer needs as key reasons their endeavors took hold. The narrative of the hero entrepreneur (Shane, 2008) is intertwined with the fake-it-'til-you-make-it mindset, and the net effect is that there is too often a romanticized view of what entrepreneurs hold under their control. Hence, when entrepreneurs deceive themselves and then others about what can be achieved, the reality is that they have limited power to make fiction fact. Entrepreneurs should appreciate this. It is well understood that entrepreneurs are often passionate and optimistic (Cardon et al., 2009), and sometimes act in disinhibited ways (Lerner, 2016) which when coupled with a fake-it-'til-you-make-it mindset, the mix becomes the perfect storm for the development of unrealistic projects that start and end with deception. One way to potentially mitigate the perfect storm is to structurally impede the upper limits of what entrepreneurs claim they can achieve via a mechanism that provides accountability to salient outsiders in the form of sharing key information and getting feedback on the feasibility of various aspects of entrepreneurial plans.

A third and final distortion is the assumption that creating a false reality is an easier path than confronting the truth, as unfavorable as that might be. The fact is that constructing and propagating deceptions is hard work, in part because it requires rationalizing and keeping deceptions straight (Jenkins & Delbridge, 2017), which requires high levels of cognitive energy. Over time, people begin to buy into their own fabrications, and they begin to lose track of the lines between fact and fiction. Hence, entrepreneurs should understand that faking it only gets harder over time. As our discussion on the frequent versus infrequent interactions with stakeholders reveals, faking it may be rather easy in the early days, but in the

long run, keeping up with the embellishments is difficult to do, and entrepreneurs should be aware of this before engaging in such practices. Understanding that once an entrepreneur fakes it, the deceptions create a path-dependent liability where fiction must be made fact before stakeholders find out that false claims have been offered as part of the justification for the endeavor. While the fake-it-'til-you-make-it culture in entrepreneurship may not acknowledge it, deceitful practices create legitimacy lies (Rutherford et al., 2009) that persist far beyond the entrepreneur making it, imprinting deception as an accepted practice on the venture from day one. Hence, entrepreneurs should be conscious of the difficulty of maintaining deceptive claims and even if fulfilled, the potential long-term effects of using deceit. After all, deceptions can be exposed even after one makes it, and such revelations can do serious damage to one's reputation.

Taking the long-term effects of using deceit further, we note that beyond reputational concerns, faking and then making it does not mean it is safe to assume that all is forgotten and by extension, the risk of being accused of fraud goes away indefinitely. Instead, there is lingering concern because, as the entrepreneurial learning literature informs, entrepreneurs tend to repeat what has worked in the past (Minniti & Bygrave, 2001). This gives rise to the logic that because an entrepreneur has faked it and made it in the past, he or she may replicate the practice in the future. In other words, fake-it-'til-you-make-it practices could become a standard procedure in their business practices. Our model suggests that what may follow is a repetitive cycle in which the venture grows, perhaps rapidly as observed in blitzscaling (Kuratko et al., 2020), and does so by leveraging fake-it-'til-you-make-it deception as a strategic mechanism. Under these conditions, an extension of our model suggests that success in one cycle of faking it and making it may trigger additional faking it practices in later phases of the business. As this cycle repeats, the scale of the deception would likely increase in lockstep, meaning that the success of faking-it actions would increasingly compound over time. A key concern here is that this cycle could eventually create a situation where the scale of deception is so significant that not making it could have substantial, wide-ranging negative effects.

Fake-it-'til-you-make-it practices have become engrained in entrepreneurial culture and are often praised as necessary strategies for achieving entrepreneurial success. However, in recent years, the mounting number of fraud accusations against entrepreneurs, and in some cases highly profile criminal charges and lawsuits (e.g., Theranos, Lordstown Motors), suggest some rethinking is warranted when it comes to fake-it-'til-you-make-it practices. The concepts and model presented in this article are an effort to increase awareness of the risk entrepreneurs expose themselves to by engaging in fake it 'til you make it and to establish some useful guardrails against the escalation of deception for entrepreneurs electing to deploy fake-it-'til-you-make-it practices. In that vein, we conclude with a reminder that even with the best of intentions, entrepreneurs' fake-it claims are predicated on the use of fiction and when fiction cannot be turned into reality, accusations of fraud may follow. Such accusations are troubling for individual entrepreneurs, but as fraud accusations aggregate across the population of entrepreneurs, they become highly damaging to the image and reputation of entrepreneurship as a profession.

## References

Abrahamson, E., & Park, C. (1994). Concealment of negative organizational outcomes: An agency theory perspective. *Academy of Management Journal, 37*(5), 1302—1334.

Alois, J. D. (2014, August 24). uBiome raises $4.5 million including Andreessen Horowitz. *Crowdfund Insider*. Available at https://www.crowdfundinsider.com/2014/08/47643-ubiome-raises-4-5-million-including-andreessen-horowitz/

Associated Press. (2021, March 18). Lordstown Motors accused of fraud in shareholder lawsuit. *MSN*. Available at https://www.msn.com/en-us/money/companies/lordstown-motors-accused-of-fraud-in-shareholder-lawsuit/ar-BB1eJRiz

Berger, P. L., & Luckmann, T. (1966). *The social construction of reality: A treatise in the sociology of knowledge*. New York, NY: Anchor.

Bird, B. (1988). Implementing entrepreneurial ideas: The case for intention. *Academy of Management Review, 13*(3), 442—453.

Block, J., Hornuf, L., & Moritz, A. (2018). Which updates during an equity crowdfunding campaign increase crowd participation? *Small Business Economics, 50*(1), 3—27.

Brenkert, G. G. (2009). Innovation, rule breaking, and the ethics of entrepreneurship. *Journal of Business Venturing, 24*(5), 448—464.

Business Journal Daily. (2020, March 10). *Lordstown Motors paid $12.2M for Workhorse tech*. Available at https://businessjournaldaily.com/lordstown-motors-paid-12-2m-to-license-workhorse-tech/

Cacciotti, G., Hayton, J. C., Mitchell, J. R., & Giazitzoglu, A. (2016). A reconceptualization of fear of failure in entrepreneurship. *Journal of Business Venturing, 31*(3), 302—325.

Calantone, R. J., Schmidt, J. B., & Song, X. M. (1996). Controllable factors of new product success: A cross-national comparison. *Marketing Science, 15*(4), 341—358.

Campana, P. (2016). When rationality fails: Making sense of the 'slippery slope' to corporate fraud. *Theoretical Criminology, 20*(3), 322—339.

Cardon, M. S., Wincent, J., Singh, J., & Drnovsek, M. (2009). The nature and experience of entrepreneurial passion. *Academy of Management Review, 34*(3), 511–532.

Chapman, M. (2021, June 14). Lordstown Motors' rough road continues; CEO and CFO are out. *AP NEWS*. Available at https://apnews.com/article/technology-business-65ea1f8f92208cadd12e32d60bb88e6b

Clance, P. R., & Imes, S. A. (1978). The imposter phenomenon in high achieving women: Dynamics and therapeutic intervention. *Psychotherapy Theory Research and Practice, 15*(3), 241–247.

Corley, K. G., & Gioia, D. A. (2004). Identity ambiguity and change in the wake of a corporate spin-off. *Administrative Science Quarterly, 49*(2), 173–208.

Cutler, K.-M. (2015, March 20). Andreessen-backed uBiome is now doing an Indiegogo campaign to check out dental bacteria. *TechCrunch*. Available at https://techcrunch.com/2015/03/20/andreessen-backed-ubiome-is-now-doing-an-indiegogo-campaign-to-check-out-dental-bacteria

Davidsson, P. (2015). Entrepreneurial opportunities and the entrepreneurship nexus: A re-conceptualization. *Journal of Business Venturing, 30*(5), 674–695.

Derksen, K., Blomme, R. J., de Caluwé, L., Rupert, J., & Simons, R. J. (2019). Breaking the paradox: Understanding how teams create developmental space. *Journal of Management Inquiry, 28*(3), 366–380.

Dimov, D. (2011). Grappling with the unbearable elusiveness of entrepreneurial opportunities. *Entrepreneurship: Theory and Practice, 35*(1), 57–81.

Ellman, M., & Hurkens, S. (2019). Optimal crowdfunding design. *Journal of Economic Theory, 184*(C), Article 104939.

Farr, C. (2019, May 2). Insiders describe aggressive growth tactics at uBiome, the health start-up raided by the FBI last week. *CNBC*. Available at https://www.cnbc.com/2019/05/02/ubiome-what-really-happened-at-health-start-up-raided-by-fbi.html

Fassin, Y. (2005). The reasons behind non-ethical behaviour in business and entrepreneurship. *Journal of Business Ethics, 60*(3), 265–279.

Fisher, G., Kotha, S., & Lahiri, A. (2016). Changing with the times: An integrated view of identity, legitimacy, and new venture life cycles. *Academy of Management Review, 41*(3), 383–409.

Fisher, G., Kuratko, D. F., Bloodgood, J. M., & Hornsby, J. S. (2017). Legitimate to whom? The challenge of audience diversity and new venture legitimacy. *Journal of Business Venturing, 32*(1), 52–71.

Fisher, G., Stevenson, R., Neubert, E., Burnell, D., & Kuratko, D. F. (2020). Entrepreneurial hustle: Navigating uncertainty and enrolling venture stakeholders through urgent and unorthodox action. *Journal of Management Studies, 57*(5), 1002–1036.

Gao, Z., & Scorpio, E. A. (2011). Does puffery deceive? An empirical investigation. *Journal of Consumer Policy, 34*(2), 249–264.

Gastelu, G. (2021, March 5). Lordstown Endurance electric pickup entering San Felipe 250 off-road race. *Fox News*. Available at https://www.foxnews.com/auto/lordstown-motors-electric-endurance-pickup-san-felipe-250

Guzzo, R. A., & Dickson, M. W. (1996). Teams in organizations: Recent research on performance and effectiveness. *Annual Review of Psychology, 47*(1), 307–338.

Haan, P., & Berkey, C. (2002). A study of the believability of the forms of puffery. *Journal of Marketing Communications, 8*(4), 243–256.

Herbert, R. F., & Link, A. N. (1988). *The entrepreneur: Mainstream views and radical critiques*. New York, NY: Praeger.

Hindenburg Research. (2021, March 12). *The Lordstown Motors mirage: Fake orders, undisclosed production hurdles, and a prototype inferno*. Available at https://hindenburgresearch.com/lordstown/

Holtfreter, K., Van Slyke, S., & Blomberg, T. G. (2005). Sociolegal change in consumer fraud: From victim-offender interactions to global networks. *Crime, Law and Social Change, 44*(3), 251–275.

Hossain, M., & Oparaocha, G. O. (2017). Crowdfunding: Motives, definitions, typology, and ethical challenges. *Entrepreneurship Research Journal, 7*(2), Article 20150045.

Jenkins, S., & Delbridge, R. (2017). Trusted to deceive: A case study of 'strategic deception' and the normalization of lying at work. *Organization Studies, 38*(1), 53–76.

Kowalska, A. (2018). The study of the intersection between food fraud/adulteration and authenticity. *Acta Universitatis Agriculturae et Silviculturae Mendelianae Brunensis, 66*(5), 1275–1286.

Kuratko, D. F., Holt, H., & Neubert, E. (2020). Blitzscaling: The good, the bad, and the ugly. *Business Horizons, 63*(1), 109–119.

Lerner, D. A. (2016). Behavioral disinhibition and nascent venturing: Relevance and initial effects on potential resource providers. *Journal of Business Venturing, 31*(2), 234–252.

Lordstown Motors Corp. (2020a, April 21). *An update from Lordstown Motors*. Available at https://www.lordstownmotors.com/blogs/news/a-message-from-our-ceo.

Lordstown Motors Corp. (2020b, June 25). *Lordstown Motors Endurance launch* [YouTube video]. Available at https://www.youtube.com/watch?v=39y5FNxvHgk

Lordstown Motors Corp. (2021). *About us*. Available at https://www.lordstownmotors.com/pages/about

McMullen, J. S., & Dimov, D. (2013). Time and the entrepreneurial journey: The problems and promise of studying entrepreneurship as a process. *Journal of Management Studies, 50*(8), 1481–1512.

McMullen, J. S., & Shepherd, D. A. (2006). Entrepreneurial action and the role of uncertainty in the theory of the entrepreneur. *Academy of Management Review, 31*(1), 132–152.

Metcalfe, M. (1990). Corporate deception. *Journal of General Management, 15*(4), 68–75.

Minniti, M., & Bygrave, W. (2001). A dynamic model of entrepreneurial learning. *Entrepreneurship: Theory and Practice, 25*(3), 5–16.

Mizruchi, M. S., & Fein, L. C. (1999). The social construction of organizational knowledge: A study of the uses of coercive, mimetic, and normative isomorphism. *Administrative Science Quarterly, 44*(4), 653–683.

Mohammed, S., & Nadkarni, S. (2014). Are we all on the same temporal page? The moderating effects of temporal team cognition on the polychronicity diversity–team performance relationship. *Journal of Applied Psychology, 99*(3), 404–422.

Montoya-Weiss, M. M., & Calantone, R. (1994). Determinants of new product performance: A review and meta-analysis. *Journal of Product Innovation Management, 11*(5), 397–417.

Moore, D. A. (2021). Perfectly confident leadership. *California Management Review, 63*(3), 58–69.

Navis, C., & Glynn, M. A. (2011). Legitimate distinctiveness and the entrepreneurial identity: Influence on investor judgments of new venture plausibility. *Academy of Management Review, 36*(3), 479–499.

Neergaard, H. (2005). Networking activities in technology-based entrepreneurial teams. *International Small Business Journal, 23*(3), 257–278.

Nelson, G. (2019, November 9). Lordstown Motors ready to "hit the ground running". *Business Journal Daily*. Available at https://businessjournaldaily.com/lordstown-motors-ready-to-hit-the-ground-running/

Packard, M. D., & Clark, B. B. (2020). Mitigating versus managing epistemic and aleatory uncertainty. *Academy of Management Review, 45*(4), 872–876.

Page, S. E. (2006). Path dependence. *Quarterly Journal of Political Science, 1*(1), 87–115.

Pahnke, E. C., Katila, R., & Eisenhardt, K. M. (2015). Who takes you to the dance? How partners' institutional logics influence innovation in young firms. *Administrative Science Quarterly, 60*(4), 596–633.

Patzelt, H., Preller, R., & Breugst, N. (2020). Understanding the life cycles of entrepreneurial teams and their ventures: An agenda for future research. *Entrepreneurship: Theory and Practice, 45*(5), 1119–1153.

Pflanzer, L. R. (2021, March 18). The cofounders of bankrupt poop-testing startup uBiome have been charged with fraud. *Business Insider*. Available at https://www.businessinsider.com/ubiome-cofounders-zachary-apte-jessica-richman-sec-charges-2021-3

Pollack, J. M., & Bosse, D. A. (2014). When do investors forgive entrepreneurs for lying? *Journal of Business Venturing, 29*(6), 741–754.

Pollack, J. M., Burnette, J. L., & Hoyt, C. L. (2012). Self-efficacy in the face of threats to entrepreneurial success: Mind-sets matter. *Basic and Applied Social Psychology, 34*(3), 287–294.

Pratt, T. C., Holtfreter, K., & Reisig, M. D. (2010). Routine online activity and internet fraud targeting: Extending the generality of routine activity theory. *Journal of Research in Crime and Delinquency, 47*(3), 267–296.

Rutherford, M. W., Buller, P. F., & Stebbins, J. M. (2009). Ethical considerations of the legitimacy lie. *Entrepreneurship: Theory and Practice, 33*(4), 949–964.

Scheaf, D. J., & Wood, M. S. (2021). Entrepreneurial fraud: A multidisciplinary review and synthesized framework. *Entrepreneurship: Theory and Practice*. Available at https://doi.org/10.1177/10422587211001818

SEC v. Apte and Richman,3:21-cv-01911 (N.D. Cal. 2021). Available at https://storage.courtlistener.com/recap/gov.uscourts.cand.375310/gov.uscourts.cand.375310.1.0.pdf

Shackle, G. L. S. (1979). *Imagination and the nature of choice*. New York, NY: Columbia University Press.

Shane, S. A. (2003). *A general theory of entrepreneurship: The individual-opportunity nexus*. Cheltenham, UK: Edward Elgar Publishing.

Shane, S. A. (2008). *The illusions of entrepreneurship*. New Haven, CT: Yale University Press.

Shane, S. A., & Venkataraman, S. (2000). The promise of entrepreneurship as a field of research. *Academy of Management Review, 25*(1), 217–226.

Shapero, A., & Sokol, L. (1982). Social dimensions of entrepreneurship. In C. A. Kent, D. L. Sexton, & K. H. Vesper (Eds.), *Encyclopedia of entrepreneurship* (pp. 72–90). Englewood Cliffs, NJ: Prentice Hall.

Stinchcombe, A. L. (1965). Social structure and organizations. In J. March (Ed.), *Handbook of organizations* (pp. 142–193). Chicago, IL: Rand McNally.

Straker, K., Peel, S., Nusem, E., & Wrigley, C. (2021). Designing a dangerous unicorn: Lessons from the case of Theranos. *Business Horizons, 64*(4), 525–536.

Theoharakis, V., Voliotis, S., & Pollack, J. M. (2020). Going down the slippery slope of legitimacy lies in early-stage ventures: The role of moral disengagement. *Journal of Business Ethics, 172*, 673–690.

Thompson, J. D. (1967). *Organizations in action*. Chicago, IL: McGraw Hill.

Thornton, P. H., & Ocasio, W. (1999). Institutional logics and the historical contingency of power in organizations: Executive succession in the higher education publishing industry, 1958–1990. *American Journal of Sociology, 105*(3), 801–843.

United States v. Apte and Richman,CR 21-0116CRB (N.D. Cal. 2021). Available at https://www.justice.gov/usao-ndca/press-release/file/1377481/download

Vanac, M. (2020, November 16). Lordstown Motors goes public. Shares of RIDE to begin trading Monday on Nasdaq. *Cleveland Business Journal*. Available at https://www.bizjournals.com/cleveland/news/2020/10/23/lordstown-motors-goes-public.html

Venkataraman, S., Sarasvathy, S. D., Dew, N., & Forster, W. R. (2013). Of narratives and artifacts. *Academy of Management Review, 38*(1), 163–166.

von Werder, A. (2011). Corporate governance and stakeholder opportunism. *Organization Science, 22*(5), 1345–1358.

Waldron, T. L., Fisher, G., & Pfarrer, M. (2016). How social entrepreneurs facilitate the adoption of new industry practices: Social entrepreneurs and industry practices. *Journal of Management Studies, 53*(5), 821–845.

Waltz, E. (2017). After Theranos. *Nature Biotechnology, 35*, 11–15.

Williamson, O. E. (1993). Transaction cost economics and organization theory. *Industrial and Corporate Change, 2*(2), 107–156.

Wood, M. S., Bakker, R. M., & Fisher, G. (2021). Back to the future: A time-calibrated theory of entrepreneurial action. *Academy of Management Review, 46*(1), 147–171.

# Exhibit 14

# THE UNIQUE VULNERABILITIES OF ENTREPRENEURIAL VENTURES TO MISCONDUCT

Donald Palmer and Tim Weiss

## ABSTRACT

*Entrepreneurs and their ventures are often portrayed as unambiguously positive forces in society. Specifically, high technology and equity-funded start-ups are heralded for their innovative products and services that are believed to alter the economic, social, and even political fabric of life in advantageous ways. This paper draws on established theory on the causes of misconduct in and by organizations to elaborate the factors that can give rise to misconduct in entrepreneurial ventures, illustrating our arguments with case material on both widely known and less well-known instances of entrepreneurial misconduct. In venturing into the dark side of entrepreneurship, we hope to contribute to theory on entrepreneurship and organizational misconduct, augment entrepreneurship pedagogy, and offer ideas and examples that can enhance entrepreneurs' awareness of their susceptibility to wrongdoing.*

**Keywords:** Entrepreneurship; start-up; innovation; technology; fraud; misconduct

## INTRODUCTION

Entrepreneurial ventures and their founders have assumed critical roles in capitalist societies. These ventures, also known as "startups," have spearheaded technological innovation, generated millions of jobs, and created trillions of

**Entrepreneurialism and Society: New Theoretical Perspectives**
**Research in the Sociology of Organizations, Volume 81, 129–159**
**Copyright © 2022 by Emerald Publishing Limited**
**All rights of reproduction in any form reserved**
**ISSN: 0733-558X/doi:10.1108/S0733-558X20220000081007**



Downloaded from www.emerald.com/books/edited-volume/chapter-pdf/9218303/s0733-558x20220000081007.pdf by Reprints Desk Inc user on 14 September 20

dollars in stockholder value; in some instances, evolving to dominate the industries in which they are situated. Successful founders have amassed great wealth; in some cases, even acquiring celebrity status. Indeed, entrepreneurship is seen as an important way, in some eyes the most effective way, to address a vast array of social problems (cf., Bruton, Ketchen, & Ireland, 2013; Jones et al., 2016; Zhao & Wry, 2016; but see Acs, Astebro, Audretsch, & Robinson, 2016). Consequently, startups and their founders have attracted the attention and imagination of academic researchers, college, secondary, and even grammar school educators, journalists, and the public at large. By in large, these audiences, as well as members of the general public (Gamez-Djokic, Kouchaki, & Waytz, 2021), tend to view startups as more virtuous than established companies.[1]

Yet, startups and their founders' have suffered dents to their images over the past decade. A good number of startups have been accused of committing a range of unsavory behaviors. Elizabeth Holmes founded Theranos to develop a home blood testing machine that could conduct over 100 tests on a single drop of blood, sparing needle-phobic patients the ordeal of standard blood draws. But in 2015, suspicions arose about the firm's showcase technology, the Edison. Later, with the aid of whistleblowers, the technology was determined to be entirely fictious, in the parlance of the industry "vaporware," and Holmes was indicted for conspiracy and wire fraud (Carreyrou, 2018). Similarly, Elon Musk founded Tesla to manufacture an affordable electrical vehicle that would spearhead the development of environmentally sustainable transport in the United States and abroad. But in 2018, he faced fraud charges brought by the US Securities and Exchange Commission (SEC) over a tweet in which he falsely claimed his intention to delist the venture from the NASDAQ stock exchange, producing an immediate jump in the firm's share price (US Securities and Exchange Commission, 2018). Concerningly, these are not isolated cases. Other high-profile startups such as WeWork and many less well-known ventures such as Ubiome, Just Mayo, Nikola and others that we will discuss here have similarly been plagued by misconduct.

We draw on existing scholarship on the causes of misconduct in and by organizations to develop a preliminary analysis of misconduct in entrepreneurial ventures. A key insight of misconduct research is that wrongdoing is a normal phenomenon, in that it is prevalent and a product of organizational structures and processes that are inherent in formal organization (Palmer, 2013). While the urge is strong to consider entrepreneurial misconduct an abnormal phenomenon, casting firms such as Theranos as outliers, we argue that misconduct in and by entrepreneurial ventures also is normal; that is, prevalent and a function of structures and processes inherent in entrepreneurship. As such, it deserves scholarly and practitioner attention.

We pursue three objectives in this paper. First, we aspire to advance theory on entrepreneurship and on misconduct in and by organizations. Existing theories on entrepreneurship largely focuses on its positive aspects, concerned first-and-foremost with venture performance and success. We show how distinctive features of entrepreneurial ventures constitute vulnerabilities to misconduct. Existing theory on organizational wrongdoing focuses on large, established, professionally

Downloaded from www.emerald.com/books/edited-volume/chapter-pdf/9218303/s0733-558x20220000081007.pdf by Reprints Desk Inc user on 14 September 20

managed enterprises. We extend this theory into the domain of small, nascent, and founder managed ventures. Second, we strive to provide theoretical arguments and illustrate them with real world examples derived from journalistic accounts that can be used to expand the scope of pedagogy which to date has focused primarily on individual-level ethics and morality (Byers, 2020; Shepherd, 2019; Shepherd, Patzelt, & Barron, 2012). Third, we endeavor to offer entrepreneurs insights that can help them stay on the right side of the line separating right from wrong.

This paper proceeds as follows. First, we delineate the type of entrepreneurial ventures and misconduct on which we focus. Second, we elaborate known causes of misconduct in and by organizations, indicate how these causes manifest uniquely in entrepreneurial ventures, and provide examples of contemporary cases of entrepreneurial misconduct that illustrate our arguments. Finally, we summarize our main arguments, indicate their shortcomings, and offer suggestions for future research.

## ENTREPRENEURIAL VENTURES AND MISCONDUCT

### *The Entrepreneurial Ventures on Which We Focus*

We focus on a subset of entrepreneurial ventures that are: (1) nascent, less than 10 years old at the time of misconduct; (2) primarily owned and controlled by their founders, who typically occupy the positions of chief executive officer and chairperson of the board of directors; (3) for-profit enterprises, although they may generate no revenue or operate at a loss; (4) risk-capital financed, with the objective of "going public" or becoming acquired; and (5) innovative in regards to the technologies they commercialize or the business models they adopt (Beckman, Eisenhardt, Kotha, Meyer, & Rajagopalan, 2012; Hsu, 2008). We focus on this subset of entrepreneurial ventures because it is the subset of ventures upon which scholars, educators, commentators, and the public focus most of their attention (Aldrich, 2019).[2]

### *The Misconduct in and by Organizations on Which We Focus*

We primarily focus on behavior that provokes formally constituted social control agents to investigate, indict, convict, and punish organizations or their participants. Such behaviors include wire fraud, scientific fraud, data fraud, performance and product misrepresentation, sexual harassment and assault, wage theft, and anti-competitive practices, among others. Formally constituted social control agents are organizations that are established for the purpose of policing organizational and organizational participant behavior and are recognized by the organizations and organizational participants they police as legitimate (albeit not always fair) adjudicators of their innocence or guilt. These organizations include professional associations, such as the American Institute of Certified Public Accountants, governmental bodies, such as the US Securities and Exchange

Downloaded from www.emerald.com/books/edited-volume/chapter-pdf/9218303/s0733-558x20220000081007.pdf by Reprints Desk Inc user on 14 September 20

Commission, and law enforcement agencies, such as the US Justice Department (Greve, Palmer, & Pozner, 2010; Palmer, 2013).

Focusing on behaviors that provoke reactions from formally constituted social control agents has advantages, the most important of which is that it renders the identification of misconduct an empirical exercise. Consequently, it frees us from the necessity of engaging in repeated theoretical or philosophical discussion about whether specific behaviors do or do not constitute wrongdoing. Most of the startups discussed in this paper engaged in misconduct as defined in the above respect. But limiting our focus to behavior that provokes response from formally constituted social control agents has three significant disadvantages when studying misconduct in and by entrepreneurial ventures.

First, entrepreneurial ventures typically have short life spans and thus often do not survive long enough for any objectionable behavior they or their members perpetrate to come to the attention of formally constituted social control agents. For example, Planswell was founded in 2016 to offer online financial planning services. But in 2019, on the verge of securing a $20 million risk capital investment, the Canadian fintech startup became the subject of a former employee's highly publicized sexual harassment allegations. The allegations led to investors' divestment and the firm's demise, even though the allegations were never litigated (Soltys, 2019). Similarly, the promising Chinese autonomous vehicle startup Roadstar.ai collapsed following an investor revolt in the wake of misconduct allegations leveled first against the venture's Chief Scientist and later against its Chief Strategy Officer and CEO, without a formal investigation of any government agency (Nan, 2019).

Second, startups are private entities and thus are largely exempted from the scrutiny to which public organizations are subjected. For example, Adam Neumann founded WeWork in 2010 to develop communal workspaces for firms that could not afford their own, independent rental spaces. Neumann engaged in excessive spending, self-dealing, and misrepresentation of the venture's performance for much of its early life. But his behavior only came to the attention of social control agents in 2019 when the venture filed documents in advance of its bid to go public (Peter & de la Merced, 2019; Stoller, 2019). Entrepreneurial ventures' insulation from scrutiny is bolstered by their recent tendency to stay private longer, pursuing additional rounds of Series D, E, and F investments (Davis, 2016; Joint Venture, 2020).

Third, startups often inadvertently or intentionally occupy legal grey zones, gaps in the terrain patrolled by formally constituted social control agents. For example, Robert Boback founded Triversa in 2004 to meet the security needs of firms that experienced increasingly frequent data breaches and leaks. Boback published breached and leaked data on the "Deep Web" or "Dark Net" and then contacted the data owners to offer his venture's risk management services; sometimes exaggerating potential clients' risk and sometimes subtly threatening to spread the data to a wider audience if the companies did not engage Triversa's services. While the Federal Trade Commission (FTC) has long policed this exploitative marketing strategy, known as "fear, uncertainty, and doubt" (FUD), in non-internet businesses, it had little capacity and authority to police the strategy in the

Downloaded from www.emerald.com/books/edited-volume/chapter-pdf/9218303/s0733-558x20220000081007.pdf by Reprints Desk Inc user on 14 September 20

digital marketplace. As a result, the FTC not only failed to investigate Triversa's use of FUD but became an unwitting accomplice of the firm's misconduct. While the Justice Department eventually opened a criminal investigation of Boback, it ultimately dropped its inquiry, partly because Trivera's marketing practices did not clearly violate existing law (Khatchadourian, 2019).

For these three reasons, we expand our primary focus to include behavior that provokes extensive negative media coverage of the type associated with scandals (Graffin, Bundy, Porac, Wade, & Quinn, 2015). In most cases, such behavior would provoke a reaction from formally constituted social control agents if they knew of the behavior and they had the resources to develop programs to address it.[3]

## EIGHT THEORIZED CAUSES OF ORGANIZATIONAL MISCONDUCT

### *1. Performance Strain*

Misconduct in and by organizations often is attributed to performance strain. Organizational actors experience strain when they possess a strong desire to achieve an objective but are unable to achieve it through legitimate means. For this reason, performance strain is sometimes called "blocked aspirations." When organizational actors experience strain, they tend to use illegitimate means to pursue their objectives. Scholars have invoked this theory to explain misconduct at the organizational (McKendall & Wagner, 1997; Simpson, 1986; Staw & Szwajkowski, 1975) and the individual levels of analysis (Palmer & Yenkey 2015). Journalists and commentators frequently invoke strain theory to explain specific instances of misconduct (Gumbel, 2004; Timmons & Wassener, 2009).

We think entrepreneurs are particularly likely to experience performance strain for two reasons. First, they possess a particularly strong desire to achieve their business objectives. Entrepreneurs are often characterized as possessing extraordinary passion for their objectives (Amore, Garofalo, & Martin-Sanchez, 2020; Cardon, Wincent, Singh, & Drnovsek, 2009), partly because they view their ventures as expressions and extensions of their personal identities (Fauchart & Gruber, 2011; Powell & Baker, 2014). For example, Elizabeth Holmes founded Theranos to develop a way for people like herself, who possessed a deathly fear of needles, to obtain crucial diagnostic tests without subjecting themselves to standard blood draws (Carreyrou, 2018). Similarly, Adam Neumann founded WeWork to advance his unique version of new age philosophy (Chozick, 2019).

Further, entrepreneurs are typically advised to self-invest and show "skin in the game" by resourcing their early operations partly with their own investments (i.e., private savings, debt and time) and partly from close ties in their social networks (i.e., financial and human resources from family, friends and friends of friends) (Aldrich & Ruef, 2006). If entrepreneurs invest the bulk of their savings and/or incur massive debt to launch their ventures, they may come to equate venture failure with personal financial ruin. Further, while socially embedded and affective

Downloaded from www.emerald.com/books/edited-volume/chapter-pdf/9218303/s0733-558x20220000081007.pdf by Reprints Desk Inc user on 14 September 20

Case 1:25-cr-00592-LAK Document 88-1 Filed 10/15/26 Page 352 of 506



relationships may be conducive to attracting critical resources early on, leading to venture growth (Huang & Knight, 2017), they also may lock entrepreneurs into consequential relationships that make them reluctant to disappoint those around them. In short, for entrepreneurs, failure may not be an option.

Second, entrepreneurs are particularly likely to struggle to achieve their objectives. The founders of the enterprises upon which we focus tend to operate under conditions of extreme uncertainty, entering or creating new industries, developing new technologies, in the absence of organizing blueprints. Their difficulties are in part compounded by investors' exponential growth, so-called blitz-scaling, expectations (Hoffman & Yeh, 2018), and in part by their own aspirations, anchored in hypothetical and anticipatory claims about distant futures (Garud, Schildt, & Lant, 2014; Mische, 2009; Wood, Bakker, & Fisher, 2021). Importantly, such expectations and aspirations when articulated in pitches are not symbolic in nature but become performance goals, against which entrepreneurs and their ventures are evaluated (Garud, Gehman, & Tharchen, 2017). For example, Elizabeth Holmes envisioned a blood analysis device that could conduct over one hundred highly reliable tests on a single drop of blood, an aspiration that became the endpoint of the yardstick used to evaluate her and her venture's performance (Carreyrou, 2018).

Performance strain makes entrepreneurs vulnerable to two types of misconduct. On the one hand, entrepreneurs may engage in performance enhancing misconduct, in which they employ fraudulent means to obtain their performance goals. For example, Theranos entered into a contractual agreement with Walgreens to use its signature technology, the Edison, to conduct a long list of tests on just a few drops of the drug store's customers' blood. But when the venture struggled to perfect the technology, its founders authorized the use of commercially available blood analyzers (rather than the Edison) to conduct the tests (Carreyrou, 2018). Similarly, when Ubiome struggled to develop its technology for analyzing the micro-organisms populating the adult human gastrointestinal tract, its executive team endorsed a shortcut that entailed substituting the analysis of adult human feces with the analysis of infant and pet feces. What is more, when Ubiome's sales did not meet financial projections, top managers pressured contracted doctors to order tests that patients did not need (Brodwin, Ramsey, & Court, 2019).

On the other hand, entrepreneurs can engage in performance misrepresenting misconduct, in which they employ fraudulent means to represent their goal attainment. For example, when the startup Just Mayo failed to meet sales projections upon which prospective investors were focused, its founder Josh Tetrick instructed employees to buy cases of the startup's vegan mayonnaise off grocery store shelves, inflating the company's sales figures (Bercovici, 2017; Zaleski, Waldman, & Huet, 2016).

### *2. Perverse Incentives*

Organizational misconduct also often is attributed to perverse incentives. Organizational participants tend to be formally rational; that is, they tend to

Downloaded from www.emerald.com/books/edited-volume/chapter-pdf/9218303/s0733-558x20220000081007.pdf by Reprints Desk Inc user on 14 September 20

engage in behaviors that simultaneously maximize benefits and minimize costs. When incentives are well aligned, they give rise to stable work relationships that allow organizations to function efficiently and effectively. But when the projected benefits of wrongdoing outweigh the anticipated costs (which are a function of the likelihood of detection and the magnitude of punishments), organizational participants have an incentive to engage in misconduct (cf., Becker, 1968). More specifically, agency theorists argue that top managers have an incentive to engage in self-serving misconduct (e.g., the misappropriation of funds) if they are not major stockholders of their firm, in which case their interests diverge from the interests of the firm's stockholders, which are linked to their firms' long-term welfare. Agency theorists assert, though, that top managers' incentive to engage in misconduct is held in check when the firm's stock is concentrated in the hands of a few individuals or institutions and/or the firm is overseen by an independent board of directors, both of which are capable of monitoring and disciplining top managers' parochial errant behavior (Fama, 1980; Fama & Jensen, 1983).

Agency theorists would expect that entrepreneurs have little incentive to engage in misconduct that can undermine their firms' long-term prospects, insofar as they are principal owners of their ventures (Garg, 2013). But we think some types of entrepreneurs face unique cost-benefit tradeoffs that can motivate them to engage in misconduct. Specifically, serial entrepreneurs may be prone to misconduct because they prefer starting ventures rather than managing them over the long-term. For example, research has shown that vulnerabilities may arise when entrepreneurs begin to disengage from their venture (Rouse, 2016) and when entrepreneurs found a start-up in a new industry after venture failure (Eggers & Song, 2015).

Consider the example of Trevor Milton who founded a series of ventures, some of which he exploited for personal gain and each of which he fraudulently portrayed as more valuable than they were before selling or relinquished control of them at a profit. Most famously, after founding several businesses under the radar of media scrutiny (an ADT alarm company franchise, a classified-ad website called uPillar, and a natural gas diesel fuel truck company called dHybrid), he founded the hydrogen fuel cell powered truck startup Nikola. After achieving "unicorn" status, Milton reportedly extracted from the startup and its investors loans and cash sufficient to purchase a $2.15 million home, a $32 million ranch, and three private planes (including a Gulfstream G-V jet). Then he exited the venture in the short period of time between its successful initial public offering and a short seller's revelation of the startup's fraudulent character, leaving the enterprise with an estimated $94 million paycheck. Milton was recently indicted for securities fraud and Nikola, which is under investigation by the Department of Justice and the SEC, has lost several high-level partnerships, and now trades at a fraction of its former stock market value (Foldy, Colias, & Naughton, 2020; Ramey, 2021).

In addition, we think incentives-related vulnerabilities to entrepreneurial misconduct increase when ventures raise large sums of money for which there is no public accountability and hence formal oversight. Over the past decade, the ticket price of startup investments has greatly increased (Joint Venture, 2020), often driven by intensive capital requirements to fund high-growth aspirations and

Downloaded from www.emerald.com/books/edited-volume/chapter-pdf/9218303/s0733-558x20220000081007.pdf by Reprints Desk Inc user on 14 September 20

Case 1:25-cr-00592-LAK Document 88-1 Filed 10/15/26 Page 354 of 506



fueled by capital providers' abnormal return expectations. A recent *New Yorker* article described one instance of venture capitalists' inclination to invest massive sums of money into startups. It chronicled the experience of Jeremy Neuner, who founded NextSpace. Neuner's venture was an early entrant to the co-working real estate industry that employed a business model similar to the model employed by WeWork, but Neuner had more modest financial aspirations (and projections) than his competitors.

> Venture capitalists began telling Jeremy Neuner that making piddly investments in his company wasn't worth their time .... To Neuner, this seemed nuts. He was building a solid business, but the V.C.s wanted fantasy. "All we needed was five million dollars a year in revenues, and we would have made money for everyone," he told me. "That's enough to earn a living and buy a house and put your kids through school. But no one wanted something that just made a healthy living. They all wanted to find the next Zuckerberg." Neuner was frustrated, but he wasn't surprised. He knew that American history was filled with entrepreneurs like P. T. Barnum, Walt Disney, and Charles Ponzi, self-promoters whose audaciousness created new industries and vast riches – and who, occasionally, ended up in jail. What Neuner hadn't realized was that some venture capitalists had become co-conspirators with such hype artists, handing them millions of dollars and encouraging their worst tendencies, in the hope that one lucky wager would more than offset many bad bets. (Duhigg, 2020, pp. 38–39)

We think risk capital investors' appetite for placing big bets play a role in promoting or tolerating entrepreneurial misconduct. Arguably most important, venture capitalists who place big bets on startups typically receive seats on their board of directors and thus are formally tasked with monitoring and disciplining the ventures. Yet, research has shown that risk capital investors can become complicit in their investees' misconduct when they hold a short-term commitment to them. Many venture capitalists hope to exit the startups in which they invest between their founding and initial public offerring (IPO) or acquisition, and thus are motivated to overlook concerns that if made public might undermine their investments' value (Guler, 2007). For example, the venture capital firm SoftBank invested $300 million into WeWork with minimal oversight. In turn, WeWork's founder Adam Neuman purchased a $60 million corporate jet, installed an infrared sauna and a cold plunge pool in his Manhattan office, purchased properties that he subsequently leased back to the firm, trademarked the word "We" and charged the venture $5.9 million for use of it, and ultimately extracted $700 million from the venture (Chozick, 2019; Duhigg, 2020; Farrell, Hoffman, Brown, & Benoit, 2019). WeWork's board of directors was staffed by venture capitalists (with the exception of Lewis Frankfort, the former chairman and CEO of the multinational luxury fashion firm Tapestry, Inc.) who only censured Neuman when the startup's planned IPO turned sour. As potential buyers and short sellers scrutinized the startup's S-1 prospectus and discovered its performance misrepresentations, WeWork's valuation dropped from $47 billion to $8 billion and the venture was forced to abandon its IPO ambitions (Farrell et al., 2019). Subsequently, New York State's Attorney General opened an investigation of Neuman for misappropriation of funds and the SEC opened an investigation of the venture for IPO filing rule violations.

Further, as principal owners, entrepreneurs exercise inordinate control over the selection of the balance of their ventures' directors (i.e., over the selection of non-venture capitalist directors). Entrepreneurs often use this control to select directors

Downloaded from www.emerald.com/books/edited-volume/chapter-pdf/9218303/s0733-558x20220000081007.pdf by Reprints Desk Inc user on 14 September 20

Case 1:25-cr-00592-LAK Document 88-1 Filed 10/15/26 Page 355 of 506



who lend general legitimacy to their ventures, but who lack expertise to scrutinize them closely. As a result, entrepreneurs who engage in wrongdoing often are at diminished risk of detection and discipline by their boards of directors, agency theorists' key failsafe. The capacity of boards of directors to discipline wayward entrepreneurs is particularly compromised in the case of high-technology ventures that operate under extreme uncertainty. These ventures are founded to develop and commercialize new technologies as well as create new industries about which there is little prior expertise. As a result, the board of directors may know little about their ventures' emerging technologies and may be ill-equipped to monitor their internal operations. For example, Elizabeth Holmes recruited the well-known high-ranking former government officials Charles Schultz and Henry Kissinger to serve on Theranos's board of directors. Schultz and Kissinger possessed no medical technology expertise and thus subsequently backed Holmes when confronted with whistleblower allegations of her malfeasance (Carreyrou, 2018).

### *3. Flawed Administrative Systems*

Organizational wrongdoing also has been attributed to flawed administrative systems (cf., Krawiec, 2005). Administrative systems segregate tasks and the people who perform them into specialized subunits and positions. They also elaborate behavioral prescriptions (rules, standard operating procedures, and the like) that dictate how organizational participants should conduct themselves within differentiated subunits and positions. When administrative systems are well designed, they articulate behavioral prescriptions that clearly demarcate the line separating right from wrong and evolve subunits that specialize in the monitoring and disciplining of errant behavior. When administrative systems are not well designed, though, they can allow misconduct to flourish. For this reason, the reformation of organizations found to have engaged in or been the site of misconduct typically includes reinforcement of their administrative systems (cf., Valukas, 2014; Wainstein, Jay, & Kukowski, 2014).

We think entrepreneurial ventures tend to employ administrative systems that are vulnerable to misconduct. The older, the bigger, and the more technologically routinized an organization becomes, the more elaborated its administrative systems tend to be (Pugh, Hickson, Hinings, & Turner, 1969). Entrepreneurial ventures are nascent, small, and utilize unproven technologies. Thus, their role structures tend to be flexible, their routines minimal, and their decision-making centralized in the hands of a few, engendering an overall low administrative intensity (DeSantola & Gulati, 2017; Sine, Mitsuhashi, & Kirsch, 2006). Further, startups tend to forgo the creation of administrative units specializing in the monitoring and disciplining of errant employee behavior.

Elon Musk's transgression of Securities and Exchange Commission guidelines has been attributed to inadequacies in his venture's administrative systems. On August 7, 2018, Musk issued a tweet touting Tesla's readiness to go private at $420 a share, offering a substantial premium to the startups trading price on the stock market and leading to a spike in the venture's trading volume and share price. The SEC ruled that Musk's tweet constituted fraud and imposed on

Downloaded from www.emerald.com/books/edited-volume/chapter-pdf/9218303/s0733-558x20220000081007.pdf by Reprints Desk Inc user on 14 September 20

him and the firm fines of $20 million. Further, it attributed Musk's actions to the fact that

> Tesla had no disclosure controls or procedures in place to determine whether Musk's tweets contained information required to be disclosed in Tesla's SEC filings. Nor did it have sufficient processes in place to (insure) that Musk's tweets were accurate or complete.

Hence, as part of the settlement between Musk, Tesla, and the SEC, the startup was required to institute governance reforms that included the establishment of a new committee of independent directors and the elaboration of "additional controls and procedures to oversee Musk's communications" (US Securities and Exchange Commission, 2018).

Similarly, Tylor Shultz's difficulty in voicing concerns about fraudulent behavior at Theranos might be attributed to inadequacies in that startup's administrative controls. Shultz, a relatively low-level employee, came to believe that his superiors were misrepresenting the reliability of the startup's core technology, the Edison. He raised his concerns with the manager responsible for generating the device's reliability statistics, who assured him that the statistics were sufficiently accurate. Unconvinced, Shultz sought another internal authority to whom to convey his concerns. But Theranos did not have a compliance department, so he elevated his concerns to the venture's founder Elizabeth Holmes. To Shultz's dismay, Holmes recommended that he again speak with the executive responsible for generating the reliability statistics. Becoming increasingly concerned that Theranos was misrepresenting the reliability of the Edison and feeling that he was getting nowhere in his attempt to have his concerns taken seriously, Shultz chose to leave the firm and make his concerns known to state regulators. But Theranos also did not have a human relations department, so he penned his resignation letter directly to Holmes. As Shultz wrote, "I feel like I owe you this bad attempt at an exit interview since we have no HR to officially record it" (Carreyrou, 2018).

### *4. Misaligned Cultures*

Organizational wrongdoing also has been attributed to misaligned cultures (cf., Kulik, 2005; Sims & Brinkmann, 2003). Organization theorists have conceptualized culture in a multiplicity of ways (Giorgi, Lockwood, & Glynn, 2015). We employ an integration of these theorizations that understands culture to be comprised of content and form (Palmer & Feldman, 2017). Cultural content consists of shared assumptions about the nature of an organization's internal and external environment (e.g., taken for granted understandings about the degree to which the environment is inherently cooperative as opposed to competitive), shared beliefs about the value of different types of behavior in the environment (e.g., beliefs about the degree to which it is good to be cooperative), and normative prescriptions regarding how organizational participants should behave (e.g., shared convictions about the degree to which organizational participants should cooperate with one another). Cultural forms, which telegraph cultural content to organizational participants, consist of artifacts (e.g., jargon and mantras) and practices (e.g., after work get-togethers) that typically have both practical and

Downloaded from www.emerald.com/books/edited-volume/chapter-pdf/9218303/s0733-558x20220000081007.pdf by Reprints Desk Inc user on 14 September 20

symbolic value. When cultural systems feature content that aligns organizational participant behavior with ethical principles, social norms, and legal restrictions, they constitute a firewall against misconduct (cf., Trivino & Nelson, 2017). But organizational cultures also can facilitate misconduct in and by organizations in two ways.

First, culture can *explicitly* endorse misconduct, when it features assumptions, values, and norms that directly promote behaviors constituting wrongdoing (Palmer, 2013). Several cultural artifacts found in entrepreneurial ventures and the entrepreneurship field convey content that explicitly endorses misconduct. For example, the "fake it until you make it" mantra espoused by entrepreneurs and other stakeholders in the field can be understood to explicitly endorse the norm of misrepresenting one's ability to deliver on projected performance goals at intermediate points in time to gain access to critical resources needed for ultimate success. Robert Boback may have embraced this mantra when he installed phony computer towers with blinking lights to give potential investors the impression that Triversa's security software exploited more powerful hardware than it actually required (Khatchadourian, 2019). Similarly, Josh Tetrick may have embraced this mantra when he mis-represented Just Mayo's financial potential by generating wildly over-optimistic sales projections, a gambit that allowed him to attract additional investors but also led to US Securities and Exchange Commission and the Department of Justice probes (Bercovici, 2017; Zaleski et al., 2016).

Further, some techniques routinely employed by entrepreneurs represent cultural practices that can endorse misconduct. For example, the creation of product facades to convey to consumers and investors the intended characteristics of products and services, referred to as "pretotyping" and "minimum viable products," also can be understood to endorse the norm of misrepresenting a firm's actual capabilities (Blank, 2013; Ries, 2011; Savoia, 2019). Trever Milton's misadventures at Nikola illustrate the potential link between these cultural practices and misconduct. Milton displayed his venture's signature hydrogen fuel cell powered semi-truck, the Nikola One, at a product launch event in 2016, characterizing it as "not a pusher" (i.e., not a mock-up vehicle). A year later he released a video of the Nikola One that appeared to show the truck traveling down a highway under its own power. But the truck, in fact, was not operational at either time. In 2020, after the subterfuge was unmasked by the short seller Hindenburg Research, Nikola and Milton issued a carefully worded statement that characterized the 2016 portrayal and the subsequent video as essentially truthful. Among other things, they claimed that the firm's investors knew the truck's actual state of development in 2017 and noted that the misleading video was described on social media only as showing the truck "in motion" (Korosec, 2020). But the startup's stock price cratered and its key partnership with General Motors was scaled back. Soon thereafter, as noted above, the Department of Justice and the SEC opened investigations into the venture and indicted Milton for fraud (Boudette & Ewing, 2020; Eisenstein, 2020).

Second, cultural content can *implicitly* endorse misconduct, when its assumptions, values, and norms endorse behaviors that do not constitute wrongdoing, but can lead to misconduct (Palmer, 2013). We think the scholarly and

Downloaded from www.emerald.com/books/edited-volume/chapter-pdf/9218303/s0733-558x20220000081007.pdf by Reprints Desk Inc user on 14 September 20

Case 1:25-cr-00592-LAK Document 88-1 Filed 10/15/26 Page 358 of 506



practitioner discourse that characterizes entrepreneurship as "creative destruction," entrepreneurial action as inherently "disruptive," and employs mantras like "move fast and break things," and "fail fast, fail early, fail often" can have this effect. Taken together, these cultural forms imply that entrepreneurs must violate industry norms if they wish to be successful and by extension that it is good for entrepreneurs to violate norms and thus that they should do so. To the extent that entrepreneurs embrace this cultural content, they place themselves on a moral slippery slope to misconduct. In addition, these cultural forms imply that entrepreneurs must implement decisions quickly, that it is good for entrepreneurs to fail, and thus that they should embrace rather than eschew failure. This cultural content implies that the costs of acting without deliberate forethought as well as the costs of resulting failure to the startups' employees, investors, or customers either are minimal or outweighed by anticipated ultimate benefits. To the extent that entrepreneurs embrace this content, they can become susceptible to employing the "denial of harm" and "balancing the ledger" techniques of neutralization that enable people to engage in misconduct by blunting the guilt they otherwise would feel from engaging in wrongdoing (Ashforth & Anand, 2003; Palmer, 2008; Sykes & Matza, 1957).

We think the Massachusetts Institute of Technology (MIT) Media Lab, formed to incubate research projects with commercial potential, featured cultural artifacts that supported the cultural imperative to disrupt business norms that might have facilitated misconduct at the lab. Each year the Lab awarded a $250,000 prize to the researcher who stood out for "engag(ing) in responsible ethical disobedience" (Gluckman, 2019). This exhortation to engage in disobedience might have led the founder of the Media Lab's Open Agriculture Initiative, Caleb Hunter, to violate Massachusetts's wastewater dumping regulations and subsequently stonewall regulators' request for readily available data on the dumping, neither of which could be considered responsible or ethical (Song & Larkin, 2019). The MIT Media Lab also featured cultural artifacts that might have telegraphed the imperative to act quickly. The Media Lab's director, Joichi Ito, often reminded lab project leads of their pressing need to "deploy or die," where deployment meant transforming one's research project into a commercial endeavor. This mantra conveyed the norm that project leads should bring their innovations to market quickly, rather than dwell in the research phase, which was equated with death. The norm to move quickly may have caused Caleb Hunter to mis-represent his project's progress toward developing a commercially viable "food computer" that could replicate in small containers growing environments found anywhere in the world (Gluckman, 2019).

Embracing cultural content that endorses disruptive business models may be particularly problematic in fields such as healthcare, where established normative systems protect stakeholders' interests and "people's lives (may be) in the balance" (*The Inventor*, 2019). For example, the online psychotherapy startup Talkspace developed a business model that violated several industry norms that protect therapy clients' interests. The startup features its services in highly public and very explicit advertisements that experts contend can provoke symptoms and distress in psychologically vulnerable persons. Further, Talkspace uses data

Downloaded from www.emerald.com/books/edited-volume/chapter-pdf/9218303/s0733-558x20220000081007.pdf by Reprints Desk Inc user on 14 September 20

Case 1:25-cr-00592-LAK Document 88-1 Filed 10/15/26 Page 359 of 506



mining techniques to analyze its growing volume of recorded patient–therapist sessions for the purpose of "improving" its therapists' services but does so in ways that have violated client confidentiality. Finally, its signature feature of offering clients on-demand access to therapists violates a central principle of most psychotherapeutic approaches, which is to maintain clear temporal boundaries between the beginning and end of therapy sessions (Hill & Krolik, 2020).

Finally, startup culture also may give rise to a particular type of misconduct, the sexual harassment and assault of women. Entrepreneurial ventures tend to be founded and populated in the early stages by men. Consequently, they tend to feature "bro cultures," in which assumptions, values, and norms support androcentric interactions and the treatment of women as both outsiders and objects of male sexual interest (for comprehensive overview, see Fowler, 2020). Patriarchal cultures are thought to be conducive to the sexual harassment and assault of women (hooks, 2004). A survey of 950 startup founders and employees found that one in two workers either had been sexually harassed or knew someone who had been harassed in the workplace (First Round, 2019). Planswell, a Canadian financial planning startup, appears to have featured a "bro culture" that may have been conducive to sexual harassment. Reportedly, male executives frequently peppered their conversations with sexual innuendo. On one occasion, the male dominated leadership team discussed employing prostitutes to celebrate the end of an offsite meeting. On another, a male executive brought a female gendered sex doll to work, dressed in a Planswell T-shirt. Events came to a head when a young female employee requested that Planswell's male marketing director, who had pursued her romantically, restrict their interactions to work-related matters. Within days, she was fired. After experiencing little success in pressing her case with the company's CEO, the female employee went public with her allegations of harassment, contributing to the firm's demise (Hensley, 2020).[4]

### *5. Skewed Power Structures*

Organizational wrongdoing also has been attributed to skewed power structures. Power, which is the capacity to get what one wants over the resistance of others, takes two forms in organizations, the first of which is formal power or authority. Formal power is rooted in the chain of command and based on the norm of obedience. The higher a person is in the chain of command, the more authority they possess over others in the organization. When well designed, formal power relations provide a means for addressing problems that are not anticipated by an organization's administrative systems. But as Milgram (1963) famously showed, authority also can be used to compel people to participate in misconduct.

We think formal power relations in entrepreneurial ventures are uniquely prone to facilitate misconduct. Authority relations always rest on legitimating criteria, of which there are three main types: charismatic, religious/traditional, and rational/legal (Weber, 1922/1978). When formal power is legitimated by charismatic criteria, authorities retain their positions based on their presumed possession of extraordinary qualities (e.g., as was the case with Prophet Muhammad). When formal power rests on religious criteria, authorities retain their positions based on

Downloaded from www.emerald.com/books/edited-volume/chapter-pdf/9218303/s0733-558x20220000081007.pdf by Reprints Desk Inc user on 14 September 20

presumed sacred authorization (e.g., as is the case with Pope Francis). When formal power rests on rational-legal criteria, authorities retain their positions based on merit or ownership of the enterprise (e.g., as was the case with Rex Tillerson at Exxon and Henry Ford II at Ford Motor Company, respectively). Formal power legitimated on rational/legal criteria only allows authorities to issue orders narrow in scope (orders that pertain to subordinates' organizational roles), whereas formal power legitimated on charismatic or religious criteria allows authorities to issue orders broader in scope (orders that pertain to subordinates' organizational and non-organizational roles). In most contemporary organizations, leaders' formal power is legitimated on rational and/or legal grounds. But in entrepreneurial ventures, leaders' authority often rests partly on charismatic and sometimes even quasi-religious grounds (Lovelace, Bundy, Hambrick, & Pollock, 2018). Start-up founders frequently are portrayed (and sometimes portray themselves) as heroic figures, possessing one-of-a-kind exceptional qualities, including unique foresight regarding the needs and possibilities of the human enterprise (Stephen, 2018; Zuckerman, 2017). And as such, they possess broad authority to enlist the support of subordinates in their preferred courses of action, including the perpetration of misconduct (Chatterjee & Pollock, 2017).

Theranos founder Elizabeth Homes appears to have derived at least some of her authority from perceived charisma. Theranos board members General James Mattis and Henry Kissinger described her as "a true revolutionary" and "ethereal," respectively. Board member and renowned Stanford University engineering professor Channing Robertson judged Holmes to be a once or twice in a century personage on the par of Archimedes. Holmes was said to require only four hours of sleep and observed to seldom blink in interpersonal interaction, so abundant and focused were her energies. Holmes's status as a charismatic authority appeared to play a role in deterring subordinates from resisting her questionable directives, as Tyler Shultz vividly described during an event at Stanford University:

> She was extremely charismatic. I would go into her office, and she would tell me about the vision of the company and helping third world countries. I would be so motivated to do my job. I would go back, and I was working with the Theranos device, and I go: "What has just happened? How did she just do that to me?" I was working with this device everyday but in a five-minute conversation with her she was able to change my mind and for me to feel motivated again. I can see how, if you weren't actually working with the device every day, how easy it would be for her to convince you that this was real and that all these things were happening. (Spilling the Blood of a Silicon Valley Unicorn, 2019)

Similarly, Hampton Creek founder Josh Tetrick appears to have derived some of his authority from perceived charisma. One Hampton Creek employee characterized Tetrick as resembling a "religious pastor" whose vision of fixing a corrupt corporate food system made her feel "blessed to have met him." Subsequently reflecting on some of the questionable things she did at his direction, the employee wondered, "Why did I do things that made me really uncomfortable, that I knew weren't right?" (Zaleski et al., 2016).

Power also takes the form of informal power or resource dependence in organizations. Informal power is rooted in the distribution of scarce and important resources and based on the dependence relationships this distribution engenders.

Downloaded from www.emerald.com/books/edited-volume/chapter-pdf/9218303/s0733-558x20220000081007.pdf by Reprints Desk Inc user on 14 September 20

The more one controls resources that are scarce and important to others, the more informal power one possesses over others. Informal power allows organizational participants to obtain the compliance of others who are above or on the same level as them in the chain of command; that is, superiors and peers. Such power relationships can facilitate organizational adaptation to changing environmental conditions (Salancik & Pfeffer, 1977). But when not managed effectively, they also can facilitate misconduct (Palmer, 2013). We think that informal power relations in entrepreneurial ventures also are uniquely prone to facilitate misconduct.

Founders of entrepreneurial ventures often control scarce resources that are crucial for their startups' success, such as unique technological expertise, market insight, and social capital. Founders' control over these scarce resources can allow them to compel their ventures' stakeholders to facilitate or refrain from impeding their misconduct. In extreme cases, the control of unique technological expertise, market insight, and social capital has allowed founders to create dual-class shares, retaining 20-to-1 super-voting rights stock ownership of their ventures (Bercovici, 2019; Davis, 2016). Founders who own super-voting rights stock are particularly well-positioned to control appointments to their ventures' boards of directors, thereby blunting their boards' capacity to fulfill its legally mandated oversight responsibilities, even when founders only own a minority of their startups' shares. In the event of absent board oversight, founders are free to pursue their parochial interests at the expense of their ventures' other stakeholders.

For example, Adam Neuman's perceived control of unique real estate market insight allowed him to retain super-voting rights ownership of WeWork, which allowed him to control appointments to the startup's board, which in turn compromised the board's ability to fulfill its oversight responsibilities. As noted above, in the years that followed, Neuman directed WeWork to purchase the "We" trademark from him for $6 million, to lease his privately owned properties for additional untold millions, and to pay him $700 million in advance of the venture's planned public offering. Finally, after the public offering was aborted due to growing awareness of WeWork's weak financial position, Neuman engineered a golden parachute exit that netted him a $1.7 billion severance package (McGregor, 2019; Molla, 2019). Neuman's self-dealing ultimately led to investigations by the SEC and the New York Attorney General (Lutz, 2019; Reuters, 2019). Super-voting rights control of Uber by Travis Kalanick and of Lyft by Logan Green and John Zimmer may have facilitated misconduct at these ventures, which we discuss separately below (Bercovici, 2019).

The theory and examples above testify to the way in which power relations can *facilitate* misconduct in new entrepreneurial ventures. But recent research suggests that extreme power differentials also can *motivate* wrongdoing in organizations; testifying to the validity of the well-known Lord Acton adage, "power tends to corrupt and absolute power corrupts absolutely" (Acton, 1887). This research indicates that powerful persons tend to treat those over whom they have power with disregard, violating their interests, rights, and justice claims (Keltner, Gruenfeld, & Anderson, 2003). The impact that power has on the motivations of the powerful may be particularly significant in new entrepreneurial ventures, where founders not only enjoy expansive formal authority partly based on their

Downloaded from www.emerald.com/books/edited-volume/chapter-pdf/9218303/s0733-558x20220000081007.pdf by Reprints Desk Inc user on 14 September 20

perceived charisma but also possess substantial informal power based on their perceived control of unique technological expertise, market insight, and social capital. The alignment of formal and informal power may have created a perfect power storm at WeWork, where Adam Neumann portrayed himself as a charismatic figure (he was reported to voice his intention to become the world's first president and hoped to expand his company to the planet Mars) and possessed resources on which the firm's financial success was believed to rest (a belief incorporated in the venture's S-1 public offering prospectus). Neuman often treated his subordinates in arbitrary and humiliating ways, in one instance requiring a group of managers to drink days old dregs of discarded beer bottles and in another publicly referring to his chief of staff's pregnancy and subsequent maternity leave alternately as a "vacation" and "retirement" (Baca, 2019; Chozick, 2019).

### *6. Social Influence and Group Dynamics*

Organizational participants can influence one another's actions, thoughts, and even feelings, due to their dyadic social relations and coalescence into small informal groups. Social influence and group dynamics long ago were recognized as benefiting organizations by providing their members with intrinsic motivation to stay on the job and hard to codify guidance on how to perform their assigned tasks (Barnard, 1968; Roethlisberger & Dickson, 1947; Roy, 1959). But social influence and group dynamics also can facilitate organizational misconduct (Ashforth & Anand, 2003; Brief, Bertram, & Dukerich, 2001; Palmer, 2008). We think new entrepreneurial ventures are uniquely susceptible to the dark side of these individual and group-level influence processes.

Venture capitalists are susceptible to social influence processes that can undermine their capacity to provide oversight of wayward entrepreneurs. Angel investors and venture capitalists typically make their investment decisions under high uncertainty, with limited objective, quantifiable information, relying on their intuition and "gut" feel (Huang, 2019). Early-stage investors tend to rely heavily on their assessments of entrepreneurs' personal characteristics, derived from close personal interaction and observation (Huang & Pearce, 2015). Tim Draper, among the first investors to jump on the Theranos bandwagon, vividly explained venture capitalists' tendency to focus on the founder when making investment decisions.

> I invest when I see a vision, I see the opportunity, and I see the *person* who I think can make it there. I mean we invest in, you know, a *girl* and a dog or two *guys* and a cat. We just say is this *person* going to dedicate their life and make something extraordinary happen. And yes, in that case (Theranos), she (Elizabeth Holmes) was that *person*." (*The Inventor,* 2019, emphasis and parenthetical expressions added)

Venture capitalists' intuition or "gut" feel is guided by their attraction to entrepreneurs, and their attraction to entrepreneurs frequently is based on similarity. Ethnic and cultural matching along dimensions that are irrelevant to the venture in question, such as gender, ethnicity, educational background, and hobbies, often are the basis of investment decisions (Bengtsson & Hsu, 2015; Rivera, 2012). Social psychologists have shown that interaction between similar others leads to

Downloaded from www.emerald.com/books/edited-volume/chapter-pdf/9218303/s0733-558x20220000081007.pdf by Reprints Desk Inc user on 14 September 20

Case 1:25-cr-00592-LAK Document 88-1 Filed 10/15/26 Page 363 of 506



liking and, over extended periods of time, friendships (Cialdini, 2001). Liking and friendships can blind investors to early signs of misconduct.[5] For example, prominent Theranos investors and board members developed personal relationships with Elizabeth Holmes, ties that might have impaired their ability to see red flags in her behavior. Former US Secretary of State and Stanford University Hoover Institution scholar George Shultz welcomed Holmes into his home, inviting her to holiday and birthday celebrations. Shultz's close personal relationship with Holmes apparently blinded him to signs that she and Theranos were engaged in fraudulent behavior, signs that he ignored even though they were conveyed to him by his grandson Tyler who worked for the startup (Carreyrou, 2018; *The Inventor* 2019). Similarly, SoftBank's CEO Masayoushi Son developed a close personal relationship with Adam Neumann, which many believe blinded him to Neumann's self-dealing (Chozick, 2019; Farrell, et al., 2019).[6]

What is more, we suggest startup top management teams are vulnerable to group dynamics pressures that can compromise their members' moral compasses and insulate them from outside criticism. As noted above, entrepreneurs often launch and staff their start-ups with family members and friends (Ruef, Aldrich, & Carter, 2003). Further, founding teams typically work in close physical proximity for long hours and cultivate an informal atmosphere in which the line between work and play is blurred (Wasserman, 2012). Finally, founding teams often understand themselves to be pursuing noble objectives, against inefficient systems and specific antagonists. Such group dynamics can give rise to strong informal group forces (Feldman, 1984; Shaw, 1936) and can lead founding team members to tolerate and even facilitate their colleague's misconduct. In extreme cases, these dynamics can render founding group members susceptible to groupthink, a state in which informal group members consider themselves morally and otherwise superior to outsiders who might question their behavior (Janis, 1971, 1972; Ruef et al., 2003).

Adam Neumann's pursuit of parochial self-interest at WeWork might be attributed partly to intense group dynamics. Neuman hired 20 friends and family members to occupy key positions at his venture, including his wife Rebecca who served as the firm's "chief brand and impact officer" (Brown, Das, & Farrell, 2019). Lower-level WeWork employees referred to the circle of friends and family who were closest to Neumann as the "oval office," indicative of the degree to which the founding team was cut off from the rest of the firm (Baca, 2019). Similarly, Robert Boback's embrace of fraudulent marketing practices at Triversa might be attributed partly to groupthink. In conversations with the venture's top managers, Boback expressed disdain for all outsiders, even for the startup's potential clients. When WikiLeaks dumped data that compromised several firms' security, he exhorted members of his sales team to immediately reach out to the exposed firms to offer Triversa's services "before some IT *goon* in [their] organization tries to convince them that they have it covered" [emphasis added] (Khatchadourian, 2019).

Group dynamics also might have added impetus to the misconduct at Theranos. Elizabeth Holmes founded the blood diagnostic venture with her romantic partner and early investor Ramesh (Sunny) Balwani and subsequently brought her

Downloaded from www.emerald.com/books/edited-volume/chapter-pdf/9218303/s0733-558x20220000081007.pdf by Reprints Desk Inc user on 14 September 20

Case 1:25-cr-00592-LAK Document 88-1 Filed 10/15/26 Page 364 of 506



brother and several of his college friends on board. Balwani, Holmes's brother, and her brother's friends not only supported Holmes questionable business practices but rooted out and eliminated opposition to them. Holmes and Balwani often encouraged Theranos employees to redouble their efforts by proclaiming that they had embarked on a mission to free patient medical data from the control of large healthcare corporations and by contending that powerful firms such as Quest Diagnostics were aligned against them (*The Inventor*, 2019). When employees raised concerns about Theranos's questionable practices, the employees' concerns were brushed aside as indicative of the employees' faint or waning commitment to the venture's lofty mission. If critical employees persisted in their vocal disapproval of a company practice, they were "encouraged" to quit and, if they obliged, were summarily marched off the venture's premises (Carreyrou, 2018; Ramsey, 2019; The Inventor, 2019).

### *7. Escalating Commitment*

Organizational wrongdoers are often portrayed as having slid down a "slippery slope" that began with questionable behavior and ended with indisputable misconduct. The progression down such a slippery slope can entail escalating commitment, a process in which people become wedded to a course of action by taking incompletely rational incremental steps consistent with the course of action, while developing post hoc rationalizations for each successive incremental step. People are most likely to escalate their commitment to a course of action when they believe they are responsible for their incremental acts, others are aware of their acts, and their actions are difficult or costly to reverse (Cialdini, 2001). Commitment processes can indirectly facilitate misconduct, by leading organizational participants to become psychologically invested in pursuing a futile objective, a process known as "escalating commitment to a failing course of action" (Staw, 1976). Commitment to a futile pursuit can lead to strain, which as we note above is one recognized cause of organizational misconduct. Commitment also can directly facilitate misconduct, by leading organizational participants to become incrementally psychologically invested in a wrongful course of action (Palmer, 2013). We think entrepreneurs are uniquely susceptible to both commitment-related causes of misconduct.

Entrepreneurs often become committed to pursuing unobtainable goals in an incremental fashion, of their own making, in the public spotlight and with few options to reverse course. Entrepreneurs seeking risk capital investment must convincingly portray their nascent enterprises as possessing limitless technological and financial potential to satisfy venture capitalists' high-risk, high-return appetites. They accomplish these portrayals by constructing ambitious public narratives that project exponential growth, formalized in concrete performance goals (e.g., the accelerator Y-Combinator known for its prescription of 5–7% weekly growth). Entrepreneurs who successfully secure venture capital backing are expected to meet their self-imposed out-sized performance goals (Garud Gehmanand, & Tharchen 2017; Garud, Schildt, & Lant 2014). Often, funded startups are forced to raise additional rounds of financing to sustain their scaling

Downloaded from www.emerald.com/books/edited-volume/chapter-pdf/9218303/s0733-558x20220000081007.pdf by Reprints Desk Inc user on 14 September 20

trajectory, because entrepreneurial ventures often do not generate revenue and are loss-making entities with high cash "burn rates." If entrepreneurs fail to meet their performance goals and have no more runway (i.e., their venture runs out of cash), they are faced with a potential penalty, a "down round" which decreases the company's valuation and implies managerial failure as additional company shares must be sold at a lower price than in the previous financing round. While the practitioner literature describes a backdoor that allows entrepreneurs to quasi-reverse their course of action and "pivot" to a new business model, we think failure to achieve performance goals in the presence of market penalties and investor pressures can increase entrepreneurs' determination to succeed (Grimes, 2018). Thus, the brink of failure can motivate entrepreneurs to pursue additional financing to make up for lost ground, in the process generating even more ambitious performance goals, and further intensifying the misconduct inducing strain to which they are subject.

Further, entrepreneurs' transition from honest to dishonest pursuit and representation of goal attainment can itself entail an escalating commitment. When this is the case, the transition begins with questionable behavior and ends in clearly illegal acts, a process intensified by feelings of personal responsibility, public visibility, and perceived irreversibility and facilitated by the embrace of rationalizations consisting of one or more techniques of neutralization. For example, Caleb Harper engaged in increasingly deceptive practices to overstate his MIT Media Lab project's success. Initially Harper simply overstated his Open Agriculture Initiative's technological capabilities. Overtime he embraced increasingly daring ruses, such as misrepresenting store-bought greens, herbs, and flowers as products of his project's "food computers." In response to criticisms of his tendency to misrepresent his venture's technological capabilities, Harper offered a justification that combined elements of the denial of responsibility and balancing the ledger techniques of neutralization.

> It's vision versus reality, and both are necessary …. I have a pretty good handle on where the field is going. So, I talk about that. And because I'm so clear on that vision, I think people misinterpret that as reality. (Gluckman, 2019, p. A15)

It is clear from this quote that Harper recognizes that his rhetorical tactics cause audiences to confuse his vision with reality. But, in his eyes, his audience is to blame for failing to discern the difference between his entrepreneurial vision and his startup's reality, a manifestation of the denial of responsibility justification. Further, it is clear from this quote that Harper believes entrepreneurs must embrace both vision and reality if they hope to be successful, even if doing so misleads their audience. Thus, in Harper's eyes, characterizations of his venture's capabilities that mislead his audience are a necessary concomitant of its ultimate success, a manifestation of the balancing the ledger justification.

Similarly, Theranos began its descent into wrongdoing by overstating the number of tests its blood analysis prototype, the Edison, could perform. Subsequently, the venture mis-led investors and strategic partners about the reliability of the presumably market-ready blood analyzer, over 10 successive investment rounds in which USD 1.4 billion were raised (Source: PitchBook Data, Inc.). Ultimately, it

Downloaded from www.emerald.com/books/edited-volume/chapter-pdf/9218303/s0733-558x20220000081007.pdf by Reprints Desk Inc user on 14 September 20

orchestrated an elaborate scheme to mislead investors, strategic partners, employees, and patients about the method it used to test patient blood. Theranos pulled off this scam by engineering office walls so that only a few employees with special clearance could access the Edison, obligating every visitor to sign a non-disclosure agreement, and even prohibiting Theranos employees from displaying their affiliation with the firm in public. These measures erected a veil of secrecy around the venture, helping its founders Holmes and Balwani to secure further investments as the gap between projected performance goals and actual startup performance widened (Carreyrou, 2018; The Inventor, 2019).

### *8. Institutional Factors*

Recently, institutional theory has been tapped to explain organizational misconduct (cf., Gabbionetta, Greenwood, Mazzola, & Minoja, 2013). Institutional theory offers an overarching framework within which to analyze organizational environments. Scott (2013), the first to articulate the institutional perspective in a unified way, identified three structures of which organizational environments are composed: regulative, normative, and cognitive structures. We have already elaborated arguments that implicitly analyze the regulative structures in which entrepreneurial ventures are embedded, noting that the law and enforcement regimes in which startups operate are typically undeveloped and that for this reason much startup behavior that incurs public ire is not policed by any formally constituted social control agents. We also have elaborated arguments that implicitly analyze the cognitive structures in which new entrepreneurial ventures are embedded, noting that startup cultures often facilitate misconduct.

We have not, though, yet considered the normative structures in which startups are embedded. Some occupations, such as the medical, engineering, and legal fields, are highly professionalized. These fields can only be entered if one successfully completes a rigorous course of study. Further, after entry into these fields, practitioners often are required to pass periodic examinations to renew their operating licenses and typically are subjected to the discipline of collegial bodies composed of their peers. Some fields within business, such as accounting and engineering, are highly professionalized. But general management is less so and entrepreneurship is not at all. Indeed, the myth of the "dropout" entrepreneur promotes the idea that aspiring entrepreneurs should forgo extensive post-secondary school education of any kind (Watt, 2016). This mythology was inspired by some of the most famous and successful entrepreneurs, such as Steve Jobs and Mark Zuckerberg who failed to graduate college. Further, it is sustained by several of the entrepreneurs described here, such as Nikola's founder Trevor Milton who failed to graduated high school and Elizabeth Holmes and Elon Musk who both dropped out of Stanford University. It is even fostered by venture capitalists' intentional interventions, such as Peter Thiel's creation of the Thiel Fellowship, which funds individuals before the age of 23 who opt out of formal education in exchange for an entrepreneurial career. Further, there is no collegial body of peers that monitors and disciplines entrepreneurs. Thus, the founders of new entrepreneurial ventures largely operate on their

Downloaded from www.emerald.com/books/edited-volume/chapter-pdf/9218303/s0733-558x20220000081007.pdf by Reprints Desk Inc user on 14 September 20

Case 1:25-cr-00592-LAK Document 88-1 Filed 10/15/26 Page 367 of 506



own, unconstrained by normative systems that otherwise might keep them on the straight and narrow.

### *Addendum: The Special Case of Platform Organizations*

While high-tech risk capital-financed startups are a subset of all entrepreneurial ventures, they are not a homogeneous subset. Specific types of high-tech risk-financed startups themselves may be uniquely vulnerable to misconduct. Before concluding our analysis, we consider one type of high-tech equity-backed entrepreneurial venture that has captured much media attention; startups that fashion or deliver their products or services via independent contractors rather than employees. Such "gig economy" or "platform" organizations use new developments in data science, not to generate new products or services, but rather to monitor, control, and compensate legally independent (i.e., self-employed) persons who make their products or deliver their services (hereafter, "workers") in new ways, intending to reduce both management and labor costs (Rahman, 2018; Vallas & Schor, 2020). We suggest that these entrepreneurial ventures also are uniquely susceptible to misconduct, albeit in ways not considered above, two of which we briefly elaborate here.

First, platform organizations use technology to control workers at a social and physical distance. While managers of these organizations are full time employees and considered organizational members, their workers are seldom full time and in no case formally considered employees. Instead, platform organizations tend to see workers as non-members, users, or customers. Further, workers are globally distributed and seldom interact directly, face-to-face with members of platform organizations. Instead, they communicate electronically, often mediated by sophisticated and automated chat bots. Workers who are controlled through technology are less subject to the administrative systems that platform organizations have put in place to curb misconduct. What is more, part-time workers have less incentive to conform to whatever administrative constraints are in place (Siddiqui, 2019).

In addition, the social and the physical distance that separate managers of platform organizations from their workers likely insulates managers from the guilt they otherwise might feel and that otherwise might deter them from treating their workers unethically (Bazerman & Tenbrunsel, 2012). Specifically, the social and physical distance between managers and workers in gig economy ventures might allow the managers of platform organizations to make use of measures that increase worker productivity and optimize platform economics at the expense of worker welfare; for example, by increasing transaction fees and thus decreasing worker payrates without prior notice, as has been the case at Instacart (Bhattsarai, 2019). Further, as front-line workers feel increasingly squeezed, they may respond by cutting corners. Thus, drivers of so-called ridesharing ventures may be more susceptible to accidents than taxi company drivers (Rosenfeld, 2020; Siddiqui, 2019).

Second, many platform organizations derive their competitive advantage from circumventing existing legal responsibilities for protecting workers from

Downloaded from www.emerald.com/books/edited-volume/chapter-pdf/9218303/s0733-558x20220000081007.pdf by Reprints Desk Inc user on 14 September 20

exploitation and for protecting customers from worker misconduct. For example, in most states gig economy ventures are not required to guarantee their independent contractors the local minimum wage (Conger & Scheiber, 2019), nor are they required to put in place structures and processes that protect them from unfair treatment such as gender, race, or sexual orientation discrimination. Further, platform organizations such as Uber and Lyft often escape financial responsibility for compensating accident victims for injuries, reducing their incentive to ensure that their workers drive safely (Rosenfeld, 2020).

In sum, new organizational forms open new opportunities for organizational misconduct. In the case of platform organizations, as the distinction between organizational member and non-member remains formally intact, in practice this distinction becomes blurred and ambiguous, giving rise to misconduct by both members and non-members that is uncontrollable by the technological advances that make these organizations possible.

## DISCUSSION

### *Contributions*

We pursued three interconnected objectives in this paper. First, we aspired to contribute to theory on entrepreneurship and organizational misconduct. Entrepreneurship theorists tend to portray startups in a uniformly positive light, as engines of innovation that transform markets in ways that improve society. We explore startups' dark side, arguing that they are uniquely vulnerable to known causes of organizational misconduct. Misconduct theorists primarily focus on established, large and bureaucratic organizations. We show that misconduct theory also can enhance understandings of wrongdoing in nascent, modestly sized, informally organized ventures.

Second, we aimed to provide entrepreneurship educators with ideas and case materials to supplement their current approach to examining entrepreneurs' ethical and social responsibilities. Educational programs on entrepreneurship have proliferated broadly, making their way into college, secondary, and even grammar school education. We think including theory and evidence on organizational level processes that can give rise to misconduct in startups in entrepreneurship curricula can complement the current pedagogical approach, which focuses on individual level processes that shape ethical decision making (see Byers, 2020). Individual level decision making may not suffice to deal with some of the systemic issues that we have highlighted in this paper. Leaving considerations of organizational level processes off the table may increase the likelihood of entrepreneurship debacles of the sort discussed here. Hence, we urge educators to integrate organizational level tools into entrepreneurship education, such as those designed by the nonprofit organization Project Include (which focuses on increasing diversity and eliminating toxic bro cultures in entrepreneurial ventures).

Third, we averred to send up flares for entrepreneurs and other new venture stakeholders that might alert them to the potential risks in the waters they navigate. If entrepreneurs and other startup stakeholders know where the risks

Downloaded from www.emerald.com/books/edited-volume/chapter-pdf/9218303/s0733-558x20220000081007.pdf by Reprints Desk Inc user on 14 September 20

Case 1:25-cr-00592-LAK Document 88-1 Filed 10/15/26 Page 369 of 506



of engaging in misconduct lie, they can take precautionary measures to avoid them. For example, we have shown how risk capital investors' role in startup oversight can be undermined by skewed power structures, renegade group dynamics and misaligned incentives. This suggests that the investor–entrepreneur relationship requires rehabilitation; most importantly, to restore the integrity of the board of directors as a key protector of all stakeholders' interest and a safeguard against misconduct. Hence, we applaud efforts by incubators, accelerators and investors that have gone beyond evaluating a startup's technological and market *potential* to monitoring and assessing the feasibility of a startup's *actual evolving* technology.

### *Limitations*

Our analysis suffers from at least three limitations that future theorists and researchers should address. First, our analysis of high-tech risk-financed startups may not be generalizable to other types of entrepreneurial ventures. We focused on high-tech risk-financed ventures because they have captured the fascination of scholars, educators, commentators, and the public at large. But high-tech risk-financed startups comprise just a small fraction of the broad spectrum of entrepreneurial activity, much of which neither exploits new scientific discoveries or markets, nor aspires to culminate in public corporations. Most entrepreneurial activity simply seeks to fill unsaturated market niches and provide subsistence income (Aldrich & Ruef, 2017; Welter, Baker, Audretsch, & Gartner, 2017). Organization theorists interested in misconduct in entrepreneurial ventures would do well to determine whether the arguments advanced here apply to these types of entrepreneurial endeavors as well.

Second and more fundamentally, we do not offer a general theory of entrepreneurial misconduct. Instead, we identify known causes of misconduct in and by organizations to which we argue startups are uniquely vulnerable. We hope that our elaboration of causes of misconduct to which startups might be uniquely vulnerable can provide a foundation upon which a general theory of startup misconduct can be built. We expect that any such general theory at the very least will need to consider how the process of organizational maturation effects entrepreneurial ventures' vulnerability to misconduct. Certainly, startups that have matured to enjoy establishment status, such as Amazon, Facebook, and Google, have not escaped scandal. But a general theory of startup misconduct will need to consider the extent to which the maturation of ventures from startup to established firm, affects the likelihood or the kind of misconduct to which entrepreneurial ventures are vulnerable. It will also need to consider whether early misconduct tends to become normalized and imprinted in the organizational design or whether instead it is edited out as startups mature.

Finally, we do not provide empirical validation of our arguments regarding the unique vulnerabilities of startups to the various causes of misconduct we identify. Instead, we describe recent instances of startup misconduct derived from journalistic accounts that we think illustrate our arguments.[7] We think empirical validation of our arguments is necessary to elevate theoretical speculation

Downloaded from www.emerald.com/books/edited-volume/chapter-pdf/9218303/s0733-558x20220000081007.pdf by Reprints Desk Inc user on 14 September 20

Case 1:25-cr-00592-LAK Document 88-1 Filed 10/15/26 Page 370 of 506



to the level of social science understanding (and any future general theory of misconduct in and by entrepreneurial ventures). We hope that this paper inspires such empirical analyses. Conducting empirical research on this topic, though, will require overcoming sticky methodological problems, some of which are inherent to the study of organizational misconduct but uniquely problematic in the study of startup misconduct. Most problematic, because entrepreneurial ventures fail at a higher rate than other types of business organizations and because startup failure may be related to misconduct, researchers will struggle to assemble an unbiased sample of startups to study (i.e., a sample in which wayward startups are not under-represented). Also concerning, because startups often operate in regulative grey areas that social control agents are still learning to police, it will be difficult to develop an unbiased measure of misconduct (i.e., a measure that does not capture some kinds of wayward startups more than others).

## CONCLUSION

In sum, while we believe we have opened an important line of inquiry, we acknowledge that we have only scratched the surface. We think entrepreneurship scholars have overlooked the dark side of startups and organizational misconduct theorists have ignored entrepreneurial ventures. Perhaps for these reasons, entrepreneurship educators concerned about the ethical and social responsibilities of entrepreneurs have focused their pedagogical approaches on individual level determinants of founder behavior. And entrepreneurs have gone blithely into careers, unaware of the potential hazards that await them. We hope this paper has gone some way toward addressing these deficiencies in theory, pedagogy, and practice in the entrepreneurship domain and that other organizational theorists will find our preliminary effort a useful springboard for more definitive scholarship on misconduct in and by entrepreneurial ventures.

## NOTES

1. Gamez-Djokic, Kouchaki, and Waytz (2021) conducted laboratory experiments in which subjects were found not only to view startups as more virtuous than established firms but also more inclined to give startups the "benefit of the doubt" when they are associated with transgressive behaviors.

2. We do not focus on ventures that have been the locus of high-profile misconduct, but only possess some of the above characteristics. For example, we do not focus on established, management controlled, bank-financed, high-tech firms such as Hewlett Packard, which was the subject of a high profile "pretexting" scandal. Similarly, we do not focus on founder controlled, high technology firms that were risk capital financed, but have aged and grown to become established firms that dominate their industries such as Amazon, Google, and Facebook, each of which has been the locus of its own high-profile scandal.

3. We believe that ours is the first attempt to elaborate the causes of broadly defined misconduct in high-tech equity funded startups. We note, though, that Scheaf and Wood (2021) recently developed a framework for understanding a narrower range of misconduct (fraud) within a broader category of entrepreneurial ventures (all new firms, as well as established firms engaged in innovative activities such as the creation of new products and services and entry into new markets).

Downloaded from www.emerald.com/books/edited-volume/chapter-pdf/9218303/s0733-558x20220000081007.pdf by Reprints Desk Inc user on 14 September 20

Case 1:25-cr-00592-LAK Document 88-1 Filed 10/15/26 Page 371 of 506



4. This example also illustrates the frequent interconnectedness of the various causes of misconduct. The female Planswell employee brought her complaint to the firm's CEO, because the firm's HR department was only recently established and thus had little independence and clout. Further, the HR director was given the rather informal title of "Director of People," a cultural artifact that telegraphed the lax approach it would take when addressing workplace misconduct.

5. The overreliance on intimate relationships and gut feel seals off the entrepreneurial domain from underrepresented groups, as is evident in recent figures of total capital invested in entrepreneurial ventures, which indicate that only 2.7% of startups are female led (Pitchbook, 2021) and only 2.6% are African American and Latinx led (Crunchbase, 2020).

6. These social influence traps may be circumvented when financial backers are large public corporations, such as those seeking to acquire innovations related to their existing lines of business. Many such corporations have evolved specialized units to police questionable behavior and eschew connections to questionable ventures that if detected might tarnish their public image. Thus, Microsoft recently investigated the conduct of AnyVision, an Israeli facial recognition software corporation in which it held a substantial interest, to determine whether the firm's software, in use at Israel-West Bank border crossings, was being employed by the Israeli government to surveil Palestinians inside the occupied territories. But large corporate financial backers' power to alter a startup's questionable behavior may be limited if they do not hold a majority stake in the venture. Hence, when Microsoft determined that AnyVision's involvement in the Israeli government's surveillance activities might be problematic, its only recourse was to sell its minority stake in the firm (Dastin, 2020).

7. We cannot attest to the veracity of our descriptions of startup misconduct because they are derived from journalist accounts, rather than direct observation. Indeed, one entrepreneur featured in our descriptions of startup misconduct (Tiversa's Robert Boback) has disputed the accuracy of the source on which we based our account.

## ACKNOWLEDGMENTS

We acknowledge the helpful comments and criticisms of Howard E. Aldrich, Robert N. Eberhart, Mahka Moeen, and P. Deveraux Jennings.

## REFERENCES

Acs, Z., Astebro, T., Audretsch, D., & Robinson, D. (2016). Public policy to promote entrepreneurship: A call to arms. *Small Business Economics*, *47*(1), 35–51.

Acton, J. K. E. (1887). *Acton–Creighton correspondence*. Retrieved from https://oll.libertyfund.org/titles/2254

Aldrich, H. (2019). What sustains a belief in success among the unsuccessful?. *Academy of Management Discoveries*, *3*, 145–164.

Aldrich, H., & Ruef, M. (2017). Unicorns, gazelles, and other distractions on the way to understanding real entrepreneurship in America. *Academy of Management Perspectives*, *32*, 458–472.

Amore, M., Garofalo, O., & Martin-Sanchez, V. (2020). Failing to learn from failure: How optimism impedes entrepreneurial innovation. *Organization Science*, *32*, 940–964.

Ashforth, B. E., & Anand, V. (2003). The normalization of corruption in organizations. *Research in Organizational Behavior*, *25*, 1–52.

Baca, M. C. (2019). Embattled WeWork co-founder and CEO Adam Neumann will step down, company says. *The Washington Post*, September 24. Retrieved from https://www.washingtonpost.com/technology/2019/09/24/weworks-embattled-co-founder-ceo-adam-neumann-will-step-down-company-says/

Downloaded from www.emerald.com/books/edited-volume/chapter-pdf/9218303/s0733-558x20220000081007.pdf by Reprints Desk Inc user on 14 September 20

Case 1:25-cr-00592-LAK Document 88-1 Filed 10/15/26 Page 372 of 506



Barnard, C. (1968). *The functions of the executive*. Cambridge, MA: Harvard University Press.

Bazerman, M., & Tenbrunsel, A. (2011). *Blind spots*. Princeton, NJ: Princeton University Press.

Becker, G. S. (1968). Crime and punishment: An economic approach. *Journal of Political Economy*, *76*, 169–217.

Beckman, C. M., Eisenhardt, K. M., Kotha, S., Meyer, A., & Rajagopalan, N. (2012). Technology entrepreneurship. *Strategic Entrepreneurship Journal*, *6*, 89–93.

Bengtsson, O., & Hsu, D. (2015). Ethnic matching in the U.S. Venture capital market. *Journal of Business Venturing*, *30*(2), 338–354.

Bercovici, J. (2017). Here's why Hampton Creek's entire board just quit. *Inc*. July 10. Retrieved from https://www.inc.com/jeff-bercovici/hampton-creek-tetrick.html

Bercovici, J. (2019). Silicon Valley CEOs say you can have either accountability or innovation but if doesn't have to be this way. *Inc*. Retrieved from https://www.inc.com/jeff-bercovici/lyft-super-voting-shares-ipo-innovation.html

Bhattsarai, A. (2019). 'Don't game my paycheck': Delivery workers say they're being squeeze by ever-changing algorithms. *The Washington Post*, November 7. Retrieved from https://www.washingtonpost.com/business/2019/11/07/dont-game-my-paycheck-delivery-workers-say-theyre-being-squeezed-by-ever-changing-algorithms/

Blank, S. (2013). Why the lean start-up changes everything. *Harvard Business Review*, *91*, 635–672.

Boudette, N. E., & Ewing, J. (2020). Head of Nikola, a G.M. electric truck partner, quits amid fraud claims, *The New York Times*, September 21. Retrieved from https://www.nytimes.com/2020/09/21/business/nikola-trevor-milton-resigns.html

Brief, A. P., Bertram, R. T., & Dukerich, J. M. (2001). Collective corruption in the corporate world: Toward a process model. In M. E. Turner (Ed.), *Groups at work: Advances in theory and research* (pp. 471–499). Hillsdale, NJ: Lawrence Erlbaum and Associates.

Brodwin, E., Ramsey, L., & Court, E. (2019). Everything we know about uBiome, the startup that convinced Silicon Valley that testing poop was worth $600 million, and then filed for bankruptcy amid an FBI investigation. *Business Insider*, October 7. Retrieved from https://www.businessinsider.com/ubiome-what-we-know-microbiome-startup-fbi-raid-ceos-resigned-2019-7

Brown, E., Das, A., & Farrell, M. (2019). WeWork cleans house, looks to trim staff close to ex-CEO, sell private jet. *The Wall Street Journal*. October 24. Retrieved from https://www.wsj.com/articles/wework-cleans-house-looks-to-trim-staff-close-to-ex-ceo-sell-private-jet-11569531640?mod=e2tw

Bruton, G. D., Ketchen, D. J., & Ireland, R. D. (2013). Entrepreneurship as a solution to poverty. *Journal of Business Venturing*, *28*(6), 683–689.

Byers, T. (2020). Entrepreneurship and Ethics. *eCorner*. Retrieved from https://ecorner.stanford.edu/articles/entrepreneurship-and-ethics/

Cardon, M. S., Wincent, J., Singh, J., & Drnovsek, M. (2009). The nature and experience of entrepreneurial passion. *Academy of Management Review*, *34*, 511–532.

Carreyrou, J. (2018). *Bad blood: Secrets and lies in a Silicon Valley startup*. New York, NY: Knopf.

Cialdini, R. (2001). *Influence: Science and practice*. Boston, MA: Allyn and Bacon.

Chatterjee, A., & Pollock, T. (2017). Master of puppets: How narcissistic CEOs construct their professional worlds. *Academy of Management Review*, *42*, 703–725.

Chozick, A. (2019). Adam Neumann and the art of failing up. *The New York Times*, November 2. Retrieved from https://www.nytimes.com/2019/11/02/business/adam-neumann-wework-exit-package.html

Conger, K., & Scheiber, N. (2019). California bill makes app-based companies treat workers as employees. *The New York Times*, September 11. Retrieved from https://www.nytimes.com/2019/09/11/technology/california-gig-economy-bill.html

Crunchbase. (2020). Crunchbase Diversity Spotlight 2020: Funding to Black & Latinx Founders. Retrieved from https://about.crunchbase.com/wp-content/uploads/2020/10/2020_crunchbase_diversity_report.pdf

DeSantola, A., & Gulati, R. (2017). Scaling: Organizing and growth in entrepreneurial ventures. *Academy of Management Annals*, *11*(2), 640–668.

Downloaded from www.emerald.com/books/edited-volume/chapter-pdf/9218303/s0733-558x20220000081007.pdf by Reprints Desk Inc user on 14 September 20

Case 1:25-cr-00592-LAK Document 88-1 Filed 10/15/26 Page 373 of 506



Dastin, J. (2020). Microsoft to divest AnyVision stake, end face recognition investing. *Reuters*, March 27. Retrieved from https://www.reuters.com/article/us-microsoft-anyvision/microsoft-to-divest-anyvision-stake-end-face-recognition-investing-idUSKBN21E3BA

Davis, G. F. (2016). *The vanishing American corporation: Navigating the hazards of a new economy*. Oakland, CA: Berrett-Koehler Publishers.

Duhigg, C. (2020). The enablers. *The New Yorker*, November 30, pp. 38–47.

Eggers, J. P., & Song, L. (2015). Dealing with failure: Serial entrepreneurs and the costs of changing industries between ventures. *Academy of Management Journal*, *58*, 1785–1803.

Eisenstein, P. (2020). Fraud claims, DOJ probe and sexual abuse allegations cloud $2B deal between GM and Nikola truck startup. *NBC News*, September 30. Retrieved from https://www.nbcnews.com/business/autos/fraud-claims-doj-probe-sexual-abuse-allegations-cloud-2-billion-n1241550

Fama, E. F. (1980). Agency problems and the theory of the firm. *Journal of Political Economy*, *88*, 288–307.

Fama, E. F., & Jensen, M. C. (1983). The separation of ownership and control. *Journal of Law and Economics*, *26*, 301–325.

Farrell, M., Hoffman, L., Brown, E., & Benoit, D. (2019). The fall of WeWork: How a startup darling came unglued. *The Wall Street Journal*, October 24. Retrieved from https://www.wsj.com/articles/the-fall-of-wework-how-a-startup-darling-came-unglued-11571946003

Fauchart, E., & Gruber, M. (2011). Darwinians, communitarians, and missionaries: The role of founder identity in entrepreneurship. *Academy of Management Journal*, *54*, 935–957.

Feldman, D. C. (1984). The development and enforcement of group norms. *The Academy of Management Review*, *9*(1), 47–53.

Foldy, B., Colias, M., & Naughton, N. (2020). Long before Nikola Trucks, Trevor Milton sold investors on startups that faded. *The Wall Street Journal*, October 1. Retrieved from https://www.wsj.com/articles/nikola-electric-hydrogen-trucks-trevor-milton-11601575695

Fowler, S. (2020). *Whistleblower: My Journey to Silicon Valley and fight for justice at Uber*. New York, NY: Penguin Publishing Group.

First Round. (2019). State of startups. Retrieved from https://stateofstartups2019.firstround.com

Gabbioneta, C., Greenwood, R., Mazzola, P., & Minoja, M. (2013). The influence of the institutional context on corporate illegality. *Accounting, Organizations and Society*, *38*(6–7), 484–504.

Gamez-Djokic, M., Kouchaki, M., & Waytz, A. (2021). Virtuous startups: The credentialing power of the startup label. *Academy of Management Discoveries*, Forthcoming.

Garg, S. (2013). Venture boards: Distinctive monitoring and implications for firm performance. *Academy of Management Review*, *38*(1), 90–108.

Garud, R., Gehman, J., & Tharchen, T. (2017). Performativity as ongoing journeys: Implications for strategy, entrepreneurship, and innovation. *Long Range Planning*, *53*, 1–10.

Garud, R., Schildt, H. A., & Lant, T. K. (2014). Entrepreneurial storytelling, future expectations, and the paradox of legitimacy. *Organization Science*, *25*, 1479–1492.

Giorgi, S., Lockwood, C., & Glynn, M. A. (2015). The many faces of culture: Making sense of 30 years of research on culture in organizational studies. *Academy of Management Annals*, *9*(1), 1–54.

Gluckman, N. (2019). Hype vs reality at the MIT media lab. *Chronicle of Higher Education*, *20*, A10–A15.

Graffin, S. D., Bundy, J., Porac, J. F., Wade, J. B., & Quinn, D. P. (2013). Falls from grace and the hazards of high status: The 2009 British MP expense scandal and its impact on parliamentary elites. *Administrative Science Quarterly*, *58*(3), 313–345.

Greve, H. R., Palmer, D., Pozner, J.-E. (2010). Organizations gone wild: The causes, processes, and consequences of organizational wrongdoing. *Academy of Management Annals*, *4*(1), 53–108.

Grimes, M. (2018). The pivot: How founders respond to feedback through idea and identity work. *Academy of Management Journal*, *61*(5), 1692–1717.

Guler, I. (2007). Throwing good money after bad? Political and institutional influences on sequential decision making in the venture capital industry. *Administrative Science Quarterly*, *52*, 248–285.

Hoffman, R., & Yeh, C. (2018). *Blitzscaling: The lightning-fast path to building massively valuable companies*. New York, NY: Currency.

hooks, b. (2004). *The will to change: Men, masculinity and love*. Washington, DC: Washington Square Press.

Downloaded from www.emerald.com/books/edited-volume/chapter-pdf/9218303/s0733-558x20220000081007.pdf by Reprints Desk Inc user on 14 September 20

Case 1:25-cr-00592-LAK Document 88-1 Filed 10/15/26 Page 374 of 506



Hsu, D. H. (2008). Technology-based entrepreneurship. In S. Shane (Ed.), *Handbook of technology and innovation management* (pp. 367–388). New York, NY: John Wiley & Sons Ltd.

Huang, L. (2018). The role of investors gut feel in managing complexity and extreme risk. *Academy of Management Journal*, *61*(5), 1827–1847.

Huang, L., & Knight, A. P. (2017). Resources and relationships in entrepreneurship: An exchange theory of the development and effects of the entrepreneur–investor relationship. *Academy of Management Review*, *42*, 80–102.

Huang, L., & Pearce, J. (2015). Managing the unknowable: The effectiveness of early-stage investor gut feel in entrepreneurial investment decisions. *Administrative Science Quarterly*, *60*, 634–670.

Janis, I. L. (1971). Groupthink. *Psychology Today*, November 5, pp. 43–84.

Janis, I. L. (1972). *Victims of groupthink*. Boston, MA: Houghton Mifflin Company.

Joint Venture. (2020). 2020 Silicon Valley Index.

Jones, T. M., Donaldson, T., Freeman, R. E., Harrison, J. S., Leana, C. R., Mahoney, J. T., & Pearce, J. L. (2016). Management theory and social welfare: Contributions and challenges. *Academy of Management Review*, *41*(2), 216–228.

Kashmir, H., & Aaron, K. (2020). At Talkspace, start-up culture collides with mental health concerns. *The New York Times*, August 7. Retrieved from https://www.nytimes.com/2020/08/07/technology/talkspace.html

Keltner, D., Gruenfeld, D. H., & Anderson, C. (2003). Power, approach, and inhibition. *Psychological Review*, *110*, 265–284.

Khatchadourian, R. (2019). The burn list. *The New Yorker*, November 4, pp. 42–57.

Korosec, K. (2020). Nikola disputes fraud claims in carefully worded rebuttal. *TechCrunch*, September 14. Retrieved from https://techcrunch.com/2020/09/14/nikola-disputes-fraud-claims-in-carefully-worded-rebuttal/

Krawiec, K. (2005). Organizational misconduct: Beyond the principal-agent model. *Florida State University Law Review*, *32*(2), 571–625.

Kulik, B. W. (2005). Agency theory, reasoning and culture at Enron: In search of a solution. *Journal of Business Ethics*, *59*(4), 347–360.

Laura, H. (2020). A Toronto startup folded after a sexual harassment claim. This is the woman who spoke out. *Global News*, February 13. Retrieved from https://globalnews.ca/news/6499207/planswell-sexual-harassment-allegations/

Lovelace, J., Bundy, J., Hambrick, D., & Pollock, T. (2018). The shackles of CEO celebrity: Sociocognitive and behavioral role constraints on "Star" leaders. *Academy of Management Review*, *43*, 419–444

Lutz, E. (2019). WeWork's problems are about to get even worse. *Vanity Fair*, November 19. Retrieved from https://www.vanityfair.com/news/2019/11/wework-problems-are-about-to-get-even-worse-new-york-attorney-general

McGregor, J. (2019). Adam Neumann's billion-dollar exit package from WeWork is a lesson in giving founders too much control. *The Washington Post*, October 24. Retrieved from https://www.washingtonpost.com/business/2019/10/24/adam-neumanns-billion-dollar-exit-package-wework-is-lesson-giving-founders-too-much-control/

McKendall, M. A., & Wagner, J. (1997). Motive, opportunity, choice, and corporate illegality. *Organization Science*, *8*(6), 624–647.

Milgram, S. (1963). Behavioral study of obedience. *Journal of Abnormal and Social Psychology*, *67*, 371–378.

Mische, A. (2009). Projects and possibilities: Researching futures in action. *Sociological Forum*, *24*, 694–704.

Molla, R. (2019). Why WeWork founder Adam Neumann is getting $1.7 billion to leave the company he ran into the ground. *Vox*, October 22. Retrieved from https://www.vox.com/recode/2019/10/22/20927188/wework-adam-neumann-payout-softbank-layoffs

Nan, H. (2019). Roadstar.ai: A promising autonomous driving startup wrecked by infighting. *COMPASSLIST*, July 25. Retrieved from https://www.compasslist.com/insights/roadstarai-a-promising-autonomous-driving-startup-wrecked-by-infighting

Palmer, D. (2008). Extending the process model of collective organizational wrongdoing. *Research in Organizational Behavior*, *28*, 107–135.

Downloaded from www.emerald.com/books/edited-volume/chapter-pdf/9218303/s0733-558x20220000081007.pdf by Reprints Desk Inc user on 14 September 20

Case 1:25-cr-00592-LAK Document 88-1 Filed 10/15/26 Page 375 of 506



Palmer, D. (2013). *Normal organizational wrongdoing*. Oxford: Oxford University Press.

Palmer, D., & Feldman, V. (2017). Toward a more comprehensive analysis of the role of organizational culture in child sexual abuse in institutional contexts. *Child Abuse & Neglect*, *74*, 23–34.

Palmer, D., & Yenkey, C. (2015). Drugs, sweat and gears: An organizational analysis of performance enhancing drug use in the 2010 Tour de France. *Social Forces*, *94*, 891–922.

Peter, E., & de la Merced, J. M. (2019). WeWork IPO is withdrawn as investors grow wary. *The New York Times*, September 30. Retrieved from https://www.nytimes.com/2019/09/30/business/wework-ipo.html

Peter, G. (2004). How it all went sour. *Time Magazine*, November 21. Retrieved from http://content.time.com/time/magazine/article/0,9171,880285,00.html

Pitchbook. (2021). The US VC female founders dashboard. Retrieved from https://pitchbook.com/news/articles/the-vc-female-founders-dashboard. Accessed January 29, 2021.

Powell, E. E., & Baker, T. (2014). It's what you make of it: Founder identity and enacting strategic responses to adversity. *Academy of Management Journal*, *57*, 1406–1433.

Pugh, D. S., Hickson, D. J., Hinings, C. R., & Turner, C. (1969). The context of organization structures. *Administrative Science Quarterly*, *14*(1), 91–114.

Rahman, H. (2018). *Invisible cages: Algorithmic evaluations in online labor markets*. Ph.D. Dissertation, Stanford University, Stanford, CA.

Ramey, C. (2021). Nikola founder Trevor Milton charges with securities fraud. *The Wall Street Journal*, July 29. Retrieved from https://www.wsj.com/articles/nikola-founder-trevor-milton-charged-with-lying-to-investors-11627563648

Ramsey, L. (2019). The mysterious story of former Theranos president Sunny Balwani, who was in a relationship with Elizabeth Holmes and now faces criminal charges. *Business Insider*, March 19. Retrieved from https://www.businessinsider.com/theranos-former-president-sunny-balwani-role-in-the-company-2018-5

Reuters. (2019). WeWork faces U.S. SEC inquiry over possible rule violations: Bloomberg. *Reuters*. November 15. Retrieved from https://www.reuters.com/article/us-wework-sec/wework-faces-u-s-sec-inquiry-over-possible-rule-violations-bloomberg-idUSKBN1XP1YE

Ries, E. (2011). *The lean startup: How constant innovation creates radically successful businesses*. London: Portfolio Penguin.

Rivera, L. (2012). Hiring as cultural matching: The case of elite professional service firms. *American Sociological Review*, *77*, 999–1022.

Roethlisberger, F. J., & Dickson, W. J. (1947). *Management and the worker*. Cambridge: MA: Harvard University Press.

Rosenfeld, S. (2020, January 7). *California agency is hiding Uber and Lyft accident reports*. San Francisco, CA: San Francisco Public Press. Retrieved from https://sfpublicpress.org/news/2020-01/california-agency-is-hiding-uber-and-lyft-accident-reports

Rouse, E. D. (2016). Beginning's end: How founders psychologically disengage from their organizations. *Academy of Management Journal*, *59*, 1605–1629.

Roy, D. (1957). Banana time: Job satisfaction and informal interaction. *Human Organization*, *18*(4), 158–168.

Ruef, M., Aldrich, H., & Carter, N. (2003). The structure of founding teams: Homophily, strong ties, and isolation among US entrepreneurs. *American Sociological Review*, *68*, 195–222.

Salancik, G., & Pfeffer, J. (1977). Who gets power and how they hold on to it: A strategic contingency model of power. *Organizational Dynamics*, *Winter*, 3–21.

Savoia, A. (2019). *The right it: Why do many ideas fail and how to make sure yours succeed*. New York, NY: HarperOne.

Scheaf, D. J., & Wood, M. S. (2021). Entrepreneurial fraud: A multidisciplinary review and synthesized framework. *Entrepreneurship Theory and Practice*. doi:10.1177/10422587211001818

Scott, R. (2013). *Institutions and organizations*. Los Angeles, CA: Sage Publications.

Shaw, M. (1936). *Group dynamics* (3rd ed.). New York, NY: Harper.

Shepherd, D., Patzelt, H., & Baron, R. (2012). "I care about nature, but …": Disengaging values in assessing opportunities that cause harm. *Academy of Management Journal*, *56*(5), 1251–1273.

Shepherd, D. A. (2019). Researching the dark side, downside, and destructive side of entrepreneurship: It is the compassionate thing to do!. *Academy of Management Discoveries*, *5*, 217–220.

Downloaded from www.emerald.com/books/edited-volume/chapter-pdf/9218303/s0733-558x20220000081007.pdf by Reprints Desk Inc user on 14 September 20

Case 1:25-cr-00592-LAK Document 88-1 Filed 10/15/26 Page 376 of 506



Siddiqui, F. (2019). Uber discloses 3,000 reports of sexual assault on U.S. rides last year in its long-awaited safety study. *The Washington Post*, December 5. Retrieved from https://www.washingtonpost.com/technology/2019/12/05/uber-disclosed-sexual-assaults-us-rides-last-year-its-long-awaited-safety-report/?arc404=true

Sine, W. D., Mitsuhashi, H., & Kirsch, D. A. (2006). Revisiting burns and stalker: Formal structure and new venture performance in emerging economic sectors. *Academy of Management Journal*, *49*(1), 121–132.

Simpson, S. S. (1986). The decomposition of antitrust: Testing a multilevel, longitudinal model of profit-squeeze. *American Sociological Review*, *51*, 859–975.

Sims, R. R., & Brinkmann, J. (2003). Enron ethics (Or: Culture matters more than codes). *Journal of Business Ethics*, *45*, (3), 243–256.

Soltys, D. (2019). Planswell CEO attributes company downfall to "social media storm" in investor email. *Betakit: Canadian Startup News and Tech Innocation*, November 5. Retrieved from https://betakit.com/planswell-ceo-attributes-company-downfall-to-social-media-storm-in-investor-email/

Song, L., & Larkin, M. (2019). MIT Media Lab kept regulators in the dark, dumped chemicals in excess of legal limit. *ProPublica*, September 20. Retrieved from https://www.propublica.org/article/mit-media-lab-kept-regulators-in-the-dark-dumped-chemicals-in-excess-of-legal-limit

Spilling the Blood of a Silicon Valley Unicorn. (2019). YouTube Video, added by Ethics in Society. Retrieved from https://www.youtube.com/watch?v=YJx-cU9CKLI&feature=emb_logo

Staw, B. M. (1976). Knee-deep in the big muddy: A study of escalating commitment to a chosen course of action. *Organizational Behavior and Human Performance*, *16*, 27–44.

Staw, B. M., & Szwajkowski, E. (1975). The scarcity-munificence component of organizational environments and the commission of illegal acts. *Administrative Science Quarterly*, *20*, 345–354.

Stephen, B. (2018). The gospel of Elon Musk, according to his Flock. *The Verge*. Retrieved from https://www.theverge.com/2018/6/26/17505744/elon-musk-fans-tesla-spacex-fandom

Stoller, M. (2019). WeWork and counterfeit capitalism. *Big*, September 25. Retrieved from https://mattstoller.substack.com/p/wework-and-counterfeit-capitalism

Sykes, G., & Matza, D. (1957). Techniques of neutralization: A theory of delinquency. *American Sociological Review*, *22*(6), 664–670.

*The Inventor: Out for Blood in Silicon Valley*. (2019). Alex Gibney, HBO, Film.

Timmons, H., & Wassener, B. (2009). Satyam chief admits huge fraud. *The New York Times*, January 7.

Trivino, L. K., & Nelson, K. A. (2017). *Managing business ethics: Straight talk about how to do it right*. Hoboken, NJ: Wiley.

US Securities and Exchange Commission. (2018). Elon Musk settles SEC fraud charges; Tesla charged with and resolves securities law charge. Press Release 2918-226. Retrieved from https://www.sec.gov/news/press-release/2018-226

Vallas, S., & Schor, J. (2020). What do platforms do? Understanding the gig economy. *Annual Review of Sociology*, *46*, 273–294.

Valukas, A. R. (2014, May 29). "Report to Board of Directors of General Motors Company regarding ignition switch recalls," Jenner & Block, select pages. Retrieved from http://www.beasleyallen.com/webfiles/valukas-report-on-gm-redacted.pdf

Wainstein, K. A., Joseph, J., III, & Kukowski, C. D. (2014). *Investigation of irregular classes in the Department of African and Afro-American Studies at the University of North Carolina at Chapel Hill*. New York, NY: Cadwalader.

Watt, P. (2016). The rise of the 'dropout entrepreneur': Dropping out, 'self-reliance' and the American myth of entrepreneurial success. *Culture and Organization*, *22*, 20–43.

Wasserman, N. (2012). *The founder's dilemmas: Anticipating and avoiding the pitfalls that can sink a startup*. Princeton, NJ: Princeton University Press.

Weber, M. (1922/1978). *Economy and society*. Berkeley, CA: University of California Press.

Welter, F., Baker, T., Audretsch, D. B., & Gartner, W. B. (2017). Everyday entrepreneurship – A call for entrepreneurship research to embrace entrepreneurial diversity. *Entrepreneurship: Theory and Practice*, *41*, 311–321.

Wood, M., Bakker, R., & Fisher, G. (2021). Back to the future: A time-calibrated theory of entrepreneurial action. *Academy of Management Review*.

Downloaded from www.emerald.com/books/edited-volume/chapter-pdf/9218303/s0733-558x20220000081007.pdf by Reprints Desk Inc user on 14 September 20

Case 1:25-cr-00592-LAK Document 88-1 Filed 10/15/26 Page 377 of 506



Zaleski, O., Waldman, P., & Huet, E. (2016). How Hampton Creek sold Silicon Valley on a fake-mayo miracle. *Bloomberg Businessweek*, September 22. Retrieved from https://www.bloomberg.com/features/2016-hampton-creek-just-mayo/

Zhao, E. Y., & Wry, T. (2016). Not all inequality is equal: Decomposing the societal logic of patriarchy to understand microfinance lending to women. *Academy of Management Journal*, *59*(6), 1994–2020. doi:10.5465/amj.2015.0476

Zuckerman, E. (2017). Zuckerberg and the imaginary cosmopolitan. *The California Review of Images and Mark Zuckerberg*, Winter.

Downloaded from www.emerald.com/books/edited-volume/chapter-pdf/9218303/s0733-558x20220000081007.pdf by Reprints Desk Inc user on 14 September 20

# Exhibit 15

This article was downloaded by: [162.90.146.65] On: 12 October 2026, At: 07:14
Publisher: Institute for Operations Research and the Management Sciences (INFORMS)
INFORMS is located in Maryland, USA




Organization Science

Publication details, including instructions for authors and subscription information:
http://pubsonline.informs.org

# Criminal Deception in Silicon Valley

Tim Weiss, Nevena Radoynovska

To cite this article:
Tim Weiss, Nevena Radoynovska (2026) Criminal Deception in Silicon Valley. Organization Science 37(5):1649-1676.
https://doi.org/10.1287/orsc.2024.19981

Full terms and conditions of use: https://pubsonline.informs.org/Publications/Librarians-Portal/PubsOnLine-Terms-and-Conditions

This article may be used only for the purposes of research, teaching, and/or private study. Commercial use or systematic downloading (by robots or other automatic processes) is prohibited without explicit Publisher approval, unless otherwise noted. For more information, contact permissions@informs.org.

The Publisher does not warrant or guarantee the article’s accuracy, completeness, merchantability, fitness for a particular purpose, or non-infringement. Descriptions of, or references to, products or publications, or inclusion of an advertisement in this article, neither constitutes nor implies a guarantee, endorsement, or support of claims made of that product, publication, or service.

Copyright © 2026, INFORMS

Please scroll down for article—it is on subsequent pages

With 12,500 members from nearly 90 countries, INFORMS is the largest international association of operations research (O.R.) and analytics professionals and students. INFORMS provides unique networking and learning opportunities for individual professionals, and organizations of all types and sizes, to better understand and use O.R. and analytics tools and methods to transform strategic visions and achieve better outcomes.
For more information on INFORMS, its publications, membership, or meetings visit http://www.informs.org

informs
https://pubsonline.informs.org/journal/orsc

ORGANIZATION SCIENCE
Vol. 37, No. 5, September–October 2026, pp. 1649–1676
ISSN 1047-7039 (print), ISSN 1526-5455 (online)

Downloaded from informs.org by [162.90.146.65] on 12 October 2026, at 07:14 . For personal use only, all rights reserved.

# Criminal Deception in Silicon Valley

**Tim Weiss,[a,*] Nevena Radoynovska[b]**

[a] Department of Management and Entrepreneurship, Imperial College, London SW7 2AZ, United Kingdom; [b] Strategy and Organization Department, Emlyon Business School, F-69007 Lyon, France

*Corresponding author

**Contact:** timweiss@imperial.ac.uk, https://orcid.org/0000-0002-0682-5287 (TW); radoynovska@em-lyon.com, https://orcid.org/0000-0003-3780-2018 (NR)

**Received:** December 21, 2024
**Revised:** September 5, 2025; February 27, 2026
**Accepted:** May 13, 2026
**Published Online in Articles in Advance:** June 29, 2026

**https://doi.org/10.1287/orsc.2024.19981**

**Copyright:** © 2026 INFORMS

**Abstract.** With entrepreneurial fraud cases on the rise, we investigate how entrepreneurs carry out *criminal deception*, employing deceptive means to defraud audiences. Analyzing court data from Silicon Valley ventures and their founders prosecuted for fraud between 2000 and 2023, our findings reveal that entrepreneurs carry out criminal deception through a process of *façading*: Entrepreneurs construct, perform, and protect illusory appearances (façades) that externally project high-growth performance to audiences while masking ventures' actual underperformance. We identify three forms of façading—surface, reinforced, and deep façading—that are contingent on the severity of the gap that entrepreneurs face between audiences' performance expectations and ventures' performance reality. Our theoretical framework captures how entrepreneurs facing minor, wide, and extreme expectation-reality gaps engage in evermore sophisticated efforts to detach the venture's externally projected appearance from its actual operational reality. Practically, we propose several approaches to deter and detect criminal deception, including the extension of U.S. Securities and Exchange Commission surveillance and whistleblower program, investor due diligence reform, and dedicated entrepreneurship education interventions that clearly demarcate when entrepreneurs transgress into criminal deception. We make contributions to literatures on cultural entrepreneurship, organizational wrongdoing, and the social effects of entrepreneurship.

**Supplemental Material:** The online appendices are available at https://doi.org/10.1287/orsc.2024.19981.

**Keywords:** court data • cultural entrepreneurship • deception • entrepreneurship • fraud • new ventures • organization and management theory • qualitative research • Silicon Valley • startups • scaling • wrongdoing

## Introduction

There is increasing interest in understanding how entrepreneurs employ deception (Shepherd 2019, Scheaf and Wood 2022, Gehman and Wry 2022, Palmer and Weiss 2022, Garud et al. 2025). In organization science, for instance, the cultural entrepreneurship literature's focus on how entrepreneurs craft and mobilize compelling stories, narratives, and frames to acquire resources, provides a starting point for thinking of deception as an extension of dramatized discourse. Scholars suggest that entrepreneurial stories may deceive because they "do not necessarily need to reflect any objective reality to be effective" (Lounsbury and Glynn 2019, p. 15); moreover, they are often dramatized, selective, and stylized (Taeuscher et al. 2022), and audiences may even expect dramatization from entrepreneurs (Gamez-Djokic et al. 2022). Empirical work provides further nuance, showing how entrepreneurs leverage dramatization by crafting ambiguous narratives (Bureau et al. 2026) and projecting exaggerated venture identities that are only loosely connected to the venture's actual resources (Martens et al. 2007, Piazza et al. 2023). Further, scholars assert that dramatization happens as entrepreneurs formulate outsized, aspirational claims that may prove unachievable (Wood et al. 2022), leading entrepreneurs to either revise such aspirational stories (Garud et al. 2014) or dramatize even further by generating evermore unrealistic goals (Garud et al. 2025). Despite these important advances, one potential trajectory of deception remains severely underexplored: how entrepreneurs may begin to transgress from dramatized discourse into more severe, *criminal deception*, employing deceptive means to defraud audiences. The consequences of criminal deception include not only losses for victims but also legitimacy loss for entrepreneurs and their ventures, as well as potential prosecution and incarceration.

Recent high-profile cases of technology ventures' involvement in entrepreneurial fraud surface some of the underlying dynamics of dramatization-turned-criminal deception. For example, the technology venture Nikola organized high-end product demos to

Downloaded from informs.org by [162.90.146.65] on 12 October 2026, at 07:14 . For personal use only, all rights reserved.

provide evidence for its claim of having successfully created a hydrogen fuel cell truck. In actuality, the truck was made to roll down an inclined stage and highway in these demonstrations, masking the fact that Nikola's technology was far from operational (Boudette and Ewing 2020, SEC 2021). Similarly, Frank, a fintech venture focused on student financial aid, organized a network of collaborators to fabricate a synthetic data set in support of its narrative of rapid customer growth, concealing that its actual customer base was only 1/10th of the 4 million users portrayed to investors (SEC 2023). These and other less publicized cases show how discursive work and organizing work are inextricably linked as entrepreneurs craft convincing, yet false, stories and carry out discrete organizing efforts to artificially substantiate them. Accordingly, we build on cultural entrepreneurship's empirical focus on the interaction of discursive and organizing work (Lounsbury and Glynn 2001, Zott and Huy 2007, Karp and O'Mahony 2025) to begin to advance our understanding of how entrepreneurs also mobilize organizing efforts to deceive audiences. More specifically, we leverage the discourse-organizing interface[1] to help us understand how, beyond crafting dramatized stories, symbols, and narratives for audiences, entrepreneurs also employ organizing efforts to generate fake data, evidence, and information in support of their stories.

Adjacently, the literature on organizational wrongdoing has a long tradition of studying the antecedents and consequences of misconduct, illegality, and fraud within and across organizations (Greve et al. 2010, Palmer 2013, Palmer et al. 2016). Nevertheless, the organizing efforts underlying these transgressions—the often-hidden yet critical "how-tos" of wrongdoing—are rarely theorized. Steeped in the context of large, publicly listed corporations, the wrongdoing literature captures the environmental conditions that can facilitate corporate illegality (Gabbioneta et al. 2013), the processes that lead to the diffusion of deviant practices within and across organizations (Mohliver 2019), and the effects of fraud on organizational outcomes, including entrepreneurial innovation (Wang et al. 2021). Similarly, the emerging literature connecting entrepreneurial fraud and organizational wrongdoing provides a useful foundation for understanding criminal deception; however, it remains restricted to conventional theorizing on the causes of entrepreneurial fraud (Palmer and Weiss 2022) and the processes through which deception diffuses within ventures (Mohliver et al. 2022). To comprehensively theorize criminal deception in the context of entrepreneurship, we argue that a scholarly agenda integrating both discourse and organizing is needed. Accordingly, we ask: *How do entrepreneurs carry out criminal deception?*

To address this question, we must overcome an important methodological barrier in studying criminal deception, namely, that criminal acts and processes are typically hidden and difficult to observe empirically. To this end, we leverage an underutilized data source that affords detailed insight into the acts of criminal deception: court documents on the prosecution of technology entrepreneurs and their ventures for securities fraud in the United States. By examining civil and criminal prosecutions by the U.S. Securities and Exchange Commission (SEC) and Department of Justice (DOJ), we constructed a database of Silicon Valley–based entrepreneurs and their technology ventures charged with securities fraud between 2000 and 2023. Arguably, some criminal deception remains undetected or unprosecuted. Nevertheless, in the spirit of qualitative research, we sample prosecuted cases to reveal the hitherto understudied processes involved in criminal deception. Our sample includes 12 ventures that collectively raised $1.8 billion in equity capital funding and were involved in 27 court cases, resulting in cumulative financial losses of $687.6 million and 73 years of prison sentences for entrepreneurs.

We focused on Silicon Valley because it constitutes an innovation ecosystem in which audiences have extraordinarily high growth expectations anchored in a collective vision and pursuit of a hyped, ideal venture type: a rapidly scaling "unicorn" typically valued above $1 billion (Zankl and Grimes 2024, Canales et al. 2025, Hampel and Dalpiaz 2025). Entrepreneurs may be particularly prone to leveraging deception when confronted with a significant discrepancy between audiences' institutionally conditioned performance expectations of rapid scale and the venture's actual performance—that is, when entrepreneurs face a significant expectation-reality gap. Research has shown that entrepreneurs manage the expectation-reality gap —often once it has been exposed or acknowledged—in a variety of ways, such as through revising aspirational visions and venture goals (Garud et al. 2014, Chapple et al. 2022), formulating even more unrealistic goals (Garud et al. 2025), recalibrating expectations (Karp and O'Mahony 2025), carefully managing audiences (McDonald and Gao 2019), or pivoting (Hampel et al. 2020). In contrast, we suggest that deception may constitute an avenue through which entrepreneurs can eliminate an expectation-reality gap in the eyes of audiences by enveloping the latter in a false sense of reality.

Based on inductive coding of our court data (Charmaz 2011), we theorize criminal deception as a process of "façading." A façade is broadly defined as a "false, superficial, or artificial appearance or effect" (Merriam-Webster 2025) and is understood by organizational scholars as "a symbolic front erected by organizational participants designed to reassure their

Downloaded from informs.org by [162.90.146.65] on 12 October 2026, at 07:14 . For personal use only, all rights reserved.

organization's stakeholders of the legitimacy of the organization and its management" (Abrahamson and Beaumard 2008, p. 43). Our data show how façading by entrepreneurs integrates both discursive and organizing efforts, including constructing a façade, performing the façade before resource-holding audiences, and protecting the façade from scrutiny.

In particular, we theorize three forms of façading that correspond to specific degrees of expectation-reality gaps and capture increasingly sophisticated organizing efforts. The first form, *surface façading*, occurs when entrepreneurs engage in discursive work by fictionalizing stories of imminent venture success that lack any evidentiary basis in the venture's operational reality. The second form, *reinforced façading*, captures how entrepreneurs go beyond discourse and reinforce their fictionalized stories of progress by (a) organizing the production of interlocking sets of false, highly specific retrospective evidence of a venture's historical performance (e.g., faking realized revenue, falsifying bank statements, or fabricating nonexistent customer contracts) and (b) organizing to centralize and control information flows within and outside the venture. The third form, *deep façading*, describes how entrepreneurs employ highly sophisticated organizing efforts ranging from faking experiential performances (e.g., fake product demos) to co-opting verification processes (e.g., sabotaging due diligence) and manipulating regulatory compliance, as well as entrenching organized secrecy in their ventures.

We synthesize our findings to inductively develop a theoretical framework of criminal deception that explains how entrepreneurs backfill expectation-reality gaps through façading, and we further theorize façading sophistication as a discontinuous process contingent on the degree of the expectation-reality gap. By engaging in façading, entrepreneurs effectively decouple the venture's externally projected appearance from its operational reality, making it *appear* to audiences as if no expectation-reality gap exists, despite the venture's actual (subpar) performance. We argue that entrepreneurs transgress from dramatized discourse into criminal deception when their stories become unhinged from reality and involve increasingly sophisticated organizing efforts to fabricate material evidence, data, and information about their ventures' performance.

Through our analyses, we contribute to four critical areas of theory and practice. First, we expand the cultural entrepreneurship literature by introducing a theoretical framework of criminal deception as a process of fictionalizing not just the future but also *the past* through discursive and organizing efforts. Second, we advance research on organizational wrongdoing by exploring and theorizing the hidden acts and processes of wrongdoing, rather than focusing strictly on its causes and effects. Third, our study augments the growing discussion on the social effects of entrepreneurship by accentuating the harm of carrying out criminal deception and problematizing investors' implication in deception. Fourth, this paper contributes to ongoing policy conversations in the legal domain by supporting the call for additional SEC surveillance of privately held startups and the extension of whistleblower protection schemes to institutionalize mechanisms for detecting and reporting criminal deception.

## Theoretical Motivation

As early as 2007, cultural entrepreneurship scholars called for more research into the acts and processes through which entrepreneurs misrepresent and falsify their ventures' operational realities when engaging with audiences (Martens et al. 2007, Lounsbury and Glynn 2019, Gehman and Wry 2022). Yet, despite cultural entrepreneurship's recognition of the importance of both discourse and organizing (Zott and Huy 2007, Delmestri and Greenwood 2016, Massa et al. 2017, Karp and O'Mahony 2025), the recent literature stream on deception has predominantly theorized the discursive work involved in crafting deceptive stories, narratives, and frames while sidelining the organizing efforts that are also involved in deception. We suggest that refocusing attention on the discourse-organizing interface can advance our understanding of the often-hidden practices involved in deception, providing a more holistic theoretical account of more severe, criminalized forms of deception.

### Deception as Dramatized Discourse

The cultural entrepreneurship literature provides an important starting point to begin to understand deception. Specifically, regarding entrepreneurial stories as dramatized discourse of venture resources and progress affords a theoretical window into how deception may emerge. Taeuscher and colleagues (2022) emphasize how entrepreneurial "narratives can disproportionally emphasize a highly unusual feature of an offering or a unique aspect of the entrepreneur's identity to positively influence perceptions … packaging certain stylized dimensions of reality while *hiding others* to promote an offering to audiences" (p. 2105; emphasis added). The literature goes further and captures embellishments and exaggerations, wherein stories are inflated or loosely connected to a venture's stock of financial, social, and human capital. For instance, in examining IPO prospectuses and investor decision-making, Martens and colleagues (2007, p. 1125) "did not find complete correspondence between a firm's objective resource level and its socially construed

Organization Science, 2026, vol. 37, no. 5, pp. 1649–1676, © 2026 INFORMS

Downloaded from informs.org by [162.90.146.65] on 12 October 2026, at 07:14 . For personal use only, all rights reserved.

identity," suggesting that "authors of entrepreneurial narratives have at least some freedom to 'represent' the facts." Similarly, more recent empirical work reveals that entrepreneurs who signal expertise in their self-presentation narratives receive more resource flows from audiences, irrespective of whether their signaled expertise corresponds to their actual underlying skillset (Piazza et al. 2023).

Relatedly, dramatized discourse through projective storytelling is often recognized as part of entrepreneurial future-making (i.e., formulating and attempting to bring about aspirational claims and visions of the distant future). Garud et al. (2014), for example, argue that skillful entrepreneurs develop stories with compelling plots, making future possibilities seem plausible and achievable to investors by communicating concrete steps and milestones. When these milestones are not reached, entrepreneurs can respond by revising their stories. Likewise, entrepreneurs may engage in "omitting, embellishing, misrepresenting, or fabricating facts" (Garud et al. 2025, p. 15). Consequently, entrepreneurs may drive dramatization further as they set evermore unrealistic goals to access additional resources while retaining legitimacy in the eyes of key audiences. Similarly, scholars have argued that entrepreneurs utilize dramatized discourse to generate ambiguous narratives that conceal fraudulent activities (Bureau et al. 2026), generate fictions that they later need to turn into reality (Wood et al. 2022), mobilize implied social validations to "fake it" (McMullen 2025), and produce outright false promises, speculation, and "reality distortions" (Gehman and Wry 2022).

Beyond its focus on dramatized discourse, however, extant research has only alluded to the underlying organizing efforts at play in deception. This is surprising, given the volume of work that has studied how entrepreneurs can manage the expectation-reality gap through a variety of discursive and/or organizing work (McDonald and Gao 2019, Canales et al. 2025, Knight et al. 2025). For example, Karp and O'Mahony (2025) theorize how integration work through organizational and technological adaptations in conjunction with recalibrating audience's expectations help narrow the gap between expectation and reality. Hampel et al. (2020) showcase how ventures pivot and, beyond discursive work, also engage in organizing work by changing manufacturing processes, developing new products, and changing their community engagement efforts to bring expectation and reality into renewed alignment. In line with our focus on theorizing deception, Garud et al. (2025) evoke Goffman (1959) to emphasize the analytical distinction between "what is happening backstage" (p. 16), whereas entrepreneurs project a "frontstage" image. Yet, "backstage" practices and processes remain under-researched. Building on these initial insights, our goal is to develop a more holistic account of the work involved in constructing, performing, and protecting entrepreneurial lies and misrepresentations.

## Wrongdoing and Entrepreneurial Fraud

Over the past decade, research on organizational wrongdoing has offered a rich understanding of the environmental conditions that facilitate the diffusion of wrongdoing within and across organizations, as well as an appreciation of the outcomes and consequences of wrongdoing (Palmer 2013; Palmer et al. 2016; Gabbioneta et al. 2023). Yet, even as the literature has empirically investigated severe forms of fraud, misconduct, illegality, and criminal behavior, the underlying organizing of the acts and processes involved in wrongdoing is largely sidelined as descriptive material and is rarely leveraged to advance explicit theorizing.

More recently, scholars have begun to build interdisciplinary links in order to understand what makes entrepreneurial firms particularly vulnerable to misconduct (Scheaf and Wood 2022, Mohliver et al. 2022, Palmer and Weiss 2022, Wood et al. 2022). Connecting to foundational work in sociology (Davis 1959, Goffman 1959), we note an emerging, yet fragmented, trend in organization science to more richly describe and theorize the organizational acts and processes involved in wrongdoing, including how it is executed and sustained over time. For instance, in studying overprescription in the medical field, Zhang et al. (2023) focus on organizational practices and underscore the difference between liminal prescribing (a practice of acceptable, ambiguous overprescription due to a lack of updated information) and deviant prescribing (where norms or rules are knowingly broken in unambiguous wrongdoing). In a different context, Eaglin (2026) investigates strategic misconduct in South Africa's minibus industry and illuminates a set of organizational tactics that entrepreneurs use to address environmental constraints in their pursuit of firm survival and growth. Other authors have demonstrated how institutional and organizational contexts can create opportunity structures that enable fraud and misconduct to remain concealed and unpunished (Gabbioneta et al. 2013, Kaynak and Rahman 2024, Lodge et al. 2025). We connect to these emerging and distributed research efforts to make explicit the otherwise hidden acts and processes involved in wrongdoing by offering a more coherent theorization of criminal deception.

Taken together, the cultural entrepreneurship and organizational wrongdoing literatures provide important theoretical building blocks for advancing our understanding of entrepreneurial ventures' deceptive practices. In drawing on securities fraud court data involving entrepreneurial ventures, we develop an empirically

Downloaded from informs.org by [162.90.146.65] on 12 October 2026, at 07:14 . For personal use only, all rights reserved.

grounded theoretical framework of criminal deception at the discourse-organizing interface.

## Methods and Data

### Empirical Context

With its history of producing fast-growing technology ventures, Silicon Valley is one of the world's most reputable innovation ecosystems. In this institutional context, the concepts of "scale" and "scaling" are key elements. Increasingly rationalized in both academic (DeSantola and Gulati 2017, Jansen et al. 2023, Coviello et al. 2024) and practitioner conversations (Gil 2018, Hoffman and Yeh 2018, Hoffman et al. 2021), the imperative to scale generates expectations among entrepreneurs and audiences (e.g., investors and employees) to achieve extraordinary venture growth (Zankl and Grimes 2024, Canales et al. 2025, Hampel and Dalpiaz 2025). The term "unicorn" embodies these institutionally conditioned expectations, anchored in the ecosystem's ideal venture type that connotes the achievement of a $1 billion financial valuation over a relatively short time frame (approximately five to seven years from founding). Because of the collective vision and pursuit of high-growth, rapidly scalable ventures, Silicon Valley entrepreneurs face pressures to meet such expectations, often represented by the burden of proof—that is, the imperative to produce credible evidence of a scaling venture in order to meet audiences' high-growth expectations and acquire resources (Logue and Grimes 2022).

Organizational and legal scholars have noted that, due to the high liquidity of private markets, new ventures remain private for longer and manage to avoid the greater formal oversight and institutional scrutiny that come with going public (Davis 2016, Platt 2022, Pollman 2022a, Carlson 2023). Indeed, the SEC has historically focused its surveillance and enforcement on public companies, leaving private ventures to operate with limited systematic oversight (Pollman 2020). In this context of institutionally conditioned high-growth expectations and limited formal surveillance by state actors, scholars recognize an opportunity structure for entrepreneurs and ventures to backfill expectation-reality gaps via criminal deception (Pollman 2020, Palmer and Weiss 2022); this makes this empirical setting particularly appropriate for our study.

### Data Set

With our analytical focus on how entrepreneurs carry out criminal deception, we constructed a novel data set by focusing on court cases of detected and prosecuted securities (and related bank and wire) fraud against Silicon Valley–based technology ventures and their entrepreneurs in the postdotcom bubble era between 2000 and 2023. Court cases contain detailed, evidentiary-based information regarding criminal acts and processes and thus afford a unique empirical window into criminal deception. Below, we explain the three-step process used in constructing our data set.

First, we identified the U.S. legal codes that enable mandated social control agents (e.g., the SEC, DOJ, and Federal Bureau of Investigation (FBI)) to prosecute ventures for securities-related fraud. We considered both civil and criminal charges related to the following codes: §15-77 and §15-78, as covered by the SEC in 17 C.F.R. §240.10b–5, "employment of manipulative and deceptive devices"; §18-1348.F "securities and commodities fraud"; §18-1343.F "fraud by wire, radio, or television"; §18-1344.F "bank fraud"; and §18-1349.F "attempt and conspiracy to commit mail fraud."

Second, we focused our case selection on Silicon Valley–based technology ventures, where institutionally conditioned expectations of high growth are arguably most salient. To identify cases, we searched the publicly accessible federal database of electronic court records—PACER (Public Access to Court Electronic Records). After searching for cases prosecuted in the U.S. District Court of Northern California (whose jurisdiction covers Silicon Valley, including San Francisco), we downloaded the database for all court cases associated with the above-mentioned legal codes between 2000 and 2023. Next, we accessed each court case and manually verified that it met our selection criteria. We also conducted a comprehensive search of SEC and Northern California DOJ press releases to identify additional prosecutions. Our selection criteria included private equity capital-financed, and high-growth oriented technology ventures situated in Silicon Valley that had been prosecuted for securities fraud occurring within the first 10 years of their existence.[2] Recognizing that prosecuted cases represent only a fraction of existing criminal deception, we constructed a conservative data set to hold key dimensions constant and thus allow for cross-case comparisons. Hence, we excluded cases related to other venture types, such as real estate or investment firms. We also excluded fraud charges against publicly listed companies and ventures that had been prosecuted in direct relation to going public (e.g., for false claims made in an IPO prospectus), because these have been extensively studied elsewhere. Likewise, we excluded cases in which the SEC had opened investigations that were ultimately settled out of court or where the SEC had closed investigations without further notice and without pursuing prosecution, because detailed data are not publicly available in such cases.

Third, we conducted further searches on PACER to identify any additional charges against the entrepreneurs or ventures identified in Step 2. Because certain founders and ventures had been prosecuted multiple times for securities fraud during our study period, this additional search resulted in 27 unique court cases.

Case 1:25-cr-00592-LAK Document 88-1 Filed 10/15/26 Page 385 of 506



Downloaded from informs.org by [162.90.146.65] on 12 October 2026, at 07:14 . For personal use only, all rights reserved.

Table 1 presents an overview of venture characteristics and of the court cases associated with each venture.

## Data Analysis

Given the limited inductive analysis of court records in organization science, we describe our five-step analytical process in greater detail below.

***Step 1: Selection of relevant court documents.*** We began by analyzing a single court case in detail. The first step involved downloading the chronological list of all court documents and administrative entries produced in the case (available as docket entries via PACER) and selecting relevant documents for analysis. Depending on the case's length and complexity, a case record can contain tens to hundreds of documents. To familiarize ourselves with the initial case's court records and history, we read all related documents (e.g., initial complaint, motions, replies to motions, orders, memoranda, judgments). However, given our analytical focus on how entrepreneurs carry out criminal deception, we prioritized empirical material that substantively covers the accusations against entrepreneurs and ventures, the evidence and argumentation pertaining to deception, and the resolution of the case.

With the insights from this preliminary process, we systematically selected the following for coding: (1) the initial complaint and/or indictment listing the charges against the defendant(s) as well as the defendant's reply to the complaint; (2) any court records adjudicating the case (e.g., plea agreement, jury verdict, sentencing order, final judgment), as well as related documents revealing the prosecution's and the defendant's arguments (e.g., sentencing memoranda, motions to dismiss); and (3) additional court records containing substantive information on the practices of criminal deception (e.g., transcripts of trial hearings with witness testimony). We excluded purely administrative documents (e.g., motions to reschedule a hearing date, changes to legal representatives) and documents related strictly to the judicial process itself (e.g., motions to admit or exclude certain types of evidence from a jury trial, juror instructions). In our findings section and tables, we reference data sources using the venture's pseudonym[3] and indicate whether the data pertain to a civil or criminal case.

***Step 2: In vivo coding of selected documents.*** We used in vivo coding to code the eight cases associated with the first three ventures. For the first venture, each author independently coded the documents with a broad focus on the criminal deception process: the various reported practices and dynamics through which deception was deemed to have been carried out; the victims of deception and degree of harm suffered; the motives attributed to entrepreneurs for their acts of deception; and the consequences of deception for the entrepreneurs, the venture, and various stakeholders. During several meetings, we discussed the overlap and divergence in our coding in order to develop aggregate codes. For instance, we initially grouped early first-order codes, such as "listing clients that discontinued business relationships as existing customers" and "doctoring invoices to show higher billed amounts by hundreds of thousands of dollars," into an emerging second-order theme of "producing retrospective evidence" in support of entrepreneurs' stories.

***Step 3: Engaging with relevant literature and developing a codebook.*** We consulted the relevant literatures on deception and entrepreneurial fraud and iterated between literature and data to generate a codebook that captured both discursive and organizing efforts. Specifically, we identified a latent, untheorized connection between the organizational construct of façades in the cultural entrepreneurship literature (Lounsbury and Glynn 2019, p. 15) and the deception literature (Garud et al. 2025). Hence, we built our understanding of the construct by consulting key references (Nystrom and Starbuck 1984, Abrahamson and Beaumard 2008).

As a first stage of this step, we captured the work involved in criminal deception with the term *façading*, which showcases the three subprocesses of (1) constructing a façade, (2) performing a façade before audiences, and (3) protecting a façade from scrutiny. Concretely, we captured *constructing a façade* by identifying the facet(s) of the venture toward which entrepreneurs oriented their deceptive acts, such as finances (e.g., doctoring revenue invoices), customer engagement (e.g., fraudulently claiming nonexistent clients), business model (e.g., faking product-market fit), or technology (e.g., falsely portraying technological capabilities or readiness). Our coding also captured the different discursive and organizing efforts of deceptive acts, such as through fictionalizing stories (e.g., making baseless claims of imminent acquisition or IPO), reinforcing stories through the organized production of interlocking sets of faked evidence (e.g., fabricating past bank or revenue statements), faking experiential performances (e.g., faked product demos), co-opting audience verification processes (e.g., organizing the impersonation of customers and investors during investor due diligence processes), and manipulating regulatory compliance (e.g., avoiding regulatory approval). Table 2 provides a selective overview of the practices associated with these deceptive acts. We further coded for the operational reality the entrepreneurs had sought to mask by constructing a façade (e.g., lack of traction and revenue, deceleration of startup).

Second, we coded for *performing a façade* to showcase the resource-holding audiences (e.g., investors,

Downloaded from informs.org by [162.90.146.65] on 12 October 2026, at 07:14 . For personal use only, all rights reserved.

**Table 1.** Venture Information, Court Case Details, and Legal Consequences

| Venture information | | Case information | | | Legal consequences | | Data |
|---|---|---|---|---|---|---|---|
| Venture ID | Industry & total capital raised (USD)[a] | Case code | Legal charges | Case status | Financial (fines, restitution payments, forfeiture etc.) | Personal for entrepreneur (incarceration & other restrictions) | # of pages of analyzed court documents |
| Speedify | E-commerce $12 million | SEC v. Founder of Speedify | Securities fraud | Founder neither denied nor accepted allegations, entry of final judgment | Disgorgement of $159,130.87 | Permanently prohibited from acting as an officer or director | 28 |
| TakeOff | Business/ Productivity Software $22 million | USA v. Founder of TakeOff | Wire fraud & money laundering | Founder plead guilty to counts of wire fraud; sentenced; remaining counts dismissed by USA | $6,000 fine; $572,039 in restitution | 24 months prison; 3 years supervised release | 64 |
| RapidLauncher | Social/Platform Software $1.13 million | USA v. Founder of RapidLauncher | Wire fraud | Founder plead guilty; sentenced | $91,376.04 restitution | Time served (8 months in custody); 3 years supervised release | 53 |
| QuickSnap | Business/ Productivity Software $115.7 million | SEC v. QuickSnap | Securities fraud | Founder neither denied nor accepted allegations, entry of final judgment | Agreed to cooperate in an SEC investigation | Forced to resign as CEO following internal investigation | 153 |
| | | USA v. Founder of QuickSnap | Wire & securities fraud | Founder plead guilty; sentenced; determination of restitution is ongoing (as of Oct. 2024) | $1,000,000 fine; government request for at least $6,162,813.16 in restitution | 18 months prison; 3 years supervised release; no position of fiduciary capacity without permission of probation officer | |
| | | SEC v. Founder of QuickSnap | Securities fraud | Ongoing; last filing 3/10/ 2025 | Case pending | | |
| ProfitDash | E-commerce $4.5 million | USA v. Founder of ProfitDash | Wire fraud | Founder plead guilty; sentenced | $1,520,074 in restitution; forfeiture of $1,500,000 | 36 months prison; 3 years supervised release | 58 |
| Accelify | Artificial Intelligence $204.5 million | SEC v. Founder of Accelify | Securities fraud & unregistered sale of securities | Founder neither denied nor accepted allegations, entry of final judgment | Disgorgement of $16,763,034; $640,000 penalty | Permanently prohibited from acting as an officer or director | 25 |
| RevenueBoost | Social Media/ Platform $7.3 million | USA v. RevenueBoost | Wire & securities fraud | Founder plead guilty to wire fraud; remaining counts dismissed; sentenced | $8,058,476 in restitution | 88 months prison; 3 years supervised release | 94 |
| ScaleX | Biotechnology $910.41 million | SEC v. Founder & Executive of ScaleX | Securities fraud | Founder & executive neither denied nor accepted allegations, entry of final judgment | $500,000 penalty | 10-year prohibition on acting as officer or director; return $18,897,137 in Class B stock | 2702 |
| | | SEC v. Executive of ScaleX | Securities fraud | Administratively closed | NA | | |

**Weiss and Radoynovska:** *Criminal Deception in Silicon Valley*
Organization Science, 2026, vol. 37, no. 5, pp. 1649–1676, © 2026 INFORMS

Downloaded from informs.org by [162.90.146.65] on 12 October 2026, at 07:14 . For personal use only, all rights reserved.

**Table 1.** (Continued)

| Venture information | | Case information | | | Legal consequences | | Data |
|---|---|---|---|---|---|---|---|
| Venture ID | Industry & total capital raised (USD)[a] | Case code | Legal charges | Case status | Financial (fines, restitution payments, forfeiture etc.) | Personal for entrepreneur (incarceration & other restrictions) | # of pages of analyzed court documents |
| | | USA v. Founder of ScaleX | Conspiracy to commit wire fraud & wire fraud | Jury trial; guilty of conspiracy to commit wire fraud & 3 counts of wire fraud; found not guilty on several counts; sentenced | $452,047,268 in restitution | 135 months prison; 3 years supervised release; no position of fiduciary capacity without prior permission of probation officer | |
| | | USA v. Executive of ScaleX | Conspiracy to commit wire fraud & wire fraud | Jury trial; Executive found guilty on all counts; sentenced | $1200 fee; $25,000 fine; $452,047,268 in restitution | 155 months prison; 3 years supervised release; no position of fiduciary capacity without permission of probation officer | |
| | | Appeal to case USA v. Founder of ScaleX<br>Appeal to case USA v. Executive of ScaleX | | District Court decisions affirmed in both cases | | | |
| Tracton | Information Services $17.6 million | SEC v. Tracton | Securities fraud | Ongoing, last filing 04/22/2025 | Case pending | | 68 |
| | | USA v. Founder of Tracton | Wire fraud; securities fraud | Founder plead guilty to securities fraud; counts of wire fraud dismissed; case ongoing | Restitution to be determined; $50,000 fine | 30 months; 3 years of supervised release; no position of fiduciary capacity without permission of probation officer | |
| UnicornHealth | Biotechnology $104.79 million | USA v. Cofounder of UnicornHealth | Conspiracy to commit wire fraud & securities fraud; securities & wire fraud | Ongoing, last filing 3/29/2022 | Cases pending | | 135 |
| | | USA v. Founder of UnicornHealth | Conspiracy to commit wire fraud & securities fraud; securities & wire fraud | Ongoing, last filing 3/29/2022 | | | |
| | | SEC v. Founders of UnicornHealth | Securities fraud | Ongoing, last filing 3/26/2025 | | | |

Organization Science, 2026, vol. 37, no. 5, pp. 1649–1676, © 2026 INFORMS


Downloaded from informs.org by [162.90.146.65] on 12 October 2026, at 07:14 . For personal use only, all rights reserved.

**Table 1.** (Continued)

| Venture information | | Case information | | | Legal consequences | | Data |
|---|---|---|---|---|---|---|---|
| Venture ID | Industry & total capital raised (USD)[a] | Case code | Legal charges | Case status | Financial (fines, restitution payments, forfeiture etc.) | Personal for entrepreneur (incarceration & other restrictions) | # of pages of analyzed court documents |
| HyperJet | Financial Software $93.77 million | SEC v. HyperJet | Securities fraud | Founder neither denied nor accepted allegations, entry of final judgment | Disgorgement of $1,850,941.86; civil penalty tbd | NA | 521 |
| | | USA v. Founder of HyperJet | Wire fraud | Founder plead guilty to wire fraud, sentenced | $93,125,909.15 in restitution; $94,000,000 in forfeiture + forfeiture of property | 180 months prison; 3 years supervised release | |
| | | USA v. Cofounder of HyperJet | Wire fraud | Co-Founder plead guilty to wire fraud, sentenced | $93,125,909.15 in restitution; $1,008,458.70 in forfeiture | 160 months prison; 2 years supervised release | |
| | | Appeal to USA v. Cofounder of HyperJet; original judgment affirmed | | | | | |
| | | SEC v. Cofounder of HyperJet | Securities fraud | Neither denied nor accepted allegations, entry of final judgment | Disgorgement of $975,548.25; civil penalty tbd | NA | |
| GrowthHacker | Application Software $0.30 million | SEC v. GrowthHacker | Securities fraud | Settlement; Founder accepted allegations in complaint | Disgorgement of $2,819,692[b] | Prohibited from acting as an officer or director of any issuer that has a class of securities | 121 |
| | | USA v. Founder of GrowthHacker | Bank fraud; wire & securities fraud | Founder plead guilty to all counts; sentenced | $8,069,900 in restitution | 36 months prison; 3 years supervised release; not to maintain a position of fiduciary capacity without permission of the probation officer | |

[a]Data derived from Pitchbook, Crunchbase, or court records depending on availability of information.
[b]Rulings of disgorgement require the defendant(s) to return fraudulently obtained resources (e.g., funds) even when there is no direct victim identified. Whereas restitution is paid to specific victims (e.g., investors), disgorgement is paid to the U.S. Government as a form of penalty for unjust enrichment.

Case 1:25-cr-00592-LAK Document 88-1 Filed 10/15/26 Page 389 of 506



Downloaded from informs.org by [162.90.146.65] on 12 October 2026, at 07:14 . For personal use only, all rights reserved.

**Table 2.** Selective Practices of Constructing a Façade

| Deceptive acts | Associated practices |
|---|---|
| Fictionalizing stories of imminent success and progress | Making false claims of:<br>• Signed contracts with large partners/clients<br>• Existing high-profile customers with long-term contracts<br>• Achieved significant year-to-year growth in annual recurring revenue<br>• Impending IPO<br>• Being a patent holder for key technologies<br>• Acquisition by major corporation is imminent and seemingly a done deal<br>• Impending product launch<br>• Entrepreneur's credentials, level of experience, skill and financial endowment<br>• Entrepreneur's personal investment in focal venture |
| Reinforcing stories through the organized production of interlocking sets of faked evidence | • Fabricating historical revenue and profit figures (in emails, pitch decks and other investor communication)<br>• Providing investors with faked historical and projected profit and loss statements<br>• Repeatedly creating fake contracts<br>• Doctoring or entirely fabricating invoices<br>• Fabricating bank statements<br>• Reporting unrealized or nonexisting revenue<br>• Fabricating nonexistent recurrent customers<br>• Fabricating strategic initiatives and collaborations with companies<br>• Falsely generating customer reports with well-known companies<br>• Fabricating venture ownership documents<br>• Forging signatures on falsified revenue agreements<br>• Forging signatures of third parties on customer contracts<br>• Creating false letters of intent from prominent partners/firms<br>• Creating fake term sheets<br>• Creating falsified board authorization for specific transactions (e.g., selling shares, entering into partnership agreements)<br>• Employing accounting techniques, such as, "round-trip transaction" to artificially inflate revenue |
| Faking experiential performances | • Staging fabricated tests and product demos, employing third party technology while claiming to showcase proprietary technological capabilities<br>• Secretly removing tests during product demos that cannot be carried out with proprietary technology<br>• Outsourcing work to humans while claiming to demonstrate and possess AI technological capabilities |
| Co-opting audience verification processes | • Impersonating a key customer contact for a due diligence call<br>• Impersonating a key venture capital investor for a due diligence call<br>• Fabricating third-party venture audit with auditing firm logo and full report<br>• Failing to correct inaccuracies in investor/media understandings of venture's success and progress<br>• Curating a "data room" with faked venture details<br>• Fabricating financial information and sending different financial information to third-party valuation firms than to investors<br>• Fabricating endorsements from prominent companies<br>• Leaving out vital (but unfavorable) information in responses to investor queries<br>• Setting up fake phone numbers, email addresses and/or websites to control investor information flow and verification processes |
| Manipulating regulatory compliance | • Ignoring and systematically hiding regulatory warnings from board and investors<br>• Misconstruing need for regulatory approval to maintain venture operations<br>• Redefining regulator's conclusions of "immediate jeopardy" as representing minor deficiencies in product/protocol<br>• Conducting A/B testing to see which billing claims will be approved by regulated parties while claiming to use only approved billing practices<br>• Removing regulatory concerns from external counsel statements |

Downloaded from informs.org by [162.90.146.65] on 12 October 2026, at 07:14 . For personal use only, all rights reserved.

customers, employees, professionals, novices) toward which a façade was oriented and the kind of image entrepreneurs sought to project (e.g., of a resourceful and mature venture, a scalable venture with proven product-market fit).

Lastly, we coded for the work involved in *protecting a façade* to capture the varied approaches entrepreneurs used to deflect scrutiny and prevent the unmasking of their deception up until the point of detection. For example, we coded for simple tactics such as "passing blame to others to deter investigative behavior" as well as sophisticated forms of organized secrecy such as "developing code names to prevent detection internally and externally."

***Step 4: Creating summaries and timelines for each case and venture.*** Building on our emerging insights, we developed individual case summaries for each venture.[4] We created venture-specific timelines that detail the venture's founding, all documented instances of deceptive acts and their situational or audience-induced circumstances as described in the court data, any episodes of investigative behavior (probing/scrutiny) by audiences, the eventual detection of criminal deception and initiation of court proceedings, and the consequences of prosecution for the entrepreneur and the venture. Pitchbook data afforded further contextual information on scaling, such as when each venture completed (or failed to complete) various funding rounds. We mapped funding data onto the timeline to better understand the venture's full trajectory and audience expectations related to different phases of the venture's life cycle. Online Appendix A contains exemplary case timelines for each of the three forms of façading.

***Step 5: Consolidating findings into a conceptual model.*** In a final step, we compared the 12 venture case summaries and timelines to reveal patterns of criminal deception across our sample. We noted that some deceptive schemes were comparatively rudimentary, whereas others involved more sophisticated organizing work. To pursue this observation, we grouped cases based on the variety of deceptive acts involved and the range of audiences defrauded. We also constructed several tables to help us test different explanations for the patterns in our data. For instance, we examined whether the sophistication level of façading depended on how soon deceptive acts began relative to the venture's founding and how long the deception was sustained. This inquiry led us to explore how stages in the venture life cycle (corresponding to different degrees of expectation-reality gaps) affect façading sophistication. Based on these patterns, we developed three aggregate dimensions of façading—surface, reinforced, and deep—that informed our theoretical framework of criminal deception.

## Findings

Our findings reveal how entrepreneurs backfill minor, wide, and extreme gaps between institutionally conditioned expectations for high growth and the operational reality of their ventures' performance. Through three forms of façading, as summarized in Table 3, entrepreneurs alter audiences' perception of venture reality. Our findings inform an inductive theory of criminal deception, capturing how façading sophistication is contingent on the degree of the expectation-reality gap and the audiences that entrepreneurs engage with.

### Surface Façading

Existing work on deception has highlighted that in order to resonate with audiences, such as investors, entrepreneurs dramatize by crafting embellished stories, projecting exaggerated identities, and making outsized aspirational claims for the distant future, which are only loosely connected to a venture's operational reality (Martens et al. 2007, Garud et al. 2014, Scheaf and Wood 2022, Piazza et al. 2023). Nevertheless, it has remained unclear how deception through dramatized discourse may transgress into criminal activity. Our findings show that entrepreneurs transgress into criminal deception when they engage in what we term surface façading, which involves constructing fictionalized stories of imminent financial success that are fully unhinged from the venture's operational reality, masking the actual lack of achievements and progress. In the early stage of a venture's life cycle (e.g., the ideation and seed stage), when the expectation-reality gap is minor and audience demands for concrete evidence to substantiate entrepreneurs' stories are low, we find that entrepreneurs backfill the gap through surface façading, involving a high degree of discursive and a low degree of organizing works. We illustrate surface façading using exemplary empirical material from three prosecuted entrepreneurs and their ventures: Speedify, TakeOff, and RapidLauncher (see Online Appendix B for additional data).

#### Constructing a Façade Through Fictionalized Stories.

Our data show that prosecuted entrepreneurs engaged in discursive work by fictionalizing stories about their ventures' financial resources. For example, one entrepreneur had founded two technology ventures, hereafter identified as Speedify,[5] that offered online classified ads and e-commerce services, respectively. Within a year of the ventures' founding, the entrepreneur had engaged in criminal deception to acquire $7 million, as the SEC complaint details:

> During investor presentations made in 2007 and 2008, [the entrepreneur] made serial misrepresentations about the companies' prospects, claiming, among other things, that: (i) both companies would soon conduct IPOs (e.g., "within six months to a year") with

Organization Science, 2026, vol. 37, no. 5, pp. 1649–1676, © 2026 INFORMS

Downloaded from informs.org by [162.90.146.65] on 12 October 2026, at 07:14 . For personal use only, all rights reserved.

**Table 3.** Forms of Façading

| | | Surface façading | Reinforced façading | Deep façading |
|---|---|---|---|---|
| Expectation-reality gap | | Minor | Wide | Extreme |
| Constructing façade | Deception acts | • Fictionalizing stories of imminent success & progress | • Fictionalizing stories of imminent success & progress<br>• Reinforcing stories through the organized production of interlocking sets of faked evidence | • Fictionalizing stories of imminent success & progress<br>• Reinforcing stories through the organized production of interlocking sets of faked evidence<br>• Faking experiential performances<br>• Co-opting audience verification processes<br>• Manipulating regulatory compliance |
| | Masked operational reality | Lack of achievements and progress<br>↓ | Unproven business model and slow growth<br>↓ | Slow or no scaling<br>↓ |
| Performing façade | Illusory venture appearance (the façade) | Imminent financial success and resourcefulness | Accelerating market traction | Rapid scaling |
| | Audiences | Novice<br>↓ | Expert<br>↓ | Expert<br>↓ |
| Protecting façade | Protection approach | Passing blame | Centralizing and controlling information | Entrenching organized secrecy |
| Empirical cases | | 1. Speedify<br>2. TakeOff<br>3. RapidLauncher | 1. QuickSnap<br>2. ProfitDash<br>3. Accelify<br>4. RevenueBoost | 1. ScaleX<br>2. Tracton<br>3. UnicornHealth<br>4. HyperJet<br>5. GrowthHacker |

> skyrocketing stock prices; (ii) the companies had lucrative patents and contracts that would generate millions in revenue; and (iii) [the entrepreneur], as a wealthy venture capitalist who had previously conducted IPOs, had the requisite experience and contacts to take the companies public. None of these claims were true.

In this example, the entrepreneur's fictitious stories conjured an image of imminent financial success based on claims of realized achievements, such as acquired patents and contracts and the entrepreneur's expertise and skill. The stories set near-term expectations of an impending IPO, made explicit across Speedify's pitches and as captured in the civil complaint which reports that "[Speedify] would 'go public or sell' within a short period of time that ranged from specific quarters (e.g., 'QI or Q2 2008,' 'Q3 or Q4 2008'), 'six months to a year,' and/or 'after August 2008'; The IPO was 'a done deal'." As the data reveal, this dramatized discourse was fully disconnected from the ventures' strategic plans and operational realities, masking Speedify's lack of achievements and progress, as the complaint describes (emphases added):

> In reality, [Speedify was] *years from even considering a public offering* and had taken only the most rudimentary steps toward generating revenue in 2007 and/or 2008. The companies had *no revenue-generating contracts*, were still developing and testing their products, and relied solely on sales of their stock to fund business operations. Moreover, despite [the entrepreneur's] claims of IPO experience and great wealth, he in fact had *no such credentials or financial resources*.

Similarly, the entrepreneur of TakeOff, a technology venture founded in 2010 to simplify the real-time analysis of traffic data through wireless sensors, engaged in discursive efforts to fabricate stories regarding the venture's impending financial success. TakeOff's founder fictionalized stories about the venture's imminent acquisition as the criminal complaint states: "CISCO had already paid [TakeOff] with a nonrefundable good faith ten percent of $76,000,000." As the FBI, which led the criminal investigation, went on to describe,

> [The entrepreneur] executed his scheme by, among other things, falsely telling victims that [TakeOff] was going to be acquired by a well-known multinational

Downloaded from informs.org by [162.90.146.65] on 12 October 2026, at 07:14 . For personal use only, all rights reserved.

> company based in Silicon Valley. [The entrepreneur] falsely told his victims, in sum and substance, that in exchange for providing money to [TakeOff], his victims would share in the massive profits resulting from the acquisition. As [the entrepreneur] knew, however, there was no such purported acquisition planned, and the victims lost the money they provided based on [the entrepreneur's] false statements.

This entrepreneur's fictitious stories blurred the lines between "what is" and "what is to come," conveying to investors that "[TakeOff] might be acquired, [TakeOff] was going to be acquired, and [TakeOff] was in the process of being acquired." To varying degrees, these fictionalized stories appeared to audiences as actualized, nearly actualized, or soon-to-be-actualized when no evidence supported the claims.

The entrepreneur who founded RapidLauncher, a technology venture using artificial intelligence to develop a gig worker platform, also relied on fictionalized stories, albeit with a focus on the entrepreneur's financial endowment and personal investment in the venture. As the criminal court case details,

> [T]he [entrepreneur] falsely told [RapidLauncher's] employees that he personally invested over $1 million of seed money into [RapidLauncher] to allow the company to run without generating revenue while the company's product was being developed. The [entrepreneur's] purported funding was expected to allow [RapidLauncher] to operate for approximately two years [ … ] none of these funding sources appeared.

Through these misrepresentations, the entrepreneur masked the venture's lack of resources, achievements, and progress. As the government contended, 'the defendant's false and misleading statements created a veneer which enabled his scheme to defraud, resulting in a wide range of victimization, including hiring and retaining employees to continue working at an otherwise failing company'."

As these data show, entrepreneurs engage in surface façading by generating near-term and past fictions to convince audiences, be they investors or employees. Prosecuted entrepreneurs go beyond simply stretching the truth and crafting exaggerated claims, as previous research has argued, to fully fictionalizing stories that lack any evidentiary basis in the venture's resources or strategy at the time.

**Performing a Façade of Imminent Financial Success and Resourcefulness to Novice Audiences.** Our data show that, through surface façading, entrepreneurs engage in low-level organizing efforts to convince novice audiences of the venture's imminent financial success and resourcefulness. For instance, from its inception, Speedify's entrepreneur engaged in organizing efforts to perform the façade before hundreds of inexperienced investors in intimate, private settings. As the SEC complaint explains, more than 100 novices ultimately committed resources to Speedify based on the façade:

> In soliciting investments, [the entrepreneur] drove three hours from [Speedify's] offices in Silicon Valley to hold investor presentations approximately every other week before groups of investors (including a couple who resided in Illinois) at people's homes near Sacramento, California and/or Stockton, California. Many of the investors were inexperienced in finance and/or investing.
>
> [ … ]
>
> Among other things, [the entrepreneur] knew that investors pooled together their funds to meet the $25,000 minimum investment because they lacked money. [The entrepreneur] also made comments noting that he wanted to 'help lower and middle-class families' by permitting them to invest and that he hoped to be able to hire them as [Speedify] employees.

In performing the façade, Speedify's entrepreneur engaged in low-level organizing efforts to coordinate a large base of novice investors in Northern California, arranging meetups and facilitating the pooling of small-scale capital to enable resource transfers.

Similarly, the prosecuted entrepreneur who founded TakeOff performed a façade of imminent financial success during the venture's seed round by projecting the appearance of being on the brink of being "acquired by a well-known company that would make [investors'] investment extremely valuable" (criminal sentencing transcript). The entrepreneur successfully performed the façade before a novice audience of friends and acquaintances with whom he had cultivated long-lasting relationships. A forensic reconstruction of text messages between the entrepreneur and one such friend captures the informal organizing work involved in enticing novice investors. The criminal complaint reads:

> On November 27, 2013, [the entrepreneur] sent the following text to [friend] 'I set aside some shares for you a long time ago but wasn't sure I could get them to you,' followed by 'Are you interested?' … [Friend] then texted [entrepreneur] asking 'Do you advise me to?' to which [entrepreneur] responded 'Closing is December 13th so yea obviously … '.

The entrepreneur and novice investor engaged in back-and-forth messaging to arrange the deal and facilitate the resource transfer.

In its seed stage, RapidLauncher's founder similarly projected the appearance that "he had access to significant personal wealth and was investing significant amounts of that money into the company" (criminal complaint). Further, the entrepreneur engaged in low-level organizing efforts to attract and retain employees and to convince them to invest personal resources into the company. The criminal complaint reads as follows:

Downloaded from informs.org by [162.90.146.65] on 12 October 2026, at 07:14 . For personal use only, all rights reserved.

> On multiple occasions [the entrepreneur] induced [RapidLauncher] employees to loan money to or invest in [RapidLauncher] by falsely claiming that the money he intended to invest would shortly be forthcoming. In total [the entrepreneur] collected hundreds of thousands of dollars from his own employees through false representations about the company's financial health and his own ability to financially support [RapidLauncher] in its early stages of development.

As these examples illustrate, the performative effect of surface façading captures how entrepreneurs leverage discursive work and engage in organizing efforts to subject novice audiences to a desirable, yet illusory, venture appearance that masks an otherwise unattractive operational reality.

**Protecting the Façade Through Passing Blame.** Investigative behavior and probing by vested audiences can reveal cracks in a surface façade, which, as the data show, entrepreneurs seek to protect by shifting blame to others. For instance, the Speedify complaint details that "[u]pon receiving several investor inquiries regarding the status of [Speedify] … [the entrepreneur] verbally misrepresented to investors that former employees had misappropriated millions of dollars from [Speedify], and, in that process, irreparably delayed the plan for [Speedify] to go public." Despite covering up the deceptive scheme, Speedify ran out of operating funds and was forced to shut down within two years of founding. In a subsequent SEC investigation, the entrepreneur settled with the government and has been permanently barred from serving as an officer or director of a public company.

TakeOff's investors also began probing the venture's façade shortly after committing resources. The entrepreneur responded with blame-shifting, "including blaming the attorneys, the government shutdown, and the financial institutions for the delay, all while knowing that no acquisition was ever planned" (criminal prosecutor's sentencing memo). The façade was ultimately exposed by a novice investor and their lawyer in the course of a conventional reference check. Once lawyers became involved, TakeOff released the entrepreneur from his chief executive officer (CEO) role, and a formal investigation was launched. The investigation resulted in a criminal indictment that led to a 24-month prison sentence for the entrepreneur and obligations to restitute $572,039 to defrauded victims.

The prosecuted entrepreneur of RapidLauncher likewise sought to protect the surface façade when employees began to probe the reason for unpaid wages, as evidenced in the criminal complaint:

> After certain [RapidLauncher] employees came to learn that [RapidLauncher's] bank accounts did not contain the capital that [the entrepreneur] claimed to have invested, [the entrepreneur] stated that a significant portion of the money he pledged to invest was tied up overseas and elsewhere, which was why [RapidLauncher] did not have immediate access to the money.

The entrepreneur attempted to conceal the growing cracks in the façade through a combination of discursive and low-level organizing efforts, forging wire transfer confirmations of salaries and emailing those confirmations to employees. However, this protection approach proved short-lived, as '[a]n intern quickly realized that the supposed confirmation forms were fakes—apparently, a form had been downloaded from the Internet and then photoshopped' (criminal defendant's request for further specification of charges). A former employee's blog post exposed the façade; the entrepreneur pled guilty to the fraud charges and was sentenced to 9 months in prison and a payment of $91,367.04 in restitution to victims.

As these cases illustrate, surface façading captures a high degree of discursive work and a low degree of organizing work in carrying out criminal deception at the outset of a venture's life cycle when the expectation-reality gap is comparatively minor and the burden to prove venture performance or progress is low. Through surface façading, entrepreneurs engage in discursive work by fictionalizing stories of imminent success and, through rudimentary organizing efforts, provide novice audiences with desirable, yet illusory, appearances that mask the venture's under- or nonperformance. Next, we turn to a more sophisticated form of criminal deception.

### Reinforced Façading

We find that through reinforced façading, entrepreneurs leverage deceptive discursive and organizing work to backfill widening expectation-reality gaps during later venture life cycle stages, when the burden to produce proof of progress and achievements increases. Through reinforced façading, entrepreneurs engage in discursive work by fictionalizing entrepreneurial stories, akin to the examples of surface façading. Moreover, they reinforce such stories by engaging in organized efforts to produce fake, retrospective evidence (i.e., data, facts, and key information); generating interlocking sets of fabricated evidence to withstand an expert audience's verification efforts; and centralize and control information to avoid internal and external scrutiny. We illustrate these patterns with salient evidence from four cases: QuickSnap, RevenueBoost, ProfitDash, and Accelify (see Online Appendix C for additional evidence).[6]

**Constructing a Façade Through Fictionalized Stories Reinforced by the Organized Production of Interlocking Sets of Faked Evidence.** We find that entrepreneurs who engage in reinforced façading deceive an

Downloaded from informs.org by [162.90.146.65] on 12 October 2026, at 07:14 . For personal use only, all rights reserved.

expert audience by artificially generating retrospective evidence that aligns with and supports fictitious stories about the venture's past, present, and future performance. For instance, in the case of QuickSnap, a technology venture offering tools for testing mobile app compatibility with different operating systems, the entrepreneur organized the repeated production of fake customer contracts and invoices and recorded nonexistent revenue to artificially enhance material evidence about past venture performance. In the criminal complaint, the FBI-led investigation details,

> [The entrepreneur] created fake invoices regarding former customers in an effort to inflate [QuickSnap's] revenue. For example, a major technology company based in San Francisco ('NONCURRENT CUSTOMER 2') made a single [QuickSnap] purchase for $720,000, in 2018. [The entrepreneur] falsely claimed that NONCURRENT CUSTOMER 2 agreed to pay [QuickSnap] approximately $1.44 million per year starting in 2018. In order to conceal this fact, [the entrepreneur] created a fake invoice to cover the remaining amount of approximately $720,000, in 2018. And in 2019, [the entrepreneur] created two more fake invoices to represent a supposed renewal of the full $1.44 million deal, which did not exist.

The data show how the entrepreneur edited the material accounting records of venture resources to influence audience perceptions of QuickSnap's operational reality and performance. Importantly, the entrepreneur did not merely engage in fictionalizing the future through expected revenues or customer figures (the subject of much extant deception research). Instead, the *retrospective fictionalization* of the past is evident in the FBI's label "noncurrent customer," which captures the organizing efforts to create falsified proof of annual recurring revenue from an otherwise one-off customer. In the same fashion, the entrepreneur generated false data by overbooking existing revenue for example, by "adding a '3' to the front of the total dollar amount and changing AUD to USD" (criminal complaint) in order to book $381,600 U.S. dollars instead of $81,600 Australian dollars and generate otherwise nonexistent historical revenue data. Our data show how QuickSnap projected a false appearance of accelerating market traction, masking an altogether different operational reality. The criminal complaint reveals these organizing efforts (emphases added):

> The Series B investor deck included a slide addressing [QuickSnap's] year over year growth. The slide reported that [QuickSnap's] total 2018 1st quarter revenue *was* $6,043,369 and *net income was* $1,758,032. However, *the auditor review and financial recast* in 2020 determined that the actual 2018 1st quarter revenue was $1,300,381 and that [QuickSnap] actually suffered a net loss of $274,250 for that period.

RevenueBoost's entrepreneur, who was engaged in developing a social media platform dedicated to young children, similarly engaged in the organized production of a series of interlocking financial statements and contracts to lend credence to stories of revenue growth and an established customer base. For instance, the entrepreneur created "fake contracts with [ … ] forged counterparty signatures to other investors" and "fake bank statements to assure investors that he had money and could repay their investments. And [he] shared falsified profit and loss and ownership documents reflecting investors' supposed ownership stake in [his] companies" (criminal prosecutor's sentencing memo). The data thus reveal how prosecuted entrepreneurs engaged in discrete organizing efforts to generate interlocking, retrospective data to support a desirable, yet illusory, appearance of accelerating market traction. The reinforced façade masked the operational reality of an unproven business model and shrinking revenue. During the in-court sentence hearing, RevenueBoost's entrepreneur explained as follows:

> Here's where I messed up. At that point, as opposed to being honest, I was not. At that point, as opposed to asking for help—I don't know what to do; our revenue is falling—I did not. At that point, I made horrific decisions to try to buy time because I truly believed in what we were doing, truly believed.

Here, RevenueBoost's entrepreneur emphasized the key decision to backfill the expectation-reality gap and "buy time" with faked evidence amid the reality of falling revenue.

We observe similar processes in ProfitDash, a venture providing novel solutions to manage employee bonus payments. ProfitDash's entrepreneur forged a set of specific documents and signatures to reinforce their entrepreneurial story with falsified facts, "designed to make [ProfitDash] look like a much stronger investment than it in fact was" (criminal complaint). As the criminal complaint further reports, "[the entrepreneur] fraudulently placed a signature on a Term Sheet that purported to indicate that a large publicly traded corporation was interested in purchasing [ProfitDash] at a price of $150,000,000 … [and] then caused this Term Sheet to be transmitted to persons representing [investor]."

The data also show that the entrepreneur behind Accelify, a venture facilitating secure mobile phone purchases, fabricated financial data to support claims of significant market traction. The SEC complaint explains that "[t]o facilitate [the sale of unauthorized securities], [the entrepreneur] provided investors with financial statements that, among other things, overstated [Accelify's] revenue by more than ten times through inclusion of revenue that [Accelify] *did not earn* as well as revenue from a round-trip transaction that had no economic substance" (emphasis added). As the

Downloaded from informs.org by [162.90.146.65] on 12 October 2026, at 07:14 . For personal use only, all rights reserved.

SEC observed, the entrepreneur organized the creation of retrospective evidence using a sophisticated accounting technique known as a "round-trip transaction" to portray nonexistent venture resources as actualized and real. Specifically, the deceptive scheme involved recording "the total amount of processing fees collected by the Payment Processor—instead of the 10% [Accelify] earned—as [Accelify's] revenue. [The entrepreneur] also omitted certain expenses associated with [Accelify's] commissions from the financial statements, thus overstating [Accelify's] profitability" (civil complaint). The reinforced façade projected the illusory appearance of a profitable venture with established market traction on an accelerating trajectory, as revealed in the civil complaint (emphases added):

> [Accelify's] 2013 financial statements represented: [Accelify's] gross revenue *was* $101 million, when in fact it was $9.5 million; that its gross margin *was* $23 million, when in fact it was $9.2 million; and that it had a net profit of $1.3 million, when in fact it had a net loss of $10 million . . . . [Accelify's] 2014 financial statements represented: that [Accelify's] gross revenue *would be* $150 million, when in fact it was $7.7 million; that gross margin *would be* $26 million, when in fact it was $3 million; and that the company *would have* a net loss of $11 million, when in fact it had a net loss of $26 million.

These data demonstrate how reinforced façading involved a higher level of organizing efforts to manipulate the records of the venture's resources. In this case, the entrepreneur falsified realized revenues as well as existing and recurring customers to generate proof in support of fictionalized stories of growing revenue and profitability, thereby masking the venture's actual deceleration. Through such tactics, entrepreneurs met their audiences' demand for evidence and backfilled a widening expectation-reality gap. Specifically, entrepreneurs projected an illusory image of accelerating traction, which appeared to close the expectation-reality gap in the eyes of audiences while sustaining such a gap in actuality.

**Performing a Façade of Accelerating Market Traction to an Expert Audience.** In addition to illustrating façade construction, our data also show how entrepreneurs perform a reinforced façade of accelerating market traction to expert audiences of venture capital investors. For instance, the entrepreneur who founded QuickSnap gave Series C venture capital investors the illusion of a drastically accelerating venture that impacted the company's valuation, as the civil complaint captures:

> The company's impressive (but false) financials fueled a valuation of approximately $1.1 billion, a milestone that earned the startup "unicorn" status – a status touted by [the entrepreneur] and noticed by investors. Ultimately, 29 investors purchased [QuickSnap] stock at prices based on that inflated valuation.

Through this façade, the entrepreneur met risk capital investors' expectations of high growth performance during the later stages of the venture's life cycle and falsely acquired the coveted unicorn status despite experiencing deceleration and financial losses. The criminal complaint reveals how the entrepreneur further leveraged manipulated startup metrics, such as annual recurring revenue (ARR), to project dramatic realized and expected revenue growth to investors:

> INVESTOR 3's General Partner emailed [the entrepreneur] the following question, "Hey [entrepreneur's first name], Hope you're doing well. I'm giving our LPs our mid-year fund update in a couple days. Can you let me know roughly what you think we'll end Q2 and 2019 at in terms of ARR?" In response, [the entrepreneur] emailed INVESTOR 3's General Partner a snippet of a chart which falsely claimed that [QuickSnap's] 2019 second quarter ARR was $51,937,845. In addition, attached to the email was a [venture] Investor Deck which falsely claimed [QuickSnap's] 2019 second quarter ARR was $51,979, 665.

Similarly, following several successful funding rounds, the ProfitDash entrepreneur performed a façade of accelerating traction to "a long-time, wealthy and sophisticated investor participating in both large and small-scale investments across multiple industries over the last 50 years" (defendant sentencing memo). This entrepreneur organized the production of manipulated legal startup documents, as the prosecution's sentencing memo asserts:

> [The entrepreneur] also fraudulently created or altered documents designed to make [ProfitDash] look like a much stronger investment than it in fact was. [The entrepreneur] created a false Term Sheet that purported to indicate that a large publicly-traded corporation was interested in purchasing [the venture] for $150,000,000, and then forged the signature of a corporate executive on that document. [The entrepreneur] then caused this document to be transmitted to [investor].

The data further reveal that entrepreneurs engage in lengthy, detailed discussions with sophisticated investors in which they perform the façade for extended periods of time. In the Accelify case, for example, after successfully raising Series A and B funding, the entrepreneur engaged in reinforced façading by placing false financial statements into "data rooms for investors" and intensively performing the façade before investors, as the civil complaint reveals:

> [The entrepreneur] also personally discussed [Accelify's] financial results with several of the investors, in person and in phone calls. Many of the secondary market investors would not have bought the shares if they had known that [Accelify's] revenue was less

Case 1:25-cr-00592-LAK Document 88-1 Filed 10/15/26 Page 396 of 506



Downloaded from informs.org by [162.90.146.65] on 12 October 2026, at 07:14 . For personal use only, all rights reserved.

than 10% of what they had been told, and that the company did not have a net profit.

We find that performing a façade of accelerating traction is key to investors' decisions to commit resources. In later venture life cycle stages, when pressure to produce evidence of performance increases, reinforced façading reveals more sophisticated organizing efforts to meet audience expectations by masking the reality of the venture's unproven business model and slower-than-expected revenue growth.

**Protecting the Façade by Centralizing and Controlling Information.** Our data indicate that entrepreneurs may leverage elaborate organizing efforts to protect the reinforced façade from scrutiny and probing. Specifically, entrepreneurs in QuickSnap, RevenueBoost, ProfitDash, and Accelify engaged in centralizing and controlling information flows to prevent detection of fraudulent activities. For instance, as the civil complaint of QuickSnap reveals,

> The CEO had sole ownership of the [Annual Recurring Revenue] Spreadsheet and used it to personally calculate the company's quarterly and yearly ARR. [The entrepreneur] rebuffed repeated requests from late 2017 into 2020 from [QuickSnap's] board to hire a CFO to manage [QuickSnap's] day-to-day finances.

In our study, entrepreneurs leverage their position of power in the venture's hierarchy to centralize key information flows, prevent key hires that would enhance governance oversight, and deflect potential probes into their deception. Indeed, this protection approach allowed the QuickSnap façade to remain intact for over two years. The criminal complaint summarizes how deception was sustained (emphases added):

> [The entrepreneur] accomplished this by *maintaining tight and close control* over significant aspects of operations, sales, and record-keeping at [QuickSnap], including operational decisions, customer interactions, sales efforts, invoicing, and major and minor company expenditures. [The entrepreneur] *siloed information*, including financial figures, sales and customer information, and *routinely restricted* employees from speaking with each other or customers about the company's finances.

Despite these elaborate organizing practices to protect the venture's reinforced façade, the scheme was eventually revealed by an employee who, in reviewing the company's financial records, detected nonexistent customers. The employee's probing ultimately led to the formation of a special investigative committee, the hiring of an audit firm to verify QuickSnap's financial records, the CEO's resignation, and a severe devaluation of the company. The entrepreneur pled guilty to the charges and was sentenced to 18 months in prison.

Similarly, the Accelify entrepreneur protected the façade for nearly two years before the serendipitous hiring of an external chief financial officer (CFO) led to its unmasking. As the civil complaint reveals,

> [Accelify] hired a CFO, who quit after just a few days on the job. He told [Accelify's] board that [Accelify's] revenue numbers were inaccurate, pointing out the Round-Trip Transaction in particular. [Accelify's] board then hired external accountants to assess [Accelify's] books, leading to a restatement of [Accelify's] 2013 and 2014 financial statements.

In this case, the entrepreneur managed to assuage stakeholder concerns for a few years. The criminal deception was only exposed by a new hire, and a dedicated internal investigation and external audit led the entrepreneur to resign, and the venture to file for bankruptcy in 2016.[7] Having since fled the United States, the entrepreneur agreed to settle with the SEC in 2019 for repayment of $16.67 million in fraudulently obtained resources in addition to penalties.[8]

Through reinforced façading, entrepreneurs engage in elaborate discursive and organizing efforts to produce interlocking sets of false, retrospective evidence in support of fictionalized stories. In doing so, they materially manipulate the venture's resources and begin to generate a fictitious, alternative version of the venture designed to address a wide expectation-reality gap amid the venture's subpar performance.

## Deep Façading

In the scale-up stage of a venture's life cycle, when pressures to produce highly specific evidence of technological achievements and exponential growth are high and an extreme expectation-reality gap may develop, we find that the prosecuted entrepreneurs in our study engaged in highly sophisticated discursive and organizing efforts to carry out a form of criminal deception we term *deep façading*. Our data show that, under these conditions, entrepreneurs not only fictionalize stories and evidence but also engage in sophisticated organizing efforts, namely by faking experiential performances (e.g., product demos), co-opting audience verification processes (e.g., due diligence), and manipulating regulatory compliance. In doing so, entrepreneurs apply façading to an expansive array of venture facets—notably those pertaining to the venture's core technological capabilities, financial resources, and commercial viability. The resulting façade generates the illusory appearance of a rapidly scaling venture that has achieved product-market fit, masking the operational reality of slow (or nonexistent) scaling from multiple expert audiences (e.g., institutional investors, customers, regulators). Moreover, to protect such a comprehensive and far-reaching façade, entrepreneurs entrench organized secrecy into their ventures. We illustrate these patterns with salient empirical evidence

Case 1:25-cr-00592-LAK Document 88-1 Filed 10/15/26 Page 397 of 506



Downloaded from informs.org by [162.90.146.65] on 12 October 2026, at 07:14 . For personal use only, all rights reserved.

from five ventures: ScaleX, Tracton, UnicornHealth, HyperJet, and GrowthHacker (see Online Appendix D for additional evidence).[9]

**Constructing a Façade Through Fictionalized Stories and Fabricated Evidence Enhanced by Faking Experiential Performances, Co-Opting Verification Processes, and Manipulating Regulatory Compliance.** First, we find that entrepreneurs construct a deep façade through the additional, sophisticated organizing efforts of faking experiential performances, which are known in the startup world as "product demos." An example is ScaleX, a medical device and biotechnology venture that faked its technological capabilities, as the civil complaint explicates:

> This initial [investor] meeting was often followed by a purported demonstration of [ScaleX's core technology] .... Based on what they saw, potential investors believed that [ScaleX] had tested their [specimen] on either an earlier-generation [technology] or [ScaleX's new technology]. As [the entrepreneur] knew, or was reckless in not knowing, however, [ScaleX] often actually tested their [specimen] on third-party [technology], because [ScaleX] could not conduct all of the tests it offered prospective investors on its proprietary [technology].

We find that entrepreneurs staged experiential performances in front of audiences to showcase nonexistent technological achievements. Such performances were organized to make audiences experience the technology as if it were actualized and operational and to align with fictionalized stories communicated via "presentations and other written materials to [customers] representing that [ScaleX] had the ability to conduct a broad range of tests on its proprietary [technology]" (civil complaint).

Similarly, the entrepreneur of Tracton, a machine learning venture purporting to develop advanced artificial intelligence (AI) software tools to derive customer insights from vast online video content, faked its AI capabilities, as the criminal complaint reveals (emphasis added):

> [The entrepreneur] had not developed AI that could perform all of the functions [they] represented to potential investors, investors, and to potential clients. It appeared to investors that some of the product that was generated by [its tools] and *purported to be the product of AI software was, in fact, the product of paid workers in India* watching videos and then recording their impressions .... There did not appear to be any IP or patents.

Beyond reinforcing fictionalized stories with fabricated evidence, we find that, through deep façading, entrepreneurs mask deficient technological capabilities—in this case, by organizing workers in India to produce the output ostensibly created by Tracton's AI.

Second, we find that entrepreneurs who engaged in deep façading deployed discrete organizing efforts to co-opt audiences' verification processes. For instance, the entrepreneur in HyperJet, a venture offering payment processing and administrative tools for bank and healthcare payers, artificially staged and then self-authored a financial audit to validate the venture's financial viability and dramatic growth to investors. As described in the court's final opinion in the entrepreneur's appeal case (emphases added),

> For starters, *there never was a KPMG audit*. Instead, [the entrepreneur] concocted financial statements out of thin air and *put them on fake KPMG letterhead*. These counterfeits suggested—falsely—that [the venture's] revenue exceeded its expenses. [The co-founder] played a part, too; he reviewed the phony papers to make sure they looked like real KPMG documents. [The co-founder] also sent emails, drafted by [the entrepreneur], that *falsely suggested [HyperJet] was in contact with KPMG auditors*.

Importantly, the auditor's report, which falsely represented HyperJet's current financial situation and future prospects, was "material to [a Series D investor's] decision to invest in HyperJet." In self-authoring an audit report by a high-status, internationally recognized firm, HyperJet's entrepreneur thwarted investors' verification (i.e., due diligence) efforts. Additional organizing efforts were utilized to recruit a HyperJet employee to impersonate an employee of the venture's customer during a due diligence call. The impersonating employee provided the Series D investor with "false information about the number of end users of HyperJet's products," as well as "false statements related to the potential for millions of revenue-generating client accounts to be added to the HyperJet system" (plea agreement). Producing such an elaborate deception scheme further involved coordinating with the cofounder and connecting various layers of deceit to mask the venture's slow scaling trajectory.

Similarly, GrowthHacker, an e-commerce venture offering novel advertisement services, co-opted verification processes by impersonating customers and investors in reference-check calls. The FBI agent leading the investigation against GrowthHacker's entrepreneur explains the organizing efforts (emphases added):

> The Nike contact [the entrepreneur] provided VC Firm E was [name of Nike representative] with phone number [XXX-XXX-4825]. [Investor] spoke to who he thought was [the Nike representative]. On the call, [the Nike representative] told [investor] that he would increase the amount of business Nike did with [GrowthHacker] if he could and overall gave a positive reference. The FBI reached out to Nike and interviewed the real [Nike representative], Senior Director

Downloaded from informs.org by [162.90.146.65] on 12 October 2026, at 07:14 . For personal use only, all rights reserved.

of Sustainability Marketing. *[The real Nike representative] had never heard of [GrowthHacker or the entrepreneur], never used the phone number [XXX-XXX-4825], and never spoke on the phone to [investor]. Based on database records, [XXX-XXX-4825] is a wireless number registered to an individual determined to have been an employee of [GrowthHacker].*

Recruiting a venture employee to impersonate a senior member of a high-status customer reflects a high degree of sophistication in organizing to co-opt audiences' verification processes. In so doing, these entrepreneurs ensured that audiences interested in verifying the venture's operational reality unknowingly interacted solely with the constructed façade of a rapidly scaling venture, masking the actuality of slow or no scale.

A third element of façade construction in deep façading involved manipulating regulatory evidence, as shown in the case of UnicornHealth, a biotechnology venture offering proprietary technology to perform novel diagnostics. In highly regulated markets such as healthcare, obtaining or being exempt from regulatory approval is a key achievement that provides evidence of a venture's growth and scaling prospects. The criminal complaint showcases the manipulation of regulatory approval (emphasis added):

> However, [the entrepreneurs] caused [UnicornHealth] to submit numerous reimbursement claims to insurance providers … to show investors that [it] could earn significant revenue through clinical billings. *[The entrepreneurs] did so despite knowing that [UnicornHealth] had neither validated that particular [technology] pursuant to [government regulations]* nor issued any patient test results, and despite knowing of concerns raised by certain [UnicornHealth] personnel about the propriety of billing health insurance providers under such circumstances.

UnicornHealth demonstrated astute awareness of insurance billing systems by faking compliance and fit with insurance providers' coding practices, on which the venture's revenue stream depended. By simultaneously ignoring and feigning regulatory compliance, the entrepreneurs fraudulently generated revenue and masked the venture's noncompliance. The civil complaint captures how the façade was reinforced by forged financial statements claiming "[r]evenue growth of almost 900% since June 2017." In actuality, UnicornHealth had covertly engaged in organizing efforts to "dup[e] doctors into ordering unnecessary tests … which, once discovered, led insurers to claw back their previous reimbursement payments to [UnicornHealth]."

ScaleX similarly manipulated its regulatory compliance, as the civil complaint reports (emphases added):

> By the time of [ScaleX's] financing round in 2014, [the regulatory agency] told [ScaleX] that clearance or approval would be necessary for [its technologies] … . However, [ScaleX] continued to *raise additional funds while telling potential investors [ScaleX] was seeking [regulatory] approval voluntarily*. But [ScaleX's executive] knew, or was reckless in not knowing, that *[regulatory] approval was necessary for [its] technologies*.

Manipulating regulatory compliance assured investors that the startup met industry norms and expectations by following the "industry's gold standard." Projecting regulatory compliance was central to convincing audiences of ScaleX's scaling trajectory because regulatory "approval or clearance would have been an obstacle in the company's path to realizing full commercialization," as the criminal complaint stipulates.

The above examples show how entrepreneurs engaging in deep façading skillfully organize elaborate, interlinking acts of deception to convince audiences of the soundness of their businesses' core technology, third-party validation, regulatory compliance, and scaling trajectory.

**Performing a Façade of Rapid Scaling to Multiple, Expert Audiences.** Through deep façading, entrepreneurs seek to meet the expectations of multiple expert audiences (including investors, banks, partners, and customers) by projecting an illusory appearance of a venture that has achieved product-market fit and is rapidly scaling, masking the lackluster operational reality. For example, seven years after founding the biotechnology venture ScaleX, the entrepreneur performed fake product demos of its technological capabilities before a large-scale, nationwide customer that, if successful, would provide a pathway to achieve rapid scale. The civil complaint reads as follows:

> [The entrepreneur] also instructed [ScaleX] employees to place numerous [proprietary products] – which could only be used for research and development purposes and could not be used for clinical testing – in a room in [ScaleX's] clinical laboratory. This made it appear as if [ScaleX] used its [proprietary technology] for clinical purposes. [The entrepreneur] then led a group of [customer company] executives on a tour of that room, and those … executives saw rows of [ScaleX's proprietary technology] in [the venture's] clinical laboratory. Based on [the entrepreneur's] presentation … executives understood that the [specimen] from their demonstration samples would be tested on [ScaleX proprietary technology]. [The entrepreneur] never told the executives that [ScaleX] was actually testing some of their [samples] on modified third-party analyzers. At the end of 2013, [customer company] agreed to accelerate a portion of a $100 million 'innovation fee' to help [ScaleX] broaden its roll-out of services to [customer company retail] stores. Unbeknownst to [customer company], [ScaleX] was scaling its retail offering by relying on third-party analyzers.

Organization Science, 2026, vol. 37, no. 5, pp. 1649–1676, © 2026 INFORMS

Downloaded from informs.org by [162.90.146.65] on 12 October 2026, at 07:14 . For personal use only, all rights reserved.

The data show how the entrepreneur faked product demos before an expert audience, which convinced the partner to extend a quasi-investment into ScaleX to further accelerate the diffusion of the technology and service within their retailer network. ScaleX then leveraged this relationship to support the narrative that it "would be rolling out to 800 or 900 stores by year-end 2015" (civil complaint), thereby convincing other late-stage equity capital investors to commit resources.

The data also illustrate how HyperJet, Tracton, and UnicornHealth performed façades of rapid scaling to expert audiences, many of them follow-on investors, including foundations, venture capitalists, angel investors, and corporate venture capitalists who provided debt and equity financing. For example, for its Series D funding of USD 74 million, HyperJet performed a façade of dramatic customer growth by manipulating operating reports. The civil complaint shows the following:

> [HyperJet] Operating Reports provided to investors show an increase in the number of client accounts, increasing from 214,735 in February 2009, to 1,012,002 in May 2009. [The entrepreneur] knew or should have known that [HyperJet] Operating Report entries showing the number of client accounts were false. As of June 2009, [HyperJet's] internal records show that it only had 81,618 client accounts.

Throughout the data, we find that entrepreneurs generated material evidence to perform illusory appearances of rapid scale, which the FBI pointedly connected to the role of the institutional environment, stating "because tech startups are expected to show rapid growth, [the entrepreneur] had to falsely claim even more revenue … [the entrepreneur] continued to show investors an ever-growing list of customers" (criminal prosecutor's sentencing memorandum).

In the e-commerce venture GrowthHacker, the entrepreneur engaged in deep façading after the venture relocated its headquarters to Silicon Valley. GrowthHacker sought to convince not only risk capital investors but also banks when seeking both initial and additional lines of credit that ultimately totaled $5,000,000. As the criminal felony charge reads,

> To secure the lines of credit, [the entrepreneur] provided materially false financial information to [bank]. For example, [the entrepreneur] fabricated millions in revenue and account receivables from companies that never had contracts with [GrowthHacker]. Once the bank approved and issued the lines of credit, [the entrepreneur] used the money to pay off other creditors and investors, and to settle personal expenses.

Collectively, these data show how entrepreneurs perform deep façades to make their ventures appear to be rapidly scaling before multiple, expert audiences. The data reveal that these façades were generally sustained for extended time periods before being unmasked, the subject to which we next turn.

**Protecting the Façade Through Entrenching Organized Secrecy.** We find that in deep façading, entrepreneurs protect the façade not only by shifting blame and controlling information flows but also by entrenching organized secrecy in their ventures. Organized secrecy is designed to normalize secrecy within a venture, notably by introducing and legitimating concealing processes (Costas and Grey 2014, p. 1426). For example, court data detail how ScaleX utilized code words to normalize its use of third-party devices in order to conceal the venture's lack of operational proprietary technology from its employees. The civil complaint reports the following:

> [ScaleX's] executive also instructed [ScaleX] laboratory employees to use code names to refer to third-party [technology] in its laboratory information systems, ensuring that even other [ScaleX] employees would not know that [ScaleX] was using third-party [technology] to conduct a portion of its patient testing.

By entrenching secrecy through the use of code words, the entrepreneur further contributed to generating a fictionalized, parallel reality of rapid venture scaling and unfaltering success. ScaleX's parallel reality was unmasked after five years, when employees leaked information to regulators and the press. A grand jury convicted the entrepreneur and a C-suite executive of fraud, leading to prison sentences of 135 and 155 months, respectively, in addition to $425,047,268 in restitution payments. The venture filed for bankruptcy.

UnicornHealth went a step further, infusing improper business practices with startup "flair" by referring to them internally as a "growth hack." The criminal complaint demonstrates this tactic:

> At the direction of [the entrepreneurs] [UnicornHealth] developed a practice referred to by various names, including 're-sequencing' and 'upgrading' (hereafter referred to as 'upgrades'). Upgrades were internally referred to at [UnicornHealth] as a 'growth hack', through which [the entrepreneurs] intended to increase numbers of billable claims by marketing to customers who had previously submitted [medical] samples to [UnicornHealth] to have those archived samples reprocessed through newer versions of [UnicornHealth's] tests.

Infusing improper business practices with technical and entrepreneurial jargon highlights the combination of discursive and organizing work that contributes to normalizing secrecy within a venture and enlisting employees in the deception. The civil complaint further show that the entrepreneurs concealed information about fraudulent venture practices from "[UnicornHealth's]

Downloaded from informs.org by [162.90.146.65] on 12 October 2026, at 07:14 . For personal use only, all rights reserved.

general counsel, [UnicornHealth's] board, and insurers," including by "directing [UnicornHealth] employees to provide insurers with backdated and misleading medical records to substantiate the company's prior claims for reimbursement" to avoid detection. Moreover, the entrepreneurs leveraged employees to protect the façade internally and externally. Yet despite protecting the façade for four years, the criminal deception eventually came to light when insurance companies probed, leading the venture's board to launch an internal investigation that "brought [UnicornHealth's] improper billing practices to light and made clear that [UnicornHealth's] business model was untenable" (civil complaint). The entrepreneurs were fired and fled the country. The venture went into liquidation proceedings in late 2019, and the criminal and civil cases are ongoing.

As shown in these examples, entrepreneurs entrenched organized secrecy by bringing others into the fold, including by enlisting cofounders, venture executives, or employees in the deceptive schemes. Consider the payment processing venture HyperJet, in which the entrepreneur leveraged his cofounder to send a ghost-written email to a potential investor regarding a staged audit. In the criminal complaint the FBI investigation reveals the following:

> On April 13, 2009, [the entrepreneur] sent an email with the subject line 'Ghost write' to [co-founder]. The email stated, 'Inn [sic] going to ghost write a note for you to send to [investor] and I re: KPMG today. Remember you're supposed to be spending time with them today … cool?'
>
> Later in the same day, [the entrepreneur] sent a second email to [co-founder] with the subject line 'Ghost Written Notes' which stated: Send to [investor] and [me].
>
> Guys, I spent the day with the auditors and we still have a list of things that are outstanding and we are in the way.

The prosecution notes the complicit nature of the criminal deception in that the cofounding entrepreneurs "jointly devised the scheme." The façade was unmasked by happenstance when the venture's general counsel contacted an acquaintance at the audit firm KPMG to scout a new CFO and, in the process, learned that KPMG had never conducted the purported HyperJet audit. The entrepreneurs pled guilty to the charges and were each sentenced to 180 months in prison and $93,125,915.12 in restitution payments. HyperJet filed for bankruptcy. Similar patterns of involving employees in façade protection occurred in the Tracton and GrowthHacker[10] cases, where organizational actors were leveraged to protect the façades from probing, thereby contributing to normalizing and organizing secrecy.

Overall, we find that when faced with a high burden of proof to showcase rapid scaling and an extreme expectation-reality gap, prosecuted entrepreneurs employed elaborate discursive and organizing efforts to accomplish deep façading, generating a sophisticated façade akin to a parallel reality that blurred the lines between fictitious representations and operational reality.

## Discussion

In pursuit of a theoretical framework to advance our understanding of entrepreneurs' criminal deception, we inductively studied Silicon Valley technology ventures and their founders who were charged with securities-related fraud. Based on these data, we theorize criminal deception as a three-part process of façading through which entrepreneurs construct, perform, and protect an illusory venture appearance—the façade—before diverse audiences. A façade projects a desirable illusion of a high-performing venture designed to meet institutionally conditioned audience expectations and to mask a venture's operational reality of underperformance. Figure 1 presents our theoretical framework, with which we make four key theoretical arguments.

### Toward a Theory of Criminal Deception

First, as Figure 1 illustrates, entrepreneurs can backfill the gap between expected and actual venture performance (indicated by the light grey to dark grey shaded areas) through façading. Extending actor-centric arguments that assume entrepreneurs self-set expectations through aspirational narratives, we follow an institutional line of argumentation to suggest that audience expectations are conditioned by the institutional context—in our case, Silicon Valley—and anchored in the collective pursuit of the ideal venture type (a unicorn). As ventures progress, they must convincingly meet institutionally conditioned expectations of audiences hoping for exponential growth during a venture's life cycle. In the process, they produce not just stories but also increasingly elaborate evidence of progress to acquire resources. When venture performance fails to meet such expectations, façading provides an avenue to alter what audiences perceive as the venture's operational reality, making it appear as if no expectation-reality gap exists.

Second, we argue that the form of façading (surface, reinforced, or deep) is contingent on the degree of expectation-reality gap, commensurate with discrete phases in a venture's life cycle. Under conditions of a minor expectation-reality gap early in the venture's life cycle, when audiences typically expect to see ideation, testing, and research and development (R&D), and the burden of proof is low, we argue that entrepreneurs engage in surface façading. Here, entrepreneurs transgress from dramatized stories to criminal deception (whether intentionally or not) when their

Case 1:25-cr-00592-LAK Document 88-1 Filed 10/15/26 Page 401 of 506



Downloaded from informs.org by [162.90.146.65] on 12 October 2026, at 07:14 . For personal use only, all rights reserved.

**Figure 1.** Theoretical Framework of Criminal Deception Through Façading




entrepreneurial narratives become wholly detached from the venture realities and strategies, serving only to influence audience perceptions and elicit support. During subsequent stages in the venture's life cycle, audiences expect to see evidence of revenue generation and customer growth, and the burden of proof grows. Here, a wider expectation-reality gap may emerge, which entrepreneurs can backfill through reinforced façading. In this case, fictionalized stories are reinforced through the organized production of interlocking sets of faked evidence (i.e., data, facts, and information) of retrospective venture performance, which further supports optimistic future projections of accelerating venture traction. Finally, during the scale-up phase, when the burden of proof is high and audiences expect evidence of technological readiness and a rapidly expanding customer base, an extreme expectation-reality gap may emerge, which entrepreneurs can backfill through deep façading. This involves an expansive set of organizing processes that include faking experiential performances, co-opting audience verification processes, and manipulating regulatory compliance. In our theoretical framework, we theorize façading as a discontinuous process with varying entry points (represented by the dotted lines between façading forms in Figure 1). Although linear progression across forms of façading is hypothetically possible, we did not observe this pattern in our data. Future research could investigate the possible transitions between forms of façading as well as how entrepreneurs may eventually shift "out of" façading by reducing the expectation-reality gap through means other than deception.

Third, our framework theorizes criminal deception at the discourse-organizing interface. We argue that façading sophistication is contingent on a widening expectation-reality gap, requiring more integrated discursive and organizing efforts to shoulder the increasing burden of proof and to secure audience support. As such, we suggest that entrepreneurs may slip into criminal deception as they fictionalize their stories, seamlessly shifting from making aspirational claims in their projective storytelling to conveying fabricated narratives wholly detached from the venture's operational reality. Entrepreneurs who solely engage in fictionalizing stories deploy considerable discursive strategies yet minimal organizing efforts. With widening expectation-reality gaps, organizing efforts intensify, and the deception scheme becomes increasingly elaborate. Indeed, protecting façades from detection involves extraordinary organizing efforts toward controlling and siloing information as well as entrenching organized secrecy within the venture. This organized secrecy requires remarkable levels of organizational skill on the part of entrepreneurs; it also demands that regulatory and governance approaches be reconfigured to effectively prevent and unmask criminal deception.

Fourth, our framework theorizes how façading involves an increasing detachment of the venture's projected appearance from its actual, operational reality. Through surface façading, entrepreneurs generate an illusory appearance akin to a cultural veneer that aestheticizes and simultaneously masks elements of the venture's undesirable operational reality. Reinforced façading generates more of a standalone façade—a cultural artifact derived from, but independent of, the

Case 1:25-cr-00592-LAK Document 88-1 Filed 10/15/26 Page 402 of 506



Downloaded from informs.org by [162.90.146.65] on 12 October 2026, at 07:14 . For personal use only, all rights reserved.

venture—with which audiences interact. Through deep façading, entrepreneurs generate an illusory, *Truman Show*–like parallel reality in which audiences interact with a fully fictionalized, desirable venture twin that bears little resemblance to the actual venture. Much as Truman, the movie's protagonist, experiences a scripted, staged world as genuine and real, audiences interact with a venture's carefully fabricated performance data, faked product demos, nonexistent technologies, and more as if they were engaging with the real venture.

Taken together, our arguments underscore the need to theorize criminal deception more comprehensively by specifically analyzing the intersection of discursive and organizing work. We next discuss our work's contributions to the literatures on cultural entrepreneurship, organizational wrongdoing, and the societal effects of entrepreneurship.

## Contributions to Research on Cultural Entrepreneurship

Cultural entrepreneurship research has provided an important starting point to begin to understand deception. Extant scholarship foregrounds the discursive work involved in deceiving audiences through the dramatization of stories, narratives, symbols, and framing (Martens et al. 2007; Garud et al. 2014, 2025; Piazza et al. 2023; Bureau et al. 2026). We extend this line of work by studying deception at the interface of discursive *and* organizing work. Through façading, entrepreneurs engage in discursive work as they fictionalize stories of progress and imminent success to convince their audiences. Yet when faced with a widening expectation-reality gap and an increasing burden to demonstrate progress, entrepreneurs use discrete organizing efforts to produce and perform false evidence, stage faked performances of technological capabilities, and co-opt audiences' verification processes through elaborate schemes (e.g., impersonating investors or customers, manipulating venture resources, incorporating employees in the deception, and protecting the façade). By broadening the scope of theorizing beyond discursive work, we highlight the hidden dimension of organizing that is involved in fabricating the false evidence that shores up deceptive stories. A future research agenda for criminal deception must further develop our understanding of how discursive and organizing work intersect to produce façades.

Furthermore, in building on research that depicts deception as part of aspirational future-making (Garud et al. 2014, 2025; Wood et al. 2022), we highlight how criminal deception also hinges on *fictionalizations of the past* to portray nonexistent technologies and venture performance as though they had been actualized. Faked revenue, falsified bank statements, fabricated recurring customer contracts, and made-up product demos represent the organized production and performance of *retrospective evidence*, which entrepreneurs use as raw materials in crafting deceptive stories of the past, present, and future. Fictional stories reinforced by fabricated historical data are hallmarks of criminal deception, and they are markedly distinct from future-oriented entrepreneurial visions that may or may not materialize.

In accordance with extant research, we confirm that evidence of venture performance is essential in meeting audience expectations. Logue and Grimes (2022) argue that audiences expect entrepreneurial stories to be bolstered by evidence, such as "proofs of concept, hard data, or even convincing prototypes" (p. 1059). We argue that the organized production and performance of evidence can itself be completely fabricated, often rendering audiences' standard verification processes ineffective. As such, we suggest that entrepreneurs not only act to narrow and close the expectation-reality gap by, for instance, revising stories (Garud et al. 2014, 2025; Chapple et al. 2022; Knight et al. 2025), recalibrating expectations (McDonald and Gao 2019, Karp and O'Mahony 2025), or pivoting (Hampel et al. 2020), but that they can also sustain the gap over time by focusing their attention and skill on influencing audiences' perceptions, creating the illusion that no gap exists. We see much value in future research on deception that further explores the dynamics and motivations of entrepreneurs who engage in façading, with a specific analytical focus on misrepresenting ventures' past performances.

Extant research theorizes how entrepreneurs create entrepreneurial identities; fit within, extend, or create market categories; and achieve legitimacy (Martens et al. 2007, Überbacher 2014, Lounsbury and Glynn 2019, Lockwood and Soublière 2022). We add the argument that façades enable entrepreneurs to project and maintain illusory identities that bear little to no resemblance to the actual venture. Although research on façades has explained how organizations may engage in ceremonial compliance with institutional pressures (Nystrom and Starbuck 1984, Abrahamson and Beaumard 2008), more work is needed to foster our still rudimentary understanding of how entrepreneurs first engage in façading, how they learn and acquire the skills of façading, how they manage the frictions and tensions resulting from façading, and how—in some cases—they may abandon façading for more legitimate practices.

Emerging conversations on constructing guardrails against deception have foregrounded entrepreneurial authenticity (Martens et al. 2007, Gehman and Wry 2022) as a way to curb deceptive practices. We posit that a focus on *verifiability* is better suited to detecting and preventing criminal deception. Authenticity judgments tend to focus on assessing consistency between the entrepreneur's/venture's internal values and their

Downloaded from informs.org by [162.90.146.65] on 12 October 2026, at 07:14 . For personal use only, all rights reserved.

external expression, their conformity to an established market category, or the venture's connection to a person, place, or time (Lehman et al. 2019) rather than on verifying the relationship between entrepreneurial stories and operational realities in the context of fraud. Further, authenticity judgments in the entrepreneurial domain can be counterproductive, as entrepreneurial authenticity thrives on rule-breaking, deviance, hubris, and aspirational stories (Hampel and Dalpiaz 2025, Wadhwani and Lubinski 2025). Hence, we argue that future work ought to inform our understanding of the verifiability of entrepreneurial claims and of how entrepreneurs can be encouraged to craft not just convincing stories but also verifiable ones. An analytical focus on verifiability also highlights the role of investors. More research is needed to critically examine investors' verification processes by studying how investors (fail to) make sense of entrepreneurs' stories, evidence, and organizing processes, and how (willingly or not) investors may be implicated in coproducing criminal deception.

### Contributions to Research on Wrongdoing

Recent work on misconduct and wrongdoing has begun to reconnect with its historical roots and emphasize the hidden acts and processes—the how-to of wrongdoing (Gabbioneta et al. 2013, Mohliver et al. 2022, Zhang et al. 2023, Lodge et al. 2025, Eaglin 2026). We build on this stream of work to more systematically analyze and theorize the acts, repertoires, and organizing work that individuals and organizations engage in to further wrongdoing in and by organizations. Specifically, a new focus in the literature on entrepreneurial wrongdoing (Scheaf and Wood 2022, Mohliver et al. 2022, Palmer and Weiss 2022, Wood et al. 2022) goes beyond mature, large-scale, public organizations to theorize misconduct in comparatively small, young, private, and thinly organized firms that lack the routines, formalization, and structures of large organizations. Strikingly, the data showcase how deception can become fully entrenched in startups.

Misconduct research typically adopts a realist-structural understanding of culture as involving systems of beliefs, norms, and understandings that potentially endorse misconduct (Palmer 2013)—such as the "fake it 'til you make it" trope (Palmer and Weiss 2022). We balance this view by proposing a Swidlerian understanding of how entrepreneurs skillfully leverage and mobilize culture (Swidler 1986, Lounsbury and Glynn 2019), which we see as particularly germane to the study of entrepreneurial wrongdoing. By viewing culture as a resource, wrongdoing researchers can transcend macro descriptions of culture to analytically show how discourse becomes enacted in organizations and how features of organizational design can facilitate deception. Our research shows how entrepreneurs leverage façading to comply with audience expectations, buffer against external strain, and protect against internal and external scrutiny so that illegality can manifest and prosper. Here, linguistic and symbolic actions in the form of stories are tightly coupled to discrete organizing efforts. We see the discourse-organizing interface as a pathway to go beyond the traditional focus on the antecedents and consequences of wrongdoing to analytically disentangle how wrongdoing in startups is carried out.

Given our focus on detected and prosecuted cases of entrepreneurial fraud, we draw inspiration from criminology research that focuses on actors' "modus operandi" to better understand the systematic nature of wrongdoing and identify prevention strategies. Research on modus operandi investigates "the method criminals use to commit a crime that they find both practical and successful over a period of time" (Levinson 2002, p. 1071). Focusing on the criminal acts and processes across cases creates a deeper understanding of the hidden organizing methods, frameworks, and repertoires involved in organizational wrongdoing (Fosdick 1915). In our context, court data offer particularly promising opportunities for both qualitative and quantitative researchers to study pathways of criminal deception that can serve as blueprints in alerting entrepreneurs to potential dangers, educating them on how to stay in the clear, and developing preventative measures to curb entrepreneurial fraud. Given the broader frame of wrongdoing research, we see great potential in examining the full spectrum of criminal acts and offenses carried out in (and by) entrepreneurial ventures and beyond. For example, our understanding of sexual misconduct, discrimination, and other forms of harm in the entrepreneurial context is in its infancy. We encourage future researchers to examine this spectrum of wrongdoing.

### Contributions to Research on the Social Effects of Entrepreneurship

Research on the social effects of entrepreneurship focuses on how entrepreneurship affects society (Eberhart et al. 2022b, Weiss et al. 2023), capturing how entrepreneurship has become a major cultural theme and ideology (Bromley et al. 2022, Caliskan and Lounsbury 2022, Eberhart et al. 2022b, Lubinski and Tucker 2025) and reckoning with its adverse effects (Jones and Spicer 2005, 2009, Essers et al. 2017, Kwon and Sorenson 2023, Gagliardi and Sorenson 2026). Too often, conventional wisdom is quick to oust prosecuted entrepreneurs as lone outliers (Hoffman 2018) without interrogating the broader dynamics that facilitate harmful entrepreneurial acts. That is, entrepreneurs are often cast as the sole perpetrators of criminal deception, sidelining the role of other actors, such as

Downloaded from informs.org by [162.90.146.65] on 12 October 2026, at 07:14 . For personal use only, all rights reserved.

investors. Investors are institutionally embedded, act as important gatekeepers (Suchman 2000), coach and mentor entrepreneurs, and culturally promote rapid scaling approaches (Hoffman and Yeh 2018). Our 2022bfindings hint at coproduction dynamics between entrepreneurs and investors, such as when façading becomes more sophisticated with increasing expectations to prove rapid venture scaling in exchange for resources. This avenue deserves further scrutiny.

Entrepreneurs' co-optation of audiences' verification processes and entrepreneurs' façade protection approaches suggest several institutional failures in how stakeholders neglect their fiduciary responsibilities as investors and board members. More research is needed to understand these entrepreneur-investor dynamics to balance the overemphasis on the entrepreneur as the sole perpetrator of wrongdoing.

Further, deception can become valorized and misunderstood as deviance in entrepreneurship (Wadhwani and Lubinski 2025), suggesting that virtuous ends can justify dubious methods. We confront such arguments with a clear view of the costs of criminal deception. Prosecuted and sentenced entrepreneurs experience a drastic, comprehensive loss of agency when they bring their ventures to ruin and lose their entrepreneurial identity, in addition to relinquishing their personal freedom via incarceration. Similarly, criminal deception can destroy substantial amounts of financial capital, which is often sourced from limited partners such as pension and insurance funds, as well as causing significant harm to consumers. More broadly, and as some of the judges adjudicating the analyzed cases argue, criminal deception can undermine trust in the very ecosystem that sustains entrepreneurship. We argue that it is important to distinguish between productive deviance and harmful, criminal deception.

Our work highlights Silicon Valley's peculiar institutional context in valorizing the pursuit of unicorn ventures and a "growth at all costs" mantra (Zankl and Grimes 2024, Hampel and Dalpiaz 2025). We argue that institutionally conditioned audience expectations of extraordinary growth facilitate criminal deception, which can extend to other geographies where the Silicon Valley scaling paradigm of high-growth, equity-backed entrepreneurship flourishes (Kim and Kim 2022). More research is needed to examine the dynamics of criminal deception in other jurisdictions.

Additional research could help illuminate façading and criminal deception in relation to other forms of entrepreneurial harm. For instance, Uber, Lyft, and others have faced prosecution for misclassifying employees as independent contract workers. Seemingly, these ventures construct, perform, and protect illusory identity labels to mask the increasing precarity of their gig workers (Eberhart et al. 2022a, Vogel 2022, Bathini et al. 2026). As such, the playbook of criminal deception may expand beyond typical audiences, such as investors, to capture how ventures relate (deceptively) to their employees, customers, partners, the judiciary, and society more broadly.

## Practical Implications

Current debates among legal scholars center on the SEC's engagement in secondary capital markets to provide oversight and expand enforcement over investments in private ventures (Pollman 2020, 2022b; Carlson 2023; Platt 2023; Wansley and Weinstein 2023). Our findings present a novel database of securities fraud by prosecuted Silicon Valley entrepreneurs and showcase the important role that the SEC plays in prosecution and in bringing such cases to the attention of the DOJ. Given that the redistribution of resources within the SEC toward more private market enforcement is contested (Platt 2023), we concur with legal scholars such as Pollman (2020, p. 399) that venture employees and board members can serve as important allies in detecting criminal deception. Specifically, we suggest that the barriers for whistleblowing be substantially lowered, such as by increasing SEC resources for existing whistleblower protection schemes and specifically incorporating startup ventures in the latter to facilitate both detection and deterence of criminal deception. Further, we suggest that institutionalizing formal audits of ventures by the SEC, particularly later in the venture life cycle, could provide important corrective and detection measures for criminal deception.

Relatedly, investors' role in corporate governance as board members is central, yet rarely scrutinized. Within current legislation, investors are protected and thus qualify as "victims" when criminal deception is prosecuted. As our data suggest, however, investors play a key role in defining venture performance and return expectations (Canales et al. 2025). Although investors with board seats have oversight obligations, criminal deception and other forms of entrepreneurial fraud are rarely considered a corporate governance failure, and investors are not typically held liable for the consequences. We propose that more accountability and responsibility should fall on investors to reduce entrepreneurs' vulnerabilities to criminal deception and improve the chances of detecting deception. We also recommend that investors upgrade their due diligence processes to minimize opportunities for deceit by adequately verifying entrepreneurial claims and scrutinizing supporting evidence through multiple data sources.

Finally, entrepreneurial education tends to rely on ethics and morality as a counterforce to deception (Byers 2020). These efforts notwithstanding, we see particular promise in clearly delineating between permissible—and perhaps even expected—forms of deception (such as dramatization) and criminal forms

Downloaded from informs.org by [162.90.146.65] on 12 October 2026, at 07:14 . For personal use only, all rights reserved.

of deception, such as, façading. We argue that entrepreneurship education needs to demarcate the boundaries for students to enhance the chances of detecting and preventing criminal deception rather than inadvertently contributing to its normalization. Hence, we propose that educational efforts need to directly incorporate topics of entrepreneurial misconduct and law violations into their curricula, regarding how to legally manage all stakeholders (e.g., board of directors, prospective and current investors, employees, and partners).

## Conclusion

Criminal deception knows no geographical or institutional boundaries. Given the dramatic increase in the financialization of private capital markets and the pressure for entrepreneurs to generate quick financial returns and address societal problems ranging from climate change to poverty to healthcare, we see an increasing opportunity structure for criminal deception to prosper. Accordingly, researchers and regulators alike should explore how to curb the unfettered, and often unrealistic, scaling expectations that audiences place on entrepreneurs and that entrepreneurs place on themselves (Zankl and Grimes 2024). Organization and management researchers have an important role to play in this regard. By developing a more nuanced understanding of how entrepreneurial ventures become enmeshed in criminal activity, we can illuminate our current blind spots that allow entrepreneurial stories to evolve into criminal conduct.

## Acknowledgments

The authors thank Inka Luhrs, Anne Mokhtari, Manuel Peichl, Afrooz Shafiei, Doron Tadmor, and Jaimie Zheng for research assistance; Salem Alsanousi, Joel Bothello, Chris Eaglin, Don Palmer, and Hatim Rahman for feedback on earlier drafts of the paper; colleagues at seminars and conferences at IE University, IESEG, KTO-SKEMA, LBS Ghoshal conference, McGill Montreal, Rethinking Entrepreneurship at CBS, and STORM-emlyon for generous feedback; Sarah O'Brien, Michelle Darlington, and Catie Phares for editorial support; and senior editor, Grace Augustine, and three anonymous reviewers for thoughtful guidance and feedback. Both authors contributed equally.

## Endnotes

[1] Our conceptualization builds on similar distinctions and interfaces, such as tangible-intangible resources (Lounsbury and Glynn 2001) and symbolic-substantive actions (Karp and O'Mahony 2025), as well as empirical research that analyzes both discourse and organizing as inextricably linked (Zott and Huy 2007, Delmestri and Greenwood 2016, Massa et al. 2017).

[2] Although numerous definitions of "startup venture" exist in the literature—including 6, 8, or 10 years of age and up to 20 years of age or less at the time of the IPO—we chose a 10-year cutoff from when criminal deception was reported as occurring, although the legal prosecutions could extend beyond this period.

[3] Even though the court data are publicly available, we intentionally chose to anonymize entrepreneurs and ventures. We seek to facilitate a process of identifying patterns across cases as opposed to singling out individual cases or entrepreneurs as deviant outliers (as is dominant in public discourse), which we argue hinders a more substantive engagement with criminal deception.

[4] In this step of the analysis, we combined both civil and criminal charges into a single case summary per venture, given that the underlying facts of the allegations tended to be similar, with cases often starting as civil prosecutions and escalating to criminal investigations. We nevertheless coded documents in all cases.

[5] The SEC filed a single complaint for securities fraud pertaining to these two ventures, given that "substantially similar misrepresentations" occurred in both ventures at the same time.

[6] We focus the findings of reinforced façading on the novel aspects of the organized production of interlocking sets of fictionalized evidence and relegate evidence of the fictionalization of stories to Online Appendix C.

[7] The venture filed for Chapter 11 bankruptcy but ultimately survived the entrepreneur's criminal deception, was acquired by a venture capital company, and remains operational.

[8] The data regarding ProfitDash's and RevenueBoost's protection approaches were limited. ProfitDash's entrepreneur was sentenced to 36 months in prison and restitution payments of $1.5 million. RevenueBoost's entrepreneur was sentenced to 88 months in prison and $8,058,476.4 in restitution payments.

[9] We focus the findings of deep façading on the novel aspects of faking experiential performances, manipulating regulatory compliance, and co-opting verification processes and include evidence of the fictionalization of stories as well as the organized production of fictionalized evidence in Online Appendix D.

[10] Tracton's entrepreneur was sentenced to 30 months in prison, and restitution payments have not yet been determined. GrowthHacker's entrepreneur was sentenced to 36 months in prison and $8,069,900 in restitution payments.

## References

Abrahamson E, Beaumard P (2008) What lies behind organizational facades and how organizational facades lie: An untold story of organizational decision making. Hodgkinson G, Starbuck W, eds. *The Oxford Handbook of Organizational Decision Making* (Oxford University Press, Oxford, UK), 437–452.

Bathini DR, Parth S, Kandathil G (2026) The legitimacy lie as dark institutional work: Rhetoric and reality in India's platform economy. *J. Management Inquiry*, ePub ahead of print March 10, https://doi.org/10.1177/10564926261427991.

Boudette NE, Ewing J (2020) Head of Nikola, a G.M. electric truck partner, quits amid fraud claims. *New York Times* (September 21), https://www.nytimes.com/2020/09/21/business/nikola-trevor-milton-resigns.html.

Bromley P, Meyer JW, Jia R (2022) Entrepreneurship as cultural theme in neoliberal society. Eberhart R, Lounsbury M, Aldrich H, eds. *Research in the Sociology of Organizations: Entrepreneurialism and Society: New Theoretical Perspectives*, vol. 85 (Emerald Group Publishing Limited, Leeds, UK), 55–75.

Bureau S, Gerges-Yammine R, Battaglia D, Zhou J (2026) Legitimising destructive entrepreneurship: The case of a crypto-entrepreneur. *Small Bus. Econom.* 66(2):633–646.

Byers T (2020) Entrepreneurship and ethics. https://ecorner.stanford.edu/articles/entrepreneurship-and-ethics/.

Caliskan K, Lounsbury M (2022) Entrepreneurialism as discourse: Toward a critical research agenda. Eberhart R, Lounsbury M, Aldrich H, eds. *Research in the Sociology of Organizations:*

Downloaded from informs.org by [162.90.146.65] on 12 October 2026, at 07:14 . For personal use only, all rights reserved.

*Entrepreneurialism and Society*, New Theoretical Perspectives, vol. 81 (Emerald Group Publishing Limited, Leeds, UK), 43–53.
Canales R, Regele MD, Groberg MG, Eftekhari N (2025) Falling off the unicorn: The maintenance of unrealistic startup labor narratives. *Acad. Management J.* 68(4):760–786.
Carlson M (2023) (Private) market mania: Assessing the impact of private market booms on venture capital-backed startup governance. *Hastings Bus. Law J.* 19(2):199–220.
Chapple D, Pollock N, D'Adderio L (2022) From pitching to briefing: Extending entrepreneurial storytelling to new audiences. *Organ. Stud.* 43(5):773–795.
Charmaz K (2011) *Constructing Grounded Theory* (Sage Publications, London).
Costas J, Grey C (2014) Bringing secrecy into the open: Towards a theorization of the social processes of organizational secrecy. *Organ. Stud.* 35(10):1423–1447.
Coviello N, Autio E, Nambisan S, Patzelt H, Thomas LDW (2024) Organizational scaling, scalability, and scale-up: Definitional harmonization and a research agenda. *J. Bus. Ventures* 39(5): 106419.
Davis F (1959) The cabdriver and his fare: Facets of a fleeting relationship. *Amer. J. Sociol*. 65(2):158–165.
Davis GF (2016) *The Vanishing American Corporation: Navigating the Hazards of a New Economy* (Berrett-Koehler Publishers, Oakland, CA).
Delmestri G, Greenwood R (2016) How Cinderella became a queen: Theorizing radical status change. *Admin. Sci. Quart.* 61(4):507–550.
DeSantola A, Gulati R (2017) Scaling: Organizing and growth in entrepreneurial ventures. *Acad. Management Ann.* 11(2):640–668.
Eaglin FC (2026) The need for speed: The impact of capital constraints on strategic misconduct. *Management Sci.* 72(2):1680–1698.
Eberhart RN, Barley S, Nelson A (2022a) Freedom is just another word for nothing left to lose: Entrepreneurialism and the changing nature of employment relations. Eberhart R, Lounsbury M, Aldrich H, eds. *Entrepreneurialism and Society: New Theoretical Perspectives* (Emerald Group Publishing Limited, Leeds, UK), 13–41.
Eberhart R, Lounsbury M, Aldrich H, eds. (2022b) *Entrepreneurialism and Society: New Theoretical Perspectives* (Emerald Group Publishing Limited, Leeds, UK).
Essers C, Dey P, Tedmanson D, Verduyn K, eds. (2017) *Critical Perspectives on Entrepreneurship: Challenging Dominant Discourses* (Routledge, London).
Fosdick RB (1915) Modus operandi system in the detection of criminals. *J. Amer. Institute Criminal Law Criminology* 6:560.
Gabbioneta C, Clemente M, Greenwood R, eds. (2023) *Organizational Wrongdoing as the "Foundational" Grand Challenge: Consequences and Impact* (Emerald Publishing Limited, Leeds, UK).
Gabbioneta C, Greenwood R, Mazzola P, Minoja M (2013) The influence of the institutional context on corporate illegality. *Accounting, Organ. Soc.* 38(6):484–504.
Gagliardi L, Sorenson O (2026) Entrepreneurship and gentrification. *Organ. Sci*. 37(1):1–16.
Gamez-Djokic M, Kouchaki M, Waytz A (2022) Virtuous startups: The credentialing power of the startup label. *Acad. Management Discoveries* 8(3):441–458.
Garud R, Schildt HA, Lant TK (2014) Entrepreneurial storytelling, future expectations, and the paradox of legitimacy. *Organ. Sci.* 25(5):1479–1492.
Garud R, Snihur Y, Thomas LDW, Phillips N (2025) The dark side of entrepreneurial framing: A process model of deception and legitimacy loss. *Acad. Management Rev.* 50(2):299–317.
Gehman J, Wry T (2022) Cultural entrepreneurship: Theorizing the dark sides. Lockwood C, Soublière JF, eds. *Research in the Sociology of Organizations*, Advances in Cultural Entrepreneurship, vol. 80 (Emerald Publishing Limited, Leeds, UK), 97–110.
Gil E (2018) *High Growth Handbook: Scaling Startups from 10 to 10,000 People* (Stripe Press, San Francisco).
Goffman E (1959) *The Presentation of Self in Everyday Life* (Anchor Books, New York).
Greve HR, Palmer D, Pozner J (2010) Organizations gone wild: The causes, processes, and consequences of organizational misconduct. *Acad. Management Ann.* 4(1):53–107.
Hampel CE, Dalpiaz E (2025) When hype collides with morality: How entrepreneurial framing affects the behavior and legitimacy of hyped ventures. *J. Bus. Ventures* 40(4):106506.
Hampel CE, Tracey P, Weber K (2020) The art of the pivot: How new ventures manage identification relationships with stakeholders as they change direction. *Acad. Management J.* 63(2): 440–471.
Hoffman R (2018) (1) Theranos: Blitzscaling, blitzfailing, or blitzfrauding? Retrieved July 22, 2025, https://www.linkedin.com/pulse/theranos-blitzscaling-blitzfailing-blitzfrauding-reid-hoffman/.
Hoffman R, Yeh C (2018) *Blitzscaling: The Lightning-Fast Path to Building Massively Valuable Companies* (Currency, New York).
Hoffman R, Cohen J, Triff D (2021) *Masters of Scale: Surprising Truths from the World's Most Successful Entrepreneurs* (Bantam Press, London).
Jansen JJP, Heavey C, Mom TJM, Simsek Z, Zahra SA (2023) Scaling-up: Building, leading and sustaining rapid growth over time. *J. Management Stud.* 60(3):581–604.
Jones C, Spicer A (2005) The sublime object of entrepreneurship. *Organization* 12(2):223–246.
Jones C, Spicer A (2009) *Unmasking the Entrepreneur* (Edward Elgar Publishing, Cheltenham).
Karp R, O'Mahony S (2025) Confronting the limits of symbolic actions: How entrepreneurs narrow the presentation-performance gap. *Organ. Sci.* 36(5):1643–1675.
Kaynak E, Rahman HA (2024) "It takes more than a pill to kill": Bounded accountability in disciplining professional misconduct despite heightened transparency. *Organ. Sci.* 35(6): 2064–2094.
Kim S, Kim A (2022) Going viral or growing like an oak tree? Towards sustainable local development through entrepreneurship. *Acad. Management J.* 65(5):1709–1746.
Knight E, Grimes MG, Gehman J (2025) The limits of pivoting: A culturally informed model of resource commitments during repeated organizational transformation. *Acad. Management J.* 68(5):1130–1162.
Kwon D, Sorenson O (2023) The Silicon Valley syndrome. *Entrepreneurship Theory Practice* 47(2):344–368.
Lehman DW, O'Connor K, Kovács B, Newman GE (2019) Authenticity. *Acad. Management Ann.* 13(1):1–42.
Levinson D (2002) Modus operandi. *Encyclopedia of Crime and Punishment* (SAGE Publications, Thousand Oaks, CA), 1071–1072.
Lockwood C, Soublière JF, eds. (2022) *Research in the Sociology of Organizations: Advances in Cultural Entrepreneurship* (Emerald Group Publishing, Leeds, UK).
Lodge J, Augustine G, Radic M (2025) From paralysis to publicization: How victims of the UK post office horizon it scandal experienced and confronted organizational harm. *Acad. Management J.* 69(2).
Logue D, Grimes M (2022) Living up to the hype: How new ventures manage the resource and liability of future-oriented visions within the nascent market of impact investing. *Acad. Management J.* 65(3):1055–1082.
Lounsbury M, Glynn MA (2001) Cultural entrepreneurship: Stories, legitimacy, and the acquisition of resources. *Strategic Management J.* 22(6–7):545–564.
Lounsbury M, Glynn MA (2019) *Cultural Entrepreneurship: A New Agenda for the Study of Entrepreneurial Processes and Possibilities.* Phillips N, Greenwood R, eds. (Cambridge University Press, Cambridge, UK).

Case 1:25-cr-00592-LAK Document 88-1 Filed 10/15/26 Page 407 of 506



Downloaded from informs.org by [162.90.146.65] on 12 October 2026, at 07:14 . For personal use only, all rights reserved.

Lubinski C, Tucker HK (2025) Entrepreneurialism: Conceptual exploration of an ideology. *Entrepreneurship Regional Development* 38(1–2):1–17.

Martens ML, Jennings JE, Jennings PD (2007) Do the stories they tell get them the money they need? The role of entrepreneurial narratives in resource acquisition. *Acad. Management J.* 50(5):1107–1132.

Massa FG, Helms WS, Voronov M, Wang L (2017) Emotions uncorked: Inspiring evangelism for the emerging practice of cool-climate winemaking in Ontario. *Acad. Management J.* 60(2):461–499.

McDonald R, Gao C (2019) Pivoting isn't enough? Managing strategic reorientation in new ventures. *Organ. Sci.* 30(6):1289–1318.

McMullen JS (2025) "Fake it 'til you make it": The power and peril of implied social validation in the entrepreneurial journey. *Acad. Management Perspect.*, ePub ahead of print May 22, https://doi.org/10.5465/amp.2023.0513.

Merriam-Webster (2025) Definition of FACADE. Retrieved July 21, 2025, https://www.merriam-webster.com/dictionary/facade.

Mohliver A (2019) How misconduct spreads: Auditors' role in the diffusion of stock-option backdating. *Admin. Sci. Quart.* 64(2): 310–336.

Mohliver A, Karp R, Zuzul T (2022) Dominant deceptions: Explaining the tenacity of deceit in entrepreneurial ventures. Preprint, September 29, https://dx.doi.org/10.2139/ssrn.4286604.

Nystrom PC, Starbuck WH (1984) Organizational facades. *Acad. Management Ann. Meeting Proc.* 1984(1):182–185.

Palmer D (2013) *Normal Organizational Wrongdoing: A Critical Analysis of Theories of Misconduct in and by Organizations* (Oxford University Press, Oxford, UK).

Palmer D, Weiss T (2022) The unique vulnerabilities of entrepreneurial ventures to misconduct. Eberhart R, Lounsbury M, Aldrich H, eds. *Research in the Sociology of Organizations: Entrepreneurialism and Society*, vol. 81 (Emerald Group Publishing Limited, Leeds, UK), 129–159.

Palmer D, Smith-Crowe K, Greenwood R, eds. (2016) *Organizational Wrongdoing: Key Perspectives and New Directions* (Cambridge University Press, Cambridge, UK).

Piazza A, Reese D, Chung SH (2023) Venturing through the doors of perception. *Acad. Management Discoveries* 9(1):1–16.

Platt AI (2022) Legal guardrails for a unicorn crackdown. *Michigan Law Rev.* 120:89–112.

Platt AI (2023) (More) legal guardrails for a unicorn crackdown. *NYU Law Rev.* 98:359.

Pollman E (2020) Private company lies. *Georgetown Law J.* 109:353.

Pollman E (2022a) Adventure capital. *Southern California Law Rev.* 96:1341–1370.

Pollman E (2022b) The rise of regulatory affairs in innovative startups. Smith DG, Broughman B, Hurt C, eds. *The Cambridge Handbook of Law and Entrepreneurship in the United States* (Cambridge University Press, Cambridge, UK), 27–48.

Scheaf DJ, Wood MS (2022) Entrepreneurial fraud: A multidisciplinary review and synthesized framework. *Entrepreneurship Theory Practice* 46(3):607–642.

SEC (2021) Nikola Corporation to pay $125 million to resolve fraud charges. Retrieved August 22, 2025, https://www.sec.gov/newsroom/press-releases/2021-267.

SEC (2023) SEC charges founder of Frank with fraud in connection with $175 million sale of student loan assistance company. Retrieved August 22, 2025, https://www.sec.gov/newsroom/press-releases/2023-74.

Shepherd DA (2019) Researching the dark side, downside, and destructive side of entrepreneurship: It is the compassionate thing to do! *Acad. Management Discoveries* 5(3):217–220.

Suchman MC (2000) Dealmakers and counselors: Law firms as intermediaries in the development of Silicon Valley. *Understanding Silicon Valley* (Stanford University Press, Palo Alto, CA), 27–97.

Swidler A (1986) Culture in action: Symbols and strategies. *Amer. Sociol. Rev.* 51(2):273–286.

Taeuscher K, Zhao EY, Lounsbury M (2022) Categories and narratives as sources of distinctiveness: Cultural entrepreneurship within and across categories. *Strategic Management J.* 43(10):2101–2134.

Überbacher F (2014) Legitimation of new ventures: A review and research programme. *J. Management Stud.* 51(4):667–698.

Vogel SK (2022) Neoliberal ideology and the myth of the self-made entrepreneur. Eberhart R, Lounsbury M, Aldrich H, eds. *Research in the Sociology of Organizations: Entrepreneurialism and Society*, vol. 81 (Emerald Publishing Limited, Leeds, UK), 77–99.

Wadhwani RD, Lubinski C (2025) Hype: Marker and maker of entrepreneurial culture. *J. Bus. Ventures* 40(2):106455.

Wang Y, Stuart T, Li J (2021) Fraud and innovation. *Admin. Sci. Quart.* 66(2):267–297.

Wansley M, Weinstein S (2023) Venture predation. *J. Corporation Law* 48(4):813–869.

Weiss T, Eberhart R, Lounsbury M, Nelson A, Rindova V, Meyer J, Bromley P, et al. (2023) The *social* effects of entrepreneurship on society and some potential remedies: Four provocations. *J. Management Inquiry* 32(4):251–277.

Wood MS, Scheaf DJ, Dwyer SM (2022) Fake it 'til you make it: Hazards of a cultural norm in entrepreneurship. *Bus. Horizons* 65(5):681–696.

Zankl J, Grimes M (2024) Taming unicorns: Toward a new normal of responsible entrepreneurship. *Acad. Management Rev.* 49(4): 879–905.

Zhang V, Mohliver AC, King M (2023) Where is all the deviance? Liminal prescribing and the social networks underlying the prescription drug crisis. *Admin. Sci. Quart.* 68(1):228–269.

Zott C, Huy QN (2007) How entrepreneurs use symbolic management to acquire resources. *Admin. Sci. Quart*. 52(1):70–105.

**Tim Weiss** is an assistant professor of entrepreneurship and innovation at Imperial College London. His research program advances our understanding of how entrepreneurship can effectively contribute to socioeconomic development: the value generating and capturing dynamics of entrepreneurship in frontier markets and social effects of entrepreneurship on society. He is a founding member of the Interdisciplinary Network for Technology and Entrepreneurship Research in Africa.

**Nevena Radoynovska** is an associate professor of strategy, organizations and social innovation at emlyon business school. Her research examines the role of entrepreneurship in social change, particularly in marginalized communities in France. More broadly, her work sits at the intersection of organizations, entrepreneurship, and social problems and has explored such settings as emergency services for the homeless, hybridizing social enterprises, and multistakeholder cooperatives.

# Exhibit 16

The Honorable Lewis A. Kaplan
United States District Judge
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street New York, New York 10007

Dear Judge Kaplan,

My name is Melis Abacıoğlu. I am the founder of Kızlar Sahada — in English, "Girls on the Field" — a social enterprise in Turkey that uses football to break the gender stereotypes our girls grow up inside, and the founder and CEO of Wellbees, a corporate wellbeing company. I have spent more than twenty years building startups and organizations and I have worked with thousands of young people along the way. I am aware that Gokce has pleaded guilty and that she will stand before Your Honor for sentencing. I do not write to explain away what brought her there; she has taken responsibility for that herself. I write because I have known Gokce since she was a thirteen-year-old girl with wet hair and an idea, and fourteen years of knowing someone — really knowing them, through their growing up, their failures, their generosity — gives me something I hope is useful to the Court: the long story of who she is.

Let me tell you how we met, because I have told this story in almost every speech I have given since, and it has never stopped moving me. It was a rainy day in 2013. I was in my office in Istanbul — my late twenties, deep in my third venture, tired in the way founders get tired. My assistant told me there was a girl waiting to see me. Not a woman. A girl. Thirteen years old, straight from soccer practice, still in her training clothes, rain-soaked, because she had talked her coach into giving her my phone number and then simply come to find me. She did not apologize for showing up. She sat down and told me what she had come to say: that in our country, soccer and coding were both treated as things young girls do not do; that she had watched the tournaments I organized for grown women; and that she wanted to build the same thing — for girls. Then she asked me, directly, the way adults rarely dare to: "Would you do it with me?"

I have met hundreds of founders. I have hired, mentored, invested, judged competitions, sat on panels. I say this without exaggeration and I have said it publicly for over a decade: I have never come across anyone like Gokce. What I saw in that thirteen-year-old was not precocity or performance. It was the purest form of what we call a social entrepreneur — someone who feels a problem in her own life and cannot rest until it is solved for everyone who shares it. She was not asking me to fix something for her. She was asking me to build it with her, as a partner, at thirteen. That day I saw her light, and I decided on the spot that whatever this girl wanted me to back, I would back.

What followed was not a photo opportunity. It was years of real, unglamorous work, and she showed up for all of it. Together we built the Girls on the Field Academy under Kızlar Sahada. We brought in partners like Visa and Coca-Cola. We convinced private schools to open their resources and ran camps, weeks at a time, in underserved cities — places where a girl kicking a ball draws stares and a girl at a keyboard draws laughter — and we taught those girls soccer, coding, and robotics in the same breath, so they would learn early that no field belongs to someone else. I watched Gokce, still a teenager herself, kneel next to ten-year-olds to debug their

first lines of code and then run drills with them in the afternoon heat. The girls did not follow her because she was older. They followed her because she was proof.

Together we became national finalists in a Impact Hub and Imece's accelerator programs. And the work has not stopped: today our tournaments draw the sponsorship and participation of leading law, technology, and professional firms; our camps and academies reach thousands of girls and young women every single year. I have watched girls arrive at our camps silent, certain the world had already decided what they could be, and leave two weeks later arguing about robot designs. Some of them are now coaches, engineers, and founders themselves. Every one of those stories traces back, in part, to a thirteen-year-old who walked into my office in the rain. I do not think it is too much to say that Gokce helped change what our country imagines when it hears the words "young woman leader." She certainly changed what I imagine.

Your Honor, I know that this Court sees people at their worst moment, described at their best by the people who love them. So let me be precise about what I am claiming. I am not claiming Gokce is perfect. What I am claiming is this: character is what a person does when there is nothing to gain, and I met Gokce's character before there was anything to gain — before any company, any headline, any award. At thirteen she had homework, practice, and every social reason to stay quiet and small. Instead she knocked on a stranger's door in the rain to build something for girls she would never meet. In fourteen years — from thirteen to twenty-seven, and God willing many more — I have watched that same instinct hold steady through every season of her life: the instinct to fix, to build, to reach back and pull others up behind her.

I used to tell Gokce that whatever she asked me to support, I would support without hesitation. That was true when she was a child, and it is true now, with full knowledge of why I am writing this letter. I intend to work alongside her for the rest of my working life.

The community she helped build — the girls of Kızlar Sahada, many of them now grown women — stands behind her too, most of them without ever knowing her name, because they inherited what she started.

I respectfully ask Your Honor to weigh, alongside everything else before the Court, the fourteen years I have described: a life that began its public chapter, at thirteen, in service of others, and that has never stopped serving them. Girls in cities she has never visited are on soccer fields and in coding classrooms today because of a door she knocked on as a child. I believe with my whole heart that she has far more of that good left to give, and I will be there to help her give it.
Thank you for your time and for your consideration.

Respectfully,
Melis Abacıoğlu
Founder, Kızlar Sahada (Girls on the Field), Founder & CEO, Wellbees



# Exhibit 17

Birsen Baybogan,
Adana, Turkey
July 14, 2026

The Honorable Lewis A. Kaplan
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

**Re: United States v. Gökçe Güven**

Dear Judge Kaplan,

My name is Birsen Bayboğan. I am Gökçe's grandmother. I am in my eighties, and I must begin with a confession, because without it you cannot understand what this letter is. I never went to school. For most of my life I could not read a street sign, a medicine bottle, or a letter from my own family. I carried that shame quietly for eighty years, the way women of my generation carried everything — quietly. It was my granddaughter who ended it.

She went down into our basement and came back up with her own first-grade schoolbooks — the same worn books from which she had learned her own letters as a little girl — and she put them on the table in front of me. She sat beside me, hour after hour, an old woman and a child's primer, and she never once made me feel old, or slow, or ashamed. Letter by letter, the alphabet became mine.

Your Honor, I tell you this first because every word you are reading right now is her work. She gave me these words. I am using them now to speak for her.

To understand what she is to me, you must know what my life was before her. My husband was killed due to political climate of those years in Turkey, when my daughter, Gökçe's mom, was two years old. As a 24 year old woman with no job I worked in the fields to support my kids. Then I lost my son to another crime. A mother who buries her child does not heal; she only learns to keep walking. I raised my family alone, in hardship, and I made a quiet peace with the idea that life takes and does not give back.

Then Gökçe was born, and life gave something back. I cared for her from her first day in this world until she was five years old. I fed her, I bathed her, I walked her to sleep in my arms. Years later, when she was in high school, we lived under the same roof again when she started boarding school at the age of thirteen — but by then something had changed. The child I had raised had begun to take care of me.

I want the Court to know what that looked like, because it is not one story; it is a whole life. I belong to a generation of women who were not welcomed at the sea. All my life I stood on the shore and watched. When she was merely seven , it was Gökçe who took my hand, walked into the water with me, and did not let go — and for the first time in my life, I swam. I ask you to picture that: an old woman in the sea for the first time, laughing, held up by her granddaughter. When she was away at boarding school and knew that I was lonely, she did not send word — she came home, she signed me up to classes and she sat beside me at my Quran lessons so I would build a

community , learn and not sit there alone. She put clay in my hands — hands that had spent a lifetime working and mourning on the cotton fields of Adana— and took me to ceramics classes, so they would make something instead of only grieving. And she taught me to read. Who does these things? Where does a young girl find this inner power? She always had it — this energy to teach, to lead, to give. She never waited to be asked. She saw a need and she moved toward it.

Then came the worst days of my old age, and it was my turn to be held up in the water. When I was [redacted] I was terrified. Gökçe did not hesitate. She flew back from New York immediately. She and her mother searched until they found the best doctor for me. She paid the costs of my operation herself. She still financially and emotionally supports my care which was deeply affected by the current case. A year ago, she stayed beside me before my hopefully last surgery, when I was most afraid, and after it, when I was weakest. I am still recovering, but the doctors say the illness can return, and if it does, I know whose hand I will reach for. I depend on her — financially, socially, emotionally — the way an old tree depends on its deepest root and now she is away from me and away from home. I am blessed with two daughters and with grandchildren, and I love them all. But it is Gökçe who brought me back to life, back among people, back to myself. That is not a figure of speech. I mean it exactly: I live today, as myself, because of her.

My doctors forbade me to fly. I came to United States anyway for her plea. When she stood in your courtroom to enter her plea, I was there, because in our family this is the law we live by: I am always there for her, and she is always there for me. She has never once broken that law. Neither will I.

I know why this letter is being written. I know that my granddaughter has pleaded guilty and that you must decide her sentence. I am an old woman from another country, and I do not pretend to understand American law. I do not write to excuse anything — she herself would not allow me to. I write only so that when you decide, you are deciding about the whole of her: not one chapter, but the entire book. I have read that book from its first page. I know how it was written, because I was there.

She reminds me of my son. She reminds me of my husband. She reminds me of everything that was taken from me before she was born — and she is the proof that God gives some of it back. I am in my eighties. I do not count what remains of my time in years; I count it in the days I have with her. In every way one person can hold up another, she holds me up. I ask you, with everything I have left, in these words she taught me to write from her own childhood books: please do not take her from me. I have already buried a husband and a son. She is what I have. She is my rock.

With deepest respect,

Birsen Baybogan
Grandmother of Gökçe Güven

Email: birsenbaybogan@gmail.com



# Exhibit 18

The Honorable Lewis A. Kaplan United States District Judge Southern District of New York

Re: United States v. Gökçe Güven,

500 Pearl Street NY, NY 10007

Dear Judge Kaplan,

My name is Fadime Baybogan. I am Gökçe Güven's mother. I am a medical doctor, a neurologist, and I have practiced in Adana, Turkey, for 34 years. I know that my daughter has pleaded guilty and her life is at your hands. I am writing as her mother, because I raised her alone, and I am the only person who can tell you what it cost to raise her and who she truly is.

I fought for this girl by myself from the beginning. When Gökçe ranked first in the national high school entrance exam, first, among millions of students in our country, her father did not even want her to go to the school she had earned. When I was earning 10,000 lira a month, I paid 7,000 of it to that school, and the three of us, my two daughters and I, lived on what remained. It was very hard, but God helped us. I will not put every detail of my marriage before the Court, so I will say only this: [redacted] My daughters are the only thing I have left from it, and in this life I only live for them.

I want to tell you about a children's book, because I do not know a truer way to explain my daughter to you. Before Gökçe could even read, her favorite book was the one I read to her, “One Peach, a Thousand Peaches," by Samed Behrengi. It is the story of a small, independent peach tree growing on its own while the big industrial orchards spread around it. The little tree carries the best seed, and it gives everything it has to the children who love it, and at the end of the story, the little tree dies, giving, loving, full of purpose, in the hands of a child. One night when Gökçe was six, she made me read it to her again, and she cried until morning. She is twenty-seven years old now, and she still cries when she thinks of that little tree. I have thought about that night many times this past year, and I believe I finally understand it. At six years old, my daughter had already recognized the thing she would spend her life trying to be.

Because that is exactly how she grew. She had every right, after all her experiences at a young age, to become bitter and closed against life. Instead she chose to love it and to hold the rest of us up. She was infinitely curious, never stopped asking me questions: why is the sky blue, how does the brain work. At ten — ten years old! — she played with her Barbies by inventing scenarios for hours like a little scriptwriter, and then wrote them down; she tried to write a whole novel in her diary. She was unfailingly gentle with her older sister; the two of them held each other up, and together they held me up. At seventeen she read the psychologist Carol Dweck's Growth Mindset book and wrote to the researchers of Stanford Dweck Lab, one by one, until someone gave a teenager a place, and spent four months doing a lab's most unglamorous work purely to contribute. From that book she took her creed: a person is not a fixed mindset, and what someone becomes after a failure matters more than the failure itself.

And like the little tree, she gave her fruit quietly, to whoever was near. In her high-school summers she went to Karataş, near Adana, and prepared a camp for Syrian refugee girls, picked tomatoes in the fields beside them, taught them to draw, fundraised for them day and night. At my hospital she helped the workers, Süleyman, Şakir, many others, quietly covering their families' groceries and calling every month to check on them herself. Her great uncle was like a father to her and he got cancer when she was raising her seed round. He was a proud, difficult man who accepted help from no one, but he accepted her, and she carried everything he could no longer carry. She flew home and sat at his side as he died. That day she lost her fatherly male figure. And yet, still, your Honor, she still took her laptop and showed up to her company all hands meeting with tears in her eyes, and then we drove the funeral. And she buried her feelings and a part of her heart.

I wish Your Honor could see how my daughter spent every single day of these last four years, since she started her company — and the years before that, working her way through college. She never took a day off, not once, even when all of us were begging her to. I have never in my life seen a human being work harder than her. My only regret as her mother is that I never made her stop and live a little for herself — she gave all of her days to her work and to other people, and none to herself. But every sacrifice I made for that girl, I would make again, twice over. I know her heart. I know her values. I am so proud of my daughter.

I cannot be objective about my daughter, but I have watched her through this period honestly. In the first days after the charges she could not breathe; she could not get out of bed. Then she stood up. She continued through the worst period of her life as a fighter. Every day she gets up and works towards making things right for everyone, step by step – her team, her work, and more. She has lived by the belief that who a person becomes after a failure matters more than the failure – the growth mindset. I believe it about her now more than I have ever believed it.

Your Honor, we are a very small family: my two daughters, my elderly mother, our dog, and me. We have no one else in the world. My girls grew up without a father and they grew up as fighters , I raised fighters, alone. If you take one of my daughters, you take half of me. Gökçe left home at thirteen and never really came back; even now I see her perhaps twice a year. A mother wants simple things, to see her child, to hold her, to smell her hair. I was already living on so little of her. She was arrested a day before my birthday.

On my birthday, I asked God for only one thing, that she be released, and my prayer was answered. Now, with the same heart, I ask Your Honor for mercy.

At the end of Gökçe's book, the little peach tree speaks its last words to the children: "My reason for existence was your love, your smile. Without you, what meaning is there in bearing fruit?" I feel like that tree. My daughters are the ones who water me. My reason for existence is their love. Please do not take my daughter from us. We have already lived what no family should have to live.

I only ask that when you weigh everything before you, you see the whole of her: Whatever happens, my daughter will spend her life giving. It is the only way she knows to live.

Respectfully,

Fadime Baybogan, M.D. Neurologist, Adana, Turkey

+905324636744

fadimebaybogan@gmail.com

# Exhibit 19

July 17, 2026

The Honorable Lewis A. Kaplan United States District Judge Southern District of New York
Daniel Patrick Moynihan United States Courthouse 500 Pearl Street New York, NY 10007

Dear Judge Kaplan,

I write respectfully in connection with the sentencing of Gökçe Güven. My name is Razi Canikligil. I am the Founder and President of UNEMAG, a non-profit 501(c)(3) foundation headquartered at the United Nations, and the Publisher of *Envoy Magazine*, a United Nations–affiliated publication covering innovation, artificial intelligence, and international development. I have been a journalist for over forty years, and since 1990 I have served as the New York correspondent for Hürriyet, one of Türkiye's largest newspapers. Over more than three decades, I have reported extensively from the federal courthouse in this District — including *Motorola Credit Corp. v. Uzan*, the Çukurova litigation, and, from the first day of trial, *United States v. Zarrab* and the related Halkbank proceedings, No. 15 Cr. 867 (S.D.N.Y.) — and I was the only Turkish journalist credentialed to cover proceedings in this District. I have also conducted interviews inside maximum-security federal institutions with special permission from the Department of Justice. During the Halkbank-related proceedings, I submitted correspondence to Judge Berman that appears in the record of that case. A selection of my coverage is listed in the appendix to this letter.

I mention this background only so the Court knows that I have spent much of my career observing proceedings in this courthouse, and that in all those years covering this District's major financial prosecutions, I never once considered writing a letter like this one. This is the first time. I do so now because both the person before the Court and, in my long observation, the character of this matter are unlike anything I have covered — and because I have known Ms. Güven's case closely, this time not only as a journalist but as a dear friend of her and her family.

I have known Ms. Güven for five years, and Envoy is, in a very real sense, what it is today because of her. She serves on our advisory board for artificial intelligence and technology, where she helps set our editorial direction on everything we publish in that field. She helped build the voice, the vision, and the core of our brand and her design shaped the voice and tone of our editions. She works with our writers day and night, giving them edits and guidance tirelessly as a best friend would. She became the technical and creative backbone we cannot operate without. And she has done all of this without compensation, from our earliest days as a non-profit, because she believed information about technology, climate and development should reach communities that do not usually get it.

I want the Court to see her the way we see her, so let me be specific. Our weekly advisory sessions at our United Nations NY office are among the memories I am most fond of in my forty years of work. There were stretches when the foundation had no money at all, and it was Gökçe who kept our spirits up.I still remember her telling us, "We are doing something for humanity here. It doesn't matter that we earn nothing — what matters is that we can bring people knowledge about climate change, development, and technology." She lived those words. I remember a publishing deadline when she was still with us at one o'clock in the morning. Our

writers loved her edits; our whole team loved having her in the room. She hosted book club evenings for our staff in the Financial District, in her own time and at her own expense.

Your Honor, when you meet her, I hope you will see what everyone instantly sees: she is special. She has an unwavering energy and curiosity that fills a room — in her words, in her smile — and people want to be around her and to work with her. She becomes your first and most loyal supporter: through thick and thin, she is there to solve problems and to push you toward your goals. That is exactly what she did for me and for Envoy. She is the kind of person you build, create, and share things with, and we do not want to lose her. We are fortunate to get to work with her, and it would be a privilege to continue working with her on everything related to design, technology, and social development, because her contribution is irreplaceable to us.

For decades, I have entered the courtrooms of this District as a journalist. This was the first time I entered one as a friend — to stand with a family I have known and supported for years, and with a young founder whose character I know firsthand. I would stand by her, and work with her, again without hesitation. I was present in the courtroom when Ms. Güven addressed the Court, and I have followed the proceedings closely. She did not make excuses. She stood up, as a young founder, and apologized. Having observed many defendants over many years in this District, I can say that genuine acceptance of responsibility is unmistakable when you see it, and I saw it in her. I also note that throughout these proceedings she has not withdrawn from the world: she has continued to work, to design, to edit, and to contribute — including to our publication — which tells me her contributions were never a performance. They are simply who she is.

I would add one final thought. Ms. Güven's entire adult life is rooted here. New York is her home: her work, her community, her colleagues, and the institutions she serves — including ours, at the United Nations — are all here. The people she teaches, mentors, and builds with are here. A sentence that allowed her to remain in New York, among the community that knows and relies on her, would allow everything I have described in this letter to continue. Her absence from this city — and from this country — would be a loss felt well beyond her own life, by our foundation and by the many people her work reaches.

I am aware that the Court must weigh many factors that are beyond my knowledge and my role, and I do not presume to address them. I ask only that Your Honor consider, alongside everything else, the person I have described: a gifted designer, engineer, and editor who has consistently used her abilities in service of others, and who I am certain will continue to do so. I respectfully ask the Court to extend her whatever leniency it deems consistent with justice, so that she may remain here, among us, and keep contributing what she has always contributed.

Thank you for your time and consideration.

Respectfully,

Razi Canikligil Founder & President, UNEMAG (non-profit 501(c)(3)) Publisher, Envoy Magazine (United Nations–affiliated) New York Correspondent, Hürriyet

# Appendix — Selected Coverage by the Author

**United States v. Reza Zarrab / United States v. Mehmet Hakan Atilla (Halkbank proceedings)**, No. 15 Cr. 867 (RMB) (S.D.N.Y.)

- "Zarrab davasında flaş gelişme," Hürriyet, Nov. 2017 — https://www.hurriyet.com.tr/gundem/zarrab-davasinda-flas-gelisme-40647900
- "Zarrab iddiaları: İran'ın paraları için Atilla yöntem buldu," Hürriyet, Nov. 30, 2017 — https://www.hurriyet.com.tr/dunya/zarrab-iddialari-iranin-paralari-icin-atilla-yontem-buldu-40662761
- "Son dakika: Atilla davası sonuçlandı... İşte ilk yorumlar," Hürriyet, Jan. 2018 (verdict-day coverage from the courtroom) — https://www.hurriyet.com.tr/dunya/son-dakika-atilla-davasi-sonuclandi-iste-ilk-yorumlar-40698902

**Motorola Credit Corp. v. Uzan**, No. 02 Civ. 666 (JSR) (S.D.N.Y.) and related Çukurova litigation

- Covered contemporaneously for Hürriyet from the courthouse (2002–2004); full reporting archive: https://www.hurriyet.com.tr/yazarlar/razi-canikligil/ and https://www.hurriyet.com.tr/haberleri/razi-canikligil

**Fethullah Gülen — Green Card proceedings and U.S. immigration file**

- "Yeşil kart kefillerinin tam listesi," Hürriyet, June 2008 (first reporting on the sponsor list) — http://www.hurriyet.com.tr/yesil-kart-kefillerinin-tam-listesi-9276671
- "ABD Göçmenlik Bürosu 2006 raporu: Dikkat edin," Hürriyet, Oct. 2016 — https://www.hurriyet.com.tr/gundem/abd-gocmenlik-burosu-2006-raporu-dikkat-edin-40243567
- Author, *ABD Gizli Belgelerinde Fethullah Gülen* (Doğan Kitap, 2016) — https://www.kitapyurdu.com/kitap/abd-gizli-belgelerinde-fethullah-gulen/404354.html
- Voice of America interview on the book — https://www.voaturkce.com/a/abd-gizli-belgelerinde-gulen/3543959.html

**Envoy Magazine / UNEMAG (United Nations–affiliated, 501(c)(3))**

- Envoy Magazine — https://envoymag.com/
- Mission and second-anniversary statement — https://envoymag.com/purpose/
- Articles by Razi Canikligil — https://envoymag.com/author/razi/
- Masthead and organization details — https://envoymag.com/contacts/

# Exhibit 20

To: Hon. Lewis A. Kaplan
United States District Judge
Southern District of New York
Daniel Patrick Moynihan
United States Courthouse
500 Pearl St
New York, NY 10007

Dear Judge Kaplan,

My name is Doruk Cinar. I live in Istanbul, Türkiye, and work across art, design, and spatial projects. I am writing to you about my best friend, Gokce.

I have known her since 2019, when we were in college. For almost seven years, she has been one of the most important people in my life. Not being able to stand beside her in the courtroom is very difficult for me. We speak almost every day, and I could not let this moment pass without trying to explain who she is to the people who know and love her.

To explain what Gokce has meant to me, I first need to be honest about myself.

I have struggled with OCD, anxiety, and panic attacks. I grew up believing that, as a man, I should keep these things to myself and continue as though nothing was wrong. Gokce is one of the very few people I have been able to speak to openly. She has never made me feel weak, dramatic, or ashamed.

There is one night from last summer that explains her character better than anything else I could write. Gokce was hosting a dinner for around fifty friends. Many people had travelled to be there. She is normally the social center of every gathering: the person making sure everyone feels included, comfortable, and looked after.

What almost no one at that dinner knew was that she was also going through an extremely difficult period in her own life. She was carrying serious concerns about her work and her future privately. Still, she welcomed everyone, smiled, and made the night feel effortless.

During the dinner, I began having a panic attack.

At that point, panic attacks were still new to me. I did not fully understand what was happening to my body. I could not speak properly or move. I was surrounded by people, but no one noticed what was happening except Gokce.

She saw me from across the room and immediately understood that something was wrong. She also understood something that was harder to see: I was ashamed and did not want anyone to notice.

She did not create a scene. She did not announce what was happening or make me the center of attention. She came over quietly, helped me leave without drawing attention, put me in her car, and drove me directly to the emergency room.

When I could not explain what I was feeling, she spoke to the doctors for me. She called her mother, who is a physician, and kept her involved so that nothing would be overlooked. While I sat there frozen and terrified, Gokce held my hand and spoke to me in the same calm voice for hours.

She did not repeatedly tell me to calm down. She did something much more valuable: she stayed.

Near the morning, when I was finally able to sleep, she lay down on the empty hospital bed beside mine instead of going home. I still have a photograph from that night. She is asleep on the bed next to me, with her hand turned toward mine.

She had left her own dinner, her guests, and her entire night behind. Yet she never mentioned what she had given up. She never allowed me to feel that I had ruined anything or become a burden.

After I was discharged, she did not want me to return home and be alone. She took me to her family's house, where I stayed for a period while I began to feel stable again. There were meals at the table, her mother quietly keeping an eye on my health, and someone checking every morning that I had got out of bed and seen the daylight.

They helped me return to myself one day at a time. Gokce treated all of this as though it were the most natural thing in the world.

Your Honor, I genuinely do not know how I would have made it through that period without her. It was one of the most frightening times of my life, and she carried me through it while she was struggling herself. Not once did she make me feel that helping me was an obligation.

Her support did not end when I left the hospital.

She encouraged me to return to therapy and to take what I was experiencing seriously. She calls me, FaceTimes me, checks whether I have left the house, and sends me poems, books, and small pieces of motivation at exactly the moments I seem to need them. She does this while managing her own life and running a company. I honestly do not understand how she finds the time. She simply makes it.

There is another side of Gokce that may never appear in a court filing, but it is important to understanding her: she paints.

She creates small worlds filled with characters, her sunflower girl, her trampoline seal, her purple dancers, and her flutewoman. She gives each of them a personality and a story. She does not simply paint an image; she imagines where these characters have come from, what they are feeling, and where they are going.

Her mind is restless, playful, and incredibly generous.

When this case began, at a time when many people would have withdrawn completely, she continued creating. In fact, she painted more. As her own world became frightening and uncertain, she built new ones on paper and shared them with me.

To me, those paintings always seemed to carry the same message: there is still color here; keep going.

After leaving the gallery where I had worked for 3 years as a Director, I went through a period of uncertainty. I often questioned where I belonged and what I was supposed to build next. Gokce has always had a way of making possibilities feel endless rather than frightening.

Before she travelled to the United States in November, we visited a museum together. I was almost an hour late to breakfast. When I arrived, she was sitting alone in the restaurant, reading Epictetus's *Enchiridion*. She looked up, smiled, and was not angry with me at all. That is one of the clearest images I have of her.

Later, at the museum, she turned to me and said, "You should create a place like this. I am here for you. Let's plan it."

Then we ate ice cream and börek and laughed as though the world were simple.

That is who she is. Even when her own life is uncertain, she creates a sense of possibility for the people around her.

I also want you to understand what this case has done to her. She would never explain it herself or ask anyone to feel sorry for her. I have seen how exhausted, frightened, and deeply affected she has been. At the beginning of the case, I was terrified of losing my friend and began spiraling again.

Even under pressure that I believe would have broken many people, she did not forget me. She continued calling, checking on me, and showing up. I want to end with one final memory.

Last summer, shortly after the hospital night, we were swimming together in the Aegean Sea near Bodrum. We floated on our backs, held hands in the water, and looked at the sky.

Gokce said, "Everything will be great. The sky is infinite."

We were both carrying more than we admitted at the time. We promised each other that the following year we would return to the same place, hold hands in the sea again, and that life would be better.

Your Honor, you are reading this letter close to the time when that promise was supposed to be kept. I respectfully ask you to show Gokce leniency and to leave room for that future.

Gokce has carried many people through their darkest periods. I have been one of them. When I was frightened, ashamed, and unable to find my way, she found me without ever making me feel lost.

I ask you to see her as those of us who know her see her: as a deeply good, deeply loyal, creative, and compassionate person who deserves the opportunity to continue being that person in the lives of the people who love and depend on her.

Thank you for taking the time to read my words.

With respect and sincerity

Doruk Cinar
Teşvikiye mahallesi, Poyracik sokak 37/6 sisli,Istanbul/Turkey
dorukcinarr@gmail.com
+905356807366

# Exhibit 21

Tutku Cinkilic
92 Redchurch St.
E2 7GP, London, UK
cinkilictutku@gmail.com
+44 7391 133 002

Date: 15/07/2026

To: Hon. Lewis A. Kaplan
United States District Judge
Southern District of New York
Daniel Patrick Moynihan
United States Courthouse
500 Pearl St
New York, NY 10007

Dear Judge Kaplan,

My name is Tutku Cinkilic. I am a data consultant living in London, and I am writing in support of Gokce Guven, whom I have known for more than fifteen years, since she was twelve years old. I know that my friend has pleaded guilty to a federal offense and that Your Honor will decide her sentence. I want to tell you about the person I have known for all these years.

I met Gokce through her older sister, Gonca, who has been my closest friend since boarding school. We are all from Adana, Türkiye, and although Gokce attended a different boarding school, we spent every summer together back home when we returned from Istanbul. I have had the privilege of watching Gokce grow from a young girl into the woman she is today.

The Gokce I first knew was a curly-haired kid in outfits far too serious for her age, holding breath-holding contests with me in the pool while Gonca was sunbathing, and making Turkish coffee for Gonca and me because she was the younger one. As someone with no sister of my own, I would watch the two of them argue and stare in shock, then see them completely fine a minute later. Over the years I got used to it, learned to play Switzerland, and became something like the third sister, sharing outfits, meals, and everything in between.

Even then, Gokce was quietly going further than anyone expected. While still at school she found herself an office internship, then a summer research internship at Stanford. These were opportunities nobody around her knew existed, let alone how to get, and she found them entirely on her own, before Gonca and I at university had managed anything like it. She also volunteered for Girls in the Field, a programme empowering girls to play football, which in Türkiye is very much treated as a boys' sport. I watched her pour herself into it without fully understanding what it was at first; she worked so hard on it that I assumed it was a school project. I was proud, and honestly surprised, when I realised she was doing all of this voluntarily, on the side of her schoolwork, her internships, and her university applications,

while Gonca, Defne (our 4th one) and I were mostly there being a distraction. Nobody asked her to and nobody paid her.

It was not the first time I saw her go above and beyond for people other than her, entirely voluntarily, and that is the pattern I have watched for fifteen years. On holidays together I would try to talk her into taking a single full day off; she would bring her laptop to everywhere, spend time with us, then quietly return to her work, because she felt responsible for what she was building and for the people relying on her.

Over the years, my relationship with Gokce has grown into a relationship with her entire family. I have spent many summers in their home and have been welcomed with warmth and generosity, through countless meals and conversations with their mother, their grandmother, and their sassy dog. Their mother cooked vegan meals just for me and sewed my dresses to make them more "appropriate." Some of my fondest memories are the ordinary ones: coming home after evenings out when we were younger and finding their grandmother waiting up to make sure we had arrived safely. And their care has never been only in small things. Last year, when I needed surgery for a potentially serious cyst, Gokce's mother, who is a doctor, did everything she could to get me seen as quickly as possible, and followed my case afterwards as if I were her own daughter. This is the family that raised Gokce, and she carries their values. I know her not just through her accomplishments but as a daughter, a sister, and a friend.

Watching this caring family go through this period, and the stress it has placed on them, has been one of the hardest things I have had to witness. Living in London means I cannot be physically present as often as I would like, but the four of us, Gokce, Gonca, Defne, and I, have remained closely connected through regular calls and messages and the WhatsApp group we have kept running for thirteen years. I have seen how much this experience has affected the people I care about, and I have seen how heavily Gokce herself carries it. I have also seen her continue to face each day with the same determination she has always had.

In all the years I have known her, from a twelve-year-old girl to the woman she is today, I have known Gokce to be honest, responsible, generous, and truly like a sister. The conduct in this case is entirely inconsistent with the person I have watched grow up.

I feel incredibly lucky to have Gokce, Gonca and their family in my life, and I will continue to be part of her support system after sentencing, as I have been through fifteen years of calls, messages, and summers together. I have no doubt she will lead a law-abiding and productive life; building things and taking responsibility for others is what she has done since she was a child.

I kindly ask you to show Gokce leniency and mercy when imposing her sentence. Thank you for your consideration.

Respectfully,
Tutku Cinkilic



# Exhibit 22

Ali Baba
MEDITERRANEAN
CUISINE

Dear Judge Kaplan,

My name is Ali Riza Dogan. My wife owns Ali Baba Mediterranean & Turkish Cuisine on East 53rd Street in Manhattan, and it is our family restaurant. Although the restaurant is my wife's business, my name is part of the name "Ali Baba." "Ali" is my name, and "Baba" means "father" in Turkish. Our restaurant represents our family and the life that my family and I have built together.

I came to the United States with very little. When I first arrived, I did not speak English, I had nowhere to go, and I knew no one. I spent my first night in America sleeping in the entrance of a building because I had nowhere else to stay. I have never forgotten that experience. It shaped who I am and is one of the reasons I have always tried to help people who are struggling or in difficult circumstances.

I am writing this letter on behalf of Ms. Gokce Guven. I understand that she has pleaded guilty to a federal offense, and I have the utmost respect for this Court and for the decision Your Honor will make. I believe that justice is ultimately on the side of what is right and fair. My purpose in writing is simply to share my personal experience with Gokce and what I have personally witnessed over nearly the past four years.

For almost four years, I have known Gokce and have personally witnessed her character, her compassion, and her dedication to helping others.

Every Wednesday, our family restaurant prepares and distributes hot meals to people experiencing homelessness and others in need in New York City. We believe that one meal means one person. This idea — "One Meal, One Plate" — was Gokce's idea. She believed that every plate of food represents a person who deserves to be seen, respected, and treated with dignity.

Gokce has volunteered with us almost every Wednesday. She never did this because she wanted recognition or publicity. In fact, she often did not want to be photographed. She simply wanted to help people.

What I have seen from Gokce goes far beyond handing someone a plate of food. She sits with people, talks to them, listens to their stories, and treats them with respect. She remembers people and their situations. She has helped people prepare resumes, look for jobs, and encouraged businesses, including our restaurant, to give people an opportunity to work and rebuild their lives.

I have personally seen people who once came to us for a meal eventually find employment. Gokce played an important role in encouraging and helping them.

She has also given her professional time and skills to help our charitable work. She helped develop our charitable foundation, created our website, and helped develop the vision behind our "One Meal, One Plate" campaign. She did these things without asking us for payment.

Even while dealing with her own legal situation, Gokce continued to show up and help others. I remember her asking me, "Baba, what more can we do?" That question says a great deal about the kind of person I have come to know.

Your Honor, I personally believe that Gokce is a good person who has always shown compassion toward others. I believe in her heart and in the person I have personally known and witnessed over these past years.

As a show of our support for Gokce, I want the Court to know that our restaurant and our family are willing to keep employment opportunities open to her. If she needs an opportunity to work, our doors are open to her.

If there is anything else I can do to help Gokce, I am more than willing to do so. If Your Honor has any questions for me or would like any additional information about my personal experience with Gokce, I would be honored to provide it.

Thank you, Your Honor, for your time and consideration.

Respectfully submitted,

Ali Riza Dogan

Ali Baba Mediterranean & Turkish Cuisine

224 East 53rd Street

New York, NY 10022

# Exhibit 23

PARiBU

September 8, 2026

The Honorable Lewis A. Kaplan

United States District Judge

Southern District of New York

500 Pearl Street

New York, NY 10007

Dear Judge Kaplan,

My name is Utku Dördüncü. I am the Strategy Director at Paribu, one of Turkey's largest cryptocurrency exchanges. In August 2022, at the time of our investment, I was the Director of Paribu Ventures, Paribu's venture investment arm, where I led our investments in more than 20 startups and scaleups. Judging founders is the core of that work, and it is in that capacity that I write to you about Gökçe Güven.

I am aware that Gökçe has pleaded in this case and accepted responsibility for her conduct. I do not write to excuse it or to argue with anything. I write because I knew Kalder and Gökçe Güven from the inside, as both an investor and a business partner, and I can offer a firsthand view.

Paribu Ventures invested $150,000 in Kalder's seed round in August 2022, after a real evaluation process, alongside institutional investors including Emergence Capital Partners and 8VC. We reviewed the product, traction, market, and team, and recorded our findings in an internal memo that described Kalder as *"an application with significant potential and a quality team."* The same memo listed the weaknesses we saw: long B2B sales cycles and dependence on new technology adoption. We invest at the earliest stage, where most companies fail, and we priced that risk fully.

What convinced us, more than any metric, was Gökçe herself. Her track record was real and verifiable: a graduate of Robert College, Turkey's most selective high school, admitted only at the very top of a nationwide exam; an early team member at OpenSea; consumer crypto products at Celo and Robinhood Crypto; and work with premium brands. That path is not possible without hard work and perseverance from a young age. In our meetings she was full of energy, and mature beyond her years and incredibly hard working. At the earliest stage we invest mostly in the team and the idea, and Gökçe checked those boxes.

My knowledge did not stop at the investment. Paribu worked with Kalder as a partner: we explored building fan token and ticketing applications with PRB Chain, and we used Kalder's product internally, including building quizzes for PRB Chain fan tokens. My teams worked directly with Kalder's engineering and product teams as they iterated. What I saw was a real product, built by a real team.

More important to me is what I saw when things fell apart. Gökçe spent months working to sell the company's assets so that investors could recover money, and she never asked me for anything. She prioritized the company, the team, and the investors, and took the biggest financial, reputational, and emotional hit herself.

Years of early-stage investing have taught me to separate the fate of a company from the character of its founder. Knowing everything I know today, including everything that came out in this case, I would invest in Gökçe's next venture. I do not say that lightly: across more than 20 investments, she is one of very few founders about whom I would say it after an outcome like this.

UD

PARiBU

In the Turkish technology community, Gökçe's path meant something: a young woman from Adana who went to the US and raised venture capital at twenty-two was a story that reached founders who had never met her. I have watched her carry that visibility, then its collapse, and keep working. In my experience, that is what genuine character looks like.

I respectfully ask that Your Honor consider these firsthand observations, and Gökçe's capacity to keep contributing to the technology community in both of our countries, in determining her sentence. I am available if further information would be helpful.

Respectfully,

Utku Dördüncü
Strategy Director, Paribu · utku.dorduncu@paribu.com / +905335274545

# Exhibit 24

The Honorable Lewis A. Kaplan United States District Judge Southern District of New York

Dear Judge Kaplan,

My name is Can Gizer. I am a Warehouse Operations Leader at Procter & Gamble in Türkiye, where I have worked for the past four years, first in customer planning and now leading warehouse operations. I studied industrial engineering at Boğaziçi University. Before that, I was a student at Robert College in Istanbul, and that is where I met Gökçe, when we were both thirteen years old. She has been my friend ever since, more than half of my life. I know she has pled guilty and accepted responsibility for what she did, and I am not writing to argue about any of that. I am writing because after thirteen years I know who she is, and I do not think you can sentence a person fairly without someone telling you what those thirteen years actually looked like.

I want to tell you first about the place we came from, because I think it explains something about who Gökçe is. Robert College is the oldest American school outside the United States, founded in 1863, and it is one of the hardest schools in Turkey to enter. Children across the entire country sit a national examination, and only a few hundred of the very highest scorers are admitted each year. It is the school that has produced Turkey's prime ministers, its Nobel laureate in literature, its scientists, its business founders. When your child gets into Robert College, it is the proudest day a Turkish family has. I say this not to boast, but so you understand the room Gökçe and I grew up in: it was full of the most driven, most capable teenagers in the country, children who had already been told their whole lives that they were the ones expected to lead. That is a room where ego runs high and warmth runs thin. And in that room, Gökçe was the person everyone loved, not because she was the most impressive, though she was near the top of any list, but because she was the kindest and the most genuinely herself.

The first time I really noticed her was at a party during those early Robert College years, when everyone was buried in exams and applications. I remember it clearly because you could not miss her. She had this Adana energy, the warmth of the south of Turkey, and she was dressed in every color at once, which I would learn is simply how she dresses, because whatever is inside her shows on the outside. You could see the brightness in her before she even spoke. Most of us at that age were trying to look serious and impressive, the way ambitious teenagers at a school like ours do. Gökçe was just fully, loudly herself, and everyone gravitated toward her.

My funniest memories from those years are all with her. My friend Arda and I loved to tease her, constantly, mercilessly, the way you only tease someone you love. She never once took offense. She loved it. She gave it right back. That may sound like a small thing to put in a letter to a federal judge, but I have thought about why it stayed with me, and I think it is this: people who need to be seen a certain way cannot be teased. Gökçe never needed that. She was secure and warm and completely without pretension, and she has stayed that way for thirteen years, through everything she went on to accomplish.

She also had a habit that shaped my whole social life: every time she made a new friend, she introduced them to me, and I did the same with her. Half the people in my life today I know because Gökçe decided we should meet. She has never treated friendship as something to keep. She multiplies it.

During our years together in high school and later in life, she was beside through all the problems regardless how small they seemed. I remember whenever I had problems within my family, relationships or academic/professional life, I can find couple of ears that is ready to listen and a compassionate heart. She was there to listen when my parents were being separated, or I had problems with my girlfriend. I knew I can find solace when talking to her, and she was there to care for me selflessly. Her personality and her actions has led us to not only be friends and made us part of a shared family even. Time and time again I have met with her sister and her mother, and vice versa.

Then there is the tradition my family will not let go of. Years ago, my sister, Gökçe, and I went to see a John Wick movie together. It became a ritual. Every installment, the three of us, together. My family loves her; when she comes over, she is not a guest, she is one of us. I want you to understand that in Turkey, being folded into someone's family like that is not casual. It happens when a person has proven, over years, that they are good.

When Gökçe went to America for school, I worried our friendship would fade the way most teenage friendships do across an ocean. The opposite happened. Every single time she came back to Turkey, we met, without exception, and every time I was stunned by how much she had grown. We are the same age, but honestly, some of our friends are exactly the same people they were in high school. Gökçe would come back each year as if she had lived ten years in one. New ideas, new adventures, new things she had learned and could not wait to tell me about. Talking to her was like reading a book that never ends. And through all of that growth, the core never changed: the colors, the energy, the optimism, the girl from the party.

I also watched, from Turkey, what she was doing over there, and I want to say plainly what that meant to us. Robert College sends its graduates out to accomplish things, that is the whole point of the place, but even by that standard Gökçe stood apart. At around eighteen years old she was interning at Celo, Robinhood, OpenSea, doing research in crypto and financial technology, in rooms where there were almost no Turks and very few young women. For my generation here, she was proof that one of us could do it. She went to the best schools, worked at the best companies, and represented our country with real success. She was a role model for me and for our whole circle of friends, and I do not use that phrase lightly. She still is.

Which brings me to why I am really writing. I have known Gökçe since she was thirteen. The conduct she has taken responsibility for is inconsistent with every single thing I have seen from her across those thirteen years. If her life is a hundred parts, I have witnessed the other ninety-nine: the loyalty, the generosity, the work, the honesty in how she treats the people around her. I am asking you to sentence the whole person, not only the one part, because the whole person is someone I would trust with anything I have. Even now she remains positive, still shows up for me , still asks about my family, and that I have seen how heavily this weighs on her.

Whatever happens, I will be by her side, and so will my family. She will always have us in Turkey. I know exactly what will happen the next time she lands in Istanbul: she will come straight to meet me in Suadiye and she will tell me about everything, the whole journey, like Phileas Fogg back from around the world in eighty days. She has done that after every chapter of her life, and I know she will do it after this one, wiser again, ten more years lived in one.

I respectfully ask for your leniency and mercy for my friend. She has so much good left to give, and there are many of us, on the other side of the world, counting on the chance to keep receiving it.

Thank you for taking the time to read this.

Can Gizer

+90 532 446 35 96

# Exhibit 25

July 20, 2026

United States District Judge Southern District of New York

The Honorable Lewis A. Kaplan

Dear Judge Kaplan,

My name is Süleyman Güneş. For 15 years I worked at Adana Seyhan State Hospital, a public hospital in Adana, Turkey, as secretary to Dr. Fadime Baybogan, a neurologist. She is Gökçe Güven's mother. I am now retired and I earn my living driving a taxi. I have known Gökçe since she was a small girl. I know that she has pleaded guilty in this case and that Your Honor will decide her sentence. There are things about Gökçe that I believe only I saw that Your Honor should know about before deciding her future – because for years I was the one driving her, and a man sees a child's true character from the front seat of a car.

Dr. Fadime raised Gökçe as a single mother while working as a doctor in a crowded public hospital. There were not enough hands. When Gökçe needed to be taken to her riding lessons and there was no one to take her, I volunteered. For years I carried that girl to her classes and to the stable and back. I did not do it as a duty. I did it because of what I saw when I got there.

Gökçe trained in showjumping at Adana Atlıspor Kulübü under Dilan Evtimov, a Bulgarian trainer, and a very strict one. In eighth grade, the year of the high school entrance exam, when every family in Turkey locks their child in a room with books, Gökçe still trained every single day. I would wait for her, and I want the Court to know what I watched from that car. She trained until she could barely walk back to me. I could see from her steps how finished her body was. And still, before she would let me drive her home, she washed her horse, fed it, and cleaned the stable with her own hands. Thirteen years old. Nobody made her do this. The trainer demanded discipline, but the girl demanded more from herself than anyone demanded from her. Then she would sit in my car and open her exam books.

That discipline was rewarded. Gökçe won the Adana Atatürk Mediterranean Cup – the Star of Adana. I attach the newspaper from that day, because it was a beautiful moment for all of us who had watched her earn it hour by hour. The newspaper wrote that she was the star of Adana, and it was true. And I will tell you something else I saw from the front seat: the horses were not only sport for her. They were her medicine. A girl growing up without a father figure, with a mother who carried everything alone, and this was where she became calm, patient, and strong. I watched it settle her, week after week, year after year.

Then came the injury. It was a serious one, and she had to quit the sport completely. For a child who had given every day of herself to something, this was a heavy loss, and I saw her through that too. She did not become bitter. She put the same discipline into her studies, and that discipline carried her to America. But I have always believed a piece of her stayed at that stable.

Your Honor, I tell you about the stable because everything I have seen from Gökçe since then is the same girl. About fifteen years ago, Dr. Fadime began quietly supporting my family. When Gökçe and her sister grew up and began to earn, they took this duty from their mother onto themselves, and to this day they send support every month, without being asked and without

missing. My wife does not work and I was the only earner in our home, and because of this family, all four of my children went to university. That is not a small thing for a taxi driver's family; it is everything. And when Gökçe's troubles began in America, the support did not stop for a single month. The girl who washed her own horse when she was too tired to walk is the woman who carried my family while her own life was falling.

One more thing, told against myself. One day I became angry with my daughter for wearing a short skirt and stopped speaking to her. I was wrong. Gökçe said to me: "Then you should not have sent her to school. What do you want her to do, hide the skirt in her bag and wear it in secret? Let her be the woman she wants to be and be proud of her." Then she and her mother enabled me to convince my daughter to talk to me and come back home. That day I understood how to treat my own daughters. She did not only help educate my children; she taught their father something.

Your Honor, you are deciding the future of a person I watched grow from the front seat of a car, and I know what heals her, because I saw it every day for years: work she can pour herself into, and sport. Discipline is not a punishment for Gökçe; it is her nature and her medicine. She is a good gem of a person, and she is already giving, quietly, the way she has since she was a girl. Whatever road lies ahead of her, I hope it is one that lets her return to the things that made her, because I have seen with my own eyes what she becomes when she is near them.

In her hardest days, after her troubles began, Gökçe did not quit on herself. She began visiting horses again. When I heard this, I understood it immediately, because I had watched it from the front seat for years: the sport and the animals are her rehabilitation. That is where she repairs herself, and she comes back from that place stronger and better every time. So I will allow myself one request, from an old driver who watched a thirteen-year-old girl become the star of Adana: let her stay close to the horses and the discipline that made her. She is already giving quietly the way she has since she was a girl, and I believe with all my heart that if she is allowed to return to what made her, you will see that star again.

I gain nothing from this letter. This family has done more for mine than I could repay in a lifetime. I hope you can help me show this support to this family that has always supported me by seeing the starlight in her and giving her the future she deserves. This family is special and deserves the best, and I wish I could do more to show that. I hope you see the star I see.

Respectfully,

Süleyman Güneş

Taxi Driver, Adana



SÜPER SPOR

# Şov yaptılar

**Akdeniz Oyunları için yenilenen Adana Atlıspor Kulübü Binicilik Tesisleri kapılarını Gençlik ve Spor Bakanlığı Kupası Binicilik Engel Atlama Yarışmaları için açtı.**

Gençlik ve Spor Bakanlığı, Adana Valiliği, Büyükşehir Belediyesi gibi önemli yarışmalara ev sahipliği yapan Adana Atlıspor Kulübü, yeni yüzü ile büyük beğeni kazandı.

Türkiye Binicilik Federasyonu Başkanı Tunç Çapa, Adana tesislerinin Avrupa'nın en iyileri arasında yer aldığını belirterek "Özellikle doğal konumu ve yeşil ortamı ile benim için Avrupa'nın en iyisi burası. Binicilik için gerekli her şey var burada. Gençlik ve Spor Bakanlığımız Türkiye'nin en iyi tesisini yaptı. 2 gün süren müsabakalarda da yarışmacılarımız çok güzel mücadele verdiler" dedi.

Renkli görüntülere sahne olan yarışmalarda sporcularda birbirlerine üstünlük sağlamak için manejde olağanüstü mücadele verdi.

ADANA/DHA

## ADANA BÜYÜKŞEHIR BELEDIYE BAŞKANLIĞI KUPASINI KIZILKAPLAN KAZANDI

Atlıspor Kulübünde halka açık ve ücretsiz olan yarışmaların ilk gününün 3. bölümünde gerçekleştirilen Adana Atlı Spor Kulübü Kupası yarışmasını 80 ve 100 santimetrelik Kategorisini Adana Atlı Spor Kulübü'nden Zeynep Kavi ile Başkent Spor Kulübünden Taha Vedikardeş kazandı.

Ödüllerini Atlı Spor Kulübü Başkanı Namık Kemal Güngören ile Gençlik Hizmetleri ve Spor İl Müdür Fazıl Bayram Hadi verdi.

Günün ikinci yarışında Adana Büyükşehir Belediye Başkanlığı Kupası'nı Başkent Binicilik Kulübünden Kaan Kızılkaplan kazandı. Ödülünü Büyükşehir Belediye Başkan Vekili Zihni Aldırmaz ve Türkiye Binicilik Federasyonu Başkanı Tunç Çapa verdi.

Günün son yarışı olan Türkiye Amatör Spor Kulüpleri Konfederasyonu Kupası'nı Başkent Binicilik Kulübü sporcusu Ömer Çetin kazandı. Ödülünü Adana Amatör Spor Kulüpleri Federasyonu Başkanı Ali Güleri tarafından verdi.

Bu arada, bugün saat 15'de yapılacak Valilik Kupası ile Gençlik ve Spor Bakanlığı Kupası engel atlama yarışmalarına Spor Bakanı Suat Kılıç'ın da katılacağı öğrenildi.

Binicilik Federas…
biniciliğin takvimde…

Kaprisle…

…piyonlar Vali'nin huzurunda

3YIL GARANTİ

...r Bakanlığı Kupası Bi-
na Yarışmaları için açtı.



## ADANA BÜYÜKŞEHİR BELEDİYE BAŞKA

Atlıspor Kulübünde halka açık ve ücretsiz olan yarışmaların ilk gününün 3. bölümünde gerçekleştirilen Adana Atlı Spor Kulübü Kupalı yarışmasını 80 ve 100 santimetrelik Kategorisini Adana Atlı Spor Kulübü'nden Zeynep Kavi ile Başkent Spor Kulübünden Taha Yedikardeş kazandı.

Ödüllerini Atlı Spor Kulübü Bakanı Namık Kemal



# Exhibit 26

Hon. Lewis A. Kaplan
United States District Judge
Southern District of New York
Daniel Patrick Moynihan
United States Courthouse
500 Pearl St
New York, NY 10007

Dear Judge Kaplan:

My name is Nazli Gungor. I am writing as a close friend and a colleague of Gokce, whom I have known for nearly thirteen years. We met in 2013, when she was fourteen years old and moved into the dormitory at Robert College in Istanbul, where we attended high school together.

Even as a teenager, Gokce stood out. She was intellectually curious about everything, driven, and endlessly entrepreneurial. She was deeply involved in more student organizations and initiatives than I can list, including Kizlar Sahada, the RC Debate Society, and our school's soccer team, and she was recognized with a social entrepreneurship award upon graduating from our school.

Over the years, our friendship continued across cities and continents. When we were both studying abroad in London, we went together to readings and signings by Turkish authors. Later, we shared dinners in San Francisco during the early years of her company, Kalder. She is one of the people with the strongest grit I have ever known, and she has always inspired me to keep learning and to expand my horizons. The obstacles she overcame to build Kalder were an inspiration to everyone around her.

When I moved to New York in 2023, I had the chance to spend much more time with her. She welcomed me to the city, introduced me to her family and friends, and showed the deep empathy that has always defined her. In September 2025, as I was transitioning out of my role at Puzzle, I joined Kalder as a product manager. Working alongside Gokce became one of the most rewarding experiences of my career. She built a team that genuinely loved the work. Under her leadership I learned constantly, met people I never imagined meeting, and regained my confidence. I believe it says a great deal about her character that our entire team chose to stay together through very difficult months continuing to work, at times without full pay, to serve our customers and that those customers stood by us as well. People do not show that kind of loyalty to someone unless she has earned it.

This has been an extraordinarily hard period for Gokce, yet she has continued to show up for her family, her friends, and her colleagues, and she has never lost hope. She is truly an exceptional person, and being able to call her a friend, a colleague, and my boss has been one of the great honors of my life. I am confident that she is committed to leading a law-abiding and productive life going forward, that she has a great deal to offer, and that she will continue to be a positive

force for the people around her. I intend to remain a close part of her support system, just as she has always been part of mine.

I respectfully ask Your Honor to show leniency and mercy to Gokce when imposing sentence, and to consider the positive impact she has had on so many people through her character and her work.

Thank you for considering this letter.

Respectfully,

Nazli Gungor

# Exhibit 27

Dear Judge Kaplan,

My name is Gonca Güven. I am Gökçe Güven's older sister. I work as a consultant at Bain & Company and I just finished my MBA at Columbia Business School. Twenty-seven years ago I was in the room in İzmir when Gökçe opened her eyes for the first time, and I have been beside her nearly every day since — the same house, the same dormitories, and for the past two years, the same small studio apartment in New York, where we share not just a home but literally the same bed. No one alive has watched my sister more closely than I have. That is the only qualification I bring to this letter, and I believe it is the one that matters.

We were raised in Adana by a single mother. Our father was not part of our lives. Our mother worked and studied at the same time to keep us afloat; our grandmother and our uncles helped raise us. Because of this, Gökçe never really had a childhood in the ordinary sense — she had to become an adult almost immediately, and she did it by building things. When she was 13 she scored first in the entire nation among more than a million students on Turkey's high school entrance exam — a perfect score, not a single mistake — and her face went up on billboards in Adana as an example for young girls. Our city talks about her that way to this day. She was able to attend the best high school in country where previous presidents, nobel prize winners, self made billionaires, CEOs attended. She has been working since she was in high school. At fifteen, she found the founder of an e-commerce startup called Lidyana on LinkedIn, sent him a message cold, and talked her way into her first internship. Fifteen years old. She was a Mediterranean champion athlete that same year in equestrian, winning the Atatürk Cup, and when an injury ended it, she did not sulk for even a season — she took up soccer, and then turned the soccer into a nonprofit called Girls on the Field so that other girls in our city could play. Who does all of that at that age? My sister does. It is the only speed she has ever had.

She has now spent most of of her life here in US. She went to UC Berkeley earned scholarships, spent her whole life building a network in venture capital and startup world. Her education is here, her work is here, everything she has ever built is here. When she talks about America, she does not talk about it the way an immigrant talks about a host country. She talks about it the way you talk about the place that made you. I need Your Honor to understand this, because it is the frame around everything that has happened to her since.

I want to be honest that I am not a starry-eyed sibling writing on instinct. I placed in the top 200 in Turkey's national university exam among 2 million students. I have interned in venture capital and in banking, I work at Bain, and through my sister's world I have sat across the table from a great many founders. I also worked at Kalder from its very first day, when Gökçe started it at twenty-one — I watched her convince friends and classmates to work beside her for nothing, simply because being near her made you want to build too. She was, and still is, magnetic. But here is what I actually want the Court to know, because I lived inside her finances as her roommate and her sister: Gökçe always took the lowest salary in her own company. She took it last, and she cut it first. For years she leaned on our mother so the company would not have to lean on her. When she flew to Las Vegas for an industry conference — at a time when the company had money in the bank — she flew Spirit Airlines and slept on the couch in a friend's hotel room. She brought her laptop to family dinners. She arrived late and left early from every trip home to Adana. She worked through the week our great-uncle passed. We begged her, for years, to put herself first, and she never learned how. I used to tell her that was her greatest flaw.

I have not changed my mind. This success did not come from nothing it came with a lot of sacrifices.

Now I want to tell you what I see today, because I am the only person on earth who sees all of it. My sister built an identity, brick by brick, from the age of thirteen— the billboard girl, the founder, the mentor. In the space of a year, all of it came down. The company she raised like a child of her own is gone. The name she spent fifteen years building is gone; people who once stopped her on the street to thank her now look at her as if she is contaminated. The media about the case was very distorted from reality and made her seem like a thief. Now we are about to lose the apartment we share. And at night — no one knows this but me — she wakes up screaming. [redacted] She cries out that they are coming to take her. She cries out that she could be sent away from this country — the place she calls home. She says, in her sleep, "I am nobody now." I hold her until she goes back down. I am telling Your Honor this not for pity, but because I need you to see what I see every morning after those nights: at six o'clock, rain or shine, she gets up, gets dressed, and goes to work. And what does her work look like now, when there is no company, no salary, no applause, no outcome to chase? She started writing a book. She taught herself new tools and is quietly building again — she goes out to construction sites and sits with contractors to learn their problems, the same way she cold-messaged a founder at fifteen. When money ran short, she took out a personal loan and paid her team out of her own pocket so that not one of them would lose their job. In these same months I have watched her build a website for a nonprofit, for free, and design an entire system for a friend's struggling startup, for free. She does not announce any of it. There is only one moment when my sister smiles without thinking anymore, and it is when she is showing me something she has made for someone else. Everyone who is in her life can attest to this. She is not waiting for this case to end to become useful. She never stopped.

And through all of it, she is the one carrying us. Since this began, my mother and I have had trouble sleeping, sometimes trouble leaving the house — and it is Gökçe, whose case this is, who takes me on walks, who says "let's get to work," who put *The Forty Rules of Love* in my hands because she thought Rumi's world would soften what I was carrying. She keeps repeating one line of Rumi to me: "The wound is the place where the light enters you." I confess to Your Honor that some days I am jealous my little sister is this strong. Most days I am simply in awe. Our family is intact and standing today because of her. She was this way long before there was anything to lose. Through Berkeley and her venture fellowships at Kleiner Perkins and Accel, she mentored young women founders and engineers — so many that strangers used to stop her on the street to thank her for a blog post, or for help she had forgotten ever giving. At sixteen, after reading a business book, she told me: "When I die, I want people to say her products are still used by millions, changing their lives daily." Sixteen. In twenty-seven years, I have never once heard my sister say she wanted to be rich.

I am begging you, as the person who has known her since her first breath, to show her mercy — and to leave her the chance to keep being who she has been since she was a little girl in Adana. She will not waste it. I would stake everything I am on that.

Respectfully,
Gonca Güven
70 Pine Street +19174706279 goncaguven1@gmail.com



# Exhibit 28

Kabiru Haruna

42 Road 9 Temidire Eleweran Ile-Ife, Osun Nigeria
hrnkabir@gmail.com
13/07/2026

Hon. Lewis A. Kaplan
United States District Judge
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl St
New York, NY 10007

Dear Judge Kaplan:

My name is Kabiru Haruna. I am writing in support of Gokce Guven, whom I have known for 9 months. I worked with her at Kalder as a senior frontend engineer, where I worked on her team day to day. I am aware of the charges to which she has pleaded, and I write with that knowledge.

What has stayed with me most is something I saw during a difficult stretch of our time working together. When the company hit hard times, Gokce didn't hide it from us or leave us guessing she was straightforward with the team about where things stood. And rather than delay salaries or let the burden fall on the people who worked for her, she paid her employees out of her own pocket. She was carrying more pressure than anyone at the time, and her first instinct was still to protect the people who depended on her. That is not something a person does for appearances. It told me more about her character than anything she ever said.

That is who she was to the people around her in the time we worked together: someone who absorbed hardship herself before letting it reach the people with less power than her.

I would gladly work with Gokce again, and I intend to remain part of her professional and personal support system going forward. Based on everything I have seen of how she treats people and carries responsibility, I am confident she is committed to leading a law-abiding life and that she has a great deal still to offer.

I respectfully ask that you show her leniency and mercy when imposing sentences.

Sincerely,
Kabiru Haruna



# Exhibit 29

Frazier Horn
20 Pine Street, Apt. 514
New York, NY 10005

August 14, 2026

Re: Gokce Guven

Dear Honorable Judge Kaplan:

Have you ever met someone and thought, almost immediately, “I want to be like them”? My mother used to tell me growing up, “You are who you surround yourself with.” In many ways, that belief is part of why I left Louisiana. I wanted to surround myself with people who were building lives that, from where I stood, seemed almost impossible.

Gokce was one of those people. When I first met her, I wanted to be like her. Years later, I sat in your courtroom and watched her plead guilty. And I had to ask myself a much harder question: *Do I still?*

I do.

I know how that sounds. I do not mean that I admire the decisions that brought Gokce before this Court. I do not. What she did was serious, and she has admitted it. I mean that after watching the company, the reputation, the success, and so much of what originally impressed me about her fall away, I got to see what was underneath all of it. In a different and much deeper way, I still want to be like that person.

I also know there is very little I can say about second chances that this Court has not heard before. You have probably read every version of the letter that says a person is more than the worst thing they have done. So I am not going to try to persuade you with a list of adjectives about Gokce. What I can tell you is something only I can tell you: what she did to the course of my life, what I watched happen to hers, and why the person I see today may be the person I admire most.

My name is Frazier Horn. I am the Founder and CEO of Luumis, an operational AI company based in New York, and the creator of ServiceSync AI. I have known Gokce personally and professionally for approximately four years. She is a close friend.

When I moved to New York and began building my own company, I thought I was moving into a community of builders. What I found was much lonelier than I expected. Everyone was racing, comparing, fundraising, networking, and trying to make it. There were plenty of people willing to tell me what I was doing wrong. Very few were willing to stop what they were doing and actually help me.

Gokce did.

Before we were close friends, I admired her from a distance. She had come to this country in her early twenties, started a company, raised capital, built a team, and convinced other people to believe in an idea that had once existed only in her head. I was trying to do the same thing and had absolutely no idea whether I could. I remember looking at her and thinking, "Wow. I want to do that someday."

During my final semester at Columbia, I told her about an idea that would eventually become ServiceSync AI. She did not give me some vague "that sounds cool" and move on. Her mind immediately went to work. What do you need to build? Who do you need to talk to? What is stopping you? Here is what you need to do next.

Then came one night I will probably remember for the rest of my life. My family was basically telling me that I needed to decide whether I was really going to build this company or get on with my life. I was exhausted. I was questioning whether I was capable of doing what I had set out to do, and for the first time I was seriously considering whether everybody telling me it was not going to happen might be right.

Gokce looked at me and said, "We're going to keep you here. If I have to build your MVP over the weekend, I will. You already have everything you need. You just have to believe in yourself."

I remember being almost stunned. Not because somebody told me my idea was good. People say things like that all the time. She was offering to actually do something. She was basically saying: if you cannot get yourself across this line right now, I will help get you across it.

That conversation happened years before Gokce was charged, and I think that matters. I did not become her friend because something terrible happened to her and I felt sorry for her. I knew her before any of this. I knew the ambitious founder. I knew the person people wanted to meet. I knew the person I looked up to. When she saw me beginning to lose faith in myself, there was nothing she stood to gain by helping me.

She just did.

Then everything changed. When the charges became public, I read what everybody else read. I made assumptions too. I would be lying to the Court if I said otherwise. This was somebody I had admired, and suddenly I was asking myself whether I had been completely wrong about her. It would have been easy to walk away. People told me I should distance myself from her. And my mother's words came back to me: you are who you surround yourself with.

What young founder trying to build his own reputation chooses to stay close to another founder who has now admitted committing fraud?

I thought about that. And then I watched her.

I stayed close enough to see what happened when the fundraising, the praise, the company, and much of the identity I had originally admired were stripped away. I stayed close enough to see the part that never becomes a headline.

I was there when Gokce pleaded guilty. I sat in your courtroom behind her with her family. I watched her mother cry. I watched her grandmother cry. I watched her sister cry. What I saw in their faces did not feel to me like shame, or simply fear of punishment. It felt like grief for a future Gokce had spent her entire adult life building and which, because of her own decisions, had suddenly become uncertain.

Afterward, Gokce looked at me and said, "I can't go back to Turkey. I don't ever want to leave the United States."

I did what I tend to do when somebody I care about has a problem. I immediately tried to solve it. I told her, "You could go to London."

She did not want London.

That exchange has stayed with me because I realized I had misunderstood what she was telling me. She was not asking me to name another good city where she could work.

She was telling me where home was. For the first time, I understood that the country I had spent my life taking for granted was the same country she was terrified of losing.

America was not simply where Gokce built Kalder. It was where she built herself. And I think that affected me so deeply because, in a very different way, I recognized something of myself in it. I grew up in Louisiana feeling constrained by the version of life I could see around me. I wanted out. I wanted New York. I wanted to build something. I wanted a life that felt larger and more open than the one I imagined if I simply stayed where I was.

I fought to leave. Gokce fought to stay.

Sitting with her after her plea made me understand the enormous difference between us. I was born into the country Gokce chose. I had spent my life taking for granted the ability to leave Louisiana, fail in New York, start over somewhere else, build another company, and still know that this country was mine to come home to. I never thought of that freedom as a privilege because I had never known life without it. Gokce had crossed an ocean for a possibility I had been born with.

None of that changes why she was sitting in that courtroom. She was there because of decisions she made, and by pleading guilty she admitted that. But that day made something very real to me: accountability does not happen to a headline or a case number. It happens to a whole human being—a daughter, a granddaughter, a sister, a friend—whose future will now look very different because of what she did.

What has mattered enormously to me is what I watched her do with that reality.

The startup world can be brutal about reputation. Investors talk. Founders talk. Rumors move through rooms faster than almost anything else. People who once wanted to be around you suddenly do not. Gokce knew that. She felt it. And she never once stopped.

She never once gave up. She never once walked away from her team. She kept showing up when there was no applause left, when there was no glamorous announcement coming, and when being associated with the company she had built had become something entirely different from what it once was.

One of the first things that struck me was where her mind went as she began confronting what she had done. She started talking to me about whether she could someday teach other founders—financial literacy, raising capital, what it actually means when somebody gives you money because they trust what you have told them, and the responsibilities a young founder can suddenly carry before fully understanding their weight.

I remember thinking: how bold.

There is an obvious irony in Gokce teaching a course like that. She knows that better than anybody. In a way, that was exactly the point. She was not talking about teaching founders how to raise more money or become better at pitching investors. She was asking whether the hardest lesson of her life could someday stop another twenty-something founder from making the same mistakes.

That does not undo what she did. But it tells me something about what she wants to do with what she learned.

There is something else I have watched that carries enormous weight with me: her team stayed. Not one person on her core team walked away. These are not kids at the beginning of their careers with nothing else going on in their lives. Her CTO had worked at JPMorgan. He has a wife and children, a career, and responsibilities completely separate from Gokce. There was a period when there was not even a salary keeping him there. Money can explain why someone stays at a company. It cannot explain why someone stays when the money is gone.

He stayed. The others stayed too. At one point, the team even got tattoos together.

I realize that may sound like a strange detail to put in a letter to a federal judge. I mention it because these were people who knew Gokce in a way neither a newspaper article nor even I could. They had worked beside her on ordinary Tuesdays. They had seen her exhausted, under pressure, making decisions, arguing, failing, succeeding, and building for years. When the money disappeared, when the prestige disappeared, and when being associated with Kalder became far more complicated than it had ever been useful, they stayed.

I do not offer their loyalty as evidence that Gokce did not do what she admitted doing. She did. I offer it because when I try to understand someone's character, I pay attention to the people who

have actually seen them up close and what they choose to do when there is nothing left for them to gain.

Gokce never left them. They did not leave her either.

Eventually Gokce and I shared an office, and I saw the unglamorous aftermath myself. There were no funding announcements anymore. No celebrations. No startup glamour. There were lawyers, difficult conversations, a team whose future mattered, and a company that would never become what she had once imagined. She kept coming in. She kept working. She kept helping me with my company even while hers was being dismantled.

Somewhere along the way, our roles began to reverse.

Years earlier, Gokce was the founder trying to convince me not to give up. This year, my company acquired the operating assets of hers. There are acquisitions that feel like winning. This one did not. There is an emotion in writing that sentence that I still have trouble putting into words. I had once looked at Kalder as evidence of everything I hoped I could become. Years later, I found myself quietly gathering pieces of what Gokce had spent years building and bringing them into my own company.

I did not feel triumphant.

I felt the weight of it—the technology. The work. The people. The years of her life that had gone into building it. In some strange way, a piece of Gokce's American dream had become part of mine, and I feel a responsibility to that.

What Gokce and her team built did not end with the acquisition. It now has a new path forward inside Luumis. Kalder was built with the ambition to serve some of the largest enterprises in the world, and I still see that vision. At Luumis, we have the opportunity to carry it forward while also bringing those capabilities to the thousands of service businesses struggling to keep pace with larger companies, greater access to capital, and now AI. I come from a family of those businesses. For me, carrying Kalder forward means pursuing the enormous opportunity Gokce saw while opening it to people who have historically never had access to technology like it.

But what I have learned through this transition is how much of a company does not live in its technology. It lives in the people who built it—the years of customer conversations, decisions, relationships, successes, failures, and knowledge accumulated along the way. I had already watched Gokce hold that group together through a period when the money, prestige, and certainty that ordinarily keep people at a startup had disappeared. Several of those people are now continuing that work with us.

Gokce is the connective tissue between what Kalder was and what it can become next. We rely on her knowledge of the technology and its customers, but also on the context and relationships that cannot simply be transferred with a codebase. I have watched firsthand how much of that team, its knowledge, and its ability to keep moving forward runs through her.

We need her.

Not simply the version of Gokce I first admired because she knew how to build and raise capital. We need the Gokce who now understands, in a way very few founders ever will, what responsibility costs when you get it wrong.

I understand the weight of writing those words to this Court. I do not mean that the needs of my company should decide her sentence. I mean that there is already a real place in the world where Gokce is contributing, where people expect things from her, where there are boundaries around her responsibilities, and where she is being asked to turn everything she has learned into something productive.

Her role at Luumis is deliberately bounded. For the next twenty-four months, she is engaged as an advisor. She has no equity, no officer position, and no authority over company funds. Her responsibility is to transfer years of knowledge to our team: why the technology was built the way it was, what customers needed, what worked, what failed, and what she understands now that she did not understand when she began.

Those boundaries are intentional. I am not pretending the past did not happen, and neither is she. We are building around it.

There is a symmetry in that which is difficult for me to ignore. Years ago, when I was ready to stop, Gokce refused to let me give up on what I was building. Today, after watching her lose the company she built, plead guilty, and confront what comes next, I find myself carrying part of that work forward with her.

Maybe that is what a second chance actually looks like—not getting the first life back and not pretending the terrible chapter never happened, but taking what remains—the knowledge, the people, the lessons, the good and the bad—and doing something better with it.

Watching Gokce has changed the way I run my own company. Some of the most important things she has taught me are lessons she never intended to teach. Ambition is not enough. Intelligence is not enough. Working harder than everyone else is not enough. Believing you will somehow figure it out later is not enough. When people trust you with their money, their careers, and their families' stability, the decisions you make stop belonging only to you.

I have watched that lesson land on somebody I care deeply about. I will carry it for the rest of my career.

My mother told me I am who I surround myself with. When I was younger, I thought that meant surrounding myself with successful people—finding the people doing the things I wanted to do and becoming like them. That is part of why I came to New York, and part of why I first wanted to know Gokce.

I understand my mother's advice differently now.

Success may actually be one of the least interesting tests of somebody's character. I want to know who somebody is after the success disappears. When there is no applause left. When the room gets quieter. When being their friend is no longer useful or fashionable. When they have to look directly at the worst thing they have done and decide what kind of person comes after it.

When I first met Gokce, I admired her for what she had built. Today, I admire something harder: what I have watched her do after losing it.

I first admired Gokce because she made success look possible. I stand beside her now because she has shown me that failure does not have to be final.

I want to be someone who keeps showing up when there is no applause left. I want to remain generous when my own life is falling apart. I want to build relationships strong enough that the people who truly know me will still believe there is something worth standing beside even after they have seen me fail. And if I ever fail as badly as Gokce did, I hope I have the courage to face what I did rather than run from it, learn from it, and make the rest of my life more useful because of what it taught me.

So yes. Knowing everything I know today, I still choose to surround myself with Gokce. I wanted to be like her when I first met her. In a different and much deeper way, I still do. *I say that with every fiber of my being.*

Years ago, when I was sitting across from Gokce ready to give up on the future I had imagined for myself, she looked at me and said, "We're going to keep you here." What she meant was: you are not giving up yet. That belief changed the trajectory of my life.

I never imagined that years later I would be writing to this Court with our positions reversed. I cannot return what Gokce gave me by telling you that she did nothing wrong. She did. I can return it only by telling you the truth about the person I have actually known: the good and the bad, the ambition and the terrible judgment, the founder I once looked up to and the person I have watched get back up after losing almost everything she once used to define herself.

She never once stopped. She never once gave up. She never once abandoned the people who had built beside her. And as I write this today, she is vital to what we are building at Luumis. She will continue to be.

The Court will decide what Gokce owes for her past. All I can tell you is what I believe she still has to give to the future.

There is real work waiting for her. There are real expectations and real boundaries around that work. There are people who will hold her accountable. I am one of them.

I respectfully ask the Court, when determining Gokce's sentence, to consider not only the serious conduct that brought her here, but the person she has been before and since, the people who continue to rely on her, and the life she is already working to rebuild through her actions.

What Gokce did will always be part of her story. It should be.

But the Court has before it a woman who still has something to give.

I just do not believe it has to be the last meaningful thing she does with it.

Thank you for taking the time to read this letter and for considering the person I have had the privilege—and, at times, the difficulty—of knowing in full.

Respectfully,

Frazier Horn
Founder & CEO, Luumis

# Exhibit 30

Defne Kayalar

kayalar.defne@gmail.com

Date: 17/07/2026

To: Hon. Lewis A. Kaplan

United States District Judge

Southern District of New York

Daniel Patrick Moynihan

United States Courthouse

500 Pearl St

New York, NY 10007

Dear Judge Kaplan,

My name is Defne Kayalar. I have known Gökçe since 2011, for the past 15 years, and she is one of my closest friends. I first met her through her older sister, who attended the same high school as I did, and Gökçe and I became close very quickly. Since then, we have been there for each other through many different stages of our lives, and over the years, I have had the chance to know her character very closely.

I recognize that Gökçe has accepted responsibility by entering a guilty plea to a federal offense. I offer this letter solely to provide Your Honor with a fuller understanding of the person I have known closely for the past 15 years.

Even when I first met Gökçe, I was struck by how much she cared about being useful to the people and the community around her. While she was still in high school, she took part in a social responsibility project supporting young girls who had been denied access to education. She also completed an internship at f, driven by the same curiosity, ambition, and desire to learn that I had seen in her from a very young age. At an age when most of us were focused on a much smaller world, Gökçe was already thinking about the lives and circumstances of people beyond herself, as well as the kind of meaningful work she hoped to create in the future. Entrepreneurship, and the idea of building something of her own that could make a real difference, meant everything to her from a very young age. That is why it feels right to begin this letter with these parts of her character. Her desire to help others, to learn, and to create something of value is not something she developed later or something she is trying to present today. It has been a natural part of who she is for as long as I have known her.

When we tried to include her in a fun plan, especially during the summers, we sometimes had to persuade her because she would rather stay home and study. I saw that same discipline become part of every area of her life.

Her commitment to life, the seriousness with which she approaches her work, the care she shows her family and friends, and the respect she has for herself and the people around her are all qualities I have always admired. Perhaps the best way I can convey to Your Honor the depth of the sorrow this experience has caused Gökçe is by describing how deeply she has always valued her work and the people around her. Her work was never merely a profession to her, and the people beside her were never simply colleagues.

During university years, when she was living abroad and had limited time in Turkey, she always made space for the people she loved. Some of our most meaningful conversations happened during simple walks with her dog, when she would listen carefully, ask thoughtful questions, and make the person beside her feel fully heard. During those years, our close group of friends often stayed at Gökçe's family home. Her family welcomed us with a warmth and generosity that made us feel entirely at ease and included, never as guests who were imposing. Over time, I came to

recognize that same instinct in Gökçe herself. She has always had a natural way of making the people around her feel accepted, cared for, and safe. To me, this was not an isolated kindness, but part of a consistent pattern I witnessed both in the home in which she was raised and in the way she later treated her friends, colleagues, and community. This may seem like a small example, but to me it reflects something essential about her character. Gökçe has always been present, considerate, and deeply committed to the people in her life. The same care can be seen in the way she approaches her work, her personal growth, and her desire to contribute positively to those around her. She carried the same values into her professional life. Her first concern was never what she could take for herself, but whether the people around her felt valued, secure, and happy in their work. She devoted herself to creating a workplace that was fair, respectful, and built on the right principles.

I believe that people grow not only through their own strength, but also through the relationships in which they feel valued, supported, and safe. Over the past 15 years, I have seen Gökçe create that sense of support not only for me, but for many of the people around her. This was already evident when she was in high school, when she chose to devote her time to a social responsibility projects. Years later, I saw the same instinct reflected in her professional life. Even within the company she worked so hard to build, she often chose to pay herself less so that greater care and resources could be directed toward the people working alongside her. Her priority was not her own comfort or financial benefit, but creating a fair, respectful, and stable environment in which others could feel valued and grow.

These were not isolated gestures made for recognition. They reflect a consistent pattern I have witnessed across different stages of her life: Gökçe has repeatedly placed the well-being, development, and security of others ahead of her own interests. For that reason, I have never doubted the sincerity of her intentions and the values I have consistently seen her live by. For these reasons, I felt it important to respectfully share these observations with the Court. Throughout the 15 years I have known Gökçe, I have never known her to be someone motivated by material gain. She has always placed far greater value on meaningful work, personal growth, and the well-being of the people around her than on money or status.

I have every confidence that Gökçe will continue to accept responsibility, learn deeply from this experience, and move forward with greater care and purpose.

She has always been someone who faces her responsibilities rather than turning away from them. Having known Gökçe closely for the past 15 years and stood beside her through both joyful and difficult periods of her life, I felt a responsibility to respectfully share with the Court my honest understanding of the person she has always been.

This letter is not simply something I feel obligated to do as her friend. It is the natural result of my honest experience of the person I have known for so many years.

I feel deeply sorry for the times when I could not be by her side or share the weight of what she was going through. The most honest thing I can do today is share with you what I have witnessed over these 15 years, the love I have for her, and my faith in her future. I sincerely hope that I have been able to convey my thoughts with the clarity, respect, and care that this matter deserves, and I respectfully submit them for Your Honor's consideration.

Respectfully,

Defne Kayalar



# Exhibit 31

July 23, 2026

The Honorable Lewis A. Kaplan United States District Judge Southern District of New York

Dear Judge Kaplan,

My name is Alpan Keskin, Founder and President of WL Hospitality Investments. I have spent more than thirty years in luxury hospitality, including leadership roles at The Peninsula New York, The Peninsula Beijing, and Park Hyatt New York.

I am writing in support of Gökçe to share the person I have come to know personally and the qualities I have observed in her.

Gökçe has been fully transparent with me about her case and has not attempted to minimize the seriousness of her situation. What I have seen instead is someone who is committed to working hard, moving forward responsibly, and building a positive future for herself.

She is among the most passionate and hardworking individuals I have encountered. She is ambitious, resilient, thoughtful, and exceptionally determined.

This summer, after her company lost its office, Gökçe asked whether her small team could use a room in our hotel so they could continue working. She did not ask for financial assistance or sympathy only for a place where she and her team could continue their work. Since then, I have seen her there almost every day, often from early morning until late at night, working alongside her team despite the uncertainty she is facing. Witnessing this firsthand has given me deep respect for her resilience, discipline, and determination.

Gökçe and her team have developed an AI software product for construction and contract management that I find impressive and believe has strong potential to be valuable within the construction industry. I am already recommending the product to my counterparts in the industry, and we will certainly use the AI program they have developed in our business during the renovation planning of our properties in the coming months.

I am also in discussions with Gökçe regarding the possibility of becoming a partner in her company. I would not consider such a commitment merely as an act of friendship. I am considering it because I believe in the product, the team, and Gökçe's ability to build a successful and responsible future.

Based on what I have personally observed, I believe Gökçe has the intelligence, work ethic, resilience, and character to learn from this experience and move forward responsibly. I sincerely believe she has much to contribute to her company, the people who rely on her, and society.

Thank you for taking the time to consider my perspective.

Respectfully,

Alpan Keskin Founder and President WL Hospitality Investments

# Exhibit 32

Dear Judge Kaplan,

I am writing in support of Gokce, whom I had the opportunity to work with from October 2025 through March 2026 while she served as CEO of Kalder. As a software engineer on a small engineering team of approximately ten developers, I interacted with her regularly through day-to-day work and biweekly one-on-one meetings.

What stood out most to me was her willingness to listen and act on employee feedback. During one of our one-on-one meetings, I shared that I wanted greater visibility into the impact of my work and hoped to contribute earlier in product discussions instead of only after requirements had been finalized. She listened carefully and subsequently invited me to client meetings where discussions around the Consumer Rewards program took place. That gave me the opportunity to provide technical input earlier in the process and helped me feel that my perspective was valued.

I also observed her commitment to improving collaboration across teams. During our integration with VGS for the Rewards program, she created shared Slack channels with external teams so engineers could communicate directly rather than waiting for information to be relayed through multiple layers. It was a practical change that reduced delays and helped the team work more effectively.

I also remember her recognizing the engineering team's efforts after we quickly delivered the UI integration for the Kalder Rewards home page, helping improve the experience for publisher services. Taking the time to acknowledge the team's work, even while leading a growing startup, reflected the kind of leadership I experienced throughout my time at Kalder. Although I worked with Gokce for approximately five months, I interacted with her regularly in a close-knit company where employees had direct access to leadership. Based on those experiences, the conduct that brings her before the Court is inconsistent with the leader I came to know through our professional interactions.
Thank you for considering my perspective.

Respectfully,

Harsha Konreddy
Former Software Engineer, Kalder
Email: harshakreddy@gmnail.com
Phone: 8626215664
Date: 07/19/2026

# Exhibit 33

July 18, 2026

Hon. Lewis A. Kaplan
United States District Judge
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, NY 10007

Dear Judge Kaplan:

My name is Pavan Krishnamurthy. I immigrated to the United States in 2007 and have worked in the software industry at various companies for nearly two decades. I have known Gokce since August 2025, and I joined Kalder as its Chief Technology Officer in October 2025. Since then, I have worked with her closely and interacted with her frequently through leadership meetings, company decisions, and individual conversations.

In my experience, Gokce is exceptionally hardworking, honest, open, and respectful toward the people around her. When Kalder faced a serious financial crisis, Gokce reduced her own salary before discussing financial sacrifices with other members of the team. I personally viewed this as a clear demonstration of her commitment to the company and her concern for her colleagues. Rather than asking others to make sacrifices first, she was willing to accept the burden herself.

I also witnessed the effort Gokce made to recruit the right people and treat them with respect. Before I joined Kalder, she flew to Tampa, Florida, where I live, to meet with me personally and discuss my becoming part of the company. Her willingness to make that effort showed me that she was prepared to go above and beyond to build the team thoughtfully and make prospective team members feel valued.

As CTO, I was responsible for many important technical and operational decisions. Gokce trusted me to exercise my professional judgment. She listened carefully to my recommendations, asked thoughtful questions, and considered the available information before making decisions. These experiences showed me that she is a collaborative and thoughtful leader who respects the expertise and contributions of others.

In all the time I have known and worked closely with Gokce, the conduct that brought her before the Court has been inconsistent with the person I have personally experienced. The Gokce I know is hardworking, respectful, generous toward her colleagues, and deeply committed to the people who depend on her.

I also personally observed how heavily these proceedings weighed on her. As a fellow immigrant, I understand the hopes and ambitions that come with building a life in the United States. Despite carrying an enormous personal and emotional burden, Gokce never directed her frustration toward her colleagues. In meetings and personal interactions, she continued to treat team members with warmth, patience, and respect.

Gokce and I are continuing to work together on a new initiative that we have already begun. I intend to remain part of her professional and personal support network going forward. I have great confidence in her

talent, work ethic, and ability to learn from this difficult period. I firmly believe she will lead a productive, responsible, and law-abiding life.

I respectfully ask the Court to consider the person I have described and to extend Gokce leniency and mercy.

Respectfully submitted,

---

Pavan Krishnamurthy

19763 Leonard Rd
Lutz, FL 33558

Telephone: (520) 289-7282
Email: pavankris@gmail.com

# Exhibit 34

Dear Judge Kaplan,

I am writing to support Gokce. I am aware of the charges she is facing, but I want to share my firsthand experience of working with her - as I worked closely with Gokce as an engineer on the Kalder team, collaborating with her day-to-day.

From my view as a person on the engineering team, she never shielded herself at the expense of her employees, and even when things were incredibly difficult at the company, she treated those who depended on her with respect, and always valued our contributions.

I’ve also seen the high level of personal transparency when the legal situation first emerged. Instead of creating distance or leaving the team in the dark, she was consistently communicating the reality directly with us, about how the situation affects our work and our daily lives. She made sure we knew where things stood as individuals, which meant a great deal to the team.

Knowing everything that has happened, I still stand by my positive experience of who she is as a person. I value her fairness and transparency, and I intend to continue working with her on future projects.

I respectfully ask the Court to consider this side of her character and show her mercy when deciding the outcome of her case.

Sincerely,

Filip Lintner
Ľuda Zúbka 9, Malacky, 90101, Slovakia
filip.lintner@icloud.com
+421 948 888 092

# Exhibit 35

**Uzm. Dr. Mihriban Aral Özcan**
Specialist in Neurology
Adana, Türkiye
Tel: +90 532 361 07 14

To the Honorable Judge Kaplan
SDNY, 500 Pearl Street, New York, NY 10007

**Re: Medical information regarding Ms. Gökçe Güven (date of birth: May 18, 1999)**

Dear Honorable Judge Kaplan,
I am a neurologist practicing at Adana Seyhan State Hospital in Adana, Türkiye. I write in my professional capacity as a physician involved in the neurological care and follow-up of Ms. Gökçe Güven since 2021. I respectfully submit this letter, together with the attached radiology report, to inform the Court of medical circumstances that I believe are directly relevant to Ms. Güven' future.

[redacted]

[redacted]

Thank you for your consideration of this information.
Respectfully,

______________________________

Uzm. Dr. Mihriban Aral Özcan
**Attachment:** (1) Brain MRI report, Adana Seyhan State Hospital, report date May 7, 2021 (radiologist: Uzm. Dr. İlker Yavuzer, Dip. Reg. No. 99860),

SEYHAN DEVLET HASTANESİ
Uz. Dr. Mihriban ÖZCAN
Nöroloji Uzmanı
Dip. Tes. No : 95162

ADANA SEYHAN DEVLET HASTANESİ

MR

[redacted]

Uzm.Dr.İLKER YAVUZER
Radyoloji
Dip. Tes. No: 99860

MR, beyin

[redacted]

[redacted]

[redacted]

# Exhibit 36

The Honorable Lewis A. Kaplan

United States District Judge Southern District of New York

Dear Judge Kaplan,

My name is Şakir Özgün. I am 57 years old. I work in Adana Seyhan Public Hospital in Adana, Turkey. I am the secretary of Dr. Fadime Bayboğan. She is a neurologist. She is also Gökçe Güven's mother. I have worked with over 20 years, and I have known Gökçe since she was a girl in school. I know Gökçe pleaded guilty and that you will decide her sentence, and I want to write to you what I saw myself.

In 2017 my daughter [redacted] She was 20 years old. She was staying in a student dormitory. She had said to me, let me move out to an apartment. I said, I have no money, I cannot do it. Afterward I asked myself all the time: if I had moved her to an apartment, would she still have done this? I blamed myself. I still blame myself. In that time I fell into an emptiness. I did not know what to do. I felt helpless. Gökçe was still in high school then. She and her mother were very affected by what happened to us. They supported me through that whole time. And then they did something I could never meet, not with money and not with spirit: together they sent me to Umre, the pilgrimage to Mecca.

I want to explain to you what Umre means for a Muslim, because otherwise you cannot weigh this gift. Umre is the journey to the Kaaba in Mecca, the house of God. Five times a day, every Muslim in the world turns his face toward that one point to pray. His whole life he prays toward a place he has never seen. To go there and see it with your own eyes, to walk around the Kaaba, to pray inside that mosque where one prayer is counted by our belief as worth a hundred thousand prayers anywhere else, this is the dream of every Muslim. In Umre everyone wears the same simple white cloth. A rich man and a poor man stand side by side and you cannot tell which is which. Our Prophet, peace be upon him, taught that Umre wipes away the sins committed since the last one. People in Turkey save money for many years for this journey. Many die without going. On a secretary's salary, with the debts I had, it was not possible for me in this life. That is why our religion gives a special place to the one who pays for another person's pilgrimage: it is counted as valuable as going yourself. Gökçe did not go yet. She gave her portion to me.

So I went. I stood in front of the Kaaba, the place I had prayed toward my whole life without seeing. I circled it with millions of people from every country. I drank Zamzam water. We also went to Medina and prayed at the Prophet's mosque. And there, in the most holy place a Muslim can stand, I prayed for my daughter and I prayed for Gökçe and her mom, her family. I asked God to have mercy on her and to forgive me for what I could not give her. There was no other place on this earth where I could have put down what I was carrying. Living this made me very happy. I do not have better words for it. It connected me back to life and to God. Still, every day when I pray namaz, I think of those days. And I want you to know: Gökçe was a high school student when she did this for me.

I sit in front of Fadime Hanım's door every day, so I see how Gökçe was raised. Ours is a state hospital. Many patients come poor, and many come completely alone, with nobody. Fadime

Hanım gives these patients her own phone number. She tells the hospital staff to walk them through their paperwork so they do not get lost. If a patient has physical needs and came alone, she finds someone in the hospital to stay next to them. One time an old man did not want to be discharged. He lived alone and he was afraid of going back to the empty house. She gave him her number, she arranged for him to stay a few more days so his spirit could recover, and then she took him home in her own car. Her door is open after working hours too. If an elderly patient needs her, she stays. This is that kind of family. Gökçe and her mother talk on video call a few times every day, even now. When Gökçe comes to Adana she helps her mother with all of this, whoever in the hospital needs something. And she has never come to Adana without visiting me. I still tell Fadime Hanım every problem in my own family. She listens like a sister.

In Islam it is taught that a Muslim has six duties to another Muslim: greet him with peace, accept his invitation, give him honest advice when he asks, bless him when he sneezes, visit him when he is sick, and follow his funeral when he dies. I can say honestly that Gökçe and her family did all of these things for me and for many families in our hospital. In my mourning they did not leave me alone. Every year on Kurban Bayramı, the Feast of Sacrifice, they share the sacrifice meat with my family and with other hospital families. Every few months they support my household. When Gökçe comes, they invite us to their table for dinner.

I also want to say what I saw in Gökçe in these last year. Trouble usually pushes people away from God. With Gökçe it was the opposite. She prays more now, not less. When her travel was allowed again, one of the first things she did was go to a mosque in New Jersey and pray with a congregation. Some of her friends left her, her teammates left her, and she had money troubles and troubles in her name. I never heard her speak with bitterness. She only says she must take her responsibility and repair what was broken and become a better person from this. In our belief, hardship is also a test, and how you carry it shows who you are. Our poet Rumi says that serving people is a way of loving God. I watched this girl serve people since she was a child.

Your Honor, I will finish. I am 57 years old. The person who reached me in the worst year of my life and pulled me back to life was a high school student and her mother. After that Gökçe never stopped. She supported my family, visited me, honored me, and asked for nothing.

All I can ask from you is this: please consider enabling her life, as she enabled mine and the lives of many others. She is still young. I believe with my whole heart that if she is able to work and to give, she will spend all her years doing good for people, because she was already doing it before anyone was watching her. I pray that God gives you mercy in your decision.

With my respect and my prayers, Peace be upon you.

Şakir Özgün

Secretary, Adana Seyhan Devlet Hastanesi

Adana, Turkiye



# Exhibit 37

The Honorable Lewis A. Kaplan United States District Judge Southern District of New York

Re: United States v. Gökçe Güven, [docket number]

Dear Judge Kaplan,

My name is Jack Solomon. I am the co-founder and Chief Technology Officer of Guac, a Y Combinator–backed company in New York that builds AI demand forecasting for grocery retailers to reduce food waste.

I studied at Oxford, performed research on grocery logistics before founding my company, and I have spent the last several years building a venture backed startup - raising capital, hiring, shipping products, procuring clients, and so on.

I am writing to you both as a founder, as someone who has worked in the startup world, and, most importantly, as one of Gökçe Güven's closest friends for the past four years.

I know that Gökçe has pleaded guilty to a federal offense and that Your Honor will decide her sentence.

I met Gökçe at the start of 2022 through the 8VC fellowship. 8VC is a venture capital firm that later invested in her company. That year, they ran a retreat in Austin with all of their student fellowship partners.

When I met her, I was completing my Master's degree in Computer Science, and she was finishing her degree at Berkley. I remember of all the students who were part of the 8VC fellowship, Gökçe stood out: like all of us, she was a full-time student, doing venture scouting for the fellowship, and working at a trendy tech company (OpenSea). What she was also doing, though, was building a product on the side - a memberships tool that took off on its own and later formed the basis of Kalder. Out of the entire fellowship class, she was, I believe, the only fellow that 8VC offered to incubate.

What was especially telling was that Gökçe, who no doubt could have joined 8VC or OpenSea or many other safe, prestigious, well-paid paths, turned both down to keep building the company that she wanted to build.

I remember on the drive to the airport, she turned to me and said something that at the time I hadn't heard from a peer yet: "You should start something. You love building." To me at the time - around the same age as her - that seemed crazy. It was something that I always wanted to do, but felt incredibly out of reach. Seeing her go off and start her own company over the proceeding year was one of a number of factors that helped me to believe that I could start a meaningful company.

I retell that because I think it speaks to two things. One is the sincerity with which she wanted to build and create something meaningful - really against the odds of what is expected of someone in their early 20s still finishing their final year of college. The second is that it speaks to how hard she works. Among an already elite group of college students who I met, Gökçe did more,

worked harder, and really had experience far beyond her years - and all of those things stuck with me.

Since meeting Gökçe, those qualities have continued. She has become one of my closest friends, moving to New York City only slightly before I did, and being one of the friends I rely on for direct advice, someone with whom to share stories both of work and personal life, and someone who - as a peer - is a rare example of a founder.

In my recent conversations with Gökçe, I've noticed 3 things relevant to this letter:

First, she has learned the lesson that I believe sits underneath this whole period: that she cannot do everything alone. The Gökçe I met in 2022 was coming out of college as a solo founder trying to carry an entire company on her own back (at least from my observations, it is rare for a company to be solo founded - most people will have at least one co-founder with whom they work). The Gökçe I walk with today has built a real team around her - co-founders and colleagues who complement her, check her, and share the load. I have watched that change happen month by month.

Second, she has taken responsibility. In our conversations she does not blame others or see the situation as unreasonable. She talks about what she would change and what she regrets.

Third, she has not stopped contributing. She is building again in construction technology, and this time she built the team first and is quietly acquiring customers without bold press claims or social media posts. That, to me, is the clearest evidence of who she actually is: she genuinely likes to create things and create value in the world.

I suspect the Court does not often see the workings of early stage startups, so I thought it might also be useful to refer to at least my experiences with investors. When Y Combinator invested in my co-founder and me, we had a roughly 2 month old product, no live revenue, and no paying customers. What they underwrote was mostly anecdotal potential: the founders, the team we could build, the size of the problem, early customer interest, and whether the product we imagined could matter.

At the seed stage, at least in my experience, complete financial statements barely exist (I remember our shock when one of the dozens of investors we spoke to asked for a full financial model!). Unlike more traditional investors, their aim isn't to find an opportunity for slightly-better-than-market growth. They are looking to get in the door very early with the next Google or Facebook - with full expectations that 99% of their investments will fail and just 1% will become valued at tens of billions of dollars. In three years I have lived through pivots, missed goals, products rebuilt from scratch, and plans rewritten monthly, and my company is considered one of the disciplined ones that - 3 years on from founding - is still operational and generating substantial revenue.

I say that without the knowledge that the Court would have of the full facts of this case or the details of the Law here, but as a general structure within which to view Gökçe's dealings.

I understand the seriousness of the matter before Your Honor, and I respect the Court's judgment. I ask only that you consider the whole of who Gökçe is: someone who has owned her mistakes, changed how she works, and has an enormous amount left to contribute — and is already contributing — to the people around her, to this country, and to the industry she loves. I believe in her future, and I will be part of it as her friend and teammate whatever comes next.

Thank you for taking the time to read this letter.

Yours,

Jack Solomon

Co-Founder & CTO, Guac

21 July 2026

# Exhibit 38

Dear Judge Kaplan,

My name is Amie Sun. Although I have not known Gökçe for as long as some of the other people in her life, we have remained close and stayed in regular contact since meeting in person in early 2024.

I recognize that the Court has already heard the facts of this case. My purpose in writing is simply to describe the person I have come to know through our friendship.

I remember attending one of her birthday dinners and being struck by how naturally she brought people together. She made a point of engaging every person at the table, drawing quieter guests into conversation, and by the end of the night people who had arrived as strangers were exchanging phone numbers because of the introductions she had made.

What also stood out to me was that she treated everyone with the same warmth and respect, including the restaurant staff. In New York, where conversations can easily revolve around résumés, job titles, and social circles, that was never my experience with Gökçe. She was genuinely interested in people for who they were, not what they could offer her.

Gökçe is also the kind of friend who shows up when it matters most and treats other people's ambitions almost as if they were her own.

When a mutual friend was going through a difficult time, Gökçe went to their apartment with takeout and stayed for hours, simply listening and being there for them.

I have personally seen her spend countless hours helping friends think through personal and professional challenges. Whether someone was wrestling with a difficult decision or trying to build a company, she has always been remarkably generous with her time and experience.

Two of our mutual friends later told me they were inspired by Gökçe to apply to Y Combinator. She spent real time and energy helping them think through their application and product, sharing her experience as a founder and encouraging them throughout the process. She had nothing to gain from helping them. She simply believed in them and wanted to see them succeed. Hearing that did not surprise me because it was entirely consistent with the generosity I had already witnessed in my own friendship with her.

Personally, one of the things I value most about our friendship is that I almost always leave our conversations having learned something new. Whether we are talking about technology, startups, or broader ideas, Gökçe approaches every discussion with genuine curiosity. She enjoys learning, but just as importantly, she enjoys helping others learn and think more deeply as well.

In every interaction I have had with her over the past few years, through both good times and difficult ones, the person I have described above is the person I have consistently known. The conduct that brought her before this Court is difficult for me to reconcile with that experience.

Whatever the Court ultimately decides, I intend to remain a close friend of Gökçe's and to be part of her support system moving forward. I believe her kindness, generosity, curiosity, and intellect still

have a great deal to offer the people around her, and I sincerely hope she is given the opportunity to continue making positive contributions in the future.

I respectfully ask the Court to consider my perspective as it determines an appropriate sentence.

Respectfully,

Amie Sun

2455 Overland Ave, Apt. 508
Los Angeles, CA 90064

408-628-7603
amiesun123@gmail.com

Signed by:
BBDD8DB780CE47B...

July 17, 2026

# Exhibit 39

06/23/2026

United States Probation Office
Southern District of New York
500 Pearl Street New York, NY 10007

**Dr. Ismail Ünal**
Psychiatrist | Adana Seyhan Devlet Hastanesi, Reşatbey, Baraj Cad. No:10 D:719, 01140 Seyhan/ Adana, Türkiye

**Re: Gökçe Güven — Psychiatric Treatment Summary**

Dear Probation Officer,

I am the treating psychiatrist for Gökçe Güven, whom I have cared for continuously since 2018. I am writing at your request to provide a clinical summary.

[redacted]

I remain actively involved in her treatment and am monitoring her closely. I am available to provide any further clinical information that may assist the Court or the Probation Office.

Respectfully,
Dr. Ismail Ünal

SEYHAN DEVLET HASTANESİ
Uz. Dr. İsmail ÜNAL
Ruh Sağlığı ve Hastalıkları Uzmanı
Dip. Tes. No: 89305

# Exhibit 40

July 10, 2026

Dear Judge Kaplan,

Your Honor, my name is Anika Valenzuela, and I am writing to you as a teammate and close friend of Gokce. We were introduced in September by a mutual friend. At the time, I was seeking a more supportive and empowering environment, and she graciously offered me an opportunity within her company. From my very first day at the company, she was always eager to mentor me. Right from the start, she went out of her way to invest in my growth. During my first week, she even included me on a business trip to Las Vegas, solely because she saw my potential and wanted me to have the best hands-on learning opportunity possible. She opened doors for me by introducing me to her professional network and teaching me the vital tools of the industry.

Working together daily, our professional relationship quickly evolved into a close and supportive friendship. Knowing that I had just moved to New York, and was having a difficult time adjusting, she went out of her way to ensure I felt supported. Every Thursday after work, she started a tradition of taking the team to a nearby spot to eat truffle fries and prosecco while we decompressed and talked through life's challenges. Throughout these conversations, she proved to be an exceptional listener who offered genuine guidance. She even invited me to her New Year's celebration so I would not be alone. Through her kindness, she provided a safe space for me when I needed it most, serving as just one example of innate compassion.

During this difficult time, the immense personal toll and deep remorse she experiences have been clearly visible to me. Yet, even when the situation was at its most draining, she held her head high and put her team's welfare ahead of her own. Seeing her stand so strong inspired all of us; we actually chose to volunteer our work without pay for a time, simply because we believed in her potential and refused to let the momentum stall.

Today, she is focusing all of her energy on moving forward constructively. She is launching a new business venture with the sole intention of using her entrepreneurial skills to create positive value. This new company is composed of her past teammates, all of whom have chosen to join her because we believe completely in her leadership. Our joint effort is a direct reflection of our faith in her character and her absolute commitment to building something positive out of this experience.

I humbly ask that you show her leniency and mercy during sentencing. She has a rare ability to inspire and lift up those around her, and she is fully dedicated to a productive future. Thank you for your time, fairness, and compassion.

Best regards,
Anika Valenzuela
anikavalenzuela00@gmail.com
(339) 364-4317

# Exhibit 41

October 1, 2026

Dear Judge Kaplan,

I wanted to share my perspective on Gokce, having worked with her for two years as an advisor and later as an investor and advisor to Kalder.

Gokce was hardworking, ambitious, and technically strong. I sat in on many of her demos and helped her navigate business development decisions. I invested in Kalder because, after two years of watching her work, I believed she could build something unique and valuable.

Unfortunately, Gokce made serious mistakes that will affect her career and life. Founders often present an overly optimistic picture to attract investors and clients, and she took this too far. I wish she had done many things differently. Still, she sold the company and plans to return most, if not all, of the invested capital to her investors, which reflects her good faith in trying to build a legitimate business.

I believe Gokce should be held accountable for her actions. I also ask that you weigh her youth, the influence of blockchain mentors from a loosely regulated industry (I was not among them), and the fact that she has taken full responsibility for her wrongdoing.

Thank you for your consideration.

Sincerely,

Alyssa Fanelli Varadhan

# Exhibit 42

Hon. Lewis A. Kaplan
United States District Judge
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, NY 10007

Dear Judge Kaplan:

My name is Pryce Yebesi, and I am writing in support of my close friend, Gokce Guven. I have known Gokce since 2021, when we met through the Kleiner Perkins Fellows community. Over the five years since, our friendship has grown through both our personal lives and the unusual experience we shared of becoming technology founders at a very young age.

By way of background, I am a technology entrepreneur and have spent essentially my entire adult life building companies. I co-founded Utopia Labs while I was an undergraduate at Washington University in St. Louis and helped build the company through its growth and fundraising before its eventual acquisition by Coinbase. I later served as an Entrepreneur-in-Residence at Washington University and went on to co-found another financial technology company, Open Ledger. Earlier in my career, I was also a Kleiner Perkins Fellow and worked in engineering roles at technology companies including Facebook and Robinhood.

I share this background not because my own accomplishments are the subject of this letter, but because they have given me an unusually close understanding of the circumstances in which I came to know Gokce. We were both very young people suddenly navigating investors, employees, customers, enormous expectations, and responsibilities for which there is no real instruction manual. I know firsthand both how exciting that experience can be and how extraordinarily difficult it can become.

Against that background, what has always stood out to me about Gokce is not simply that she is intelligent and ambitious—although she certainly is—but that she is an extraordinarily kind and caring person. Throughout our friendship, she has been supportive of me personally and of many other young founders in our community. I especially remember her willingness to support other women trying to build companies in an industry in which doing so could be isolating and difficult. In the community where I knew her, Gokce was someone who genuinely wanted the people around her to succeed and who readily gave her time, advice, and encouragement to help them.

Some of my most meaningful memories of our friendship are not from conferences, fundraising announcements, or moments when things were going well. They are the late-night phone calls when one of us was struggling.

Gokce and I have spent many hours being a shoulder for one another as we tried to navigate the pressure and uncertainty of running companies while still in our early twenties. We talked about the weight of being responsible for other people, the fear of disappointing those who

believed in us, and the difficulty of knowing whether we were making the right decisions. Those conversations allowed me to know Gokce not simply as another founder, but as a person.

In those private conversations, Gokce frequently spoke about wanting to build an honest and successful business and to do right by the people who had trusted her. She had enormous admiration for many of her investors and mentors. She viewed them as people she could learn from and regularly expressed how fortunate she felt to have the opportunity to work alongside people she respected so much. The trust that others placed in her mattered deeply to her.

I understand that the Court is considering a serious matter. I do not write to minimize that seriousness, nor would I presume to speak about facts or circumstances outside my personal knowledge. I can only tell the Court about the person I have personally known since 2021.

For that reason, seeing one of my closest friends depicted so negatively has been difficult to reconcile with my own experience of her. The Gokce I know has been honest with me, generous with her time, deeply supportive, and genuinely concerned about the people around her. Whatever mistakes have brought her to this moment, I do not believe that they represent the entirety of her character or the person she is capable of becoming.

I have also seen how deeply this experience has affected her. Our conversations now are necessarily different from the conversations we had as young founders several years ago. I see someone confronting painful consequences and thinking seriously about the choices she will make for the rest of her life. I believe she understands that moving forward requires not simply regret, but growth, responsibility, and a commitment to doing things differently.

Having watched Gokce navigate enormous challenges from such a young age, I remain confident in her capacity to rise to this one as well. She is still a young person with an extraordinary amount of life ahead of her. She is intelligent, hardworking, resilient, and capable of contributing meaningfully to the world around her. I believe that the lessons she takes from this experience will remain with her for the rest of her life and that she is committed to living and conducting herself with integrity going forward.

Gokce is my friend, and she will continue to have my friendship and support. I intend to be someone she can call when she needs advice, perspective, or simply someone willing to tell her the truth. I know that she has other people around her who care deeply about her as well, and I believe that community will help hold her accountable to the life she wants to build from here.

I respectfully ask that, when imposing sentence, Your Honor consider the person I have come to know over these past five years and show Gokce leniency and mercy. I sincerely believe that she has the ability to learn from this experience, to grow from it, and to spend the many years ahead of her making a positive contribution to her community and to society.

Thank you for considering my perspective.

Respectfully,

Pryce Yebesi

Pyebesi9@gmail.com

09/03/2026

# Exhibit 43

Dear Judge Kaplan,

My name is Tansu Yegen. I am an angel investor in Kalder, the company Gokce Guven funded, and I have known her since 2022. I am aware that Gokce has pleaded guilty, and I write this letter to showcase what it means for people like me who put money into her company.

I have spent roughly three decades building and leading technology businesses. I served as CEO of Turkcell Ukraine and Europe, ran 3bln Samsung mobile business as VP with full profit and loss responsibility. I was Country General Manager of IBM Global Business Services in Turkey, I led Apple in Turkey, led growth markets at Uipath and today I am Vice President Europe at Amplitude responsible for 100+ countries for this public digital analytics company.

Alongside that career I coach and invest my own money in early stage companies in artificial intelligence othe emerging technologies, including Kalder, Ekos.ai and others. I have evaluated many startups and founders, I invested $50.000.- in Kalder after I got introduced to her by one of her Angel investors.

Gokce was bright, young, smart, and energitic and had everything that an early stage looks for. I decided to put a check after a 30 mins meeting. I looked at her and saw a founder that could pivot and iterate in good days and bad days make Kalder a success whatever it takes. She put the company and the team above and had extraordinary preseverance based on her hardships during her upbringing and credentials compared to her age. Overtime we had regular calls, I introduced her to some customers and our relation grew into a genuine friendship based on trust.

I say without hesitation I will continue to support and invest what in what she builds and in the future. I watched her over 4 years and very proud what she achieved through the hardest period of her life.

Gokce is a good and special person contributing alot to our society and we should enable her to do so, I respectfully ask the "Court" to keep that in view when it determines her sentence.

Thank you for your time and consideration

Respectfully, TANSU YEGEN

03 Sept 2026

# Exhibit 44

July 24, 2026

Hon. Lewis A. Kaplan
United States District Judge
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, NY 10007

**Dear Judge Kaplan:**

My name is Ashley Zangrillo. I am a 29-year-old woman living in New York City, where I work for a family office focused on venture capital and technology investing across the private markets, with a particular emphasis on early-stage companies. My profession requires me to evaluate not only business opportunities, but also the people behind them. Much of what I do involves assessing founders, executives, and entrepreneurs - their integrity, judgment, resilience, and character - to determine who I believe is worthy of trust, partnership, and long-term investment.

It is in that capacity, as well as a close personal friend, that I write in support of Gokce. I have had the privilege of knowing her for the past year, and during that time she has become one of my closest friends. We speak almost every day, and because of the consistency of our friendship, I have come to know her character exceptionally well.

I am aware that Gokce has accepted responsibility by pleading guilty, and I write with full knowledge of that fact. While I cannot speak to the events that brought her before the Court, I can speak with complete honesty about the person I have come to know. Nothing about what I have learned regarding this case aligns with the woman I know.

From the very beginning of our friendship, Gokce has been one of the most genuine, thoughtful, and dependable people in my life. She is the type of person who shows up without being asked, checks in on the people she loves, and consistently puts others before herself. She has an infectious warmth that makes everyone around her feel welcomed and valued. Her kindness has never felt performative or self-serving - it is simply who she is.

What has impressed me most is the combination of her intelligence, work ethic, humility, and compassion. She carries herself with grace and elegance, treats everyone with respect, and has a remarkable ability to make people feel seen and supported. She is exceptionally bright, incredibly efficient, and someone who approaches everything she does with professionalism and purpose. She is also genuinely fun, charismatic, and full of life. She has become like a sister to me, and I consider myself incredibly fortunate to have her in my life.

If someone asked me whether I would recommend Gokce professionally, trust her with an important responsibility, or invest in a business she was building, my answer would be an immediate and unequivocal yes. Those are not statements I make lightly. They are based on the person I have consistently come to know through countless conversations and experiences over the past year. I have complete confidence in her integrity, her judgment, and her future.

Throughout this difficult chapter, I have remained in close contact with Gokce. I have personally witnessed the emotional weight this experience has carried for her. I have seen someone who has reflected deeply, accepted responsibility, and approached this process with humility and dignity. She has carried herself with remarkable grace despite the uncertainty surrounding her future. From my perspective, her remorse is genuine, and her commitment to becoming an even better version of herself is real.

I also know that this experience does not define her. The woman I know is someone who is constantly learning, evolving, and striving to improve herself. She welcomes accountability, learns from difficult experiences, and is deeply committed to living with integrity. I have every confidence that she will continue to lead a productive, law-abiding life and use this experience as motivation to make an even greater positive impact on those around her.

Perhaps the strongest statement I can make is this: if I met Gokce for the first time today, knowing everything I know about her character, I would still choose to build a friendship with her. I would still trust her. I would still recommend her. I would still invest in her. My belief in her is rooted in the person I have consistently known - not in a single chapter of her life.

I will continue to stand beside Gokce as a friend and as part of her support system. I believe wholeheartedly that she has an extraordinary future ahead of her and that she has so much more to contribute to her community and to the people fortunate enough to know her. I respectfully ask the Court to consider the entirety of her character, her genuine remorse, and the person she has consistently demonstrated herself to be. I respectfully ask for mercy and leniency in sentencing.

Thank you for your time and consideration.

Respectfully,

*Ashley Zangrillo*

Ashley Zangrillo

650-888-6149

ashleyzangrillo1@gmail.com