UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------x

UNITED STATES OF AMERICA :

:

- v. – : S3 25 Cr. 592 (LAK)

:

GÖKÇE GÜVEN, :

Defendant. :

---------------------------------------------------x

**SENTENCING MEMORANDUM OF THE UNITED STATES OF AMERICA**

JAMES M. MCDONALD
United States Attorney
Southern District of New York

Allison C. Nichols
Alexandra N. Rothman
Assistant United States Attorneys
- *Of Counsel*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT .......... 1
FACTUAL BACKGROUND .......... 2
A. Güven and Kalder .......... 2
B. Güven Lied to Investors .......... 2
C. Güven Lied to Obtain an O-1A Visa .......... 6
D. Güven Lied to Internal Investigators .......... 7
PROCEDURAL HISTORY .......... 8
APPLICATION OF SENTENCING GUIDELINES .......... 9
A SENTENCE OF 30 TO 36 MONTHS' IMPRISONMENT IS NECESSARY .......... 10
I. The Nature, Circumstances, and Seriousness of the Offense Warrant a Sentence of 30 to 36 Months' Imprisonment .......... 11
II. A Sentence of 30 to 36 Months' Imprisonment Is Necessary to Protect the Public and for Specific Deterrence .......... 19
III. A Sentence of 30 to 36 Months' Imprisonment Is Necessary for General Deterrence .......... 20
IV. The Defendant's History and Characteristics Do Not Warrant a Substantial Variance .......... 23
V. The Collateral Consequences Do Not Warrant a Substantial Variance .......... 26
VI. A Sentence of 30 to 36 Months' Imprisonment Is Necessary to Avoid Unwarranted Sentencing Disparities .......... 28
FORFEITURE AND RESTITUTION .......... 30
CONCLUSION .......... 31

The Government respectfully submits this memorandum in advance of the sentencing of defendant Gökçe Güven, presently scheduled for October 29, 2026, and in response to the defendant's sentencing submission dated October 15, 2026 ("Def. Ltr.").

## PRELIMINARY STATEMENT

Gökçe Güven, though young, is not the ingenue she claims to be. Güven deliberately, repeatedly, and methodically deceived investors about the state of her start-up business, Kalder. Through misrepresentations about annual recurring revenue—important in venture capital investing because it offers important proof-of-concept evidence for the business's use case—Kalder's brand partnerships, and Kalder's historical revenue numbers, Güven induced investors to part with approximately $7 million. When employees began raising concerns about Güven's misrepresentations to Kalder's Board, Güven sidelined and terminated them, and she disparages their qualifications and intentions in her submission to this day. Güven continued to minimize her conduct through an internal investigation, in which she repeated her lies.

Meanwhile, Güven lacked lawful immigration status. Rather than seek out lawful means of continuing to live and work in this country, Güven repeated the lies about Kalder's supposed success to U.S. Citizenship and Immigration Services, over multiple visa applications. Güven papered these lies with false recommendation letters that she forged and submitted on her own behalf to make it appear that successful business executives vouched for her and for Kalder. Some of these letter-writers barely knew Güven, and if asked to write on her behalf, would have had little or nothing to say. Güven spends much of her submission and her personal letter to the Court focusing on her own alleged potential, but fails to appreciate the irony that she could not, apparently, use her true credentials either to achieve success at her business or in obtaining lawful work status.

Güven's crimes were serious, several, multi-faceted, and yearslong. For the reasons described herein, a sentence of 30 to 36 months' imprisonment, which is slightly below the Stipulated Guidelines Range, would be sufficient but not greater than necessary to serve the purposes of sentencing.

## FACTUAL BACKGROUND

### A. Güven and Kalder

In 2022, Güven launched Kalder, a technology startup in the loyalty and rewards space. PSR ¶ 8. Güven marketed Kalder as a "fintech-marketing platform" that brands could use to create and monetize customized rewards programs. PSR ¶ 8. Instead of brands developing their own costly, loyalty programs, Güven promised that brands could utilize Kalder's technology platform to embed cash-back and rewards programs directly into their websites. PSR ¶ 8. In 2022, Güven raised an initial $3 million in pre-seed fundraising for Kalder. PSR ¶ 8.

Through Kalder, Güven garnered significant publicity for herself. PSR ¶ 9. She spoke on panels, attended networking events, and was named to the *Forbes* "30 Under 30" list for Marketing and Advertising in late 2024. PSR ¶ 9. Publicly, and to potential investors, Güven boasted of Kalder's rapidly growing brand partnerships and increasing revenue. PSR ¶ 9. In reality, and as Güven knew, Kalder's business was a flop. The company had few brand partners paying for Kalder's purported services and little actual revenue. PSR ¶ 9.

### B. Güven Lied to Investors

In April 2024, Güven began raising Kalder's second funding round, which was referred to as its "seed round." PSR ¶ 10. Güven solicited investments from dozens of venture capitalist firms and individual investors. PSR ¶ 10. Güven understood that showing growth in Kalder's annual recurring revenue was critical to her fundraising efforts. PSR ¶ 10. But Güven also knew that Kalder's business was fledgling: few brands had paid for Kalder's "services," and those brands

that had paid, typically had done so through heavily discounted or brief trial periods. Güven further understood that an accurate portrayal of her business as underwhelming would lead to a lackluster funding round. So instead of being honest with investors, or delaying the launch of the seed round, Güven deployed a series of lies to raise millions of dollars from more than a dozen investors. Critically, those lies were calculated, and were not the byproduct of mistake or misapprehension. Güven lied about the following, among other things:

Annual Recurring Revenue: Güven lied about Kalder's annual recurring revenue ("ARR"). In April 2024, Güven falsely represented that Kalder's recurring revenue had grown month over month from February 2023 and that by March 2024, Kalder had reached $1.2 million in ARR. PSR ¶ 13. Below is an excerpt from the pitch deck that Güven provided to her prospective investors:




This reported metric—$1.2 million ARR—wasn't even close to accurate. Kalder's monthly revenue was, at best, closer to $10,000. Many months it was a few thousand dollars. And Kalder never had the consistent month-over-month revenue growth that Güven reported to her prospective

investors. No amount about "probabilistic projection" on the part of Güven could credibly explain the difference between Kalder's actual revenue and Güven's ARR numbers. *See* Def. Ltr. 12 n.15.

Güven's lies about ARR continued throughout her fundraising round. By the summer of 2024, Güven represented that Kalder's ARR had grown to $1.6 million. By November 2024, after the round had closed, Güven shared with all investors that Kalder had "$1.3 million ARR, with additional deals in the closing/activation stage with Uber, Synchrony Bank, Stop & Shop, Sacramento Kings, Pegasus Airlines, Schnucks." That was false, as Güven well knew.

