**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

May 7, 2026

**VIA E-MAIL**
Scott Hartman, Esq.
Quinn Emanuel Urquhart & Sullivan, LLP
scotthartman@quinnemanuel.com

Andrea Griswold, Esq.
Skadden, Arps, Slate, Meagher & Flom LLP
andrea.griswold@skadden.com

Danielle Sassoon, Esq.
Clement & Murphy PLLC
danielle.sassoon@clementmurphy.com

**Re: *United States v. Gökçe Güven*, S3 25 Cr. 592 (LAK)**

Dear Counsel:

On the understandings specified below, the Office of the United States Attorney for the Southern District of New York ("this Office") will accept a guilty plea from Gökçe Güven ("the defendant") to Count One of the above-referenced S3 Superseding Information (the "Information").

Count One of the Information charges the defendant with securities fraud, in violation of Title 15, United States Code, Sections 77q(a) and 77x. Count One carries a maximum term of imprisonment of five years; a maximum term of supervised release of three years; a maximum fine, pursuant to Title 15, United States Code, Section 77x and Title 18, United States Code, Section 3571, of the greatest of $250,000, twice the gross pecuniary gain derived from the offense, or twice the gross pecuniary loss to persons other than the defendant resulting from the offense; and a $100 mandatory special assessment. In addition to the foregoing, the Court must order restitution as specified below.

The total maximum term of imprisonment on Count One is five years.

In addition, by accepting the terms of this agreement, the defendant agrees not to contest, at sentencing, the facts set forth in paragraphs 1 through 16 of the S2 Superseding Indictment, which is attached hereto as Exhibit A, and further agrees and stipulates that this conduct constitutes information to be used in imposing sentence, pursuant to U.S.S.G. § 1B1.4.

In consideration of the defendant's plea to the above offense, the defendant will not be further prosecuted criminally by this Office (except for criminal tax violations, if any, as to which this Office cannot, and does not, make any agreement) for (1) making material misstatements regarding the revenue and brand partners of Kalder to prospective and current investors of Kalder, in connection with the defendant's solicitation of approximately $7 million in investments as part of Kalder's seed round (the "Seed Round"), as charged in Count One of the Information, and (2) knowingly making a false immigrant visa application and using, without lawful authority, the means of identification of other people as part of that application, it being understood that this agreement does not bar the use of such conduct as a predicate act or as the basis for a sentencing enhancement in a subsequent prosecution including, but not limited to, a prosecution pursuant to 18 U.S.C. §§ 1961 *et seq.* In addition, at the time of sentencing, the Government will move to dismiss any open Count against the defendant. The defendant agrees that with respect to any and all dismissed charges the defendant is not a "prevailing party" within the meaning of the "Hyde Amendment," Section 617, P.L. 105-119 (Nov. 26, 1997), and will not file any claim under that law.

The defendant hereby admits the forfeiture allegation with respect to Count One of the Information and agrees to forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c): (i) a sum of money equal to $6,717,998 in United States currency, representing proceeds traceable to the commission of said offense; and (ii) all right, title, and interest of the defendant in the following specific property: all monies, assets, and funds contained in Mercury Technologies Inc. accounts 202217285146 and 8IS-06631-12 RR ZXB (collectively the "Specific Property"). The defendant agrees that the defendant will not file a claim or a petition for remission or mitigation in any forfeiture proceeding involving the Specific Property and will not cause or assist anyone else, including but not limited to Kalder, in doing so. The defendant also agrees to take all necessary steps to pass clear title to the Specific Property to the United States, including, but not limited to, the execution of all necessary documentation. It is further understood that any forfeiture of the defendant's assets shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty the Court may impose upon the defendant in addition to forfeiture. The defendant consents to the entry of the Consent Order of Forfeiture annexed hereto as Exhibit B and agrees that the Consent Order of Forfeiture shall be final as to the defendant at the time it is ordered by the Court.

The defendant further agrees to make restitution in the amount of $6,717,998 and as specified in the attached schedule in accordance with Title 18, United States Code, Sections 3663, 3663A, and 3664, and the obligation to make such restitution shall be made a condition of probation, *see* 18 U.S.C. § 3563(b)(2), or of supervised release, *see* 18 U.S.C. § 3583(d), as the case may be. The restitution amount shall be paid according to a plan established by the Court. The defendant will be given credit against this restitution amount for any payments made prior to sentencing, as verified by the Office.

