UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

v. 24 Cr. 153 (LGS)

JOHN ARTHUR HANRATTY,

Sentence

Defendant.

------------------------------x

New York, N.Y.
May 26, 2026
11:10 a.m.

Before:

HON. LORNA G. SCHOFIELD,

District Judge

APPEARANCES

JAY CLAYTON
United States Attorney for the
Southern District of New York
DANIELLE KUDLA
Assistant United States Attorney

GUSRAE KAPLAN & NUSBAUM PLLC
Attorneys for Defendant
BY: KARI PARKS
ANDREW NICOTRA REILLY

(Case called)

MS. KUDLA: Good morning, your Honor. On behalf of the government, Assistant United States Attorney Danielle Kudla. I'm joined at counsel table by paralegal specialist Alex Ross and FBI Special Agent Zack Williams. I also want to note that in the courtroom here today, counsel on behalf of Emigrant and its entities is Alex Willscher and Emma Burke from Sullivan & Cromwell. And in the audience is also Christopher Staudt on behalf of Emigrant Bank. And he intends to make a victim impact statement before the Court when directed.

THE COURT: All right. Thank you.

MS. PARKS: Good morning, your Honor. Kari Parks, with me at counsel table is defendant, John Hanratty. And to his right is someone you have not met before, Andrew Nicotra Reilly who recently joined our firm and will be assisting today. In the gallery are a number of John's friends and family.

THE COURT: Good morning. Would you like to introduce any or all of Mr. Hanratty's friends and family?

MS. PARKS: Sure. If John doesn't mind helping me with --

THE COURT: Or if he prefers.

THE DEFENDANT: Sure. How are you doing, your Honor? With me is my father, Bill Hanratty, my mother Margaret Hanratty, my uncle Joseph Crotty, my sister Elizabeth Hanratty,

my brother-in-law James Fields, my other sister Monica Finnegan, my brother-in-law Owen Finnegan, and my friend Amare Santiago.

THE COURT: Thank you.

THE DEFENDANT: Oh, I'm sorry, I didn't see my brother back there. My brother Ted.

THE COURT: Good morning. Thank you for being here.

Is there anyone the government would like to specifically introduce? I know you've told me some names, but you can go ahead and introduce them if you would like.

MS. KUDLA: Your Honor, apart from Mr. Staudt who will be speaking on behalf of Emigrant, that is the only party that needed to be introduced.

THE COURT: Mr. Staudt, good morning. Thank you and welcome.

So we're here today to impose sentence in the case of the United States v. John Arthur Hanratty. After a nine-day jury trial which began on August 4, 2025, Mr. Hanratty was found guilty of -- actually the end of the trial was August 4th, but Mr. Hanratty was found guilty of four crimes: Wire fraud, bank fraud, and two counts of engaging in monetary transactions in property derived from a specified unlawful activity.

To prepare for the proceedings today I've reviewed the presentence report, which was last revised December 8, 2025. I

also reviewed the defendant's submissions at Docket Numbers 210, 211, 221, 224, and 226 which included letters from the following people, many of whom are here today, and I want to thank you for your letters. And I also want to thank Mr. Hanratty for his letter. It is very helpful for me to hear what you have to say firsthand without your necessarily having to recite it all in court today. So thank you.

The letters are from: Elizabeth Hanratty, his sister; William J. Hanratty, his father; Bonnie Crotty, his aunt; Dennisse Mendez Baez, a friend and former employee; Emma Hanratty, his former wife on behalf of the children; James Fields, his brother-in-law; Joseph Crotty his uncle; Julia Humphries, his therapist; Margaret Hanratty, his mother; Mary Frances Seymour his aunt; Matthew Fanning, his recovery coach; Monica Hanratty his sister; Ryan Abbott his friend; and Tristen Crotty his cousin.

I also have the government's submissions at Docket Numbers 215, 216, 218, 219, 225, 229, and 230. I also understand that the government has provided my courtroom deputy, I believe, with a revised proposed order of forfeiture. Among the documents the government submitted, are victim impact statements from Emigrant, James Santori and Michael Erickson.

Is there anything I'm missing, Ms. Kudla.

MS. KUDLA: Not from the government, your Honor.

THE COURT: Ms. Parks?

MS. PARKS: No, your Honor. Thank you.

THE COURT: So Ms. Parks, have you read the presentence report and discussed it with Mr. Hanratty?

MS. PARKS: Yes, your Honor.

THE COURT: And Mr. Hanratty, have you read the presentence report?

THE DEFENDANT: I have, your Honor.

THE COURT: Did you have an opportunity to discuss it with your lawyers?

THE DEFENDANT: I did have an opportunity to discuss it with them.

THE COURT: Did you also have the opportunity to point out to them anything that you thought should be brought to the Court's attention for your sentencing?

THE DEFENDANT: I did.

THE COURT: Let me ask Ms. Kudla, have you reviewed the presentence report?

MS. KUDLA: I have, your Honor.

THE COURT: I'll ask you since you're standing, do you have any objections to the factual accuracy in the report?

MS. KUDLA: No, your Honor.

THE COURT: All right. So the defendant had a number of factual objections to the report. I will now briefly put on the record my resolution of those objections. I'm also going to submit an addendum to be appended to the presentence report

with my amendments and corrections. Some of those responsive to the defendant's objections so that the presentence report is in accord with what I rule on today.

First of all, for the paragraphs in the section of the presentence report labeled "Offense Conduct," that is Paragraphs 7 through 25, there are objections to paragraphs 8, 9, 13 through 15, 18 through 21, and 24. These objections are overruled as moot because I presided at the trial and am familiar with the case because of the trial and also have available the trial transcript and the trial exhibits, I'm not considering this section of the presentence report. And the report summary and characterization of the evidence will not affect my sentencing. My views about the evidence are reflected in my decisions on docket, Post-Trial Motion Decision at Docket 228, and the order to terminate the guidelines loss amount and offense level at what I assume is Docket 231. And I will append these to the presentence report as well.

Next, for the paragraphs under the heading "Victim Impact," in other words, Paragraphs 28 to 32, the defendant objects to Paragraph 29 which relates to restitution. The objection is overruled because Paragraph 29 merely states what EBCC is seeking for restitution and what the probation office believes is owed to EBCC for restitution. I will discuss it more later, but I agree with the probation office and will detail that in a moment and also append my determination to the

presentence report.

Next, for the paragraphs of the presentence report relating to the loss amount and guidelines offense level, that is Paragraphs 27, 33 to 46, and 111, the defendant objects to Paragraphs 27, 34, 44, 38, and just a footnote, that's referred to as Paragraph 35, maybe that report was renumbered, but it is 38 I think, and 111. The objections are sustained in part and overruled in part. My order of May 23, 2026, explains my calculation of the loss amount. It rejects defendant's proposed adjustment for acceptance of responsibility and calculates the resulting offense level. And I will append that order to the presentence report.

Next, for the paragraphs under the heading "forfeiture," Paragraphs 124 to 126. Defendant objects to Paragraph 124 which pertains to the forfeiture of the proceeds of the offenses charged in Counts One and Two because "the government has never argued that Mr. Hanratty has custody or control any proceeds traceable to his bank or wire fraud conviction." The objection is overruled because the defendant does not need to have retained control of the property for it to be forfeitable. Forfeiture is proper as long as the defendant had control over the property at some point. And I am relying on *United States v. Tanner*, 942 F.3d 60 at 67 to 68 (2d Cir. 2019).

I direct that a complete copy of the presentence

report be prepared for the Bureau of Prisons and sentencing commission. I direct that the following three documents be appended to the presentence report as they modify it in some respect. First, an addendum memorializing my rulings on the objections and other amendments to the report. Second, my decisions on defendant's post-trial motions and the sufficiency of evidence at Docket 228. And finally, my decision on the guidelines calculation of the offense level, which I presume will be Docket 231. This presentence report will be made a part of the record in this matter and placed under seal. If an appeal is taken, counsel on appeal may have access to the sealed report without further application.

First, just apologies to all our guests. I know this a little bit tedious. But what I've basically just done is reviewed the objections that defense counsel has made to various portions of the presentence report and put my rulings on the record. A lot of those aren't a surprise because I ruled on many of them in the last few days in written decisions that counsel have.

Now, I would like to address the sentencing options and the recommendation under the sentencing guidelines. Although the Court is no longer required to follow the sentencing guidelines, we are still required to consider them in deciding what the appropriate sentence is. And to do that, it is necessary to accurately calculate the guidelines

sentencing range. So I'm consulting the November 2025 edition of the sentencing guidelines manual. As explained in my May 23, 2026, order, I find that the offense level is 28. And I also find that the Criminal History Category is I. What that means is those are the two variables that get to what the guidelines recommend as a sentence. The recommended guidelines, as a result are a term of imprisonment of 78 to 97 months. For people whose arithmetic may not be as crisp as it might be, that's six and a half years to just over eight years. The recommended sentence is also a fine of $25,000 to $250,000 per count for a maximum of a million dollars. Supervised release, the recommended period is up to three years on Counts One, Three, and Four, and up to five years on Count Two. And there is no recommended probation. That is less than what I could sentence under the maximum for this case. The maximum term of imprisonment is 30 years on each of Counts One and Two, and ten years on each of Counts Three and Four for a combined maximum of 80 years in prison.

The maximum fine is a million dollars on each of Counts One and Two. And $250,000 for each of Counts Three and Four, for a combined maximum of $2.5 million.

Supervised release under the statute is a maximum five years on Counts One and Two and three years on Counts Three and Four, all to be served concurrently. And Mr. Hanratty is ineligible for probation under the statute.

The maximum term of imprisonment, fine, and term of supervised release for Count One, I will just note are different from what's in the presentence report because Count One charged that the violation of Section 1344 affected a financial institution which results in a change. I'll include that change in my addendum to the presentence report. In addition, there is a mandatory special assessment of $400.

And I would like to turn now to the sentencing options concerning restitution and forfeiture. First, as to restitution, just so everyone knows, restitution is basically the concept of compensating a victim for its losses or their losses as the case may be. So in this case restitution is mandatory because the offenses were committed by fraud or deceit. And the restitution order must require the defendant to return or pay the value of property that a victim lost as a result of the fraud. The government seeks restitution for EBCC of approximately $18.2 million which is the unpaid principal on the loan to Ebury. Second, for Ebury investors the government seeks restitution of the initial investment capital owed of approximately $8.2 million. Plus, the government seeks prejudgment interest on the amount of restitution that I've determined.

