**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

October 22, 2026

**BY ECF**
Honorable Lewis A. Kaplan
United States District Judge
Daniel Patrick Moynihan
United States Courthouse
500 Pearl Street
New York, NY 10007

**Re: *United States v. Gökçe Güven*, S3 25 Cr. 592 (LAK)**

Dear Judge Kaplan:

The Government respectfully submits copies of the Victim Impact Statements it has received in advance of sentencing. Some of these letters are from former Kalder employees, who have requested that their names be redacted publicly. One letter also contains sensitive medical information for two former employees. The Government respectfully requests that the Court allow these limited redactions. The Government is prepared to address this matter further at sentencing.

Respectfully submitted,

JAMES M. MCDONALD
United States Attorney

By: ______________________
Allison C. Nichols
Alexandra N. Rothman
Assistant United States Attorneys
(212) 637-2366/-2580

# Victim Impact Statement No. 1

[redacted]

---

**From:** Skey, Elizabeth H.
**Sent:** Friday, August 21, 2026 10:00 AM
**To:** 'Rothman, Alexandra (USANYS) [redacted]>
**Cc:** Nichols, Allison (USANYS) [redacted]
**Subject:** RE: Kalder

Hi Alexie,

I hope you've had a good Summer. On behalf of Alumni Ventures, see below for their victim impact statement. Please let me know if you have any questions or if you'd like to discuss.

Thanks,
Elizabeth

---

In Spring 2024, Alumni Ventures invested $500,000 in Kalder, after meeting with Defendant Gocke Guven and conducting investment diligence, during which Alumni Ventures received financial information that included Kalder's ARR and customer relationships. The material represented that Kalder had $1.2 million in ARR and customer relationships with companies such as Godiva, IATA, and Mile, among others.

Unbeknownst to Alumni Ventures, Ms. Guven falsified that financial information. Ms. Guven created two sets of "books;" one in which she inflated ARR and the Company's customer list by orders of magnitude and another accurate set that Ms. Guven kept a secret from investors. Ms. Guven only provided the inflated financials to investors and did so to raise far more money than the business justified.

Alumni Ventures learned of Ms. Guven's deceit in Summer 2025 when a Kalder insider blew the whistle on Ms. Guven's fraudulent conduct and immediately began efforts to recoup its $500,000 investment. Alumni Ventures engaged counsel and made multiple demands to Kalder and Ms. Guven to return its investment. Ms. Guven, both directly and through intermediaries, spent months attempting to induce Alumni Ventures into waiving its right to pursue claims. On multiple occasions, Alumni Ventures was told that Ms. Guven would "destroy" Kalder and all investor capital therein before returning Alumni Ventures' investment. When her efforts to deter Alumni Ventures from pursuing civil relief proved unsuccessful, Ms. Guven engaged counsel and contested Alumni Ventures' suit seeking return of its investment. Indeed, she continues those efforts today.

Alumni Ventures has expended extensive financial resources trying to recover the money Ms. Guven misappropriated, including by engaging outside counsel to negotiate with Kalder and its outside counsel, respond to government requests in connection with the criminal proceedings, and to represent it in a Delaware civil suit to recoup its investment. Ms. Guven and Kalder failed to respond to the initial Delaware filing, which resulted in the court entering a default judgment against her and the company. Ms. Guven thereafter moved to vacate the default judgment and fight the suit, despite pleading guilty to the same underlying conduct in the criminal matter. As a result, Alumni Ventures continues to expend resources to this day despite not having recovered a single dollar from its initial $500,000 Kalder investment. Alumni Ventures asks that the court consider her ongoing conduct and refusal to take responsibility for her actions in connection with her sentencing.

[redacted]

# Victim Impact Statement No. 2

# Victim Impact Statement

## United States v. Gökçe Güven, 25 Cr. 592 (LAK)

## Submitted by [redacted] Former Chief Revenue Officer, Kalder Inc.

---

Your Honor,

I am writing as one of the former employees of Kalder who raised concerns internally regarding the conduct that ultimately led to this prosecution. I submit this statement because the harm suffered by employees does not otherwise appear in the current criminal record.

