UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

GÖKÇE GÜVEN, Defendant.

CEM YILDIRIM, Third Party Petitioner

S3 25 Cr. 592 (LAK) (GS)

**Memorandum in Opposition to the Government Motion to Dismiss and Request for Leave to Amend**

Petitioner Cem Yildirim respectfully opposes dismissal of his petition, Dkt. 72, under Federal Rule of Criminal Procedure 32.2(c)(1)(A). He requests consideration of the accompanying declaration and exhibits for purposes of the standing challenge and, alternatively, leave to file the attached proposed amended petition. This submission concerns Cem's own claim; he does not represent Tunc Yildirim or Iconium Technologies Inc.

**Preliminary statement**

The Government characterizes this case as a conclusory allegation of an unpaid debt and states that Petitioner was not defrauded. Gov. Mem., Dkt. 84, at 10–11. The record warrants a more particular examination. Kalder prepared a written cash-and-equity agreement; Petitioner signed it; its chief executive acknowledged it; and Petitioner supplied the leadership, recruiting, and hiring resources that Kalder urgently sought. After Petitioner introduced Tunc and Pavan and helped establish the replacement engineering team, Kalder retained the benefits while leaving both payment and the promised equity unimplemented.

Petitioner alleges that Ms. Güven induced this work through representations about enterprise demand and the opportunity to share in Kalder's growth, then withheld the promised consideration. Her documented investor fraud supplies relevant context, but Petitioner offers his own communications and performance to support his claim. He asks the Court to evaluate those facts rather than adopt the Government's categorical description of him as a person who was not defrauded.

The original petition preserves a distinction between the compensation and equity rights and title to the Mercury balances. Pet. ¶¶ 33, 89, 95. The supplemental facts explain the relationship and the asserted equitable injury while preserving that distinction. Petitioner seeks adjudication of his asserted equitable interest and an opportunity to amend, with factual development as Rule 32.2 permits.

**Relevant facts and the supplemental record**

Kalder's engineering organization was in transition in June and July 2025. Petitioner wanted to use his experience and professional network to help an inexperienced woman founder stabilize the company. Ms. Güven asked him to become full-time CTO. He instead accepted a full-time technology and product leadership role at Bolt while supporting Kalder as an advisor and interim engineering leader. His July 2 message described equity and cash for him, with cash arrangements initially contemplated for Tunc and others. Ms. Güven knew about Bolt: on July 23 she asked whether that job would mean less of Petitioner's time; he reassured her and she expressed enthusiasm about rebuilding Kalder together. Decl. ¶¶ 2–5; Ex. B.

Petitioner introduced Tunc in June, introduced Pavan Krishnamurthy in July as a potential engineering leader, and lined up approximately three or four further engineering candidates for potential contractor work as Pavan settled in. He helped design interviews and candidate assessments, supplied hiring materials, and advised on organizational and technical decisions. Tunc worked for approximately two months on infrastructure and service recovery in the face of substantial access problems. Petitioner describes what he personally did and observed; he does not claim Tunc's code as his own property or assume that every candidate became a full-time employee. Decl. ¶¶ 6–9; Ex. B.

Petitioner signed Kalder's negotiated consulting agreement through DocuSign on July 23. The audit records show that Ms. Güven subsequently viewed it on August 30; no company countersignature appears in the supplied final agreement. The Statement of Work provides $400 per hour and 15 hours per week. Its initial equity provision concerns an opportunity to purchase 0.5% of common stock, identified as 50,000 restricted shares, subject to board approval and other stated terms. A second grant carries separate launch and full-time-hiring conditions. Petitioner relies on the actual terms, not an assertion that all 100,000 shares were automatically issued. Pet. Exs. 1–3; Decl. ¶¶ 10–11.

On August 30, Ms. Güven acknowledged the July contract and described Petitioner's hiring, referral, and communications support as valuable. She proposed a revised advisory scope, referred to an initial 0.5% equity milestone, and stated that Kalder would process payment for July 23 through September 1 under the current agreement. Her email also disputed the extent to which the original hours and hands-on scope had been used. On September 9 she said she would add Petitioner to Gusto for payment processing, while discussing Tunc's engagement separately. These are the complete substantive selected messages, including their qualifications. Decl. ¶¶ 12–13; Ex. A.

The Government's March filing states that Kalder's other director resigned in August 2025. Dkt. 48 at 2. Petitioner identifies that director as Noah Doyle. His control argument concerns the period after the resignation, not the July formation period. Invoice 201 is dated August 11; invoice 202 is dated September 5 and bills August work. Petitioner does not assume the resignation preceded the first invoice because the precise day is not established by Dkt. 48. He remains unpaid and has received no equity. Ms. Güven never told him the board had rejected his grant. Decl. ¶¶ 14–17.