<u>Historical Revenue</u>: Güven also lied about Kalder's historical revenue numbers. PSR ¶ 14. Güven maintained two sets of books for Kalder. PSR ¶ 14. One internal set contained Kalder's actual monthly revenue numbers and was prepared by Kalder's outside accounting firm. A second set contained false numbers that Güven personally prepared and transmitted to prospective investors. PSR ¶ 14. Güven first shared fake historical revenue numbers with prospective investors in April 2024, when she launched her funding round. Several months later, in September 2024, Güven prepared updated fake historical financials that included further lies.

The differences between the two sets of books were stark. The "line" between reality and lies did not move a "little at a time," as Güven claims. Def. Ltr. Ex. 1 at 3. She distributed false historical revenue numbers in April 2024, and then several months later, distributed additional months of fake financials. For instance, in April 2024, Güven told investors that Kalder had earned $86,000 in revenue that month. PSR ¶ 15. In truth, Kalder's actual revenue hovered around $10,000. PSR ¶ 15. In September 2024, when Güven sent out a new set of historical financials, she reported that revenue had grown to nearly $100,000. PSR ¶ 15. The actual number was closer to $15,000. PSR ¶ 15. Kalder's internal financials showed that its total revenue for 2023 was

approximately $50,000, and its total revenue for 2024 was approximately $140,000. PSR ¶ 15. Güven had told investors it was ten times higher.

<u>Brand Partnerships</u>: Güven also lied about Kalder's brand partnerships. PSR ¶ 12. As reflected below, Güven falsely represented to prospective investors that Kalder had 26 brands "using Kalder" and 53 brands in "live freemium" (using basic Kalder services free of charge):




Güven prepared detailed spreadsheets that listed dozens of supposed brand partners and their supposed monthly recurring revenue payments to Kalder. Those numbers were false and misleading. As to some brands, Kalder had only entered into pilot programs for Kalder to provide services for a limited time period and typically at a heavily discounted price. Other brands had no agreement with Kalder whatsoever, not even for free services. Güven told similar lies about these brand partnerships to other brands that she was trying to onboard to Kalder. In other words, Güven capitalized on the names and reputations of brands that were *not* her customers to try and enlist other brands to pay for Kalder's services. That too failed.

Forged Contract: Güven also forged at least one customer contract in the course of her fraud scheme. PSR ¶ 16. In the spring of 2024, Kalder was in discussions with a Web3 services corporation ("Brand-1") for Kalder to provide certain services. No deal was ever struck, as Güven well knew. But Güven needed to add "signed" contracts to the materials she provided to potential investors. Not having any real contracts with actual revenue to share, Güven added the name and signature of an executive at Brand-1 to the draft contract and then shared that forged contract with prospective investors. PSR ¶ 17.

### C. Güven Lied to Obtain an O-1A Visa

In 2018, Güven enrolled as a college student at the University of California, Berkeley. Through her enrollment, Güven obtained a student visa and was permitted to live in the United States. While at UC Berkeley, Güven secured student internships, including at OpenSea and Robinhood.

In 2025, following graduation and as her student visa was set to expire, Güven sought permission to reside in the United States indefinitely through an O-1A visa. An O-1A visa, colloquially known as a "genius visa," is available to individuals with an extraordinary ability in the sciences, education, business or athletics. PSR ¶ 20. In February 2025, Güven caused Kalder to apply for an O-1A visa on her behalf. That application was riddled with lies, both about Kalder and herself.

As to Kalder, Güven repeated in her application similar misrepresentations regarding Kalder as those she had previously provided to investors. For instance, Güven falsely represented that "Kalder has already generated $1.5 million in revenue." PSR ¶ 22. That, of course, was false.

Güven's lies about herself were even worse. Here, Güven appended to her application several letters that appeared to be signed by business leaders supposedly touting Güven's success,

skills, and fame. The letters boasted of Güven's "unique ability to integrate product design, loyalty, architecture, and financial technology," and recounted her supposed "extraordinary contributions" to past employers. PSR ¶ 22. The letters described Güven's time at OpenSea and Robinhood in great detail. The letters were also fake. Güven had drafted them herself. To affix digital signatures in the names of others to the letters, Güven secretly created a fictious email address in the name of an associate and then used that email address to generate Docusign, or electronic, signatures for the purported reference letters. PSR ¶ 23. Güven then caused the letters to be submitted with her visa application.

In the spring of 2025, USCIS responded to Güven's visa application with a series of questions and requests for further evidence to substantiate the claims in the application. Güven responded to USCIS's questions and obtained an additional reference letter from a college professor, which she drafted and which contained, unbeknownst to the professor, misrepresentations about her qualifications, but her first visa application was denied.

During the summer of 2025, Güven was without lawful employment status for a period of time. She was not authorized to run Kalder and spent much of the summer abroad. In response, she enrolled in Harrisburg University for supposed post-graduate study, all to become eligible for a new student visa. By the fall of 2025, Güven caused Kalder to resubmit her application for an O-1A visa. The visa application again included the forged reference letters, as well as other misrepresentations regarding Kalder. This time, USCIS granted Güven's application, and she received the O-1A visa.

### D. Güven Lied to Internal Investigators

In the spring of 2025, certain Kalder employees raised concerns about Güven's misrepresentations regarding the business to Kalder's Board and a few investors. Those complaints resulted in an audit of Kalder's financials and an internal investigation of the allegations by a law

firm. The audit revealed that Kalder's actual revenue numbers were a mere fraction of the ARR numbers that Güven had promoted. The internal investigation conducted by lawyers was also stymied by Güven who refused to acknowledge the full extent of her conduct. She, for instance, failed to disclose that, in addition to providing inflated ARR metrics to investors, she also provided false historical revenue information. She also continued to insist that certain brand partners were clients when, in truth, they were not. Güven also failed to disclose any conduct related to her fraudulent visa application.

In the fall of 2025, after the internal investigation was "complete," Güven contacted a few investors to try and persuade them to release any civil claims against Kalder in exchange for a revaluation of their Kalder equity. Güven did not disclose to the investors that she had intentionally fabricated financial statements or lied about the Kalder business. No investors accepted Güven's offer, and one later filed a lawsuit against Kalder and Güven. *See* Victim Impact Statement No. 1.