In consideration of the foregoing and pursuant to United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") Section 6B1.4, the parties hereby stipulate to the following:

A. Offense Level

1. The applicable Guidelines Manual is the November 1, 2025 manual.
2. The applicable Guideline section to Count One is U.S.S.G. § 2B1.1.
3. Pursuant to U.S.S.G. § 2B1.1(a)(2), because the offense of conviction has a statutory maximum of fewer than 20 years, the base offense level for Count One is six.
4. Pursuant to U.S.S.G. § 2B1.1(b)(1)(J), 18 levels are added because the loss was more than $3,500,000 but less than $9,500,000.
5. Pursuant to U.S.S.G. § 2B1.1(b)(2)(A)(i), two levels are added because the offense involved 10 or more victims.
6. Pursuant to U.S.S.G. § 4C1.1(a), the offense level is decreased by two levels because, based upon the information now available to this Office (including representations by the defense), the defendant meets all of the criteria in that section.
7. Assuming the defendant clearly demonstrates acceptance of responsibility, to the satisfaction of the Government, through the defendant's allocution and subsequent conduct prior to the imposition of sentence, a two-level reduction will be warranted, pursuant to U.S.S.G. § 3E1.1(a). Furthermore, assuming the defendant has accepted responsibility as described in the previous sentence, the Government will move at sentencing for an additional one-level reduction, pursuant to U.S.S.G. § 3E1.1(b), because the defendant gave timely notice of the defendant's intention to enter a plea of guilty, thereby permitting the Government to avoid preparing for trial and permitting the Court to allocate its resources efficiently.

In accordance with the above, the applicable Guidelines offense level for Count One is 21.

B. Criminal History Category

Based upon this Office's current understanding (including from representations by the defense), the defendant has zero criminal history points.

In accordance with the above, the defendant's Criminal History Category is I.

C. Sentencing Range

Based upon the calculations set forth above, the defendant's stipulated Guidelines range is 37 to 46 months' imprisonment (the "Stipulated Guidelines Range"). In addition, after determining

the defendant's ability to pay, the Court may impose a fine pursuant to U.S.S.G. § 5E1.2. At Guidelines level 21, the applicable fine range is $15,000 to $150,000.

The parties agree that neither a downward nor an upward departure from the Stipulated Guidelines Range set forth above is warranted. Accordingly, neither party will seek any departure or adjustment pursuant to the Guidelines that is not set forth herein. Nor will either party in any way suggest that the Probation Office or the Court consider such a departure or adjustment under the Guidelines.

The parties agree that either party may seek a sentence outside of the Stipulated Guidelines Range based upon the factors to be considered in imposing a sentence pursuant to Title 18, United States Code, Section 3553(a).

Except as provided in any written Proffer Agreement that may have been entered into between this Office and the defendant, nothing in this Agreement limits the right of the parties (i) to present to the Probation Office or the Court any facts relevant to sentencing; (ii) to make any arguments regarding where within the Stipulated Guidelines Range (or such other range as the Court may determine) the defendant should be sentenced and regarding the factors to be considered in imposing a sentence pursuant to Title 18, United States Code, Section 3553(a); (iii) to seek an appropriately adjusted Guidelines range if it is determined based upon information not contained in this Agreement that the defendant's criminal history category is different from that set forth above; and (iv) to seek an appropriately adjusted Guidelines range or mandatory minimum term of imprisonment if it is subsequently determined that the defendant qualifies as a career offender under U.S.S.G. § 4B1.1. Nothing in this Agreement limits the right of the Government to seek denial of the adjustment for acceptance of responsibility, *see* U.S.S.G. § 3E1.1, regardless of any stipulation set forth above, if the defendant fails clearly to demonstrate acceptance of responsibility, to the satisfaction of the Government, through the defendant's allocution and subsequent conduct prior to the imposition of sentence. Similarly, nothing in this Agreement limits the right of the Government to seek an enhancement for obstruction of justice, *see* U.S.S.G. § 3C1.1, regardless of any stipulation set forth above, should it be determined that the defendant has either (i) engaged in conduct, unknown to the Government at the time of the signing of this Agreement, that constitutes obstruction of justice or (ii) committed another crime after signing this Agreement.

It is understood that pursuant to U.S.S.G. § 6B1.4(d), neither the Probation Office nor the Court is bound by the above Guidelines stipulation, either as to questions of fact or as to the determination of the proper Guidelines to apply to the facts. In the event that the Probation Office or the Court contemplates any Guidelines adjustments, departures, or calculations different from those stipulated to above, or contemplates any sentence outside of the stipulated Guidelines range, the parties reserve the right to answer any inquiries and to make all appropriate arguments concerning the same.