I have the government's submission. So I'm not going to invite the government to speak unless there is something you have to say that you haven't already said. I've considered

what you said. But I have not yet heard from the defendant on restitution, apart from your objection to the loss amount, which I've already ruled on. If there is anything else you have to add on restitution, I'm happy to hear it, if not then I will proceed. Ms. Parks?

MS. PARKS: Thank you, your Honor. And thank you for setting that out all so clearly. It's much appreciated. And also thanks for the weekend work and sorry.

On restitution, beyond our objections we've already articulated and you ruled on, the only addition I have is that the Court waive interest in this case because of Mr. Hanratty's inability to pay. The statute providing for that potential waiver 18 U.S.C. Section 3612(f)(3)(A). And that provides that if the Court finds that Mr. Hanratty does not have the ability to pay, that it may waive interest. We can talk about it more if you would like, but obviously we are talking about big numbers here. And in addition to restitution, of course there's the forfeiture, et cetera, and he won't be working for a while. Thank you.

THE COURT: Okay. Thank you.

MS. KUDLA: Your Honor?

THE COURT: Yes.

MS. KUDLA: The government does have one point or two points on restitution.

THE COURT: Why don't you stand up, and tell me about

it.

MS. KUDLA: Your Honor, first with respect to restitution, I will get to prejudgment interest in a second, but I wanted to note in light of the Court's order dated, I think, May 22nd, the Court found that the defendant's misrepresentations concerning the third-party custodian were not reasonably foreseeable the cause of the investors' loss. It impacts restitution, and I wanted to clarify that for the Court.

I just want to note, the government respectfully notes that we believe that there was record testimony from Mr. Staudt, Mr. Arora, Mr. Gardner and Mr. Meeks that these highly specialized assets required a third-party custodian to maintain their value, and absent that custodian the value of those assets declined, which is a reasonably foreseeable consequence of the harm suffered by those investors. We wanted just to note that for the record. But we certainly respect the Court's factual finding and decision here. And in light of that, we would modify the restitution and forfeiture order to seek restitution and forfeiture for Emigrant. And in the forfeiture order that now seeks the unpaid principal balance to Emigrant which is about 18.2.

In terms of restitution, I wanted to touch on that now, you saw that we are seeking prejudgment interest under *Qurashi*. We believe that that is extremely appropriate here in

light of the factual record, which included a number of years for which Emigrant was trying in good faith to reach a resolution and could not, based on continual misrepresentations by Mr. Hanratty. The total default interest calculated on a total default interest rate of approximately 14 percent, which would be governed by the contracts themselves, would result in a restitution amount of $29,735,957.26, that would include the principal owed which is $18,251,647.03. And then the total default interest based on the interest rates guided by the contracts here results in $11,484,310.23. So I just wanted to put those numbers on the record that we would be seeking that on behalf of Emigrant.

THE COURT: Thank you. Did you want to address the defendant's argument that interest should be waived under 18 United States Code 3612 because of the defendant's inability to pay? And I'm going to look at that provision right now if you would like to address it.

MS. KUDLA: Your Honor, I believe here the point of the restitution is to make the victim whole. And Mr. Hanratty's assets, the ability to pay is not necessarily the chief concern here. It is getting an order that will continually allow Emigrant to seek that monetary payment to satisfy the Mandatory Victim Restitution Act. And here, under *Qurashi* they have said specifically when people give money, they do so with the expectation that they could be using that

money elsewhere. And that is a very important consideration in commercial lending. And it's a very important consideration to Emigrant Bank as they were lending money to Mr. Hanratty and being deceived at the same time. That money could have gone elsewhere and also impacted Emigrant EBCC substantially in that they had to close the entire business.

Here, regardless of Mr. Hanratty's ability to pay, even if it's going to be $30 a month, having that order in place that they can turn to and seek assets that even they may not be known at this point that if Mr. Hanratty perhaps won the lottery at some point in time, those assets would still be subject to Emigrant's rightful return. So I think here, just looking at Mr. Hanratty's financial ability at this point in time is an inaccurate assessment because time changes, circumstances change. And really what is here is does the value in that restitution order reflect what would make Emigrant whole as a victim under the statute. And with that in mind, the prejudgment interest, as directed by the Second Circuit, is completely appropriate certainly under the facts of this case.

THE COURT: Okay. Thank you.

MS. PARKS: Your Honor?

THE COURT: Yes.

MS. PARKS: May I respond very briefly?

THE COURT: Yes, you may.

MS. PARKS: I shouldn't say "very briefly."

Two points, one, of course, in our view of that statute it is up to your discretion. Today, he is not going to be able to pay even close to that. I do want to say though in the broader perspective --

THE COURT: Let me just ask you a question about it. It says, if the Court determines the defendant does not have the ability to pay interest under this section, the Court may, among other things, waive the requirement for interest. I believe interest under this section is post-judgment interest, so it doesn't directly address prejudgment interest.

MS. PARKS: Yes, your Honor. I think on the prejudgment issue there are really two separate chunks that I'm thinking of. One is under the guidelines themselves they are very clear. We're talking about in a loan and in lending situation it is the principal, not the interest that counts towards the loss amount. It's quite clear.

Two, on the sort of broader business perspective -- I won't go into much detail. Your Honor is well aware there is a pre-existing civil case that was already at summary judgment that was stayed in light of this criminal case. A big reason why it is stayed is that potentially whatever may happen here may just dispose of any existing issues there. It's in commercial division. They know how to deal with that type of case and likely that judgment will involve interest that is

going to be coming down in the civil case.

THE COURT: That was one of my questions, which is what is the relationship and even the status of civil case? Because EBCC still has contractual rights to the contractual rate of interest. And perhaps this is a question better put to the government or even to EBCC's lawyers, but I'm not even sure what role or what difference the award of interest makes here, given the contractual right to interest.

MS. PARKS: Yes, your Honor. Well, the current status is it's stayed. It's been stayed for a couple of years. We have a hearing on some pending motion in September, at the end of the summer. And the intention -- at least on our side the intention was to see what happens after we have a final judgment here, go back and negotiate, find some sort of resolution that saves Emigrant money and us as well.

THE COURT: And do you have some indication from Emigrant that they are willing to negotiate a settlement?

MS. PARKS: That was my understanding before. We certainly talked settlement over the years. We have disagreed on that number. I will say generally we spoke about it after the jury verdict as well. We haven't come to agreement on that number. As your Honor can understand, on the defense side we've really been prioritizing this case as opposed to the civil action.

THE COURT: Of course.

MS. PARKS: I will say at a very, very high level, we have not picked up those commercial division case negotiations recently. And an issue potentially in that case as far as the number is concerned is that there actually are defenses to the interest and the reliance and the reasonable reliance that were available under New York common law, contract law that not available in criminal case, ironically. So I don't know that the interest is a foregone conclusion in that case. As a practical matter, maybe after today we just say, look, it doesn't matter. We'll just agree to whatever number you want to agree to. I don't know yet.

THE COURT: You may be seated.

Just to state the obvious, I mean, I take Ms. Kudla's point that things could change. But it seems highly likely that this entire discussion is academic because we are talking about tens of millions of dollars in restitution and forfeiture obligations. And the likelihood that Mr. Hanratty is going to be able pay even that without interest strikes me as very small, although I understand your point, Ms. Kudla, things could change.

MS. KUDLA: Your Honor, on just a couple of points here, I think things obviously could change. But I do want to note that in terms of the civil proceeding, counsel for Emigrant would probably be best suited to answer those specific questions. And from the government's perspective, regardless

of the academic nature of this pursuit, the job here is to get the answer correct in light of the law. And under the law and under Second Circuit precedent, prejudgment interest is appropriate here. I believe that would be the appropriate restitution order that is put in place because it's consistent with the factors that you're looking under for criminal law. And whether or not Mr. Hanratty will ever be able to pay it is moot in the sense that as long as the order in place for the right reasons factually and legally, that should be what is guiding the Court's decision.

And I believe if counsel for Emigrant would like to clarify the record as to the civil proceeding, my assumption is having an order in the criminal proceeding that includes this, may resolve many of the litigation costs that would then go into the civil proceeding of trying to work through this at a litigation level there. But I'll leave it to the Court's discretion if you would like.

THE COURT: Okay. What I would say about interest is I agree that it is imperative to get the answer right under the law. But I believe that the law gives the Court discretion as to whether to apply interest, whether to apply prejudgment interest, in what amount, and for what duration, if at all. And so it would still be legally correct if one were to reasonably exercise discretion to modify it from, say, the contractual rate of interest.

I will leave that aside for the moment. And I'm happy to hear from Emigrant's counsel and to hear the status of the civil action. I know there were some sanctions motions that were supposed to be argued, I thought in February, but maybe that's what's been adjourned to September. And I'm very interested in what the relationship between the forfeiture order, the restitution order, and the civil action might be from the point of view of Emigrant.

MR. WILLSCHER: Thank you, your Honor. Alex Willscher from Sullivan & Cromwell.

Your Honor, maybe the week after the verdict last summer I called Ms. Parks and said in light of the jury's verdict, why don't we resolve the case now, the civil case. Let's get the assets, release the collateral. If there is any value, somebody can sell that and try to, you know, make lemon out of lemonade, and also let's end the litigation.

We made a point in our victim impact statement that we are entitled to attorney's fees for all of the legal fees Emigrant has incurred as a result of the government's prosecution. The bank decided to forego that but the interest is important to the bank for the basic commercial reasons, as Ms. Kudla said.

THE COURT: Well, the interest is important to the bank if you could collect it, right. I mean, there is no other reason, is there?

MR. WILLSCHER: That's correct, your Honor. But he agreed to it as part of the contract.

THE COURT: I understand. He owes a lot of money. But the old saying, you can't get water out of a stone. You can get what you can get, and you are entitled to a lot.

MR. WILLSCHER: That's right. But I'm not here authorized today to say we are not going to seek the interest.

THE COURT: Understood.

MR. WILLSCHER: And I have reason to think that if you don't award interest today, then we will continue to litigate this case in the civil court. I do think, by contrast, if you do award the interest today, then there will be much less reason for my client to continue to incur any attorney's fees on this matter.

THE COURT: Okay.

MR. WILLSCHER: Thank you, your Honor.

THE COURT: Thank you.