On June 4, 2025, I underwent [redacted]

One hour before I went under anesthesia, I received an email from the defendant's sister. She was joining the company. I would now report to her. She had already begun reaching out to Kalder's clients and partners I managed as Chief Revenue Officer.

While I was on the operating table, she removed me from the company's financial systems. Mercury Banks's audit records document both the timing of my removal and the identity of the user who performed it. (Mercury screenshot attached to this letter). At the same time, the defendant inserted her sister into the company as Head of Special Projects – without authorization from any employee or officer. No W-2 employee had hired her, approved her appointment, or signed any employment documentation on her behalf. At that time, the defendant's own U.S. work authorization had already expired. I went under anesthesia knowing something was deeply wrong. When I woke up, the retaliation had already begun.

In the weeks that followed, while recovering on crutches, access to the systems I needed to do my job was stripped away piece by piece – financial accounts, payroll authority, company cards, partner calls. Each removal followed a whistleblower complaint filed, a governance objection raised, or a refusal to process an unauthorized hire. The pattern and timing of these removals were documented.

One of the most difficult aspects of this experience was the position employees were placed in. We were repeatedly told that certain issues – particularly surrounding the defendant's immigration status and operational authority – were personal matters that should not be questioned. Those same issues were used to justify access changes, personnel decisions, and shifting authority structures that directly affected our ability to do our jobs. The same fact was private when it was inconvenient and operative when it was useful. Employees who raised concerns about payroll, benefits, and governance were pushed aside – while being told the

underlying causes of those problems were none of our business. This was the operating pattern inside the company well before any of it reached this Court.

This was a company where one person held every role that mattered: founder, CEO, majority shareholder, and board member. One person. Every role. No one to answer to. **The defendant having it both ways was not incidental to this case. It was the operating structure.**

When that structure created legal obstacles, the response was not to change it. It was to make it look different on paper.

## What Happened to the Team

Five people reported directly to me – [redacted]. [redacted] was pregnant. [redacted] was on a visa. [redacted] had been the first to document concerns in writing in September 2024. I was their manager, on crutches, and I had no ability to protect them. In each case, the same sequence occurred. Check-in meetings to extract client lists, pipeline data, and account intelligence. Terminations entered into the payroll system minutes later. Each misclassified as a voluntary resignation – so employees would lose severance, benefits continuation, and unemployment eligibility. I reversed those misclassifications when I discovered them.

I was terminated in August 2025 alongside the rest of the team.

## The Harm Did Not End with Termination – Stripping of Protections

After my termination, I stopped attending physical therapy during the most critical stage of [redacted] I made that decision because I had no income and believed I no longer had insurance. Months later, I learned that the health plan had actually been cancelled on April 30, 2025 – three months before my termination. The premiums had initially been paid. Then the defendant instructed her bank to reverse the payments that had already cleared. UnitedHealthcare's own billing records document this: "Corporate customer advises not authorized." This was not simply a missed payment. Payments that had already cleared were reversed while premiums continued to be deducted from our paychecks. I found out around Christmas 2025 when my surgeon's office began calling about retroactive recoupment – the emergency room visit, the ambulance, the X-rays, the surgery itself, the anesthesia, every physical therapy session. All of it taken back. My outstanding medical liability exceeds $150,000.

There was no COBRA to elect. UnitedHealthcare confirmed in writing that no continuation rights exist when a group plan is terminated this way. I had no notice and no recourse.

Before the plan was cancelled, our Chief Technology Officer, [redacted], told her directly about his planned surgery in a conversation the three of us had together. He had also posted notice of the surgery in a public company Slack channel visible to the entire team. The surgery was not a private matter. Everyone knew. The plan was cancelled regardless.

Today, more than a year after surgery, I still have significant limitations. [redacted]. I do not know which of these limitations will ultimately prove permanent, or what my recovery would have looked like had I been able to continue physical therapy uninterrupted. That question was decided for me.

The physical consequences are still with me, and so are the financial ones. The bills and envelopes from that loss of coverage still sit in a stack on my desk. Every new envelope is another reminder that I am still dealing with the administrative and financial aftermath of what happened.