Petitioner and Iconium sued Kalder in Florida in May 2026; a clerk's default followed in June. That document is not a final damages judgment or a lien against the Mercury accounts. Kalder's counsel separately represented that substantially all company assets had been seized. Dkt. 48-1 at 1. Luumis now publicly states that it acquired Kalder in July 2026. The announcement confirms a transaction, but not its price, the recipients of consideration, liability assumptions, or any named engineer's transfer. Decl. ¶¶ 18–19; Ex. C; Pet. Exs. 9–10.

## I Apply the pleading standard without deciding disputed motives or performance

Rule 32.2(c)(1)(A) requires the petition's factual allegations to be assumed true on a motion to dismiss. See Pacheco v. Serendensky, 393 F.3d 348, 352 (2d Cir. 2004). Petitioner offers the declaration to clarify his own facts and to support amendment; he does not assume it automatically substitutes for a verified amended petition. If the Court limits its merits review to Dkt. 72, Petitioner asks that it consider the additional material in deciding whether amendment should be permitted.

The Government's statements that Petitioners were not defrauded and that their services were unrelated to the fraud are arguments, not factual findings about Petitioner's dealings. Gov. Mem.

10–11 & n.2. Petitioner disputes them. The July 8 message tied compensation negotiations to enterprise demand and future equity upside; the July 23 exchange confirms that Ms. Güven knew of his Bolt employment. Ex. B. Those facts support his account of inducement and the agreed working arrangement. Later disagreements cannot erase the earlier requests, introductions, and acknowledgments.

Petitioner does not contend that every customer representation was false, or that nonpayment alone proves an original intent to defraud. The source record includes actual enterprise negotiations and Petitioner's later questions about the customer pipeline. The prosecution establishes investor fraud; the relationship between particular misrepresentations, Petitioner's reliance, and his own losses requires attention to his evidence. He does not ask the Court to infer that relationship merely because the conduct occurred during overlapping dates.

**II The equity commitment and control after the resignation require separate consideration**

The missing company signature should be evaluated with the objective evidence of assent, including the document Kalder prepared, accepted performance, and the August 30 acknowledgment. New York permits enforcement of an unsigned agreement where objective evidence establishes intent to be bound. Flores v. Lower E. Side Serv. Ctr., Inc., 4 N.Y.3d 363, 368–70 (2005). That principle supports examining the actual relationship; it does not remove the separate board-approval and stock-issuance requirements.

The agreement identifies particular equity consideration rather than only an unspecified debt. Petitioner alleges that he performed in reliance on that commitment and that Kalder cannot defeat its obligation by wrongfully frustrating a corporate step under its own control. Once the other director resigned in August, Ms. Güven's position as the sole remaining director is material to responsibility for seeking or taking the promised action. Dkt. 48 at 2. Petitioner alleges deliberate nonimplementation based on the prepared agreement, his signature, Ms. Güven's later viewing of it, her acknowledgment of the arrangement, and the continued absence of payment or equity. He identifies intent as an inference from that conduct, not something the DocuSign audit itself proves.

New York's prevention doctrine restricts reliance on the failure of a condition that the relying party wrongfully frustrated. Kooleraire Serv. & Installation Corp. v. Bd. of Educ., 28 N.Y.2d 101, 106 (1971); HGCD Retail Servs., LLC v. 44-45 Broadway Realty Co., 37 A.D.3d 43, 53–54

(1st Dep't 2006). The doctrine must respect the contract: it cannot create a right that the parties withheld. OKL Holdings, Inc. v. Abercrombie & Fitch Stores Inc., 223 A.D.3d 476 (1st Dep't 2024). Petitioner asks whether Kalder wrongfully frustrated its undertaking; he does not claim sole-director status automatically satisfied every grant condition.

The original petition also addresses Delaware requirements for stock authorization. Pet. ¶¶ 64–65, 81. The New York contract argument does not dispense with those requirements or establish that Petitioner became a record shareholder. The Court should distinguish a claim to enforce an equity undertaking from a claim that stock was validly issued. The relevant board actions, grant documentation, and capitalization records would clarify the former claim; their absence from Petitioner's possession should not be mistaken for proof that the undertaking was meaningless.

### III Address the particular property and the constructive trust theory

Article III standing and entitlement to relief under section 853(n)(6) require separate analysis. The Government itself recognizes that a financial stake may support constitutional standing without formal title, but a claim only against the property's owner is insufficient. Gov. Mem. 4–5, citing United States v. Cambio Exacto, S.A., 166 F.3d 522, 527–29 (2d Cir. 1999). Petitioner invokes his alleged equitable interest, not an assumption that any unpaid worker can challenge forfeiture. His detailed relationship and identified contributions distinguish the bare ownership assertion discussed in Rahmankulov, Gov. Mem. 9–10. They must still support a legally cognizable interest in the res. He requests that the Court identify any remaining deficiency and consider the proposed amendment rather than equate lack of record title with the absence of every possible equitable interest.