## PROCEDURAL HISTORY

On November 21, 2025, the Government obtained a sealed Complaint charging Güven with wire fraud and securities fraud. Dkt. 1. On November 27, 2025, Güven was arrested at Newark Airport upon her arrival in the United States from Turkey. Güven was transported to the MDC, where she spent the following day and night, before being transported to the federal courthouse for presentment on November 29, 2025. Güven was released on bail the same day.

On December 18, 2025, the defendant was charged in Indictment 25 Cr. 592 (LAK) with one count of wire fraud, in violation of 18 U.S.C. § 1343. Dkt. 5. On January 6, 2026, the parties appeared for an initial conference. At both the conference and in a letter filed the prior day, Güven informed the Court that she sought a "speedy trial [] at the end of February or early March" in

order "to clear her name and return to the work of managing and building her company." Dkt. 16 at 2; Jan. 6, 2026 Tr. at 12. The Court scheduled trial for June 15, 2026. Dkt. 32.

On January 29, 2026, the S1 Superseding Indictment was returned, adding three new counts against Güven for securities fraud in connection with her misrepresentations to Kalder investors, in violation of 15 U.S.C. §§ 78j(b) & 78ff, 17 C.F.R. § 240.10b5; visa fraud in connection with her submission of false information to obtain an O-1A visa, in violation of 18 U.S.C. § 1546(a); and aggravated identity theft in connection with her falsifying the signatures on reference letters submitted in connection with her visa application, in violation of 18 U.S.C. § 1028A. Dkt. 38.

On March 10, 2026, the S2 Superseding Indictment was returned, adding a new aggravated identity theft count against Güven for falsifying the signature of an executive at Brand-1 on a purported contract. Dkt. 47.

On May 15, 2026, Güven pleaded guilty, pursuant to a plea agreement with the Government, to the S3 Superseding Information, which charged her with one count of offering fraud, in violation of 15 U.S.C. §§ 77q(a) and 77x. As part of her plea agreement, Güven agreed not to contest the facts set forth in paragraphs 1 through 16 of the S2 Superseding Indictment.[1]

**APPLICATION OF SENTENCING GUIDELINES**

The parties stipulated in the plea agreement that the total offense level is 21 as calculated below:

- *Base Offense Level*: Pursuant to U.S.S.G. § 2B1.1(a)(2), the base offense level is six.
- *Loss Amount*: The total loss to Kalder investors was more than $3,500,000 and less than $9,500,000 resulting in an 18-level increase under U.S.S.G. § 2B1.1(b)(1)(J).
- *Number of Victims*: The offense involved more than ten victims, resulting in a two-level increase under U.S.S.G. § 2B1.1(b)(2)(A)(i).

[1] Plea Agreement, attached as Exhibit A.

- *Chapter Four Adjustment*: Because the defendant is a zero-point offender, a two-level decrease is required by U.S.S.G. § 4C1.1(a) and (b).
- *Acceptance of Responsibility*: A three-level decrease is applicable under U.S.S.G. § 3E1.1(a), (b).

The defendant has zero criminal history points, and is in Criminal History Category I, resulting in a Stipulated Guidelines Range of 37 to 46 months' imprisonment.

The Probation Department similarly calculates a Guidelines range of 37 to 46 months' imprisonment and recommends a variance of 18 months' imprisonment. PSR at 28.

**A SENTENCE OF 30 TO 36 MONTHS' IMPRISONMENT IS NECESSARY**

The Sentencing Guidelines promote the "basic aim" of "ensuring similar sentences for those who have committed similar crimes in similar ways," *United States v. Booker*, 543 U.S. 220, 252 (2005), and so "to secure nationwide consistency, the [Sentencing] Guidelines should be the starting point and the initial benchmark," *Gall v. United States*, 552 U.S. 38, 49 (2007). Along with the Guidelines, the other factors set forth in Title 18, United States Code, Section 3553(a) must be considered. Section 3553(a) directs the Court to impose a sentence "sufficient, but not greater than necessary" to comply with the purposes set forth in paragraph two. That sub-paragraph sets forth the purposes as:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . .

Section 3553(a) further directs the Court to consider: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the statutory purposes noted

above; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range as set forth in the Sentencing Guidelines; (5) the Sentencing Guidelines policy statements; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to any victims of the offense. *See* 18 U.S.C. § 3553(a).

Taking into account the Sentencing Guidelines and all the factors set forth in 18 U.S.C. § 3553(a), a slightly below-Guidelines sentence of 30 to 36 months' imprisonment is warranted. The defense's request for a "substantially" below-Guidelines sentence would be inadequate to satisfy the purposes of sentencing, and send the wrong message to the defendant, to others considering committing fraud, to victims, and to society at large.

## I. The Nature, Circumstances, and Seriousness of the Offense Warrant a Sentence of 30 to 36 Months' Imprisonment

The nature and circumstances of the defendant's crimes are serious. Güven lied to more than a dozen prospective investors about Kalder's business, financial performance, and brand partnerships. In doing so, she raised nearly $7 million from investors: real people and institutions who believed they were investing in a real business, with revenue and customers. In truth, and as is now apparent, Kalder was little more than a shell of a business. It lacked revenue, paying customers, technology that worked, or anything else to justify the $35 million valuation that Güven achieved when she raised her $7 million "seed round." In considering the nature and circumstances of the offense, the following features bear emphasis:

*First*, Güven's fraudulent conduct was prolonged. Her crimes were not the product of a one-off mistake or momentary lapse of judgment. They began in April 2024, when she launched her "seed round," and continued well until the fall of 2025, including after an employee had raised concerns about her deceptive behavior to the Kalder Board. Along the way, Güven had many offramps to reverse course and come clean about the ways that she had inflated company

performance and lied to investors. Instead, she doubled down. In the fall of 2024, she prepared a new set of false historical financials to close out the fundraising round. In February 2025, she repeated the same lies about her business in her O-1A visa application, and went even further by preparing a series of forged letters touting her supposed accomplishments to further deceive USCIS. In the summer of 2025, she withheld information about her fraud from the law firm conducting an internal investigation. She then fired the same employees who had raised concerns following completion of the investigation. And in the fall of 2025, she repeated the same lies about her business when she submitted her second O-1A visa application. She also attempted to buy her victims' silence, offering a few larger investors a revaluation of their Kalder shares in exchange for a release of claims against the company—all while failing to disclose that the company's "product" still did not work, and that they had been duped into investing in Kalder in the first place.