It is understood that the sentence to be imposed upon the defendant is determined solely by the Court. It is further understood that the Guidelines are not binding on the Court. The defendant acknowledges that the defendant's entry of a guilty plea to the charged offenses authorizes the sentencing court to impose any sentence, up to and including the statutory maximum

sentence. This Office cannot, and does not, make any promise or representation as to what sentence the defendant will receive. Moreover, it is understood that the defendant will have no right to withdraw the defendant's plea of guilty should the sentence imposed by the Court be outside the Guidelines range set forth above.

It is agreed that the defendant will not file a direct appeal or otherwise challenge, by petition pursuant to 28 U.S.C. § 2255 or any other provision, the defendant's conviction. In addition to any other claims the defendant might raise, the defendant waives the right to challenge the conviction based on (1) any non-jurisdictional defects in the proceedings before entry of this plea, (2) a claim that the statute to which the defendant is pleading guilty is unconstitutional, and (3) a claim that the admitted conduct does not fall within the scope of the statute. It is further agreed that (i) the defendant will not file a direct appeal or otherwise challenge, by petition pursuant to 28 U.S.C. § 2255 or any other provision, any sentence within or below the Stipulated Guidelines Range of 37 to 46 months' imprisonment and (ii) that the Government will not appeal any sentence within or above the Stipulated Guidelines Range. This provision is binding on the parties even if the Court employs a Guidelines analysis different from that stipulated to herein. Furthermore, it is agreed that any appeal as to the defendant's sentence that is not foreclosed by this provision will be limited to that portion of the sentencing calculation that is inconsistent with (or not addressed by) the above stipulation. The parties agree that this waiver applies regardless of whether the term of imprisonment is imposed to run consecutively to or concurrently with the undischarged portion of any other sentence of imprisonment that has been imposed on the defendant at the time of sentencing in this case. The defendant further agrees not to appeal or bring a collateral challenge of any term of supervised release that is less than or equal to the statutory maximum or any condition of supervised release imposed by the Court for which he had notice, including from a recommendation by the Probation Office in the presentence investigation report, and an opportunity to object. The defendant also agrees not to appeal or bring a collateral challenge of any forfeiture amount that is less than or equal to $6,717,998, and the Government agrees not to appeal any forfeiture amount that is greater than or equal to $6,717,998. The defendant also agrees not to appeal or bring a collateral challenge of any restitution amount that is less than or equal to $6,717,998, and the Government agrees not to appeal any restitution amount that is greater than or equal to $6,717,998. The defendant also agrees not to appeal or bring a collateral challenge to any special assessment that is less than or equal to $100. Notwithstanding the foregoing, nothing in this paragraph shall be construed to be a waiver of whatever rights the defendant may have to assert claims of ineffective assistance of counsel, whether on direct appeal, collateral review, or otherwise. Rather, it is expressly agreed that the defendant reserves those rights.

The defendant hereby acknowledges that the defendant has accepted this Agreement and decided to plead guilty because the defendant is in fact guilty.

By entering this plea of guilty, the defendant waives any and all right to withdraw the defendant's plea or to attack the defendant's conviction or sentence, either on direct appeal or collaterally, on the ground that the Government has failed to produce any discovery material (other than information establishing the factual innocence of the defendant), including *Jencks* Act material, material pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), and impeachment material pursuant to *Giglio v. United States*, 405 U.S. 150 (1972), that has not already been produced as of the date of the signing of this Agreement.

The defendant recognizes that because the defendant is not a citizen of the United States, the defendant's guilty plea and conviction make it very likely that the defendant's removal from the United States is presumptively mandatory and that, at a minimum, the defendant is at risk of being removed or suffering other adverse immigration consequences. The defendant acknowledges that the defendant has discussed the possible immigration consequences (including removal) of the defendant's guilty plea and conviction with defense counsel. The defendant affirms that the defendant wants to plead guilty regardless of any immigration consequences that may result from the guilty plea and conviction, even if those consequences include removal from the United States. It is agreed that the defendant will have no right to withdraw the defendant's guilty plea based on any actual or perceived adverse immigration consequences (including removal) resulting from the guilty plea and conviction. It is further agreed that the defendant will not challenge the defendant's conviction or sentence on direct appeal, or through litigation under Title 28, United States Code, Section 2255 and/or Section 2241, on the basis of any actual or perceived adverse immigration consequences (including removal) resulting from the defendant's guilty plea and conviction.