All right. So just to be clear where we are in our discussion right now, what I'm really trying to do is discuss what the Court's sentencing options are. We just talked about restitution. I would like to talk about forfeiture now. Criminal forfeiture is mandatory for each of the crimes for which the defendant was convicted. There are two provisions under 18 United States Code 982(a), the lawyers I know are familiar with them so I won't belabor them. I have the

government's proposed preliminary order of forfeiture which has now been amended. I have had it described; I haven't seen it. And the government seeks a money judgment, as I understand it, now, comprised of basically the 18 million or $18.2 million principal loss to EBCC. And also forfeiture of the defendant's interest in specific property subject to the preliminary order of forfeiture, including all assets of Ebury Fund 1 and 2 including tax liens and real estate. And the proposed order states that the forfeited specifically property will be applied to satisfy the money judgment. So essentially it caps the forfeiture at the $18.2 million number.

Again, I've heard the government position on forfeiture and have their submissions.

What is the defendant's position on forfeiture if you have anything to add to your prior submissions?

MS. PARKS: Thank you, your Honor. Nothing really to add to the prior submissions. The brief bullet points are: We object to this proposed order. One, because Mr. Hanratty never personally obtained proceeds. As we all know, they went out the door immediately. We believe that forfeiture is a personal judgment. It's not an *in rem* judgment, at least not criminal forfeiture, and that's why forfeiture is not appropriate here.

Beyond that, as far as the involved-in prong, we've all litigated it at some length over the years. And so we stand by the same objections we've asserted previously,

essentially that to apply this Section 1956 concealment concept of involved-in doesn't make sense in this 1957 case focused on very specific assets and specific transactions. But we've all articulated that at length before.

THE COURT: Okay. Thank you.

So those are the sentencing options. I have discussed the guidelines. I've discussed the maximum sentence. We've discussed the parties' positions; on restitution. We've discussed the parties' positions on forfeiture. Are there any objections to the sentencing options I've outlined? Ms. Parks?

MS. PARKS: Not an objection, just a question, do we need to talk about the fine right now?

THE COURT: No.

MS. PARKS: Then no, your Honor.

THE COURT: Ms. Kudla?

MS. KUDLA: No, your Honor.

THE COURT: All right. At this point, would the government like to be heard with respect to sentencing?

MS. KUDLA: Yes, your Honor.

Your Honor, today the government is requesting a substantial sentence, one that will include a serious term of imprisonment, restitution, and forfeiture. And we believe that this is absolutely necessary to reflect both the seriousness of this offense, based on the unique facts that were presented at trial, deter both the defendant and others who may believe that

sophisticated financial fraud is a way to manage financial risk, and to promote respect for the law.

The defendant deliberately engaged in deception that caused substantial harm to Emigrant Bank. They forced a small business loan division of Emigrant Bank, EBC, to close. As a result of the defendant's fraud scheme, it resulted in a harm to New Yorkers, both in small business lending and medium business lending, and also to Emigrant employees. His fraud scheme was also sophisticated in its deception. It relied on fake records. It made false promises concerning the stability of his business. And he even eliminated the very group that was supposed to guard the value of these assets.

Your Honor to this day, despite the trial evidence and the swift jury verdict, the defendant has not met with these acts of deception with recognition or remorse in any way. Instead, it is met with continued denial. And so this morning I wanted to touch on the nature of the offense, his unique characteristics that go to specific deterrence, and also briefly on general deterrence.

Beginning with the nature of the offense, it was unique here. This is unique in the duration. It's unique in his uncanny ability to abuse the trust of those closest to him in the business-partner relationship, both his lenders and his investors. And it was unique in its level of concealment, hiding fake liens in voluminous data, removing those liens when

audit was disclosed, doctoring spreadsheets and false promises.

First, the duration of the fraud scheme, and I think this is very important when we're considering the appropriate sentence, this was calculated and delivered over time. This was not a one-off impulse decision or an isolated misrepresentation. Mr. Hanratty repeatedly certified Ebury accounting records that he knew were false to get money. At least beginning in October of 2018, November of 2018, February of 2019, March, May, September, October, all of 2019 and in January of 2020 he was continually submitting fake liens to inflate his assets.

Your Honor, he was using Emigrant as an ATM to pay off his investors that were literally banging on his door. At the time he started his lies at least in October of 2018 he was already millions of dollars in debt, and he went on to borrow nearly $18 million more. He did all of this while telling his investors one thing and his lender another. He told his investors he was liquidating the fund. Meanwhile, he was telling Emigrant that he was taking that money to build his business.

He was using deception to save himself, your Honor, and that's a point that continues through this day, and I think it's going to be critical to the sentencing determination.

And then looking at the nature of the scheme, this was abusing the trust of his closest business partners. It was key

to the scheme. EBC wasn't a large group. There were a handful of individuals who were responsible for this lending relationship, Mr. Jack Brady, Mr. Sahil Arora were one of them. And he repeatedly lied to them over the years. I want to emphasize here that at its core the integrity of the commercial lending business is based on trust. The lender has to start with the fundamental premise that your counterparty is not going to deliberately and intentionally lie to you. And that's exactly what Mr. Hanratty was doing each time he falsely certified those records, knowing that the assets were false, and knowing that he eliminated the custodian. He was abusing the trust of the very people who were trying to negotiate a restructuring deal with him to make it better. He was abusing the trust of the investors who were just saying, tell us the truth. If our investments went poorly, fine, but just give us answers.

And you hear that also in the victim impact statement of Mr. James Santori. He spent years trying to obtain answers from the defendant about status of the assets, assets that some were not there and assets not being watched by the custodian as promised. Mr. Santori said, this wasn't just a business associate. This was a colleague that I trusted. And he went on to say while the financial loss I sustained was bearable, the real damage was the breach of trust and countless hours I spent over the years trying to get honest answers from

Mr. Hanratty. I believed in his integrity, and that belief cost me time, energy, and peace of mind. The sense of betrayal is something that I will carry for a long time. And that, sentiment, your Honor is echoed in Emigrant's victim impact statement as well. This idea of frustration, that you're dealing with someone that you have a fundamental belief in human relationships that they are going to start off from an honest premise. And that was never the case with Mr. Hanratty and that's what continues today.

I want to now turn to the idea of Mr. Hanratty's own personal characteristics and his refusal to accept responsibility as it pertains to specific deterrence. This isn't a case about a defendant being punished for exercising his right to trial. The issue here, your Honor, is after sitting through trial, after seeing all of the documents that he falsified, the spreadsheets that he doctored, in listening to the witnesses who testified about their personal and financial hardship as a result of his lies, he contends that he is innocent. To this day, your Honor, he continues to portray himself as a victim of misunderstanding or bad circumstances rather than accepting responsibility for his own deliberate and deceptive conduct.

And this is not a one-time issue. It was a repeated pattern of self-denial over the years. In early 2021 he was directed to submit an updated borrowing spreadsheet Emigrant

that would reveal the fraud. And he didn't come clean. He lied. He ripped out liens and did not provide Sound Shore, the auditor, with the requested information that would have revealed MTAG had been eliminated.

And during restructuring negotiations with Emigrant he was saying that his assets were worth $30 to $40 million, when he couldn't make a good faith payment of a million.

And a point there that I think sometimes gets lost in the PSR and sometimes in the sentencing submissions, is that during this time period, your Honor, he committed a completely separate fraud on another lender, Kirtland Capital. He pledged 619 Portland Avenue, an asset that was already pledged to, Emigrant he pledged to a new lender to get money. He promised that lender that that loan would be secured by that residential property. And what did he do? He went and sold it without telling the lender, again, putting that lender in a position of significant financial risk that lender had no idea that they were in. And he lied to Mr. Freeman's face when Mr. Freeman asked, do you need an extension, or are you going to pay this off? Never once did Mr. Hanratty step up and say, actually I sold that months ago.

The pattern continues to this day. And that's the point, the defendant is economically dangerous to the public because of his dishonesty. His refusal to acknowledge fraudulent conduct after conviction presents an ongoing risk

because the issue is no longer fraud because of financial deceit or financial distress. It's the willingness to deceive when it's advantageous to himself.

And you see that in the PSR. Paragraphs 107 to 108, probation called this out, fiscal year 2023 to 2024 the defendant reported zero income. Yet, he was telling pretrial services that he was making $15,000 a month. Both can't be true. But it's advantageous in one scenario to say X, and advantageous in another scenario to say Y.

His family has been surprised by the fraud, of course, because they love him and care about him. He's grown up in a tightknit community. But it seems that he hid the fraud from them. And he's hid it because he is a master of deception and it starts with him as the first person.

And I want to touch on his personal circumstances. Because this is important to the analysis. The defendant is not a man without advantages in his life. He came from a middle-class upbringing. He has a huge amount of support in the crowd today. He has a father who was a naval officer. His mother was a bookstore owner. His father had stated it was a tightknit and loving family. He graduated law school. He was the chief compliance officer at a highly successful brokerage firm. Mr. Hanratty had every opportunity afforded to him. He had a loving family. He had education. He had privilege. And he had professional success. Despite those advantages, he

turned to fraud.

And when his business was in trouble, honest businessmen come clean. It's the hardest thing to do. You tell your investors it didn't go well. You tell your lender, I'm really sorry. I tried my best, but it's not working. And you deal with the fallout. But rather than facing those tough and difficult and honest choices, he chose lies. And those lies, as we discussed, impacted multiple lives for many years.

And the final point that I want to touch on, your Honor, is general deterrence. We believe a substantial sentence both in terms of imprisonment and financial penalties is particularly necessary in this type of case because it goes to the confidence of our lending institution which is uniquely harmful. Financial markets, as I noted, depend on truthful representation. You can't contract away dishonesty from the start. And when sophisticated actors like the defendant repeatedly falsify information for personal gain, that damage extends far beyond any single transaction. These are crimes that are difficult to detect. To prove this case, as your Honor saw, required forensic reconstruction of both tax lien prominence of thousands of liens and also the financial tracing of where that money went into multiple business accounts.

The scheme was successful because of the accounting complexity, and that is true of almost all large-scale sophisticated financial crimes. So for these types of crimes,

a substantial sentence for general deterrence carries special importance because they are rational, they're deliberate, and they're motivated by the belief that the financial upside of fraud will outweigh the risk of enforcement. And that is why it's important to have a sentence that reflects that not the case, your Honor.