Our retirement contributions were deducted from our paychecks and never deposited. We discovered this only months after our terminations. During the same period the defendant fired the entire company, records and emails from her corporate account show that she was renting a summer house in Bodrum, and she was seen on social media celebrating with her sister the night the terminations went out. Her sister was also traveling in Mykonos that summer. This was consistent with a broader pattern reflected in company records of company funds being used for personal travel and leisure. Meanwhile, our retirement contributions remained undeposited, and employees were left processing the reality that we had been fired for speaking up and doing the right thing.

The contrast was surreal: employees were worrying about wages, healthcare, retirement contributions, and whether they could remain in the country, while members of the defendant's family were being inserted into company operations and company resources continued to be used for their benefit.

One employee was pregnant when her wages were deliberately withheld. She was, to my knowledge, the only person not paid while everyone else received payment. The defendant knew she was pregnant. [redacted]. I don't believe that fact appears anywhere in the criminal record. I believe it should. To this day she still cannot talk about what happened to [redacted]. No legal or financial remedy can undo this loss. I do not claim to know whether those events were medically related. I include it because it illustrates the extraordinary personal burdens employees were carrying while also dealing with the financial insecurity created by the defendant's conduct.

Another employee lost his right to work in the United States as a direct result of his termination and was forced to leave the country. He has not been able to return. The defendant used her own unresolved immigration status as a shield to avoid accountability throughout this period – while

reporting to the board and outside counsel that he was violating his visa status based on vacation photographs. That characterization was false.

On July 25, 2025, all eleven of us submitted a formal written communication to the company's board member. We documented our protected disclosures and asked directly whether the audit findings would be shared with all shareholders. We later learned the answer was no. We stated explicitly that this was not a resignation. The board member resigned on August 4. The following day, the Chief Technology Officer and I were terminated. The remaining terminations followed.

We raised these concerns before the federal investigation became public. It was already underway before any of us were terminated. We were not fired because we raised concerns after the fact. We were fired because we raised them at all.

Even after terminating me, the defendant continued using my name and identity. I have since discovered communications showing that she used my former company email and identity to inquire about and purchase Employment Practices Liability Insurance (EPLI, insurance typically purchased by employers to cover claims of wrongful termination and discrimination). She also used my identity to communicate with UnitedHealthcare and U.S. Citizenship and Immigration Services (USCIS). At the same time, she was sending emails to technology vendors, such as Amazon, falsely accusing me and Kalder's Chief Technology Officer of "IP theft." There was no credible IP-theft issue. It was retaliatory narrative-building, occurring in the same period when the company's own records showed serious questions about whether there was a functioning product corresponding to the revenue and customer claims being made externally.

# The Conduct Continued after the Guilty Plea

This conduct has not stopped since the guilty plea. On August 3, 2026, my Kalder employment history was reported to LinkedIn as inaccurate. This is the second such report against me and the third targeting the Kalder employment histories of former employees in thirteen months. My employment is accurate and supported by payroll records and signed employment agreements.

This is particularly concerning because I watched LinkedIn get used against another Kalder whistleblower before it happened to me. During [redacted] termination dispute, she was pressured to change the end date of her Kalder employment on LinkedIn. That changed date was then pointed to as evidence that she had resigned earlier, rather than been terminated after raising concerns, affecting the whistleblower protections she was asserting. The platform was used to change the record, and then the changed record was used against her.

Now my own accurate employment record has been challenged twice. I cannot prove who submitted the latest report, and I have asked LinkedIn to investigate and preserve its records. But after everything that has happened, being forced to prove for a second time that I worked at

Kalder is deeply concerning to me. I cooperated with the federal investigation. I am a witness in this case. Someone is still trying to erase or challenge the record that I was there.

I raise this because, from my perspective, the retaliation did not end when I was fired, and it did not end when the defendant pleaded guilty.