The forfeited property is the defendant's interest in funds held in Kalder's two identified Mercury accounts. Dkt. 65. Petitioner asserts an equitable interest only to the extent the law recognizes an interest in that property. The rule excluding general unsecured creditors cannot be avoided simply by describing a debt as equity or a trust. Gov. Mem. 6–8. Nor would shareholder status alone establish ownership of corporate accounts. The Court should nevertheless assess the alleged transfer and retention of identifiable benefits and the asserted wrongful frustration of equity, rather than resolve the matter solely from the label "consultant."

The Government recognizes that a properly established constructive trust may constitute a superior legal interest. Gov. Mem. 8. Federal Insurance Co. v. United States, 882 F.3d 348, 371–

76 (2d Cir. 2018), requires examination of state-law equitable rights and the link to the forfeited property; it does not make an unpaid invoice a trust asset. Petitioner identifies the relationship of trust, the cash-and-equity promises, his hiring materials and introductions, accepted performance, and continued retention without the promised consideration. Those are the facts he seeks to develop, not a claim to all assets merely because his efforts benefited the company.

Two issues require direct treatment. First, section 4.2 of the agreement immediately assigns consultant work product. Petitioner does not allege an express payment condition that the contract lacks. His equitable theory therefore depends on legally cognizable grounds to challenge retention of specifically identified property, rather than an assertion that nonpayment automatically reversed the assignment. Second, even an equitable right in that property must connect to the particular Mercury funds. The present record does not identify a deposit representing sale proceeds from Petitioner's work product. An increase in enterprise value is not itself such a deposit.

The Luumis acquisition makes the disposition of Kalder's assets a concrete factual subject. It does not prove that the later sale consideration entered earlier seized accounts. Petitioner requests inquiry into the assets conveyed, the consideration and its disposition, and any documented connection to the Specific Property only if the Court finds a sufficient basis under Rule 32.2. He does not seek to forfeit Luumis's property, add an unidentified sale fund to this proceeding, or assert that a public announcement proves tracing.

The Government also invokes relation back because the fraud preceded the consulting arrangement. Gov. Mem. 10. A pre-forfeiture contract date alone is not an answer to that rule. Petitioner requests a property-specific determination of the nature and timing of any interest he can establish, including whether state law recognizes an equitable interest in an identifiable res. If the pleaded facts remain insufficient, he requests an opportunity to address the deficiency through amendment rather than a finding that the work was unrelated to deception or that no amendment could ever matter.

### IV A nominal right to sue does not resolve practical adequacy of relief

Petitioner has already pursued a civil remedy, and Kalder did not appear. The default, counsel's representation concerning seizure of substantially all company assets, and the announced acquisition support concern about actual collection. The Government's statement that Petitioner

can sue does not address those circumstances. Gov. Mem. 11. Petitioner asks the Court to assess adequacy on the actual record. He does not treat nonappearance as proof of insolvency, the acquisition as proof that investors received all proceeds, or collection difficulty as a substitute for the required property interest.

**V Alternatively permit amendment and appropriately limited further proceedings**

The original petition expressly requested leave to amend. Pet. ¶ 97. The attached proposal supplies a concrete account of Petitioner's role, the relevant communications, the post-resignation governance issue, and the limits of his knowledge. It preserves the original acknowledgment that tracing has not yet been established. It does not add a claim on Tunc's behalf or assert an unsupported bona fide purchaser theory.

United States v. Swartz Family Trust, 67 F.4th 505, 519–20 (2d Cir. 2023), explains that expiration of the original petition window does not categorically foreclose amendment of a timely petition. Its remand involved a different, bona fide purchaser claim; Petitioner relies on the amendment principle, not an entitlement to the same result. The Court should assess whether this proposed amendment or a further specified amendment could cure a deficiency, including any additional verified facts concerning the particular property.

If a sufficient claim survives the motion, Petitioner requests only the discovery the Court finds necessary or desirable under Rule 32.2(c)(1)(B): relevant board and grant records; records identifying any disposition of specifically identified work product and resulting consideration; and the corresponding account entries, if any, in the forfeited accounts. The request is directed to the identified deficiencies and does not presume a right to discovery before the pleading threshold is met. If leave is granted to plead more specifically, Petitioner requests 30 days after the Court's order.