*Second*, Güven's crimes were pervasive. The conduct here was not limited to lying to investors about Kalder's future projections. Güven lied about historical revenue numbers for the business. She lied about the number of Kalder's brands, claiming that companies were clients when they were not. She also lied to the Government in her visa application. She created a fake email address in another individual's name, and then used that email address to forge the signatures of several business executives on supposed reference letters. She similarly forged the signature of a business executive on a supposed business contract between Kalder and another entity when, in fact, that entity did not agree to enter into a financial or business relationship with Kalder. She then represented that the contract was part of Kalder's recurring revenue.

*Third*, even when Güven was not forging the signatures of others, she was still engaging in acts of deception. Take one example: in the spring of 2025, USCIS sought more information in

connection with Güven's first O-1A visa application. Among other things, USCIS requested proof from an industry "expert" of Güven's "extraordinary ability in her field." Güven turned to a college professor with whom she had a close relationship and asked him to submit a reference letter on her behalf. Güven's immigration lawyer drafted the letter, which the professor reviewed. The professor raised concerns about many of the specifics in the letter, including claims about Güven's prior employment at OpenSea. Güven reassured the professor that the claims in the letter were accurate, even offering to provide him with a copy of the OpenSea reference letter, *which Güven had forged*. Ultimately, based on the reassurances from Güven—a student he trusted—the professor signed the reference letter, even though most of the claims in the letter were false. That experience caused real harm to the professor. As he told the Government during a witness interview, the professor has "probably written over 1,000 recommendations for people," he "goes into them with trust for his students," and this experience "change[d] the way [he will] approach[] writing recommendation letters in the future."

Güven raises several arguments in her sentencing submission designed to temper the severity of her crimes. None is persuasive.

*First*, Güven blames her "age, immaturity, and inexperience" for her crimes. Def. Ltr. 9. In support, Güven cites to the now-rescinded Section 5H1.1 of the Guidelines. That Guideline provided for sentencing departures recognizing that "certain risk factors may affect a youthful individual's development into the mid-20's and contribute to involvement in criminal justice systems, including environment, adverse childhood experiences, substance use, lack of educational opportunities, and familial relationships." U.S.S.G. § 5H1.1 (U.S. Sentencing Comm'n 2004), App. C, amend. 829 (eff. Nov. 1, 2024). Even putting aside this Guideline no longer applies, and the defendant agreed, as part of her plea agreement, not to seek any departures from the Guidelines,

the concerns underlying this outdated Guideline have little application here. Güven has no substance issue or addiction issues. She had a wealth of educational opportunities: an exceptional primary school education in Turkey that produces "prime ministers, its Nobel laureate in literature, its scientists, its business founders," Def. Ltr. 3, and college in the United States where she claims to have excelled. And while her sentencing letter describes a difficult relationship with her father during her childhood, by her own admission, Güven was raised in a supportive home environment with a mother, grandmother, uncles, and sister who cared deeply for her.[2]

Moreover, the premise underlying Güven's argument—that youthful indiscretions explain her crimes—does not fit the facts of this case. Güven's crimes were not caused by a lack of impulse control or too much risk-seeking behavior. The conduct here was deliberate and designed. Long before Güven put together her first fake financial statement or lied to a prospective investor, she dreamed of being the "youngest self-made women billionaire of the world." PSR ¶ 10. In private notes on her iPhone, she sketched out her plans to make it onto Forbes's "30 under 30" list, and for Kalder to achieve more than "$1m+ ARR." PSR ¶ 10. Güven wanted to be a success. But when the reality of her business did not live up to the vision she had dreamed up for herself, she took the easy way out and lied. That was a choice she made, and then continued to make each time that she told further lies about her business.

*Second*, Güven blames the start-up and venture capital culture, quoting from a handful of academic journals that describe the pressures young entrepreneurs face in Silicon Valley to "fake-it-till-you-make it." Def. Ltr. 10-11. This argument should be called out for what it is: Güven trying to blame everyone but herself for her mistakes. None of Güven's investors asked to be lied to.

[2] The Court will recall that sentencing was adjourned at the defense's request so that Güven's grandmother could attend the proceeding in person.

They expected truthful answers from Güven, which is why they probed her representations and asked for supporting revenue metrics to back up her claims. Her victims' probing also explains the reason Güven lied. Güven fabricated historical financials because investors asked for those metrics; not because they did not care about them.[3] Victim after victim told the Government during this investigation that certain factors mattered the most during early-stage investing: the dynamism of the company's leadership team and the proof of concept of the business plan, including recurring revenue and the size and sophistication of the brand partners. These are the metrics Güven faked. Güven's false claims that mainstream brands like Starbucks, Nike, Sephora, Synchrony Bank, Godiva, and several soccer teams had signed on to partner with Kalder were meaningful to investors trying to vet her business model.

Moreover, Güven's finger-pointing at her VC investors, the victims here, does little to explain her decision to lie to the United States Government, not once, but twice, in submitting fraudulent visa applications. Nor does it explain her deliberate and calculated decision to use a fraudulent email address to forge the signatures of several business executives in connection with these fraudulent applications. Nor does it explain her decision to withhold information from the

[3] For this reason, Güven's reliance on a handful of excerpts from investor interviews is meaningless. Def. Ltr. 11-13. Consistent with its disclosure obligations, the Government reviewed notes of its witness interviews and produced certain materials to the defense that the defense may wish to argue were helpful. But those excerpts do not reflect the thrust of the witness statements gathered in the Government's investigation, only the ones arguably helpful to the defense. They do not even reflect the entirety of a particular witness's interview. As just one example, Güven cites to a statement from Güven's lead investor, Noah Doyle, that "[a]t the seed stage companies usually do not have much." Def. Ltr. 12. But in the same interview, Doyle explained, "When a company is making representations [Doyle] expects them to be accurate. [Doyle] expects historical financial information to be accurate. Seed stage companies don't typically have robust reporting, but [Doyle] expects numbers to be based in fact and in reality." Thus, Güven's cherry-picking of statements to advance a false narrative that investors did not care about the financial metrics Güven provided should be rejected.

law firm retained to do an internal investigation, or fire the employees who brought her misrepresentations to the attention of the Board in the first place.

*Third*, Güven argues that her crimes were less serious because she did not deplete investor money to fund a "lavish lifestyle" and her victims, even if lied to, "received equity in Kalder, a real company with money in its bank accounts." Def. Ltr. 11-14. Here, Güven seems to be seeking leniency because her intent was to "spend the money on furthering Kalder's success," and not on herself. Def. Ltr. 11-12. In making this claim, Güven merely underscores the ego that propelled her crimes. Güven did not act altruistically by intending to spend investor money on her failing business; she acted to achieve the status, prestige, and influence that follows a successful start-up founder. This is not speculation. Güven openly aspired to be the "youngest self-made women billionaire of the world." PSR ¶ 10. Güven's payday may not have come in 2024 or 2025, while she was engaging in her fraud, but she was hoping for a big payout, nonetheless. Nor should Güven be rewarded because the Government brought charges in this case before she could deplete the $7 million in investor funds that she raised, or even worse, before she could raise another round of investor funds based on another set of lies.