Further, the defendant agrees to cause Kalder to withdraw, revoke, or terminate her 0-1A petition by the time of sentencing and to the entry of a stipulated judicial order of removal pursuant to Title 8, United States Code, Sections 1228(c)(5) and 1182. Specifically, the defendant admits that the defendant is a native and citizen of Turkey, and that, upon entry of judgment, the defendant is removable from the United States pursuant to Title 8, United States Code, Section 1182(a)(2)(A)(i)(I).

After consultation with counsel and understanding the legal consequences of doing so, the defendant knowingly and voluntarily waives the right to the notice and hearing provided for in Title 8, United States Code, Section 1228(c)(2), and further waives any and all rights to appeal, reopen, reconsider, or otherwise challenge the judicial order of removal. The defendant understands and knowingly waives the defendant's right to a hearing before an immigration judge or any other authority under the Immigration and Nationality Act of 1952 ("INA"), as amended, on the question of the defendant's removability from the United States. The defendant further understands the rights the defendant would possess in a contested immigration hearing and waives these rights, including the defendant's right to examine the evidence against the defendant, to present evidence on the defendant's behalf, and to cross-examine the witnesses presented by the Government.

The defendant agrees to waive the defendant's rights to any and all forms of relief or protection from removal or exclusion under the INA, as amended, and related federal regulations. As part of this Agreement, the defendant waives any right to claim that the defendant was persecuted in, or has a present fear of persecution in Turkey on account of the defendant's race, religion, nationality, membership in a particular social group, or political opinion. Similarly, the defendant further waives any right to claim that the defendant was tortured in, or has a present fear of torture in Turkey.

The defendant agrees to request that an order be issued by the Court for the defendant's removal to Turkey. The defendant agrees to accept a written judicial order of removal as a final

disposition of these proceedings and waives any and all rights to challenge any provision of this Agreement in any United States or foreign court or tribunal.

The defendant hereby agrees to make the judicial order of removal a public document, waiving the defendant's privacy rights, including the defendant's privacy rights under 8 C.F.R. § 208.6. At the request of the U.S. Attorney's Office, ICE has concurred with the Government's request for a judicial order of removal. As a result of the above-referenced order, upon the completion of the defendant's criminal proceedings, including any sentence of incarceration, the defendant shall be removed from the United States.

The defendant agrees to assist ICE in the execution of the defendant's removal. Specifically, the defendant agrees to assist ICE in the procurement of any travel or other documents necessary for the defendant's removal; to meet with and to cooperate with representatives of any country to which the defendant's removal is directed, including the above-listed countries; and, to execute those forms, applications, or waivers needed to execute or expedite the defendant's removal. The defendant further understands that the defendant's failure or refusal to assist ICE in the execution of the defendant shall breach this Agreement and may subject the defendant to criminal penalties under Title 8, United States Code, Section 1253.

The defendant concedes that the entry of a judicial order of removal renders the defendant immediately excludable from and inadmissible to the United States for a period of 20 years. The defendant agrees that the defendant will not enter, attempt to enter, or transit through the United States without first seeking and obtaining permission to do so from the Secretary of the Department of Homeland Security or other designated representative of the U.S. Government.

It is understood that the defendant will have no right to withdraw the defendant's plea of guilty should the Court fail, for any reason, to enter a judicial order of removal. Moreover, the Court's failure, for any reason, to enter a judicial order of removal shall only void the portion of this Agreement pertaining to the defendant's stipulation to a judicial order of removal, and shall have no impact on the remaining terms of this Agreement.

It is further agreed that should the conviction following the defendant's plea of guilty pursuant to this Agreement be vacated for any reason, then any prosecution that is not time-barred by the applicable statute of limitations on the date of the signing of this agreement (including any counts that the Government has agreed to dismiss at sentencing pursuant to this Agreement) may be commenced or reinstated against the defendant, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the commencement or reinstatement of such prosecution. It is the intent of this Agreement to waive all defenses based on the statute of limitations with respect to any prosecution that is not time-barred on the date that this Agreement is signed.

It is further understood that this Agreement does not bind any federal, state, or local prosecuting authority other than this Office.

Apart from any written Proffer Agreements that may have been entered into between this Office and defendant, this Agreement supersedes any prior understandings, promises, or

conditions between this Office and the defendant. No additional understandings, promises, or conditions have been entered into other than those set forth in this Agreement, and none will be entered into unless in writing and signed by all parties.