So we're not asking the Court to sentence the defendant more harshly because he is successful or sophisticated or exercised his right to trial. We are asking for this sentence because the evidence established years of deliberate deception that damaged financial institutions, harmed investors, and even now has not been met with true remorse or responsibility for his crimes. Under the circumstances, we believe that a sentence of at least 72 months' imprisonment is necessary to reflect that. We believe restitution should include both the unpaid principal and also the prejudgment interest. And we ask for the forfeiture for the unpaid principal.

THE COURT: Thank you.

Ms. Parks, would you like to be heard?

MS. PARKS: Yes, your Honor. Thank you.

May I proceed?

THE COURT: You may.

MS. PARKS: Thank you, your Honor.

Again, we want to thank you and your staff for all the

care you've taken with this case. We appreciate it. And we appreciate it's complicated and all the work you've done. And certainly all the orders over the weekend helped us to focus our presentation today, so we appreciate that as well.

I know that you read everything multiple times. So I'm not going to get up here and repeat everything that's in our brief or re-litigate the trial. We are here for a reason.

I do want to touch on now four -- now that we've dealt with restitution and forfeiture, four topics that I think either were a little unclear after the briefing or maybe they're sort of newer that may have arisen over time. The first is maybe emphasis of Ms. Kudla's presentation, remorse and responsibility. The second thing I'd like to talk about is the need to avoid unwarranted sentencing disparities. The third topic I'd like to discuss is that of general deterrence, which I understand is generally important to your Honor, especially in a case like this. And then, some logistics if your Honor would rather discuss that later but as far as a surrender date and that sort of thing.

THE COURT: Let's talk about that letter.

MS. PARKS: Okay. So we'll stick to three topics.

THE COURT: All right.

MS. PARKS: Your Honor, I guess three and a chunk. Very, very briefly, I do not want to talk about the facts of the case, again, too much, your Honor. You were here. You saw

everything. There was a lot of argument right now. Your Honor knows the record, and I will leave it at that, as far as the truth and credibility of various people that were involved in this very unfortunate situation. But let's focus on Mr. Hanratty because, of course, is he the defendant in this case today.

There are really two points I would like to make on remorse and responsibility. One is a little bit related to the acceptance of responsibility guidelines adjustment. We understand that the guidelines do not necessarily carry the day, but I think thematically that's where we are starting from.

Something that Ms. Kudla's emphasized is her perception that Mr. Hanratty has not accepted responsibility for all the wrong he's done and that he is not remorseful. I don't know if this matters to your Honor too much but I'll touch briefly on, essentially, why didn't we plead like so many other people do before? And I think the single largest reason is that we did have a really stark factual interpretation difference with the government when it came to the investors and loss amount. Your Honor has now resolved that over the weekend. But to put the very, very short version as in our literally years of negotiations, we were never able to see that side of the story the same way. And that, of course, was very important to Mr. Hanratty. He was not comfortable pleading

guilty to trying to trick investors into lending money when that is not charged that was really charged within the timeframe, et cetera, et cetera. So that was a gating issue as far as responsibility and lying is concerned.

All of the offers extended by the government required Mr. Hanratty to agree to that nearly $30 million number that included the investors and the loss amount. And there was just no movement off of that. And that was just a factual dispute that we could not come to agreement on.

I will say though that rereading the briefs, I want to clarify, what do we mean when trying to reconcile the ideas that Mr. Hanratty is asserting his factual innocence of the charges against him versus he admits that he lied a lot. He messed up a lot, and he did a lot of things wrong that he truly regrets. And he's spoken to your Honor via the letter and we will discuss today. I do just want to clarify that the very short version of his position is that Mr. Hanratty maintains that he did not intentionally include liens on those borrowing bases that he did not own, but he fully admits that he was not as honest with EBC as he should have been. And he certainly lied to EBC after the maturity date, et cetera. But as far as the factual elements to obtain money or property, that's really where the disconnect is in the short version. So I do want to emphasize that.

Mr. Hanratty, of course, discussed at length in his

quite long letter, a number of the lies that he regrets making, the abuses of trust that he committed and how sorry he is. I'm not going to speak for him. He is going to speak again about that today. But to the extent that could be a little unclear, that is really where the distinction is coming from. So even though Mr. Hanratty to this day says that he did not intend to lie on those borrowing bases.

He has never disclaimed that he is responsible financially, of course, for the losses. That happened even before the Commercial Division case began. Mr. Hanratty had already signed over more collateral, signed the term sheet and said I will be held personally liable for this. This is my responsibility. So from a purely financial and contractual perspective, he has accepted responsibility for that for years.

On the criminal and the intentional fraud level, that is where the distinction lies. That he maintains he did not lie to try to get the money. But he lied a lot to try to buy more time to try to pay back money, and that is where the distinction is.

On that note, and Mr. Hanratty, again, tell you that he, of course, wishes the jury had reached a different verdict. But we can all understand, as your Honor articulated in your Rule 29 order, why the jury saw what it saw and believes what it did. Mr. Hanratty accepts that. He accepts responsibility for that. He accepts there are consequences for that beyond

the financial that likely include imprisonment and other time. He understand that and wants to pay his debt to Emigrant if he can make that much money some day, he will be paying them back. Regardless, as far as the broader social implications are concerned, he of course, understands that, feels deep remorse for that and is committed to self-improvement, which, again, we discussed at length in the letter. So I'm not going to talk about that too much here. And I know your Honor is familiar and he specifically noted that his recover coach is one of the people who has submitted those letters.

So moving on, the next thing to discuss briefly is that, of course, under 3553(a) your Honor has to avoid unwarranted sentencing disparities. This case, at least for me, is unusual as there is no conspiracy count and no codefendants. So we are not in a position to look at other people involved in the same crime. But I did look, of course, at your Honor's previous sentences. And there were a couple that I thought maybe are benchmarks that of course are favorable, in my opinion to Mr. Hanratty because that's my job, but that I would like to bring up nonetheless. One that your Honor may or may not remember this one. It was quite a while ago. There was a man named Mr. Nazar Hoffman [ph.] who you sentenced to five years imprisonment. He had been a fraudster who befriended multiple elderly people. He moved into the home of one them. He waited for one of the spouses to die, and he

had them sign over the inheritance to him and he spent it all on terrible things and this is a pattern he engaged in multiple times. Everybody has bias, to me, as a moral matter, that feels very extra terrible and icky and one of the more horrible things that I've read that any fraudster committed to abuse trust in that way of people who really loved him. That was a horrible case. And your Honor deliberated very seriously about what sentence was sufficient but not greater than necessary to punish and achieve all the other goals of sentencing. And you found in that case that five years of incarceration was appropriate for him. And, again, in comparison here the government is asking for six.

A little more factually analogous to the situation we have today. About a year ago your Honor had I think sentenced a number of defendants involved in a Medicare fraud scheme. There was a gentleman Mr. Patel, quite recently actually Adam Sowlati who is not here with us today, one of the prosecutors on that case stood in at that sentencing. Mr. Patel had pled guilty to participating in a $48 million Medicare fraud scheme. He agreed to 6.39 million in forfeiture and 48-plus million in restitution because he and his co-conspirator agreed that they had fraudulently sold prescriptions for equipment and drugs and lab tests and all of that which was billed to medicare and essentially to all of us as fellow citizens and taxpayers. In that case he was the one who said that he had realized later in

life he had high-functioning autism perhaps and maybe that led him to make some poor decisions. Again there's that distinction. He of course pled. In that case your Honor sentenced him to 14 months' incarceration, three years of supervised release, including one of those years to be home confinement, 1,000 hours of community service and some other factors as well. So we think that case is more recent and a little closer, though different, from this one. And there you decided that a little over a year in prison plus those other very strong conditions were sufficient to serve the purposes of sentencing.

The final example before I move on to the next topic is a very broad one that your Honor did not preside over but that the prosecutors in this case were deeply involved and that's the FTX trial. That's the one that I won't go too much into details because we read the newspaper. But that was the one involving Sam Bankman-Fried. And that involved $8 billion in customer losses. There were a number of defendants in that case brought by this office, by this prosecutor. And I want to point out two of those defendants received extremely lenient sentences, despite personally admitting that they've stolen millions of dollars for themselves to spend on whatever they felt like. One of them Gary Wang, he was the cofounder of FTX. He received no time in prison at all. Another that I would like to focus on is the head of trading at FTX, Caroline

Ellison, who received two years and, as often the case, got out much sooner.

Now those, I'm sure, the major distinction that the government is always going to draw in this situation is they both pled guilty. But as a citizen and as a defense attorney we have to note that they received such low sentences partially to reward them and incentivize other people when they have information about somebody who's deemed to be a much larger player to cooperate with the government, provide that information, and in exchange receive a more lenient sentence no matter what they did.

Now, I can understand the policy rationale. I can understand how that is helpful from an investigation purpose. But from a bird's eye view, it does not seem just to a general person as far as looking at the sentencing structure in criminal justice system that someone who admits to personally pocketing tens of millions of dollars for yachts and Ferraris and whatever can go in for zero or two years, while Mr. Hanratty who stole to stave off investors, which is terribly stupid and wrong and immoral and all sorts of things, but didn't keep anything for himself is facing five years. We just don't think that makes sense in a global perspective, and it wouldn't inspire confidence in the justice system.

We already discussed forfeiture and restitution. You said for the other logistical pieces, you would rather discuss

that later. So unless your Honor has any questions, for those reasons we respectfully request that six months is sufficient but not greater than necessary of incarceration. Supervised release, et cetera, we would be happy to talk about more, but perhaps your Honor would rather discuss that later as well.

THE COURT: One thing I would like to understand a little better, particularly since I know that I will be hearing from Emigrant, I'm unclear on what's been happening with the Ebury business and the tax liens since the time the defendant was arrested? I know there was a restraining order in state court. I know that there was the PIRO in this court. My impression was that nothing was happening and that Mr. Hanratty was barred from doing anything with the business. But I got a different impression from Emigrant's letter and perhaps that was just an incorrect assumption on my part. So what has been happening with all of that? Who, if anyone, has been overseeing it? Who has it? Where is it? I know the bank accounts are closed and there's supposed to be a lockbox. Just what is going on with those assets?

MS. PARKS: The short answer is nothing since the PIRO is basically what happened. To tie it up a little bit more let's say 2020 to 2021, your Honor, saw a bit about how Ebury was going. It was still a live business. It was making payments, doing its thing, had some employees. The commercial division case Emigrant began at the end of September 2022.