## We were fired for doing the right thing

I went into surgery knowing something was wrong and came out into a retaliation campaign that cost me my income and healthcare, disrupted my rehabilitation, left me with physical limitations I am still living with more than a year later, and left me carrying what happened to the people I was responsible for protecting. I ask the Court to consider all of that. I understand the defendant pleaded guilty to securities fraud only. But behind every misrepresentation were real people whose lives were permanently altered. Employees lost careers, healthcare, retirement savings, immigration status, and in my case, lasting limitations in my physical mobility. We raised concerns before anyone knew there was a federal investigation because we believed it was the right thing to do. For that, we were retaliated against. She benefited from the institutions and protections of this country while repeatedly disregarding the obligations that came with them, and harming the people who trusted her.

What has been particularly difficult to witness is that, even after her arrest and guilty plea, I have seen little indication – in how she has publicly presented herself since – that Ms. Güven appreciates the harm her conduct caused to the people who worked for her. Instead, I have watched Kalder's acquisition publicly announced through members of Ms. Güven's team and the acquiring company, while Ms. Güven presents herself as moving on to a new professional chapter, including a new AI venture. The acquiring company is led by Frazier Horn, who was also the Financially Responsible Person on Ms. Güven's bond and attended her federal court hearing. Meanwhile, former employees are still dealing with unpaid wages, undeposited retirement contributions, healthcare losses exceeding $150,000 in my case alone, and consequences that, in some cases, cannot be undone.

I do not presume to tell the Court what sentence is appropriate. But I hope the sentence imposed reflects not only the financial conduct underlying this case, but the seriousness of the harm and the importance of genuine accountability. I respectfully ask the Court to consider those consequences when determining an appropriate sentence and any available restitution or forfeiture relief.

Respectfully submitted,

[redacted]
Former Chief Revenue Officer, Kalder Inc.
August 25, 2026.

kalder

[redacted]

## You've been removed from Kalder Inc.

**Mercury** <hello@mercury.com>
Reply-To: help@mercury.com
To: [redacted]@getkalder.com

Wed, Jun 4, 2025 at 10:58 AM

MERCURY

Hi [redacted]

Gonca G. has removed you from the Mercury account for Kalder Inc.. If you have any questions or think this was done in error, just reply to this email.

Thanks,
The Mercury Team

*Mercury is a financial technology company, not a bank. Banking services provided by Choice Financial Group, Column, N.A., and Evolve Bank & Trust®; Members FDIC.*

Sent with care from
Mercury Technologies, Inc.
333 Bush St, San Francisco, CA 94104

· Download iOS Android

Invisible things alone are

# Victim Impact Statement No. 3

Victim Impact Statement
United States v. Gökçe Güven, 25 Cr. 592 (LAK)

Your Honor,

I am submitting this statement as a former member of the sales team at Kalder Inc. I attended secondary school in the United Kingdom, came to the United States for university at NYU, and built my entire professional life here. After my termination I spent Christmas alone in New York with no job, uncertain about my status, far from my family, and trying to figure out whether I still had a future in this country. Eventually I made the decision to return to Bangkok and work for my family's business. I have not returned to the United States. Whether I will is still an open question

This is how I got there:

I joined Kalder because I believed I was joining something real. The company presented itself as having clients including Gentle Monster, HEAT, and IATA — globally recognized brands. That was a meaningful part of why I accepted the offer. After I joined, I learned those were not active customers. They were conversations. Some had already ended entirely before I arrived.
I raised that internally. So did others on the sales team. We questioned why we were being asked to describe companies as customers when they were not. We were told to continue using those names anyway.

Before the company's second funding round, I was instructed directly by Gökçe Güven to inflate our internal ARR spreadsheet so the total exceeded $15 million. I questioned it the next day. She told me it represented potential ARR — what the company could generate if every active sales conversation converted at 100%. I understood it as an internal projection exercise. What I did not know was that those same figures would be presented to investors as if they reflected actual existing customers and realized recurring revenue.

Throughout my time at Kalder, members of the sales team, including myself, repeatedly raised concerns about misleading investors and prospective customers. We were instructed to present non-existent or inactive companies as active customers in outreach materials, sales scripts, and pitch decks. When we objected, Gökçe Güven insisted we continue using those names and explicitly told us to refer to them publicly as customers.