**Conclusion**

Petitioner respectfully requests that the Court deny dismissal to the extent his allegations state a cognizable claim; alternatively, grant leave to file the attached proposed amended petition or a further verified amendment addressing specified deficiencies; and permit such limited further proceedings as Rule 32.2 and section 853(n) authorize. He seeks no alteration of the defendant's sentence through this opposition.

Dated: November 2, 2026

At: Tampa, Florida

Signature: s/Cem Yildirim

Cem Yildirim, Petitioner Pro Se

10474 Greendale Dr.

Tampa, FL 33626

(312) 342-4828

findcem@icloud.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA
v.
GÖKÇE GÜVEN, Defendant.

CEM YILDIRIM, Third Party Petitioner
S3 25 Cr. 592 (LAK) (GS)

**Declaration of Cem Yildirim in Support of Opposition and Leave to Amend**

1. I am the petitioner who filed Dkt. 72. I make this declaration from personal knowledge, except where I expressly describe a public record, information learned from another source, or my own inference. I speak only for myself.

2. I wanted to use my experience rebuilding engineering organizations and my professional network to help an inexperienced woman founder stabilize Kalder. I devoted my time and relationships to that effort because I expected the cash and equity consideration we negotiated, as well as an opportunity to help the company succeed.

3. Ms. Güven asked me to become Kalder's full-time CTO. I instead accepted a full-time technology and product leadership position at Bolt. I continued to support Kalder through an advisory and interim engineering leadership arrangement involving cash compensation and equity.

4. On July 2, 2025, I described the arrangement in a WhatsApp message as equity and cash for me as advisor/interim CTO, with Tunc and others initially working for cash. We continued negotiating afterward. The later written agreement contains the terms on which I rely; earlier proposals are not separate claims to additional bonuses.

5. Ms. Güven knew about my Bolt employment. On July 23 she asked whether my full-time Bolt job meant Kalder would have less of my time. I responded that Kalder would continue to receive my support, and she expressed enthusiasm about rebuilding the company together. Selected messages are reproduced in Exhibit B.

6. I introduced Tunc Yildirim to Ms. Güven in June 2025 to assist with the engineering turnaround. During approximately two months of recovery work, he dealt with substantial obstacles obtaining the administrative access needed to restore AWS and related services. I base this description on my involvement in the engagement and our communications. I do not mean that no access invitation or credential was ever provided during that period.

7. I introduced Pavan Krishnamurthy in July as an engineering leader and potential CTO. I helped him connect with Kalder and participate in its interview and engineering planning process. I also lined up approximately three or four other engineers for potential contractor work as he settled in. My work included introductions and evaluations for both contractor and potential full-time roles. I do not assert that every candidate I identified was hired, or that lining up contractors alone fulfilled the separate full-time-hiring condition in the additional equity provision.

8. I helped prepare and share engineering interview guidance, questions, and technical assessments, and participated in organizational and technical planning. The messages identify particular hiring materials and my contributions. I am not claiming authorship or ownership of Tunc's engineering repositories or infrastructure code.

9. Ms. Güven described enterprise demand as a reason the rebuild was urgent and a reason to align my compensation with future upside. On July 8 she described existing enterprise demand and the prospect that a partner launch could support further financing. Those statements and the compensation promises were material to my continued involvement. I later questioned the customer pipeline; I do not claim I personally verified every customer agreement or that every later enterprise negotiation was fictitious.

10. Kalder prepared and transmitted the negotiated consulting agreement and Statement of Work. I signed through DocuSign on July 23, 2025. The final agreement in my records does not contain Kalder's countersignature. The audit records show Ms. Güven viewed it on August 30. I distinguish that negotiated envelope from an earlier envelope that was voided or expired.

11. The Statement of Work specifies $400 per hour and 15 hours per week. It also describes an initial opportunity to purchase 0.5% of common stock, stated as 50,000 restricted shares, subject to its terms, and a separate additional grant with program-launch and full-time-hiring conditions.

I expected Kalder to take the steps needed to implement its equity commitment. I did not receive a share certificate or other completed grant implementing that commitment.

12. Exhibit A reproduces the substantive August 30 and September 9, 2025 emails from Ms. Güven to me found in the retained business email chain. The August message acknowledges our July contract, describes my hiring contribution, proposes a different scope going forward, refers to an initial equity milestone, and says payment will be processed under the current agreement. It also includes her comments about lighter hours and the original scope. I have included those qualifications.

13. The September 9 message states that she would add me to Gusto for processing. It discusses Tunc’s engagement separately. I demanded payment of the invoices; the email chain includes my September follow-ups. I do not offer later compromise proposals as proof that she unconditionally admitted my full claimed amount.