As for Güven's argument that her victims were not harmed because there was a "real company" behind the scheme, this Court has previously rejected a nearly identical argument in *United States v. Miller*, No. 25 Cr. 138 (LAK) (S.D.N.Y. 2005). In *Miller*, a father and son scammed investors into putting up money for a sports park business. There, much like Güven, the defendants argued they were entitled to substantial leniency because "[t]here was real interest in th[e] park, people used the park…[i]n fact, today, the park is operating successfully, which I think tends to show this was not a bill of goods." *Id.* Dkt. 42, at 6. The Court rejected this argument and sentenced the two defendants to 72- and 60-months, respectively, explaining:

> In listening to the presentations on behalf of the defendants, one might have thought that they had been convicted of trying to build a wonderful sports facility that they never had any intention of building, but that wasn't the crime charged, and the protestations that this was a lifelong dream and they really wanted to do it and they envisioned kids playing there is not a defense, and it's no mitigation.
>
> The fraud, the crime, the scam was the fraud, the crime, and the scam they committed on the investors, who they tricked into putting up the money to try to do this. That was the scam. And it was a scam. They forged documents, they made up supposed facts, they altered documents. It was a sophisticated scheme. It went on for a long time. And they both knew exactly what they were doing

*Id.* Dkt. 42 at 33-34. The same is true here.

*Fourth*, and relatedly, Güven argues that the 18-level loss enhancement overstates the seriousness of her conduct because it "swallows" the other sentencing factors. Def. Ltr. 7. This argument is misguided: the current fraud Guideline is the result of extensive and iterative work by the Sentencing Commission and is based on sound policy choices, and even if the fraud Guidelines were overly reliant on loss as a general matter—a point the Government does not concede—they are an appropriate measure of the seriousness of the offense in this case.

The defense cites to this Court's "below-Guidelines sentence" in *United States v. Bankman-Fried*, No. 22 Cr. 673 (LAK) (S.D.N.Y. 2024), which was based, at least in part, on a "policy disagreement" with the Guidelines loss table. Def. Ltr. 7. The comparison to *Bankman-Fried* is strained. There, the loss was in the billions, the Guidelines were 110 years, and the Court sentenced the defendant to 25 years. Here, the $7 million that Güven raised needs no reduction; it is a fair measure of her criminal conduct. Moreover, that the money was frozen by the Government upon charges being brought in this case, and not dissipated, is relevant to issues of restitution and forfeiture, but does not detract from the lies Güven told to steal that money in the first place.

In support of her argument, Guven also relies upon the New York City Bar Association's recent comments to the Sentencing Commission on proposed amendments which, among other

things, criticize the use of loss as a proxy for culpability when the loss figure is large compared to the defendant's actual intent and gain. Def. Ltr. 8. But the underlying case cited, *United States v. Corsey*, 723 F.3d 366, 379 (2d Cir. 2013), involves different facts than those here. In *Corsey*, the defendants were prosecuted for trying to carry out an outlandish scheme against, what turned out to be, an FBI informant. The court in *Corsey* explained, "[t]his was a clumsy, almost comical, conspiracy to defraud a nonexistent investor of three billion dollars. That scheme never came close to fruition." *Corsey*, 723 F.3d at 378. However, the defendants in *Corsey* immediately faced a Guidelines calculation that was above the statutory maximum of 20 years and close to life in prison. It is in this context that Judge Underhill, in a concurring opinion, found the Guidelines to be of "low marginal value" for the case at hand. But he did not say the guidelines were always of such little import. In fact, Judge Underhill quoted *United States v. Adelson*, 441 F. Supp. 2d 506, 509 (S.D.N.Y. 2006), in holding that in other instances, the Guidelines are "of considerable help to any judge in fashioning a sentence that is fair, just, and reasonable." *Id*. at 380.

Whatever merit there is to the argument that the Guidelines overstate the seriousness of the offense generally, this case is a poor vehicle to make it. While reasonable minds can disagree about the precise workings of the fraud Guidelines and whether they are unduly driven by loss, no one would argue that the size and scope of a financial fraud should be *unrelated* to the resulting sentence. It stands to reason that a defendant who engages in a longer, bigger fraud involving more victims should be punished more harshly than a defendant who engages in a short-term scheme or does not harm real victims. Here, Güven stole $7 million from real victims, and her prison sentence should reflect that conduct.

## II. A Sentence of 30 to 36 Months' Imprisonment Is Necessary to Protect the Public and for Specific Deterrence

A sentence of 30 to 36 months' imprisonment is separately necessary to "protect the public from further crimes of the defendant" and "afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2)(B), (C). Despite professing to accept responsibility, the defendant attributes her crimes to outside pressures, while simultaneously downplaying the significance of her conduct. Where, as here, a defendant is unwilling or unable to grapple with her crimes, this Court can have no assurance that she has been specifically deterred from reoffending.

Rather than take full responsibility, Güven attributes her crimes to factors beyond her control: the pressures of Silicon Valley and a childhood where "[a]chievement was her way of coping." Def. Ltr. 3. She assures the Court that her risk of recidivism is low because she "did not force the Court, the Government, or the victims to go through trial." Def. Ltr. 17. That is a superficial gloss on the procedural history of this case. As the Court will recall, when the Government first arrested Güven in late-November 2025, she was insistent on going to trial, and doing so on a quick timeline. As she explained to the Court, she wanted "to clear her name and return to the work of managing and building her company." Dkt. 16 at 2; Jan. 6, 2026 Tr. at 12.

Over the next few months, the full extent of Güven's crimes were revealed. Not because the defense offered any of this information to the Government, not because Güven repented, but because the Government uncovered it, on its own. The crime was no longer, as it appeared initially, simply lying about ARR metrics in pitch decks. A mountain of evidence had piled up against Güven—fake historical financial statements, forged signatures, fraudulent visas, a fake contract. By March 2026, Güven was facing a five-count Superseding Indictment, and looking at decades in prison. It was only then, months after she had been charged, that Güven decided to plead guilty.