Very truly yours,

JAY CLAYTON
United States Attorney

By: [signature]
Allison Nichols
Alexandra N. Rothman
Assistant United States Attorneys
(212) 637-2366/-2580

APPROVED: [signature]
Nicolas Roos/Andrew Thomas
Co-Chiefs, Securities & Commodities Fraud Task Force

AGREED AND CONSENTED TO:

[signature]
Gökçe Güven

05/14/2026
DATE

APPROVED:

[signature]
Scott Hartman, Esq.
Andrea Griswold, Esq.
Danielle Sassoon, Esq.
Attorneys for Gökçe Güven

14 MAY 2026
DATE

# Exhibit A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

GÖKÇE GÜVEN,

Defendant.

**SUPERSEDING INDICTMENT**

S2 25 Cr. 592 (LAK)

**COUNT ONE**

**(Securities Fraud)**

The Grand Jury charges:

1. From at least in or about 2024 up to and including at least in or about November 2025, GÖKÇE GÜVEN, the defendant, engaged in a scheme to defraud the investors of Kalder Inc. ("Kalder"), a company that she founded and led as Chief Executive Officer ("CEO"). While raising money from venture capital investors as part of Kalder's "seed round," GÜVEN falsely represented Kalder's business success and prospects through lies about Kalder's financials, brand partners, and paying customers. GÜVEN overstated Kalder's annual recurring revenue—a financial metric that reflects predictable (recurring) income generated through subscriptions—by nearly tenfold. GÜVEN also falsely represented that Kalder had dozens of paying customers. In truth, and as GÜVEN knew, Kalder had minimal revenue, recurring or otherwise, and few paying customers. GÜVEN raised approximately $7 million from "seed round" investors in exchange for equity interests in Kalder.

2. GÖKÇE GÜVEN, the defendant, also used lies about Kalder to obtain an immigration benefit. GÜVEN, who is a Turkish national, developed Kalder while in the United States on a student visa. As her student visa reached expiration, GÜVEN used false statements

about Kalder's success, among other lies, to fraudulently obtain a visa that would allow her to remain in the United States indefinitely. Specifically, in 2025, GÜVEN caused Kalder to sponsor her for an O-1A visa, colloquially known as a "genius visa," which is issued to individuals with extraordinary ability in the sciences, education, business or athletics. GÜVEN's visa application repeated the same sorts of misrepresentations that GÜVEN had provided to Kalder's investors, including that Kalder had more than $1.2 million in annual recurring revenue and dozens of paying customers. As part of her application, GÜVEN also supplied letters of support and reference purportedly signed by business executives but that, in fact, GÜVEN had forged and digitally signed herself without the executives' knowledge or consent. Based on a visa application that contained these material misrepresentations and forgeries, GÜVEN was ultimately issued an O-1A visa in the fall of 2025.

**GÜVEN's Scheme to Defraud Investors**

3. GÖKÇE GÜVEN, the defendant, was the founder and CEO of Kalder, a New-York based technology startup focused on business loyalty and rewards programs. GÜVEN created Kalder in 2022, raising $3 million for the business in a pre-seed investment round. She promoted Kalder as a "fintech-marketing platform" that brands could use to create and monetize customized rewards programs. According to GÜVEN, brands could embed cash-back and rewards programs directly into their websites, thereby increasing customer engagement and spending.

4. Through Kalder, GÖKÇE GÜVEN, the defendant, generated significant publicity for herself, particularly in the technology and startup space. GÜVEN spoke on panels, attended networking events, and was named to the *Forbes* "30 Under 30" list for Marketing and Advertising in late 2024 after touting Kalder to the magazine. Publicly, and to potential investors and brand partners, GÜVEN boasted of rapidly growing brand partners and increasing revenue for the

business. In reality, and as GÜVEN knew, Kalder's business was not gaining traction. The company had few brand partners paying for Kalder's purported services and little actual revenue.

5. In April 2024, GÖKÇE GÜVEN, the defendant, began raising Kalder's seed round, soliciting investments from dozens of venture capitalists, including investors based in Manhattan. By late 2024, GÜVEN had raised approximately $7 million from more than a dozen investors. In soliciting these investments, GÜVEN provided prospective investors with false statements, misleading claims, and fabricated documents regarding Kalder's revenue and brand partners.