That fall, Justice Chan in connection with the motion EBC had made had issued a TRO and preliminary injunction, that did not stop Ebury from functioning. At a very high level, there were a lot of safeguards put in place to essentially prevent fraudulent transfers and that sort of thing while the case was ongoing. So there were ongoing financial reporting obligations and prohibitions against spending money not for business or living purposes, that kind of thing. So from about December 2022 until the PIRO issued in this case which I believe was March 2024, Ebury was kind of chugging along. It had a little bit of a smaller staff than maybe pre-COVID, but it was still doing business.

Mr. Hanratty was arrested the week before Christmas 2023. He was arrested on an information. And even after Mr. Hanratty was arrested Ebury continued to exist, do business, again, limping along, responding to grand jury subpoenas, et cetera. But it still was doing its thing. It had a couple of employees left at that point. Ms. Mendez Baez, who testified, she continued to work for Ebury. I believe there were a couple of lower-level operations-type employees as well at that time.

The PIRO issued in March 2024 at that point freezing all assets. Essentially, John paid -- to the extent there was payroll left, he paid with some personal money he had to try to keep things floating, to pay the licenses for the software and

to the people. I don't know the exact date, but more or less summer 2024 there is nobody left at Ebury other than John. He's the only human left associated with Ebury. Ms. Mendez Baez had been working for free for a while, but she stopped.

THE COURT: So until the summer of 2024 somebody was overseeing the real estate and the tax liens so that they weren't just languishing somewhere?

MS. PARKS: That's right. I'm going to say approximately summer 2024. It didn't all stop the same day. And Ebury filed for Chapter 11 in September of 2024. It was late summer or early fall. At that point it was trying to rely on some legacy records and after that it didn't work out either at that point. I would say officially no later than the end of 2024 Ebury was just in purgatory, I guess, including the assets. We did detail a little bit in that letter where we talked about how annoying it might be to try to figure it all out where we think the assets are.

THE COURT: Thank you.

MS. PARKS: Thank you.

THE COURT: I would like to hear from Emigrant. So Mr. Staudt, I know you are prepared to speak. Would you come up.

MR. STAUDT: Thank you, your Honor. My name is Christopher Staudt and I'm the president of Emigrant Business Credit Corp. I'm here today on behalf Emigrant Bank to discuss

the impact the defendant's fraud had on our organization, our employees, and the communities we serve.

By way of background, Emigrant is a family-owned community bank. We proudly support local businesses in New York City and small businesses throughout the country. And we contribute to these communities in times of need. As a community bank, Emigrant offered many programs that served low and moderate income areas, including financial literacy programs, flexible lending programs, numerous grant initiatives, such as the small business recovery grant program, among many others. The majority of our commercial lending is also to small businesses, which as I'm sure this Court knows, represents the majority of job growth in this country.

Emigrant has had a long history of making millions of dollars of direct charitable donations to customers and communities impacted by disasters, Superstorm Sandy, the COVID pandemic, Hurricane Milton, and the Maui fires are among many examples. I mention these because the losses at the bank do not just impact the shareholders of the bank, they do also impact the communities we serve.

The defendant is an attorney. He previously worked as a compliance officer at a financial institution. He understood the agreements he signed and he understood exactly what he was doing. The jury found that the defendant undertook the fraud willingly and over an extended period of time. Quite simply,

he stole from us.

Despite the jury's verdict, the defendant continued to demonstrate a surprising lack of remorse and accountability. His actions led directly to a principal loss of 18.2 million. After giving consideration for interest, it was 29.7 million. And with attorney's fees the true cost to Emigrant of his actions is well over $30 million.

Yet, as recently as a couple weeks ago he tried to argue that EBC did not, in fact, suffer any losses as a result of this fraud and even suggested he was just trying to make things right before he got caught. The jury and this Court have already rejected that argument.

I would remind the Court that this is the same defendant that violated this court's PIRO and state court civil injunctions even after his arrest, resulting in numerous contempt charges. The defendant was deceitful and obstructive in all of its dealing with Emigrant, failing to provide information to us and delaying at every opportunity. He even tried to convince us on more than one occasion to agree to settlements based on highly suspicious and likely either fraudulent or nonexistent sources of funds and then had the audacity to accuse EBC of not mitigating damages when we did not accept such offers.

As this Court knows, any lending relationship is based on management representations and good faith. Even the

tightest credit agreements are built fundamentally on trust, and he broke this trust with us.

I have worked at Emigrant almost 20 years. Loans sometimes go bad, and banks sometimes lose money. It's not uncommon that we restructure a loan when a borrower cannot repay. Coincidentally, at the exact same time Ebury was in default, I was negotiating with another defaulted borrower. Emigrant ended up recovering only a small fraction of the loan value in that case, but we didn't sue the owner. And there were no criminal charges filed. We worked collaboratively through the process. And when it was all done, we took our losses, shook hands and wished each other well. In fact, that business owner reconstituted his business with his existing employees and customers and is still operating today. But this situation is different. Ebury failed not for external events or even honest management mistakes. The losses occurred directly due to the defendant's willful decisions to steal and to defraud us.

I would like to end by discussing the impact of the fraud. The defendant caused irreparable harm to EBCC and to Emigrant Bank. In terms of monetary losses, the defendant violated EBC's trust to the tune of $29.7 million in loan principal and interest. When legal fees are added, as I mentioned, the true loss is much higher.

To address one of the things that the government

mentioned, interest is a real loss to us. Absent the fraud, the principal would have been productively used elsewhere to earn interest for ourselves and for the benefit of borrowers. So the interest is a true and real loss in this case.

THE COURT: For what it's worth, I understand the way a lending institution functions and is economically viable by charging interest and the time value of money is a real asset. I understand that.

MR. STAUDT: Wonderful. Thank you.

I'd also like to note that whether it's 18 or 30 or 35 million, whatever the number is, this amount is significant to a community bank of our size and has impacts that go beyond mere dollars and cents. It goes beyond the balance sheet breakdown. In this particular case, the loss led directly to Emigrant winding down operations at EBC. Seven employees, seven real people lost their jobs and in some cases were out of work for extended periods of time, having a very real impact on their careers and families and livelihoods. Existing EBC borrowers were unable to access capital for new projects, impacting their business and employment growth. And the losses also impacted Emigrant as a whole in their ability to reinvest in other small businesses as well as impact the capital available for philanthropic activities. There was simply less money to spend following such a large loss.

This fraud had real-world impacts on individuals,

businesses, the community and bank itself. This isn't a victimless crime. It's also not a drop in the bucket for a large financial institution. We are a community bank. The bottom line, but for the defendant's crimes, EBC would still have its principal, folks would have kept their jobs, businesses would have kept their credit, and the bank would have more funds to reinvest in the community.

The defendant's failure to acknowledge the impact of his lies before and after the jury's verdict exposes his lack of remorse and accountability. Therefore, we at EBC respectfully ask the Court to consider the full scope of the defendant's impact to Emigrant Bank and the community when determining the appropriate sentence. Thank you for the opportunity to be heard.

THE COURT: All right. Thank you.

Mr. Hanratty, you don't have to speak, but if you would like to, now is your opportunity. I of course have read your letter, and I appreciate it.

THE DEFENDANT: Thank you, your Honor. Yeah, I have a couple words I would like to say.

So I as you know through my letter, I am in treatment, and we always say -- I learned a new way of speaking. And we always say thank you for letting me share. So thank you for giving me the chance to share.

I just want to get some apologies on the record,

first. With Emigrant, I did not deal with them honestly, transparently. My deal with them was far from what I had signed and the expectations of what they should have expected. They didn't get near what they deserved. I think with Chris, with Declan, I took their time. I think I know they are a very busy bank. I took their focus, their energy on my behavior, my choices. They, as people, didn't deserve that. Throughout all this -- I kind of look at this as one big timeframe. It's just a lot of money from them.

On the personal frontier, I just -- I know they are not here, I would like to apologize to Karen and Jack. They were my direct people at Emigrant. And kind of as the universe would have, I actually saw Jack this morning. I didn't think it was kind of the time or place to make my amends to him in front of a room full of people. But I definitely think it was as good reminder to me that there are a lot of people beyond this room that I owe amends or apologies to. For people here in this room, I know this room exists for circumstances like mine. But from my choices I put these people in these seats. I put you in here because of me. And so for me that's a real cause for them. I'm sorry for that.

I obviously impacted a tremendous amount of family and friends, people who continue to support me, people who don't support me. It's interesting, to say the least, process. And I don't think anybody who wants to see people they care for go

through this.

To me, I think I wrote it to you, I always think of my circumstances. It's not like I have a -- it's not a random act that I'm here. I'm here because of my character defects. I'm here because of my choices and my behaviors. And their effect on -- for my choices, they chose to support me unconditionally, which I don't know if I deserve. But I would not be here. I wonder if I would be here physically, but definitely not be here on the trajectory like I am as a person today.

I want to apologize to Kari. She's been my attorney for longer than all this. As I kind of devolved personally, I didn't want to deal with her, honestly in the way that you deserved. I've gotten better at it, hopefully, at least to earn back a little bit of your trust. But I think, again, I don't know what form I would be here without you.

So to me, I stand here, I'm not going to use the word, "lucky," but I'm blessed that I can be here in the form that I am today. Before I got arrested, I was devolving personally and not just because of alcohol. My personality is one that I would say a long time ago I've always been a pleasing person, somebody who would always roll up my sleeves and try to make things right. And that came to me from a good place. But I think as you go along in life and you try to solve problems and you're okay at it. Like, I built a business, and I employed a lot of people. And this business re-payed a lot of people.

Like Emigrant's not -- like, I had a decent track record for what it was. But I lost my way because of my character defects and the impact on the choices I made when it came to my drinking. I went from a place of trying to just make things right innocently to me defining what right was. Like in my mind, I'm sitting here and I'm like I can make this right for you. And I will make these choices in the manner in which I will make things right for you is what you're going to get. And then when things don't work out, it's your fault, not mine. In that, you know, I was disconnected from the world I was living. I'm not just talking about with Emigrant. I'm talking about the manner in which I've dealt with my family, my friends. I wasn't able to let people in to see my struggle, to deal with it. It was a way I would hide what I had really going on. And to me it is interesting just in light of where I am now.