At the same time, the sales team was placed under constant pressure to close deals for a product that was often not operationally ready for deployment. Despite major implementation delays and unresolved integration requirements, Gökçe Güven launched what she called a "zero-to-close challenge," criticizing employees in meetings for not closing deals quickly enough while ignoring the operational realities that made those timelines unrealistic.

This pattern repeated constantly: abrupt strategy changes, unrealistic expectations, and public criticism directed at employees for problems outside of their control. Entire sales strategies

would be aggressively pushed and then abandoned shortly afterward, forcing the team to repeatedly rebuild credibility with prospective partners and customers.

As tensions escalated, I also experienced direct interference with my client relationships. Customers I personally managed, including Les Benjamins, began cancelling meetings with me after being contacted directly by Gökçe Güven. She would then reschedule those meetings exclusively with herself, effectively cutting me out of relationships I had worked to build and preventing me from properly performing my role.

On April 30, 2025, my health insurance lapsed after premium payments that had initially been processed were reversed. I was never informed. Premiums continued being deducted from my paycheck. I did not find out until later. I kept working. I kept paying. I had no coverage, despite a deducted paycheck. Employee 401(k) contributions were similarly deducted from my paycheck and never deposited into my retirement account.

The financial harm extended further. When I raised questions about a time-sensitive tax election related to my equity, I was told to speak to outside counsel. Outside counsel never responded. When I went back internally, I was told again to speak to outside counsel. Gökçe Güven was the one who had issued the equity. She was the only person who could have answered my questions. Instead she redirected me to lawyers who had no reason to respond — because the question was never really theirs to answer. The deadline passed while I was being redirected in circles. To this day I do not know whether I ever actually held any of the equity I was told I had. Every time I tried to find out, I was pointed somewhere else. That is not an accident. That is a pattern: Every time an employee tried to understand or protect something they were entitled to e.g., their equity, their benefits, their client relationships, their immigration status, they were redirected, deflected, or silenced using whatever authority or mechanism was available by her – while maintaining plausible deniability. She wanted the authority of a CEO but also protection of someone who couldn't be held accountable.

After I participated in raising concerns internally, the retaliation became personal.
She accessed and screenshotted a personal Instagram post from a vacation I had taken in Mexico with my partner during her birthday week. She used that photograph to claim I had been violating my F-1 STEM OPT visa status by working remotely from Mexico, forwarding this claim to Kalder's board member Noah Doyle and outside counsel. I was not working. I was on vacation. I had an out-of-office notice on my calendar. When I returned to the office, she greeted me with the words: "How was your trip?". She knew, but she used it anyway.

When my termination came in August 2025, the Record of Employment attached to my notice listed August 5 as the date given to the employee, even though I did not actually receive the notice until August 15. For someone on F-1 STEM OPT status, ten days is significant. My visa permitted only a limited number of unemployment days, some of which had already been used, and the discrepancy immediately created fear and uncertainty about my ability to maintain lawful status in the United States.

Although I still technically had remaining unemployment time available under my visa, the experience at Kalder fundamentally changed how secure I felt living and working in the United States. After months of retaliation, threats tied to my immigration status, and the constant fear that my ability to remain in the country could be affected at any moment, I no longer felt stable or safe building my future in the United States. Even my unemployment dates and my personal visa status was used against me in an effort to retaliate against my truth.

I want the Court to understand that the harm here was not abstract. It was not a spreadsheet adjustment or an HR error. It was my life in this country. It ended because someone who was herself operating without valid work authorization used my immigration status as a weapon after I told the truth.

I respectfully ask the Court to consider all of that.

Respectfully submitted,
[redacted]

# Victim Impact Statement No. 4

The Honorable Lewis A. Kaplan
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

Dear Judge Kaplan,

My name is [redacted], and I served as Sales Lead at Kalder.

While much of this case has understandably focused on the investors who were defrauded, I respectfully ask the Court to recognize that employees were also victims of many of the same misrepresentations.

Just as Ms. Güven induced investors to invest millions of dollars through false representations about Kalder's revenue, customers, partnerships, and business performance, she made the same or similar representations to fraudulently induce employees to join the company, accept compensation packages, and dedicate their careers to its supposed success.