14. I understand that Noah Doyle resigned from Kalder’s board in August 2025. The Government’s Dkt. 48 at page 2 independently reports the resignation of the other director in that month. I do not know the exact effective day from that filing. My assertion that Ms. Güven was the sole remaining director concerns the period after that resignation, not the July agreement negotiations.

15. Ms. Güven never told me, verbally or otherwise in the communications I recall, that the board had rejected my equity. She did not implement the promised equity. I believe her failure to complete the company’s signature and equity steps was deliberate, based on the agreement she prepared, her viewing of it, her subsequent acknowledgments, and the continued withholding of both payment and equity after my demands. That is my inference from the conduct, not a fact about her private thoughts that I personally observed.

16. I continue to claim $42,000 in unpaid compensation as described in my original petition. The original invoices contain inconsistent line-item totals or subtotals, which my filed exhibits disclose. I have not altered them. Invoice 201 is dated August 11, 2025; invoice 202 is dated September 5 and concerns August work. The amount and period Kalder proposed paying were disputed; I do not characterize its correspondence as an unconditional acknowledgment of every invoice entry.

17. As of the date I sign this declaration, I have received no payment for the services at issue and no Kalder equity. I allege that I supplied the agreed benefits in reliance on representations and compensation promises that were not honored. I dispute the Government's description that I was not defrauded, but do not claim the criminal judgment itself adjudicated my individual fraud claim.

18. In May 2026, Iconium and I sued Kalder in Florida. The June 24 document is a clerk's default. I have not identified a perfected lien on the forfeited Mercury accounts. My pursuit of that case has not resulted in payment to me.

19. I understand Luumis acquired Kalder. Its public website states that an acquisition occurred in July 2026; Exhibit C identifies that statement and its source. I do not know the transaction price, allocation or destination of consideration, assumed liabilities, or which particular people moved to the purchaser. I do not know from firsthand evidence that Pavan moved to Luumis.

20. The business emails in Exhibit A and messages in Exhibit B accurately reproduce the selected communications in my retained records, subject to the transcription and omission notes printed on those exhibits. Exhibit B contains selected English-language messages; intervening messages are omitted. I have not included passwords or private access links. The exhibits are excerpts, not complete conversation histories.

21. I do not possess bank records establishing that proceeds from property in which I hold a legally cognizable interest entered the two forfeited accounts. My requested equitable relief is limited to an interest I can lawfully establish in the Specific Property. The fuller facts above explain my claim and why I request leave to amend and such limited factual development as the Court permits.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed at Tampa, Florida on November 2, 2026

Signature: s/Cem Yildirim
Cem Yildirim

**Exhibit A Selected Business Emails**

A-1 August 30 2025
Source: embedded business message in the retained chain with subject Re: Cem/Iconium Invoice 7/1-8/11. Recipient identified by the salutation as Cem. Transcription, not a native mailbox printout. Surrounding correspondence is omitted.

On Sat, Aug 30, 2025 at 5:19 PM, Gokce Guven <gokce@getkalder.com> wrote:
Hi Cem!!

Thank you again for your time and support over the past few weeks!! Have a great flight to Turkey — It was so great catching up in Florida and getting your perspective during such an important transition period for us.

First, our contract was signed the week of July 23rd, and while there were some lighter hours before and after that, I think it's best to align billing starting then since we never fully utilized 15 hours/week, but that's okay — I really appreciate you being core to helping us stop the bleeding and set the stage for building an exceptional engineering culture and team together.

Second, now that bleeding has stopped and we have worked together past month, I've realized that the original scope of the agreement — especially around hands-on product and engineering execution — hasn't really been fully utilized. Your strength and support in eng hiring, referral and communications have been super helpful and core → and I'd love to keep building on that and focusing on that in our partnership. And I think that aligns with your full-time role at Bolt and where we are now.With Tunc and Pavan now being more hands-on and needing the right comp structure too, this setup will align better with the current stage and how we're operating.

**Exhibit A Continued**

A-2 August 30 2025 continued

As for go forward, I think the best path forward is to shift this to an engineering advisory agreement that better reflects the type of work you and I are actually doing. We can initial 0.5% equity milestone and move to an hourly contract so you can bill us based on the hours we design together.

I think we should focus on —
Engineering hiring support — referrals and interview participation
Guidance on engineering leadership and execution
Occasional strategic input for partner/investor comms (Noah and I aligned on not adding anyone to the board over the next six months, so we can revisit that later)
Weekly or biweekly check-ins as we scale the team
What do you think ? What would you add / remove here for our partners I?

We'll process payment for the period covering July 23 – September 1 under the current agreement, then move forward with the updated structure so our expectations and scope are fully aligned.