Güven may be a first-time offender, but her risk of reoffending is real, even if she is located in Turkey following deportation. Güven's sentencing submission describes the recent work she has been doing to "develop an AI software product for construction and contract management." Def. Ltr. 16. Güven insists she is not "raising money or publicizing the venture," at present, but there is nothing to stop her from doing so in the future. Def. Ltr. 16. Indeed, there is little to stop the defendant from picking up where she left off. She will face no professional bar or reporting requirements. The private markets do not require disclosure of Güven's crimes. And her professional network, some of whom continue to stand by her through their letters submitted in support of her at sentencing, will enable her to locate investors easily. Thus, the need for specific deterrence is real and justifies a significant prison sentence.

**III. A Sentence of 30 to 36 Months' Imprisonment Is Necessary for General Deterrence**

A sentence of 30 to 36 months' imprisonment is also necessary to afford general deterrence to criminal conduct, particularly in the startup sector. The legislative history of Section 3553 demonstrates that "Congress viewed deterrence as 'particularly important in the area of white collar crime.'" *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (citing S. Rep. No. 98-225, at 76 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3259); *see also United States v. Mueffelman*, 470 F.3d 33, 40 (1st Cir. 2006) (deterrence of white-collar crime is "of central concern to Congress").That is because the decision to commit white collar crimes is often a calculated cost-benefit analysis. *Martin*, 455 F.3d at 1240 ("Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence."); *United States v. Johnson*, No. 16-CR-457-1 (NGG), 2018 WL

1997975, at *5 (E.D.N.Y. Apr. 27, 2018) ("The need for general deterrence is particularly acute in the context of white-collar crime.").

This is particularly true in the venture space. Empirical work on startup fraud suggests that significant sentences are necessary for deterrence for three reasons. *First*, startups are structurally prone to fraud: high-growth pressure creates incentives to exaggerate or fabricate performance, while the technologies many startups pursue compound the problem on the detection side. As Dyck, Fang, Hebert, and Xu explain, the use of novel and complex technologies in markets with uncertain demand can raise monitoring costs, as outcomes driven by deception are often difficult to disentangle from those resulting from technological or market risk. *See* Alexander Dyck, Freda Fang, Camille Hebert & Ting Xu, *Venture Fraud* (Nat'l Bureau of Econ. Rsch., Working Paper No. 34868, 2026), https://www.nber.org/papers/w34868. Venture fraud is therefore a uniquely difficult category of fraud to detect and prove, which independently argues for a sentence sufficient to offset the low probability of apprehension.

*Second*, the informal market mechanisms that discipline fraud in public companies—reputational sanctions, short-selling, analyst scrutiny—are largely absent here. *Id.* Despite the contractual protections investors attempt to build into their investments, Dyck et al. find a lack of market discipline for fraudulent founders, leaving legal punishment as one of the few remaining checks on fraud by startup founders. *Id.*

*Third*, this absence of market discipline is not merely theoretical, it shows up directly in founders' ability to keep raising money. Dyck et al. find that fraudulent entrepreneurs continue to found new investor-backed startups unharmed relative to non-fraudulent entrepreneurs, suggesting a lack of market discipline. Where the ordinary consequence of fraud—the inability to raise capital again—does not materialize, and where fraud in this sector is both easy to commit and hard to

detect, criminal sentencing is one of the only tools left to impose a real cost on founders who would otherwise treat fraud as a low-risk strategy with a ready supply of new investors on the other side.

Here, imposing a 30 to 36-month sentence will be consistent with Congress' intent and academic research, and send a clear message that the fraudulent solicitation of startup investors will be punished. Headlines that continue to report on founders who believe it acceptable to "fake it till they make it"[4] demonstrate the need for general deterrence. *See, e.g.*, *United States v. Holmes*, No. 18 Cr. 258 (EJD) (N.D. Cal.) (founder of blood-testing company, Theranos, defrauded investors by making misrepresentations about the company's innovative technology); *United States v. Javice*, No. 23 Cr. 251 (AKH) (S.D.N.Y.) (founder of financial aid startup, Frank, defrauded JP Morgan Chase by making misrepresentations about the company's number of student users); *United States v. Hunsicker*, No. 25 Cr. 503 (JPO) (S.D.N.Y.) (founder of clothing technology business, CaaStle, defrauded investors by making misrepresentations about the company's revenue and customers). Startup companies are not subject to SEC registration requirements and therefore provide fertile ground for fraudsters who prey on investor excitement and competition. This case presents an opportunity to send an urgent message about the consequences of startup fraud.

In response, Güven argues that this case has already delivered a "clear message to immigrant startup founders—misconduct will result in, at a minimum, a felony conviction, restitution, forfeiture, public disgrace, removal from the United States, and a 20-year-ban from the United States." Def. Ltr. 18. But the defense offers no explanation for why "immigrant startup founders" is the relevant population to be deterred from future criminal acts. The Court, with its

---

[4] Ironically, the defense cites to the same "fake it till you make it" trend in their sentencing submission, Def. Ltr. Ex. 13-15, but asks the Court to give Güven a pass, instead of using this court proceeding to curtail this dangerous trend.

sentence, should seek to deter *all* startup founders from engaging in fraud, not just those who happen to be from a different country. This makes the imposition of a meaningful prison sentence critically important.

Nor is the reputational harm or "public disgrace" that Güven has experienced a sufficient substitute for a meaningful prison sentence. Def. Ltr 18, 19. As the Second Circuit has explained, simply because a case has been widely reported on and drawn notoriety does not suggest that imprisonment is not required to promote deterrence:

> [T]he circumstances referred to by the district court do not constitute punishment. The public nature of criminal prosecutions is part of our constitutional fabric; the public humiliation suffered by one prosecuted and convicted of a crime is an ordinary consequence of his conduct, not a condition imposed by the criminal codes or the judicial process. These circumstances, though adverse, are not what § 3553(a)(2)(A) means by "punishment." Hence they cannot properly be viewed as fulfilling the need for the imposition of just punishment. And given that the more massive a fraud, the more likely it is that the prosecution will generate publicity, the logical extension of the district court's view—i.e., that Freedman's public humiliation and the public nature of his prosecution were punishment enough—would mean that the more flagrant the crime, the less actual statutorily prescribed "punishment" it would require. And of course, the less punishment that is meted out, the less deterrent effect the sentence will have on others contemplating similar crimes.

*United States v. Cutler*, 520 F.3d 136, 171 (2d Cir. 2008). Nor is it obvious that Güven's case has achieved the sort of notoriety akin to that of the cases she cites in her submission. Def. Ltr. 19 (citing cases involving Lynne Stewart, a lawyer who smuggled messages to the Blind Sheikh, and Trevor Milton, a public company fraudster who achieved great notoriety for his fraud involving Nikola).