6. For instance, beginning in or around April 2024, GÖKÇE GÜVEN, the defendant, prepared and transmitted to potential investors a pitch deck for Kalder that misrepresented, among other things, the status of Kalder's business partnerships. In the pitch deck, GÜVEN represented that Kalder had 26 brands "using Kalder" and 53 brands in "live freemium" (that is, using basic Kalder services free of charge). Those numbers were false and misleading. As to some brands, Kalder had only entered into pilot programs for Kalder to provide services for a limited time period and typically at a heavily discounted price. Other brands had no agreement with Kalder whatsoever—not even for free services.

7. Kalder's pitch deck, which GÖKÇE GÜVEN, the defendant, caused to be transmitted to investors and prospective investors, also reported, among other things, that Kalder's recurring revenue had steadily grown month over month since February 2023 and that by March 2024, Kalder had reached $1.2 million in annual recurring revenue. That was false. As GÜVEN well knew, Kalder's revenue had been largely flat over the prior year, and was nowhere near the $1.2 million that GÜVEN had represented. Nor did Kalder have contracts with brand partners that would result in $1.2 million in annual recurring revenue.

8. GÖKÇE GÜVEN, the defendant, concealed the true financial condition of the company from multiple investors by maintaining two sets of books—one internal set containing Kalder's accurate monthly and annual financial information that was prepared by Kalder's outside accounting firm, and a second set with false and inflated numbers that was transmitted to investors and prospective investors.

9. The discrepancies between Kalder's internal financial records and those transmitted to investors and prospective investors were stark. For instance, a purported historical financial statement that GÖKÇE GÜVEN, the defendant, caused to be transmitted to prospective investors reflected that Kalder's revenue had grown month over month from March 2023 to April 2024, with Kalder earning approximately $86,000 in revenue in April 2024. That month's supposed revenue figure was inflated by nearly tenfold; in truth, as GÜVEN knew, Kalder's actual historical financials showed that revenue had been largely flat over the prior year, and Kalder had earned less than $10,000 in revenue in April 2024. Likewise, in or about September 2024, GÜVEN caused to be transmitted to another potential investor an updated historical financial statement showing, falsely, that Kalder's revenue had continued to grow between April 2024 and August 2024, and that Kalder had earned nearly $100,000 in revenue in August 2024. That too was false; as GÜVEN knew, Kalder's actual historical financials showed that August 2024 revenue was approximately $15,000. Indeed, Kalder's actual, internal financials showed that its total revenue for the year 2023 was approximately $50,000, and its total revenue for the year 2024 was approximately $140,000.

10. GÖKÇE GÜVEN, the defendant, also transmitted and caused to be transmitted to prospective investors a forged contract between Kalder and a global Web3 services corporation ("Brand-1"). This forged contract purported to require Brand-1 to pay Kalder a minimum monthly rate of $2,500 per month. In truth, and as GÜVEN knew, while representatives of Kalder and

Brand-1 had engaged in discussions about a potential partnership, no deal was ever struck and no contract was ever signed. To create the forged contract and make it appear as though it has been consummated, GÜVEN added to it the name of and affixed a signature purportedly belonging to a representative of Brand-1. GÜVEN then conveyed the forgery to Kalder's investors and prospective investors as an example of Kalder's existing brand partnerships.

11. Following these false statements, misleading claims, and fabricated documents regarding Kalder's revenue and brand partners, GÖKÇE GÜVEN, the defendant, raised approximately $7 million from more than a dozen investors, who each received equity interests in Kalder. As a result of this seed round, Kalder had an implied valued of approximately $35 million, and GÜVEN's majority stake had an implied value of approximately $18 million.

**GÜVEN's Scheme to Fraudulently Obtain a Visa**

12. Beginning in or about 2018, GÖKÇE GÜVEN, the defendant, resided in the United States on a student visa. In or about 2025, as her student visa approached its end, GÜVEN, a citizen of Turkey, sought permission to reside in the United States indefinitely. Specifically, GÜVEN caused Kalder to apply to U.S. immigration authorities for an O-1A visa to be issued to GÜVEN. An O-1A visa is available to individuals with an extraordinary ability in the sciences, education, business or athletics. To enable immigration officers to determine whether a particular individual meets these criteria, United States visa regulations require, among other things, that an applicant provide evidence, including "Affidavits written by present or former employers or recognized experts certifying to the recognition and extraordinary ability . . . ." 8 C.F.R. § 214.2(o)(ii)(A)(1).