For me I ended up, obviously, as I wrote, I ended up in a treatment facility for alcohol. And that was, like, the first time in years I could just be myself without context of who I was, what I did. And you are in there with everybody with problems, and you're hearing them talk about it. And for me, I didn't really grasp that was something that people did. And so to me it was a tremendous learning experience to start thinking about how to behave and to be transparent and be honest and tell people what you are thinking and feeling and

your actions. To me, it just wasn't something I did. And for me in there, I came to start to understand -- and I'm not fully there, I'm working on it, but I can't control everything. And I shouldn't even think about things I can't control.

And I was filling out my bankruptcy filings there, in rehab in July 2024, and there was this guy, Steve, an ex-army vet. And he was like, you know, bankruptcy, we are lucky in this country we have institutions which, you know, it will help you get through this. It's kind of like amends. It's a step ladder. You fill this all out. You tell them what it all is. You do the best you can, and they will tell you what to do. That's it, and you go do it. And I think, like, for me, this process with you, I just knew my job was to come in here, hear what people have to say about me. And that was it. Like the jury was going to decide what they decided. I had no part of it. You run this room. You decide what happens to me. And that's it. I just have to do what you tell me to do. My job, in a way, is frictionless. I just have to listen which for me up until the last couple years not something I've been great at, but I tried my best to get better.

So today, as I said, I look at my life, and I lost personally a lot of -- everything. And so to me, my character, my defects, my choices, it's just something about it, and I don't ask why to these things. It just required me to go down to the foundations a bit to learn. I think maybe my ego is so

big that I feel like I could always figure things out. I don't know. But for a lot of reasons this is where I'm at.

So for me I feel, like, me as a person, person in these circumstances, I'm happy. I'm happy that I'm responsible just for my feelings. I've got to do only what I think and my actions and that's it. Like, my job is to just not have a drink. And if on that day that I don't drink, I mess up, I say sorry for it and that's it.

And so life for me, looking back, a lot less friction. I'm glad to be able to know it, the lessons that I've learned are the reason I'm here and that's it. So thanks again for letting me share.

THE COURT: Thank you.

Is there any reason why sentence should not be imposed Ms. Kudla?

MS. KUDLA: No, your Honor.

THE COURT: Ms. Parks?

MS. PARKS: No, your Honor.

THE COURT: As I stated, the guidelines recommend a prison sentence in this case of 78 to 97 months. But that's just one factor the Court considers in deciding an appropriate sentence. I'm also required to consider other factors that are set forth in the statute which is 18 United States Code, Section 3553(a) and they include the nature and circumstances of the offense. Mr. Hanratty, I'm addressing your own personal

history and characteristics, also, factors that are somewhat removed from you, the need for the sentence to promote respect for the law, provide just punishment, reflect the seriousness of the offense, also provide adequate deterrence to criminal conduct, meaning not only deter you from engaging in other crimes but also deterring other people who might think about similar crimes, also protecting the public from further crimes and providing you with needed vocational training, medical care, correctional treatment. I'm also required to avoid unwarranted sentence disparities among similarly situated defendants. And most important, I'm required to impose a sentence that is sufficient but no greater than necessary to comply with these purposes. I find the sentence I'm about to pronounce does that.

So I have thought long and seriously about what the appropriate sentence is in this case. The lawyers have given me lots of material to think about. And I have to start with the offense. I think there's no doubt it was a serious offense. And after a nine-day jury trial the jury found that you have committed fraud and that you had intentionally lied to Emigrant about various aspects of the lending relationship. I don't have to recount it all. Many of us were here for the trial.

And the offense is serious for reasons that both the government pointed out and that Emigrant pointed out. The

duration, the harm that it caused to Emigrant, the closing of its subsidiary, the impact that has on borrowers and the community, and the impact it had on particularly employees, including people you had significant working relationships with. All of this is serious, and I don't want to underestimate it. Also, there was just a lot of money involved, 18 million in principal plus the interest attached to that, as a result of the fraud is a huge loss.

I will also add, although I think judges aren't supposed to prognosticate too much, I think there is very little prospect of Emigrant recovering any significant part of that loss. I think they admitted that in their victim impact statement, which they submitted. And they also contend that you have circumvented court orders like the PIRO and the injunction. And that the government's also talked about the second fraud on Kirtland Bank. So this was as serious course of events and the crimes you were convicted of were very serious. And that, for better or worse, is the main thing that I have to think about when I sentence you.

I know you were arrested in Puerto Rico on December 18, 2023, and that you were released on bail. I know a lot about your personal circumstances, both because of the presentence report but also thanks to your family which I really appreciate for having submitted letters to really paint a picture of who are. I know you were -- I know you are 51

years old. And some of this, I will say most of this is as of the time the submissions were made, so in the presentence report and letters from your family. So they may be outdated by a few months. But in any event, you are 51, close to that. You are a United States citizen. I know that you moved from Virginia to New Jersey when you were small, when you were four. I know your mother and father are now in their early 80s and your father suffers from a serious illness. I know your father was a career officer with the U.S. Navy. And I very much appreciate the insight from your parents' letters about who you are and the struggle this has been and also the feelings in the family having felt that they have, in some sense, failed you. And I hope you fully appreciate or carry the weight of that responsibility that your family feels.

I know you have three siblings. I know you met your ex-wife in 2000. You got married in 2004. You separated 20 years later in 2024, shortly after your arrest. You were divorced in October of that year. I know you have three children who at least at the time of the presentence report were 10, 15, and 17. To me that means one in elementary school and two in high school. Let's see, this is May, so we're at the end of the school year. What grades are we talking about?

THE DEFENDANT: Sure. My oldest, Molly is graduating high school in June. And Caroline is a sophomore going into junior year next year.

THE COURT: Okay. So your children are old enough to know what's going on. And I know that you have taken or have gone to great lengths to be in their lives and maintain your relationship with them. All of the people who have known you, some for your entire life have described you as a caring and kind family member, devoted not only to your immediately family but to others in your family, not only coaching sports teams and organizing outings and being the fun uncle, brother, person in the family but also a person who cares for people when they are sick and does errands for them and basically cares for people in a very physical way.

Your former employee Ms. Mendez Baez described you as a caring and supportive boss. I know from the letters how committed you are to your children. I found it very interesting. I think it was Mr. Santori, in his victim impact letter, who said despite his sense of loss and breach of trust, that he hoped for a sentence that was, in essence, just, but also took into account your children and your relationship with your children. That reflected some insight to me on the part of Mr. Santori the impact of the relationship that you have with your children which I think is very important and is relevant to sentencing.

Several people also commented on the positive steps you've taken in recovering from your substance abuse disorder. I know about your employment background. I won't recount it

all here. I do know you are a Brooklyn Law School grad. You have a JD, that you worked in compliance. We all know what compliance is about for a brokerage firm. I know that since your arrest, and nobody's really talked about this here, but I certainly read about it, I know that you have been basically working as a delivery person. There was as reference to two jobs and 50 hours a week and that one of those is being employed as a part-time driver for a bakery in Rhode Island working the shift from 2:00 a.m. to 10:00 a.m. I don't know how up to date all of that is, but what I took from it and I understand is that you are working as a laborer for nothing like the kind of money you were earning before in an effort to work and also support yourself and support your family to the extent you are able to.

I know since June of 2024 you resided with your parents in New Jersey except that you also reside in Rhode Island, and this may have changed as well. And the time that you spend in Rhode Island is because your children are there and you've spent time with your children.

Is there any of that that you want to update or that has changed significantly?

THE DEFENDANT: Not tremendously. I still work the 2:00 a.m. delivery shift. I have three other jobs as well. Like I'm doing bar-backing in a couple of restaurants, and I help out a fellow I met through my groups with his catering

business. Where I live, I have been in the majority Rhode Island. I've made friend with a woman who used to run an Airbnb and that is where I'm living, out of her garage that's been converted. So that's where I am for the most part, and I get down to see my folks when I can.

THE COURT: Thank you.

I know you or at least appear to be in good physical health. You have been getting mental health help to address your alcoholism and deal with some of the stress and also manic tendencies in the words of the therapist who has been helping you. I know that there is a little bit of drug use in your past, but I don't think that is not the significant issue here. The significant issue is alcohol. And I read your letter recounting that. And I know that you have spent time in an inpatient treatment center, I believe for six weeks, no 36 days. And then you lived with your parents for several months with very clear boundaries and rules and electronic monitoring at that time also. I know that you essentially have a clean criminal record. You have an arrest that seems to be related to drinking. But there is no evidence of any fraud or dishonesty in the criminal record other than what is here. So that paints a pretty vivid picture for me of where you've been and who you are. And I've considered all that.

I'm also a required to avoid unwarranted sentencing disparities. The sentencing commission gathers statistics on

all the sentences imposed throughout the federal system. I want to thank Ms. Parks for reminding me of some of these cases in which I've sentenced other defendants for fraud. But that is very anecdotal, to say the least. And I don't know how representative I am.

But according to the judiciary sentencing information, during the last five years ending December 2025 there were 74 people across the country who were sentenced for money laundering and whose primary guideline was 2S1.1 and who, like you, had a final offense level of 28 and a Criminal History Category of I. And after excluding defendants who received a lesser sentence because they cooperated with the government, 97 percent or 72 of them served some time in prison. The average was 65 months. The median was 68 months.

I also looked at the same information for defendants whose primarily guideline was 2B1.1 for fraud and with, again, the same offense level and criminal history category as you. And after excluding cooperators, 99 percent or 181 of them received some time in prison. The average term was 62 months. And the median was 60 months.

I've considered this information in determining the appropriate sentence but also noted that there are outliers and that every case depends on its own facts. The probation department recommended what it thought was a bottom of the guideline sentence of 97 months, based on a higher guidelines

determination than what I ultimately found. The government is requesting 72 months, which is a below guidelines sentence under either guidelines calculation. And your lawyer is asking for a sentence of six months.

My own view is that it's important to impose a substantial sentence of incarceration under the circumstances because of the seriousness of the offense, to promote respect for law, provide just punishment, and also to provide general deterrence. I know, as someone who is trained in the law, you know what that means. I don't think specific deterrence is an issue here. I believe that after everything you've been through, you are not going to be engaging in any other criminal activity. I also believe that a sentence substantially less than what is recommended is warranted here because of several mitigating factors, which I will outline. Some of this has been mentioned, some of this I think not as much.