These were not ambitious projections or statements about what Kalder hoped to accomplish. They were presented as established facts about existing customers, revenue, partnerships, and business operations. Like investors, employees relied on these representations when making significant financial and professional decisions.

When I joined Kalder, I genuinely believed I was taking an important step forward in my career. I trusted the opportunity Ms. Güven presented and accepted a below-market base salary based on the company's purported success, existing customer base, and commission potential. These expectations were reinforced by written representations that midsize accounts could generate approximately $3,000 to $5,000 per month in commissions per contract. I committed myself to that opportunity, working tirelessly to develop business relationships, pursue new clients, and represent a company I believed in. I put not only my time and effort into Kalder, but also my professional reputation and future earning potential. Discovering that the underlying business was fundamentally different from what had been represented was devastating. The customers, partnerships, and business traction necessary to support those expectations did not exist as presented. What I lost was not simply potential compensation, but a year of valuable professional growth, opportunities, and dedication that I can never get back. I know other employees made significant personal and professional sacrifices based on the same representations.

Beyond these misrepresentations, I believe the Court should also consider Ms. Güven's treatment of employees when evaluating her character. As employees began raising concerns about the accuracy of her claims regarding customers, revenue, and product readiness, we experienced conduct that raised serious concerns about retaliation. In my case, my termination was processed through our payroll and HR system without formal notification, while Ms. Güven continued assigning work, requesting detailed business reports, and conducting meetings as though nothing had changed. The termination was subsequently reversed, disrupting my employment status and healthcare coverage.

The emotional toll of this environment should not be overlooked. Employees who raised concerns in good faith faced the fear of losing their jobs, financial security, and access to healthcare. I experienced firsthand the uncertainty of having my employment status and health benefits abruptly changed while still being expected to perform my duties. Separately, I later discovered that my employer-sponsored health insurance had not been properly maintained, leaving me with a medical bill exceeding $1,000 for what should have been a routine covered appointment. Beyond the financial consequences, there was a profound sense of betrayal in feeling that trying to do the right thing and raise legitimate concerns could put my livelihood at risk.

I find it difficult to reconcile this pattern of conduct with the suggestion that Ms. Güven's actions were merely the result of youthful inexperience, excessive ambition, or innocent mistakes. There is a fundamental difference between believing a company will succeed and repeatedly presenting achievements that have not occurred as established facts. If these representations were simply the product of good-faith optimism, I struggle to understand why employees who questioned their accuracy were met with conduct that appeared designed to discourage them from speaking up. To me, the treatment of employees who raised concerns is just as revealing as the misrepresentations themselves.

What has been equally disappointing is the absence of meaningful acknowledgment or remorse toward the former employees affected. Instead, I have seen public messaging regarding Kalder's purported sale and future ventures, while former employees continue to face the financial and professional consequences of what occurred.

Investors entrusted Ms. Güven with their capital. Employees entrusted her with their livelihoods, careers, financial security, and professional reputations. Both relied on representations that proved to be false, and both suffered consequences.

Respectfully,

[redacted]

# Victim Impact Statement No. 5

Victim Statement re: Gokce Guven / Kalder

I joined Goldman Sachs in 1999 and was named managing director in 2006. During 14 years with the firm, I lived in New York, Hong Kong, Tokyo and London. Afterward, I ran a sole proprietorship recruiting Wall Street executives for about a decade. Which is to say, at 55, I have about seen it all.

I quit another job to join Kalder because of Gokce's evident talent and ambition. It's a tremendous shame, as I soon learned, that she cannot, and will not, fly straight.

I've met people like Gokce before, who thrive on dishonesty to such an extent that they're untruthful even when it would suit them to be honest, but I have never met anyone so thoroughly hardwired toward it. The numbers on the term sheet, fraudulent. The story told to investors, falsified. The small talk with employees, fictitious. The explanations to clients, fabricated. When I joined, she asked what concerned me most about the company. My answer was simple: "You."

She treated her employees with the same disrespect as her investors. I was made to endure her constant lying, pressure to join her in it, and abuse for being honest. Finally, when my colleagues and I mounted an intervention to tell her to cut it out, she fired us. We were offered a brief severance in exchange for our silence. Considering the magnitude of her mistreatment and dishonesty, none of us signed it. In that way, we made a financial sacrifice in the interest of seeing justice served, and for that reason, I ask that justice be served.