Excited to keep working together and take Kalder to the next level :)
Best,
Gökçe

**Exhibit A Continued**

A-3 September 9 2025
Source and transcription method as stated on A-1. Surrounding correspondence is omitted.

On Sep 9, 2025, at 10:52 PM, Gokce Guven <gokce@getkalder.com> wrote:

Hey Cem,

Sorry for the delay—lots of team-related things happening! I'll review this now, thanks for sending it over. I'll also add you to Gusto so this can be processed.

Regarding Tunc's invoice, we currently have no agreement in place with him. This needs to be addressed separately with Tunc, which I've mentioned several times. It seems the full-time role and advisor offer aren't moving forward, so the offer will need to be revised. To compensate for his previous work, I'll discuss it with Tunc, assess the work, and propose a plan. Since we haven't received any updates on Fidel's milestones, I assume he's no longer working. It's frustrating to see how this tension is being managed, we are all adults here above all what matters is bringing users to Kalder, and both Pavan and Tunc should have been collaborating on that. I'll handle this and reach out to Tunc directly.

Thanks,
Gokce

**Exhibit B Selected WhatsApp messages**

B1 Engagement and the engineering turnaround

Transcribed from retained English-language messages. Dates, speakers, and wording are preserved; intervening messages are omitted. Decorative emoji and invisible display controls are omitted. The July 8 compensation proposal is negotiation history, not the final agreed compensation. No Turkish-language translation is offered here.

[6/26/25, 8:17:30 AM] cem: @Tunc Yildirim Gökçe has clients in Turkey, Pegasus and THY. She needs to turnaround the Eng as we discussed before

[7/2/25, 1:53:29 PM] cem: As we discussed, equity and cash for me as the advisor/interimCTO, Tunc and others will be just cash to begin with and in 3 months we can revisit what a permanent offer could be. But hopefully by that time you have a sellable product.

[7/8/25, 7:02:16 PM] Gokce Guven: Hi Cem — I want to align around execution and upside. We’re not Bolt or JPM — but I believe the upside here is bigger if we execute. We already have enterprise demand at seed stage for executing whitelabeled Bilt rewards for leading retailers, and if we take even one partner live, this becomes a category-defining business and we raise Series A and onwards.

That’s why I don’t think a traditional contractor rate fits — I’d rather align on a lower hourly rate and high-leverage success bonuses:

$25K for launching the enterprise first partner rewards program live

$25K for each strong hire you make that we bring on

Lower hourly rate during first 3 months as we assess so this is not a consulting work ( then I don't feel comfortable going fully in because this shows incentives or timesheets are not aligned)

Let’s do this as a three-month agreement and reassess after we’ve shipped and brought in the right people. If we succeed, the equity and long-term upside will be far more meaningful than anything at JPM, Bolt, or Fiserv.

Let me know what feels fair and aligned here.

If not we can also keep it simple as advisor contract and you can help during transition, we will need someone bulls eye targeting one partner rewards launch and that's where I failed with Eric , not aligning business goals or incentives and I can't afford that again - Let me know and I will plan accordingly open to ideas!

**Exhibit B Selected WhatsApp messages**

B2 Recruiting Pavan and acknowledging the Bolt role

Transcribed from retained English-language messages. Dates, speakers, and wording are preserved; intervening messages are omitted. Decorative emoji and invisible display controls are omitted. The July 8 compensation proposal is negotiation history, not the final agreed compensation. No Turkish-language translation is offered here.

[7/11/25, 7:52:12 PM] cem: This is a good FE profile.
https://www.linkedin.com/in/aryehstiefel?utm_source=share&utm_campaign=share_via&utm_content=profile&utm_medium=ios_app

[7/11/25, 7:53:26 PM] cem: This is a good hands on leader. I was going to bring him in for you but he is trying to leave JPM to do his startup.
https://www.linkedin.com/in/pavan-krishnamurthy?utm_source=share&utm_campaign=share_via&utm_content=profile&utm_medium=ios_app

[7/23/25, 3:22:34 PM] Gokce Guven: also will your full time Bolt job now means Kalder has less of Cem :(

[7/23/25, 3:23:11 PM] cem: no, Kalder will still be there as it is. not less maybe more

[7/23/25, 3:23:44 PM] Gokce Guven: I want to re-build and scale Kalder together!

**Exhibit C  Public acquisition announcement**

Source: Luumis website, https://luumis.ai/

Section: Coverage of the Kalder acquisition

Retrieved: November 2, 2026

Selected statement: “In July 2026, Luumis acquired Kalder.”