## IV. The Defendant's History and Characteristics Do Not Warrant a Substantial Variance

Güven's personal history and characteristics do not warrant the substantially below-Guidelines sentence requested by the defense. Here, Güven relies mostly on her commitment to

Kalder, even after she was arrested, as well as the commitment a handful of employees have shown her in the recent months. Def. Ltr. 15. But neither of these grounds is a basis for leniency.

*First*, Güven's devotion to Kalder is as unsurprising as it is meaningless. Kalder was Güven's company. She wanted it to succeed because Kalder's success would bring Güven success. That she still wanted it to succeed, even after she was arrested and charged with fraud, reflects her unwillingness to accept the reality of her failing business, not "extraordinary and mitigating" personal characteristics that might warrant leniency. In response, Güven relies heavily on the supposed acquisition of Kalder by Luumis, a company run by Frazier Horn, who is also the co-signer on Güven's appearance bond. As far as the Government knows, this acquisition is little more than a signed piece of paper. No money has changed hands. No victims have been paid back. Nor is it clear what, if anything, Luumis is buying from Kalder, or why Luumis will supposedly succeed when Kalder failed.[5]

*Second*, Güven's employees' supposed devotion to her and to Kalder presents an incomplete picture of the Kalder business and Güven. As an initial matter, one of those employees is her sister, Gonca Güven, and so her devotion is predictable. Def. Ltr. Ex. 27. As to the others, the devotion of a select inner circle of employees says little about Güven's character. Notably, Güven has chosen to ignore the group of employees who raised serious concerns about her behavior to Kalder's Board, and who Güven then fired. Four of those employees have submitted written statements which describe their experiences at Kalder. *See* Victim Impact Statements Nos. 2, 3, 4, and 5.

---

[5] Horn's letter offers noticeably few specifics on his plans for Kalder, and instead is filled mostly with vague praise for Güven. Def. Ltr. Ex. 29.

One employee, Kalder's former Chief Revenue Officer, describes Güven as someone who "benefited from the institutions and protections of this country while repeatedly disregarding the obligations that came with them, and harming the people who trusted her." Victim Impact Statement No. 2 at 5. Another employee similarly describes how Güven retaliated against him and made him feel unsafe to remain in the country. He explains:

> I want the Court to understand that the harm here was not abstract. It was not a spreadsheet adjustment or an HR error. It was my life in this country. It ended because someone who was herself operating without valid work authorization used my immigration status as a weapon after I told the truth.

Victim Impact Statement No. 3 at 2.

A third employee implores the Court "to recognize that employees were also victims of many of the same misrepresentations" that Güven fed investors. Victim Impact Statement No. 4 at 1. "I trusted the opportunity Ms. Güven presented and accepted a below-market base salary based on the company's purported success, existing customer base, and commission potential. . . . Discovering that the underlying business was fundamentally different from what had been represented was devastating." *Id.* at 1. This employee also asks the Court to "consider Ms. Güven's treatment of employees when evaluating her character," explaining that when employees began raising concerns about the accuracy of Guven's claims to investors regarding Kalder's product, customers, and revenue, they experienced employment retaliation. *Id.* at 2.

This retaliation continues. The only mention of Kalder's Chief Revenue Officer ("CRO") in Güven's sentencing submission is to disparage her. Def. Ltr. 13 n.16. Güven writes that "this case did not originate with Kalder's investors crying foul, but from a complaint by a *disgruntled employee*." *Id.* at 13 (emphasis added). Güven goes on, in a footnote, that "[h]ad [the CRO] testified she would have been subject to vigorous impeachment" and that she "has a history of litigiousness against her former employers and has been terminated four times in her brief career."

Def. Ltr. 13 n.16. What Güven does not, and apparently cannot, acknowledge, is that the CRO's concerns were right, because Güven was lying to her investors, employees, and Board. That does not make the CRO disgruntled; it makes her a whistleblower. The CRO bravely reported Güven's misconduct to the Board, faced adverse employment consequences, and still to this day faces Güven's gratuitous aspersions on her and invitation to the Court to review unrelated employment history. *See* Def. Ltr. Ex. 12. Güven was lying to investors about Kalder, something she has now admitted through her guilty plea. The CRO did exactly what employees should do when they find themselves at a company where the CEO is engaging in fraud—speak up and report it to law enforcement.[6] That Güven has chosen to use her sentencing submission to further disparage the CRO only confirms that further leniency is not warranted.

## V. The Collateral Consequences Do Not Warrant a Substantial Variance

Güven argues that the collateral consequences of her conviction is another basis for a substantially below-Guidelines sentence. Def. Ltr. 19-22. There may be collateral consequences as a result of Güven's immigration status, but they are rationally related to that status. They in no way justify the substantial variance from the Guidelines that the defendant seeks.

As an initial matter, Güven cites to the emotional distress she has experienced as a result of this case, as well as a "brain lesion" that was caused by stress and lack of eating. She and her doctor ask that her sentence be structured to allow for her continued recovery, which includes frequent meals and snacks, and periodic access to neurological exams and imaging. Def. Ltr. 18; *id.* Ex. 35. These are all needs the Bureau of Prisons can meet. Inmates frequently receive mental

[6] Nor it is obvious how "vigorous impeachment" of the CRO would have made a difference at trial. Lest Güven forget, it was Güven, not the CRO, who forged the signatures of several executives to fraudulently obtain an O-1A visa, among other crimes.

health treatment or counseling while in prison. They receive regular meals and medical attention. And, when needed, inmates can get access to neurological exams and medical imaging.

Turning next to immigration, Güven cites to the direct immigration consequence of her conviction—her deportation. As a condition of her guilty plea, Güven agreed that Kalder would withdraw her O-1A visa petition, and further agreed to a stipulated judicial order of removal. Those consequences are appropriate given the facts of this case. Güven committed visa fraud when she had Kalder submit a O-1A visa application on her behalf that was riddled with lies and forged signatures. Her agreed-upon deportation is a proportional and logical result of that conduct. To impose deportation as an alternative punishment to prison, as the defense seems to be requesting, would send the message that individuals who lack lawful status can commit crimes in this country and the only consequences will be removal from the United States—a consequence that would have resulted anyway when Güven's lies to USCIS were revealed.[7] Moreover, unlike some cases where an individual is deported to a country they hardly know, Güven spent her entire youth, until college, in Turkey. She traveled there frequently while in the United States (including immediately before she was arrested), and has familial support, including her mother and grandmother, who remain in the country.