13. GÖKÇE GÜVEN, the defendant, initially caused Kalder to apply for an O-1A visa on her behalf in February 2025, as supplemented in June 2025. GÜVEN's application focused on her purportedly extraordinary business ability and included numerous assertions about Kalder's

business success and GÜVEN's personal accomplishments. Because the O-1A visa is available only to qualifying persons evincing "extraordinary ability," GÜVEN's assertions about Kalder and about her personal accomplishments addressed the core question presented by the application.

14. GÖKÇE GÜVEN, the defendant, lied on both fronts. As to Kalder, she repeated in her application similar misrepresentations regarding Kalder as those she previously provided to investors. For instance, and among other things, GÜVEN falsely represented that "Kalder has already generated $1.5 million in revenue." As to her alleged personal accomplishments and skill, the application appended letters from various business leaders touting GÜVEN's success, skill, and fame. One letter purportedly from a senior executive at a financial services technology company ("Executive-1") claimed, among other things, that GÜVEN "represents an exceptional caliber of talent," "[h]er unique ability to integrate product design, loyalty architecture, and financial technology is both rare and critically important," and "it is squarely in the national interest to enable [GÜVEN] to continue her work in the United States." Another letter purportedly from the CEO of a technology company where GÜVEN worked briefly as a student intern ("Executive-2") claimed, among other things, that "[t]he technology [GÜVEN] is building, enabling real-time, card-linked, interoperable rewards, represents a major evolution in consumer infrastructure, and I believe [GÜVEN's] continued work in this field is of national economic benefit." A third letter purportedly from the former chief operating officer ("COO") of the same technology company ("Executive-3") claimed, among other things, that GÜVEN made "extraordinary contributions" to the company that were "instrumental to the company's success and its distinguished reputation." And, a fourth letter purportedly from an executive at another financial services company where GÜVEN also had worked as a student intern ("Executive-4") claimed, among other things, that

GÜVEN had been "instrumental" in the launch of a particular program that had not even existed at the time of GÜVEN's involvement with the company.

15. The letters discussed in the preceding paragraph were forged by GÜVEN. GÜVEN secretly had created an email address in the name of another person ("Individual-3"). She then used that email address to generate DocuSign signatures purportedly from Executive-1, Executive-2, Executive-3, and Executive-4, and digitally affixed them to the letters of support that she caused to be drafted and submitted with her visa application. By using an email address in Individual-3's name, rather than in her own, GÜVEN attempted to conceal her role in the forgeries.

16. Even after these false statements and forgeries, GÖKÇE GÜVEN, the defendant, was not initially successful in obtaining an O-1A visa. However, GÜVEN caused Kalder to reapply for a visa on her behalf, repeating in the second application many of the same false representations from the first application and appending again the forged letters from Executive-1, Executive-2, Executive-3, and Executive-4, among others. GÜVEN was ultimately issued an O-1A visa in the fall of 2025.

**Statutory Allegations**

17. From at least in or about 2024 up to and including at least in or about November 2025, in the Southern District of New York and elsewhere, GÖKÇE GÜVEN, the defendant, willfully and knowingly, directly and indirectly, by the use of a means and instrumentality of interstate commerce and of the mails, and of a facility of a national securities exchange, used and employed, in connection with the purchase and sale of a security, a manipulative and deceptive device and contrivance, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing a device, scheme, and artifice to defraud; (b) making an untrue statement of a material fact and omitting to state a material fact necessary in order to make the statements made,

in light of the circumstances under which they were made, not misleading; and (c) engaging in an act, practice, and course of business which operated and would operate as a fraud and deceit upon a person, to wit, GÜVEN engaged in a scheme to defraud by making materially false and misleading statements to current and prospective investors regarding Kalder's revenue and business partnerships, in connection with the sale of equity shares of Kalder.

(Title 15, United States Code, Sections 78j(b), 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5; Title 18, United States Code, Section 2.)

**COUNT TWO**

**(Wire Fraud)**

The Grand Jury further charges:

18. The allegations contained in paragraphs 1 through 16 of this Indictment are repeated and realleged as if fully set forth herein.

19. From at least in or about 2024 up to and including at least in or about November 2025, in the Southern District of New York and elsewhere, GÖKÇE GÜVEN, the defendant, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, to wit, GÜVEN engaged in a scheme to defraud investors in Kalder by making materially false and misleading statements to current and prospective investors regarding Kalder's revenue and business partnerships in order to obtain money from those investors, and sent and received, and caused others to send and receive, electronic communications and financial wires to and from the Southern District of New York and elsewhere, in furtherance of that scheme.