First, this is not a case where the defendant used proceeds of the fraud to make lavish purchases like designer clothing, expensive jewelry, exotic cars, multiple homes or foreign travel. All of which I've seen in other cases that I've presided over. Instead, the evidence at trial showed that you've committed these offenses because Ebury did not have sufficient funds to redeem equity holders' investments in the way and at the time that they demanded.

Second, I think it's important that, again, unlike

some defendants I've seen, you are not, let's see, a "sociopath," maybe that's not the right word. But there are people who lived their lives from the beginning as swindlers and con artists trying to rip off every person they encounter and every entity they encounter. My view of what happened here is you were an inexperienced businessman who got in over their head and that handled the situation with lies rather than coming clean and trying to deal with it, for example, by restructuring the debt in the way that Emigrant had described. And I think perhaps because of your inexperience, you hoped and expected that you would somehow be able to right the ship, and I think that was somewhat confirmed by the remarks you just made.

A third mitigating factor is I think you suffered extreme losses already because of your crimes. You didn't dwell on that, and I think that is commendable. But you've lost your business, your livelihood, your money, your home, your reputation. You have a law degree, but as a convicted felon, it will be very difficult for you to practice law even if you were inclined to do that. You are no longer married and living in a house with a wife and three children. I know that you are living in essentially an Airbnb-type apartment in Rhode Island so that you could be near your children. You are working multiple jobs for a very low wage, many hours a week, including delivering bread for a bakery at the 2:00 a.m. shift.

Fourth, you've made significant progress in facing and dealing with your alcohol addiction, including, as I said, inpatient treatment and living in your parent's house for eight months and then continuing now to attend Alcoholics Anonymous and working on being sober. And I understand you've been sober since July 2024, and what a huge difference that has made. I think that all of the events that we heard about that were less than commendable occurred before you became sober. So I wish you the best of luck in continuing that.

And fifth, and not the least important, in all of the losses in your life, the one thing that you've been able to salvage from what looks to me like real wreckage is the relationship with your family. As evidenced by the family members who are here with you, the family members who wrote letters in support and who were effective in conveying not only who you are but their commitment in helping you live a better life going forward. I know your parents are not young. I know your father is being treated for a serious medical condition. I have now confirmed that you have one child in elementary school, one child in high school, and one who just graduated. And I also know those relationships are critical to your ability to take each next step and to rehabilitate yourself.

So all of those mitigating factors I think distinguish this case from the more typical case of fraud that I have seen.

I should note that I considered the guidelines

recommendation, but ultimately did not rely on it in determining my sentence. The guidelines recommended are largely driven by the loss amount here, which was large. But they do not take into account the Section 3553(a) factors, particularly your own history and characteristics and nature and circumstances which I've just recounted. The sentence I intend to impose reflects my judgment based on the facts of the case, my consideration of the evidence at trial, the parties' arguments, the Section 3553(a) factors, but not the guidelines. And my sentence would have been the same regardless of the guidelines calculation.

So I will now state the sentence I intend to impose, but the attorneys will have a final opportunity to make legal objections before the sentence is final.

Mr. Hanratty, will you please stand.

After assessing the particular facts of this case and the factors under Section 3553(a) including the sentencing guidelines, I conclude that a sentence below the guidelines is justified as follows. Mr. Hanratty, it is the judgment of the Court that you are remanded to the custody of the Bureau of Prisons for a period of 366 days to be followed by two years of supervised release. That is a sentence on each count, each to run concurrently. I find that two years of supervision is necessary to both provide you with support so you are established on a good path and also to ensure that you make

meaningful contributions towards your restitution and forfeiture obligations.

You may be seated.

During the period after your release, this two-year period of supervision, you will be subject to certain conditions which are similar to bail conditions. And the probation department has proposed various conditions in the presentence report, and I have directed that your counsel discuss those with you.

I just want to confirm with Ms. Parks, have you discussed the proposed conditions with your client?

MS. PARKS: Yes, your Honor.

THE COURT: Do you have any objection to my just referring to them and incorporating by reference rather than reading each one verbatim into the record?

MS. PARKS: No, your Honor, I don't.

THE COURT: Thank you.

With respect to the mandatory conditions, I'm imposing the mandatory conditions on page 49, and the mandatory drug testing condition is imposed.

For standard conditions, let me just take a look at a note I received. For the standard conditions, I'm imposing the conditions which are stated on pages 50 and 51 of the presentence report without change except as I will now state. So Standard Condition Number Three restricts you from leaving

the federal judicial district where you are authorized to reside without getting permission from the Court or the probation officer. Because I don't know necessarily where that will be after you served your sentence, I will modify that condition to limit your travel to the district where you reside, the district where your children reside. And I have to specify what district that is, so I will say the District of Rhode Island. And the district where your parents reside, which I know is in New Jersey, and I frankly don't know -- is there only one district in New Jersey?

MS. PARKS: Yes, your Honor.

THE COURT: Okay. So the District of New Jersey with travel to the latter two districts for the sole purpose of visiting your family members.

I don't know what the plans of your oldest child are, but you can seek a modification of these conditions if she ends up residing in one of the places where you are not authorized to go, and we can consider it at that time.

I find each of the 12 standard conditions, including Condition Three, as modified, as warranted based on the circumstances of this case and to provide Mr. Hanratty with support to live a safe and law-abiding life and also to provide the probation department with information needed for supervision.

As for special conditions, the probation department

recommends three special conditions on pages 51 and 52 of the PSR. I'm imposing each of these as they are written and incorporating by reference except as I will now explain. So there are two financial special conditions, which are access to requested financial information and no new credit without permission. I find these are warranted, first, to help prevent the recurrence of the type of crimes you were convicted of, namely fraud in connection with loan financing. And two, to help the probation department monitor your compliance with your restitution and forfeiture obligations.

I'm modifying the search condition to remove the search of electronic devices. So with the amendment, you must submit to a search of "your person, property, residence, office, vehicle and papers" under the circumstances stated in the presentence report. I find the condition is warranted to help prevent and detect any further crimes like the ones that occurred here.

I'm adding a special condition for alcohol abuse treatment, given your history of alcohol addiction and to provide you additional support in maintaining your sobriety. The condition will be "you shall participate in a program approved by the United States Probation Office which program may include testing to determine whether you have reverted to using alcohol. And the Court authorizes the release of available drug and alcohol treatment evaluations and reports to

the substance abuse treatment provider as approved by the probation officer. You must contribute to the costs of services rendered (co-payment) in an amount determined by the probation officer based on your ability to pay or availability of the third-party payment." And I'm going to amend what I just read so that the first words read, "you shall participate in an alcohol abuse program" because it wasn't specified.

Fourth, you will be supervised in district of your residence.

My question for Ms. Parks, do you have any objections to any of the conditions I've imposed?

MS. PARKS: No, your Honor. Thank you.

THE COURT: And do you agree they are appropriate and lawful under 18 United States Code Section 3583(d) and U.S. Sentencing Guidelines Section 5D1.3(b)?

MS. PARKS: Yes, your Honor. Thank you.

THE COURT: I'm not imposing a fine because I don't believe you'll have the ability to pay it with your restitution and forfeiture obligations.

So let me address restitution. For restitution, the record is presently insufficient for me to ascertain one aspect of the victim loss necessary for me to issue a final order of restitution, but I will state my findings to the extent I'm able to. First, as to EBCC and Emigrant, the amount of loss for which restitution is mandatory is the outstanding principal

owed by Ebury to EBCC on the date of default or approximately 18.2 million. My rationale is substantially the same as explained in my order of May 23, 2026, determining the loss amount under the sentencing guidelines.

Second, as for investor losses, I find they are not recoverable as restitution because the investors were not "directly and proximately harmed as a result of the commission of" the offense. And I'm quoting 18 United States Code Section 3663A(a)(2). Again, my reasoning is substantially the same as in my order of May 23rd.

So with respect to prejudgment interest, I'm going to ask for further briefing. I certainly understand the arguments that have been made here. But what I'm interested in is the applicability of the code section Ms. Parks referenced to prejudgment interest, as well as other exercises of the Court's discretion, if it exists, to waive prejudgment interest.

If interest applicable, I find that it should accrue during the period of 2021 when EBCC placed Ebury in default and the date of judgment in 2026. And when I explain my findings, as I am right now, that means I have decided it and I expect you not to brief it or challenge it unless it's some kind of formal motion for reconsideration.

And the fifth issue I would like you to adjust is if there is interest, what the appropriate prejudgment interest rate is. I find that the appropriate rate is not the

contractual rate of interest in the credit agreements between Ebury and EBCC. In awarding restitution a court cannot award "expectation damages" because restitution "is not meant to guarantee the benefit of any bargain." I'm citing the Second Circuit's decision in *Qurashi*. And that is *United States v. Qurashi*, 634 F.3d 699 at 703 (2d Cir. 2011).

I would like a letter brief from the government June 2, 2026, which may include Emigrant's views addressing the prejudgment interest issue, both the extent to which it is waivable and the appropriate interest rate if it is not waived.

I would like a response from the defendant by June 9th, 2026. I will put all of this in a written order. I would like the parties to address Judge Cote's opinion in *United States v. Smerling*, 21-Cr-317 at 22 WL 1806300 (S.D.N.Y. Jun. 1, 2022) in which she awarded prejudgment interest at the statutory post-judgment interest rate.

The final issue is the form of restitution order. I have the government's letter from last Friday requesting the opportunity to submit a proposed order. The government may submit its proposed order with its letter brief consistent with these findings. And the parties should confer in an effort to agree on the terms of the order. To the extent that you can't agree, for example about these open issues, you can leave those blank, and I will look at your letter briefs. I will issue a final restitution order no later than 90 days from today.

Next, I would like to address forfeiture. As I mentioned, the government seeks a money judgment and seeks to forfeit specific property. First, I find the government is entitled to a money judgment in the amount of $17,795,412.44. This is the amount that Ebury borrowed from EBCC beginning in October 2018 which is when the defendant first submitted fraudulent borrowing base spreadsheets and began misleading EBCC about a third-party servicer and custodian through the end of the lending relationship. I find that this amount is subject to forfeiture as proceeds of the fraud and a portion of which -- I'm going to leave it at that. Forfeiture is proceeds of the fraud.