She also abused the benefits of her visa to be in the United States. Other charges were set aside as part of this plea package. This is only what she pleaded to.

When caught lying, she blames others. This is her pattern: she will point fingers at witnesses, lean on her family for sympathy, and try to twist this around to make herself the victim. That does not suggest to me that she believes she did anything wrong.

After she fired us, I was unemployed for six months (because I asked her to stop lying). Considering how many people she has harmed, it would be unjust for her to walk away with only a probationary sentence. I ask the court to impose the sentence the government is seeking.

[redacted]

[redacted]

# Victim Impact Statement No. 6

October 16, 2026

The Honorable Lewis A. Kaplan
United States District Judge
Southern District of New York
500 Pearl Street, New York, NY 10007

**Re: United States v. Gökçe Güven, S3 25 Cr. 592 (LAK)**

Dear Judge Kaplan,

My name is Doğakan Toka, and I am the founding partner of BridgeX Ventures. I write in my personal capacity, not on behalf of any fund, to share some context about Gökçe Güven as I came to know her. I am not writing to minimize what happened or to address the facts of the case. Matters of restitution I leave to the Court and the government.

I met Gökçe during my graduate studies at the Haas School of Business at UC Berkeley, while I was serving as president of the Berkeley Entrepreneurs Association. She stood out among the many students I engaged with in that role. In my view, she was one of the most promising young people in the Computer Science program: ambitious, hardworking, and full of energy about what new technology could make possible.

Over the following years, Gökçe sought feedback and advice from time to time, and she took feedback openly. She worked at a pace that sometimes worried those around her; more than once, about burning herself out. She dedicated roughly four years of her life fully to the company and once described it as her "baby." That dedication was always evident.

The news of this case came as a genuine surprise to me, given the talent and commitment I had seen in her. Since the charges were brought, I have left all matters relating to the case to my legal counsel.

I hope she will have the opportunity to rebuild her life and put her abilities to meaningful and honest use. I wish her well.

Respectfully,
Doğakan Toka

Dogakan Toka

# Victim Impact Statement No. 7

# SchachterLaw, PC

**David N. Schachter, Attorney at Law**
SchachterLaw, PC
P.O. Box 1009
Conifer, CO 80433

dschachter3@gmail.com

303.517.0737

The Hon. **Lewis A. Kaplan,** US Dist. Ct. Judge
United States District Court
Southern District of New York
Daniel Patrick Moynihan US Courthouse
500 Pearl Street
New York, NY 10007-1312

July 15, 2026

RE: **Victim – Witness Information Statement**
**United States of America v. Gökçe Güven**
**S1 25 Cr. 592 (LAIC)**

Dear Judge Kaplan:

I represent Leading Points Corporation, a Colorado corporation, and its affiliated business, Military Connect, Inc. I write to respectfully provide information that may be relevant to the prosecution of *United States v. Gökçe Güven* and to advise the court that my client may constitute an additional impacted commercial party possessing potentially relevant evidence.

Leading Points Corporation entered into a contract with Kalder, Inc., effective November 24, 2025, for procurement of Kalder's white-labeled partner rewards technology to launch a proprietary platform known as "Military Perks," intended for integration into the Military Connect ecosystem. Prior to entering into the Agreement, at Leading Points' request, Kalder completed and submitted a Partner Information Request, containing details concerning the company's management, operations, the existence of any material information concerning Kalder's legal and financial status, and other due diligence matters.

In express reliance on the information contained in the Partner Information Request, my client signed the Agreement and paid Kalder an initial sum of $10,000.00 pursuant to onboarding invoices. We now have reason to believe that Leading Points was induced into taking these steps through Kalder's willful concealment of material information related directly to the charges set forth in the Indictment.

Specifically, based upon documents, communications, and legally recorded statements presently in our possession, the following facts may be relevant:

1. Continued Invoicing / Acceptance of Funds.

Kalder invoiced and accepted funds from my client during a period in which material facts concerning the company's legal and financial condition were known to them and intentionally concealed so as to induce performance by Leading Points.