This is a selected text excerpt identifying the publicly announced transaction, not a purchase agreement, closing statement, or account of the consideration. The source page describes bringing rewards and customer intelligence into Luumis’s platform. No representation is made here that a particular employee transferred, that particular liabilities were assumed, or that sale proceeds entered either forfeited account.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

GÖKÇE GÜVEN, Defendant.

CEM YILDIRIM, Third Party Petitioner

S3 25 Cr. 592 (LAK) (GS)

**Proposed Amended Ancillary Petition**

Submitted with the opposition for consideration on the request for leave to amend. Not effective as an amended pleading unless accepted by the Court.

**Petitioner and the specific property**

1. I, Cem Yildirim, seek adjudication of my alleged interest in the Specific Property described in the May 28, 2026 preliminary forfeiture order, Dkt. 65. I filed my original petition on July 29, 2026, Dkt. 72, following the Government's July 13 notice. This proposed amendment concerns the same property and engagement.

2. The Specific Property consists of the defendant's right, title, and interest in funds contained in Kalder's Mercury checking account ending 5146 and Mercury treasury account ending ZXB, both identified in Dkt. 65. I seek no adjudication of an unidentified separate sale fund or of property belonging to Luumis in this petition.

3. I proceed pro se for myself. Iconium Technologies Inc. is not represented by me in this proceeding, and Tunc's separate petition concerns his own engagement. My claim includes the personal consulting and equity terms directed to me. Invoices issued through Iconium do not authorize duplicate recovery; any question of ownership of an invoiced receivable must be resolved on the agreement and billing records.

**The engagement and consideration**

4. Ms. Güven asked me to serve as full-time CTO. I accepted a full-time leadership role at Bolt instead and supported Kalder through an advisory and interim engineering leadership

engagement. She knew of and discussed my Bolt position. I wanted to help an inexperienced founder stabilize her company using my experience and network.

5. During June and July 2025, Ms. Güven described an urgent engineering turnaround and enterprise opportunities. On July 8 she described existing enterprise demand, partner launches, and potential future financing as reasons to align compensation with equity upside. The business opportunity and negotiated compensation were material to my participation. I later questioned the pipeline; I do not allege that all customer relationships were fictitious.

6. On July 2 I described cash and equity for my advisory/interim CTO role, while Tunc and others would initially work for cash. Further negotiations produced the written consulting agreement and Statement of Work prepared and sent by Kalder. I signed the negotiated document through DocuSign on July 23, 2025. The final document lacks a Kalder countersignature. Ms. Güven viewed it on August 30 according to the audit records.

7. The Statement of Work specifies $400 per hour and 15 hours per week. Its scope includes product and technical scoping, architectural decisions, engineering support, and recruiting and vetting engineering contributors. Section 2.3 provides for payment of invoices within 30 days, subject to good-faith disputes.

8. The initial equity term concerns an opportunity to purchase 0.5% of the fully diluted common stock as of July 18, 2025, stated as 50,000 restricted shares. It includes board approval, equity-plan and purchase-documentation terms, fair-market-value pricing, four-year monthly vesting, continued advisory service, and a change-of-control acceleration provision.

9. A separate additional 0.5% provision includes a partner rewards launch and hiring three to five full-time engineers, as well as approval and vesting terms. I do not allege that identifying potential contractors alone satisfied that additional grant’s conditions or that the acquisition automatically satisfied every condition.

10. Section 4.2 immediately and irrevocably assigns consultant work product to Kalder. I do not assert that the agreement expressly conditioned that assignment on prior payment. My equitable theory challenges wrongful retention only to the extent state law permits, rather than alleging automatic reversion of all assigned rights.

**Performance and subsequent conduct**

11. I introduced Tunc in June 2025 to assist in recovery of infrastructure and services. I participated in communications concerning the substantial access problems affecting the work. I do not claim his independently created code as my own property.

12. I introduced Pavan Krishnamurthy in July as an engineering leader and potential CTO and helped facilitate his involvement. I lined up approximately three or four other engineering candidates for potential contract work. I provided recruiting, interview participation, organizational guidance, hiring materials, and technical evaluation support. I distinguish candidates from completed hires.

13. On July 23 Ms. Güven asked whether my Bolt job meant less of my time for Kalder. I reassured her and she expressed support for rebuilding Kalder together. The full-time Bolt role was therefore known to her during agreement formation, rather than disclosed only after a payment dispute.

14. On August 30 Ms. Güven acknowledged the contract signed during the week of July 23, thanked me for the recruiting and communications contribution, discussed an initial 0.5% equity milestone, and stated that payment would be processed for July 23 through September 1 under the current agreement. She also discussed lighter hours, use of the original scope, and proposed a revised arrangement. I preserve those qualifications.