Güven finally cites to the "indirect" immigration consequences that flow from her conviction. The Government recognizes that certain aspects of Güven's incarceration will be different because she is a "deportable alien." For instance, the defense is correct that Güven is

[7] *Farhane v. United States*, 141 F.4th 353 (2d Cir. 2024), is irrelevant. *See* Def. Ltr. 20. In *Farhane*, the Second Circuit merely reaffirmed that "criminal defense attorneys have a Sixth Amendment obligation to inquire into and advise a naturalized citizen client of any risk of deportation following denaturalization proceedings that accompany the client's guilty plea." 141 F.4th at 358. But Güven was well-informed of the immigration consequences of her guilty plea, and fully understood, at the time of her plea, that she would be removed from the country following her prison sentence.

ineligible for placement in a minimum-security facility and instead would be placed in a low-security facility. *See* Bureau of Prisons, Program Statement 5110.08. She is also ineligible for home confinement for the final portion of her sentence. *See* Bureau of Prisons, Program Statement 7310.04. But the location where Güven serves her sentence is not an additional form of punishment, as the defense seems to suggest. It instead reflects an assessment by the Bureau of Prisons that individuals who are subject to deportation present greater security risks than those who do not.[8]

## VI. A Sentence of 30 to 36 Months' Imprisonment Is Necessary to Avoid Unwarranted Sentencing Disparities

Among the factors a sentencing court must consider in imposing sentence is "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). Congress adopted Section 3553(a)(6) "to eliminate unwarranted disparities nationwide." *United States v. Williams*, 524 F.3d 209, 215 (2d Cir. 2008).

The PSR notes that the sentencing data from the last five years shows that for the 317 defendants sentenced under the fraud Guidelines with offense level 21 and Criminal History Category I, the average sentence was 27 months' imprisonment and the median sentence was 28 months' imprisonment. PSR at 24. The specifics of the cases cited in the PSR are unknown, but it is unlikely they include all of the aggravating facts present here, including that Güven also engaged

[8] On the other hand, Güven can still earn up to 54 days of good time credits during her sentence, although she cannot earn First Step Act "time credits" as a result of her final order of deportation. *See* Bureau of Prisons, Program Statement 541.01. As for whether Güven would face an additional period of immigration detention prior to deportation, that is a decision that falls to U.S. Immigration and Customs Enforcement, not the Bureau of Prisons, but is a necessary consequence of her pending deportation.

in visa fraud, and forged several signatures of business executives in furtherance of her fraud scheme.

Güven cites to three cases where courts imposed below-Guidelines sentences of 12 to 14 months' imprisonment. Def. Ltr. 22-23. But none of these cases is a fair comparison. In *United States v. Borges*, No. 24 Cr. 253 (LGS) (S.D.N.Y. Nov. 14, 2025), the defendant admitted to defrauding one client out of $2.7 million. Dkt. 88, at 2. Here, by contrast, Güven defrauded more than a dozen investors out of $7 million, engaged in visa fraud, and forged the signatures of multiple executives in furtherance of her criminal aims. *United States v. Bozzo*, No. 23 Cr. 499 (AS) (S.D.N.Y. Aug. 26, 2024), involved an accounting fraud scheme where loss was calculated, not based on the dollars the defendant stole, but based on the "market capitalization coupled with the stock price change." *Id.* Dkt. 75 at 7. It is therefore an inapt comparison on its face.

*United States v. Hanratty*, No. 24 Cr. 153 (LJL) (S.D.N.Y. May 26, 2026), may be a closer case. But what seems, at least in part, to have animated the court's leniency in *Hanratty* was that the defendant did not use the "proceeds of the fraud to make lavish purchases."[9] This Court has previously rejected this sort of argument in imposing 72- and 60-month sentences on two investment fraud defendants in *United States v. Miller*, No. 25 Cr. 138 (LAK), Dkt. 42 at 33-34. In *Miller*, as described above, the defendants used fraudulently obtained funds, not on lavish purchases, but on their business idea, and the Court still imposed lengthy prison sentences, finding their use of funds was "no mitigation." *Id.*

On the other extreme, the defense argues this case is nothing like *United States v. Javice* or *United States v. Milton*, where the Guidelines were much higher and courts still imposed below-

[9] *See United States v. Hanratty*, No. 24 Cr. 153 (LJL) (S.D.N.Y. May 26, 2026), Sent. Tr. 59-62, attached as Exhibit B.

Guidelines sentences: 85 months for Javice and 48 months for Milton. Def. Ltr. 3. While the scale of the fraud was greater in *Javice*—Javice stole hundreds of millions of dollars from JPMorgan Chase—Güven engaged in other fraudulent acts that Javice did not: Güven forged signatures and applied for, and obtained, a fraudulent visa. In any event, the Government is not seeking, and the offense of conviction does not permit, a sentence in the range of Javice's 85-month sentence.

*United States v. Milton*, No. 21 Cr. 478 (ER) (S.D.N.Y.), is an even worse comparison. Unlike Güven, Milton targeted the stock price of Nikola. Loss was calculated as a percentage of the decline in Nikola's $16 billion market capitalization. *Milton*, Dkt. 322 at 14. Güven, by contrast, targeted the pocketbooks of her investors. Loss is calculated without resorting to formulas or percentages but instead by tallying up the actual dollars Güven stole from her victims. Milton also did not engage in identity theft or forge any signatures, as Güven did.

Thus, the cases cited by the defense are distinguishable and in no way suggest that a substantially below-Guidelines sentence is appropriate.

## FORFEITURE AND RESTITUTION

As a condition of her guilty plea, the defendant has agreed to forfeit $6,717,997.61, as proceeds of her fraud scheme, and to make restitution in the amount of $6,717,997.61

As to forfeiture, the Court has signed a Consent Preliminary Order of Forfeiture. Dkt. 65. At the time of sentencing, the Government requests the Court impose a money judgment in the amount of $6,717,997.61

With respect to restitution, the Government will submit a proposed Restitution Order and Sealed Schedule of Victims to the Court in advance of sentencing.

## CONCLUSION

The Government respectfully asks the Court to impose a sentence that reflects the serious nature of Güven's crimes; prevents the defendant from again committing fraud; and sends a powerful message to others who might be tempted to engage in fraud that the consequences will be stern. A sentence of 30 to 36 months' imprisonment is necessary to serve the purposes of sentencing.

Dated: New York, New York
October 22, 2026

Respectfully submitted,

JAMES M. MCDONALD
United States Attorney

By: Alexandra Rothman
______________________
Allison C. Nichols
Alexandra N. Rothman
Assistant United States Attorneys
Telephone: (212) 637-2366 / -2580