(Title 18, United States Code, Sections 1343 and 2.)

## COUNT THREE

**(Visa Fraud)**

The Grand Jury further charges:

20. The allegations contained in paragraphs 1 through 16 of this Indictment are repeated and realleged as if fully set forth herein.

21. In or about 2025, in the Southern District of New York and elsewhere, GÖKÇE GÜVEN, the defendant, knowingly made under oath, and as permitted under penalty of perjury under Title 28, United States Code, Section 1746, knowingly subscribed as true, a false statement with respect to a material fact in an application, affidavit, and other document required by the immigration laws and regulations prescribed thereunder, and knowingly presented such application, affidavit, and other document which contained such false statement and which failed to contain a reasonable basis in law and fact, to wit, GÜVEN caused to be signed and presented to immigration authorities a petition for a O-1A visa that contained false information and evidence to demonstrate her alleged eligibility for the visa, namely materially false statements and forged letters of support.

(Title 18, United States Code, Sections 1546(a) and 2.)

## COUNT FOUR

**(Aggravated Identity Theft)**

The Grand Jury further charges:

22. The allegations contained in paragraphs 1 through 16 of this Indictment are repeated and realleged as if fully set forth herein.

23. In or about 2025, in the Southern District of New York and elsewhere, GÖKÇE GÜVEN, the defendant, knowingly transferred, possessed, and used, without lawful authority, a

means of identification of another person, during and in relation to a felony violation enumerated in Title 18, United States Code, Section 1028A(c), to wit, GÜVEN falsified the names and signatures of multiple individuals, including Executive-1, Executive-2, Executive-3, and Executive-4, on forged letters of support submitted in connection with GÜVEN's O-1A visa application, during and in relation to the visa fraud charged in Count Three of this Indictment.

(Title 18, United States Code, Sections 1028A(a)(1), 1028A(b), and 2.)

**COUNT FIVE**

**(Aggravated Identity Theft)**

The Grand Jury further charges:

24. The allegations contained in paragraphs 1 through 16 of this Indictment are repeated and realleged as if fully set forth herein.

25. In or about 2024, in the Southern District of New York and elsewhere, GÖKÇE GÜVEN, the defendant, knowingly transferred, possessed, and used, without lawful authority, a means of identification of another person, during and in relation to a felony violation enumerated in Title 18, United States Code, Section 1028A(c), to wit, GÜVEN added the name and falsified the signature of an executive of Brand-1 on a purported contract between Brand-1 and Kalder, during and in relation to the wire fraud charged in Count Two of this Indictment.

(Title 18, United States Code, Sections 1028A(a)(1), 1028A(b), and 2.)

**FORFEITURE ALLEGATIONS**

26. As a result of committing the offenses alleged in Counts One and Two of this Indictment, GÖKÇE GÜVEN, the defendant, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any and all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of said offenses, including but not limited to a sum of money in United States currency

representing the amount of proceeds traceable to the commission of said offenses, and the following specific property:

a. Any and all monies, assets, and funds contained in the Mercury checking account bearing account number 202217285146, held in the name of Kalder; and

b. Any and all monies, assets, and funds contained in the Mercury treasury account bearing account number 8IS-06631-12 RR ZXB, held in the name of Kalder.

27. As a result of committing the offense alleged in Count Three of this Indictment, GÖKÇE GÜVEN, the defendant, shall forfeit to the United States, pursuant to Title 18 United States Code Section 982(a)(6), all conveyances, including any vessel, vehicle, or aircraft, used in the commission of said offense; all property, real and personal, that constitutes or is derived from or is traceable to the proceeds obtained directly or indirectly from the commission of the offense; and all property, real or personal, that was used to facilitate, or was intended to be used to facilitate, the commission of said offense, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offense.

**Substitute Assets Provision**

28. If any of the above-described forfeitable property, as a result of any act or omission of the defendant: (a) cannot be located upon the exercise of due diligence; (b) has been transferred or sold to, or deposited with, a third person; (c) has been placed beyond the jurisdiction of the Court; (d) has been substantially diminished in value; or (e) has been commingled with other property which cannot be subdivided without difficulty; it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p) and Title 28, United States Code, Section

2461(c), to seek forfeiture of any other property of the defendant up to the value of the above forfeitable property.

(Title 18, United States Code, Section 981;
Title 21, United States Code, Section 853; and
Title 28, United States Code, Section 2461.)

[redacted]
FOREPERSON

Jay Clayton
JAY CLAYTON
United States Attorney