Even though the loan proceeds were received by Ebury, money received by a corporation may be indirect proceeds when an individual "so extensively controls or dominates the corporation and its assets that money paid to the corporation was effectively under the control of the individual." United States v. Peters, 732 F.3d 93 at 103 and 104 (2d Cir. 2013). And that was the case here. I'm not including amounts received from investors and the forfeiture amount for the same reasons their losses are not included in the guidelines loss amount and are not recoverable as restitution. The investors losses also are also not "proceeds" of the fraud subject to forfeiture.

Next, addressing forfeiture of specific property, the government also seeks forfeiture of "any and all assets held by

Ebury Fund 1 and Ebury Fund 2, including municipal tax liens and real estate. Assets were subject to forfeiture under 18 United States Code Section 981(a)(1) if they are "involved in" a violation of 18 U.S. Code Section 1957, which is the charged offense for Counts Three and Four. Courts in this district in the Second Circuit in a summary order have found this standard satisfied when the property acts as a conduit for the laundered money. *See United States v. Portillo*, 09-Cr-1142 at 2024 WL 3565784 at *9 (S.D.N.Y. Jul. 29, 2024). Two citations to that, *650 Fifth Avenue and Related Properties*, 777 F. Supp. 2d 529 at 567 and 568 (S.D.N.Y. 2011). And *United States v. Kenner*, 443 F. Supp. 3d at 354 371 to 372 (E.D.N.Y. 2020). I find that the assets held by Ebury Fund 1 and Ebury Fund 2 were "involved in" the offenses charged in Counts Three and four because the funds acted as a conduit for the violation of Section 1957. Therefore, I agree that the forfeiture of "any and all assets held by Ebury Fund 1 and Ebury Fund 2, including municipal liens and real estate" is required in this case.

I'm also imposing a mandatory special assessment of $400 which shall be due immediately.

Does either counsel know of any legal reason why the sentence should not be imposed as stated?

Ms. Parks?

MS. PARKS: No, your Honor.

THE COURT: Ms. Kudla?

MS. KUDLA: No, your Honor.

THE COURT: The sentence as stated is imposed.

Are there any applications in connection with the sentence, Ms. Parks?

MS. PARKS: No, your Honor.

THE COURT: Well, let's talk about that. So the first question is, is there a preference for location to facilitate family visitation?

MS. PARKS: Yes, your Honor. Thank you. We respectfully request -- we understand that your Honor cannot direct the Bureau of Prisons to do it, but we would request to be placed at the FMC Devens Minimum Security Satellite Camp. We don't believe there is --

THE COURT: Which is where?

MS. PARKS: Sorry, in Massachusetts.

And the reason is that appears to be the one closest to Mr. Hanratty's ex-wife and the children, including where his eldest will be going to college.

THE COURT: Okay.

MS. PARKS: We don't believe there is an RDAP at that facility. But just in case there is, we would like request that as well, the alcohol abuse treatment program.

THE COURT: Let me just be clear. In terms of priorities, your preference is to be at a facility as close as possible to Rhode Island, namely that one, to facilitate family

visitation. And second, if there is an RDAP program, you would request his participation in that.

MS. PARKS: Yes, exactly, your Honor. Thank you for clarifying.

You also asked us to suggest a self-surrender date. We would like to ask for September 9th. That's a little bit after the 90 days. There's basically two reasons why we're asking for that. One, Mr. Hanratty's eldest daughter is, as you noted, she's about to be a freshman in college. Her move into to college which is local to the area, the college's website says September 2. The parents haven't actually received an official confirmation yet. But that's what we think the date is. The other reason is, as Mr. Hanratty said earlier, he has a number of jobs which are essentially are seasonal jobs. Where he is living is a very popular summer tourist destination. So for the bar-backing, the catering, the food service, he would like to be able to work for those people through the end of the season which is Labor Day. This season Labor Day it's a little bit late, it's September 7th. So that's why we are requesting September 9th, which is a Wednesday to self-surrender.

THE COURT: Okay. Thank you. I will make those recommendations. I will set a September 9th surrender date.

Does the government have any applications in connection with sentence? I guess there are no open counts

because we had a trial, but is there anything else?

MS. KUDLA: No, your Honor. But out of an abundance of caution, we move to dismiss any open counts.

THE COURT: All right. That request granted.

Mr. Hanratty, you may have the right to appeal your conviction and sentence. If you are any unable to pay the cost of appeal, you may apply for leave to appeal *in forma pauperis*. The notice of appeal must be filed within 14 days of the judgment of conviction.

Because you have a surrender date, your conditions of release continue until then, in other words, your bail conditions continue until then. Between now and then you should get an assignment, essentially, of where to report. And if you fail to report for your sentence, you may be charged with another criminal offense.

Before I acknowledge and thank your family and friends for being here, one thing I'm still interested in, and I think Ms. Kudla, and perhaps Emigrant can help straighten this out, what is the plan going forward for the assets of Ebury? And is there anything you need from me in the way of an order to try to facilitate that? Because there are competing demands for restitution which is due to Emigrant, forfeiture which is due to the government, we have civil case with monies due to Emigrant. What is the plan logistically for how to deal with liquidation and distribution of assets? Anyone to speak to

that?

MS. KUDLA: Your Honor, very briefly, I think this would have to be handled by our asset forfeiture department in light of the specificity of this asset. As we noted, we don't think these assets have any value based upon the purchase date which was, is in many cases, 16 years ago, the fact that there's never been a custodian actually managing them. And --

THE COURT: Actually, there was a custodian managing some but in any event.

MS. KUDLA: In any event, setting that aside, ultimately the marshals would have to find a market for them. As we've heard at trial, there is a very limited niche market for tax liens from 2009 to essentially 2018. And then they would have to sell them on those markets to use the proceeds --

THE COURT: And there may be real property that Ebury owns.

MS. KUDLA: Correct, if any real property that's actually been foreclosed upon in the appropriate manner.

The understanding is that that is likely *de minimis*, if any. But ultimately that's going to be a process that's undertaken likely by the marshals unless both Emigrant and Mr. Hanratty can reach an agreement as to how the sales can be done by a third party who has the experience to sell them. So my understanding is this is going to be a very complicated process that may not result in any actual value. Likely, if

they cannot reach an agreement about a third party that would be selling these, it would likely be taken upon by the marshals. And I don't have any insight as to the timing in which the marshals would be able to handle these unique assets.

THE COURT: In other words, what you are saying is that the government has first dibs and that the government will manage it?

MS. KUDLA: Your Honor, actually, I think the fastest way would be if the parties who are most equipped to deal with these assets, both Emigrant and Ebury, have an agreement that they can have a third party sell these, that may be the fastest way, as opposed to the U.S. Marshals who do not normally sell tax liens on the secondary market. Absent that, I think that will go to the U.S. Marshals. So perhaps one way to facilitate this is if the Court says, you know, the parties between Emigrant and Hanratty would reach an agreement within 90 days as to who that third party would be to sell any assets. If not then that default would go to the U.S. Marshal Service at that point.

THE COURT: Okay. I mean, I think it's both in Mr. Hanratty's and in Emigrant's interest to realize the most value, if any, from these assets.

So Mr. Willscher, would you like to be heard?

MR. WILLSCHER: Your Honor, we have been working with Mr. Hanratty for more than five years. He's had every

incentive along the way to find a buyer. Every buyer he's proposed has been arguably a fraudster as well. The property has now been forfeited. It belongs to the U.S. government. So I don't really understand what Ms. Kudla is suggesting that I should have a discussion with Mr. Hanratty.

THE COURT: It's a discussion maybe you should figure out who should sell the properties.

MR. WILLSCHER: The U.S. Marshals should, your Honor.

THE COURT: If you have the U.S. Marshals do it, they are probably the least qualified of anyone you could jointly come up with. And therefore you are least likely to realize much value from your assets. But if that's how you want to proceed.

MR. WILLSCHER: The most recent quotes we have received from experts on this is that their fees for doing anything with this would outstrip whatever value the collateral has.

THE COURT: All right. Well, then that makes sense. But what you were saying before didn't, so I appreciate that additional information.

MR. WILLSCHER: To be clear, the property is forfeited. He should have nothing to do with it anymore.

THE COURT: Absolutely. I mean, I think all the government was suggesting, and I don't want to put words in their mouth, is to the extent he has any information or

expertise that might be helpful, he should contribute it. But the property is forfeited, yes.

MR. WILLSCHER: And to date he has never done so, including in the bankruptcy court.

THE COURT: All right. Thank you.

MS. KUDLA: On that note then, your Honor, it seems like everybody seems that then the U.S. Marshals would be the most efficient way. And absent any information from Mr. Hanratty, so we will tell our asset forfeiture department that once the forfeiture order is on docket that these exist and they will proceed to go through any process to claim the value. My assumption is that process will take a significant period of time, be costly, and not result in any credit that's truly offsetting the forfeiture amount

THE COURT: Understand.

Ms. Parks?

MS. PARKS: Thank you, your Honor. Just, two things. One, I know there was a lot of paperwork over the past two days. To the extent it's helpful, in our submission on Thursday we did set forth a process we think, whether it's the marshals, whoever wants to do it, we think that's the most reliable way to find an attempt to liquidate Ebury's assets. So I don't remember the docket number but if anybody is interested reading --

THE COURT: I remember reading it, and I'm sure

Ms. Kudla does too. Perhaps you could pass it on to the marshals.

MS. PARKS: Yes, we absolutely will.

THE COURT: In fact, I will add to the forfeiture order. I will find docket number and ask that it be forwarded to the marshals to assist in the recovery of assets.

MS. PARKS: Thank you, your Honor.

And just one other minor point. I don't think this matters, but I'm really just not a forfeiture expert. I do want to make clear, Mr. Hanratty personally has not had any ownership interest in any Ebury thing in the past several years. I assume that is not going to impede this process, but in case there is something that your Honor needs to do to make that clear for the marshals or whoever is going to dispose of it, I just want to make sure that is clear on the record.

THE COURT: All right. I suspect nothing is needed from him, but I'm sure the government will let us know if something is needed. Thank you.

So is there anything else from the lawyers?

MS. KUDLA: Not from the government, your Honor.

MS. PARKS: Not from us. Thank you, your Honor.

THE COURT: All right. I want to thank Mr. Hanratty's family again for your submissions to the Court. It makes all the difference in the world to have some understanding of who the person is who is being sentenced, apart from the crimes

that they've committed. And Mr. Hanratty will need your continued support in the future to live the kind of life I know he wants to live. So I appreciate what you've done for him so far and hope that you will continue to do so.

We are adjourned. Thank you.

(Adjourned)