2. Inducement / Reliance Concerns.

My client has substantial concerns that it was induced to make payments and continue the commercial relationship without the benefit of Kalder's disclosure of material facts that would have directly affected its decisions. Had the true circumstances regarding the pending Indictment, operational constraints, asset restrictions, and surrounding matters been disclosed, my client would not have made subsequent payments or continued to launch planning activities, and may have elected not to proceed with the Agreement at all.

3. January 29, 2026 Planning Meeting

On or about January 29, 2026, my client participated in a planning meeting with Kalder representatives regarding the launch of the Military Perks platform. No disclosure was made during that meeting regarding the criminal proceedings involving Kalder's CEO, or the direct impact this would have on the availability of funds, despite public announcements made that same day.

4. Admissions Regarding Frozen or Restrained Assets

Thereafter, Kalder representatives acknowledged that company assets were, or would be, frozen or otherwise restrained, and we believe Kalder knew of, and failed to disclose, the likelihood that such repercussions would come about as a result of the Indictment. Ms. Guven, and her principal management team, repeatedly assured Mr. Sullivan, in a series of recorded text messages, that steps were underway to restructure the company, ensure a refund of the $10,000, and continue in business despite Ms. Güven's departure.

5. Recorded Statements Regarding Ongoing Operations.

My client possesses a legally recorded Zoom communication, made in Colorado with my client's consent, in which Kalder representatives discussed continuing operations, continuing invoicing, and using revenues associated with my client's program to sustain business activity notwithstanding those constraints, which were not disclosed at the time.

6. Unfulfilled Repayment Commitment

Kalder later committed, through counsel, to repay the $10,000.00 to my client by April 1, 2026. That commitment was not honored, and now Kalder now indicates it has no ability to assure that the payment will ever be refunded.

As a direct and foreseeable result of Kalder's conduct, Leading Points Corporation and Military Connect suffered damages far exceeding the initial $10,000 payment. Beyond the unreimbursed funds, the company invested substantial executive time, employee resources, development efforts, legal expenses, and launch preparation costs in reliance upon Kalder's representations.

Military Connect intended to deploy the Kalder platform as the foundation of its proprietary "Military Perks" marketplace, serving as the exclusive deals and discounts platform for military media partners representing an audience of more than 10 million service members, veterans, and military family members. Because Kalder was unable to perform as represented, that strategic market opportunity was lost or substantially delayed.

In addition, Leading Points hired and dedicated personnel specifically to support the Military Perks initiative, incurred unrecoverable development and implementation expenses, and suffered significant reputational harm with strategic partners, participating brands, and members after publicly committing to capabilities that could not be delivered because of Kalder's misconduct. These business consequences extended well beyond the initial payment and materially impaired the company's growth strategy, commercial opportunities, and credibility within the military marketplace.

We understand and fully appreciate that, in adjudicating this matter, you are required to take a number of factors into consideration so as to strike the appropriate balance of equities between the rights of the defendant, the administration of justice, and protection of the victims. My client entered into this relationship only after conducting due diligence and relying upon representations that we now believe were materially false or materially incomplete. Those representations were material to our decision to contract with Kalder, invest company resources, and publicly commit to the launch of the Military Perks platform. The resulting business disruption affected existing and prospective commercial relationships, delayed our market strategy, and diminished confidence among partners who had committed to participate in the Military Perks launch. To put it bluntly, my client was misled, overtly lied to, and strung along by people who chose to exploit Mr. Sullivan's trust and confidence solely for their own personal agendas and with no regard to their contractual obligations or the damage their actions caused to Mr. Sullivan and others. Those factors, we believe, deserve the court's reasoned consideration in the assessment of what judicial remedies to impose.

If you wish to obtain the identified materials, please have the appropriate contact person reach out to me for further arrangements.

Respectfully,

David N. Schachter
Chief Legal Counsel, Leading Points Corporation

cc: Kevin T. K. Sullivan, President, Leading Points Corporation
Assistant U.S. Attorney Allison C. Nichols
Assistant U.S. Attorney Alexandra N. Rothman