15. The Government's Dkt. 48 at page 2 reports that the other director resigned in August 2025. I identify that director as Noah Doyle. After the resignation Ms. Güven was the sole remaining director. My control allegation concerns that period and does not assert she was the sole director throughout July. The exact effective day is not established by that filing.

16. I sought payment and implementation of the agreed equity. Invoice 201 is dated August 11; invoice 202 is dated September 5 for August services. Ms. Güven's September 9 message stated that she would add me to Gusto for processing and addressed Tunc separately. I have received neither payment nor equity. She did not tell me that the board rejected the grant.

17. I infer that nonimplementation was deliberate from the agreement she prepared, her later viewing of it, continued acknowledgment of our arrangement, accepted benefits, and failure to implement the consideration after my demands. I allege that Kalder wrongfully frustrated steps

within its control. I do not treat the DocuSign audit as direct proof of her mental state or of a formally rejected board resolution.

18. I claim $42,000 unpaid compensation as in my original petition. The historical invoices contain inconsistent totals or subtotals; I preserve the originals and acknowledge the discrepancies. Later correspondence disputes scope and performance. My position is that I supplied requested and accepted value, not that no dispute was ever raised or that every later proposal admitted the entire claim.

19. I allege that Ms. Güven induced my contributions through business representations and compensation promises and then retained the benefits while withholding the consideration. I dispute the description that I was not defrauded. Her investor-fraud conviction supplies context but does not itself establish the falsity of each statement to me or adjudicate my separate claim.

**The nature and limits of the asserted interest**

20. My asserted rights arose through the 2025 negotiations, the July written agreement, my performance, Kalder's acceptance, and the subsequent conduct described above. They include rights under the equity undertaking and a claimed equitable interest in specifically identifiable property or proceeds to the extent recognized by law. I do not claim that the agreement's date alone makes my rights superior to proceeds of earlier criminal acts.

21. I ask that the Court consider whether the company wrongfully prevented implementation of its equity undertaking after the other director resigned. I do not allege that valid shares were issued, that every contractual grant condition was satisfied, or that the prevention doctrine dispenses with Delaware authorization requirements.

22. I seek a constructive trust only to the extent the evidence and applicable law establish a cognizable interest in an identifiable res and its traceable proceeds within the Specific Property. The supporting circumstances include the trust placed in Ms. Güven, promises inducing my contributions, identifiable hiring materials, accepted performance, and retention without payment or implemented equity. Whether these establish the required relationship and transfer is a legal question, not assumed from the value of my services.

23. As in paragraph 95 of my original petition, I do not presently identify segregated compensation, a promise to pay from a named Mercury account, or a deposit demonstrably

traceable to property owned by me. My service and recruiting contributions may have preserved value; preservation of value alone is not an identified bank transfer. An interest in shares likewise does not itself establish ownership of the company's bank balances.

24. Luumis publicly states that it acquired Kalder in July 2026. That announcement supports examining an actual transaction, but I do not know the price, the conveyed assets in detail, the destination of consideration, or assumed liabilities. I do not claim firsthand knowledge that Pavan moved to the acquirer, or assume that a later transaction generated the earlier seized Mercury balances.

25. The Government's plea proffer identifies corporate records, including capitalization records. Dkt. 61-1 at 27. The records most directly relevant to the remaining questions include board and grant actions, documentation of dispositions of specifically identified property, consideration records, and any matching entries in the forfeited accounts. I request only further proceedings allowed by Rule 32.2 after the Court's threshold review.

26. Iconium and I sued Kalder in Florida in May 2026; a clerk's default was entered June 24. The document is not a final damages judgment or a perfected Mercury-account lien. Kalder's counsel represented that substantially all company assets had been seized. Dkt. 48-1 at 1. The announced acquisition and lack of payment raise a practical question about collection, but I do not allege those facts alone prove complete insolvency or replace the property-interest requirement.

**Requested relief**

27. I request adjudication of any legally cognizable interest I can establish in the Specific Property under section 853(n)(6)(A), amendment of the forfeiture order only to that extent, such limited discovery and hearing as Rule 32.2 permits, and leave to supply a further verified amendment if the Court identifies a curable deficiency. I assert no new bona fide purchaser claim and seek no duplicate recovery of Tunc's or Iconium's separate rights.

28. The supporting declaration and Exhibits A through C submitted with my opposition support the additional facts. The original agreement, Statement of Work, audit records, invoices, Florida documents, forfeiture order, and notice remain at Dkt. 72, Exhibits 1–3, 6, and 9–12. These

identified documents are incorporated for their actual contents, subject to the explanations above; I do not adopt conflicting characterizations from prior working drafts.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed at Tampa, Florida on November 2, 2026

Signature: s/Cem Yildirim
Cem Yildirim